**JOSEPH W. COTCHETT (SBN 36324)**
jcotchett@cpmlegal.com
**MARK C. MOLUMPHY (SBN 168009)**
mmolumphy@cpmlegal.com
**GINA STASSI (SBN 261263)**
gstassi@cpmlegal.com
**STEPHANIE D. BIEHL (SBN 306777)**
sbiehl@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

*Attorneys for Plaintiff Jeremiah F. Hallisey,*
*Derivatively on behalf of Facebook, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMIAH F. HALLISEY,<br><br>        Plaintiff, derivatively on behalf of<br><br>FACEBOOK, INC., a Delaware Corporation,<br><br>        Nominal Defendant<br><br>                    v.<br><br>MARK ZUCKERBERG, SHERYL K.<br>SANDBERG, MARC L. ANDREESSEN,<br>PETER A. THIEL, REED HASTINGS,<br>ERSKINE B. BOWLES, SUSAN D.<br>DESMOND-HELLMAN, and JAN KOUM,<br><br>        Defendants. | Case No.<br><br>**SHAREHOLDER DERIVATIVE**<br>**COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**SHAREHOLDER DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   JURISDICTION AND VENUE ......................................................... 8

III.  PARTIES ........................................................................................... 9

IV.   DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS AND COMPLY WITH APPLICABLE LAWS ......................................... 11

V.    THE BOARD KNEW THAT FACEBOOK'S USER PRIVACY POLICIES AND INADEQUATE INTERNAL CONTROLS POSED A SUBSTANTIAL RISK TO THE COMPANY'S BUSINESS ................................................................. 13

      A.   Defendants Regarded User Privacy and Data Security as Critical to Facebook's Brand, and Repeatedly Emphasized that in Public Statements ................................. 14

      B.   Defendants Maintained Policies That Permitted Developers to Obtain User Information ............................................................. 16

      C.   Defendants Received Numerous "Red Flag" Warnings of the Same User Privacy and Data Security Issues That Led to the Breach, Yet Failed to Act ........................... 22

           1.   Early Litigation Involving User Privacy Claims ................. 22

           2.   The FTC Action and Consent Order .................................... 24

           3.   Reports from Facebook's CISO and Other Sources at the Company ................. 26

           4.   Government Investigations and Lawsuits ............................. 30

           5.   The FTC Investigation into Possible Consent Order Violations ........................ 31

VI.   DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9, AND BREACHED THEIR FIDUCIARY DUTIES, BY CAUSING FACEBOOK TO FILE A MATERIALLY MISLEADING PROXY STATEMENT IN 2017 .................................................................. 32

VII.  CERTAIN DEFENDANTS SOLD THEIR FACEBOOK STOCK WHILE IN POSSESSION OF MATERIAL, NONPUBLIC INFORMATION ................................. 34

VIII. DAMAGES TO FACEBOOK ......................................................... 42

IX.   DEMAND ON FACEBOOK'S BOARD WAS FUTILE AND THUS, EXCUSED ....... 43

Law Offices
COTCHETT, PITRE & McCARTHY, LLP

A.  Demand Is Excused Because the Board's Conduct Did Not Constitute a Valid Exercise of Business Judgment ................................................................. 44

B.  Demand Is Excused Because Defendants Face a Substantial Likelihood of Liability Due to Their Knowledge or Conscious Disregard of Facts Relating to the Cambridge Analytica Leak and the Company's Inadequate Internal Controls........................... 45

C.  Demand Is Excused Because Facebook is "Controlled" By Zuckerberg and the Board Admittedly Lacks Independence ................................................. 47

X.    CAUSES OF ACTION ................................................................................. 50

FIRST CAUSE OF ACTION
Breach of Fiduciary Duty (Against All Defendants) .................................................. 50

SECOND CAUSE OF ACTION
Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information
(Against the Insider Selling Defendants) ................................................................. 51

THIRD CAUSE OF ACTION
Unjust Enrichment
(Against All Defendants) ................................................................................. 52

FOURTH CAUSE OF ACTION
Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
(Against All Defendants) ................................................................................. 52

FIFTH CAUSE OF ACTION
Violation of Section 25402 of the California Corporations Code
(Against the Insider Selling Defendants) .............................................................. 55

SIXTH CAUSE OF ACTION
Violation of Section 25403 of the California Corporations Code
(Against All Defendants) ................................................................................. 56

SEVENTH CAUSE OF ACTION
Contribution and Indemnification
(Against All Defendants) ................................................................................. 57

XI.   PRAYER FOR RELIEF ................................................................................ 57

XII.  JURY DEMAND ........................................................................................ 59

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**SHAREHOLDER DERIVATIVE COMPLAINT**                                    ii

Plaintiff Jeremiah F. Hallisey ("Plaintiff"), a shareholder of Facebook, Inc. ("Facebook" or the "Company"), brings this action on Facebook's behalf seeking relief under federal and state laws for the misconduct perpetrated against the Company by its current and former officers and directors identified below (collectively, the "Defendants") arising from the misappropriation and unauthorized use of personal information for 50 million Facebook users.  Plaintiff, through counsel, has conducted an investigation into the facts supporting the allegations in this Complaint and believes discovery will elicit further evidentiary support for the allegations herein.

## I.      INTRODUCTION

1.       On March 17, 2018, the *New York Times* and the *Guardian*'s *Observer* reported that Cambridge Analytica, a data firm retained to assist the Trump election campaign, had accessed and retained information of 50 million Facebook users without their permission and informed consent.  According to the *Observer*, a whistleblower had revealed that Cambridge Analytica used the users' personal information in early 2014 to build a system that could profile U.S. voters and then target those individuals with personalized political advertisements.  Christopher Wylie ("Wylie"), a Canadian data analytics expert who worked with Cambridge Analytica and Cambridge research professor Dr. Aleksandr Kogan ("Kogan") to devise and implement the scheme, told the *Observer*: "We exploited Facebook to harvest millions of people's profiles. And built models to exploit what we knew about them and target their inner demons. That was the basis the entire company was built on."

2.       The misappropriated user data was collected through an application or "app" called "thisisyourdigitallife" designed by Kogan and his company, Global Science Research ("GSR").  GSR, in collaboration with Cambridge Analytica, convinced Facebook users to open their app to take a personality test with the collected data supposedly to be used for academic purposes.  Approximately 270,000 people downloaded the app using their Facebook login credentials, which, under Facebook's developer platform, allowed Kogan to access not only the app users' personal data, but also every one of their Facebook friends.  Kogan ultimately collected data on 50 million Facebook users, which he then shared with Cambridge Analytica for

use on the Trump election campaign.

3.     Inexplicably, while this massive data breach was known to Facebook and its management for years, it was never disclosed to Facebook's users or the public markets.

4.     As reported by the *Observer* and confirmed by Facebook in recent statements, Company officials learned that Kogan had violated Facebook's platform policies, including those relating to its developer application programming interface ("API"), as early as 2015, but did not inform the millions of affected users or make reasonable and meaningful efforts to recover and secure the private information of the individual users.  The *New York Times* reported that copies of the data harvested for Cambridge Analytica could still be found online in 2017, and its reporting team had viewed some of the raw data.

5.     The recent revelations regarding Facebook's actual practices with respect to user privacy and data security have severely damaged the Company's reputation and imposed significant costs on it, including regulatory investigations, lost business, exposure to litigation, and other damages.  In the first two days following public revelation of the data breach, Facebook lost $50 billion in market value.  Federal regulators and state prosecutors reportedly opened investigations into Facebook, and politicians in the United States and Europe are calling for Facebook's Chief Executive Officer ("CEO"), defendant Mark Zuckerberg ("Zuckerberg"), to testify before them.

6.     The *New York Times* also reported on March 19, 2018, that Facebook's Chief Security Officer, Alex Stamos ("Stamos"), would be stepping down after internal disagreement with the way the Company handled concerns about misinformation in the 2016 U.S. presidential election.

7.     Facebook and its Board of Directors should have been extra vigilant to such practices.  Long before the Cambridge Analytica breach occurred, Facebook's Board was informed by current and former Facebook employees, among numerous other sources, about the risks associated with Facebook's platform policies and practices with respect to user privacy and data security.  In addition, Facebook had been subject to government investigations and civil lawsuits alleging that Facebook's user privacy practices violated the law.  In 2009, Canada's

Privacy Commissioner found that Facebook's data handling violated Canadian law, noting that "[a]pplication developers have virtually unrestricted access to Facebook users' personal information."

8.      Despite these prior red flags, and their heightened duty to ensure Facebook's compliance with pertinent privacy rules and regulations, Defendants failed to ensure that Facebook implemented reasonable system of internal controls and systems that would enable the Company to detect and prevent similar issues.  Worse, even after learning of the Cambridge Analytica information leak by at least 2015, neither Zuckerberg nor Facebook's Chief Operating Officer ("COO"), Sheryl K. Sandberg ("Sandberg"), nor any of the other Defendants, disclosed the leak or notified Facebook users that their personal information had been compromised.

9.      To the contrary, with knowledge of the breach, Defendants continued to downplay concerns about access to user information when addressing Facebook's role in the 2016 U.S. election.  Defendants denied that Facebook had experienced any data leaks or security breaches, and continued to assure investors that Facebook maintained effective" internal controls and systems that automatically detected "suspicious activity."  Defendants also publicly affirmed the Company's commitment to continually monitor and improve its data security systems. "[M]isleading people or misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data," a Facebook spokesman said in a statement to the *Guardian* in 2015.

10.     It was not until the *Observer* sought comment from Facebook just a few days prior to breaking the news of the Cambridge Analytica leak – but more than two years after the incident was first reported to Facebook officials – that Facebook announced that it was (finally) suspending Cambridge Analytica and Kogan from the platform pending further information over misuse of data.  Facebook also said that it was suspending Wylie from accessing the platform while it carried out its own internal investigation, despite his role as a whistleblower.

11.     Just one month earlier, in February 2018, both Facebook and the CEO of Cambridge Analytica, Alexander Nix ("Nix"), had told a U.K. parliamentary inquiry on fake

**SHAREHOLDER DERIVATIVE COMPLAINT**                                    3

1    news that the company did not have or use private Facebook data.  Simon Milner, Facebook's

2    U.K. policy director, when asked if Cambridge Analytica had Facebook user data, told U.K.

3    officials: "They may have lots of data but it will not be Facebook user data. It may be data about

4    people who are on Facebook that they have gathered themselves, but it is not data that we have

5    provided."  Cambridge Analytica's Nix told officials: "We do not work with Facebook data and

6    we do not have Facebook data."

7           12.    However, Wylie, a Canadian data analytics expert who worked with Cambridge

8    Analytica and Kogan to devise and implement the scheme, showed a dossier of evidence about

9    the data misuse to the *Observer* which appears to raise questions about their testimony.  Wylie

10   also provided the evidence to the U.K.'s National Crime Agency's cybercrime unit and the

11   Information Commissioner's Office, including emails, invoices, contracts and bank transfers that

12   reveal more than 50 million profiles – mostly belonging to registered U.S. voters – were

13   harvested from the site in one of the largest-ever breaches of Facebook data.  Wylie said

14   Facebook was aware of the volume of data being pulled by Kogan's app.  "Their security

15   protocols were triggered because Kogan's apps were pulling this enormous amount of data, but

16   apparently Kogan told them it was for academic uses," Wylie said.  "So they were like: Fine.'"

17          13.    The evidence Wylie supplied to U.K. and U.S. authorities includes a letter from

18   Facebook's own lawyers sent to him in August 2016, asking him to destroy any data he held that

19   had been collected by GSR, the company set up by Kogan to harvest the profiles.  "Because this

20   data was obtained and used without permission, and because GSR was not authorized to share or

21   sell it to you, it cannot be used legitimately in the future and must be deleted immediately," the

22   letter said.  According to Wylie, Facebook did not pursue a response when the letter initially

23   went unanswered for weeks because Wylie was travelling, nor did it follow up with forensic

24   checks on his computers or storage.  "That to me was the most astonishing thing. They waited

25   two years and did absolutely nothing to check that the data was deleted. All they asked me to do

26   was tick a box on a form and post it back."

27          14.    Even recently, after Facebook finally admitted that user information was

28   misappropriated, it denied that the harvesting of tens of millions of profiles by GSR and

Cambridge Analytica was a data "breach" or that it was due to any defect in the Company's systems.  In a statement posted in Facebook's newsroom on March 16, 2016, Facebook's attorneys said that Kogan "gained access to this information in a legitimate way and through the proper channels" but "did not subsequently abide by our rules" because he passed the information on to third parties.  Facebook said it had removed the app in 2015 and required certification from everyone with copies that the data had been destroyed, although the letter to Wylie did not arrive until the second half of 2016.

15.    According to Facebook, SCL Elections, an affiliate, had worked with Facebook over the period to ensure it was satisfied no terms had been "knowingly breached" and provided a signed statement that all data and derivatives had been deleted.  "Several days ago," a Facebook attorney wrote, "we received reports that, contrary to the certifications we were given, not all data was deleted."  Facebook also said the Company is now "moving aggressively to determine the accuracy of these claims."  In other words, the investigation was initiated only in response to regulators and amidst litigation and public outcry, not as a decision in the ordinary course of business to address the illicit information-sharing that Defendants knew was occurring and permitted by its policies.  Facebook's lawyers also threatened to sue the *Observer* for supposedly "false and defamatory" allegations, insisting that no "breach" had occurred.

16.    In an update to the statement posted on March 18, 2016, Facebook again denied that any "breach" or misappropriation of user datas had occurred, stating, "The claim that this is a data breach is completely false. Aleksandr Kogan requested and gained access to information from users who chose to sign up to his app, and everyone involved gave their consent. People knowingly provided their information, no systems were infiltrated, and no passwords or sensitive pieces of information were stolen or hacked."

17.    Facebook Chief Security Officer Alex Stamos ("Stamos") also initially posted a series of tweets defending claims of a data breach, but later deleted those tweets and said: "I should have done a better job weighing in. There are a lot of big problems that the big tech companies need to be better at fixing. We have collectively been too optimistic about what we build and our impact on the world. Believe it or not, a lot of the people at these companies, from

the interns to the CEOs agree."

18.     Since the revelations, Facebook has been under fire from customers, analysts, and government officials alike.  Facebook is now facing government inquiries in the United States and Europe regarding its user privacy and data sharing practices.

19.     Facebook is also reportedly the target of an inquiry by the Federal Trade Commission ("FTC"), which obtained a consent decree against Facebook in 2011 that required the Company to get express permission from and notify users before sharing their data with third parties.  Facebook could face massive fines if the FTC determines that it violated the terms of the agreement.

20.     Facebook's management and Board were well aware of the FTC consent order and the potential repercussions it had on the Company if violated, and thus had an affirmative obligation to ensure the Company's compliance with its terms.  In 2011, Facebook entered into the consent order to settle charges that the Company deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public.  The consent order required Facebook to take several steps to make sure complied with the privacy of its users, including giving consumers clear and prominent notice and obtaining consumers' express consent before their information is shared beyond the privacy settings they have established.  The consent order also barred Facebook from making any further deceptive privacy claims and required Facebook to get consumers' approval before it changes the way it shares their data.  In addition, Facebook was (and is) required to obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years.

21.     However, rather than addressing these underlying problem, Defendants continued to fail to implement and maintain adequate internal controls and procedures to detect and prevent similar misconduct from occurring at Facebook.  Worse, Defendants failed to ensure that Facebook complied with the terms of the FTC consent order.

22.     In an interview with the *Washington Post*, David Vladeck, former director of the FTC's Bureau of Consumer Protection, said the Cambridge Analytica incident may have violated Facebook's 2011 consent decree. "I will not be surprised if at some point the FTC looks at this. I

would expect them to," he said.  Jessica Rich, who also served as director of the bureau and was deputy director under Vladeck, said, "Depending on how all the facts shake out, Facebook's actions could violate any of all of these provision, to the tune of many millions of dollars in penalties. They could also constitute violations of both U.S. and EU laws," adding, "Facebook can look forward to multiple investigations and potentially a whole lot of liability here."

23.    Despite this backdrop, until the past few days, Defendants claimed that Facebook did nothing wrong and placed the blame for the Cambridge Analytica leak on Kogan.  On March 20, 2018, Facebook issued a statement saying that "[t]he entire company is outraged we were deceived."

24.    However, on March 21, 2018, defendant Zuckerberg finally addressed the Cambridge Analytica scandal for the first time and admitted that Facebook was at fault.  "This was a breach of trust between Kogan, Cambridge Analytica, and Facebook.  But it was also a breach of trust between Facebook and the people who share their date with us and expect us to protect it.  We need to fix that."  In a Facebook newsroom post entitled "Hard Questions: Update on Cambridge Analytica," Zuckerberg wrote: "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you."  Notably, Zuckerberg did not explain how Facebook came to have such a close relationship with Kogan.

25.    On March 22, 2018, the *Guardian* revealed that "Facebook provided the dataset of 'every friendship formed in 2011 in every country in the world at the national aggregate level' to Kogan" for a study on international friendships that was co-authored by two Facebook employees in 2015.  A University of Cambridge press release on the study's publication noted that the paper was "the first output of ongoing research collaborations between [Kogan's] lab in Cambridge and Facebook."  Facebook spokeswoman Christine Chen reportedly told the *Guardian* that the Company "ended the relationship [with Kogan] soon after [the Company's investigation], in 2016."  However, a Facebook spokesperson told *The Intercept* in 2017 that "[o]ur investigation to date has not uncovered anything that suggests wrongdoing," and Facbook would not respond to inquiries about whether any other collaborations had occurred.  Moreover, Facebook did not act to ban Kogan and Cambridge Analytica from the website until news of the

leak was reported in March 2018.

26.     In short, Defendants failed—repeatedly, and brazenly—to serve the best interests of Facebook and its shareholders, and the public at large.  As a result of their misconduct, Defendants are liable to the Company under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") as well as for breaches of their fiduciary duties and other violations of state law.

## II.     JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action under Article III of the United States Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder, and has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

28.     This Court has jurisdiction over each of the Defendants because each defendant has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under California Code of Civil Procedure § 410.10 as well as the United States and California Constitutions and traditional notions of fair play and substantial justice. Facebook is headquartered in California, and through their misconduct, Defendants caused substantial harm and injury in California, and to California citizens.

29.     Venue is proper in this District in accordance with Section 27 of the Exchange Act. Venue is also proper under 28 U.S.C. § 1391(b) because: (i) Facebook maintains its principal place of business in this District, and has its most significant contacts with, the Northern District of California; (ii) one or more of the Defendants resides in this District; (iii) a substantial portion of the transactions and wrongs complained of in this Complaint occurred in this District; and (iv) Defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had effects in this District.

30.     This action is not a collusive one to confer jurisdiction that the court would otherwise lack.

**SHAREHOLDER DERIVATIVE COMPLAINT**                                                    8

III.   PARTIES

Plaintiff

31.   Plaintiff Jeremiah F. Hallisey, a citizen of California, is a current shareholder of Facebook stock and has continuously held his Facebook stock during the entire period of wrongdoing alleged herein.

Nominal Defendant

32.   Nominal defendant Facebook is a Delaware corporation headquartered at 1601 Willow Road, Menlo Park, CA 94025.  Accordingly, Facebook is a citizen of Delaware and California.  Facebook operates a social networking website that allows people to communicate with their family, friends, and coworkers. Facebook develops technologies that facilitate the sharing of information, photographs, website links, and videos. Facebook users have the ability to share and restrict information based on their own specific criteria. By the end of 2017, Facebook had more than 2.2 billion active users. The company's mission is "to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."  Facebook's securities trade on the NASDAQ under the ticker symbol "FB."

Individual Defendants

33.   Defendant Zuckerberg is the Founder, Chairman and Chief Executive Officer ("CEO") of Facebook.  Zuckerberg is responsible for Facebook's day-today operations, as well as the overall direction and product strategy of the Company, and is the Company's controlling stockholder with ownership of stock and proxies for stock representing more than 60% of Facebook's voting power, though he owns 16% of Facebook's total equity value.

34.   Defendant Sandberg is the Chief Operating Officer ("COO") of Facebook since 2008 and a director since 2012.

35.   Defendant Marc Andreessen ("Andreessen") is a member of the Board and has been a director of the Company since June 2008. Andreessen is also a member of Facebook's Audit Committee and Compensation & Governance Committee.

36. Defendant Peter A. Thiel ("Thiel") is a member of the Board and has been a director of the Company since April 2005. Thiel is also a member of the Company's Compensation & Governance Committee.

37. Defendant Reed Hastings ("Hastings") is a member of the Board and has been a director of the Company since June 2011. Hastings also serves as Chair of the Company's Compensation & Governance Committee.

38. Defendant Erskine B. Bowles ("Bowles") is a member of the Board and has been a director of the Company since September 2011. Bowles also serves as the Chair of the Company's Audit Committee.

39. Defendant Dr. Susan Desmond-Hellmann ("Desmond-Hellmann") is a member of the Board and has been a director of the Company since March 2013. Desmond-Hellmann is also a member of Facebook's Audit Committee and the Company's Lead Independent Director.

40. Jan Koum ("Koum") is a Facebook director and has been since October 2014.

41. The individuals identified in Paragraphs 33-40 above are referenced collectively in this Complaint as the "Defendants."

**Other Relevant Persons**

42. Kogan, a.k.a. Dr. Spectre, is a psychology professor and data scientist at the University of Cambridge and currently resides in the United Kingdom. Kogan created an app called thisisyourdigitallife which was used to collect the data on millions of Facebook users.

43. Global Science Research ("GSR") is a privately held company headquartered in Cambridge, United Kingdom. The company was founded in 2014 by Kogan and optimizes marketing strategies using big data and psychological sciences.

44. Cambridge Analytica is a privately held company that offers services to businesses and political parties who want to "change audience behavior." Cambridge Analytica, which claims to be able to analyze large amounts of consumer data and combine that behavioral science to identify people who organizations can then target with marketing material, was created in 2013 by its British parent company, SCL Group, and Nix. Cambridge Analytica is partly owned by Robert Mercer. In 2014, Cambridge Analytica was involved in 44 U.S. political

races.  In 2015, Cambridge Analytica became known as the data analysis company that was working with Ted Cruz's presidential campaign.  In 2016, Cambridge Analytica began working with Donald Trump's presidential campaign and the Leave EU campaign for the United Kingdom's withdrawal from the European Union.

45.     Strategic Communication Laboratories ("SCL") is Cambridge Analytica's parent company and is headquartered in the U.K.

46.     Nix is the former CEO of Cambridge Analytica and a director of the Strategic Communication Laboratories ("SCL") Group.  Nix set up Cambridge Analytica in 2013 and has been its CEO until he was suspended on March 20, 2018 after video revealed Nix talking about how his company used "honey traps, bribery stings, and prostitutes for opposition research."  Nix currently resides in the United Kingdom.  According to Nix, Cambridge Analytica was set up "to address the vacuum in the US Republican political market" after Mitt Romney lost in 2012.  Nix said, "The Democrats had ostensibly been leading the tech revolution, and data analytics and digital engagement were areas where Republicans had failed to catch up.  We saw this as an opportunity."

## IV.    DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS AND COMPLY WITH APPLICABLE LAWS

47.     By reason of their positions as officers or directors of Facebook, and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed Facebook and its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that Facebook operated in compliance with all applicable federal and state laws, rules and regulations. Defendants were and are required to act in furtherance of the best interests of Facebook and its shareholders so as to benefit all shareholders equally and not in furtherance of the Defendants' personal interest or benefit.  Each director and officer owes to Facebook and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

48.     Because of their positions of control and authority as directors and officers of Facebook, the Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts detailed in this Complaint.  Due to their positions with Facebook, the Defendants had knowledge of material non-public information regarding the Company.

49.     To discharge their duties, the Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company. By virtue of such duties, the officers and directors of Facebook were required to, among other things:

- Manage, conduct, supervise, and direct the employees, businesses, and affairs of Facebook in accordance with laws, rules, and regulations, as well as the charter and by-laws of Facebook;

- Ensure that Facebook did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

- Remain informed as to how Facebook was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

- Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Facebook, and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company;

- Preserve and enhance Facebook's reputation as befits a public corporation;

- Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; and

- Refrain from unduly benefiting themselves and other Facebook insiders at the expense of the Company.

## V. THE BOARD KNEW THAT FACEBOOK'S USER PRIVACY POLICIES AND INADEQUATE INTERNAL CONTROLS POSED A SUBSTANTIAL RISK TO THE COMPANY'S BUSINESS

50. Throughout the relevant period, Defendants emphasized the importance of user privacy to Facebook's revenues and business, while concealing the fact that the Company's internal controls and policies allowed third party developers to obtain mass amounts of Facebook user information without verification as to the nature of its use.

51. Defendants repeatedly emphasized the importance of data security and user privacy to the Company in Facebook's public statements, and acknowledged their specific responsibility for overseeing the substantial risks that a breach, like the Cambridge Analytica incident, posed to the Company. According to Facebook's preliminary proxy statement, filed with the SEC on or about April 14, 2017 (the "2017 Proxy Statement"):

Our board of directors as a whole has responsibility for overseeing our risk management. The board of directors exercises this oversight responsibility directly and through its committees. ***The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of directors about the identification and assessment of key risks and our risk mitigation strategies.***

The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit committee has the responsibility for overseeing our major financial and accounting risk exposures as well as legal and regulatory risk exposures. Our audit committee also oversees the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Finally, our audit committee oversees our internal audit function. Our compensation & governance committee evaluates risks arising from our compensation policies and practices, as more fully described in "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment." The audit committee and the compensation & governance committee provide reports to the full board of directors regarding these and other matters.

52. Notwithstanding their significant obligations as members of the Board or corporate officers, and (for some of the Defendants) as members of committees charged with overseeing Facebook's risk exposure, corporate governance, and other critical aspects of the Company's business and operations, the Defendants maintained policies that allowed Kogan and other third party app developers to obtain mass amounts of Facebook user information without

verification as to the nature of its use, and upon learning that 50 million users' personal information had been misappropriated and used by Cambridge Analytica, failed to notify users or disclose anything about the incident, or its significant impact on the Company, publicly and to investors.  Worse, Defendants affirmatively misrepresented and concealed these facts from the Company's regulators and in public statements and filings with the SEC.

### A.   DEFENDANTS REGARDED USER PRIVACY AND DATA SECURITY AS CRITICAL TO FACEBOOK'S BRAND, AND REPEATEDLY EMPHASIZED THAT IN PUBLIC STATEMENTS

53.     Maintaining user privacy and data security has long been considered central to Facebook's business and growth prospects.  Defendants have assured users and investors for years that the Company monitors user accounts for precisely the type of leaks that allowed Cambridge Analytica to obtain millions of users' personal information without their knowledge, and to retain such information for years after Facebook claimed to have confirmed that neither Cambridge Analytica nor any unauthorized person or entity associated with it was in the possession of any misappropriated user data.

54.     For instance, a June 21, 2013 blog post entitled "Important Message from Facebook's White Hat Program" states: "At Facebook, we take people's privacy seriously, and we strive to protect people's information to the very best of our ability. We implement many safeguards, hire the brightest engineers and train them to ensure we have only high-quality code behind the scenes of your Facebook experiences. We even have teams that focus exclusively on preventing and fixing privacy related technical issues before they affect you….. *Your trust is the most important asset we have, and we are committed to improving our safety procedures and keeping your information safe and secure.*"

55.     The Company's failure to detect and prevent the Cambridge Analytica leak, or to adequately respond with proper notification and disclosures in accordance with best practices and applicable laws, belies any claim that Facebook's actual "monitoring" practices and internal controls were sufficient.  In fact, Facebook's statements throughout the relevant period indicate that Defendants sought to conceal the deficiencies in Facebook's user privacy data security practices through materially false and misleading statements denying that any such leak had ever

occurred and falsely assured that the Company maintained effective internal controls.

56.     For example, a October 16, 2015 post by Stamos, Facebook's Chief Information Security Officer, stated:

> **The security of people's accounts is paramount at Facebook, which is why we constantly monitor** for potentially malicious activity and offer many options to proactively secure your account.  Starting today, we will notify you if we believe your account has been targeted or compromised by an attacker suspected of working on behalf of a nation-state.
>
> *          *          *
>
> While we have always taken steps to secure accounts that we believe to have been compromised, we decided to show this additional warning if we have a strong suspicion that an attack could be government-sponsored. We do this because these types of attacks tend to be more advanced and dangerous than others, and we strongly encourage affected people to take the actions necessary to secure all of their online accounts.
>
> It's important to understand that **this warning is not related to any compromise of Facebook's platform or systems**, and that having an account compromised in this manner may indicate that your computer or mobile device has been infected with malware. Ideally, people who see this message should take care to rebuild or replace these systems if possible.
>
> To protect the integrity of our methods and processes, we often won't be able to explain how we attribute certain attacks to suspected attackers. That said, we plan to use this warning only in situations where the evidence strongly supports our conclusion. We hope that these warnings will assist those people in need of protection, and we will continue to improve our ability to prevent and detect attacks of all kinds against people on Facebook.

57.     In a post to the Company's website on March 18, 2018, Facebook VP Adam Bosworth also noted that maintaining user privacy is in the Company's best interests, and noted the purportedly indirect effects on Facebook's revenues.  "Yes developers can receive data that helps them provide better experiences to people, but we don't make money from that directly and have set this up in a way so that no one's personal information is sold to businesses," Bosworth wrote. "If people aren't having a positive experience connecting with businesses and apps then it all breaks down. This is specifically what I mean when we say our interests are aligned with users when it comes to protecting data."

**B.      DEFENDANTS MAINTAINED POLICIES THAT PERMITTED DEVELOPERS TO OBTAIN USER INFORMATION**

58.    Since 2007, Facebook has allowed outside developers to build and offer their own applications within its space.  Facebook's Data Use Policy, last revised in 2013, states, in relevant part:

> Granting us permission to use your information not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways. While you are allowing us to use the information we receive about you, you always own all of your information. Your trust is important to us, which is why we don't share information we receive about you with others unless we have:
>
>      ☐ received your permission
>
>      ☐ given you notice, such as by telling you about it in this policy; or
>
>      ☐ removed your name and any other personally identifying information from it.

(https://www.facebook.com/full_data_use_policy).

59.    Despite this policy, Ben Thompson, creator of Stratechery, which **"**provides analysis of the strategy and business side of technology and media, and the impact of technology on society," noted that a Facebook developer page from 2013 that showed that Facebook's API would allow developers to access user and a user's friends account information.  The images below show exactly what was available.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

https://web.archive.org/web/20130911191323/https://developers.facebook.com/docs/reference/login/extended-profile-properties/

60.     These extended profile properties show that Kogan had all the information at his fingertips and did not have to hack into Facebook's system to obtain the information.

61.     Because this was part of the information available to developers, Facebook recently argued that this was not a "breach" of Facebook's network.  A post by Facebook attorneys published on March 16, 2018, and updated on March 17, 2018, stated, in relevant part:

> *Update on March 17, 2018, 9:50 AM*: **The claim that this is a data breach is completely false.** Aleksandr Kogan requested and gained access to information from users who chose to sign up to his app, and everyone involved gave their consent. People knowingly provided their information, no systems were infiltrated, and no passwords or sensitive pieces of information were stolen or hacked.
>
> *Originally published on March 16, 2018:* We are suspending Strategic Communication Laboratories (SCL), including their political data analytics firm, Cambridge Analytica, from Facebook. Given the public prominence of this organization, we want to take a moment to explain how we came to this decision and why.
>
> **We Maintain Strict Standards and Policies**
>
> Protecting people's information is at the heart of everything we do, and we require the same from people who operate apps on Facebook. In 2015, we learned that a psychology professor at the University of Cambridge named Dr. Aleksandr Kogan lied to us and violated our Platform Policies by passing data from an app that was using Facebook Login to SCL/Cambridge Analytica, a firm that does political, government and military work around the globe. He also passed that data to Christopher Wylie of Eunoia Technologies, Inc.
>
> Like all app developers, Kogan requested and gained access to information from people after they chose to download his app. His app, "thisisyourdigitallife," offered a personality prediction, and billed itself on Facebook as "a research app used by psychologists." Approximately 270,000 people downloaded the app. In so doing, they gave their consent for Kogan to access information such as the city they set on their profile, or content they had liked, as well as more limited information about friends who had their privacy settings set to allow it. Although Kogan gained access to this information in a legitimate way and through the proper channels that governed all developers on Facebook at that time, he did not subsequently abide by our rules. By passing information on to a third party, including SCL/Cambridge Analytica and Christopher Wylie of Eunoia Technologies, he violated our platform policies.
>
> When we learned of this violation in 2015, we removed his app from Facebook and demanded certifications from Kogan and all parties he had

given data to that the information had been destroyed. Cambridge
Analytica, Kogan and Wylie all certified to us that they destroyed the data.

**Breaking the Rules Leads to Suspension**

Several days ago, we received reports that, contrary to the certifications
we were given, not all data was deleted. We are moving aggressively to
determine the accuracy of these claims. If true, this is another
unacceptable violation of trust and the commitments they made. We are
suspending SCL/Cambridge Analytica, Wylie and Kogan from Facebook,
pending further information. We are committed to vigorously enforcing
our policies to protect people's information. We will take whatever steps
are required to see that this happens. We will take legal action if necessary
to hold them responsible and accountable for any unlawful behavior.

62.     Earlier statements posted by Facebook personnel suggest that Facebook had

changed its policies to address the same issues at least a year before Facebook claimed that the

Company became aware of such violations and the need to change its policies and practices to

prevent similar future leaks, in 2014.

63.     In mid-2014, Facebook announced a new review process, where the Company

would make sure that new apps asked only for data they would actually use. "People want more

control," the Company said at that time. "It's going to make a huge difference with building trust

with your app's audience." Existing apps were given a full year to switch over to have Facebook

review how they handled user data.

64.     Although Facebook claims it did not receive notice of the Cambridge Analytica

incident until 2015, the Company's response to an inquiry from WIRED regarding the leak

confirms that Facebook personnel were aware of similar user privacy issues by at least 2014, and

knew that updates to Facebook's policies and data security practices were necessary to alleviate

concerns that had already expressed by Facebook users.  "In 2014, after hearing feedback from

the Facebook community, we made an update to ensure that each person decides what

information they want to share about themselves, including their friend list," Facebook stated.

"Before you decide to use an app, you can review the permissions the developer is requesting

and choose which information to share. You can manage or revoke those permissions at any

time."  Defendant Zuckerberg later confirmed in his March 21, 2018 post that the Company took

steps "in 2014 to prevent bad actors from accessing people's information in this way" – i.e., as

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

Kogan had done with his app.

65.     When Kogan created his app in 2013, Facebook allowed developers to collect information on friends of those who chose to use their apps if their privacy settings allowed it. In an email to university colleagues, Kogan said that in 2014, after he founded GSR, he transferred the app to the company and used an official Facebook Inc. platform for developers to change the terms and conditions of his app from "research" to "commercial use," and that at no point then did the social media company object.  Kogan's email further stated: Through the app, we collected public demographic details about each user (name, location, age, gender), and their page likes (e.g., the Lady Gaga page). We collected the same data about their friends whose security settings allowed for their friends to share their data through apps. Each user who authorized the app was presented with both a list of the exact data we would be collecting, and also a Terms of Service detailing the commercial nature of the project and the rights they gave us as far as the data. Facebook themselves have been on the record saying that the collection was through legitimate means."

66.     Kogan's position contradicts Facebook's stance that Kogan violated the company's terms and services and then lied about it.  "We clearly stated that the users were granting us the right to use the data in broad scope, including selling and licensing the data," Kogan wrote in a March 18, 2018 email obtained by Bloomberg. "These changes were all made on the Facebook app platform and thus they had full ability to review the nature of the app and raise issues."  Facebook's position is suspect given revelations regarding its relationship with Cambridge Analytica and the fact that Facebook researchers co-authored a study with Kogan in 2015 that also used data harvested by a Facebook app, including the anonymous, aggregate dataset of 57 billion Facebook friendships that Facebook had provided to Kogan in 2011. Jonathan Albright ("Albright"), research director at the Tow Center for Digital Journalism, told the *Guardian*, "It's not common for Facebook to share that kind of data.  It suggests a trusted partnership between [Kogan] and Facebook."  Albright also pointed out that it was Facebook who created a system for third parties to access so much personal information in the first place, and noted that system "was designed to share their users' data in meaningful ways in exchange

for stock value."

67.     The allegations in a lawsuit filed by the makers of Pikinis, an app that was shut down three years ago when Facebook finally cut off third-party access to a back-door channel to friends' data, also undermine Facebook's suggestion that it has always placed user privacy interests at the forefront of its business.  Pikinis alleged that Facebook engaged in "an anti-competitive bait-and-switch scheme" that duped Six4Three and tens of thousands of other developers into making hefty investments to build apps and then decided "it would be in Facebook's best interest to no longer compete with many developers and to shut down their businesses."  While Facebook has denied any wrongdoing in the Pikinis lawsuit, its response confirms that Facebook has always had the ability to change its practices with respect to third party developers, but did not.   "Facebook made -- and must continue to make -- important editorial decisions about what third party content is available through its platform to protect its users' privacy and experience," the company argued in a February 2018 court filing.

68.     Defendants not only had the ability (and responsibility) to change Facebook's policies and practices with respect to third party developer access to user information, they were also well aware of similar information leaks and the risk that Facebook's lax data security practices and user privacy policies could cause substantial damage to the Company's business and reputation, yet failed to act to prevent such harm.

69.     By 2013, Facebook had experienced at least one major attack to its security systems and represented that it was "working continuously" to prevent similar security threats in the future.  A February 15, 2013 post entitled "Protecting People On Facebook" states:

> Facebook, like every significant internet service, is frequently targeted by those who want to disrupt or access our data and infrastructure. As such, ***we invest heavily in preventing, detecting, and responding to threats that target our infrastructure, and we never stop working to protect the people who use our service.***  The vast majority of the time, we are successful in preventing harm before it happens, and our security team works to quickly and effectively investigate and stop abuse.
>
> Last month, Facebook Security discovered that our systems had been targeted in a sophisticated attack.  As soon as we discovered the presence of the malware, we remediated all infected machines, informed law enforcement, and began a significant investigation that continues to this

day. We have found no evidence that Facebook user data was compromised.

As part of our ongoing investigation, we are working continuously and closely with our own internal engineering teams, with security teams at other companies, and with law enforcement authorities to learn everything we can about the attack, and how to prevent similar incidents in the future. …

We will continue to work with law enforcement and the other organizations and entities affected by this attack. It is in everyone's interests for our industry to work together to prevent attacks such as these in the future.

70.     Even after Facebook changed its policy in 2014 supposedly to protect user information from being exploited by "bad actors," Facebook gave developers a ***full year*** before it ended their access to friends' newsfeeds and photos.  Worse, the Company failed to follow up on suspicious activity when security protocols were triggered, as noted by Wylie.

**C.     DEFENDANTS RECEIVED NUMEROUS "RED FLAG" WARNINGS OF THE SAME USER PRIVACY AND DATA SECURITY ISSUES THAT LED TO THE BREACH, YET FAILED TO ACT**

71.     The Board was required to ensure Facebook's compliance with the FTC consent order and other applicable laws, and to implement and monitor a reasonable system of internal controls and policies relating to user privacy and data security at Facebook.

72.     Yet, during the relevant period, Defendants failed to act in the face of numerous "red flag" warnings indicating that the Company's internal controls and policies were not only insufficient, but actually encouraging of the same privacy and data security issues that ultimately enabled Cambridge Analytica to obtain the personal information of 50 million Facebook users without their knowledge and informed consent.

**1.     Early Litigation Involving User Privacy Claims**

73.     Facebook has weathered complaints about violating user privacy since its earliest days without radically altering its practices.  In 2006, users protested that the service's news feed was making public information that the users had intended to keep private. The news feed is now the company's core service.

74.     In 2009, Facebook began making users' posts, which had previously been private,

public by default. That incident triggered anger, confusion, an investigation by the U.S. Federal Trade Commission, and, ultimately, a consent decree.

75. In March 2010, Facebook settled a class action for $9.5 million to resolve claims regarding its Beacon feature, which tracked what users buy online and shared the information with their friends.

76. Reflecting on Beacon, defendant Zuckerberg attributed part of Facebook's success to giving "people control over what and how they share information." He said that he regretted making Beacon an "optout system instead of opt-in … if someone forgot to decline to share something, Beacon went ahead and still shared it with their friends."

77. In December 2012, Facebook settled a class action for $20 million over claims it used subscribers' names without their permission to advertise products in its "Sponsored Stories" is approved.

78. Max Schrems, an Austrian lawyer and privacy activist, reportedly told Ireland's data protection authority of loopholes in Facebook's policy that allowed apps to "harvest" data about their friends without consent some time ago. "We flagged it in 2011," Schrems said. "Now it emerges that in 2014 Cambridge Analytica started doing precisely what we warned about three years earlier."

79. On September 11, 2017, the Spanish Agency for Data Protection ("AEPD") announced that it had fined Facebook €1.2 million euros for violating data protection regulations following its investigation to determine whether the data processing carried out by the Company complied with the data protection regulations.  The AEPD stated that its investigation made it possible to verify that Facebook does not inform the users in a comprehensive and clear way about the data that it will collect and the treatments that it will carry out with them, but that it is limited to giving some examples.  In particular, the AEPD found that Facebook collects other data derived from the interaction carried out by users on the platform and on third-party sites without them being able to clearly perceive the information that Facebook collects about them or with what purpose they are going to use it.  The AEPD also found that the privacy policy of Facebook contains generic and unclear expressions, and requires access to a multitude of

different links to know it.  Further, the AEPD concluded that the Company makes an inaccurate reference to the use it will make of the data it collects, so that a Facebook user with an average knowledge of the new technologies does not become aware of the data collection or storage and subsequent treatment, or what they will be used for.

80.     In May 2017, the French data protection authority fined Facebook its maximum allowable fine of €150,000 for similar violations claimed by the Spanish authorities. "Facebook proceeded to a massive compilation of personal data of internet users in order to display targeted advertising," complained the Commission Nationale de l'Informatique et des Libertés. "It collected data on the browsing activity of internet users on third-party websites, via the 'datr' cookie, without their knowledge."

## 2.    The FTC Action and Consent Order

81.     In 2011, following an investigation by the FTC, Facebook entered into a consent order to resolve the FTC's complaint alleging that the claims Facebook made about its privacy practices were unfair and deceptive, and violated federal law.

82.     The FTC complaint listed a number of instances in which Facebook allegedly made promises that it did not keep:

a.   In December 2009, Facebook changed its website so certain information that users may have designated as private – such as their Friends List – was made public. They didn't warn users that this change was coming, or get their approval in advance.

b.   Facebook represented that third-party apps that users' installed would have access only to user information that they needed to operate. In fact, the apps could access nearly all of users' personal data – data the apps didn't need.

c.   Facebook told users they could restrict sharing of data to limited audiences – for example with "Friends Only." In fact, selecting "Friends Only" did not prevent their information from being shared with third-party applications their friends used.

d.   Facebook had a "Verified Apps" program & claimed it certified the security of

1   participating apps. It didn't.

2   e.   Facebook promised users that it would not share their personal information with

3        advertisers. It did.

4   f.   Facebook claimed that when users deactivated or deleted their accounts, their

5        photos and videos would be inaccessible. But Facebook allowed access to the

6        content, even after users had deactivated or deleted their accounts.

7   g.   Facebook claimed that it complied with the U.S.- EU Safe Harbor Framework that

8        governs data transfer between the U.S. and the European Union. It didn't.

9   83.   The consent order barred Facebook from making any further deceptive privacy

10  claims, required Facebook to obtain consumers' approval before it changed the way it shared

11  their data, and required Facebook to obtain periodic assessments of its privacy practices by

12  independent, third-party auditors for 20 years following its entry.  Specifically, under the consent

13  order, Facebook is:

14  h.   barred from making misrepresentations about the privacy or security of

15       consumers' personal information;

16  i.   required to obtain consumers' affirmative express consent before enacting changes

17       that override their privacy preferences;

18  j.   required to prevent anyone from accessing a user's material more than 30 days

19       after the user has deleted his or her account;

20  k.   required to establish and maintain a comprehensive privacy program designed to

21       address privacy risks associated with the development and management of new

22       and existing products and services, and to protect the privacy and confidentiality

23       of consumers' information; and

24  l.   required, every two years for the next 20 years after entry of the consent order, to

25       obtain independent, third-party audits certifying that it has a privacy program in

26       place that meets or exceeds the requirements of the FTC order, and to ensure that

27       the privacy of consumers' information is protected.

28  84.   In the FTC's press release announcing the settlement and terms of the consent

order, issued November 29, 2011, FTC Chairman Jon Leibowitz stated, "Facebook is obligated to keep the promises about privacy that it makes to its hundreds of millions of users… Facebook's innovation does not have to come at the expense of consumer privacy. The FTC action will ensure it will not." The Board was well aware of the FTC order and the obligations placed on Facebook.

### 3. Reports from Facebook's CISO and Other Sources at the Company

85.     In June 2015, Stamos joined Facebook as its Chief Information Security Officer. According to the *New York Times*, current and former employees reported that Stamos got off on the wrong foot with some executives, including defendant Sandberg, over how best to police the platform. Internally, Stamos repeatedly argued that Facebook needed to act more like a defense contractor in dealing with security, given that the social network was becoming a similar target for nation states.

86.     In audio leaked in October 2017 to ZDNet, a tech news site, Stamos told his security team that he explained to Facebook management "that we have the threat profile of a Northrop Grumman or a Raytheon or another defense contractor, but we run our corporate network, for example, like a college campus, almost." The tape infuriated Mr. Stamos's bosses, according to the current and former employees, and a leak investigation is continuing. The employees said that some executives believed Mr. Stamos had leaked the audio himself to get Facebook to take his entreaties more seriously.

87.     While the plethora of earlier "red flag" warnings should have caused the Facebook Board to seriously address what was a systemic problem with the Company's privacy and data security practices, the so-called "White Paper" that Stamos co-authored, entitled "Information Operations and Facebook," unquestionably alerted Defendants that those activities were pervasive and supported by management. The "White Paper" also confirmed that Defendants' public statements were false and misleading. Among other things, the White Paper affirmatively misrepresented that Facebook had "no evidence of any Facebook accounts being compromised" in connection with the 2016 election as of the date it was published on April 27, 2017.

88.     Stamos said that he had initially provided a written report to Facebook executives

concerning the circumstances which led to the Cambridge Analytica leak, but instead of taking appropriate action and disclosing the leak, the report was rewritten and presented as a hypothetical scenario, which appeared in the whitewashed "White Paper" that Facebook published which further suppressed and concealed the wrongdoing at the Company that led to the leak.

89.     On September 6, 2017, Stamos published "An Update on Information Operations On Facebook" in the Facebook newsroom.

90.     On October 22, 2017, the *Guardian* reported that Facebook had handed to the special counsel and congressional investigators looking into the Kremlin's interference the content of 3,000 political ads paid for by a shadowy Russian entity called the Internet Research Agency (IRA).  In response, defendant Sandberg said Facebook owed the nation "not just an apology but determination" to defeat attempts to subvert US democracy.  In an interview with the Axios media site, Sandberg did not address whether Russian trolls were targeting the same users as the Trump campaign, which would point towards collusion, but promised: "When the ads get released we will also be releasing the targeting for those ads. We're going to be fully transparent."  However, Sandberg was purposely vague on the question of when Facebook's management became aware of large-scale Russian manipulation, saying only: *"We started to hear the rumours around the election itself of a different kind of attack*."

91.     The *New York Times* reported that, by October 2017, the relationship between Stamos and Sandberg had deteriorated over how to handle Russian interference on Facebook and how best to reorganize Facebook's security team before the midterm elections, according to more than half a dozen people who work or formerly worked at the company.  Stamos proposed that instead of reporting to Facebook's general counsel, he report directly to Facebook's higher-ups.  Instead, executives reportedly reduced Stamos' day-to-day responsibilities.

92.     Sandy Parakilas, a former Facebook platforms operations manager for policing data breaches by third party software developers between 2011 and 2012, stated that hundreds of millions of Facebook users are likely to have had their private information harvested by companies that exploited the same terms as the firm that collected data and passed it on to Cambridge Analytica.  Parakilas said he warned senior executives at the company that its lax

**SHAREHOLDER DERIVATIVE COMPLAINT**                                              27

approach to data protection risked a major breach: "[Parakila's] concerns were that all of the data that left Facebook servers to developers could not be monitored by Facebook, so [Facebook] had no idea what developers were doing with the data" and that the company did not use enforcement mechanisms, including audits of external developers, to ensure data was not being misused. Parakilas confirmed that Facebook's "trust model" was rife with security vulnerabilities and a near total abnegation of its responsibility to audit its own rules limiting use of Facebook data by third parties. Or, in Parakilas' own words, "[Facebook] felt that it was better not to know."

93.     Roger McNamee ("McNamee"), a longtime Silicon Valley investor and reported Facebook insider also warned Facebook executives about data security issues by at least 2016, which also went unheeded.  McNamee was Zuckerberg's mentor before Facebook went public, and an early investor in the Company.  McNamee and Zuckerberg first met in 2006 when Facebook's then Chief Privacy Officer, Chris Kelly, called McNamee to give some advice to Zuckerberg on whether or not to sell the company to Yahoo!.  As McNamee describes his first encounter with Zuckerberg: "I began by letting Mark know the perspective I was coming from. Soon I predicted, he would get a billion-dollar offer to buy Facebook from either Microsoft or Yahoo, and everyone, from the company's board to the executive staff to Mark's parents, would advise him to take it.  I told Mark that he should turn down any acquisition offer.  He had an opportunity to create a uniquely great company if he remained true to his vision… I told Mark the market was much bigger than just young people; the real value would come when busy adults, parents and grandparents, joined the network and used it to keep in touch with people they didn't get to see often."  McNamee advised against selling the company.  After this meeting, McNamee and Zuckerberg developed a close mentoring relationship, and McNamee reportedly acted as a father figure to Zuckerberg.  McNamee suggested to Zuckerberg that he hire Sheryl Sandberg as Facebook's Chief Operating Officer.  By the time Facebook went public, McNamee was no longer a mentor to Zuckerberg.  That role was taken over by Facebook directors Andreessen and Thiel.

94.     In or about February 2016, McNamee began noticing "viciously misogynistic anti-Clinton memes originating from facebook groups supporting Bernie Sanders."  McNamee

**SHAREHOLDER DERIVATIVE COMPLAINT**                                      28

never suspected the Sanders campaign as pushing out the memes which made him worry that Facebook was being used in a way Zuckerberg had not intended.  However, McNamee saw a similar thing happening before the Brexit vote when anti-European Union messages were all over Facebook.

95.     Following the Brexit vote, McNamee wrote an op-ed piece for Recode, warning that Facebook was being manipulated by "bad actors."  In the article, McNamee concluded that the problem seemed to be "***systemic*** – the algorithms themselves made the site vulnerable because they were coded to prioritize attention, and attention is best gained by messages that elicit fear, outrage, and hate-sharing."

96.     On October 30, 2016, McNamee sent a draft of the op-ed piece to Zuckerberg and Sandberg.  According to McNamee, "They each responded the next day. The gist of their messages was the same: We appreciate you reaching out; we think you're misinterpreting the news; we're doing great things that you can't see.  Then they connected me to Dan Rose, a longtime Facebook executive with whom I had an excellent relationship.  Dan is a great listener and a patient man, but ***he was unwilling to accept that there might be a systemic issue***.  Instead, he asserted that Facebook was not a media company, and therefore was not responsible for the actions of third parties."  McNamee ultimately decided to not publish the op-ed piece, explaining, "Mark and Sheryl were my friends, and my goal was to make them aware of the problems so they could fix them.  I certainly wasn't trying to take down a company in which I still hold equity."

97.     Defendants ignored the warnings from McNamee.  McNamee told *Quartz* that he didn't expect Zuckerberg to "just accept" the warning message that he sent him, "We hadn't spoken in a number of years at that point, but we had traded emails and it was always positive.  But when I saw what was going on in 2016, I was genuinely concerned.  I just assumed that he would have trouble accepting it, because they hadn't had anything negative in three or four years.  It must have been really hard for him to appreciate that everything wasn't perfect.  But I kind of hoped that if I talked to Dan Rose over a period of weeks or months, they would have eventually follow through.  The shock would pass and they would think 'Roger is actually really

1  serious about this, maybe we should just check it out.'  But after three months, I realized they

2  were never going to check it out."

3            **4.**      **<u>Government Investigations and Lawsuits</u>**

4       98.    Since the nature and scope of the Cambridge Analytica breach has come to light,

5  Facebook's user privacy and data security practices have become the subject of multiple

6  government inquiries.

7       99.    In the days after the breach was publicly revealed, the Attorney General of

8  Massachusetts announced an investigation into Facebook and Cambridge Analytica.  Senator

9  Ron Wyden Monday followed up with a detailed series of questions for Facebook to answer.

10       100.    Senators Amy Klobuchar, Democrat of Minnesota, and John Kennedy,

11  Republican of Louisiana, have asked the chairman of the Judiciary Committee, Charles E.

12  Grassley, Republican of Iowa, to hold a hearing. Republican leaders of the Senate Commerce

13  Committee, organized by John Thune of South Dakota, wrote a letter on Monday to Mr.

14  Zuckerberg demanding answers to questions about how the data had been collected and if users

15  were able to control the misuse of data by third parties.  "It's time for Mr. Zuckerberg and the

16  other C.E.O.s to testify before Congress," Senator Mark Warner, Democrat of Virginia, said on

17  Tuesday. "The American people deserve answers about social media manipulation in the 2016

18  election."

19       101.    On March 20, 2018, a committee in the British Parliament sent a letter to

20  defendant Zuckerberg and asked him to appear before the panel to answer questions on the

21  company's connection to Cambridge Analytica. The president of the European Parliament also

22  requested an appearance by Mr. Zuckerberg.  "The committee has repeatedly asked Facebook

23  about how companies acquire and hold on to user data from their site, and in particular about

24  whether data had been taken without their consent," wrote Damian Collins, chairman of the

25  British committee. "***Your officials' answers have consistently understated this risk, and have***

26  ***been misleading to the committee***."

27       102.    On March 21, 2018, a former Facebook employee told British lawmakers that his

28  concerns about lax data protection policies at the Company went ignored by "senior executives."

1    Parakilas, who worked as a platform operations manager from 2011 to 2012, appeared before the

2    U.K. parliament committee investigating the impact of social media on recent elections.  "I made

3    a map of the various data vulnerabilities of the Facebook platform," Parakilas told the committee.

4    "I included lists of bad actors and potential bad actors," he said, "and said here's some of the

5    things these people could be doing and here's what's at risk."  When asked by the committee if

6    any of those executives were still at the company, Parakilas said they were, but declined to name

7    them in public.  Parakilas previously told the *Guardian* on March 20, 2018 that he had warned

8    senior executives at Facebook about how the Company's data protection policies posed a risk of

9    breach.  Parakilas explained, "My concerns were that all of the data that left Facebook servers to

10   developers could not be monitored by Facebook."  He also said that Facebook could have

11   prevented the Cambridge Analytica leak.

12              **5.       The FTC Investigation into Possible Consent Order Violations**

13       103.    Facebook is also reportedly facing an investigation by the FTC relating to its

14   compliance with a FTC consent order issued in 2011 after the FTC found that the company had

15   told users that third-party apps on the social media site, like games, would not be allowed to

16   access their data.  The FTC found that the apps, by contrast, were able to obtain almost all

17   personal information about a user.

18       104.    The current FTC investigation involves similar concerns about Facebook's user

19   privacy practices.  In an interview with the *Washington Post*, David Vladeck, former director of

20   the FTC's Bureau of Consumer Protection, said the Cambridge Analytica incident may have

21   violated Facebook's 2011 consent decree. "There are all sorts of obligations under the consent

22   decree that may not have been honored here," he said.  "I will not be surprised if at some point

23   the FTC looks at this. I would expect them to[.]"  Jessica Rich, who also served as director of the

24   bureau and was deputy director under Vladeck, said, "Depending on how all the facts shake out,

25   Facebook's actions could violate any of all of these provision, to the tune of many millions of

26   dollars in penalties. They could also constitute violations of both U.S. and EU laws," adding,

27   "Facebook can look forward to multiple investigations and potentially a whole lot of liability

28   here."

105.   "We are aware of the issues that have been raised but cannot comment on whether we are investigating," an FTC spokeswoman said in a statement on March 20, 2018. "We take any allegations of violations of our consent decrees very seriously."

106.   Facebook also said it expected to receive questions from the FTC related to potential violations of the 2011 consent decree. "We remain strongly committed to protecting people's information," Facebook's deputy chief privacy officer, Rob Sherman, said in a statement. "We appreciate the opportunity to answer questions the FTC may have."  Facebook could face fines of $40,000 a day per violation if the FTC finds that Facebook broke the agreement.

## VI.    DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9, AND BREACHED THEIR FIDUCIARY DUTIES, BY CAUSING FACEBOOK TO FILE A MATERIALLY MISLEADING PROXY STATEMENT IN 2017

107.   Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Facebook to issue proxy statements that failed to disclose the Cambridge Analytica incident or the seriously deficient internal controls and policies that allowed the breach to occur and helped perpetuate the damages to Facebook. Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

108.   The Exchange Act requires publicly traded companies to disclose to shareholders "material information," the kind of information that an investor would want to know to protect their investment.  The SEC issued guidance on public reporting of cybersecurity incidents, noting that the commission "encourages companies to continue to use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters."  In 2017, Facebook did not mention the Cambridge Analytica incident in any of its Form 8-K or Form 6-K filings.  Instead, Facebook made general statements in their most recent proxy statement and annual report on Form 10-K about potential, not actual, user privacy and data security risks, and certified that the Company's internal controls were adequate and complied with applicable laws (which necessarily include the FTC consent order).

109.   Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by

causing Facebook to issue the 2017 Proxy Statement that failed to disclose the Cambridge Analytica leak or the seriously deficient internal and disclosure controls that allowed the scheme to begin and helped perpetuate it.  Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

110.   On April 14, 2017, Defendants caused Facebook to file the 2017 Proxy Statement in connection with the 2017 annual stockholders meeting to be held on June 1, 2017.

111.   The 2017 Proxy Statement omitted any disclosures regarding (i) the Cambridge Analytica leak; (ii) Defendants' knowledge that Facebook's internal controls and systems were inadequate and ineffective to protect user information; (iii) Defendants' knowledge of data security failures that had actually materialized and had not been disclosed; (iv) the fact that Facebook's internal controls and systems were inadequate to ensure that the Company complied with applicable notification and disclosure requirements concerning the Cambridge Analytica leak; (v) the fact that Defendants failed to maintain appropriate policies and procedures to detect and prevent data security leaks and to protect user information; and (vi) the fact that Defendants failed to appropriately address Facebook's privacy practices and misleading claims regarding same as required by the FTC consent order; and (vii) as a result, Facebook may be in violation of the consent order.

112.   The 2017 Proxy Statement harmed Facebook by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors.  As a result of the false or misleading statements in the 2017 Proxy Statement, Facebook stockholders voted to re-elect all of the Defendants to the Board.

113.   The statements in the 2017 Proxy Statement conveyed that the Company's corporate governance structure was "effective" and provided "oversight of management and Board accountability." In reality, Facebook's corporate government structure allowed senior executives and the Board to sidestep real accountability and instead continue perpetuating the data security practices that led to the Cambridge Analytica leak, and fail to disclose or notify users of the leak.

114.   The 2017 Proxy Statement, which contained materially misleading statements and

1 thus deprived shareholders of adequate information necessary to make a reasonably informed

2 decision, caused the Company's stockholders to re-elect all of the Defendants to the Board while

3 they were breaching their fiduciary duties to Facebook and deliberately concealing material

4 information concerning the Cambridge Analytica leak and its effects on the Company's business

5 and reputation.

6
**VII.   CERTAIN DEFENDANTS SOLD THEIR FACEBOOK STOCK WHILE IN**
7 **POSSESSION OF MATERIAL, NONPUBLIC INFORMATION**

8          115.     During the relevant period, certain of the Defendants took advantage of the

9 artificial inflation of Facebook's shares caused by the Defendants' false or misleading statements

10 and omissions that failed to disclose the Cambridge Analytica incident or the nature and extent to

11 which the Company's internal controls and policies had permitted the breach to occur.

12 Specifically, Defendants Zuckerberg, Sandberg, and Koum (the "Insider Selling Defendants")

13 collectively sold or otherwise disposed of nearly $1.5 billion worth of their personally-held

14 shares of Facebook stock during that time, all while in the possession of material, non-public

15 information.   At the time of these stock transactions in 2018, all of the Insider Selling

16 Defendants knew about or recklessly disregarded material, non-public information regarding the

17 Cambridge Analytica incident and compromises to user information posed by Facebook's

18 inadequate internal controls described above, but nonetheless sold or otherwise disposed of

19 Facebook common stock on the basis of that information.

20          116.     Defendant Zuckerberg sold 5,423,200 of his Facebook shares for proceeds of over

21 $978 million, as detailed in the below chart.

| *SALE DATE* | *SHARES SOLD* | *PRICE PER SHARE* | *TOTAL SALE VALUE* |
|---|---|---|---|
| 3/15/18 | 50,354 | 182.8076 | $9,205,093.8904 |
| | 42,146 | 183.5057 | $7,734,031.2322 |
| | 70,380 | 182.8100 | $12,866,167.8000 |
| | 57,120 | 183.5140 | $10,482,319.6800 |
| | 4,700 | 182.8330 | $859,315.1000 |
| | 3,300 | 183.5383 | $605,676.3900 |
| | 6,400 | 182.3660 | $1,167,142.4000 |
| | 2,600 | 183.6315 | $477,441.9000 |
| | 5,790 | 182.9273 | $1,059,149.0670 |

| | | | |
|---|---|---|---|
| | 2,610 | 183.5884 | $479,165.7240 |
| | 51,740 | 184.3179 | $9,536,608.1460 |
| | 40,760 | 184.7805 | $7,531,653.1800 |
| | 69,305 | 184.3106 | $12,773,646.1330 |
| | 58,195 | 184.7696 | $10,752,666.8720 |
| 3/14/18 | 38,196 | 182.5204 | $6,971,549.1984 |
| | 39,668 | 183.4088 | $7,275,460.2784 |
| | 14,636 | 183.9882 | $2,692,851.2952 |
| | 54,565 | 182.5391 | $9,960,245.9915 |
| | 55,967 | 183.4711 | $10,268,327.0537 |
| | 16,968 | 184.0118 | $3,122,312.2224 |
| | 3,700 | 182.5476 | $675,426.1200 |
| | 4,000 | 183.5940 | $734,376.0000 |
| | 300 | 184.0467 | $55,214.0100 |
| | 3,958 | 182.5469 | $722,520.6302 |
| | 4,100 | 183.5156 | $752,413.9600 |
| | 942 | 184.0334 | $173,359.4628 |
| | 4,390 | 182.6240 | $801,719.3600 |
| | 4,010 | 183.7210 | $736,721.2100 |
| 3/13/18 | 39,654 | 181.9159 | $7,213,693.0986 |
| | 25,662 | 182.5314 | $4,684,120.7868 |
| | 12,745 | 183.8776 | $2,343,520.0120 |
| | 8,736 | 184.7237 | $1,613,746.2432 |
| | 5,703 | 185.5784 | $1,058,353.6152 |
| | 61,764 | 181.9615 | $11,238,670.0860 |
| | 29,682 | 182.6152 | $5,420,384.3664 |
| | 17,174 | 183.9100 | $3,158,470.3400 |
| | 11,998 | 184.7779 | $2,216,965.2442 |
| | 6,882 | 185.5838 | $1,277,187.7116 |
| 3/12/18 | 56,259 | 184.9030 | $10,402,457.8770 |
| | 36,241 | 185.5238 | $6,723,568.0358 |
| | 89,526 | 184.9565 | $16,558,415.6190 |
| | 37,974 | 185.6028 | $7,048,080.7272 |
| 3/9/18 | 29,494 | 183.9145 | $5,424,374.2630 |
| | 58,521 | 184.8903 | $10,819,965.2463 |
| | 4,485 | 185.2872 | $831,013.0920 |
| | 42,437 | 183.9401 | $7,805,866.0237 |
| | 81,763 | 184.9082 | $15,118,649.1566 |
| | 3,300 | 185.3174 | $611,547.4200 |
| | 3,100 | 184.0000 | $570,400.0000 |
| | 5,300 | 184.9411 | $980,187.8300 |
| 3/8/18 | 54,344 | 182.1316 | $9,897,759.6704 |
| | 25,064 | 182.7593 | $4,580,679.0952 |

| | | | |
|---|---|---|---|
| | | 13,092 | 183.8115 | $2,406,460.1580 |
| | | 73,627 | 182.1329 | $13,409,899.0283 |
| | | 36,710 | 182.7412 | $6,708,429.4520 |
| | | 17,163 | 183.8567 | $3,155,532.5421 |
| | | 5,600 | 182.1983 | $1,020,310.4800 |
| | | 2,100 | 183.2005 | $384,721.0500 |
| | | 700 | 184.0421 | $128,829.4700 |
| | 3/6/18 | 33,070 | 179.7218 | $5,943,399.9260 |
| | | 36,552 | 180.6023 | $6,601,375.2696 |
| | | 21,388 | 181.6404 | $3,884,924.8752 |
| | | 1,490 | 182.2221 | $271,510.9290 |
| | | 47,648 | 179.7348 | $8,564,003.7504 |
| | | 50,649 | 180.6427 | $9,149,372.1123 |
| | | 28,003 | 181.6809 | $5,087,610.2427 |
| | | 1,200 | 182.2583 | $218,709.9600 |
| | 3/5/18 | 14,000 | 176.5458 | $2,471,641.2000 |
| | | 14,800 | 177.3944 | $2,625,437.1200 |
| | | 7,119 | 178.4443 | $1,270,344.9717 |
| | | 15,949 | 179.7159 | $2,866,288.8891 |
| | | 39,432 | 180.5252 | $7,118,469.6864 |
| | | 1,200 | 181.0560 | $217,267.2000 |
| | | 17,817 | 176.5469 | $3,145,536.1173 |
| | | 21,159 | 177.3920 | $3,753,437.3280 |
| | | 9,392 | 178.3785 | $1,675,330.8720 |
| | | 18,928 | 179.6271 | $3,399,981.7488 |
| | | 56,204 | 180.4681 | $10,143,029.0924 |
| | | 4,000 | 181.0275 | $724,110.0000 |
| | 3/7/18 | 8,400 | 178.7554 | $1,501,545.3600 |
| | | 14,400 | 179.5805 | $2,585,959.2000 |
| | | 19,000 | 180.6881 | $3,433,073.9000 |
| | | 18,354 | 181.6478 | $3,333,963.7212 |
| | | 14,600 | 182.6832 | $2,667,174.7200 |
| | | 17,746 | 183.4958 | $3,256,316.4668 |
| | | 10,110 | 178.7595 | $1,807,258.5450 |
| | | 19,266 | 179.5193 | $3,458,618.8338 |
| | | 28,070 | 180.6818 | $5,071,738.1260 |
| | | 25,683 | 181.6701 | $4,665,833.1783 |
| | | 21,590 | 182.7483 | $3,945,535.7970 |
| | | 22,781 | 183.5253 | $4,180,889.8593 |
| | 3/2/18 | 11,701 | 173.5466 | $2,030,668.7666 |
| | | 8,300 | 174.4131 | $1,447,628.7300 |
| | | 61,979 | 175.3922 | $10,870,633.1638 |
| | | 10,220 | 176.4224 | $1,803,036.9280 |

| | | | |
|---|---|---|---|
| | | 300 | 177.0900 | $53,127.0000 |
| | | 33,350 | 173.5871 | $5,789,129.7850 |
| | | 26,100 | 174.5257 | $4,555,120.7700 |
| | | 56,678 | 175.4589 | $9,944,659.5342 |
| | | 11,072 | 176.3910 | $1,953,001.1520 |
| | | 300 | 177.0833 | $53,124.9900 |
| | 3/1/18 | 13,200 | 175.3678 | $2,314,854.9600 |
| | | 26,557 | 176.0592 | $4,675,604.1744 |
| | | 23,162 | 177.2413 | $4,105,262.9906 |
| | | 21,141 | 177.9807 | $3,762,689.9787 |
| | | 7,840 | 179.0141 | $1,403,470.5440 |
| | | 600 | 179.8733 | $107,923.9800 |
| | | 14,331 | 175.2523 | $2,511,540.7113 |
| | | 40,198 | 175.9982 | $7,074,775.6436 |
| | | 27,234 | 177.1312 | $4,823,991.1008 |
| | | 33,637 | 177.8752 | $5,983,188.1024 |
| | | 10,800 | 178.9037 | $1,932,159.9600 |
| | | 1,300 | 179.8477 | $233,802.0100 |
| | | 1,990 | 175.5253 | $349,295.3470 |
| | | 1,800 | 176.3161 | $317,368.9800 |
| | | 3,110 | 177.5659 | $552,229.9490 |
| | | 1,000 | 178.6820 | $178,682.0000 |
| | | 100 | 179.1500 | $17,915.0000 |
| | | 2,000 | 175.4565 | $350,913.0000 |
| | | 2,300 | 176.2939 | $405,475.9700 |
| | | 2,800 | 177.5057 | $497,015.9600 |
| | | 1,400 | 178.3079 | $249,631.0600 |
| | | 500 | 179.0720 | $89,536.0000 |
| | | 1,100 | 175.2491 | $192,774.0100 |
| | | 2,600 | 176.0169 | $457,643.9400 |
| | | 1,900 | 177.2800 | $336,832.0000 |
| | | 2,160 | 177.9768 | $384,429.8880 |
| | | 640 | 179.0466 | $114,589.8240 |
| | 2/28/18 | 5,720 | 178.6855 | $1,022,081.0600 |
| | | 12,200 | 180.1273 | $2,197,553.0600 |
| | | 21,709 | 181.3715 | $3,937,393.8935 |
| | | 49,471 | 182.0677 | $9,007,071.1867 |
| | | 3,400 | 182.7041 | $621,193.9400 |
| | | 8,340 | 178.7068 | $1,490,414.7120 |
| | | 18,968 | 180.1772 | $3,417,601.1296 |
| | | 32,808 | 181.4623 | $5,953,415.1384 |
| | | 64,584 | 182.1070 | $11,761,198.4880 |
| | | 2,800 | 182.7807 | $511,785.9600 |

| Date | Shares | Price | Total |
|---|---|---|---|
| | 475 | 178.7205 | $84,892.2375 |
| | 1,100 | 180.2350 | $198,258.5000 |
| | 3,900 | 181.6490 | $708,431.1000 |
| | 2,525 | 182.3432 | $460,416.5800 |
| | 513 | 178.7347 | $91,690.9011 |
| | 1,400 | 180.2050 | $252,287.0000 |
| | 4,587 | 181.6775 | $833,354.6925 |
| | 2,500 | 182.3860 | $455,965.0000 |
| | 473 | 178.6834 | $84,517.2482 |
| | 1,220 | 180.1543 | $219,788.2460 |
| | 4,007 | 181.6353 | $727,812.6471 |
| | 2,700 | 182.3452 | $492,332.0400 |
| 2/27/18 | 25,908 | 182.0866 | $4,717,499.6328 |
| | 39,523 | 182.9557 | $7,230,958.1311 |
| | 26,669 | 183.9030 | $4,904,509.1070 |
| | 400 | 184.5700 | $73,828.0000 |
| | 37,767 | 182.0902 | $6,877,000.5834 |
| | 53,210 | 182.9343 | $9,733,934.1030 |
| | 35,623 | 183.8542 | $6,549,438.1666 |
| | 900 | 184.5744 | $166,116.9600 |
| 2/26/18 | 14,641 | 183.9772 | $2,693,610.1852 |
| | 72,443 | 184.7040 | $13,380,511.8720 |
| | 5,416 | 185.4171 | $1,004,219.0136 |
| | 25,546 | 184.0579 | $4,701,943.1134 |
| | 96,054 | 184.7340 | $17,744,439.6360 |
| | 5,900 | 185.4402 | $1,094,097.1800 |
| 2/23/18 | 8,800 | 180.2089 | $1,585,838.3200 |
| | 28,821 | 181.2932 | $5,225,051.3172 |
| | 34,964 | 182.1698 | $6,369,384.8872 |
| | 19,915 | 182.9340 | $3,643,130.6100 |
| | 10,900 | 180.2267 | $1,964,471.0300 |
| | 35,833 | 181.2519 | $6,494,799.3327 |
| | 49,921 | 182.0920 | $9,090,214.7320 |
| | 30,846 | 182.9089 | $5,642,007.9294 |
| 2/22/18 | 21,650 | 178.1707 | $3,857,395.6550 |
| | 45,073 | 178.9453 | $8,065,601.5069 |
| | 25,777 | 179.7782 | $4,634,142.6614 |
| | 29,139 | 178.1500 | $5,191,112.8500 |
| | 65,795 | 178.9516 | $11,774,120.5220 |
| | 32,566 | 179.7975 | $5,855,285.3850 |
| | 2,800 | 178.2914 | $499,215.9200 |
| | 3,500 | 179.0542 | $626,689.7000 |
| | 2,100 | 179.8377 | $377,659.1700 |

| | | | |
|---|---|---|---|
| 2/21/18 | 15,205 | 176.9175 | $2,690,030.5875 |
| | 9,174 | 178.1222 | $1,634,093.0628 |
| | 28,682 | 178.9320 | $5,132,127.6240 |
| | 27,523 | 180.0341 | $4,955,078.5343 |
| | 11,916 | 180.7430 | $2,153,733.5880 |
| | 20,527 | 176.9389 | $3,632,024.8003 |
| | 14,421 | 178.2019 | $2,569,849.5999 |
| | 40,904 | 178.9892 | $7,321,374.2368 |
| | 37,249 | 180.1081 | $6,708,846.6169 |
| | 14,399 | 180.8002 | $2,603,342.0798 |
| | 1,600 | 176.8735 | $282,997.6000 |
| | 1,700 | 178.4194 | $303,312.9800 |
| | 2,200 | 179.2995 | $394,458.9000 |
| | 2,700 | 180.3337 | $486,900.9900 |
| | 200 | 181.0650 | $36,213.0000 |
| 2/20/18 | 30,189 | 175.6975 | $5,304,131.8275 |
| | 40,663 | 176.6435 | $7,182,854.6405 |
| | 21,648 | 177.4202 | $3,840,792.4896 |
| | 39,106 | 175.6746 | $6,869,930.9076 |
| | 57,651 | 176.6324 | $10,183,034.4924 |
| | 30,743 | 177.4187 | $5,454,383.0941 |
| 2/16/18 | 29,844 | 177.1036 | $5,285,479.8384 |
| | 22,202 | 178.1515 | $3,955,319.6030 |
| | 36,554 | 178.8717 | $6,538,476.1218 |
| | 3,900 | 179.6693 | $700,710.2700 |
| | 38,569 | 177.0706 | $6,829,435.9714 |
| | 30,828 | 178.0474 | $5,488,845.2472 |
| | 53,003 | 178.8491 | $9,479,538.8473 |
| | 5,100 | 179.6408 | $916,168.0800 |
| | 2,893 | 177.1733 | $512,562.3569 |
| | 2,900 | 178.4266 | $517,437.1400 |
| | 2,107 | 179.0808 | $377,323.2456 |
| | 100 | 179.7800 | $17,978.0000 |
| | 2,900 | 177.0914 | $513,565.0600 |
| | 2,200 | 178.1541 | $391,939.0200 |
| | 3,600 | 178.8794 | $643,965.8400 |
| | 300 | 179.6800 | $53,904.0000 |
| | 2,400 | 177.0367 | $424,888.0800 |
| | 1,700 | 177.8888 | $302,410.9600 |
| | 3,600 | 178.7918 | $643,650.4800 |
| | 700 | 179.5243 | $125,667.0100 |
| 2/15/18 | 8,008 | 177.5645 | $1,421,936.5160 |
| | 37,059 | 178.4507 | $6,613,204.4913 |

| | | | |
|---|---|---|---|
| | 44,233 | 179.4053 | $7,935,634.6349 |
| | 3,200 | 180.3313 | $577,060.1600 |
| | 10,931 | 177.5704 | $1,941,022.0424 |
| | 48,442 | 178.4164 | $8,642,847.2488 |
| | 63,662 | 179.3809 | $11,419,746.8558 |
| | 4,465 | 180.2660 | $804,887.6900 |
| | 1,500 | 177.8893 | $266,833.9500 |
| | 3,650 | 178.8003 | $652,621.0950 |
| | 2,650 | 179.5852 | $475,900.7800 |
| | 200 | 180.3650 | $36,073.0000 |
| | 1,600 | 177.8963 | $284,634.0800 |
| | 4,200 | 178.8908 | $751,341.3600 |
| | 2,800 | 179.5896 | $502,850.8800 |
| | 400 | 180.3575 | $72,143.0000 |
| | 1,400 | 177.7736 | $248,883.0400 |
| | 2,900 | 178.5521 | $517,801.0900 |
| | 3,694 | 179.4291 | $662,811.0954 |
| | 406 | 180.3357 | $73,216.2942 |
| 2/14/18 | 1,772 | 173.4880 | $307,420.7360 |
| | 14,005 | 174.9678 | $2,450,424.0390 |
| | 5,200 | 175.7685 | $913,996.2000 |
| | 24,400 | 176.9588 | $4,317,794.7200 |
| | 16,798 | 178.0848 | $2,991,468.4704 |
| | 25,355 | 179.1175 | $4,541,524.2125 |
| | 4,970 | 179.6034 | $892,628.8980 |
| | 3,836 | 173.6151 | $665,987.5236 |
| | 20,612 | 174.8769 | $3,604,562.6628 |
| | 7,209 | 175.8668 | $1,267,823.7612 |
| | 35,202 | 176.9656 | $6,229,543.0512 |
| | 20,777 | 178.0790 | $3,699,947.3830 |
| | 31,019 | 179.0714 | $5,554,615.7566 |
| | 8,845 | 179.5662 | $1,588,263.0390 |
| 2/13/18 | 8,117 | 173.8951 | $1,411,506.5267 |
| | 50,133 | 174.7686 | $8,761,674.2238 |
| | 1,500 | 175.3860 | $263,079.0000 |
| | 23,863 | 173.8930 | $4,149,608.6590 |
| | 89,802 | 174.5992 | $15,679,357.3584 |
| | 3,785 | 175.3731 | $663,787.1835 |
| 2/12/18 | 2,100 | 172.6457 | $362,555.9700 |
| | 5,100 | 173.5538 | $885,124.3800 |
| | 20,000 | 174.8800 | $3,497,600.0000 |
| | 25,025 | 175.5967 | $4,394,307.4175 |
| | 34,120 | 176.7343 | $6,030,174.3160 |

| | | | |
|---|---|---|---|
| | 6,155 | 177.2683 | $1,091,086.3865 |
| | 4,400 | 172.4355 | $758,716.2000 |
| | 13,693 | 173.3643 | $2,373,877.3599 |
| | 17,430 | 174.3833 | $3,039,500.9190 |
| | 38,335 | 175.3712 | $6,722,854.9520 |
| | 29,372 | 176.4228 | $5,181,890.4816 |
| | 24,270 | 177.0925 | $4,298,034.9750 |
| *TOTAL NUMBER OF SHARES* | **5,423,200** | *TOTAL VALUE OF SHARES* | **$978,496,893.8126** |

117.   Defendant Sandberg sold 196,684 of her Facebook shares for proceeds of over $35 million, as detailed in the below chart.

| *SALE DATE* | *SHARES SOLD* | *PRICE PER SHARE* | *TOTAL SALE VALUE* |
|---|---|---|---|
| 2/14/2018 | 1,900 | 173.4588 | $329,571.72 |
| 2/14/2018 | 10,900 | 174.9736 | $1,907,212.24 |
| 2/14/2018 | 6,300 | 176.5354 | $1,112,173.02 |
| 2/14/2018 | 12,525 | 177.1428 | $2,218,713.57 |
| 2/14/2018 | 10,500 | 178.3241 | $1,872,403.05 |
| 2/14/2018 | 12,875 | 179.3158 | $2,308,690.93 |
| 2/15/2018 | 17,038 | 179.5200 | $3,058,661.76 |
| 2/15/2018 | 6,461 | 179.5200 | $1,159,878.72 |
| 2/15/2018 | 8,185 | 179.5200 | $1,469,371.20 |
| 3/2/2018 | 18,200 | 173.6200 | $3,159,884.00 |
| 3/2/2018 | 11,080 | 174.5121 | $1,933,594.07 |
| 3/2/2018 | 22,236 | 175.4910 | $3,902,217.88 |
| 3/2/2018 | 3,484 | 176.4824 | $614,864.68 |
| 3/15/2018 | 28,866 | 182.7890 | $5,276,387.27 |
| 3/15/2018 | 26,134 | 183.5057 | $4,795,737.96 |
| *TOTAL NUMBER OF SHARES* | **196,684** | *TOTAL VALUE OF SHARES* | **$35,119,362.07** |

118.   Defendant Koum sold 2,485,347 of her Facebook shares for proceeds of over $442 million, as detailed in the below chart.

| *SALE DATE* | *SHARES SOLD* | *PRICE PER SHARE* | *TOTAL SALE VALUE* |
|---|---|---|---|
| 2/15/2018 | 1,231,441 | 179.5200 | $221,068,288.32 |

| 2/15/2018 | 371,500 | 175.6494 | $65,253,752.10 |
| 2/20/2018 | 580,736 | 176.5977 | $102,556,641.91 |
| 2/20/2018 | 301,670 | 177.4104 | $53,519,395.37 |
| **TOTAL NUMBER OF SHARES** | **2,485,347** | **TOTAL VALUE OF SHARES** | **$442,398,077.70** |

119.    Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Facebook to issue proxy statements that failed to disclose the Cambridge Analytica incident or the seriously deficient internal controls and policies that allowed the breach to occur and helped perpetuate the damages to Facebook.  Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

120.    The Exchange Act requires publicly traded companies to disclose to shareholders "material information," the kind of information that an investor would want to know to protect their investment.  The SEC issued guidance on public reporting of cybersecurity incidents, noting that the commission "encourages companies to continue to use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters."  In 2017 and until at least March 15, 2018, Facebook did not mention the Cambridge Analytica incident in any of its Form 8-K or Form 6-K filings.  Instead, Facebook made general statements in their most recent proxy statement and annual report on Form 10-K about potential, not actual, user privacy and data security risks, and certified that the Company's internal controls were adequate and complied with applicable laws (which necessarily include the FTC consent order).  By trading while in possession of this material, non-public information, the Insider Selling Defendants breached their fiduciary duties.

## VIII.   DAMAGES TO FACEBOOK

121.    Defendants' misconduct has wrought extreme reputational damage upon the Company.  This is especially harmful to Facebook because the Company is built on customer trust.

122.    Defendants breached this trust by acting in direct contravention of the Company's publicly-touted credo.  This reputational harm undoubtedly translates into long-term damage to

the Company.

123.    The illegal practices and Defendants' gross failures to timely address, remedy, or disclose them also severely damaged Facebook's reputation within the business community and in the capital markets, as evidenced by, for example, the more than $50 billion loss in market capitalization after the Cambridge Analytica incident, and Defendants' knowledge of or conscious disregard of it, were revealed.  Further, Facebook's customers and current and potential investors consider the Company's ability to protect its users' personal information, and implement adequate controls to ensure practices that may be violative of user privacy are timely discovered and properly addressed.  This has harmed Facebook, as customers are less likely to use websites that knowingly permit or encourage unscrupulous behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information.  Thus, Facebook's ability to attract customers and investors is now impaired.

124.    Further, as a direct and proximate result of Defendants' actions, Facebook has expended and will continue to expend significant additional money, including: costs incurred in defending against, and the potential settlement of, civil and criminal legal proceedings brought against the Company related to the unauthorized sharing and use of users' personal information; and costs incurred from the substantial compensation and benefits paid to Defendants, who are responsible for the scheme.

## IX.    DEMAND ON FACEBOOK'S BOARD WAS FUTILE AND THUS, EXCUSED

125.    Plaintiff has not made a demand on the Board to institute this action against Defendants because, for the reasons detailed above and as further set forth below, any such demand would be a futile and useless act.

126.    The facts detailed in this Complaint demonstrate that the Defendants (i) affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law, which is not a legally protected business decision and can in no way be considered a valid exercise of business judgment; and/or (ii) consciously disregarded numerous red flags of misconduct throughout the relevant period, subjecting them to a substantial likelihood of liability as to Plaintiff's claims against them in this action.

Accordingly, demand on the Board is excused.

127.   At the time this action was filed, Facebook's Board consisted of nine members, defendants Zuckerberg, Sandberg, Andreessen, Thiel, Hastings, Bowles, Koum, Desmond-Hellman, and Kenneth Chenault.

### A.   DEMAND IS EXCUSED BECAUSE THE BOARD'S CONDUCT DID NOT CONSTITUTE A VALID EXERCISE OF BUSINESS JUDGMENT

128.   Plaintiffs did not make a demand on the Facebook Board prior to instituting this action because the wrongful acts complained of in this Complaint evidence a pattern of conduct showing a wholesale abandonment of Defendants' fiduciary duties. Those acts, which are detailed above, include, among other things: allowing Facebook to maintain policies that allowed the Company to facilitate and engage in the pervasive user information sharing scheme that involved marketing its targeted political advertisements to advertisers and maintaining policies that allowed app developers to access user information without their knowledge and consent, in violation of the Company's representations to users; allowing Facebook insiders to engage in insider selling while in possession of material, non-public information relating to the breach; maintaining woefully inadequate internal controls over the Company's disclosures and notification procedures, corporate governance, and risk monitoring, which allowed the unauthorized information sharing to persist for years, and allowed the Defendants to sell millions of dollars' worth of their Facebook stock at prices that were artificially inflated due to Defendants' misconduct; and causing Facebook to file materially false and misleading SEC filings.

129.   These acts, and the other improper acts set forth in this Complaint, which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment, nor could they have been.

130.   Defendants' misconduct at the heart of this case constitutes the direct facilitation of violations of federal, state, and international laws, including knowingly and consciously presiding over the Company's systematic deficiencies and unsound user privacy practices, as well as concealing Facebook's involvement in the illicit scheme. Among other things, the Defendants made, or caused Facebook to make, materially false or misleading statements (such

as in Facebook's 2017 Proxy Statement filed with the SEC during the relevant period).

131.    Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicate they knowingly adopted, endorsed, or condoned a business strategy that incorporated the illicit creation of unauthorized accounts, which cannot be considered a legitimate exercise of business judgment. Demand is therefore excused.

**B.    DEMAND IS EXCUSED BECAUSE DEFENDANTS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY DUE TO THEIR KNOWLEDGE OR CONSCIOUS DISREGARD OF FACTS RELATING TO THE CAMBRIDGE ANALYTICA LEAK AND THE COMPANY'S INADEQUATE INTERNAL CONTROLS**

132.    Demand is also excused because the Defendants face a substantial likelihood of liability for the claims alleged against them in this Complaint, given their awareness or conscious disregard of significant red flags relating to the illicit account-creation scheme, and failure to fulfill their duty of oversight by maintaining an adequate system of internal controls that is reasonably designed to detect and prevent wrongdoing.

133.    Defendants were aware of the weaknesses of Facebook's user privacy controls and failed to address and repair them.  Defendants also were aware of yet disregarded their affirmative obligations to oversee Facebook's compliance with the 2011 consent order entered into with the FTC.

134.    Section VII of the consent order provides, in relevant part, that "[Facebook] shall deliver a copy of this order to all current and future principals, officers, directors, and managers; (2) all current and future employees, agents, and representatives having supervisory responsibilities relating to the subject matter of this order, and (3) any business entity resulting from any change in structure…. [Facebook] shall deliver this order to such current personnel within thirty (30) days after service of this order, and to such future personnel within thirty (30) days after the person assumes such position or responsibilities."

135.    Thus, each of the Defendants received the consent order, pursuant to Section VII, and therefore had knowledge of the issues addressed therein and the Company's affirmative obligations under the agreement.  Yet, Defendants failed to act to ensure the Company complied with the consent order.

136.    The members of the Audit Committee failed to meet their obligations as provided in the Audit Committee Charter, in addition to their duties imposed by law, because despite the numerous regulatory fines, investigations, and reports finding fundamental failings in the Company's internal controls, they did not cause Facebook to remediate those control deficiencies. The Audit Committee's deliberate failure of oversight constituted breaches of their fiduciary duties to Facebook and has resulted in significant harm to the Company.

137.    Further, the Audit Committee members were charged with assisting the Board in overseeing the integrity of the Company's financial statements and the adequacy and reliability of disclosures to its stockholders, including the Company's internal controls.

138.    But Facebook's internal and disclosure controls were deficient, causing Facebook to issue materially false and misleading information regarding the Company's practices.  The Audit Committee was directly responsible for approving the Company's materially false and misleading 2017 Proxy Statement.

139.    Accordingly, there is significant doubt that the Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, as well as other violations of law.

140.    Given their membership on the Audit and/or Compensation & Governance Committees, their respective responsibilities under the respective charters in effect during the relevant period, and their failures to meet them, Defendants face a substantial likelihood of liability for the misconduct alleged in this Complaint, and making a demand on the Board would therefore be futile.

141.    The entire Board had the duty to ensure Facebook's systems were sufficiently well-designed to protect user information and detect suspicious activity at the developer level with respect to same. The Board's duty was heightened by the fact that the FTC imposed affirmative obligations with respect to the Company's user privacy practices in the 2011 Consent Order.

142.    The Board failed to fulfill that duty, and its failure is even more egregious in light of the many blatant warnings both before and during the relevant period that Facebook's systems

were not sufficient to address the misconduct at issue in this Complaint. Given the Board's awareness and deliberate concealment of the breach from the public, and Facebook's failure to notify affected users in accordance with applicable statutes—wrongful actions that resulted in the retention and unauthorized use of millions of users' personal information for over several years—it is clear the Board either deliberately or recklessly failed to take remedial action to stop the practices that allowed the illicit scheme to continue.

143.    For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

144.    Defendants' failure to meet their fiduciary obligations also allowed certain Facebook insiders to reap unlawful profits from selling or disposing of Facebook shares at artificially inflated prices.

145.    All of the Defendants failed to exercise any oversight over the insider sales transactions and failed to implement reasonable internal controls with respect to same. Accordingly, a clear majority of the Board is unable to consider a demand to investigate Plaintiffs' allegations that the Insider Selling Defendants engaged in illegal insider selling of Company stock, committed other wrongdoing in violation of their fiduciary duties, and artificially inflated the Company's stock price for their own personal gain. Defendants cannot investigate allegations of the other Defendants' wrongdoing in a disinterested and independent manner.

146.    In light of the foregoing facts, Defendants face a substantial likelihood of liability in this case, thus rendering demand on them futile.

### C.    DEMAND IS EXCUSED BECAUSE FACEBOOK IS "CONTROLLED" BY ZUCKERBERG AND THE BOARD ADMITTEDLY LACKS INDEPENDENCE

147.    According to Facebook's 2017 Proxy Statement:

Because Mr. Zuckerberg controls a majority of our outstanding voting power, *we are a "controlled company"* under the corporate governance rules of the NASDAQ Stock Market LLC (NASDAQ).  Therefore, *we are not required to have a majority of our board of directors be independent*, nor are we required to have a compensation committee or an independent nominating function. In light of our status as a controlled

company, our board of directors has determined not to have an independent nominating function and to have the full board of directors be directly responsible for nominating members of our board.

148.     Defendants Andreesen and Thiel lack independence from Zuckerberg and have demonstrated personal bias in favor of keeping founders in control of the companies they created.

149.     For Andreesen, this bias is deep-rooted.  When he and his partner, Ben Horowitz ("Horowitz"), were trying to get Loudcloud, a company that they co-founded, on its feet, the venture capitalist providing their funding advised Horowitz to cut Andreessen out of the project altogether.  Based on this experience, when Andreesen and Horowitz founded their own venture capital firm, Andreessen Horowitz, they "set out to design a venture capital firm that would enable founders to run their own companies" without interference from the financial backers.

150.     Andreessen also lacks independence from Zuckerberg based on the highly lucrative deals that Andreessen and his firm have made with Zuckerberg in the past few years.

151.     Andreessen Horowitz has seen two of its portfolio companies purchased by Facebook – Instagram and Oculus VR.  Andreessen turned his firm's $250,000 investment in Instragram into $78 million when the $1 billion acquisition by Facebook closed. Andreessen would not have even been able to invest in Oculus VR without Zuckerberg.  Andreessen had declined to invest in the company previously, but desperately wanted to invest by the fall of 2013, according to an October 2015 Vanity Fair article.   When Oculus VR's CEO seemed reluctant to allow the investment, Andreessen reportedly had Zuckerberg talk to the CEO about Andreessen.  Andreessen Horowitz got the deal and Andreessen became one of four board members for the fledgling company.  Not very long after, Zuckerberg offered $2 billion for Facebook to acquire Oculus VR.

152.     Andreessen knows that his firm's access to the best investments – its "deal flow" – relies heavily on his relationship with Zuckerberg and Facebook.  In a May 18, 2015 New Yorker article titled "Tomorrow's Advance Man," Andreessen reportedly said that "Deal flow is everything. If you're in a second-tier firm, you never get a chance at that great company." Andreessen Horowitz saw its biggest successes after "logo shopping" to add Facebook to the

firm's portfolio in 2010. Within two years of that investment, "Andreessen Horowitz was the talk of the town."

153.    Defendant Thiel was one of the early investors in Facebook.  He co-founded PayPal, Inc., and has been a Partner of the Founders Fund, a venture capital firm that strives to keep founders in control of the companies they have created, since 2005.  Thiel's venture capital fund, The Founders Fund, is marketed on the principle that company founders should have long-term control of the companies they create.  In fact, the Fund's website touts Facebook as a primary example of that maxim, stating that "we have often tried to ensure that founders can continue to run their businesses through voting control mechanisms, as Peter Thiel did with Mark Zuckerberg and Facebook."

154.    Thiel, like Andreessen, has greatly benefited by his relationship with Zuckerberg and his seat on the Facebook Board. The Founders Fund gets "good deal flow" from this high profile association.

155.    Defendant Hastings also lacks independence from Zuckerberg.  Defendant Hastings is a co-founder of Netflix, and currently serves as its CEO and Chairman of its board of directors.  In addition to being sympathetic to Zuckerberg's desire to maintain founder's control due to his own founder role at Netflix, Hastings has every incentive to cater to Zuckerberg's desires at Facebook due to Facebook's business relationship with Netflix. Through the "Friends and Community" initiative launched in March 2013, Netflix enjoyed very valuable word-of-mouth type marketing because the initiative allows Facebook users to share data about their Netflix viewing habits with their Facebook friends. Hastings would not want to risk losing this relationship, as the initiative's launch caused Netflix's share price to climb 6%, and displeasing Zuckerberg could mean an end to such valuable data sharing.

156.    Defendant Desmond-Hellmann lacks independence from defendant Zuckerberg due to their close business and personal relationships.  As Lead Independent Director, Desmond-Hellmann serves as a liaison between Zuckerberg and the Board's independent directors.

X.      CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty (Against All Defendants)

157.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

158.    Each of the Defendants owed and owe fiduciary duties to Facebook and its stockholders. By reason of their fiduciary relationships, the Defendants specifically owed and owe Facebook the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.  Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to Facebook and its stockholders by failing to act to ensure Facebook maintained adequate internal controls to comply with the consent order and other applicable laws.

159.    Defendants, individually and in concert, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to Facebook to protect its rights and interests.  In breach of their fiduciary duties owed to Facebook, the Defendants willfully participated in misrepresentations related to the Company's cross-selling, risk controls, and internal and disclosure controls, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors and officers, rendering them personally liable to the Company for breaching their fiduciary duties.

160.    Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Facebook's

securities.

161.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

162.     Additionally, the Defendants have affirmative obligations under the FTC Consent Order, as well as specific fiduciary duties as defined by the charters of various Board committees that, had they been discharged in accordance with the Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

163.     Defendants' actions detailed in this Complaint were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

164.     As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, Facebook has sustained and continues to sustain significant damages. As a result of the misconduct alleged in this Complaint, the Defendants are liable to the Company.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information

### (Against the Insider Selling Defendants)

165.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

166.     At the time of the stock sales set forth above, the Insider Selling Defendants knew or recklessly disregarded the information described in this Complaint regarding the breach and illicit data sharing and sold Facebook common stock on the basis of that information.

167.     The information described above was non-public information concerning the Company's unlawful conduct associated with its business strategy to generate revenues through targeted advertising.  The information was a proprietary asset belonging to the Company, which the Defendants used for their own benefit when they sold Facebook common stock.

168.     Defendants' sales of Facebook common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

169.     Because the use of the Company's proprietary information for their own gain constitutes a breach of the Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### THIRD CAUSE OF ACTION

### Unjust Enrichment

### (Against All Defendants)

170.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

171.     During the relevant period, Defendants received bonuses, stock options, stock, or similar compensation from Facebook that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of the Defendants' bad faith conduct, violation of the Company's code of ethics, and self-dealing.

172.     Plaintiff, as a shareholder and representative of Facebook, seeks restitution from Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

### FOURTH CAUSE OF ACTION

### Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9

### (Against All Defendants)

173.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth in this paragraph, except to the extent those allegations plead knowing or reckless conduct by the Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

174.     SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

175.    Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2017 Proxy Statement. The 2017 Proxy Statement contained proposals to Facebook's stockholders urging them to re-elect the members of the Board and vote against stockholder proposals for the Company to adopt a policy to require the Company to disclose information about its political dealings and Facebook's connections to the "disinformation campaign" that occurred during the 2016 election.  The 2017 Proxy Statement, however, misstated or failed to disclose (i) deficiencies in Facebook's internal and disclosure controls that were known to the Board when the Proxy Statement was filed; (ii) internal controls failures known to the Board when the Proxy Statement was filed, which failed to address the illicit account-creation scheme and thousands of related employee terminations; and (iii) the fact that Facebook and Defendants learned of the Cambridge Analytica leak, and knew that Facebook faced significant reputational harm when the truth would inevitably unfold.  Thus, the 2017 Proxy Statement soliciting materials were materially false and misleading.  By reasons of the conduct alleged in this Complaint, the Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of the Defendants' wrongful conduct, Facebook misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Facebook's recommendation to re-elect the directors who are members of the current Board, and to vote against stockholder proposals for the Company to disclose information about its political dealings and Facebook's connections to the "disinformation campaign" that occurred during the 2016 presidential election.

176.    The 2017 Proxy Statement soliciting materials were materially false and misleading because they falsely stated that the Company's Board of Directors maintained

effective internal controls and exercised adequate risk oversight over management and failed to disclose to the Company's shareholders material deficiencies in the Company's internal controls relating to user privacy and data security, and with respect to the Board's oversight of risk management.

177. The Board also knowingly agreed to include the false statements in the 2017 Proxy Statement since it believed that, had it admitted its own ineffectiveness in oversight of risk management, such admission would have led to the Defendants' own personal liability for breaching their fiduciary duties as Board members. Thus, the Board acted in bad faith and in a disloyal manner.

178. By reason of the conduct alleged herein, Defendants, who caused the issuance of the 2017 Proxy Statement, violated Section 14(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Defendants misled and/or deceived Facebook shareholders by falsely portraying material facts concerning the Board's risk oversight and the Company's internal controls. As a result of the false statements and material omissions, Facebook shareholders were deceived. The false statements and material omissions were material because there is a substantial likelihood that a reasonable shareholder would consider the information important in deciding how to vote with respect to the matters contained in the proxy, which were submitted for shareholder approval at the 2017 annual meeting.

179. The misleading information contained in the 2017 Proxy Statement was material to Facebook's stockholders in determining whether or not to elect the Defendants to the Board and was material to the integrity of the directors that were proposed for election to the Board. The proxy-solicitation process in connection with the Proxy Statements was an essential link in (i) the re-election of nominees to the Board and (ii) the decision not to approve the proposal requiring the Company to disclose information about its political dealings and Facebook's connections to the "disinformation campaign" that occurred during the 2016 election.

180. Plaintiff, on behalf of Facebook, thereby seeks injunctive and equitable relief because the conduct of the Defendants named herein interfered with Plaintiff's voting rights and choices at the 2017 annual meeting. Plaintiff does not seek any monetary damages for the proxy

law violations.

181.    This action was timely commenced within three years of the date of the 2017 Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## FIFTH CAUSE OF ACTION

### Violation of Section 25402 of the California Corporations Code

### (Against the Insider Selling Defendants)

182.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

183.    At the time that the Insider Selling Defendants—Zuckerberg, Sandberg, and Koum—sold their Facebook common stock as set forth in this Complaint, by reason of their high executive or directorship positions with Facebook, these Defendants had access to highly material information regarding the Company, including the information set forth in this Complaint regarding the illicit account-creation scheme. Further, the Insider Selling Defendants received millions of dollars of proceeds from trading on material, non-public information, which information was an asset of, and belonged exclusively to, Facebook.

184.    At the time of the Insider Selling Defendants' sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of Facebook shares at that time.

185.    Each of the Insider Selling Defendants had actual knowledge of material, adverse, non-public information and thus sold their Facebook common stock in California in violation of California Corporations Code § 25402.

186.    Pursuant to California Corporations Code § 25502.5, each of the Insider Selling Defendants is liable to Facebook for damages in an amount up to three times the difference between the price at which Facebook common stock was sold by the Defendant and the market value that stock would have had at the time of the sale if the information known to the Defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

## SIXTH CAUSE OF ACTION

### Violation of Section 25403 of the California Corporations Code

### (Against All Defendants)

187.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

188.    Defendants, through their positions, possessed control and influence over the Insider Selling Defendants' sale of Facebook common stock in violation of the California Corporations Code.  Defendants are statutorily liable to the same extent as the Insider Selling Defendants under California Corporations Code § 25403.

189.    Defendants were aware of the Insider Selling Defendants' knowledge of the material adverse non-public information, and the Defendants were aware of the Insider Selling Defendants' intent to sell Facebook common stock while in possession of material adverse non-public information.

190.    Defendants are culpable for the Insider Selling Defendants' underlying violations of California Corporations Code § 25402 because of their knowledge and ability to control and influence the Insider Selling Defendants and due to their involvement in preparing, approving, and signing the Company's false or misleading Form 10-Ks, and Proxy Statements during the relevant period.

191.    Under California Corporations Code § 25403, each of the Defendants is liable to Facebook for damages in an amount up to three times the difference between the price at which Facebook common stock was sold by the Defendant and the market value that stock would have had at the time of the sale if the information known to the Defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**SEVENTH CAUSE OF ACTION**

**Contribution and Indemnification**

**(Against All Defendants)**

192.    Plaintiff incorporates by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

193.    This claim is brought derivatively on behalf of the Company against Defendants for contribution and indemnification.

194.    Facebook is named as a defendant in a putative shareholder class action filed in this District on March 20, 2018, asserting claims under the federal securities laws for, inter alia, false and misleading statements related to the Company's user privacy practices.  In the event the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Defendants as alleged herein. The Company is entitled to receive contribution from those Defendants in connection with the securities fraud class action against the Company currently pending in this District.

195.    Accordingly, Facebook is entitled to all appropriate contribution or indemnification from Defendants.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand for a judgment as follows:

A.    Determination that this action is a proper derivative action maintainable under the law and that demand was excused as futile;

B.    Declaring that Defendants have breached their fiduciary duties to Facebook;

C.    Determining and awarding to Facebook the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.    Directing Facebook to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

resolutions for amendments to the Company's by-laws or articles of incorporation, and taking such other actions as may be necessary to place before stockholders for a vote the following corporate governance policies:

    i.    a proposal to strengthen Board oversight and supervision of Facebook's data security practices;

    ii.    a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public; and

    iii.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

E.    Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of Facebook, has an effective remedy;

F.    Awarding to Facebook restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of state securities laws;

G.    Declaring that the 2017 Proxy Statement contained materially false and misleading statements;

H.    Canceling the votes to re-elect the Defendants to the Board in connection with the annual shareholder meeting in 2017, and ordering Defendants to disgorge to the Company all compensation they received for service on the Board following the invalid election;

I.    Awarding to Plaintiff costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

J.    Granting such other and further relief as the Court deems just and proper.

XII.    **JURY DEMAND**

Plaintiff respectfully demands trial by jury on all issues so triable.

Dated: March 22, 2018            **COTCHETT, PITRE & McCARTHY, LLP**

_/s/ Mark C. Molumphy_
                         **MARK C. MOLUMPHY**

*Attorneys for Plaintiff Jeremiah F. Hallisey,*
*Derivatively on behalf of Facebook, Inc.*

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**SHAREHOLDER DERIVATIVE COMPLAINT**                                    59

1

**VERIFICATION**

2

3    I, JEREMIAH F. HALLISEY, declare:

4         I am a plaintiff in this action.  I am also a shareholder of FACEBOOK, INC. and have

5    been during the relevant time period.  I certify under penalty of perjury that I have read and

6    reviewed the Shareholder Derivative Complaint and authorized its filing.  Based upon my and

7    my counsel's investigation, the contents of the Shareholder Derivative Complaint are true to the

8    best of my knowledge, information and belief.

9

10   Dated: March __29__, 2018                                    _____

11                                                                                   JEREMIAH F. HALLISEY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28