Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
  blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Paul J. Collins (SBN 187709)
  pcollins@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone:  650.849.5300
Facsimile:  650.849.5333

*Attorneys for Nominal Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FACEBOOK, INC. SHAREHOLDER DERIVATIVE PRIVACY LITIGATION<br><br><br><br>This Document Relates To:<br><br>ALL ACTIONS | LEAD CASE NO. 4:18-CV-01792-HSG<br><br>ASSOCIATED CASES: NOS. 4:18-CV-01834-HSG, 4:18-CV-01893-HSG, 4:18-CV-01929-HSG, 4:18-CV-02011-HSG<br><br>**FACEBOOK, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT PURSUANT TO FED. R. CIV. P. 23.1; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing:**<br>Date:       November 15, 2018<br>Time:       2:00 P.M.<br>Location:   Courtroom 2, 4th Floor<br>Judge:      Hon. Haywood S. Gilliam, Jr.<br><br><br>Date First Action Filed: March 22, 2018 |

Gibson, Dunn &
Crutcher LLP

1

## **TABLE OF CONTENTS**

2  MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

3  STATEMENT OF ISSUES TO BE DECIDED .......................................................... 1

4  I.  PRELIMINARY STATEMENT ........................................................................ 2

5  II.  SUMMARY OF PLAINTIFFS' ALLEGATIONS ............................................. 4

6  III.  LEGAL STANDARD FOR PLEADING DEMAND FUTILITY ......................... 8

7  IV.  PLAINTIFFS FAIL TO DEMONSTRATE THAT A MAJORITY OF THE  BOARD
8      FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY ......................... 9

9      A.  Plaintiffs Admit That Facebook Has A Reporting System And Internal
        Controls. ........................................................................................ 11

10     B.  Plaintiffs Do Not Adequately Allege That The Individual Defendants Knew Of
11         And Ignored Control Deficiencies. ................................................... 12

12          1.  Plaintiffs Fail To Show That Litigation And Regulatory Matters Were
                Known To The Individual Defendants Or Related To Misappropriation
13              Or Misuse Of User Data By Third Parties. ......................... 13

14          2.  Plaintiffs Fail To Demonstrate That Information From A Purported
                "Whistleblower" Was A Red Flag. ..................................... 14

15          3.  Plaintiffs' Allegations Regarding The Use Of Facebook To Spread
16              Misinformation By "Bad Actors" Is Not A Red Flag. ................. 15

17     C.  The Individual Defendants Also Do Not Face A Substantial Likelihood Of
           Liability On Plaintiffs' Non-Oversight Related Claims ......................... 16

18  V.  PLAINTIFFS FAIL TO ALLEGE FACTS SHOWING THAT ANY MEMBER OF
19      THE BOARD LACKED INDEPENDENCE, LET ALONE A MAJORITY ................. 20

20  VI.  CONCLUSION .......................................................................... 25

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
    158 Cal. App. 4th 226 (2007)..............................................................................................19

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ...............................................................................9, 20, 21, 22, 25

*Beam v. Stewart*,
    845 A.2d 1040 (Del. 2004) ...............................................................................8, 20, 21, 22, 24

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) ...................................................................................................8, 9, 22

*City of Birmingham Ret. & Relief Sys. v. Good*,
    177 A.3d 47 (Del. 2017) ...............................................................................................10, 11

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007)..............................................................................................9, 20

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003)..............................................................................................10

*Horman v. Abney*,
    2017 WL 242571 (Del. Ch. Jan. 19, 2017) ....................................................................4, 12, 13

*In re Brocade Commc'ns Sys., Inc. Deriv. Litig.*,
    615 F. Supp. 2d 1018 (N.D. Cal. 2009) ...........................................................................20

*In re Caremark Int'l Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996)..............................................................................................3, 10

*In re Citigroup Inc. S'holder Deriv. Litig.*,
    964 A.2d 106 (Del. Ch. 2009)..............................................................................................8, 17, 18

*In re Dow Chem. Co. Deriv. Litig.*,
    2010 WL 66769 (Del. Ch. Jan. 11, 2010) ........................................................................13, 15, 21

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    922 F. Supp. 2d 445 (S.D.N.Y. 2013)................................................................................23, 24

*In re Google, Inc. S'holder Deriv. Litig.*,
    2013 WL 5402220 (N.D. Cal. Sept. 26, 2013) ................................................................20, 21, 24

*In re Impax Labs., Inc. S'holder Deriv. Litig.*,
    2015 WL 5168777 (N.D. Cal. Sept. 3, 2015) ..................................................................8, 16

*In re infoUSA, Inc. S'holders Litig.*,
    953 A.2d 963 (Del. Ch. 2007)..............................................................................................22

Gibson, Dunn &
Crutcher LLP

*In re Paypal Holdings., Inc. S'holder Deriv. Litig.*,
    2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ................................................................9, 10

*In re Sagent Tech., Inc., Deriv. Litig.*,
    278 F. Supp. 2d 1079 (N.D. Cal. 2003) ...........................................................................19

*In re Tyson Foods, Inc.*,
    919 A.2d 563 (Del. Ch. 2007)..........................................................................................25

*In re Verifone Holdings., Inc. S'holder Deriv. Litig.*,
    2009 WL 1458233 (N.D. Cal. May 26, 2009) ..................................................................19

*Jacobs v. Yang*,
    2004 WL 1728521 (Del. Ch. Aug. 2, 2004)......................................................................23

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) .............................................................................................................8

*Lieblein v. Ersek*,
    2016 WL 1274399 (D. Colo. Mar. 31, 2016) ...................................................................15

*Louisiana Mun. Police Emps.' Ret. Sys. v. Wynn*,
    829 F.3d 1048 (9th Cir. 2016).......................................................................8, 21, 22, 24

*Lyondell Chem. Co. v. Ryan*,
    970 A.2d 235 (Del. 2009) .................................................................................................10

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) ...............................................................................................18

*Melbourne Mun. Firefighters' Pension Tr. Fund on Behalf of Qualcomm, Inc. v.
    Jacobs*,
    2016 WL 4076369 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017)...............12

*Okla. Firefighters Pension & Ret. Sys. v. Corbat*,
    2017 WL 6452240 (Del. Ch. Dec. 18, 2017) .............................................11, 13, 14, 15

*Pirelli Armstrong Tire Corp. Ret. Med. Benefits Trust v. Raines*,
    534 F.3d 779 (D.C. Cir. 2008) ...........................................................................................8

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr.* v. *Lundgren*,
    579 F. Supp. 2d 520 (S.D.N.Y. 2008) ..............................................................................18

*In re Polycom, Inc.*,
    78 F. Supp. 3d 1006 (N.D. Cal. 2015) .............................................................................12

*Potter v. Hughes*,
    546 F.3d 1051 (9th Cir. 2008)........................................................................................8, 9

MOTION TO DISMISS PURSUANT TO FRCP 23.1
LEAD CASE NO. 4:18-CV-01792-HSG

Gibson, Dunn &
Crutcher LLP

*Quadrant Structured Prod. Co. v. Vertin*,
　102 A.3d 155 (Del. Ch. 2014)......................................................................................................19

*Quinn v. Anvil Corp.*,
　620 F.3d 1005 (9th Cir. 2010)........................................................................................................8

*Rales v. Blasband*,
　634 A.2d 927 (Del. 1993) .........................................................................................................9, 20

*Rosenbloom v. Pyott*,
　765 F.3d 1137 (9th Cir. 2014).......................................................................................................8

*Ryan v. Gifford*,
　918 A.2d 341 (Del. Ch. 2007)......................................................................................................10

*South v. Baker*,
　62 A.3d 1 (Del. Ch. 2012).......................................................................................................12, 14

*Stone v. Ritter*,
　911 A.2d 362 (Del. 2006) ..................................................................................................3, 10, 11

*Telxon Corp. v. Meyerson*,
　802 A.2d 257 (Del. 2002) ............................................................................................................23

*Tindall v. First Solar Inc.*,
　892 F.3d 1043 (9th Cir. 2018).....................................................................................................8, 9

*Wood v. Baum*,
　953 A.2d 136 (Del. 2008) ....................................................................................................9, 10, 13

**Rules**

Fed. R. Civ. P. 23.1 ........................................................................................................................8

**Statutes**

8 Del. C. § 220 ...............................................................................................................................8

Gibson, Dunn &
Crutcher LLP

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2      **PLEASE TAKE NOTICE** that on November 15, 2018 at 2:00 p.m., or as soon thereafter as

3  the matter may be heard, in the United States District Court for the Northern District of California,

4  Oakland Courthouse, Courtroom 2, located at 1301 Clay Street, Oakland, CA 94612, Nominal

5  Defendant Facebook, Inc. ("Facebook" or the "Company"), through its undersigned counsel, will, and

6  hereby does, move to dismiss the Consolidated Shareholder Derivative Complaint (the "Complaint" or

7  "Compl.") pursuant to Federal Rule of Civil Procedure 23.1 (the "Motion").

8      Facebook seeks dismissal of the Complaint with prejudice because Plaintiffs failed to make a

9  pre-suit demand on Facebook's Board of Directors or to plead adequately demand futility.  This Motion

10  is based on this Notice, the supporting Memorandum of Points and Authorities ("Memorandum"), the

11  Declaration of Brian M. Lutz filed concurrently herewith, the accompanying Request for Judicial

12  Notice, the complete files and records in this action, and any additional material and arguments as may

13  be considered in connection with the hearing.

14      Through this Motion and the Motions to Dismiss or Stay filed concurrently herewith, Facebook

15  respectfully requests that this Court consider and rule on the Motions as follows: (i) dismiss this action

16  pursuant to Federal Rule of Civil Procedure 23.1 for failure to make a demand on the board or

17  adequately plead demand futility; (ii) dismiss this action on *forum non conveniens* grounds, with a

18  related order dismissing Plaintiffs' federal securities law claims for failure to state a claim or severing

19  the federal securities claims and staying them; (iii) dismiss all of the claims in this action for failure to

20  state a claim and because they are unripe; and (iv) stay this action pending resolution of the putative

21  securities and consumer class actions and FTC Investigation involving Facebook.

22  <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

23      Facebook respectfully submits this Memorandum in support of its Motion.

24  **STATEMENT OF ISSUES TO BE DECIDED**

25      Whether the Court should dismiss Plaintiffs' Complaint with prejudice for failure to make a

26  pre-suit demand on Facebook's Board of Directors or to plead with particularity that such a demand

27  would have been futile, as required by Rule 23.1 of the Federal Rules of Civil Procedure and Delaware

28  law.

Gibson, Dunn &
Crutcher LLP

1

## I. PRELIMINARY STATEMENT

2      This lawsuit must be dismissed because Plaintiffs—five individual shareholders of Facebook—

3   admit that they did not make a pre-suit demand on Facebook's Board of Directors to commence this

4   action, and have not met their heavy burden of demonstrating that they, rather than Facebook's Board,

5   should decide whether this litigation should be pursued on the Company's behalf.  Before Plaintiffs

6   may take the extraordinary step of usurping the Board's decision-making authority without even first

7   presenting the matter to the Board via a pre-suit demand, they must plead particularized facts

8   demonstrating that, despite a presumption under controlling law that directors act independently and in

9   the best interest of the corporation, and despite the fact that the majority of Facebook's Board consists

10  of independent, non-management directors, the members of Facebook's Board are incapable of

11  faithfully executing their fiduciary duties and fairly evaluating a demand that the Board take legal

12  action.  Only in rare and exceptional cases is a shareholder able to make this difficult showing.  This

13  most certainly is not that case.

14     This action is one of a multitude of lawsuits filed in courts across the country in the wake of

15  recent press reports describing Cambridge Analytica's misuse of Facebook user data.  All of the actions

16  arise from the same core set of allegations:  that a third-party app developer named Aleksandr Kogan,

17  beginning in 2013, used an app he created to obtain information about Facebook users by paying them

18  to take a personality test; that Kogan collected information about those individuals and their Facebook

19  "friends" and then shared some of that information, through his company Global Science Research,

20  with Cambridge Analytica in violation of Facebook's terms and policies; that, in response to a demand

21  by Facebook after it learned of the violation, Kogan, GSR, Cambridge Analytica, and others falsely

22  certified to Facebook that they had deleted this data; and that Cambridge Analytica nevertheless

23  allegedly continued to retain and use the data.

24     All of the pending securities and consumer class action lawsuits arising from these allegations

25  assert claims *against* Facebook and others, asserting that Facebook should have done more to prevent

26  the events in question.  Here, by contrast, Plaintiffs seek to pursue claims *on behalf of* Facebook,

27  seeking to hold certain of Facebook's directors personally liable for allegedly failing to prevent

28  Cambridge Analytica from misusing Facebook user data and failing to disclose that Facebook

supposedly was inadequately protecting user data.  Plaintiffs seek to pursue these claims on Facebook's behalf even though they plead no facts demonstrating that any of the individual Facebook directors named as defendants had any involvement in the alleged events giving rise to Plaintiffs' claims and even though Facebook received third-party assessments confirming that, taking Plaintiffs' own allegations, "Facebook's privacy controls were operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information."  ¶ 241.

Before a shareholder of a Delaware corporation can proceed with a derivative lawsuit on behalf of the corporation, he or she must make a demand on the corporation's board of directors to investigate and pursue the claims the plaintiff seeks to assert.  Plaintiffs here admit that they did not make the required demand on Facebook's Board, claiming instead that they should be excused from the demand requirement.  Specifically, Plaintiffs assert that a majority of Facebook's Board would be disqualified from considering any demand because they are named as defendants in the proposed action and face a substantial likelihood of liability for allegedly failing to ensure that Facebook had sufficient controls to prevent the misuse of Facebook user data by third parties.

This theory of director liability—inadequate corporate oversight—"is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  To establish futility under this theory, Plaintiffs must allege sufficient facts to establish that the Board "*utterly failed* to implement any reporting or information system or controls," or having implemented such a system or controls, "*consciously failed* to monitor or oversee its operations."  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

Plaintiffs cannot make such a showing here.  Plaintiffs themselves allege that Facebook had in place internal controls and systems related to data privacy, and that a third party firm conducted assessments confirming that those internal controls were sufficient.  And Plaintiffs fail to plead any particularized facts demonstrating that the Board "consciously failed to monitor" the Company's internal controls.  There simply are no facts alleged that the directors of Facebook—each of whom is distinguished and highly respected in his or her field—intentionally and in bad faith failed to oversee Facebook.  Accordingly, Plaintiffs fail to demonstrate that a majority of Facebook's Board faces a

substantial likelihood of personal liability on this claim—or any of Plaintiffs' related claims—that would preclude a fair and independent evaluation by the Board.

Plaintiffs also fail to allege particularized facts demonstrating that demand is futile because a majority of the Board lacks independence. Because Plaintiffs cannot plausibly allege that any director faces a substantial likelihood of personal liability, there is no interested director to whom the rest of the Board could be beholden. And even if any director was interested, Plaintiffs offer nothing more than conclusory assertions of ordinary course and immaterial business and social relationships among the directors that fall short of demonstrating that any member of the Board cannot be trusted to act in the Company's best interests.

For these reasons, this case must be dismissed on the threshold ground that Plaintiffs failed to make a pre-suit demand on Facebook's Board, and have not met their heavy burden, under Rule 23.1 and Delaware law, of pleading sufficient facts demonstrating that they were excused from making such a demand before proceeding with this lawsuit on behalf of Facebook.

## II. SUMMARY OF PLAINTIFFS' ALLEGATIONS[1]

*Facebook's Business.* Facebook is a Delaware corporation, headquartered in Menlo Park, California. ¶¶ 26, 42. Facebook gives its more than two billion active users the power to stay connected with friends and family, build community, discover what is going on in the world, and to share and express what matters to them. ¶¶ 42, 44. Facebook was founded in 2004 by Mark Zuckerberg, who serves as the Company's CEO and Chairman of its Board of Directors (the "Board"). ¶¶ 27, 42. Facebook is free for users who register. ¶ 44. Facebook generates revenue through the sale of advertisements, including advertisements targeted based on user data. ¶¶ 51-53, 75. Facebook's Platform also enables third-party developers to build applications (referred to as "apps") with a social component that allows users to share their experience with their Facebook friends in some way—for

---

[1] To resolve this Motion, the Court assumes the truth of Plaintiffs' allegations. *Horman v. Abney*, 2017 WL 242571, at *2 (Del. Ch. Jan. 19, 2017). By summarizing those allegations here, Facebook does not concede that the allegations are true. The Court may refer to documents incorporated in the Complaint by reference. *See id.* Citations in the form of "¶__" or "¶¶__" refer to the paragraphs of Plaintiffs' operative Consolidated Shareholder Derivative Complaint (ECF No. 56). Citations to "Lutz Ex." refer to the exhibits to the Declaration of Brian M. Lutz ("Lutz Decl."), filed concurrently herewith. Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

1  example, by playing a game together, sharing book recommendations, and other social experiences.

2  ¶¶ 44, 46, 56.

3  Facebook's Board has nine members, each of whom is a respected luminary in his or her field.

4  ¶ 380.  The Complaint names as defendants seven current members and one former member of the

5  Facebook Board (the "Individual Defendants").  ¶¶ 27-34.  All but two of Facebook's directors are

6  independent, in the sense that they are not also members of the Company's management.  ¶¶ 27-34,

7  422, 461.  Between the filing of Plaintiffs' initial complaints and the filing of the operative Complaint,

8  one Facebook director, Jan Koum, left the Board, and was replaced by Jeff Zients, who is not a

9  defendant.  ¶¶ 34, 422.  Another director, Kenneth Chenault, is not a defendant.  ¶¶ 27-34.

10  ***Relevant Facebook Policies.***  Users must agree to Facebook's policies in order to use the

11  service.  These include Facebook's Data Use Policy, which governs the Company's collection and use

12  of user data, and informs users about the type of data Facebook collects and how it might be used by

13  Facebook or third parties.  ¶¶ 100, 160.  For example, before using a third-party app, a person may

14  "review the permissions the developer is requesting and choose which information to share" with the

15  app developer, which permission the user can revoke at any time.  ¶ 172; *see also* ¶¶ 149, 162, 164,

16  170.  Facebook users must also agree to its terms of use (then-called the Statement of Rights and

17  Responsibilities), which also include information about the platform.  Compl. Ex. 5. at 000025.

18  Third-party developers also are required to agree to the Platform Policies to operate apps on

19  Facebook.  ¶¶ 170, 255.  The Platform Policies require that developers obtain consent from users before

20  collecting and using data and also limit the extent to which developers can collect and use such data.

21  *Id.*  For example, Facebook's Platform Policies prohibit developers from selling user data or passing it

22  on to an advertising network or data broker.  ¶ 170.  Facebook reviews hundreds of thousands of apps

23  each year and enforces violations of its policies through various mechanisms.  For example, in 2017

24  alone, Facebook took action against 370,000 apps, ranging from imposing usage restrictions to

25  removing the apps from Facebook altogether.  ¶¶ 171, 316.

26  Facebook also enters into partnerships with mobile device manufacturers, such as Apple,

27  Amazon, and Microsoft, for the purpose of enabling users of those manufacturers' devices to use

28  Facebook and related features on those devices.  ¶¶ 49, 71, 233, 236.  Those partnerships are governed

by agreements that limit the user data the parties exchange, and where and how it may be stored. ¶¶ 236, 285.  Facebook maintains the right to terminate these agreements if it detects any misuse of user information.  ¶ 256.  A third-party firm also assessed Facebook's due diligence and security controls with respect to these service providers.  ¶ 285.

*The FTC Consent Decree.*  In 2011, Facebook entered into a consent decree with the Federal Trade Commission ("FTC"), which requires Facebook to maintain a comprehensive privacy program and certain security controls to protect user data, subject to regular assessments by a third-party firm. ¶¶ 40, 179, 207.  Plaintiffs allege that in the three assessments it has provided to the FTC following the Consent Decree, the firm (PriceWaterhouseCoopers or "PwC") has "certif[ied]" that Facebook's privacy program, including policies regarding user consent and notice for sharing user data with third-party apps, "meets or exceeds the requirements of the 2011 Consent Decree," ¶ 240, and that there are "no material weaknesses in Facebook's internal controls," ¶ 246; *see also* ¶¶ 168, 205, 241, 244, 254, 407.  PwC has also confirmed that Facebook continuously monitors, reviews, and enhances its privacy program to protect users' information.  ¶¶ 205, 243.

*Cambridge Analytica's Misappropriation and Misuse of Facebook User Data.*  Cambridge Analytica is a political consulting firm that mines, brokers, and analyzes data to influence voter behavior in elections around the world.  ¶ 3; Compl. Ex. 4 at 2.  In 2013, Aleksandr Kogan, a professor and data researcher at Cambridge University, developed a personality quiz app, called "thisisyourdigitallife."  Compl. Ex. 4 at 1; ¶¶ 96, 134, 138-39.  Kogan operated thisisyourdigitallife through his company Global Science Research ("GSR"), which Kogan formed to collect Facebook user data.  ¶ 135.  GSR told users of its personality quiz that it was collecting data for academic purposes. Lutz Ex. 3 at 3.  Kogan repeated this representation in a later request for certain additional permissions to user data.  ¶¶ 134, 139; Lutz Ex. 4 at 6.  The app represented that it was a "research app used by psychologists," and that, by sharing their information with the app, users would gain a better understanding of their own personalities.  Lutz Ex. 3 at 3; Lutz Ex. 5 at 2.  In fact, according to Plaintiffs, GSR and Cambridge Analytica collected data to build a psychographic database of U.S. voters who could be targeted with personalized political advertisements.  ¶¶ 3, 137.  Approximately 270,000 people used the app and consented to its collection of information, including information the

users had access to about their friends on Facebook.[2]  Compl. Ex. 4 at 1-2; ¶¶ 102-03.  Then, in blatant violation of Facebook's Platform Policies and the terms Kogan agreed to when he sought access to Facebook user data, Kogan, through GSR, sold some of the information about Facebook users that it had collected through its app for nearly $1 million to Cambridge Analytica's parent company.  Compl. Ex. 4 at 2; *see generally* Lutz Ex. 6 at 14-15.

> ***Facebook's Response to Cambridge Analytica's Misappropriation and Misuse of User Data.***
In December 2015, *The Guardian* reported that Cambridge Analytica had been given access to the data of tens of millions of Facebook users collected through Kogan's personality quiz for the purpose of creating psychological profiles of U.S. voters, which were then used to support Ted Cruz's presidential campaign.  ¶¶ 3, 124.  Facebook immediately investigated the issue and removed Kogan's app and ultimately required Cambridge Analytica's parent company, Kogan, and GSR to certify that they had destroyed the user data they had obtained.  ¶¶ 115, 124-26, 135; Compl. Ex. 4 at 2.  Each of these third parties certified in writing to Facebook that it had destroyed the user data.  ¶ 126.

In March 2018, Cambridge Analytica resurfaced in articles published by *The New York Times* and *The Guardian*.  ¶¶ 6-7.  The articles again detailed how Cambridge Analytica had misappropriated information about tens of millions of Facebook users for use in political campaigns, and that, despite a certification to the contrary, Cambridge Analytica may not have deleted the data.  *Id.*; Compl. Ex. 4 at 2.

> ***This Action.***  Plaintiffs purport to assert derivative claims on behalf of Facebook against eight current and former Facebook directors.  Plaintiffs admit that none of them made a demand on Facebook's Board to institute litigation against the Individual Defendants at any time.  ¶ 381.  Plaintiffs instead contend that making such a demand would have been futile because the "Board's conduct did not constitute a valid exercise of business judgment," "Defendants face a substantial likelihood of liability," and "Facebook is 'controlled' by Zuckerberg and he dominates the board."  Compl. at pp. iii-

---

[2]  In early 2014, Facebook implemented a series of changes to the Platform that included limiting access to information about an app user's friends.  ¶ 173.  Developers could still request and access certain information about the people who used their app (with user consent), but they could no longer access information about those users' friends.

Gibson, Dunn &
Crutcher LLP

1   iv.  In addition to not making a pre-suit demand, none of the Plaintiffs sought books and records

2   pursuant to 8 Del. C. § 220 before filing suit.

3                    **III.  LEGAL STANDARD FOR PLEADING DEMAND FUTILITY**

4          Because it is a "basic principle of corporate governance that the decisions of a corporation—

5   including the decision to initiate litigation—should be made by the board of directors," *Kamen v.*

6   *Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991), Rule 23.1 requires a shareholder plaintiff to either

7   "'demand action from the corporation's directors'" before bringing a derivative suit or "'plead with

8   particularity the reasons why such demand would have been futile,'" *Tindall v. First Solar Inc.*, 892

9   F.3d 1043, 1046 (9th Cir. 2018) (quoting *La. Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048,

10  1057 (9th Cir. 2016)).  Rule 23.1's requirements are "stringent," *Quinn v. Anvil Corp.*, 620 F.3d 1005,

11  1012 (9th Cir. 2010), and "strict compliance with Rule 23.1 and the applicable substantive law is

12  necessary before a derivative suit can wrest control of an issue from the board of directors," *Potter v.*

13  *Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008).

14         Where, as here, a shareholder alleges that demand is futile, Delaware law is "clear that the bar

15  is high, the standards are stringent, and the situations where demand will be excused are rare.'"[3]  *Pirelli*

16  *Armstrong Tire Corp. Ret. Med. Benefits Trust v. Raines*, 534 F.3d 779, 782-83 (D.C. Cir. 2008).

17  "Demand is not excused solely because the directors would be deciding to sue themselves."  *In re*

18  *Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009).  Rather, "[i]n the context of

19  demand futility, 'directors are entitled to a *presumption* that they were faithful to their fiduciary duties,'

20  and 'the burden is upon the plaintiff in a derivative action to overcome that presumption.'"  *In re Impax*

21  *Labs., Inc. S'holder Deriv. Litig.*, 2015 WL 5168777, at *4 (N.D. Cal. Sept. 3, 2015) (Gilliam, J.)

22  (quoting *Beam v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004)).  Although "'[p]laintiffs are entitled

23  to all reasonable factual inferences that logically flow from the particularized facts alleged,'"

24  "'conclusory allegations are not considered as expressly pleaded facts or factual inferences,'"

25  *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quoting *Brehm v. Eisner*, 746 A.2d 244,

26

27  _____

28  [3]  Facebook is incorporated in the State of Delaware.  Because "[t]he law of the state of incorporation governs whether demand is futile," "Delaware law … applies to this action."  *Tindall*, 892 F.3d at 1046.

255 (Del. 2000)), and "inferences that are not objectively reasonable cannot be drawn in the plaintiff's favor," *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

Delaware courts employ two tests for analyzing demand futility.  "[B]oard business decisions" are analyzed under the standards set forth in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000), whereas allegations of board inaction—such as an alleged failure of the duty of oversight—are analyzed under *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).  *See Tindall*, 892 F.3d at 1046-47.  Because Plaintiffs do not challenge any specific decisions by Facebook's Board, *Rales* applies here.  "The *Rales* test is a two-prong inquiry requiring courts to analyze whether a complaint pleads particularized facts sufficient to demonstrate that either (1) the underlying conduct being challenged renders any of the directors 'interested' and, if so, whether any of the other directors are compromised in their ability to act independently of the interested directors; or (2) at least half of the directors face a sufficiently substantial threat of personal liability as to the conduct alleged in the complaint to compromise their ability to act impartially on a demand." *Desimone v. Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007).  Plaintiffs must allege "facts specific to each director" to support the conclusion "that that particular director could or could not be expected to fairly evaluate the claims of the shareholder plaintiff," *Potter*, 546 F.3d at 1058, because "a derivative complaint may not rely on broad group allegations or presume a director's knowledge of wrongdoing based on his or her status as a director," *In re Paypal Holdings., Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *5 (N.D. Cal. Jan. 18, 2018).  Demand futility is analyzed "as of the time the complaint is filed."  *Rales*, 634 A.2d at 934.

### IV.  PLAINTIFFS FAIL TO DEMONSTRATE THAT A MAJORITY OF THE BOARD FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY

Plaintiffs claim that demand is futile because a majority of the Board faces a substantial likelihood of personal liability.[4]  ¶¶ 384-410.  "Directors who are sued have a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere threat but instead may rise to a

---

[4] Plaintiffs also allege that the Individual Defendants are interested because they "obtained personal financial benefits that were material to Defendants, and that were not equally shared by other Facebook stockholders."  ¶ 386.  This conclusory allegation, which lacks any factual support, provides no basis for a finding of demand futility.  *See Brehm*, 746 A.2d at 255.

Gibson, Dunn & Crutcher LLP

substantial likelihood.'" *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007); *see Guttman v. Huang*, 823 A.2d 492, 502-03 (Del. Ch. 2003).  Plaintiffs fail to plead with particularity that any director—let alone five of Facebook's nine directors—faces a substantial likelihood of liability.

Although pleading demand futility always is difficult, Plaintiffs' pleading burden is especially heightened here for two reasons.  First, pursuant to Section 102(b)(7) of the Delaware General Corporation Law, Facebook's Certificate of Incorporation exculpates the Company's directors from liability for breaches of fiduciary duty "[t]o the fullest extent permitted by law." Lutz Ex. 9 at Art. VII, ¶ 1.  As a result, Facebook's individual directors cannot face "personal liability for breaches of the duty of care." *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239 (Del. 2009).  "Accordingly, 'a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim,' which requires plaintiffs to allege particularized facts showing that the directors engaged in 'disloyal,' 'fraudulent, illegal or bad faith conduct,' and 'acted with scienter.'" *Paypal*, 2018 WL 466527, at *3 (quoting *Wood*, 953 A.2d at 141).  "Negligent or even reckless conduct is insufficient." *Id.* at *3.  Indeed, "if the directors failed to do all that they should have under the circumstances, they breached their duty of care.  Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty." *Lyondell*, 970 A.2d at 243-44.

Second, Plaintiffs' principal theory of liability is that the Defendants knowingly abdicated their duty of oversight.  Specifically, Plaintiffs allege that "Defendants failed to ensure that Facebook implemented adequate internal controls and reporting systems that would detect and prevent similar violations of law as gave rise to the FTC Consent Decree."  ¶¶ 92, 150.  As noted above, this type of claim, known as a *Caremark* claim, is "'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017).  To plead a *Caremark* claim, Plaintiffs must allege with particularity that either "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

"In either case, imposition of liability requires a showing that the directors *knew* that they were

not discharging their fiduciary obligations." *Id.*  Plaintiffs must plead scienter because "a showing of bad faith is a *necessary condition* to director oversight liability" under *Caremark*.  *City of Birmingham*, 177 A.3d at 55.  Accordingly, Plaintiffs cannot just allege that Facebook's "directors [were] … on notice of systematic wrongdoing, and nonetheless they act[ed] … [with] reckless indifference toward the interests of the company"—which would implicate only the duty of care.  *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *1 (Del. Ch. Dec. 18, 2017).  Plaintiffs must plead specific facts showing that the Individual Defendants failed to oversee Facebook knowingly and in bad faith.  The Complaint comes nowhere close to making this difficult showing.

### A.  Plaintiffs Admit That Facebook Has A Reporting System And Internal Controls.

As a threshold matter, Plaintiffs cannot establish that Facebook's "directors utterly failed to implement any reporting or information system or controls," for the simple reason that Plaintiffs themselves repeatedly admit the existence of such a system and controls.[5]  Specifically, they concede that the "oversight responsibility of the board of directors and its committees is informed by reports from [Facebook's] management team and from [Facebook's] internal audit department" (¶¶ 117, 340), that Facebook has an Audit Committee with duties to oversee risks (¶¶ 403-404), and that "Facebook's internal controls and systems had the ability to detect and report suspicious activity" (¶ 390).  Although Plaintiffs claim that "Defendants were aware of yet disregarded their affirmative obligations to oversee Facebook's compliance with the 2011 Consent Decree," ¶ 398, they allege that PwC conducted multiple independent assessments and concluded that Facebook was "operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information" under the FTC Consent Decree.  ¶¶ 241, 407.  Indeed, Plaintiffs allege the following, which fatally undermines any claim that the Individual Defendants breached their *Caremark* duties by failing to adopt an adequate set of internal controls:

- "Facebook has implemented technical, physical, and administrative security controls designed to protect user data from unauthorized access, as well as to prevent, detect, and respond to security threats and vulnerabilities."  ¶ 207.

---

[5]  Plaintiffs' allegations relating to Facebook's policies and oversight functions are compiled in Lutz Ex. 1.

- "Facebook **constantly enhances or updates its program to protect individual/users information**," ¶ 243, and Facebook's team responsible for the privacy program "assesses risks and controls on an on-going basis through **weekly meetings and review processes**," ¶ 205.

- PwC "has prepared three assessments … certifying that Facebook's privacy program **meets or exceeds the requirements of the 2011 Consent Decree**." ¶ 240; *see also* ¶ 407 ("[F]rom 2013-2017, PwC certified that Facebook was operating an effective privacy program during that time period.").

- PwC, "[i]n its most recent Biennial Report," "stated that there were **no material weaknesses in Facebook's internal controls** and determined that Facebook's privacy program was **sufficient to comply with the FTC Consent Decree**." ¶ 246.

- "Facebook's internal controls and systems had the ability to detect and report suspicious activity at the developer level." ¶ 390.

"Thus, the Complaint itself reveals that the Plaintiffs have not plead[ed] particularized facts that the [defendants] 'utterly' failed to adopt or implement any reporting and compliance systems." *Horman v. Abney*, 2017 WL 242571, at *8 (Del. Ch. Jan. 19, 2017); *see In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1015 (N.D. Cal. 2015) (no *Caremark* claim where Plaintiffs alleged "existence of … Audit Committee, the Committee's duties, and [] Code of Business Ethics and Conduct").

### B. Plaintiffs Do Not Adequately Allege That The Individual Defendants Knew Of And Ignored Control Deficiencies.

To succeed under the second element of *Caremark*, Plaintiffs must plead specific facts showing that the Individual Defendants "had knowledge of certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding [their] duty to address that misconduct." *Melbourne Mun. Firefighters' Pension Tr. Fund on Behalf of Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017). Plaintiffs also must plead that this "resulted in damage to the corporation" by causing a "corporate trauma." *Id.* "The subsequent complained-of 'corporate trauma,' however, must be sufficiently similar to the misconduct implied by the 'red flags' such that the board's bad faith, 'conscious inaction' proximately caused that trauma." *Id.* (quoting *South v. Baker*, 62 A.3d 1, 15, 17 (Del. Ch. 2012)).

The "corporate trauma" alleged by Plaintiffs is the supposed revelation in 2018 that Cambridge Analytica had misappropriated Facebook user data several years earlier and that, despite its written certifications to the contrary, it failed to delete, and continued to use, the data in violation of Facebook's policies. ¶¶ 14, 375. Plaintiffs claim that certain information "should have prompted the Board to

Gibson, Dunn &
Crutcher LLP

implement reasonable controls" (Compl. p. 51) to prevent an incident like Cambridge Analytica, including: (i) litigation, regulatory matters, and complaints related to data privacy (¶¶ 184-190, 249-50, 317-34); (ii) warnings by former Facebook employee Sandy Parakilas (¶¶ 118-20, 156-57); and (iii) concerns raised by Facebook's Chief Information Security Officer and a Facebook investor that Russia and other "bad actors" might be exploiting Facebook's platform (¶¶ 212-15, 219-23).  None of this information amounts to a "red flag" under *Caremark*.

> **1.      Plaintiffs Fail To Show That Litigation And Regulatory Matters Were Known To The Individual Defendants Or Related To Misappropriation Or Misuse Of User Data By Third Parties.**

Plaintiffs allege that various litigation and regulatory matters constitute potential red flags, ¶¶ 184-190, 249-50, 317-34, but they do not allege with particularity that any of these matters were brought to the attention of the Individual Defendants.  This failure alone defeats any claim that the litigation and regulatory matters constitute red flags.  To be considered a red flag, information must be "waved in one's face or displayed so that they are visible to the careful observer." *Wood*, 953 A.2d at 143.  This requires "particularized facts about what [the Individual Defendants] knew, when [they] knew it" and "what [they were] actually told" about the alleged red flags.  *See Horman*, 2017 WL 242571, at *12.

Only one litigation matter is alleged to have been communicated to *any* of the Individual Defendants.  Plaintiffs allege that in 2010—five years before the Cambridge Analytica events—Mark Zuckerberg was made aware of litigation related to Facebook's Beacon feature, "which tracked what users buy online and shared the information with their friends" on Facebook.  ¶ 187.  Even assuming the truth of this conclusory allegation, it is not a red flag because it is not alleged to have been known by a majority of the Individual Defendants.  Moreover, it does not relate to third party access to user data, and thus lacks the requisite close nexus to the alleged corporate trauma.  *See Corbat*, 2017 WL 6452240 at *20 (information regarding "misrepresentations about collateral" not red flag because "the collateral at issue was different in the two frauds"); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010) (bribery in India not a red flag as to bribery in Kuwait).

None of the other litigation and regulatory matters could possibly constitute a red flag because Plaintiffs do not allege with particularity that any Individual Defendant was made aware of them or

what they were told.[6]  Nor do they allege why the matters should have been considered as red flags given that they allegedly resulted in immaterial fines.  *See, e.g.*, ¶ 331 (€150,000 fine); ¶ 329 (€1.2 million fine).  Further, these matters have no bearing on Cambridge Analytica's misappropriation of Facebook user data.  Several such matters relate to features of Facebook's platform that have no connection to data access by third parties, such as the "tag suggest tool" (¶ 188) or the "Friend Finder" feature (¶ 327).  And Plaintiffs nowhere explain how court decisions and settlements regarding sharing user locations with their friends and permitting "search engines to show links to user profiles" (¶¶ 181-83, 332) or including user names in Facebook's Sponsored Stories (¶ 107) should have alerted the Board to user data misuse by third parties like Cambridge Analytica.

Plaintiffs' remaining allegations are even further afield and cannot support a finding that the alleged failure to address these red flags "proximately caused" the corporate trauma alleged by Plaintiffs.  *See* ¶ 188 (Facebook's account deletion policy); ¶¶ 317-22, 329-31, 334 (tracking of data by Facebook, not by third parties); ¶¶ 272-73 (adequacy of disclosures to regulators, not users, regarding Facebook's technical capabilities).

### 2.    Plaintiffs Fail To Demonstrate That Information From A Purported "Whistleblower" Was A Red Flag.

Plaintiffs claim that, in 2012, a "whistleblower" and former Facebook employee named Sandy Parakilas warned unnamed "senior executives" at Facebook that he had "concerns" about Facebook's approach to protecting data that "left Facebook servers" once users agreed to share that data with app developers.  ¶¶ 118-20.  This allegation does not change the result here or excuse Plaintiffs from making a demand.  Among other reasons, Plaintiffs nowhere claim that any such complaints were communicated to the Individual Defendants.  "[I]t is not reasonable to infer that the [Directors] acted in bad faith based on references to 'management.'"  *South v. Baker*, 62 A.3d 1, 16 (Del. Ch. 2012).

---

[6]  For the same reason, Plaintiffs' allegation that in 2011 a Facebook received a letter from a "bipartisan group" expressing "concern[s]" that Facebook has a "long, complex privacy policy" fails.  ¶ 189.  Moreover, to the extent Plaintiffs claim that FTC warning letters sent to third party app developers were red flags, *see* ¶¶ 249-50, 258-59, this claim must be rejected.  Again, the Individual Defendants are not alleged to have been made aware of these letters, and in any event, "directors' failure to act in the face of warnings about misconduct at other businesses does not imply bad faith with respect to the entity to which the directors owe fiduciary duties."  *Corbat*, 2017 WL 6452240 at *22.

Gibson, Dunn &
Crutcher LLP

Moreover, Parakilas's "mere disagreement" with how Facebook ran its business is not "the sort of red flag with which *Caremark* is concerned." *See Lieblein v. Ersek*, 2016 WL 1274399, at *7 (D. Colo. Mar. 31, 2016) (applying Delaware law).[7]

### 3. Plaintiffs' Allegations Regarding The Use Of Facebook To Spread Misinformation By "Bad Actors" Is Not A Red Flag.

Finally, allegations about concerns raised in 2016 and 2017 that Russia and other "bad actors" were using Facebook to spread misinformation is not a red flag. Plaintiffs allege that (i) on October 30, 2016, Roger McNamee, a Facebook investor, sent a draft op-ed to Mr. Zuckerberg and the Company's Chief Operating Officer, Sheryl Sandberg, expressing the view that Facebook "was being manipulated by 'bad actors'" who were sending memes to users that "elicit fear, outrage, and hate-sharing" (¶¶ 220-22), and (ii) in or around 2017, Facebook's Chief Information Security Officer, Alex Stamos, expressed "concerns that Russian interference [with U.S. elections] could have occurred via Facebook's platform" (¶¶ 214-15) and wrote a white paper (¶ 212) about the threat of "governments or non-state actors" using "false news, disinformation, or networks of fake accounts aimed at manipulating public opinion," *see* Lutz Ex. 7 at 4. Neither is alleged to have been communicated to the Individual Defendants besides Mr. Zuckerberg and Ms. Sandberg. More fundamentally, the concerns about Russia and other bad actors spreading misinformation on Facebook are not alleged to have mentioned misuse of user data by developers, and thus cannot be red flags under *Caremark*. *See Corbat*, 2017 WL 6452240, at *20; *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13.[8]

---

[7] In any event, Plaintiffs allege that Facebook *did* enforce its policies against app developers, including (i) reviewing "tens of thousands of apps per year" and "disapprov[ing] noncompliant apps," (ii) issuing "1,150 cease-and-desist letters to over 1,600 targets" since 2006, and (iii) removing apps from Facebook and requiring "parties who have procured our data without authorization to delete that data." ¶ 316. Plaintiffs also acknowledge that Facebook changed its Platform in 2014 to limit access to friends' data. ¶¶ 173, 316. This severely undercuts their attempt to plead bad faith based on conscious *inaction*.

[8] Insofar as Plaintiffs assert that the 2015 press reports about Cambridge Analytica's unauthorized use of user data constitutes a red flag, that claim is belied by Plaintiffs' own pleading. Plaintiffs do not allege that the Board as a whole was made aware of the 2015 report of unauthorized data use. And they admit that Facebook received certifications from Cambridge Analytica, Kogan, and GSR that the user data had been deleted (¶¶ 125-26, 280); and even before that, Facebook changed its policies and Platform in ways that restricted the user data available to app developers (¶¶ 171-73). Thus, there is no basis for any claim that the 2015 reports of Cambridge Analytica's data misuse was a red flag, let alone one that was consciously ignored in bad faith.

15

Gibson, Dunn &
Crutcher LLP

In sum, Plaintiffs' conclusory allegations that the members of Facebook's Board knowingly violated their duty of oversight fall far short of the required particularized facts demonstrating that a majority of the Board faces a substantial likelihood of liability for breaching their fiduciary duties.

## C.   The Individual Defendants Also Do Not Face A Substantial Likelihood Of Liability On Plaintiffs' Non-Oversight Related Claims.

*Other Breach of Fiduciary Duty Theories.*   Plaintiffs' other theories of liability also provide no basis for pleading demand futility.  Plaintiffs allege that the Individual Defendants face liability for breaches of fiduciary duty for (i) allowing Ms. Sandberg and CFO David Wehner to "determine their own compensation" (¶¶ 387-88); (ii) "implementing and overseeing Facebook's illegal business strategy of pursuing profits and revenue growth through violations of various laws" (¶ 493); and (iii) "omitting and failing to disclose material information or facts concerning illegal activity or wrongdoing in any public statements" (*id.*).  The first theory is flatly contradicted by the Proxy Statement on which Plaintiffs rely, which states that Ms. Sandberg and Mr. Wehner "have the authority to review and approve grants of restricted stock units … to employees and consultants, *other than to directors and our executive officers.*"  Lutz Ex. 13 at 15.

The second theory is unsupported by any particularized allegations that the Board decided to pursue an illegal business strategy.  Instead, Plaintiffs merely conclude that "Defendants affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law" because they were "aware of how the Company was monetizing user data."  ¶¶ 379, 385; *see also* ¶ 394.[9]  Missing from the Complaint entirely, however, are facts to support the conclusory allegation that the Board knew of and supported an "illegal" business strategy, what laws were allegedly violated and how any "business strategy" violated these unidentified laws.  These conclusory allegations are insufficient.  *See In re Impax Labs., Inc. S'holder Deriv. Litig.*, 2015 WL 5168777, at

---

[9]   As part of Defendants' purported "illegal business strategy," ¶ 493, Plaintiffs make the unsupported claim that "Defendants knew, and PwC should have uncovered in its audit, that Facebook embedded software and certain Facebook 'features' in mobile devices" through data sharing agreements in alleged violation of the FTC Consent Decree.  ¶¶ 253, 284.  The Complaint alleges no facts to support this claim about Defendants' knowledge.  Indeed, Plaintiffs allege that that the Company believes these agreements comply with the Consent Decree.  ¶¶ 284-86.  And Plaintiffs admit that Facebook implemented controls over these third parties.  ¶ 256.  There is no basis to conclude from Plaintiffs' pleading that the Defendants believed they violated the Consent Decree or any law.

Gibson, Dunn & Crutcher LLP

*8 (N.D. Cal. Sept. 3, 2015) (Gilliam, J.) (rejecting "conclusory allegation" that "[t]he Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate non-compliance with legal and regulatory requirements").

And the third theory, that the Defendants face a substantial likelihood of liability for making material misstatements, depends on Plaintiffs' primary *Caremark* theory—and specifically whether the directors were aware of "numerous red flags of misconduct" (¶ 379)—and fails for the same reasons. "[T]o establish a threat of director liability based on a disclosure violation, plaintiffs must plead facts that show that the violation was made knowingly or in bad faith, a showing that requires allegations regarding what the directors knew and when." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 133-34 (Del. Ch. 2009). Plaintiffs also must allege "with sufficient specificity the actual misstatements or omissions that constituted a violation of the board's duty of disclosure." *Id.* at 132-33 Plaintiffs' allegations here come nowhere close to meeting these requirements.

Plaintiffs allege in conclusory terms that unspecified statements in Facebook's 2016 to 2018 Proxy Statements and 2015 to 2017 Annual Reports "failed to disclose the Cambridge Analytica incident, or the seriously deficient internal controls and privacy policies that Facebook maintained."[10] ¶ 336; *see also* ¶¶ 352-353. They also assert that the Individual Defendants concealed "the extent to which Facebook's business model and revenue depends upon its targeted advertisements" (¶ 394) and failed to disclose "material facts and information related to the Company's core advertising business, advertising services, policies, practices, and internal controls, including relating to user privacy, information, and data security" (¶ 495). But "merely alleg[ing], in vague and conclusory terms, that the director defendants did not adequately disclose certain risks faced by the Company" is not enough to establish that the Individual Defendants face a substantial likelihood of liability for disclosure violations. *Citigroup*, 964 A.2d at 133. Rather, Plaintiffs must "identify [an] actual disclosure that was misleading or [a] statement that was made misleading as a result of an omission of a material fact." *Id.* Plaintiffs' vague allegations—which merely claim that information was omitted from Facebook's SEC filings without identifying "any statement that was made misleading as a result of" the alleged

---

[10] Because news of the "Cambridge Analytica incident" was in the public domain in 2015, this alleged nondisclosure is immaterial. *See* Individual Defs.' Mot. at 8-9.

Gibson, Dunn &
Crutcher LLP

omissions—"do not meet the stringent standard of factual particularity required under Rule 23.1" because "[t]hey fail to allege with particularity which disclosures were misleading, when the Company was obligated to make disclosures, what specifically the Company was obligated to disclose, and how the Company failed to do so." *Citigroup*, 964 A.2d at 133-34.

Plaintiffs also challenge statements in Facebook's proxy materials describing the "Board Role in Risk Oversight" and setting forth various risk factors concerning Facebook's business.  ¶¶ 340, 353. But Plaintiffs do not say why these statements are false.  Nor could they be.  As Plaintiffs themselves allege, "Defendants were obligated to safeguard the Company's interests and comply with applicable laws," and the Board was responsible "for evaluating strategic and operational risk management." Compl. at p. 9 & ¶ 39; *accord id.* ¶ 117.  Thus, by Plaintiffs' own admission, statements that Facebook's Board "has responsibility for overseeing our risk management" (¶ 340) and "had overall and ultimate responsibility for the management of risk" (¶ 353) are not false.

Even if Plaintiffs had pleaded an allegedly false statement, "the Complaint does not contain specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow [the Court] to reasonably conclude that the director defendants face a substantial likelihood of personal liability." *Citigroup*, 964 A.2d at 134.  Rather, Plaintiffs merely allege, in conclusory fashion, that "Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth." ¶ 492.  Thus, the Complaint "does not sufficiently allege that the [Individual Defendants] had knowledge that any disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not adequately informing themselves." *Id.*; *see Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr.* v. *Lundgren*, 579 F. Supp. 2d 520, 532 (S.D.N.Y. 2008) (rejecting disclosure claim that did "not include particularized factual allegations indicating that any of these directors knew or should have known that any of the allegedly misleading statements were false or incomplete").  The Individual Defendants do not face a substantial likelihood of liability for violating a disclosure duty.

Because Plaintiffs have not alleged a substantial likelihood of liability for their breach of fiduciary duty claim, their claim of aiding and abetting a breach of fiduciary duty likewise fails.  *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (aiding and abetting claim requires underlying

"breach of the fiduciary's duty").  In any event, the Individual Defendants, as fiduciaries of Facebook, cannot be found liable for aiding and abetting because "[i]f a defendant has acted in a fiduciary capacity, then that defendant is liable as a fiduciary and not for aiding and abetting."  *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 204 (Del. Ch. 2014).

  ***Exchange Act Claims.***  As set forth in the Individual Defendants' concurrently filed Motion to Dismiss under Rule 12(b)(6), which Facebook incorporates herein, Plaintiffs' claims for violation of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 come nowhere close to meeting the basic pleading requirements under the Private Securities Litigation Reform Act of 1995.  *See* Individual Defs.' Mot. at 5-19.   Plaintiffs allege that the Individual Defendants made false or misleading statements in Facebook's proxy statements and in connection with Facebook's repurchase of its shares. ¶¶ 464-472; Compl. at pp. 127-29.  But Plaintiffs fail to plead the essential elements of their claims, including falsity, scienter, reliance, and causation.  Accordingly, Defendants do not face a substantial likelihood of liability for violating the Exchange Act.

  ***Insider Trading Allegations.***   Nor do any of the Individual Defendants face a substantial likelihood of liability on any of Plaintiffs' claims related to purported "insider sales." ¶¶ 473-87.  First, the "Insider Selling Defendants"—Individual Defendants Mr. Zuckerberg, Ms. Sandberg, and Mr. Koum—comprise less than a majority of the Board, so even if Plaintiffs adequately pleaded these claims (they do not), that alone would not establish demand futility.  *See In re Verifone Holdings., Inc. S'holder Deriv. Litig.*, 2009 WL 1458233, at *10 (N.D. Cal. May 26, 2009) (no substantial likelihood of liability as to a majority of the board where plaintiffs "only name[d] three director defendants … who allegedly sold stock based on insider information").   Second, Plaintiffs also fail to plead particularized facts demonstrating that Mr. Zuckerberg, Ms. Sandberg, or Mr. Koum traded Facebook stock while in possession of material, non-public information, or that their trades were anything other than ordinary course transactions pursuant to validly adopted Rule 10b5-1 plans.  *See* Individual Defs.' Mot. at 21.  Third, Plaintiffs' claims for violation of the California Corporations Code are barred under the internal affairs doctrine, *see In re Sagent Tech., Inc., Deriv. Litig.*, 278 F. Supp. 2d 1079, 1092 (N.D. Cal. 2003) (Section 25402), and cannot be asserted by private litigants, *see Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 233, 255 (2007) (Section 25403).

***Contribution and Indemnification.***   Finally, Plaintiffs' claim for contribution and indemnification is unripe because it is premised on allegations that Facebook "is entitled to receive contribution from [the Individual Defendants]" in connection with the securities fraud class action and MDL proceeding currently pending in this District.   ¶¶ 505-06.   Because this claim—like all of Plaintiffs' other claims (Individual Defs. Mot. at 24-25)—depends on a finding of liability and award of damages that has not occurred (and in all likelihood will not occur), it is unripe and does not create a substantial likelihood of personal liability.   *See, e.g.*, *In re Brocade Commc'ns Sys., Inc. Deriv. Litig.*, 615 F. Supp. 2d 1018, 1049 (N.D. Cal. 2009) (dismissing contribution claim as unripe).

## V.   PLAINTIFFS FAIL TO ALLEGE FACTS SHOWING THAT ANY MEMBER OF THE BOARD LACKED INDEPENDENCE, LET ALONE A MAJORITY

Plaintiffs also fail to plead that making a demand would have been futile on the ground that a majority of the Board lacked independence.   "The key principle upon which [Delaware corporate] jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties."   *Beam v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004).   Plaintiffs fall well short of meeting their heavy burden of showing that a majority of the Board is incapable of fairly and independently reviewing a demand if one had been made.

First, Plaintiffs fail to plead particularized facts showing that "the underlying conduct being challenged renders [Mr. Zuckerberg] 'interested.'"   *See Desimone*, 924 A.2d at 928.   As set forth above, Plaintiffs have failed to plead that any director, including Mr. Zuckerberg, faces a substantial likelihood of liability for the claims asserted in the Complaint.   *See supra* Section IV.   Nor have Plaintiffs alleged that Mr. Zuckerberg is "interested" under any theory recognized under Delaware law.[11]   The fact that Mr. Zuckerberg is a member of the Company's management rather than an "outside" director is not, standing alone, sufficient to establish that he is "interested."   *See In re Google, Inc. S'holder Deriv. Litig.*, 2013 WL 5402220, at *5 (N.D. Cal. Sept. 26, 2013) ("Plaintiffs' theory would eviscerate the

---

[11]   Under Delaware law, "[d]irectorial interest exists whenever divided loyalties are present," or where a director will "receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or  when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its shareholders.  *Rales*, 634 A.2d at 933, 936; *Aronson*, 473 A.2d at 812.  Plaintiffs fail to allege facts demonstrating that Mr. Zuckerberg or any other director is interested under these standards.

Gibson, Dunn &
Crutcher LLP

'disinterested' prong of the *Rales* test, and would find any director involved in the day-to-day running of a company to be 'interested' under any set of facts.").  And absent an allegation that at least one director is "interested" for pre-suit demand purposes, Plaintiffs cannot meet their burden to show the Board lacked independence because there is no interested director to whom the rest of the Board could be beholden.[12]  *See In re Dow Chemical Deriv. Litig.*, 2010 WL 66769, at *8 ("Under *Brehm*, without an interested director the independence of the remaining directors need not be examined.").  This failure alone should end the Court's inquiry into independence.

Second, Plaintiffs are wrong when they claim that merely because Mr. Zuckerberg is a controlling shareholder, the *other* directors are incapable of exercising independent judgment when reviewing a demand.  ¶ 423.  Delaware law expressly rejects Plaintiffs' position.  *See, e.g.*, *Beam*, 845 A.2d at 1054 ("A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder.").  The "shorthand shibboleth of 'dominated and controlled directors' is insufficient" to show that the rest of the Board is incapable of acting independently.  *Aronson*, 473 A.2d at 816.

Third, Plaintiffs' conclusory allegations that certain directors lack independence because they are beholden to Mr. Zuckerberg are insufficient to show that "at least half of the board, as it was constituted when the shareholders filed the amended complaint, was incapable of entertaining a pre-suit demand."  *See Louisiana Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1058 (9th Cir. 2016).  Facebook's Board consists of highly accomplished individuals who are luminaries in their respective fields, each of whom has a "considerable investment[] in [his or her] reputation."  *Beam*, 845 A.2d at 1052 n.31.  As set forth below, Plaintiffs fall well short of pleading facts supporting an inference that *any* of Facebook's directors "would be more willing to risk his or her reputation than risk the relationship with" Mr. Zuckerberg.  *See id.* at 1052.[13]

---

[12]  Mr. Zuckerberg's status as Facebook's controlling shareholder does not impact this analysis.  *See Google*, 2013 WL 5402220 at *4 (holding that "the controlling shareholder still must be found to be 'interested'" to trigger the independence analysis).

[13]  Plaintiffs do not challenge the independence of directors Jan Koum or Jeffrey Zients, who replaced Mr. Koum on the Board in May 2018.

***Peter Thiel.***   Peter Thiel, one of Facebook's non-management directors, co-founded PayPal, Inc. and is a partner in the venture capital firm the Founders Fund.   ¶ 424.   Plaintiffs' allegations regarding Mr. Thiel's relationship with Mr. Zuckerberg consist mostly of irrelevant innuendo about Mr. Thiel's politics and private life (¶¶ 424-430) or are entirely conclusory (¶ 431).   Such allegations are insufficient to establish a lack of independence.   *See Brehm,* 746 A.2d at 254 (claims based on "suspicion[s] expressed solely in conclusory terms" are insufficient for plaintiffs to show reasonable doubt that a director lacks independence).   Plaintiffs' claim that Mr. Thiel stands to gain financially from the vesting of certain Facebook stock held in escrow (¶ 432) also is not enough to demonstrate that he would disregard his fiduciary obligations, particularly when Plaintiffs fail to plead that the value of the stock was material to Mr. Thiel in view of his personal economic circumstances.   *Wynn*, 829 F.3d at 1059 ("As to materiality, the Delaware Supreme Court 'has rejected the suggestion that the correct standard for materiality is a 'reasonable person' standard; rather, it is necessary to look to the financial circumstances of the director in question to determine materiality.'").

***Marc Andreessen.***   Plaintiffs' allegations regarding Mr. Andreessen, co-founder of Netscape and the venture capital firm Andreessen Horowitz (¶ 434), likewise fail to establish that he is beholden to Mr. Zuckerberg and thus would have been incapable of independently reviewing a demand, had one been made.   That Messrs. Andreessen and Zuckerberg are alleged to be friends (¶ 439) does not negate independence.   *Beam*, 845 A.2d at 1051-52 ("Mere allegations that [directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes.").   The lone example Plaintiffs provide in support of this allegation—that Mr. Andreessen allegedly helped Mr. Zuckerberg explain to Facebook's Board and investors why he wanted a special class of stock (¶ 440)—in no way demonstrates "extraneous considerations or influences."   *Aronson*, 473 A.2d at 816; *see also In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989 (Del. Ch. 2007) (rejecting argument that demand was unnecessary because the board had approved a "history of past [related-party] transactions").   This conclusory attack on Mr. Andreessen's independence, without any allegations suggesting that the approval of the reclassification proposal was anything other than a valid exercise of business judgment or that

Mr. Andreessen stood to benefit in any way from the proposal, is insufficient to show a lack of independence.

Plaintiffs' allegations that Mr. Andreessen is beholden to Mr. Zuckerberg because of the importance of "deal flow" also is insufficient.  ¶¶ 436-438.  Plaintiffs do not allege any facts—like the percentage of deals Mr. Andreessen invests in that are connected to Mr. Zuckerberg, the amount of money Mr. Andreessen earns from these deals, or how those earnings compare to Mr. Andreessen's net worth—to suggest that "deal flow" constitutes a material benefit that would reasonably cause Mr. Andreessen to ignore his fiduciary obligations.  *See Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002).  Plaintiffs' claim that Mr. Andreessen lacks independence because of his investment in Oculus VR, which Facebook acquired (¶ 437), also fails.  In *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 471 (S.D.N.Y. 2013), *aff'd*, 797 F.3d 148 (2d Cir. 2015), the court concluded that Mr. Andreessen's investment in Instagram, another company that Facebook later purchased, was insufficient to demonstrate a lack of independence because plaintiffs there did "not allege that Facebook paid more for Instagram than it was worth, or that the acquisition was anything other than a business deal that benefitted both parties."  Plaintiffs' claim that Mr. Andreessen's Oculus investment renders him incapable of exercising independent judgment suffers from the same fatal flaws.

***Reed Hastings.***  Plaintiffs allege that Mr. Hastings, another of the Company's non-management directors, lacks independence because Netflix, Inc., where Hastings serves as CEO and Chairman, "is one of Facebook's largest advertisers."  ¶ 441.  But it is well established that allegations of a relationship involving businesses affiliated with a director are insufficient to render a director incapable of exercising independent business judgment.  *See Jacobs v. Yang*, 2004 WL 1728521, at *6 (Del. Ch. Aug. 2, 2004) (Although the fact that a decision relates to "companies that directors are affiliated with potentially makes the board's decision more difficult, … it does not sterilize the board's ability to decide"), *aff'd*, 867 A.2d 902 (Del. 2005).  Moreover, although Plaintiffs allege that *Netflix* benefited from its relationship with Facebook, Plaintiffs do not allege that *Mr. Hastings* derived any material personal benefit from this relationship.  For the same reason, the *In re Facebook* court rejected a nearly identical challenge to Mr. Hastings's independence based on allegations that Netflix was a "major

advertiser" with Facebook.  *See* 922 F. Supp. 2d at 471-72.

**Sheryl Sandberg.**   As Facebook's COO, it is unsurprising that Ms. Sandberg works closely with the Company's CEO, Mr. Zuckerberg.   ¶ 448.   But Plaintiffs do not plead any specific facts to support an inference that Ms. Sandberg is beholden to Mr. Zuckerberg, and the fact that she is a member of Facebook's management is not itself sufficient to make her "interested."  *See Google*, 2013 WL 5402220, at *5.   To the extent Plaintiffs attempt to plead a lack of independence based on Ms. Sandberg's compensation by Facebook (*see* ¶ 452), Plaintiffs fail to plead any facts demonstrating that this compensation is material in the context of Ms. Sandberg's personal financial circumstances. *Wynn*, 829 F.3d at 1059-60.   Indeed, because Ms. Sandberg's financial interest is tied to the performance of Facebook, "the inference would seem to cut against the shareholders, insofar as [Ms. Sandberg's] interest in the financial health of [Facebook] would incline [her] to pursue its interests rather than subordinate them to [Mr. Zuckerberg's] personal interests."  *Id.* at 1060.

**Erskine Bowles.**   Erskine Bowles, another non-management director, served as Chief of Staff to President Bill Clinton and co-chair of the National Commission on Fiscal Responsibility and Reform.   Plaintiffs claim that Mr. Bowles is "beholden to the entire Board," because the Board granted him the right to serve to continue his service beyond a non-binding retirement age.   ¶¶ 454-57.   This allegation is utterly insufficient to demonstrate a lack of independence.   Plaintiffs fail to plead *any* specific relationship between Mr. Bowles and any allegedly interested director, including any management director, *any* personal, financial, or economic benefits to Mr. Bowles that result from that relationship, or *any* facts as to the materiality of those benefits to Mr. Bowles.   *See, e.g., Beam*, 845 A.2d at 1052 (Plaintiffs must "plead facts that would support the inference that because of the nature of a relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director.").

**Susan Desmond-Hellmann.**   Susan Desmond-Hellmann, another of the Company's non-management directors, is the chief executive of the Gates Foundation and former Chancellor of University of California, San Francisco.   ¶ 458.   Plaintiffs claim that Ms. Desmond-Hellmann lacks independence because she approved transactions that benefited Mr. Zuckerberg in the past.   ¶ 459.   This

type of circular logic cannot establish a lack of independence on the part of Ms. Desmond-Hellman. *See In re Tyson Foods, Inc.*, 919 A.2d 563, 588 (Del. Ch. 2007) (rejecting argument that directors' approval of prior transactions demonstrated a lack of independence with respect to a subsequent transaction).  Among other things, Plaintiffs fail to allege that Ms. Desmond-Hellmann's prior approval was based on "extraneous considerations or influences," or otherwise not a valid exercise of business judgment, and therefore, there are no particularized allegations demonstrating that Ms. Desmond-Hellmann is incapable of exercising independent judgment.  *Aronson*, 473 A.2d at 816.

> ***Ken Chenault.***  Mr. Chenault, the former CEO of American Express (¶ 461), joined Facebook's board on January 18, 2018 and is not a named defendant in this action.  He also is not a member of the Company's management.   Plaintiffs do not plead any facts suggesting that Mr. Chenault lacks independence from Mr. Zuckerberg.  ¶ 462.  That Mr. Zuckerberg sought out Mr. Chenault as a Board member before Mr. Chenault joined the Board is both unsurprising and certainly no basis for pleading a lack of independence by Mr. Chenault.  *See, e.g.*, *Aronson*, 473 A.2d at 815 (allegation that directors were "personally selected" by 47% shareholder was insufficient).

Because Plaintiffs have failed to plead with particularity that any of Facebook's directors—much less a majority of the Board—lack independence, they have failed to plead demand futility based on a lack of independence under Rule 23.1.

## VI.  CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice for failure to satisfy Rule 23.1.

Dated:  August 10, 2018

GIBSON, DUNN & CRUTCHER LLP

By:  _____*/s/ Orin Snyder*_____
      Orin Snyder
      200 Park Avenue
      New York, N.Y. 10166-0193
      Tel: 212.351.4000
      Fax: 212.351.4035
      osnyder@gibsondunn.com

1
2
3
4

Joshua S. Lipshutz
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel:  202.955.8500
Fax:  202.467.0539
jlipshutz@gibsondunn.com

5
6
7
8
9
10

Kristin A. Linsley
Brian M. Lutz
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
Tel: 415.393.8200
Fax: 415.374.8306
klinsley@gibsondunn.com
blutz@gibsondunn.com

11
12
13
14

Paul J. Collins
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel:  650.849.5300
Fax:  650.849.5333
pcollins@gibsondunn.com

15

*Attorneys for Nominal Defendant Facebook, Inc.*

16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

MOTION TO DISMISS PURSUANT TO FRCP 23.1
LEAD CASE NO. 4:18-CV-01792-HSG