JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
MARK C. MOLUMPHY (SBN 168009)
mmolumphy@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
STEPHANIE D. BIEHL (SBN 306777)
sbiehl@cpmlegal.com
GINA STASSI (SBN 261263)
gstassi@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Lead Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE FACEBOOK, INC. SHAREHOLDER DERIVATIVE PRIVACY LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 18-cv-1792-HSG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT PURSUANT TO FED. R. CIV. P. 23.1**<br><br><u>Hearing:</u><br>Date:     November 15, 2018<br>Time:     2:00 p.m.<br>Location:  Courtroom 2, 4th Floor<br>Judge:    Hon. Haywood S. Gilliam, Jr.<br><br>Initial Complaint Filed: March 22, 2018 |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................1

II. STATEMENT OF FACTS ......................................................................................3

    A.    Facebook's Background...................................................................................3

    B.    Zuckerberg Dominates and Controls Facebook's Business and Its Board.............4

    C.    The FTC Consent Decree Imposes Affirmative Obligations on Defendants .........4

    D.    Despite Repeated "Red Flag" Warnings of Ongoing Violations of User Privacy and Data Protection Laws, and the FTC Consent Decree, Defendants Fail to Take Action ..................................................................5

III. APPLICABLE LEGAL STANDARDS ...................................................................5

IV. ARGUMENT.........................................................................................................7

    A.    Demand Was Futile Because the Defendants – Who Comprise a Majority of Facebook's Board –  Face a Substantial Likelihood of Liability .......................7

          1.    Defendants' Knowledge is Properly Pleaded Inferentially.........................8

          2.    Defendants Consciously Disregarded Their Duty to Comply with the 2011 FTC Consent Decree, Exposing Facebook to Further Sanctions .................................................................................8

          3.    Defendants Knew of and Ignored Internal Control Deficiencies...............11

          4.    The Purported "Exculpatory Provision" Does Not Shield Defendants From Liability Because They Failed to Act in Good Faith ..........................................................................................14

    B.    Demand Was Also Futile Because a Majority of the Directors Lack Independence From and Are Beholden to Defendant Zuckerberg .......................14

          1.    Defendant Zuckerberg Dominates and Controls Facebook and Its Board........................................................................................15

          2.    Defendant Thiel Lacks Independence From Zuckerberg...........................19

          3.    Defendant Andreessen Lacks Independence From Zuckerberg ...............19

          4.    Defendant Hastings Lacks Independence From Zuckerberg...................20

          5.    Defendant Sandberg Lacks Independence From Zuckerberg and Other Interested Directors.......................................................21

i

**6.**     Defendant Bowles Lacks Independence From Zuckerberg and
          Other Interested Directors.............................................................22

**7.**     Defendant Desmond-Hellman Lacks Independence From
          Zuckerberg .................................................................................22

**8.**     Director Chenault Lacks Independence From Zuckerberg....................23

V.     CONCLUSION..........................................................................................24

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS PURSUANT TO FRCP 23.1
Case No. 4:18-CV-01792-HSG

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abbott Laboratories Derivative Shareholder Litigation*
    325 F.3d 795, 805–06 (7th Cir. 2003) ...............................................................10, 12

*In re Am. Int'l Grp., Inc.*,
    965 A.2d 763 (Del. Ch. 2009),.................................................................................5, 7, 8

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ........................................................................................6, 9, 13

*Beam v. Stewart*,
    845 A.2d 1040 (Del. 2004) ......................................................................................21

*Biondi v. Scrushy*,
    820 A.2d 1148 (Del. Ch. 2003)................................................................................22

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996)..................................................................................10

*Cook v. McCullough*,
    2012 WL 3488442 (N.D. Ill. Aug. 13, 2012) ........................................................10

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989)........................................................................................13

*In re Cysive, Inc., S'holder Litig.*,
    836 A.2d 531 (Del. Ch. 2003)..................................................................................16

*DCD Programs, Ltd. v. Leighton*,
    833 F.2d 183 (9th Cir. 1987) ...................................................................................24

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007)..................................................................................6, 9

*In re Dow Chemical Derivative Litigation*
    2010 WL 66769, at *14 (Del. Ch. Jan. 11, 2010) ..................................................18

*In re Ezcorp Inc. Consulting Agreement Derivative Litig.*
    2016 WL301245, at *33 (Del. Ch. Jan. 25, 2016) .................................................6

*In re EZCORP Inc.*,
    2016 WL 301245 (Del. Ch. Jan. 25, 2016) ............................................................24

*In re Facebook, Inc. IPO Securities & Derivative Litigaiton*,
    922 F. Supp. 2d 445 (S.D.N.Y. 2013)....................................................................20

iii

*In re Google Inc. Shareholder Derivative Litigation*
  2013 WL 5402220, at *5 (N.D. Cal. Sept. 26, 2013) ...........................................................18

*Hamilton v. Barnes*,
  2018 WL 4053459 (N.D. Cal. Aug. 24, 2018) ....................................................................15

*Hampshire Grp., Ltd. v. Kuttner*,
  2010 WL 2739995 (Del. Ch. July 12, 2010)..........................................................................9

*Harris v. Carter*,
  582 A.2d 222 (Del. Ch. 1990)....................................................................................2, 3, 4

*Heineman v. Datapoint Corp.*,
  611 A.2d 950 (Del. 1992) .........................................................................................18, 19

*Kahn v. Lynch Comm'ns Sys, Inc.*,
  638 A.2d 1110 (Del. 1994) ...............................................................................................16

*Kahn v. Tremont Corp.*,
  1994 WL 162613 (Del. Ch. Apr. 22, 1994) ........................................................................15

*Kamen v. Kemper Fin. Servs.*,
  500 U.S. 90 (1991)..............................................................................................................5

*Louisiana Municipal Police Employees Retirement System v. Wynn*,
  829 F.3d 1048 (9th Cir. 2017) ....................................................................................21, 22

*In re Massey Energy Co.*,
  2011 WL 2176479 (Del. Ch. May 31, 2011) .....................................................................8, 9

*In re McKesson Corp. Derivative Litig.*,
  2018 WL 2197548 (N.D. Cal. May 14, 2018) ....................................................................14

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs, Inc.*,
  854 A.2d 121 (Del. Ch. 2004)............................................................................................9

*Mizel v. Connelly*,
  1999 WL 550369 (Del. Ch. July 22, 1999)........................................................................21

*No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Grp.*,
  320 F.3d 920 (9th Cir. 2003) ............................................................................................13

*Pfeiffer v. Toll*,
  989 A.2d 683 (Del. Ch. 2010)...........................................................................................13

*In re Pfizer Inc. S'holder Derivative Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010).......................................................................... *passim*

iv

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) .................................................................................................6, 9

*In re Reliance Sec. Litig.*,
    91 F. Supp. 2d 706 (D. Del. 2000)........................................................................................7

*Ret. Sys. v. Pyott*,
    46 A.3d 313 (Del. Ch. 2012) *rev'd on other grounds sub* ......................................................8

*Rosenbloom v. Pyott*,
    765 F.3d 1137 (9th Cir. 2014) ................................................................................. *passim*

*Ryan v. Lyondell Chem. Co.*,
    2008 WL 4174038 (Del. Ch. Aug. 29, 2008) ......................................................................14

*Sandys v. Pincus*
    152 A.3d 124, 131 (Del. 2016) .....................................................................................14, 15

*Shaev v. Baker*,
    2017 WL 1735573 (N.D. Cal. May 4, 2017) ........................................................................9

*South v. Baker*,
    62 A.3d 1 (Del. Ch. 2012)....................................................................................................9

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) .....................................................................................................6

*Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*,
    119 A.3d 44 (Del. Ch. 2015)..........................................................................................14, 15

*In re Trump Hotels S'holder Derivative Litig.*,
    2000 WL 1371317 (S.D.N.Y. Sept. 21, 2000)............................................................. *passim*

*In re Tyson Foods, Inc. Consolidated Shareholder Litigation*,
    919 A.2d 563 (Del. Ch. 2007).............................................................................................23

*Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin.
    Servs. Inc.*,
    704 F.3d 155 (1st Cir. 2013) .........................................................................................16, 17

*Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011) .............................................................................................24

*In re Verifone Holdings, Inc. S'holder Derivative Litig.*,
    2009 WL 1458233 (N.D. Cal. May 26, 2009) .....................................................................24

*Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*,
    727 F.3d 719 (7th Cir. 2013) ..............................................................................................12

v

*Whittlestone, Inc. v. Handi-Craft Co.*,
    618 F.3d 970 (9th Cir. 2010) ...............................................................................24

*In re Zhongpin Inc. Stockholder Litig.*,
    2014 WL 7335920 (Del. Ch. Nov. 26, 2014 ..........................................................16

**Statutes**

CAL. CORP. CODE § 1601 ...........................................................................................24

DEL. CODE § 220 ......................................................................................................24

Delaware General Corporation Law ..........................................................................13

User Privacy and Data Protection Laws .......................................................................4

**Other Authorities**

F.R.C.P. Rule 12(b)(6) ...............................................................................................24

F.R.C.P. Rule 12(f) ....................................................................................................24

F.R.C.P. Rule 23.1 ....................................................................................2, 12, 22, 24

# I.    INTRODUCTION

This shareholder derivative action arises from Facebook's "growth-at-all-costs" business model — designed and promoted by Mark Zuckberg ("Zuckerberg"), and approved and implemented by the other Defendants.  Facebook's growth strategy saw enormous expansion of the collection and use of confidential, private data of billions of users.  And Facebook grew into a muli-billion-dollar public company.  In the name of profit, however, Defendants caused Facebook to exploit users' data without their consent, in violation of privacy laws in the United States and abroad.   Worse,  Defendants completely disregarded their obligations to ensure Facebook's compliance with a Consent Decree issued by the Federal Trade Commission ("FTC") in 2011.

Defendants' misconduct has devastating consequences to Facebook.  On March 17, 2018, *The New York Times* and *The Guardian's Observer* reported that Cambridge Analytica, in collaboration with Global Science Research ("GSR"), had accessed and retained the private information of tens of millions of Facebook users without their authorization and informed consent.   Like thousands of other third-party developers, Cambridge Analytica and GSR contracted with Facebook to collect user data through an App.  Although Zuckerberg and other Defendants learned of the data breach in 2015, they did *nothing* about it.  The user data obtained by Cambridge Analytica and GSR were used to influence the 2016 campaign for the White House. In the first two days following public revelation of the Cambridge Analytica scandal, Facebook lost $50 billion in market value.  And Facebook has been subject to multiple investigations by Congress and regulators.  The damages are still mounting.

Seeking to hold Defendants accountable for their misconduct that led to the Cambridge Analytica scandal, Plaintiffs bring this action on Facebook's behalf.  In their verified 140-page Complaint, Plaintiffs allege particularized facts demonstrating that all Defendants face a substantial likelihood of liability for causing the privacy breaches at Facebook, and thus lack the requisite "disinterestedness" to consider a demand.  The Complaint's particularized allegations demonstrate that Defendants knew about Facebook's privacy breaches long before the revelation of the Cambridge Analytica scandal.  Indeed, Defendants ignored internal-control deficiencies

despite numerous "red flags," including internal reports, government fines, regulatory investigations, and litigation.  But Defendants consciously disregarded their duties to ensure Facebook's compliance with privacy laws, as well as the FTC's Consent Decree.  This was a breach of Defendants' fiduciary duty of loyalty and a failure to act in good faith that renders demand futile, here.

The Complaint's allegations also show that Zuckerberg completely controls Facebook's business strategy and operations, and dominates the entire Board.  All of the other Board members, including six Defendants, are beholden to Zuckerberg, and the Complaint creates a reasonable doubt as to their independence.  Thus, the Complaint adequately pleads that demand was futile for a second, independent reason, that a majority of the directors lack independence from interested director Zuckerberg.

Even though the Complaint is replete with particularized factual allegations creating a reasonable doubt as to whether Defendants can impartially consider a demand, Defendants move to dismiss on the basis of arguments that fail to address many of the Complaint's well-pled allegations.  Defendants' Motion to Dismiss asks the Court to draw unreasonable inferences from the Complaint's allegations, or to draw inferences in Defendants' favor and against Plaintiffs, and to view the Complaint's allegations in isolation.  For the reasons explained below, the Court should deny Defendants' Rule 23.1 Motion to Dismiss and allow Plaintiffs to prosecute the meritorious claims on Facebook's behalf.  The Court need not address Defendants' Third Motion to Dismiss, or the Motion to Stay, if it denies the instant Motion to Dismiss, and notwithstanding its ruling on the Second Motion to Dismiss.  Where (as here) demand futility is adequately alleged, Plaintiffs are  futile, the Board's prerogative to control litigation decisions for the corporation is forfeit.  *See, e.g.*, *Harris v. Carter*, 582 A.2d 222, 230 (Del. Ch. 1990) ("What, in the end, is relevant [to demand futility] is … whether the present board is or is not disabled from exercising its right and duty to control corporate litigation.").

## II.   STATEMENT OF FACTS

### A.   Facebook's Background

Founded by Zuckerberg in 2004, Facebook is the biggest social networking service based on global reach and active users.  ¶42.  In 2018, Facebook is reported to have approximately 1.45 billion daily active users on average, and 2.2 billion monthly active users.  *See id*.  Facebook is a publicly-traded, multi-billion-dollar company.  *See* ¶¶ 26, 75.

Facebook's core advertising business is the primary source of its revenue.  *See* ¶¶ 51–55.  Facebook's customers (advertisers) can use its advertising services to targe users with specific attributes. ¶ 52.  Facebook also provides detailed analytical data to advertisers on how their ad campaigns are performance.  ¶ 53.  User attributes and analytical data are derived from user data, such as users' personal information, consumer behavior, preferences, lifestyle, all of which Facebook collects.  *See id*.  Facebook's data about its users is highly valuable.  The average cost per click for an online Facebook ad was $1.72 in 2017, and the average U.S. Facebook user is reportedly worth about $200 a year.  ¶ 54.

For the past ten years, Facebook has been working with third-party companies and App developers to expand access to and to use data.  ¶¶ 56–72.  For example, Facebook contracts with mobile device manufacturers to allow Facebook to implement its features directly on mobile devices.  ¶ 71.  This has enabled Facebook to obtain information about mobile device users, including non-Facebook users, and track users across devices. ¶ 71.  Facebook has been pursuing the strategy of monetizing its platform through partnerships with third-party companies, utilizing third-party developers to obtain as much user data as possible.[1]  *See* ¶¶ 60, 73–75.

To maintain user trust, Facebook repeatedly emphasized in public statements that privacy and data security *are critically important* to its brand.  ¶ 112.  In reality, however, Facebook shares massive user information without their consent with third parties, and without control of the third parties' use of the information.

---

[1] For example, according to Facebook's June 29, 2018 response to  Congressional inquires, Facebook shared information of users' friends, such as name, gender, birth date, current city, photos and page likes, with over 60 App developers nearly six months after announcing in 2015 that it had stopped access.  ¶ 12.  Facebook also shared information about its users with 52 hardware and software makers, including Chinese firms such as Huawei Technologies Co.  *Id*.

## B.   Zuckerberg Dominates and Controls Facebook's Business and Its Board

Zuckerberg controls more than 53.3% of Facebook's voting power, while owning approximately 16% of Facebook's total equity value.   ¶ 27.   As Facebook's controlling shareholder, founder, Chairman, and CEO, Zuckerberg behaves like a "corporate dictator," directing all aspects of Facebook's business strategy and policies. *See*, *e.g.*, ¶¶ 412–423. He exerts domination and control over the Board — with the power to select and remove Board members at will.   *See* ¶¶ 412, 418, 422, 459.   In 2012, for example, he agreed to Facebook's $1 billion acquisition of Instragram without consulting the Board.   ¶ 62.

As Sandberg admitted, Zuckerberg is responsible for "setting the overall direction and product strategy for the [C]ompany," and "leads the design of Facebook's service and development of its core technology and infrastructure."   ¶ 416.   For at least the past ten years, Zuckerberg "pushed for the growth-at-all-costs model" at Facebook.   ¶ 421.   As part of his strategy, Facebook expanded its collection and use of user data, and teamed up with third-party companies for the expansion. *See*, *e.g.*, ¶¶ 56–83. The Cambridge Analytica scandal was a product of Zuckeerberg's growth strategy.   *See id*.

## C.   The FTC Consent Decree Imposes Affirmative Obligations on Defendants

Each Defendant received a copy of the FTC's 2011 Consent Decree.   ¶ 401.   The Consent Decree was designed to remedy Facebook's past violations of privacy laws, and prevent future violations.   *See* ¶¶ 191–211.   For example, the Consent Decree prohibits Facebook from "misrepresent[ing] in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information."   ¶ 195.   The Consent Decree also requires that, prior to sharing a user's nonpublic information, Facebook has to "obtain the user's affirmative express consent" and "establish and implement, and thereafter maintain, a comprehensive privacy program" to prevent privacy breaches.   Even though Zuckerberg acknowledges "[t]he Consent decree is extremely important" to Facook's operations, Defendants failed to ensure Facebook's compliance with the order.   *See*, *e.g.*, ¶¶ 201–211.

### D. Despite Repeated "Red Flag" Warnings of Ongoing Violations of User Privacy and Data Protection Laws, and the FTC Consent Decree, Defendants Fail to Take Action

Numerous "red flags" going back to 2006 alerted Defendants to Facebook's violations of user privacy and other laws. In 2006, for example, users complained about the News Feed feature, which made public certain information that they intended to keep private. ¶184. In 2010, Facebook settled a class-action lawsuit for $9.5 million to resolve claims relating to the Beacon feature because it tracked users' online purchases without their knowledge. ¶187.

Even after entering into the FTC Consent Decree, Facebook's privacy violations remained rampant. Between 2011 and 2017, Facebook had to pay multiple government fines. ¶¶329–335. Facebook also underwent government investigations (¶¶181, 327), litigation (¶¶ 187), and received many other "red flag" warnings of similar improper conduct. See, e.g., ¶¶8, 118, 121–122, 184–188, 212, 249. Moreover, high-level Facebook employees and executives repeatedly warned Defendants regarding the fact that Facebook routinely shared user date without consent, and failed to remedy the issues. ¶¶8, 118, & Ex. 7 at 13–14. But Defendants did nothing in response. Defendants' misconduct has wrought extreme reputational damage upon Facebook, eroding the brand trust that is crucial for Facebook's success and survival. See ¶¶ 373–377.

## III. APPLICABLE LEGAL STANDARDS

In determining whether a derivative complaint adequately pleads that demand was futile (and thus, is excused), the substantive law of Delaware, Facebook's state of incorporation, applies.[2] *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 101-02 (1991). Importantly, Delaware's demand requirement "does not exist for the benefit of defendants in derivative suits." *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 808 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011). Rather, the law "makes it clear that demand exists for the benefit of the corporation itself." *Id.* at 808 n.160. Thus, Delaware law permits a plaintiff to proceed without making a demand where, as here, the Complaint adequately

---

[2] "[F]ederal law governs the degree of detail that the plaintiff must furnish when it gives its reasons for not [making a pre-suit demand], state law will determine whether those reasons are sufficient." *Rosenbloom*, 765 F.3d 1159 n.10 (quoting *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 722 (7th Cir. 2013)).

1    alleges facts creating a reasonable doubt that a demand was futile (and thus, is excused).

2            Under Delaware law, demand is futile where the complaint alleges particularized facts

3    creating a "reasonable doubt" that: (1) a majority of the board is disinterested and independent; or

4    (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

5    *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*,

6    746 A.2d 244 (Del. 2000).  Where there is no "transaction" being challenged, the relevant inquiry

7    is whether plaintiff has alleged facts that "create a reasonable doubt that … the board of directors

8    could have properly exercised its independent and disinterested business judgment in responding

9    to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  Under both the *Aronson* and

10   *Rales* tests, a director is not "disinterested," and "demand is excused if [p]laintiffs' particularized

11   allegations create a reasonable doubt as to whether a majority of the board of directors faces a

12   substantial likelihood of personal liability for breaching the duty of loyalty." *Rosenbloom v. Pyott*,

13   765 F.3d 1137, 1150 (9th Cir. 2014).

14           The Delaware Chancery Court has explained that Delaware's "'reasonable doubt' standard

15   is not intended to incorporate 'a concept normally present in criminal prosecution.'"  *In re Ezcorp*

16   *Inc. Consulting Agreement Derivative Litig.* 2016 WL 301245, at * 33 (Del. Ch. Jan. 25, 2016).

17   ***"Reasonable doubt can be said to mean that there is a reason to doubt."***  *Id*. (emphasis added).

18   It is "akin to the concept that the stockholder has a 'reasonable belief' that the board lacks

19   independence or that the transaction was not protected by the business judgment rule."  *Id*. at 1217

20   n.17.

21           A director who exposes the company to liability by participating in or permitting an illegal

22   scheme to suppress competition faces a "substantial risk of personal liability" for breach of the

23   fiduciary duty of loyalty (and the corresponding obligation to act in good faith). *Desimone v.*

24   *Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("[I]t is utterly inconsistent with one's duty of fidelity

25   to the corporation to consciously cause the corporation to act unlawfully."); *see also Stone v. Ritter*,

26   911 A.2d 362, 369 (Del. 2006) (failure to act in good faith may be shown where director

27   "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard

28

for his duties").  A claim that "the Board knew or should have known about illegal conduct and made a conscious choice to turn a blind eye can be characterized either as a *Caremark*-type oversight claim or as an *Aronson* type allegation of considered board action .... either way, demand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the [company's] board faces a substantial likelihood of liability for failing to act in the face of a known duty to act."  *Rosenbloom*, 765 F.3d at 1150-51.  *See also Am. Int'l Grp*., 965 A.2d at 799 (noting "a fiduciary duty to speak" where directors are aware of misconduct at company).[3]

In assessing the sufficiency of a complaint under Delaware law, the Ninth Circuit in *Rosenbloom* confirmed three settled rules.  *See id.* at 1137.  First, a plaintiff is required only to plead particularized facts, not evidence.  *Id*. at 1156 (the district court erred by "insist[ing] on a smoking gun of [b]oard knowledge").  Second, the court must accept all well-pleaded allegations as true, must draw all reasonable inferences in plaintiff's favor, and must allow plaintiff to show demand futility based on "an *inference*" of misconduct.  *Id*. at 1152–53, 1156 (emphasis in original).  Third, the court must view the complaint as a whole and must not "consider[] the factual allegations in isolation."  *Id*. at 1155.

## IV.   ARGUMENT

### A.   Demand Was Futile Because the Defendants – Who Comprise a Majority of Facebook's Board – Face a Substantial Likelihood of Liability

All Defendants are responsible for Facebook's data-privacy policies, as well as its violations of the Consent Decree and other laws and regulations.  In fact, the Cambridge Analytica scandal is the very product of Facebook's "growth-at-all-costs business model" designed and promoted by Zuckerberg, and approved and implemented by all Defendants.  *See* ¶¶ 411–443.  And Facebook is damaged as a result.  Thus, as discussed in detail below, all Defendants face a substantial likelihood of liability.  *See* ¶¶ 384–462.  Demand was, therefore, futile and is excused.

---

[3] A failure to act under these circumstances constitutes a breach of the fiduciary duty of loyalty as well as bad-faith conduct that, under Delaware law, cannot be exculpated.  *See, e.g., In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 732 (D. Del. 2000) (an exculpatory provision "does not release directors from liability for breaches of the duty of loyalty, or for intentional.

1.      **Defendants' Knowledge is Properly Pleaded Inferentially**

Defendants' knowledge (i.e., *conscious* inaction) is properly pleaded inferentially.  *See Rosenbloom*, 765 F.3d at 1156 (demand futility analysis does not require "smoking gun" evidence of "Board knowledge … plaintiffs can show demand futility by alleging particular facts that support an ***inference*** of conscious inaction") (emphasis in original); *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 461-62 (S.D.N.Y. 2010) ("[n]othing in … Delaware law holds it insufficient for individual directors' knowledge and liability to be pleaded inferentially"). While direct evidence as to each individual director's state of mind may be a crucial issue "at trial," this is not true at the pleading stage "even under the heightened pleading standard applicable under [Delaware law]." *In re Massey Energy Co.*, 2011 WL 2176479, at *21 (Del. Ch. May 31, 2011).

As the Delaware Chancery Court has explained, there is a "very plausible inference" that corporate officers and directors engaging in wrongdoing "do their best not to leave an obvious paper trail. Rather, consistent with their improper objectives, those at the top of such schemes try to conceal their roles and not leave marked paths leading to their doorsteps." *Am. Int'l Grp.*, 965 A.2d at 795; *see La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 341 (Del. Ch. 2012) ("*Pyott*") ("because sophisticated and well-advised individuals do not customarily confess knowing violations of law," a plaintiff need only "plead facts and circumstances sufficient for a court to infer that the directors knowingly violated positive law") *rev'd on other grounds sub nom. Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612 (Del. 2013).

2.      **Defendants Consciously Disregarded Their Duty to Comply with the 2011 FTC Consent Decree, Exposing Facebook to Further Sanctions**

For nearly seven years after entry of the FTC Consent Order, Defendants consciously caused or allowed Facebook to engage in illegal activities that caused harm to Facebook and its shareholders.  *See* ¶¶ 191–211. All Defendants received a copy of the Consent Order and, thus, had actual knowledge of the issues addressed therein and their affirmative obligations thereunder. ¶¶197, 400-401.  Although the Consent Order charged Defendants with overseeing Facebook's compliance – when they were already obligated to oversee Facebook's compliance with its legal oblications in accordance with their fiduciary duties under Delaware law – Defendants failed to do so.  Instead, Facebook continued to grant third party companies "unprecedented" access to

8

Facebook users' information and data, while publicly misrepresenting the true nature of these practices. ¶202. In fact, GSR, the company that transferred data to Cambridge Analytica, acquired its data from Facebook in June 2014 — years after the Consent Decree went into effect. *See id*. As Zuckerberg admitted before Congress, he knew about Cambraidge Analytica's unauthorized use of Facebook user data by at least 2015. ¶ 121. But neither he nor any other Defendants took any action at the time. ¶ 122. Moreover, Defendants failed to implement and revise Facebook's policies and terms of use to ensure compliance with the "affirmative express consent" requirement of the FTC Consent Decree. *See* ¶ 203.

The business-judgment rule does not protect such misconduct. *See In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011). A director "cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." *Id*.[4] Simply put, "Delaware does not charter law breakers." *Hampshire Grp., Ltd. v. Kuttner*, 2010 WL 2739995, at *30 (Del. Ch. July 12, 2010). Because Defendants face a substantial likelihood of liability, demand is futile and excused.

Even if disregarding illegal conduct were subject to the business judgment rule (it is not), demand is excused here because the facts create a reasonable inference that Defendants are incapable of considering a demand in a disinterested manner. *Aronson*, 473 A.2d at 814; *Rales*, 634 A.3d at 936. The Board failed to act in the face of significant information that the violations of the Consent Decree were ongoing. ¶¶122, 201–210. "A board that fails to act in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act." *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012) (noting "a claim that an audit committee or board had notice of serious misconduct and simply failed to investigate" will survive a motion to dismiss, even if the board or committee is otherwise well constituted or

---

[4] *See also*, *e.g.*, *DeSimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully" and "the knowing use of illegal means to pursue profit for the corporation is director misconduct."); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs, Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity").

1   otherwise functioning).  Directors "cannot simply implement control systems, consciously fail to

2   oversee its operations, and then claim to have satisfied [their] fiduciary duty to monitor."  *Shaev*

3   *v. Baker*, 2017 WL 1735573, at *14 (N.D. Cal. May 4, 2017).  The Complaint alleges that

4   Defendants did precisely that.

5          Plaintiffs' allegations that Defendants knew and turned a blind eye to the illegal conduct

6   reveals a conscious decision to look away.  *See*, *e.g.*, ¶¶122, 184–188, 249.  In light of these facts,

7   Facebook is wrong to mischaracterize Plaintiffs' claims as "*Caremark*" claims.  *See generally In*

8   *re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).  *Caremark* is inapplicable.

9   In *Caremark*, shareholders sued the board for failing to monitor company employees — not

10  executive officers or directors — violated federal law governing healthcare providers.  *Id*. at 961.

11  Significantly, there was no indication that any directors even knew of the underlying violations.

12  Id. at 971.  Thus, the court analyzed whether the directors were potentially liable for an

13  "unconsidered failure to act," and concluded they could not be, absent a "sustained or systematic

14  failure of the board to exercise oversight — such as an utter failure to attempt to assure a reasonable

15  information and reporting system exists."  *Id*.  In contrast, Plaintiffs allege that Defendants not

16  only had actual knowledge of the internal-control deficiencies and violations of the Consent

17  Decree, but also failed to take action.  *See*, *e.g.*, ¶¶ 151, 200–211.  Faced with similar facts, the

18  court in *In re Abbott Laboratories Derivative Shareholder Litigation* refused to apply *Caremark*,

19  noting that plaintiffs had alleged a deliberate violation rather than a mere failure-to-monitor claim.

20  325 F.3d 795, 805–06 (7th Cir. 2003); *see also Cook v. McCullough*, 2012 WL 3488442 at *4-6

21  (N.D. Ill. Aug. 13, 2012) (excusing demand on a *Caremark* claim); *Pfizer*, 722 F. Supp. 2d at 459

22  (same).  This Court should follow *Abbott Laboratories*, *Cook*, and *Pfizer*, and reject Defendants'

23  argument based on *Caremark*.  *See also Rosenbloom*, 765 F.3d at 1151 (excusing demand

24  regardless of whether Caremark is applicable).

25          In any event, whether or not *Caremark* applies, "demand is excused if Plaintiffs'

26  particularized allegations create a reasonable doubt as to whether a majority of the [Facebook

27  Board] faces a substantial likelihood of liability for failing to act in the face of a known duty to

28

act." *Id.* at 1150–51.  Defendants "had actual or constructive knowledge of violations of law at [Facebook]," yet they failed to halt the illicit activity.  *Id*.  Plaintiffs' allegations warrant "an inference of conscious inaction" and that is all that is required at the pleading stage.  *Id*. at 1156.

### 3.  Defendants Knew of and Ignored Internal Control Deficiencies

Facebook's path leading up to the Cambridge Analytica scandal was paved with numerous red flag warnings of similar wrongdoing. Even before the entry of the Consent Decree, Facebook users protested privacy breaches on several occasions.  In 2006, users complained about the News Feed feature, which made public certain information that they intended to keep private.  ¶ 184.  In 2009, Facebook angered users by making their post public by default.  ¶ 185.  And in 2010, Facebook settled a class-action lawsuit for $9.5 million to resolve claims relating to the Beacon feature, which tracked users' online purchases without their knowledge — offering them no opportunity to opt out.  ¶ 187.  Zuckerberg had actual knowledge of the Beacon settlement.  *See id*.

While the Consent Decree was in force, privacy issues continued to arise.  In September 2011, the Office of the Data Protection Commissioner of Ireland found non-compliance with EU data protection requirements, and recommended improvements in Facebook's use of its tag suggest tool.  ¶ 188.  In December 2011, a bipartisan group sought changes in Facebook's privacy policy, complaining that it was too long and complex.  ¶ 189.

In 2012, Sandy Parakilas, who worked at Facebook as a platform operation manager, responsible for overseeing Facebook's data policy enforcement efforts, "warned senior executives regarding the fact that Facebook routinely shared user date without consent, and failed to remedy the issues." *See* ¶¶ 8, 118, & Ex. 7 at 13–14.  But Facebook did nothing in response.

In 2015, if not earlier, Zuckerberg and the other Defendants knew about Cambraidge Analytica's unauthorized use of Facebook user data by at least 2015.  ¶ 121.  As Zuckerberg admitted, neither he nor any other Defendants took any action at the time.  ¶ 122.

In March 2016, the FTC issued warning letters to 12 app developers who used the SilverPush software to track customers' TV viewing habbits.  ¶ 249.  And in October 2016, Roger McNamee, a friend of Zuckerberg and Sandberg's, sent a draft of the op-ed piece to Zuckerberg

11

and Sandberg, warning that Facebook was being manipulated by "bad actors."  ¶¶ 221–222.

In April 2017, Facebook's Chief Information Officer published a "White Paper," confirming that Facebook's public statements were false and misleading.  ¶ 212

All of these red flags should have prompted the Board to implement reasonable controls, and prevented an incident like Cambridge Analytica.  Yet, Defendants turn a blind eye to these issues.

Under these facts, *Abbott Laboratories* is instructive.  *See* 325 F.3d at 795.  There, plaintiffs alleged that directors ignored red flags raised by a federal regulator involving six years of ongoing violations of healthcare regulations.  *See id.* at 802–03.  Plaintiffs also allege that the directors consciously failed to act to remedy those violations or to exercise reasonable oversight.  *Id*. Plaintiffs alleged that the company's board ignored repeated red flags in media reports, and chose not to "bring a prompt halt to the improper conduct causing the noncompliance, or to reprimand those persons involved, nor to seek redress for [the company] for the serious damages it sustained." *Id*.  The trial court dismissed the complaint under Rule 23.1.  The appellate court reversed the dismissal, inferring bad-faith misconduct from "sustained and systematic failure of the board to exercise oversight":

> The facts support a reasonable assumption that there was a "sustained and systematic failure of the board to exercise oversight,"  in this case intentional in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith.…
>
> With respect to demand futility based on the directors' conscious inaction, we find that the plaintiffs have sufficiently pleaded allegations, if true, of a breach of the duty of good faith to reasonably conclude that the directors' actions fell outside the protections of the business judgment rule.

*Id*. at 809. Among the facts the court relied upon were notice in the press and prior regulatory action. *Id*.

In *Westmoreland County Employee Retirement System v. Parkinson*, the court noted that *Abbott Labboratories* "did not involve any affirmative obligations imposed on the board of directors by virtue of a consent decree."  *See* 727 F.3d 719, 727 (7th Cir. 2013).  The court found evern stronger arguments for "bad faith" in *Westmoreland*, because the board there, just as the

12

Facebook Board, allowed the company to embark upon a course that violated a pre-existing consent decree.  *Id*.  Similarly, in *Pfizer*, plaintiffs alleged that defendants engaged in the illegal off-label sales of prescription drugs in violation of federal law.  *See* 722 F. Supp. 2d at 455. Citing the complaint, the court in *Pfizer* found that it was reasonable to infer that "the defendants, at a minimum, knew of a high probability that Pfizer was continuing to purposely promote off-label marketing and deliberately decided to let it continue by blinding themselves to that knowledge — thus implicating the *Aronson* test."  *Id*. at 460.

The same reasoning applies here and requires a finding that Defendants knowingly or recklessly disregarded illegal activity.  *See id.* at 456 ("In the face of all these prior violations by its subsequently-acquired subsidiaries, and despite its promises to take significant steps to monitor and prevent any further violations, Pfizer itself engaged in the same misconduct.").

Facebook's arguments to the contrary are a mere red herring.  *See* Mot. at 13–14.  All the these red flags relate to Facebook's data-privacy policies — whether the nature of the issue involves disclosure, consent, or data sharing, and whether or third-party access is implicated.  It is indisputable that user data is Facebook's core business.  *See*, *e.g.*, ¶¶ 51–55.  The importance of data privacy cannot be overstated, especially in light of the entry of the FTC Consent Decree.  As the Ninth Circuit observed in *Rosenbloom*, "[i]n demand futility cases, courts have repeatedly emphasized that it is especially plausible to infer board interest in and knowledge of developments relating to a product that is critical to a company's success or is otherwise of special importance to it."  *See* 765 F.3d at 1154.  Indeed, "[i]t is absurd to suggest that the Board of Directors would not discuss" the critical issues involving the company's core product.  *See No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Grp*., 320 F.3d 920, 942–43 & n.21 (9th Cir. 2003); *see also Pfeiffer v. Toll*, 989 A.2d 683, 693 (Del. Ch. 2010) (directors have the statutory responsibility to direct and oversee the company, which includes knowing the company's core information).  As such, it is reasonable to infer that the Board knew about the red flags relating to the data-privacy issues.  *See Rosenbloom*, 765 F.3d at 1154; *see also*, *e.g.*, *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (imputing knowledge about import restrictions eliminating a significant

source of income for the company).

### 4. The Purported "Exculpatory Provision" Does Not Shield Defendants From Liability Because They Failed to Act in Good Faith

The exculpatory provision in Facebook's Certificate of Incorporation cannot eliminate personal director liability for breaches of the fiduciary duty of loyalty or for conduct in bad faith. Facebook acknowledges that Section 102(b)(7) if the Delaware General Corporation Law ("DGCL") does not protect "acts or omissions not in good faith" or that "involve intentional misconduct or a knowing violation of law." *See* Mot. at 10; *Ryan v. Lyondell Chem. Co.*, 2008 WL 4174038, at *2-3 (Del. Ch. Aug. 29, 2008) ("a conscious disregard of one's responsibilities" is "properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith"); *see also In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 458 n.3 (S.D.N.Y. 2010) (quoting *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006)).  Here, the Complaint describes repeated and pervasive violations of law that subjected Facebook to an FTC Consent Decree (¶¶ 191–211), multiple fines (¶¶ 329–335), government investigations (¶¶ 181, 327), litigation (¶ 187), and the web of red flags indicating that all Defendants were aware of the improper conduct underlying those actions.  *See*, *e.g.*, ¶¶ 8, 118, 121–122, 184–188, 212, 249. DGCL § 102(b)(7) does not shield Defendants from this conduct that is alleged to be in bad faith. Because Defendants' liability is premised on their violation of the duties of good faith and loyalty, Facebook's reliance on Section 102(b)(7) forms no basis for dismissal.  *See In re McKesson Corp. Derivative Litig.*, 2018 WL 2197548, at *6 (N.D. Cal. May 14, 2018) (refusing to apply Section 102(b)(7)).

### B.   Demand Was Also Futile Because a Majority of the Directors Lack Independence From and Are Beholden to Defendant Zuckerberg

By its own admission, Facebook is a "controlled company."  ¶413.  According to Facebook's 2017 proxy statement, NASDAQ rules do not require Facebook "to have a majority of [its] board of directors be independent." *Id.*  Although not dispositive as to demand futility, this admission serves as "a useful source for [courts] to consider when assessing an argument that a director lacks independence." *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015).  In *Sandys v. Pincus*, the Delaware Supreme Court reversed an order

14

dismissing a derivative complaint for failure to allege demand futility, in part because the trial court "plac[ed] heavy weight on the presumptive independence of directors," despite the company's admission that certain directors were not independent under NASDAQ rules. *See* 152 A.3d 124, 131 (Del. 2016). In so holding, the Delaware Supreme Court reasoned that the "NASDAQ rules' focus on whether directors can act independently of the company or its managers *has important relevance* to whether they are independent for purposes of Delaware law." *Id*. at 133. Contrary to the Delaware Supreme Court's admonition, Facebook — a self-admitted "controlled company" — asks the Court to focus on the "*presumption* that [Defendants] were faithful to their fiduciary duties." *See* Mot. at 20 (emphasis in original) (quoting *Beam v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004)). The Court should decline this invitation and review the factual allegations in the Complaint in light of *Sandys*. *See* 152 A.3d at 133 (courts "must be cautious about according deference to directors unable to act with objectivity"). Indeed, a court in this District recently noted, following *Sandys*, that "[a] corporation's admission that certain of its directors are not independent is **highly probative** of whether that director is capable of independently considering a shareholder demand." *Hamilton v. Barnes*, 2018 WL 4053459, at *12 (N.D. Cal. Aug. 24, 2018) (emphasis added).

### 1.  Defendant Zuckerberg Dominates and Controls Facebook and Its Board

It is undisputed that Zuckerberg "controls a majority of [Facebook's] outstanding voting power." ¶ 413. Zuckerberg thus exerts domination and control over Facebook's Board and management. *See Kahn v. Tremont Corp.*, 1994 WL 162613, at *2-4 (Del. Ch. Apr. 22, 1994) (excusing demand based on the controlling shareholder's domination and control). As explained above, the Complaint's allegations demonstrate that Zuckerberg was personally involved in the policies relating to the data privacy issues at Facebook. *See* ¶¶263. 265, 412, 415–418, 420–422, 444, 448, 459, 462. As such, he cannot consider a litigation demand — to bring claims against himself — in a disinterested, independent manner. *See Sandys*, 152 A.3d at 128 (holding that the directors personally involved in allegedly illegal transaction lack independence). Nor can the other Board members do so because of Zuckerberg's domination and control. And Zuckerberg's

unilateral decision-making and dictator-esque behavior — in failing to obtain the Board's approval of the $1 billion purchase of Facebook subsidiary Instagram (¶62), making a mockery of the Special Committee process by texting Andreessen throughout the committee meeting to find out what was happening and impose his will on the Special Committee in its decision-making (¶¶439-440), and by unilaterally appointing Zienst to the Board without putting the matter to vote at the annual meeting scheduled just a few weeks later, at which the other directors were slated for re-election (¶ 422) — bear it out.  These particularized factual allegations demonstrate that the other Board members lack independence from and are beholden to Zuckerberg.  *See In re Trump Hotels S'holder Derivative Litig.*, 2000 WL 1371317, *9 (S.D.N.Y. Sept. 21, 2000) (applying Delaware law) (totality of the circumstances raised a reasonable doubt regarding directors' independence from the controlling shareholder).

Defendants cannot seriously dispute that Zuckerberg — Facebook's controlling shareholder, founder, Chairman, and CEO — was personally involved in and faces a substantial likelihood of liability for the alleged wrongdoing.  *E.g.*, ¶¶27, 121-123, 288-303, 308-311, 395, 412–423.  *See* Section IV.A, *supra*.  Moreover, Zuckerberg controls stock and proxies for stock representing more than 53.3% of Facebook's voting power, while he owns approximately 16% of Facebook's total equity value.  ¶27.  Zuckerberg is therefore a controlling shareholder as a matter of law.  *See Kahn v. Lynch Comm'ns Sys, Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994).[5]  Where, as here, a director serves as "an executive employee" of a company and was "involved at a high level" in its management, "these facts alone are sufficient to create a reasonable doubt that he could be disinterested and independent in evaluating plaintiffs' demand."  *Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc.*, 704 F.3d 155, 165-66 (1st Cir. 2013).

In addition, Zuckerberg lacks disinterestedness, and cannot consider a litigation demand

---

[5] In fact, Delaware law recognizes that a shareholder with "substantial minority interests, ranging from 20% to 40%," has been found to be a controlling shareholder.  *See Trump Hotels*, 2000 WL 1371317, *7 (excusing demand because the directors were beholden to a controlling shareholder who owned 25–35% of the underlying stock); *see also, e.g., In re Cysive, Inc., S'holder Litig.*, 836 A.2d 531, 535 (Del. Ch. 2003) (a 35% shareholder); *In re Zhongpin Inc. Stockholder Litig.*, 2014 WL 7335920, at *1-2 (Del. Ch. Nov. 26, 2014) (a 17.3% shareholder), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics, Inc. Stockholder Litig.*, 115 A.3d 1173 (Del. 2015).

relating to Facebook's data-privacy breaches, because fact-specific allegations demonstrate his personal involvement and control over Facebook's business strategies and policies.  According to Facebook's own website, Zuckerberg is responsible for "setting the overall direction and product strategy for the [C]ompany," and "leads the design of Facebook's service and development of its core technology and infrastructure."  ¶416.  For example, Zuckerberg was directly involved in designing the data-sharing business model between Facebook and WhatsApp.  *See* ¶¶ 263–274.  Following the announcement of Facebook's acquisition of WatsApp in April 2014, Zuckerberg misleadingly said: "[w]e are absolutely not going to change plans around WhatsApp and the way it uses user data."  ¶ 263.  Contrary to his public statements, Zuckerberg personally pressured WhatsApp's founders, including Koum, to change its business model in order to generate more advertising revenue.  *See* ¶ 265

Zuckerberg's tight grip over Facebook's operations — on matters big and small — are confirmed by multiple employees, including COO Sandberg.  At a media interview on May 30, 2018, Sandberg readily admitted that Facebook is under "***founder control***," and that Zuckerberg "***designed the platform and … the policies***" that led to the ***Cambridge Analytica*** debacle.  ¶¶ 416–17 (emphases in original).  In addition to senior management, Facebook's rank and file also directly experienced Zuckerberg's control and domination. Zuckerberg's speech writers from 2005, Kate Losse recalls that "Zuckerberg created an atmosphere at Facebook that discouraged questioning power and standing up to management."  ¶¶ 420–421.  A former Facebook platform operation manager, Sandy Parakilas, confirmed that Zuckerberg has always been responsible for Facebook's policies. ¶ 415.  Specifically, Parakilas recalled that, in 2011, Zuckerberg personally approved every decision to ban an app.  *See id*.

More importantly, aside from his control over Facebook's day-to-day operation, Zuckerberg dominates the Board.  In April 2016, for example, Zuckerberg caused the Board to approve his plan to issue new "Class C" shares with no voting rights, allowing himself to sell the majority of his shares for billions of dollars, while simultaneously retaining total control over decision-making.  ¶ 459.  Zuckerberg also caused the Board to reject shareholder proposals to

1  change the dual-class stock structure, solidifying his domination and control.  ¶ 418.  Zuckerberg

2  has the power to select and remove directors at will.  ¶ 412.  For example, in 2018, he unilaterally

3  appointed Jeffrey Zients to the Board.  ¶ 422.  He was also responsible for recruiting several Board

4  members, including Chenault and Sandberg.  ¶¶ 444, 448, 462.

5      These facts cast a reasonable doubt as to whether the rest of the Board members can

6  impartially consider a litigation demand, as they lack independence from defendant Zuckerberg.

7  *See Trump Hotels*, 2000 WL 1371317, *9.  Facebook's data-privacy issues, including the

8  Cambridge Analytica debacle, are products of policies and growth strategy set by Zuckerberg.

9  *See*, *e.g.*, ¶421 (noting Facebook's "atmosphere seems to have manifested into Zuckerberg's push

10  for the growth-at-all-costs model").  Under these circumstances, demand was futile with regard to

11  Zuckerberg, and, due to his domination and control, with regard to the entire Board.

12      Arguing the contrary, Defendants cite two inapposite cases.  *In re Google Inc. Shareholder*

13  *Derivative Litigation* is distinguishable because the plaintiffs there failed to "identify any specific

14  actions or knowledge on the part of" the "inside" directors regarding the underlying alleged

15  wrongdoing.  *See* 2013 WL 5402220, at *5 (N.D. Cal. Sept. 26, 2013).  Likewise, *In re Dow*

16  *Chemical Derivative Litigation* stands for the unremarkable proposition that domination and

17  control are relevant only if the controlling shareholder is conflicted.  *See* 2010 WL 66769, at *14

18  (Del. Ch. Jan. 11, 2010).  As demonstrated above, Plaintiffs have alleged specific facts connecting

19  Zuckerberg to the data-privacy policies and problems at Facebook.  *See* ¶¶ 263. 265, 412, 415–

20  418, 420–422, 444, 448, 459, 462.  Zuckerberg is thus conflicted.  Defendants' reliance on *Google*

21  and *Dow* is misplaced.  The Court should find that Zuckerberg lacks independence and is conflicted

22  for demand purposes in this action.

23      As demonstrated above, Zuckerberg's control of Facebook is a dictatorship — both on

24  paper and in reality.  *See* ¶412.  His firm grip over the Board — being able to select and remove

25  directors at will — supports a finding that all of the other Board members — six other Defendants

26  (Thiel, Andreessen, Hastings, Sandberg, Bowles, Desmond-Hellmann), Chenault (handpicked by

27  Zuckerberg to join the Board in 2018), and Zients (unilaterally appointed to the Board by

28

Zuckerberg just weeks before the 2018 annual meeting and election) — are beholden to him. *See Heineman v. Datapoint Corp.*, 611 A.2d 950, 956 (Del. 1992) (finding that a director lacked independence based on, among other things, "interlocking directorships, domination by [the controlling stockholder]"). As discussed below, each Defendant has additional ties to Zuckerberg that hamper their ability to consider a demand to commence litigation against Zuckerberg in an independent manner.

### 2.      Defendant Thiel Lacks Independence From Zuckerberg

One of the early investors in Facebook, Thiel has a long-standing business relationship with Zuckerberg. ¶ 424. Thiel is a long-term partner of the Founders Fund, a venture capital firm that, like Facebook, strives to keep founders in control of the companies they have created. *Id*. In fact, the Founders Fund's website touts Facebook as a primary excaple of its maxim, citing Thiel and Zuckerberg by name. ¶ 431. Thiel also benefited greatly from his relationship with Zuckerberg and his seat on the Facebook Board, because the Founders Fund gets "good eal flow" from this high-profile association. *Id*. According to Facebook's 2018 proxy statement, the Founders Fund stands to gain substantialy from its investments in Facebook. *See id.* These facts amply support a finding that Thiel cannot consider a demand to bring claims against Zuckerberg in a disinterested, independent manner. *See Sandys*, 152 A3d at 131 (finding that two directors lacked independence because they were partners in a venture capital firm, holding a 9.2% equity interest in the company, and because they had interlocking relationships with the company's controlling shareholder).

Without any discussion or analysis, Defendants simply say that Plaintiffs' allegations regarding Thiel are "conclusory." Mot. at 22. Not so. Plaintiffs' allegations are detailed and specific — identifying the reasons why Thiel would placate to Zuckerberg's demands.

### 3.      Defendant Andreessen Lacks Independence From Zuckerberg

Like Thiel, Andreessen was one of Zuckerberg's early funders in Silicon Valley. *See* ¶439. Andreessen's venture capital firm also stands to profit from its investments in Facebook. ¶¶435–436. In fact, Andreessen turned his firm's $250,000 investment in Instragram into $78 million, when it was acquired by Facebook. ¶437. It is indisputable that Andreessen benefits from his

19

relationship with Zuckerberg and his seat on the Facebook Board. *See* ¶¶435–36. Moreover, it is widely reported that Andreessen and Zuckerberg are close friends. ¶439. And Andreessen was known to have vouched to protect Zuckerberg in his fight for voting control in the past, including while Andreessen was a member of the supposedly "independent" Special Committee evaluating whether to allow Zuckerberg's proposed reclassification of shares. *See* ¶440. Ultimately then, Andreessen and the other members of the Special Committee ceded to Zuckerberg, and there is no reason to believe he would not do the same thing now. ¶440. Andreessen and Zuckerberg continue to share a close friendship and other business ties. ¶¶434-439.

Arguing the contrary, Defendants cite to a decision in the derivative action involving Facebook's initial public offering, *In re Facebook, Inc. IPO Securities & Derivative Litigaiton*, 922 F. Supp. 2d 445 (S.D.N.Y. 2013). Defendants assert that Plaintiffs must allege an overpayment for the Instragram transaction to infer the lack of independence. But this mischaracterizes Plaintiffs' argument. It is the oversize profit ($250,000 investment turning into a $78 million return), not any unfair price, that renders Andreessen conflicted. Moreover, the Court must consider all allegations as a whole, rather than considering the instragram in isolation. *See Rosenbloom*, 765 F.3d at 1155. Here, Zuckerberg's control over Facebook's business led to the data-privacy breaches, and his domination over the Board, as well has his ties to the other Board members, make the entire Board beholden to him. *See* ¶¶ 263. 265, 412, 415–418, 420–462. Under these facts, the Court should find that Andreessen (like the other directors) lacks independence from, and is beholden to Zuckerberg. *See Sandys*, 152 A3d at 126 (holding that an "extremely intimate personal friendship" gives rise to a finding of disabling interest).

### 4.   Defendant Hastings Lacks Independence From Zuckerberg

Defendant Hastings is the CEO and Chairman of Netflix, one of Facebook's largest advertisers. ¶ 441. Hastings has every incentive to placate to Zuckerberg's desires at Facebook due to Facebook's business relationship with Netflix. ¶ 442. Through the "Friends and Community" initiative launched five years ago, Netflix enjoyed valuable word-of-mouth type marketing because the initiative allows Facebook users to share data about their Netflix viewing habits with their Facebook friends. *Id*. The initiative caused Netflix's share price to climb 6%.

1   *Id.* This alone makes Hastings beholden to Zuckerberg. *See Trump Hotels*, 2000 WL 1371317, at

2   *9 (finding the lack of independence based on a director's "history of personally beneficial

3   affiliation with" entities controlled by the dominating board member).

4         In an attempt to avoid a finding of Hastings's lack of independence, Facebook downplays

5   the significance of a 6% share price hike and the substantial value of the Facebook-Netflix

6   relationship. That is a disguised attempt to raise factual issues at the pleading state. Hastings's

7   relationship with Zuckerberg is critical to the success of Netflix, where Hastings is Chairman and

8   CEO. *See* ¶¶ 441–443. The Court should reject Facebook's argument.

9        **5.**     **Defendant Sandberg Lacks Independence From Zuckerberg and Other Interested Directors**

10         At the outset, Sandberg is *not* independent — even putting aside her ties to Zuckerberg —

11   because she is Facebook's COO with a lucrative compensation package ¶452. Thus, she cannot

12   act independently from any of the other Board members who have the ability to remove her from

13   her position and otherwise control her compensation. *See, e.g., Mizel v. Connelly*, 1999 WL

14   550369, at *1 (Del. Ch. July 22, 1999) (finding a reasonable doubt regarding the independence of

15   a director whose "positions with [the corporation] constitute his principal employment and means

16   of earning a living"). Sandberg also has deep ties with Zuckerberg and has significant influence

17   on his decisions. ¶ 448. Zuckerberg recruited Sandberg from Google in 2008, after they spent

18   months speaking for several hours a week. *Id.* For the past decade, the two have been meeting

19   twice every week. Known as Zuckerberg's second-in-command, Sandberg is beholden to him.

20   *See Beam*, 833 A.2d at 978 (holding that an employee of one of Martha Stewart's companies, who

21   had an interest in "continued employment," was beholden to Stewart).

22         Turning Plaintiffs' fact-specific allegations on their head, Facebook argues that Sandberg's

23   lucrative compensation from Facebook should serve as a basis for an inference that she would put

24   Facebook's interrerest ahead of Zuckerberg's. *See* Mot. at 24. At the outset, the Court should reject

25   Facebook's invitation to draw inferences in favor of Facebook and compartmentalize Plaintiffs'

26   allegations. *See Rosenbloom*, 765 F.3d 1132–33. The case cited by Facebook, *Louisiana*

27   *Municipal Police Employees Retirement System v. Wynn*, 829 F.3d 1048 (9th Cir. 2017), does not

28

hold the contrary.  In any event, Sandberg would lose her positions at Facebook without Zuckerberg's support and approval.  *See*, *e.g.*, ¶¶412, 422, 444–453.  Her relationship with Zuckerberg comes first.  *See id.*  Sandberg is beholden to Zuckerberg.[6]

### 6.    Defendant Bowles Lacks Independence From Zuckerberg and Other Interested Directors

Defendant Bowles is over 70 years old — above the mandatory retirement age set by Facebook's Corporate Governance Guideline.  ¶454.  Bowles's continued membership on the Board requires a waiver from Zuckerberg and the other Board members, upon a finding of "exceptional circumstances."  ¶455.  Bowles was granted a waiver at the 2018 shareholder meeting, but no finding of "exceptional circumstances" was made.  ¶456.  In light of Zuckerberg's domination and control, Bowles is beholden to him especially because Zuckerberg could refuse to grant further age waivers.  *See Trump Hotels*, 2000 WL 137317, *8-*9 (finding that directors lacked independence from the controlling shareholder based on their past transactions).

In an improper attempt to raise factual issues at the pleading stage, Facebook argues that Bowles's seat on the Facebook Board constitutes no "personal, financial, or economic benefits" to him.  *See* Mot. at 24.  But the very fact that Bowles sought an age waiver, and received it demonstrates his desire to remain on the Board, as well as Zuckerberg's approval of it.  ¶456.  It simply defies common sense for Facebook to argue that the benefits of being a member of an multi-billion-dollar company with billions of users worldwide can somehow be immaterial to Bowle.  The Court should reject Facebook's argument outright.

### 7.    Defendant Desmond-Hellman Lacks Independence From Zuckerberg

Defendant Desmond-Hellmann has a history of ceding to Zuckerberg's demands.  ¶459. In April 2016, when Zuckerberg announced his plan to use a new "Class C" stock to maintain his voting control, Desmond-Hellmann initially objected.  *Id*.  But she changed her mind — evidently to placate to Zuckerberg's desires.  *See id.*  When the Cambridge Analytica scandal broke,

---

[6] The Court cannot dismiss Plaintiffs' insider trading claims on demand-futility grounds because, the Insider Selling Defendants lack independence and face a substantial likelihood of liability.  As such, whether or not the entire Board faces a substantial likelihood of liability, the insider trading claim survives Facebook's Rule 23.1 motion.

1   Desmond-Hellmann immediately voiced support for Zuckerberg and Sandberg — confirming her

2   loyalty to them.  ¶460; *see Biondi v. Scrushy*, 820 A.2d 1148, 1157 (Del. Ch. 2003) (finding that

3   one director was beholden to another based on his public statements of support ).  As such,

4   Desmond-Hellmann lacks independence.    Arguing the contrary, Facebook cites *In re Tyson*

5   *Foods, Inc. Consolidated Shareholder Litigation*, 919 A.2d 563 (Del. Ch. 2007).  The court in

6   *Tyson* refused to infer interestedness on the part of several directors based on conclusory

7   allegations of unidentified prior transactions where they allegedly deffered to the controlling

8   shareholder.  *See id*.  But Plaintiffs here identy the 2016 transaction on voting control.  *See* ¶459.

9   That transaction was critical to Zuckerberg's continued domination in Facebook.  And the fact that

10  Desmond-Hellmann withdraw her initial objections speaks volumes of her lack of independence,

11  as well as Zuckerberg's domination.  *See id*.  On a motion to dismiss, the Court must draw

12  inferences in favor of Plaintiffs.  *See Rosenbloom*, 765 F.3d at 1152–53 (reversing a dismissal of

13  a shareholder derivative complaint because the district court failed to draw inferences in plaintiff's

14  favor).  *Tyson* is thus inapposite; Facebook's reliance on it is misplaced.

15          **8.      Director Chenault Lacks Independence From Zuckerberg**

16          Handpicked by Zuckerberg to join the Board in 2018, Chenault is beholden to him.  ¶462.

17  Zuckerberg's statement when he announced Chenault's appointment to the Board is telling of the

18  close relationship between the two.  See *id*.  Referring to his recruitment of Chenault as a "long

19  process" that he took "very seriously," Zuckerberg said: "Ken and I have had dinners discussing

20  our mission and strategy for years."  *Id*.  This statement speaks for itself.  Chenault and Zuckerberg

21  have a close business and personal relationship that is sufficient to create a reasonable doubt as to

22  Chenault's independence.  *See Trump Hotels*, 2000 WL 137317, *8-*9.

23          Arguing the contrary, Facebook says that Zuckerberg's personal recruitment of Chenault,

24  standing alone, is insufficient for a finding of Chenault's lack of independence.  But Plaintiffs have

25  alleged more than a simple recruitment.  Plaintiffs identify Zuckerberg's years-long process of

26  recruiting Chenault, as well as the close relationship between the two.  ¶462.  Plaintiffs also

27  identify multiple instances in which Zuckerberg showed his domination and control over the

28  Board.  *See*, *e.g*., ¶¶62, 412, 422, 459.  As the Ninth Circuit held in *Rosenbloom*, all of these

23

allegations must be considered as a whole. *See* 765 F.3d at 1155 (reversing a dismissal because the district court considered the allegations "in isolation"). These facts give rise to a fair inference that Chenault is, and, in fact, all Board members are, beholden to Zuckerberg. *See* ¶¶ 424–462. In these circumstances, a demand was futile. *See In re EZCORP Inc.*, 2016 WL 301245, at *35 (Del. Ch. Jan. 25, 2016) (excusing demand).

Defendants' attacks on the "theories" of Plaintiffs' "claim" for demand futility are procedurally improper and substantively meritless. Plaintiffs assert one claim for breach of fidcuciary duty. *See* ¶¶488–502. By dividing up Plaintiffs' claim into different "theories," Defendants are essentially seeking to strike allegations from the Complaint. But it is impossible for Defendants to meet the exacting standard under Rule 12(f), which allows district courts to strike only "redundant, immaterial, impertinent, or scandalous matter[s]." FED. R. CIV. P. 12(f). Defendants are contesting only the legal sufficiency of the Complaint, and the Ninth Circuit has prohibited the use of Rule 12(f) as a substitute for Rule 12(b)(6). *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) ("Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law"). Moreover, there is no legal basis to "split" Plaintiffs' single cause of action. *See Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054–55 (9th Cir. 2011) (a complaint should be upheld if plaintiff states a plausible claim for relief). Defendants' arguments based on the "theories" of Plaintiffs' claim are thus procedurally improper and should be rejected.

## V.    CONCLUSION

For the forgoing reasons, the Court should deny Defendants' Motion to Dismiss Plaintiffs' Consolidated Shareholder Derivative Complaint under Rule 23.1.[7]

---

[7] Plaintiffs respectfully request that, should the Court grant Defendants' Motion to Dismiss, Plaintiffs be given leave to amend with the Court's guidance. The Ninth Circuit instructs that leave to amend be granted with "'extreme liberality.'" *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Here, leave to amend is particularly appropriate for three reasons. First, Plaintiffs can obtain additional documents through their inspection demand under CAL. CORP. CODE § 1601 and 8 DEL. CODE § 220. Facebook's production of documents in response to the inspection demand will help Plaintiffs bolster their demand-futility allegations. *See In re Verifone Holdings, Inc. S'holder Derivative Litig.*, 2009 WL 1458233, at *13 (N.D. Cal. May 26, 2009) (encouraging plaintiffs to make an inspection demand before amending).

1

2   Dated:  September 17, 2018                Respectfully submitted,

3                                             COTCHETT, PIRE & MCCARTHY, LLP
                                              Joseph W. Cotchett (SBN 36324)
4                                             Mark C. Molumphy (SBN 168009)
                                              Brian Danitz (SBN 247403)
5                                             Stephanie D. Biehl (SBN 306777)
                                              Gina Stassi (SBN 261263)
6

7
                                                   *Mark C. Molumphy*
8                                             _____
                                                   Mark C. Molumphy
9                                             San Francisco Airport Office Center
                                              840 Malcolm Road, Suite 200
10                                            Burlingame, CA 94010
                                              Telephone:     (650) 697-6000
11                                            Facsimile:     (650) 697-0577
                                              Email:  jcotchett@cpmlegal.com
12                                                      mmolumphy@cpmlegal.com
                                                       bdanitz@cpmlegal.com
13                                                     sbiehl@cpmlegal.com
                                                       gstassi@cpmlegal.com
14
                                              *Lead Counsel for Plaintiffs*
15

16                                            BERMAN TABACCO
                                              Joseph J. Tabacco (SBN 75484)
17                                            Daniel E. Barenbaum (SBN 209261)
                                              A. Chowing Poppler(SBN 272870)
18                                            44 Montgomery Street, Suite 650
                                              San Francisco, California 94104
19                                            Telephone:     (415) 433-3200
                                              Facsimile:     (415) 433-6382
20                                            Email: jtabacco@bermantobacco.com
                                                       dbarenbaum @bermantobacco.com
21                                                     cpoppler@bermantobacco.com

22                                            *Plaintiffs' Liaison Counsel and Executive
                                              Committee Member*
23

24                                            BOTTINI & BOTTINI, INC.
                                              Francis A. Bottini, Jr. (SBN 175783)
25                                            Yury A. Kolesnikov (SBN 271173)
                                              7817 Ivanhoe Avenue, Suite 102
26                                            La Jolla, California 92037
                                              Telephone:     (858) 914-2001
27                                            Facsimile:     (858) 914-2002

28
PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS PURSUANT TO FRCP 23.1
Case No. 4:18-CV-01792-HSG

| 1 | Email: | fbottini@bottinilaw.com |
| | | ykolesnikov@bottinilaw.com |
| 2 | | *Plaintiffs' Executive Committee Member* |

3

4  Patrice L. Bishop (SBN 182256)
   pbishop@ssbla.com
5  STULL, STULL & BRODY
   9430 W. Olympic Blvd., Suite 400
6  Beverly Hills, CA 90212
   Tel: (310) 209-2468
7  Fax: (310) 209-2087

8  Lynda J. Grant (*admitted pro hac vice*)
   lgrant@grantfirm.com
9  THEGRANTLAWFIRM, PLLC
   521 Fifth Avenue, 17th Floor
10 New York, NY 10175
   Tel: (212) 292-4441
11 Fax: (212) 292-4442

12

13 *Plaintiffs' Executive Committee Member*

14 DEREK G. HOWARD LAW FIRM, INC.
   Derek G. Howard (SBN 118082)
15 42 Miller Avenue
   Mill Valley, California 94941
16 Telephone:   (415) 432-7192
   Facsimile:   (415) 4524-2419
17 Email:       derek@derekhowardlaw.com

18 *Plaintiffs' Executive Committee Member*

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS PURSUANT TO FRCP 23.1
Case No. 4:18-CV-01792-HSG