JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
MARK C. MOLUMPHY (SBN 168009)
mmolumphy@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
GINA STASSI (SBN 261263)
gstassi@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE FACEBOOK, INC. SHAREHOLDER DERIVATIVE PRIVACY LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Lead Case No. 4:18-cv-01792-HSG<br><br>**STATEMENT OF RECENT DECISION AND RELATED SETTLEMENTS IN FURTHER SUPPORT OF PLAINTIFFS' MOTION TO LIFT STAY TO PERMIT INSPECTION IN AID OF PLEADING DEMAND FUTILITY**<br><br><u>Hearing:</u><br>Date:    June 27, 2019<br>Time:    2:00 p.m.<br>Location: Courtroom 2, 4th Floor<br>Judge:    Hon. Haywood S. Gilliam, Jr.<br><br>Date Action Filed: March 22, 2018 |

Pursuant to Local Civil Rule 7-3(d), Plaintiffs submit this Statement of Recent Decision and Related Settlements to apprise the Court of recent events related to the arguments made in Plaintiffs' Motion to Lift Stay in Aid of Pleading Demand Futility (Dkt. Nos. 114-119):

(1) the July 10, 2019 opinion by a panel of the United States Court of Appeals for the Ninth Circuit, affirming in part and reversing in part the District Court's dismissal of the case, *Oklahoma Police Pension and Retirement System, et al. v. LifeLock, Inc., et al.*, Case No. 2:15-cv-01398-SRB (D. Ariz.).  A copy of this decision is attached hereto as **Exhibit A**;

(2) the July 24, 2019 Complaint For Civil Penalties, Injunction, And Other Relief filed by the Department of Justice against Facebook in *United States of America v. Facebook, Inc.*, Case No. 19-cv-02184 (D.D.C.).  A copy of the Complaint is attached hereto as **Exhibit B**;

(3) the July 24, 2019 Stipulated Order For Civil Penalty, Monetary Judgment, And Injunctive Relief between the United States, acting on authorization of the Federal Trade Commission ("FTC"), and Facebook, filed in *United States of America v. Facebook, Inc.*, Case No. 19-cv-02184 (D.D.C.).  A copy of the Stipulated Order is attached hereto as **Exhibit C**;

(4) the July 24, 2019 Complaint filed by the Securities and Exchange Commission ("SEC") against Facebook in *Securities and Exchange Commission v. Facebook, Inc.*, Case No. 3:19-cv-04241-JD (N.D. Cal.).  A copy of the Complaint is attached hereto as **Exhibit D**.

(5) the July 24, 2019 Press Release issued by the SEC entitled, "Facebook to Pay $100 Million for Misleading Investors About the Risks it Faced From Misuse of User Data."  A copy of the Press Release is attached hereto as **Exhibit E**.

The Ninth Circuit's appellate decision discussing the requisite allegations to satisfy the Private Securities Litigation Reform Act ("PSLRA"), including allegations of a prior FTC consent decree, the FTC's Complaint and Stipulated Order imposing a $5 Billion Penalty on

1  Facebook based on allegations that Facebook failed to comply with the FTC's 2012 order

2  regarding the protection of user's privacy, and the SEC's Complaint and announced settlement

3  with Facebook based on allegations that Facebook knew about yet failed to disclose the misuse

4  of user data for years and further misled the public regarding the results of its internal

5  investigation, all relate to arguments raised in Plaintiffs' Motion to Lift Stay in Aid of Pleading

6  Demand Futility (Dkt. Nos. 114-119) and allegations in this derivative action **based on the**

7  **identical facts**.

8

9  July 24, 2019                              COTCHETT, PITRE & MCCARTHY, LLP

10                                            By:_____/s/ Mark C. Molumphy_____
                                                     MARK C. MOLUMPHY

11
                                             mmolumphy@cpmlegal.com
12                                           San Francisco Airport Office Center
                                             840 Malcolm Road, Suite 200
13                                           Burlingame, CA 94010
                                             Telephone: (650) 697-6000
14                                           Facsimile: (650) 697-0577

15                                           *Lead Counsel for Plaintiffs and Attorneys for*
                                             *Plaintiff Jeremiah F. Hallisey*

16

17

18

19

20

21

22

23

24

25

26

27

28

STATEMENT OF RECENT DECISION AND RELATED SETTLEMENTS IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION TO LIFT STAY; Case No. 4:18-cv-01792-HSG

# EXHIBIT A

**NOT FOR PUBLICATION**

FILED

UNITED STATES COURT OF APPEALS

JUL 10 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM; OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, | No. 17-16895 |
| | D.C. No. 2:15-cv-01398-SRB |
| Plaintiffs-Appellants, | |
| | MEMORANDUM* |
| v. | |
| LIFELOCK, INC.; et al., | |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted January 16, 2019
San Francisco, California

Before:  CLIFTON and FRIEDLAND, Circuit Judges, and ADELMAN,** District Judge.

---

\*        This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\*        The Honorable Lynn S. Adelman, United States District Judge for the Eastern District of Wisconsin, sitting by designation.

Plaintiff-Appellants Oklahoma Police Pension and Retirement System and Oklahoma Firefighters Pension and Retirement System (collectively, the "Oklahoma Funds") appeal the district court's dismissal of their securities fraud claims.[1]  The district court held that the Oklahoma Funds' allegations did not satisfy the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, because they did not raise a strong inference that Defendants-Appellees Todd Davis, Chris Power, Hilary Schneider and LifeLock, Inc., acted with scienter. We affirm in part, reverse in part, and remand.

**1.**    The Oklahoma Funds adequately alleged falsity.  "[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (quotation marks and brackets omitted).  In other words, companies mislead investors when they tout their products' capabilities but fail to disclose significant flaws that undercut those capabilities. *See id*. at 1010.

---

[1]  The Oklahoma Funds alleged that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. They also alleged control person claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

During the class period, LifeLock repeatedly touted the "real-time" nature of its identity theft alerts.[2]  According to the complaint, however, more than 70% of a particular type of alert (the "Credit Check Alerts") were "stale"—they were sent more than one week late.  The complaint also alleged that the Credit Check Alerts were important, because consumers of LifeLock's premium "Ultimate Plus" service valued receiving the Credit Check Alerts in real time.[3]  LifeLock's positive statements about its "real-time" alerts therefore concealed a significant flaw affecting LifeLock's identity theft products.  Thus, the Oklahoma Funds successfully alleged that LifeLock misled investors.

LifeLock contends that the warnings included in the "Risk Factors" sections of its SEC filings "undercut any claim that investors were deceived."

---

[2]  LifeLock's quarterly report issued on July 31, 2014 offered "proactive, near real-time, actionable alerts," and Schneider and Davis made statements at the Merrill Lynch Conference on June 3, 2015, promising immediate credit alerts following significant purchases.  We hold that those statements, as well as additional statements in between touting "real-time" identity theft alerts, were sufficient to allege violations of Section 10(b) from July 31, 2014 to July 21, 2015.  Davis's alleged statement on the July 30, 2014 earnings call offering "data breach notifications that will keep members up to date on significant breaches," however, is not sufficiently misleading.  Nor is Davis's statement that the Ultimate Plus package was the "most comprehensive product on the market."  As LifeLock points out, nothing in the complaint demonstrates that Ultimate Plus was *not* the most comprehensive identity protection product on the market.

[3]  Our discussion relies on the allegations in the complaint.  Because these allegations were plausible and pled with particularity, *see* 15 U.S.C. § 78u-4(b)(1), we assume they are true for the purposes of deciding LifeLock's motion to dismiss.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 612 (9th Cir. 2017).

We disagree.  Those disclosures did not "counterbalance [the] misleading impression created by [the initial misrepresentations]."  *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) (quotation marks omitted).  LifeLock's risk disclosures only discussed the possibility of future problems.  They did not warn investors that any of the Credit Check Alerts were stale, let alone close to 70% of them.  Consequently, they did not negate LifeLock's earlier misstatements.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("But learning that stop-work orders *might* be issued is quite different from knowing they were in fact issued.  One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently.").[4]

**2.**     The Oklahoma Funds also adequately alleged that Schneider, Davis, and LifeLock intentionally or recklessly deceived investors.  Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that [each] defendant acted with [scienter]."  15 U.S.C. § 78u-4(b)(2)(A).  An inference is "strong" if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts

---

[4]  LifeLock, citing *Santa Fe Industries, Inc. v. Green*, also maintains that its statements were not false because "neither mismanagement nor non-disclosure thereof constitutes securities fraud."  In *Santa Fe*, the Supreme Court held that Section 10(b) did not regulate *internal* corporate mismanagement.  430 U.S. 462, 474-79 (1977).  The defendants in that case did not make any misleading statements.  *Id.* at 474, 476.  *Santa Fe* does not protect defendants who mismanage their company and lie to investors about that mismanagement.

alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).
That analysis is "inherently comparative." *Id.* at 323. Courts must "consider
plausible, nonculpable explanations for the defendant's conduct, as well as
inferences favoring the plaintiff," and then determine which inference is more
compelling. *Id.* at 324-26. After considering the allegations in the complaint
holistically, *see id.* at 326, we conclude that the inference that Schneider and Davis
intentionally or recklessly deceived investors is as least as compelling as any
nonculpable inference.

The complaint alleged that (1) the stale Credit Check Alerts were a
widespread problem affecting one of LifeLock's most important business lines; (2)
LifeLock entered into a consent decree with the FTC in 2010 that required it to
cease exaggerating the capabilities of its identity theft products; (3) in July 2013
and March 2014, former employees filed complaints alleging that LifeLock was
throttling alerts to certain classes of customers; (4) Schneider received reports that
contained detailed statistics about stale alerts;[5] and (5) Schneider admitted that she

---

[5] LifeLock argues that we should disregard this allegation because it is based on a statement that Rob Ryan, LifeLock's Vice President of Member Services, allegedly made to CW 5, a confidential witness. "But the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus. Instead, we examine a confidential witness's hearsay report to determine if it is sufficiently reliable, plausible, or coherent." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (quotation marks and citations omitted). We credit the allegations attributed to

was working to fix the stale alert problem.  Taken together, those allegations undercut the only plausible nonculpable explanation for Schneider's conduct—that she did not discover the full extent of the problems affecting the Credit Check Alerts—because they suggest that Schneider both paid attention to the stale alerts and received detailed information about them.  We therefore conclude that the inference that Schneider intentionally or recklessly misled investors is at least as compelling as any competing inference.  The Oklahoma Funds' allegations against Schneider satisfy the PSLRA.

As to Davis, the Oklahoma Funds alleged that he discussed LifeLock's ability to send real-time alerts extensively in his public statements, and that Schneider and Davis worked together to promote LifeLock's identity protection products.  Those allegations support the inference that once Schneider discovered that 70% of the Credit Check Alerts were stale, she shared that fact with Davis.  That being said, the Oklahoma Funds have alleged that Schneider received the reports with detailed statistics on stale alerts "as early as November 2014," so that fact cannot support a strong inference of Davis's scienter for the period of July 31,

---

CW 5 because they form a plausible and coherent narrative and because CW 5 was "in a position to be personally knowledgeable" that Ryan met with Schneider and discussed the reports on stale alerts that CW 5 had compiled.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009).

2014 to early November.[6]  Nevertheless, given Davis's position as CEO, his involvement with the promotion of LifeLock's identity theft products, the 2010 consent decree with the FTC concerning LifeLock's misrepresentations of its alert-based products, the complaints filed by former employees identifying problems with LifeLock's real-time alerts, and the overall importance of real-time Credit Check Alerts to LifeLock's business model, we hold that the inference that Davis recklessly failed to discover that a high percentage of Credit Check Alerts were stale even before Schneider definitively started receiving detailed reports in November 2014 is at least as compelling as any competing inference. Consequently, the Oklahoma Funds' allegations against Davis also satisfy the PSLRA.

The allegations against Power are different.  There are no allegations connecting Power to the stale Credit Check Alerts directly.[7]  As a result, the Oklahoma Funds' allegations against Power are insufficient.  We therefore affirm the dismissal of the Oklahoma Funds' Section 10(b) claims against Power.

---

[6]  This does not affect our analysis of Schneider's scienter, because Schneider did not make any allegedly misleading statements until after November 2014.

[7]  The Oklahoma Funds argue that Power's resignation contributes to a strong inference of scienter.  But resignations that occur shortly after a company announces bad news do not suggest that an executive intentionally deceived investors unless the plaintiff "plead[s] facts refuting the reasonable assumption that the resignation occurred as a result of [the bad news] itself." *Zucco Partners*, 552 F.3d at 1002.  The Oklahoma Funds failed to plead such facts here.

That leaves the question of LifeLock's scienter. "In most cases, the most straightforward way to raise an inference of scienter for a corporate defendant will be to plead it for an individual defendant." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (brackets and citations omitted). Because the Oklahoma Funds have adequately alleged that Davis and Schneider acted with scienter, their allegations against LifeLock also satisfy the PSLRA. *See id.*

In sum, the Oklahoma Funds have adequately alleged that Schneider, Davis, and LifeLock violated Section 10(b).[8] We therefore reverse the district court's order dismissing the Oklahoma Funds' complaint with prejudice in part.

Each party to bear its own costs.

**AFFIRMED in part; REVERSED in part; REMANDED for further proceedings.**

---

[8] By dismissing the Second Amended Complaint with prejudice, the district court dismissed the Oklahoma Funds' control person claims without specifically addressing them. It apparently reasoned that plaintiffs who fail to allege a Section 10(b) claim necessarily fail to allege a Section 20(a) claim. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002). Because we conclude that the Oklahoma Funds' 10(b) claims against LifeLock survive, we also reverse the dismissal of the Section 20(a) claims against Davis, Power, and Schneider.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff<br><br>　　　　v.<br><br>FACEBOOK, Inc.,<br>a corporation,<br><br>　　　　　　　Defendant. | Case No. 19-cv-2184<br><br>**COMPLAINT FOR CIVIL PENALTIES, INJUNCTION, AND OTHER RELIEF** |

Plaintiff, the United States of America, acting by and through the Consumer Protection

Branch of the U.S. Department of Justice, alleges that:

1.　　　Plaintiff brings this action against Defendant Facebook, Inc. ("Facebook") under

Sections 5(a) and (*l*) and 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

§§ 45(a) and (*l*) and 56(a)(1), to obtain civil penalties, an injunction, and other equitable relief

for violations of a 2012 order previously issued by the Federal Trade Commission ("FTC" or

"Commission") for violations of Section 5(a) of the FTC Act.  *See* Exhibit A, *In re Facebook,*

*Inc*., C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012) (Decision and Order) ("Commission

Order" or "2012 Order").  This action seeks to hold Facebook accountable for its failure to

protect consumers' privacy as required by the 2012 Order and the FTC Act.

## NATURE OF THE CASE

2.      Facebook operates a social-networking service through its website—
www.facebook.com—and mobile applications.  Those applications connect consumer users of
Facebook's service, who each create a Facebook "profile" showing personal information, with
"Friends" who also have Facebook accounts and profiles ("Friends" or "Facebook Friends").
Through its service, Facebook collects and maintains vast amounts of consumer information.  As
of 2018, Facebook had more than 2.2 billion monthly active users worldwide.  Over one hundred
million Americans use Facebook every day to share personal information, such as their real
name, date of birth, hometown, current city, employer, relationship status, and spouse's name, as
well as sensitive personal information, such as political views, sexual orientation, photos of
minor children, and membership in health-related and other support groups.  Users can also
provide information about themselves by indicating that they "like" public Facebook pages.
Research suggests that a user's "likes" of public Facebook pages can be used to accurately
predict that user's personality traits, sometimes better than the user's own friends and family.  In
addition, Facebook users may install and use applications ("apps") developed by third-parties
("third-party developers") that allow the users to share information with their Facebook Friends.

3.      Facebook's core business model monetizes user information by using it for
advertising.  Substantially all of Facebook's $55.8 billion in 2018 revenues came from
advertising.

4.      To encourage users to share information, Facebook promises users that they can
control the privacy of their information through Facebook's privacy settings.  However, through
at least June 2018, Facebook subverted users' privacy choices to serve its own business interests.

5.      Beginning at least as early as 2010, every Facebook user who installed an app ("App User") agreed to Facebook sharing with the third-party developer of the installed app both information about the App User and the App User's Facebook Friends.  Facebook's default settings were set so that Facebook would share with the third-party developer of an App User's app not only the App User's data, but also data of the App User's Facebook Friends ("Affected Friends"), even if those Affected Friends had not themselves installed the app.  Affected Friends could only avoid this sharing by finding and opting out of it via settings on Facebook's Applications page, which was located on Facebook's website and mobile applications, separate and apart from Facebook's Privacy Settings page.  Third-party developers that received user and Affected Friend information could use that information to enhance the in-app experience or target advertising to App Users and their Affected Friends.  In the wrong hands, user and Affected Friend data could be used for identity theft, phishing, fraud, and other harmful purposes.

6.      In 2012, after an FTC investigation, Facebook settled allegations that its practice of sharing Affected Friends' data with third-party developers of apps was deceptive.  The resulting Commission Order, among other things, prohibits Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information accessible to third parties.  *See* Commission Order, Parts I.B. & C.

7.      In the wake of the FTC's initial investigation, Facebook retained the separate opt-out sharing setting on its Applications page, but it added a disclaimer to its Privacy Settings page, warning users that information shared with Facebook Friends could also be shared with the

apps those Friends used.  However, four months after the 2012 Order was finalized, Facebook removed this disclaimer—even though it was still sharing Affected Friends data with third-party developers and still using the same separate opt-out setting that undermined users' privacy choices before entry of the Commission Order.

8.     At its F8 conference in April 2014—one theme of which was user trust—Facebook announced that it would stop allowing third-party developers to collect data about Affected Friends.  Facebook also told third-party developers that existing apps could only continue to collect Affected Friend data for one year, or until April 2015.  But, after April 2015, Facebook had private arrangements with dozens of developers, referred to as "Whitelisted Developers," that allowed those developers to continue to collect the data of Affected Friends, with some of those arrangements lasting until June 2018.

9.     At least tens of millions of American users relied on Facebook's deceptive privacy settings and statements to restrict the sharing of their information to their Facebook Friends, when, in fact, third-party developers could access and collect their data through their Friends' use of third-party developers' apps.  Facebook knew or should have known that its conduct violated the 2012 Order because it was engaging in the very same conduct that the Commission alleged was deceptive in Count One of the original Complaint that led to the 2012 Order.  *See* Exhibit B, *In re Facebook, Inc*., C-4365, 2012 FTC LEXIS 136 (F.T.C. July 27, 2012) ("Original Complaint").

10.    Facebook also failed to maintain a reasonable privacy program that safeguarded the privacy, confidentiality, and integrity of user information, as required by Part IV of the 2012 Order.  The requirement in the 2012 Order that Facebook maintain a reasonable privacy program

was vitally important because Facebook had allowed millions of third-party developers to access and collect massive troves of consumer data about both App Users and their Facebook Friends, and Facebook failed to track that data in an organized, systematic way.

11.     As a general practice, Facebook did not vet third-party developers before granting them access to consumer data; instead, developers simply had to check a box agreeing to comply with Facebook's policies and terms and conditions, including those designed to protect consumer information.  This made Facebook's enforcement of its policies, terms, and conditions acutely important.

12.     Facebook's enforcement of its policies, terms, and conditions, however, was inadequate and was influenced by the financial benefit that violator third-party app developers provided to Facebook.  This conduct was unreasonable.  Facebook never disclosed this disparate enforcement practice to the third-party assessor charged by the 2012 Order with assessing the implementation and effectiveness of Facebook's privacy program, nor did Facebook disclose its enforcement practices to the Commission in its biennial assessment reports mandated by the 2012 Order.  *See* Commission Order, Part V.

13.     In addition to its violations of the 2012 Order, Facebook also engaged in deceptive practices in violation of Section 5(a) of the FTC Act.  Between November 2015 and March 2018, Facebook asked its users to provide personal information to take advantage of security measures on the Facebook website or mobile application, including a two-factor authentication measure that encouraged provision of users' phone numbers.  Facebook did not effectively disclose that such information would also be used for advertising.

14.     Finally, in April 2018, Facebook updated its data policy to explain that Facebook would use an updated facial-recognition technology to identify people in user-uploaded pictures and videos "[i]f it is turned on," implying that users must opt in to use facial recognition. Contrary to the implication of this updated data policy, however, tens of millions of users who still had an older version of Facebook's facial-recognition technology had to opt out to disable facial recognition. This violated the 2012 Order by misrepresenting the extent to which consumers could control the privacy of their information used for facial recognition.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355; and 15 U.S.C. §§ 45(a) and (*l*), and 56(a)(1).

16.     Venue in this District is proper under 28 U.S.C. §§ 1391(b)(2), (c)(2), and 1395(a); and 15 U.S.C. § 53(b).

## DEFENDANT

17.     Facebook, Inc. is a Delaware corporation with its principal office or place of business at 1601 Willow Road, Menlo Park, California 94025. At all times relevant to this Complaint, Facebook has operated its social-networking service through its website, www.facebook.com, and mobile applications that connect users with Friends on Facebook.

## COMMERCE

18.     At all times material to this Complaint, Facebook maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

### THE COMMISSION ORDER

19.     As part of Facebook's operation of its social-networking service, it has for years offered the Facebook Platform ("Platform"), a set of tools and application programming interfaces ("APIs") that enable third-party developers to access user data and develop software applications, such as games, with which Facebook users can interact; it also allows users to use apps or log into websites using their Facebook credentials.

20.     In April 2010, Facebook launched an initial version of the Graph API ("Graph API V1"), which allowed third-party developers to access and collect data about Facebook App Users.  Graph API V1 also allowed third-party developers to access and collect data about Affected Friends.

21.     At that time, Facebook's settings presented an App User with a screen whereby the app requested permission from the App User before initial installation to permit it to access certain fields of data, as shown in the example below:[1]



---

[1] https://newsroom.fb.com/news/2012/12/better-controls-for-managing-your-content/

22.     Facebook did not require third-party developers to request permission directly from Affected Friends of App Users to access those Affected Friends' data from Facebook. Instead, Facebook automatically sent Affected Friend data based solely on App Users' granted permission.

23.     Using this process, third-party developers could collect dozens of pieces of data from Facebook about Affected Friends, including information related to each Affected Friend's:

- birthday
- bio
- activities
- news article activity
- books activity
- check-ins
- current city
- education history
- events
- fitness activity
- games activity
- groups
- hometown
- interests
- likes
- music activity
- notes
- online presence
- Open Graph activity
- photos
- questions
- relationships
- relationship details
- religion/political views
- status
- subscriptions
- videos
- video-watch activity
- website URL
- work history

24.     In its 2012 Original Complaint in the proceeding bearing Docket No. C-4365, the Commission charged Facebook with engaging in unfair and deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), for, among other things, its practices associated with giving third-party developers access to Affected Friends' data.

25.     Specifically, Count One of the Original Complaint alleged that Facebook was engaging in deceptive acts and practices by representing to users that Facebook's privacy settings allowed them to restrict to limited audiences (*e.g.*, "Only Friends") the sharing of non-public personal information that they added to their Facebook profiles and their non-public Facebook posts (collectively, "Profile Information"), when, in fact, those settings did not prevent Facebook from sharing that information with third-party developers of apps installed by the users' Friends.  *See* Exhibit B at ¶¶ 10-18.

26.     The Original Complaint also asserted that Facebook misled users by placing the option to block third-party developers from accessing their information through Friends not prominently on Facebook's Privacy Settings page, but rather, on a page called, at various times, "Applications," "Apps," or "Applications and Websites."  This Applications page allowed users, among other things, to restrict the information that third-party developers of Friends' apps could access.  But no Facebook page other than the Applications page disclosed to users that, unless they adjusted the setting on the Applications page, their other privacy choices were ineffective to prevent the sharing of their data with third-party developers of their Friends' apps.

27.     The Original Complaint also noted that users who did not themselves use apps would have no reason to click on the Applications page, and thus would have concluded that

their choices to restrict Facebook's sharing of their Profile Information through the Privacy

Settings page were complete and effective.

28.     Facebook settled the Commission's Original Complaint with the Commission

Order.  The Commission Order became final in August 2012 and remains in effect.

29.     Part I of the Commission Order, in relevant part, states:

> **IT IS ORDERED** that Respondent and its representatives, in connection
> with any product or service, in or affecting commerce, shall not misrepresent in
> any manner, expressly or by implication, the extent to which it maintains the
> privacy or security of covered information, including, but not limited to:
>                                     . . .
>
> B.      the extent to which a consumer can control the privacy of any covered
> information maintained by Respondent and the steps a consumer must take to
> implement such controls;
>
> C.      the extent to which Respondent makes or has made covered information
> accessible to third parties;
>                                     . . .

*See* Commission Order, Part I.

30.     The Commission Order defines "Covered Information" as:

> information from or about an individual consumer including, but not limited to:
> (a) a first or last name; (b) a home or other physical address, including street name
> and name of city or town; (c) an email address or other online contact
> information, such as an instant messaging user identifier or a screen name; (d) a
> mobile or other telephone number; (e) photos and videos; (f) Internet Protocol
> ("IP") address, User ID or other persistent identifier; (g) physical location; or (h)
> any information combined with any of (a) through (g) above.

*See* Commission Order, Definition 4.

31.     Part IV of the Commission Order, in relevant part, states that Facebook shall:

> establish and implement, and thereafter maintain, a comprehensive privacy
> program that is reasonably designed to (1) address privacy risks related to the
> development and management of new and existing products and services for
> consumers, and (2) protect the privacy and confidentiality of covered information.

Such program, the content and implementation of which must be documented in writing, shall contain controls and procedures appropriate to [Facebook]'s size and complexity, the nature and scope of [Facebook]'s activities, and the sensitivity of covered information, including:

. . .

B.      the identification of reasonably foreseeable, material risks, both internal and external, that could result in [Facebook]'s unauthorized collection, use, or disclosure of covered information and an assessment of the sufficiency of any safeguards in place to control these risks. . . .

C.      the design and implementation of reasonable controls and procedures to address the risks identified through the privacy risk assessment, and regular testing or monitoring of the effectiveness of those controls and procedures.

. . .

E.      the evaluation and adjustment of [Facebook]'s privacy program in light of the results of the testing and monitoring required by subpart C, any material changes to [Facebook]'s operations or business arrangements, or any other circumstances that [Facebook] knows or has reason to know may have a material impact on the effectiveness of its privacy program.

*See* Commission Order, Part IV.

32.      Part V of the Commission Order states that Facebook shall "obtain initial and biennial assessments and reports ('Assessments') from a qualified, objective, independent third-party professional, who uses procedures and standards generally accepted in the profession."

33.      The Commission Order requires, among other things, that each such Assessment shall:

A.      set forth the specific privacy controls that [Facebook] has implemented and maintained during the reporting period;

B.      explain how such privacy controls are appropriate to [Facebook]'s size and complexity, the nature and scope of [Facebook]'s activities, and the sensitivity of the covered information;

C.      explain how the privacy controls that have been implemented meet or exceed the protections required by Part IV of [the Commission] Order; and

D.      certify that the privacy controls are operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the controls have so operated throughout the operating period.

*See* Commission Order, Part V.

## DEFENDANT'S NOTICE OF THE COMMISSION ORDER

34.     Facebook's General Counsel signed the Commission Order on behalf of

Facebook.  The Commission served the Commission Order in August 2012.

## DEFENDANT'S CONDUCT

**Facebook's Desktop Privacy Settings Failed to Disclose That Users' Privacy Choices Would Be Undermined by Default Settings That Allowed Facebook to Share Users' Data with Third-Party Developers of Their Friends' Apps**

35.     Around the time that it resolved the Original Complaint through the Commission

Order in 2012, Facebook added a disclaimer to the top of its desktop Privacy Settings page

stating, "You can manage the privacy of your status updates, photos, and information using the

inline audience selector—when you share or afterwards.  *Remember: the people you share with*

*can always share your information with others, including apps*." (emphasis added), as shown in

the figure below:



36.     Approximately four months after the Commission Order became effective, however, Facebook removed the disclaimer from the Privacy Settings page, as shown in the below example:



37.     Facebook's new "Privacy Settings" page purported to allow users to restrict who could see their past and future posts.

38.     Posts could include, among other things, status updates, photos, videos, check-ins, and notes.[2]

39.     A user wishing to restrict future posts on the Privacy Settings page would click "edit" and select from non-public categories, such as "Friends," "Only me," and "Custom."

---

[2] https://developers.facebook.com/docs/graph-api/reference/v2.8/post

40.     Facebook did not disclose anywhere on this page, or anywhere along the path that users would have had to take to reach the Privacy Settings page, that users who shared their posts with "Friends" or a "Custom" audience[3] could still have those posts shared with any of the millions of third-party developers whose apps were used by their Friends.

41.     As was the case before the Commission Order, Affected Friends who sought to opt out of such sharing—and to have their privacy choices honored—needed to locate and adjust settings located under the separate "Apps" tab.

42.     The Apps tab did not alert users that it linked to a page containing settings that users had to disable in order to have their privacy choices fully honored.

43.     In December 2012, Facebook introduced "Privacy Shortcuts," which it touted as a privacy tool that helps users navigate "key settings." *See* Exhibit C (Dec. 21, 2012 Press Release); *see also* Exhibit D (May 22, 2014 Press Release) (describing Privacy Shortcuts as a "tool designed to help people make sure they are sharing with just the audience they want").

44.     The Privacy Shortcuts tool also had privacy settings for posts that purported to allow users to restrict their posts to Friends, as shown in the example below:[4]

---

[3] "Custom" audiences are typically a subset of Friends and are thus a more restrictive privacy setting than "Friends." For simplicity, this Complaint refers to both "Friends" and "Custom" audience selections as "Friends."

[4] https://newsroom.fb.com/news/2012/12/better-controls-for-managing-your-content/



45.     However, Facebook did not disclose on the Privacy Shortcuts tool, or anywhere along the path that users took to reach this tool, that their non-public posts could be shared with third-party developers of Friends' apps.

46.     At all times relevant to this Complaint, Facebook also provided users with inline controls that purported to allow users to restrict who could see their posts.

47.     Specifically, when users posted a status update, photo, or video, Facebook gave users a drop-down menu that allowed them to restrict the audience for that post to, for example, "Friends," as shown below:[5]

---

[5] https://www.facebook.com/notes/facebook/making-it-easier-to-share-with-who-you-want/10150251867797131/



48.     However, Facebook did not disclose to users that sharing their non-public posts with Friends would allow Facebook to share those posts with third-party developers of Friends' apps.

49.     In addition, Facebook's settings conveyed that users could restrict on their Facebook "About" page who could see personal information that users added to their profile, such as hometown, birthday, relationship, current city, education history, and work history.

50.     But Facebook did not disclose to users on their About page that sharing their personal information with Friends would allow Facebook to share that information with third-party developers of Friends' apps.

**Facebook's Desktop "Apps others use" and "Platform"**
**Settings Also Undermined Users' Privacy Choices**

51.     Facebook also misled users by having default settings that shared Affected Friends' Profile Information with third-party developers of Friends' apps unless the Affected Friend found and opted out of settings found on the Apps Settings page.

52.     The Apps Settings page contained two opt-out settings—the "Apps others use" setting and the "Platform" setting.

53.     To access the "Apps others use" setting, Affected Friends first had to realize that Facebook shared their Profile Information with third-party developers of Friends' apps, and then successfully had to navigate a series of steps to find and opt-out of that setting.

54.     A user first had to click on the "Apps" tab in the settings menu.  This tab did not include any disclosure that the "Apps" tab linked to any privacy settings for apps not installed by the user.

55.     After clicking the "Apps" tab, users were directed to the Apps Settings page, where they had to locate the "Apps others use" setting.

56.     The format of the Apps Settings page varied over time.  However, at all times relevant to this Complaint, the "Apps others use" setting at the bottom of the page, separate and apart from the privacy settings for the apps the user installed, as shown in the below example:



57.     On the "Apps others use" setting, Facebook stated, "People who can see your info can bring it with them when they use apps.  Use this setting to control the categories of information people can bring with them."

58.     This was Facebook's only representation on any of the settings pages informing users that third-party developers of Friends' apps could access and collect their Profile Information.

59.     Facebook presented users who clicked on "edit" within the "Apps others use" setting with options that allowed them to opt out of Facebook sharing their data, as shown in the below example:



60. By default, all categories of Affected Friend data, except "Religious and political views" and "Interested in," were set to be shared with third-party developers who requested them.

61. During all times relevant to this Complaint, only a very low percentage of users opted out of this default setting.

62. Alternatively, users could prevent Facebook from sharing their Profile Information with third-party developers of Friends' apps by opting out of Facebook's "Platform" setting within the Apps Setting page. But, in so doing, users could not use any Facebook apps themselves. By default, this setting was turned "on" and allowed Facebook to share users' data with third-party developers of Friends' apps.

63. To access the Platform setting, a user had to: (1) click on the "Apps" tab in the settings menu; (2) find the Platform opt-out setting, which was located in a section of the page devoted to the user's apps and labeled at various times "Apps you use" or "Apps, Websites, and Plugins"; and (3) click on the "edit" button to disable the default setting that shared the user's data with third-party developers of Friends' apps.

64. Although the precise language varied over time, disclaimers on the Platform setting warned that turning it off would prevent users from using any Facebook apps themselves and prevent their Friends from being able to "interact and share *with you* using apps and websites" (emphasis added).



65.     This language—which focused on information that would be shared with the user, rather than information Facebook would share about the user—did not inform users that: (a) by default, Facebook shared their Profile Information with third-party developers of Friends' apps; or (b) this setting allowed them to opt out of such sharing.

66.     A very low percentage of Facebook users disabled the Platform setting between August 2012 and April 2015.

**Facebook's Mobile Privacy Settings Also Deceived Users**

67.     As early as March 2012, and until March 2013, as shown in the example below, Facebook's mobile interface contained a disclaimer near the top of the Privacy Settings page stating, "You can manage the privacy of your status updates, photos and information using the

inline audience selector—when you share or afterwards. *Remember: the people you share with can always share your information with others, including apps. . .*" (emphasis added).



68.     The mobile Privacy Settings page purported to allow users to restrict who could see their past and future posts, as well as, for approximately six months, users' birthday and contact information.

69.     During this time, Facebook's Privacy Settings page further featured a link to the Apps Settings page.

70.     In or around March 2013, Facebook removed the disclaimer about the sharing of data with apps, as shown in the below figure:



71.    Facebook also removed from the mobile Privacy Settings page the link to the

Apps Settings page.

72.    After Facebook made these changes, to find the Apps Setting page, a user on the

mobile interface had to go to the main settings menu and click on the heading labeled "Apps" or

"Apps and Websites," as shown in the below example:



73.    The headings did not disclose that the "Apps" or "Apps and Websites" tabs included privacy settings for apps that the user did not install.

74.     Once on the Apps Settings page, users had to locate the "Apps others use" setting and click on "edit" before gaining access to options that allowed them to opt out of Facebook sharing their data with third-party developers of Friends' apps.

75.     The "Apps others use" setting was located separate and apart from the privacy settings for the apps the user installed.

76.     Users' bios, birthdays, family and relationships, websites, status updates, photos, videos, links, notes, hometowns, current cities, education histories, work histories, activities, interests, "likes," app activity, and status of being online, were set to be shared with third-party developers by default.

77.     Similarly, to access the Platform setting in the mobile interface, users had to click on the "Apps" heading in the settings menu and then click on the "Platform" opt-out setting link.

78.     The Platform setting link referenced apps the *user* authorized rather than apps authorized by the user's Friends.

79.     Moreover, although the precise language varied over time, disclaimers on the Platform setting explained that turning off the Platform setting would prevent users from using any Facebook apps themselves and prevent their Friends from being able to "interact and share *with you* using apps and websites" (emphasis added).



80.     This language—which focused on information that would be shared with the user rather than information Facebook would share about the user—did not alert users to the fact that: (a) Facebook shared their Profile Information with third-party developers of Friends' apps by default; or (b) the Platform setting allowed them to opt out of such sharing.

### Facebook Was Aware That Giving Millions of Third-Party Developers Access to Affected Friend Data Posed Privacy Risks

81.     Facebook was aware of the privacy risks posed by allowing millions of third-party developers to access and collect Affected Friend data for nearly two years before it changed the Graph API to remove third-party developers' access to that data.  By August 2013, Facebook had decided to remove third-party developers' access to Affected Friend data.  As an internal document explained:

> We are removing the ability for users to share data that belongs to their friends who have not installed the app. Users should not be able to act as a proxy to access personal information about friends that have not expressed any intent in using the app.

82.     In September 2013, Facebook audited a set of apps to determine whether to revoke their data permissions. That audit revealed that over a 30-day period, the audited apps were making hundreds of millions of requests to the Graph API for a variety of data, including Affected Friends' work histories, photos, videos, statuses, "likes," interests, events, education histories, hometowns, locations, relationships, and birthdays.

83.     In some instances, the apps called for data about Affected Friends in numbers that greatly exceeded the number of the apps' monthly active users. For example, one app highlighted in the audit made more than 450 million requests for data—roughly 33 times its monthly active users.

84.     Indeed, the volume of data acquired by the audited apps led one Facebook employee to comment, "I must admit, I was surprised to find out that we are giving out a lot here for no obvious reason."

85.     This was not the only instance in which an examination of apps showed massive amounts of Affected Friends' data being accessed. A mere month after the September 2013 audit, while discussing upcoming Platform changes, senior Facebook management employees observed that third-party developers were making more than *800 billion* calls to the API per month and noted that permissions for Affected Friends' data were being widely misused.

86.     Likewise, in 2014, when discussing changes that would be made to the Platform, Facebook senior management employees considered reports showing that, every day, more than 13,000 apps were requesting Affected Friends' data.

87.     Facebook made several changes to the Privacy Settings and Apps Settings pages throughout 2013 and 2014.  However, none of the changes sought to inform users that sharing data with their Friends also allowed Facebook to share that data with any of the more than one million third-party developers whose apps could be used by their Friends.

**Financial Considerations Influenced Facebook's Decisions Regarding Whether to Restrict Third-Party Developers' Access to User Data**

88.     Even though Facebook acknowledged the data-privacy risks associated with the data access it gave to third-party developers, on numerous occasions, while determining whether to continue granting a particular developer access to user data, it considered how large a financial benefit the developer would provide to Facebook, such as through spending money on advertisements or offering reciprocal data-sharing arrangements.

89.     At one point in 2013, for instance, Facebook considered whether to maintain or remove data permissions for third-party developers based on whether the developer spent at least $250,000 in mobile advertising with Facebook.

90.     As internal Facebook documents explained, Facebook would contact apps spending more than $250,000 on advertising and ask them to confirm the need for the data they were accessing, while Facebook would terminate access for apps spending less than $250,000.

91.     Similarly, during the transition to the second version of Graph API ("Graph API V2"), when preparing to implement changes to the Platform to remove third-party developers' access to Affected Friend data, Facebook explicitly evaluated whether apps affected by the changes spent money on advertising with Facebook, generated revenue for the company, or otherwise offered something of value such as reciprocal access to user data.

**Facebook Falsely Announced That Third-Party Developers Would No Longer Be Able to Access Affected Friend Data**

92.     In 2013, Facebook conducted a survey that showed that its users were concerned about sharing their data with apps, believed apps asked for unnecessary information or permissions, and were concerned about the information apps used for marketing.

93.     Similarly, based on research Facebook conducted, Facebook employees discussed that certain categories of data requests—the user's activities, birthday, education history, list of interests, religious and political affiliation, page "likes," photos, videos, hometown, relationship preferences, work history, current city, status messages, and check-ins—were sensitive and, accordingly, should require review after Graph API V2 was introduced.

94.     As one employee explained, "Perm[ission]s like user relationships, work history, and relationship details (which indicates the user's gender preferences) can be perceived as really sensitive.  It's really bad for user trust whenever these perm[ission]s are asked for. . . ."

95.     Facebook communicates with its users through various means, including keynote addresses during F8 conferences, videos on Facebook's YouTube channel, and Facebook Newsroom.

96.     In April 2014, Facebook announced that it was deprecating (*i.e.*, discontinuing) Graph API V1 and replacing it with Graph API V2.

97.     At Facebook's April 30, 2014 F8 Conference, Facebook announced that it would no longer allow third-party developers to collect Affected Friend data.  In the keynote address, Facebook explained:

> [W]e've also heard that sometimes you can be surprised when one of your friends shares some of your data with an app. . . .  So now we're going to change this, and *we're going to make it so that now, everyone has to choose to share their own data with an app*

*themselves.* . . . [W]e think this is a really important step for giving people power and control over how they share their data with apps.

(emphasis added). Facebook posted a video of this keynote address on its YouTube channel in May 2014.

98. On April 30, 2014, Facebook also issued a press release in which it stated:

**Putting people first:** We've heard from people that they are worried about sharing information with apps, and they want more control over their data. We are giving people more control over these experiences so they can be confident pressing the blue button.

99. These communications with users addressed, among other things, the privacy controls that Facebook made available on its Platform.

100. Despite these clear statements, Facebook gave third-party developers with a pre-existing, approved app at least one year of continued access to Affected Friends' data. In other words, third-party developers that had a preexisting app on the Facebook Platform as of April 2014 could still access and collect Affected Friend data until April 2015. Facebook did not disclose this fact to its users.

**Facebook's Privacy Checkup Did Not Tell Users That Sharing with Their Friends Allowed Third-Party Developers to Access Their Profile Information**

101. In September 2014, Facebook launched "Privacy Checkup." Facebook publicized Privacy Checkup as a means to help users "be in control" of what they shared and with whom they shared it. *See* Exhibit E (Press release).

102.     Privacy Checkup purported to allow users to restrict who could see their posts and "review and edit the privacy of key pieces of information," Exhibit E, on the user's profile, as shown in the below figures:





103.    The Privacy Checkup tool highlighted the apps that users installed, but it did not list the apps that had access to users' Profile Information based on their Friends' consent.

104.    The Privacy Checkup tool also included a link to the Facebook user's About page, where Profile Information such as birthdate, hometown, religious views, political views, interests (*e.g.*, sports teams, music, movies), public page "likes," relationships, and relationship details were displayed.  These settings also purported to allow users to restrict who could see their data.

105.    Facebook did not disclose anywhere on these pages that, when users shared their Profile Information with Friends, Facebook could continue to share that information with millions of third-party developers of their Friends' installed apps.

**Facebook Finally Removed General Access to Affected Friend Data but Granted Special Access to Affected Friend Data to Certain Developers Without Telling Users**

106.    On April 30, 2015, Facebook deprecated Graph API V1.  As a result, this generally required third-party developers that had not already migrated to Graph API V2 to do so.  Graph API V2 did not allow third-party developers to access or collect Affected Friend data.

107.    In or around April 2015, Facebook gathered journalists in San Francisco and discussed the deprecation of Graph API V1 and the removal of access to Affected Friend data.

108.    However, going forward, Facebook privately granted continued access to Graph API V1 to more than two dozen developers—the Whitelisted Developers—which included gaming, retail, and technology companies, as well as third-party developers of dating apps and other social-media services.  Those Whitelisted Developers thus still had access to the same Affected Friend data that Facebook had publicly announced was no longer available.

109.    Some of the Whitelisted Developers retained access for months, while others retained access for years.

110.    Facebook granted access to Affected Friend data to a few Whitelisted Developers as a beta test, with that access left active until June 2018.

111.    Facebook granted other Whitelisted Developers specific permissions to Affected Friend data, including data on public page "likes," location, education, work status, relationship status, notes, groups, events, photos, religion, "looking for," significant other, websites, activities, and interests—much of which Facebook knew consumers might be sensitive to sharing.

112.    Facebook did not tell its users that it was still granting these Whitelisted Developers access to their data.

113. When users chose to share their data with Friends, they had no way of knowing that Facebook would still share it with these Whitelisted Developers.

### Facebook Failed to Implement and Maintain Appropriate Safeguards and Controls Over Third-Party Developers' Access to User Data

114. To address concerns associated with Facebook's sharing of user and Affected Friend data with the more than 36 million third-party apps on the Facebook Platform in 2012, Part IV of the Commission Order required Facebook to implement and maintain a comprehensive privacy program reasonably designed to address privacy risks and protect the privacy and confidentiality of covered information.

115. Part V of the Commission Order required Facebook to obtain initial and biennial assessments from an independent third-party professional that, among other things, set forth Facebook's specific privacy controls and explained how those controls met or exceeded Part IV's requirements.

116. In the initial and biennial assessment reports required by the Commission Order, Facebook claimed that it had implemented certain controls and procedures to address the privacy risks created by the extensive access to user data it provided to third-party developers.

117. Facebook's assessment reports also claimed that it had monitoring controls in place to detect material misuse of the Platform by third-party developers.

118. Other than requiring third-party developers to agree to Facebook's policies and terms when they registered their app with the Platform ("Platform Policies"), however, Facebook generally did not screen the third-party developers or their apps before granting them access to vast amounts of user data through Graph API V1.

119.    For example, while Facebook used an automated tool to check that apps had an active link to a privacy policy, it did not actually review the app's privacy policy to confirm that it, in fact, complied with Facebook's policies.

120.    Similarly, Facebook routinely granted third-party developers broad permissions to access user and Affected Friend data without first performing any checks on whether such permissions were consistent with a Facebook Platform policy requiring that apps request only data necessary to run the app or to enhance the user's app experience.

121.    The Platform Policies outlined a number of privacy obligations and restrictions, such as limits on an app's use of data received through Facebook, requirements that an app obtain consent for certain data uses, and restrictions on selling or transferring user data.  For example, third-party developers were specifically prohibited from transferring, directly or indirectly, any data—including aggregate, anonymous, or derivative data—to any ad network or data broker.

122.    According to Facebook, these policies ensured that users' personal information was disclosed only to third-party developers who agreed to protect the information in a manner consistent with Facebook's privacy program.

123.    To enforce its Platform Policies, Facebook relied on administering consequences for policy violations that came to its attention after third-party developers had already received the data.  But Facebook did not consistently enforce its Platform Policies.  Rather, the severity of consequences that Facebook administered to third-party developers for violating the company's Platform Policies, and the speed with which such measures were effectuated, took into account

the financial benefit that Facebook considered the developer to offer to Facebook, such as through a commercial partnership.

124.    Facebook did not inform its third-party assessor that it was engaging in this practice, and the differential enforcement model was not noted in any of the company's Part V assessments.

125.    As reported in the *Wall Street Journal*, Facebook's Vice President of Product Partnerships acknowledged that, for many years, the company's emphasis was on growth.  It was only after March 2018, after Facebook had been giving third-party developers access to user data through the Graph API for years, that Facebook began a "massive cultural shift" to focus more on "enforcement as a key component" of its system.

126.    The full scale of unauthorized collection, use, and disclosure of consumer information resulting from Facebook's conduct is unknown due, at least in part, to the company's lack of recordkeeping.

127.    In March 2018, Facebook announced it had launched an internal investigation into the potential misuse of user data by third-party developers.  But, due to various issues, including the company's own lack of an organized system or technical means for tracking all the massive troves of user data it released to third-party developers, Facebook could neither ascertain where most of the data went after it was pulled from the Platform, nor determine how the data had been used.

**Facebook Deceptively Used Covered Information Provided
for Security Purposes for Advertisements**

128.    Since May 2011, Facebook has allowed users to log into Facebook using two-factor authentication, originally called Login Approvals.  When they logged in from a new or

unrecognized device, users of Login Approvals accessed their Facebook accounts with their username, password, and a code texted to their phone.

129.   Until May 2018, to take advantage of this security feature, Facebook users had to add or confirm their phone numbers during the Login Approvals signup process.  After May 2018, users could log in with two-factor authentication either by adding a phone number or by using a third-party authentication app, which generated a security code that Facebook could use to authenticate the user.

130.   Facebook encouraged users to employ this security feature as an "industry best practice" for providing additional account security, and specifically touted Login Approvals as helping users take "more control over protecting their account from unauthorized access."[6]

131.   Facebook did not disclose, or did not disclose adequately, that the phone numbers Login Approvals users provided for two-factor authentication would also be used by Facebook to target advertisements to those users.

132.   For example, from at least November 20, 2015, to March 25, 2018, during the signup process for Login Approvals, Facebook presented mobile App Users with a dialog box called "Set Up Login Code Delivery."

133.   At that dialog box, Facebook asked for users' mobile phone numbers and told them, "For us to text you security codes, you need to add your mobile phone to your Timeline."[7]

---

[6] https://www.facebook.com/notes/facebook-engineering/introducing-login-approvals/10150172618258920/;   https://www.facebook.com/notes/facebook-security/two-factor-authentication-for-facebook-now-easier-to-set-up/10155341377090766/

[7] From April 25, 2017 until March 15, 2018, the text of the Set Up Login Code Delivery Box read, "For us to text you login codes, you need to add your mobile phone to your Timeline."

Facebook then provided a space for users to add their phone numbers and prompted them to click the "Continue" button.

134.    Facebook did not tell users anywhere in that dialog box, or anywhere on the path to that dialog box, that Facebook would also use phone numbers provided for two-factor authentication for advertising.

135.    Similarly, from at least November 15, 2015, to February 23, 2018, during the Login Approval signup process on its mobile interface, Facebook asked for a user's mobile phone number on a screen titled "Set Up Login Code Delivery."

136.    At that screen, Facebook told users, "For us to text you login codes, you need to add your mobile phone to your timeline."  Facebook then provided a space for users to add their phone numbers and click the "Continue" button.

137.    There was no disclosure on the "Set Up Login Code Delivery" screen, or anywhere on the path to that screen, that Facebook would also use phone numbers provided for two-factor authentication for advertising.

138.    Additionally, during the signup process for two-factor authentication on Facebook's desktop website from April 26, 2018, to November 20, 2018, Facebook presented users with a dialog box titled "Add A New Phone Number."

139.    In that dialog box, Facebook asked for users' mobile phone numbers and told them, "Add your mobile number to your account so you can reset your password if you ever need to, find friends, and more.  You can later choose to turn SMS updates on for this number."

140.    There was no disclosure in that dialog box, or anywhere on the path to that dialog box, that Facebook would also use phone numbers provided for two-factor authentication for advertising.

141.    When users were led to, or looked for, more information about adding a phone number for two-factor authentication, they were brought to a webpage that asked, "Why am I being asked to add my mobile phone number to my account?"  This webpage stated:

> Adding a mobile phone number to your account:
> * Helps keep your account secure
> * Makes it easier to connect with friends and family on Facebook
> * Makes it easier to regain access to your account if you have trouble logging in

142.    Facebook did not inform users that it would also use mobile phone numbers for advertising.

143.    The fact that Facebook would use mobile phone numbers provided for two-factor authentication for advertising would be material to users when deciding whether to use two-factor authentication at all, and, after May 2018, whether to use a third-party authentication app to log in with two-factor authentication instead of giving Facebook their mobile phone numbers.

**Facebook's April 2018 Data Policy Was Deceptive to Users Who Did Not Have Its New "Face Recognition" Setting**

144.    In 2010, Facebook began offering users a "Tag Suggestions" feature that used facial-recognition technology to assist them in "tagging" Friends in photos or videos, or associating a photo or video to a particular Friend's Facebook account.

145.    Specifically, Facebook's facial-recognition technology used, and still uses, an algorithm that analyzes pixels in a user's profile picture and photos in which the user is tagged to create a unique facial-recognition template that Facebook employs to identify that user in photos

and videos uploaded by the user's Friends. Facebook then suggests the user's name rather than requiring the Friend to manually type the user's name.

146. Users could control this feature through a Tag Suggestions privacy setting ("Tag Suggestions Setting"). All users who signed up for a Facebook account originally had the Tag Suggestions Setting following the launch of the Tag Suggestions feature. The Tag Suggestions Setting default was set to "Friends," which enabled facial recognition. Users could opt out of facial recognition by changing the Tag Suggestions Setting to "No One." For any user who opted out of facial recognition, Facebook would not create a facial-recognition template, or it would delete an existing facial-recognition template, for that user.

147. In December 2017, Facebook introduced a new "Face Recognition" setting ("Face Recognition Setting") to replace the existing Tag Suggestions Setting. Like the Tag Suggestions Setting, the Face Recognition Setting controlled whether Facebook created and stored a facial-recognition template for a user. Thus, if a user turned off the Face Recognition Setting, Facebook would not create a facial-recognition template for the user, and it would delete any existing facial-recognition template.

148. When it introduced the Face Recognition Setting, Facebook began using its facial-recognition technology for three new features, in addition to tag suggestions: Photo Review, which notifies users that they may be in certain photos or videos that have been uploaded onto Facebook even if the user is not tagged in the photo or video; Automatic Alt Text, which helps screen readers with visual impairments identify who is in the photo or video; and Profile Photo Review, which helps Facebook identify potential account impersonation. These new features

were available only to users who had migrated to the Face Recognition Setting and whose setting was "On."

149.    Between January and April 2018, Facebook provided a notice to individual users before migrating them to the Face Recognition Setting (the "Facial Recognition Notice").  This notice appeared at the top of a user's News Feed and informed users of the three new uses for facial recognition and whether the Face Recognition Setting for that user was "On" or "Off." The initial setting for the new Face Recognition Setting was based on whether the user had facial recognition enabled under their most recent Tag Suggestions Setting.  Facebook thereby imported the user's previous privacy choice on facial recognition to the new Face Recognition Setting.

150.    The Facial Recognition Notice contained a link for users to "Learn More" about Facebook's facial-recognition technology and a link to the Settings page where users could turn the Face Recognition Setting on or off.  If a user did not click either link, Facebook provided the Facial Recognition Notice to that user three separate times and then migrated the user to the new Face Recognition Setting and its new features.

151.    This migration experience occurred only for users who had Facebook accounts as of April 2018 and who had received Facebook's Facial Recognition Notice three times. Approximately 30 million Facebook users in the United States who had not received the Facial Recognition Notice three separate times were not migrated to the Face Recognition Setting.  The migration also did not occur for approximately 30 million new users who signed up for Facebook after April 2018.

152.     Accordingly, Facebook did not migrate these approximately 60 million users to the new Face Recognition Setting, and their accounts still featured only the Tag Suggestions Setting.

153.     In April 2018, Facebook deleted from its Platform all prior references to "Tag Suggestions" and updated its Data Policy to reference only its new Face Recognition Setting.  In relevant part, Facebook stated:

> **Face recognition:** *If you have it turned on*, we use face recognition technology to recognize you in photos, videos and camera experiences. The face-recognition templates we create may constitute data with special protections under the laws of your country.  Learn more about how we use face recognition technology, or control our use of this technology in Facebook Settings.  If we introduce face-recognition technology to your Instagram experience, we will let you know first, and you will have control over whether we use this technology for you.

(emphasis added).

154.     Users who still had the Tag Suggestions Setting after April 2018, however, did not have to "turn[ ] on" facial recognition, because—unless the user had previously opted out— facial recognition was turned on by default.  Thus, the updated Data Policy, which emphasized the need for users to "turn[ ] on" facial recognition, was not accurate for the approximately 60 million users who were not migrated to the Face Recognition Setting, as facial-recognition technology was turned on by default for those users.  If those users did not want the technology, they—contrary to the updated Data Policy—had to turn it off.

## VIOLATIONS OF THE COMMISSION ORDER

### Count 1—Misrepresenting the Extent to Which Users Could Control the Privacy of Their Data and the Extent to Which Facebook Made User Data Accessible to Third Parties

155.    Part I.B. of the Commission Order prohibits Facebook from misrepresenting "the extent to which a consumer can control the privacy of any covered information maintained by Respondent and the steps a consumer must take to implement such controls."

156.    Part I.C. of the Commission Order prohibits Facebook from misrepresenting "the extent to which Respondent makes or has made covered information accessible to third parties."

157.    During the period from December 2012 through April 2014, Facebook represented to consumers that they could control the privacy of their data by using desktop and mobile privacy settings to limit the information Facebook could share with their Facebook Friends, including those on the Privacy Settings page, inline settings, Privacy Shortcuts, and profile settings.

158.    In fact, Facebook did not limit its sharing of consumer information with third-party developers based on those privacy settings.

159.    Therefore, the representations described in Paragraph 157 violated Parts I.B. and I.C. of the Commission Order.

### Count 2—Misrepresenting the Extent to Which Users Could Control the Privacy of Their Data and the Extent to Which Facebook Made User Data Accessible to Third Parties

160.    Part I.B. of the Commission Order prohibits Facebook from misrepresenting "the extent to which a consumer can control the privacy of any covered information maintained by Respondent and the steps a consumer must take to implement such controls."

161.    Part I.C. of the Commission Order prohibits Facebook from misrepresenting "the extent to which Respondent makes or has made covered information accessible to third parties."

162.    At the April 30, 2014, F8 Conference, Facebook publicly announced that it would no longer allow third-party developers to access Affected Friend data.

163.    In addition, Facebook continued to represent to consumers that they could control the privacy of their data by using Facebook's desktop and mobile privacy settings to limit to their Facebook Friends the information Facebook could share, including those on the Privacy Settings page, inline settings, Privacy Shortcuts, profile settings, and Privacy Checkup.

164.    In fact, Facebook continued to allow millions of third-party developers access to Affected Friend data for at least another year.

165.    Additionally, Facebook did not limit its sharing of consumer information with third-party developers based on Facebook's desktop and mobile privacy settings, including those on the Privacy Settings page, inline settings, Privacy Shortcuts, profile settings, and Privacy Checkup.

Therefore, the representations described in Paragraphs 162 and 163 violated Parts I.B. and I.C. of the Commission Order.

### Count 3—Misrepresenting the Extent to Which Facebook Made User Data Accessible to Third Parties

166.    Part I.B. of the Commission Order prohibits Facebook from misrepresenting "the extent to which a consumer can control the privacy of any covered information maintained by Respondent and the steps a consumer must take to implement such controls."

167.    Part I.C. of the Commission Order prohibits Facebook from misrepresenting "the extent to which Respondent makes or has made covered information accessible to third parties."

168.    At the April 30, 2014, F8 Conference, Facebook announced that it would no longer allow third-party developers to access Affected Friend data.

169.    On April 30, 2015, Facebook generally deprecated Graph API V1 so that it was no longer publicly available to third-party developers.

170.    However, Facebook privately granted the Whitelisted Developers continued access to the capabilities of Graph API V1.

171.    As a result, even after April 30, 2015, the Whitelisted Developers maintained access to the same Affected Friend data that Facebook had publicly announced in April 2014 was no longer available to third-party developers.

172.    Some of the Whitelisted Developers retained access to Affected Friend data for months, while others retained access for years, with some retaining active access in 2018.

173.    Additionally, from April 30, 2015, to at least June 2018, Facebook continued to represent to consumers that they could control the privacy of their data by using Facebook's desktop and mobile privacy settings to limit to their Facebook Friends the information Facebook could share, including those on the Privacy Settings page, inline settings, Privacy Shortcuts, profile settings, and Privacy Checkup.

174.    In fact, regardless of the privacy settings a user checked, Facebook continued to provide access to Covered Information to Whitelisted Developers throughout this period.

175.    Therefore, the representations described in Paragraphs 168 and 173 violated the Commission Order.

**Count 4—Failure to Implement and Maintain a Reasonable Privacy Program**

176.     Part IV of the Commission Order requires Facebook to implement and maintain a comprehensive privacy program reasonably designed to address privacy risks related to the development and management of new and existing products and services.  Specifically, the program must contain controls and procedures appropriate to Facebook's size and complexity, the nature and scope of its activities, and the sensitivity of Covered Information.

177.     Among other things, Part IV requires that Facebook design and implement reasonable controls and procedures to address reasonably foreseeable, material risks that could result in the unauthorized collection, use, or disclosure of Covered Information.  It also required Facebook to monitor and test the effectiveness of its controls and procedures, and to assess the sufficiency of any safeguards it implemented to control privacy risks.

178.     In its initial and biennial assessment reports, Facebook claimed it had implemented controls and procedures to address the privacy risks created by third-party developers' access to user data.

179.     These controls did not include screening the third-party developers or their apps before granting them access to user data.  Instead, Facebook relied on enforcing its Platform Policies.

180.     Despite substantial reliance on its Platform Policies, however, Facebook did not consistently enforce those policies from 2012 to the present.  Rather, the severity of consequences it administered to violators of the Platform Policies, and the speed with which it effectuated such measures, took into account the financial benefit the violator provided to Facebook.

181.    Facebook did not inform its assessor that it was engaging in this practice.

182.    Therefore, Facebook violated Part IV of the Commission Order.

### Count 5—Misrepresenting the Extent to Which Users Could Control the Privacy of Their Data

183.    Part I.B. of the Commission Order prohibits Facebook from misrepresenting "the extent to which a consumer can control the privacy of any covered information maintained by Respondent and the steps a consumer must take to implement such controls."

184.    During the period from April 2018 through the present, Facebook represented, expressly or by implication, to its users that they would have to "turn[ ] on" facial-recognition technology.

185.    In fact, during this period, for users who still had the Tag Suggestions Setting, Facebook's facial-recognition technology was turned on by default unless the user opted out.

186.    Therefore, the representations described in Paragraph 184 violated Part I.B. of the Commission Order.

### VIOLATION OF SECTION 5 OF THE FTC ACT

### Count 6—Deceptive Practices Regarding Use of Covered Information Provided for Account Security

187.    As described above in Paragraphs 128-43, Facebook represented, directly or indirectly, expressly or by implication, that users' phone numbers provided for two-factor authentication would be used for security purposes and, in some instances, to make it easier to connect with Friends on Facebook.

188.    Facebook failed to disclose, or failed to disclose adequately, that Facebook would also use phone numbers provided by users for two-factor authentication for targeting advertisements to those users.

189.    Facebook's failure to disclose or disclose adequately the material information described in Paragraph 188, in light of the representations set forth in Paragraph 187, is a deceptive act or practice.

190.    The acts and practices of Facebook as alleged in this Complaint constitute unfair or deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

## COURT'S POWER TO GRANT RELIEF

191.    Each representation Defendant has made in violation of the Commission Order constitutes a separate violation for which Plaintiff may seek a civil penalty pursuant to Section 5(*l*) of the FTC Act, 15 U.S.C. § 45(*l*).

192.    Section 5(*l*) of the FTC Act, 15 U.S.C. § 45(*l*), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and Section 1.98(c) of the FTC's Rules of Practice, 16 C.F.R. § 1.98(c), directs that a defendant who violates an order of the Commission after it has become final, and while such order is in effect, "shall forfeit and pay to the United States a civil penalty of not more than $42,530 for each violation."

193.    Sections 5(*l*) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(*l*) and 53(b), also authorize this Court to grant an "injunction and such other and further equitable relief" as it may deem appropriate in the enforcement of the Commission Order.

## PRAYER FOR RELIEF

194.    WHEREFORE, Plaintiff requests this Court, pursuant to 15 U.S.C. §§ 45(*l*) and

53(b), and pursuant to the Court's own equitable powers:

A.    Enter judgment against Defendant and in favor of Plaintiff for violating the

Commission Order and the FTC Act as alleged in this Complaint;

B.    Award Plaintiff monetary civil penalties from Defendant for each violation of the

Commission Order;

C.    Enter an injunction to prevent future violations by Defendant of the Commission

Order, or as it is subsequently modified by operation of law, and the FTC Act; and

D.    Award Plaintiff the costs of bringing this action, as well as such other and further

relief as the Court may determine to be just and proper.

DATED: July 24, 2019

**FOR THE UNITED STATES:**

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

DAVID M. MORRELL
Deputy Assistant Attorney General

GUSTAV W. EYLER (997162)
Director
Consumer Protection Branch

ANDREW E. CLARK
Assistant Director

/s/ Lisa K. Hsiao
LISA K. HSIAO (444890)
Senior Litigation Counsel
PATRICK R. RUNKLE
JASON LEE
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 616-0219
Fax: (202) 514-8742
Lisa.K.Hsiao@usdoj.gov
Patrick.R.Runkle@usdoj.gov
Jason.Lee3@usdoj.gov

*Of Counsel:*

JAMES A. KOHM (426342)
Associate Director for Enforcement

LAURA KOSS (441848)
Assistant Director for Enforcement

ROBIN L. MOORE (987108)
REENAH L. KIM (478611)
LINDA HOLLERAN KOPP (472355)
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, NW,
Mail Stop CC-9528
Washington, DC 20580
(202) 326-2167 (Moore), -2272 (Kim), -2267 (Kopp), -3197 (fax)
rmoore1@ftc.gov; rkim1@ftc.gov; lkopp@ftc.gov

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff<br><br>        v.<br><br>FACEBOOK, Inc.,<br>a corporation,<br><br>        Defendant. | Case No. 19-cv-2184<br><br>**STIPULATED ORDER<br>FOR CIVIL PENALTY,<br>MONETARY JUDGMENT, AND<br>INJUNCTIVE RELIEF** |

## STIPULATED ORDER FOR CIVIL PENALTY, MONETARY JUDGMENT, AND INJUNCTIVE RELIEF

The United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Civil Penalties, Injunction, and Other Relief ("Complaint") for civil penalties and other equitable relief in this matter, pursuant to Sections 5(a), 5(*l*), 13(b), and 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(*l*), 53(b), and 56(a)(1).  Defendant has waived service of the summons and the Complaint.  Plaintiff and Defendant stipulate to the entry of this Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief ("Stipulated Order") to resolve the claims for civil penalties and injunctive relief set forth in the Complaint.

The parties have consented to entry of this Stipulated Order to resolve any and all claims that Defendant, its officers, and directors, prior to June 12, 2019, violated the Commission's Decision and Order in *In re Facebook, Inc.*, C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012).  Furthermore, this Stipulated Order resolves all consumer-protection claims known by the FTC prior to June 12, 2019, that Defendant, its officers, and directors violated Section 5 of the

FTC Act.  The FTC and the United States specifically reserve all other claims.  For purposes of this paragraph, "Defendant" shall mean Facebook, Inc., its successors and assigns, acting directly, or through any corporation, company, subsidiary, division, affiliate, website, or other device that it directly or indirectly controls.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.     This Court has jurisdiction over the subject matter and all of the parties.

2.     Venue is proper as to all parties in this District.

3.     The Complaint states a claim upon which relief may be granted against Defendant under Sections 5(a), 5(*l*), 13(b), and 16(a)(1) of the FTC Act, 15 U.S.C. §§ 45(a), 45(*l*), 52, 53(b), and 56(a)(1), including for violations of Parts I and IV of the Commission's Decision and Order in *In re Facebook, Inc.*, C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012).

4.     Defendant's activities are "in or affecting commerce," as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

5.     Defendant waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Stipulated Order, and agrees to bear its own costs and attorney's fees.

6.     Defendant neither admits nor denies any of the allegations in the Complaint, except as specifically stated in the Decision and Order set forth in Attachment A.  Only for purposes of this action, Defendant admits the facts necessary to establish jurisdiction.

7.     Defendant and Plaintiff waive all rights to appeal or otherwise challenge or contest the validity of this Stipulated Order.

# I.   MONETARY JUDGMENT FOR CIVIL PENALTY

IT IS FURTHER ORDERED that:

A.      Judgment in the amount of FIVE BILLION dollars ($5,000,000,000.00) is entered in favor of Plaintiff against Defendant as a civil penalty pursuant to Section 5(*l*) of the FTC Act, 15 U.S.C. § 45(*l*).

B.      Defendant is ordered to pay to Plaintiff, by making payment to the Treasurer of the United States, FIVE BILLION dollars ($5,000,000,000.00), which, as Defendant stipulates, its undersigned counsel holds in escrow for no purpose other than payment to Plaintiff.  Such payment must be made within 7 days of entry of this Stipulated Order by electronic fund transfer in accordance with instructions specified by a representative of Plaintiff.

C.      In the event of any default in payment, the entire unpaid amount, together with interest, as computed pursuant to 28 U.S.C. § 1961 from the date of default to the date of payment, shall immediately become due and payable.

D.      Defendant relinquishes dominion and all legal and equitable right, title, and interest to all funds paid pursuant to this Stipulated Order.  Defendant shall make no claim to or demand for return of the funds, directly or indirectly, through counsel or otherwise.

E.      Defendant agrees that the facts alleged in the Complaint will be taken as true, without further proof, only in any subsequent civil litigation by Plaintiff to enforce its rights to any payment or monetary judgment pursuant to this Stipulated Order.

F.      Defendant acknowledges that its Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Defendant has previously submitted to Plaintiff, may be used for collecting and reporting on any delinquent amount arising out of this Stipulated Order, in accordance with 31 U.S.C. § 7701.

## II.     MODIFICATION OF DECISION AND ORDER

IT IS FURTHER ORDERED that Defendant, and its successors and assigns, shall consent

to:  (i) reopening of the proceeding in FTC Docket No. C-4365; (ii) waiver of its rights under the

show cause procedures set forth in Section 3.72(b) of the Commission's Rules of Practice,

16 C.F.R. § 3.72(b); and (iii) modifying the Decision and Order in *In re Facebook, Inc.*, C-4365,

2012 FTC LEXIS 135 (F.T.C. July 27, 2012), with the Decision and Order set forth in

Attachment A.

## III.     ADDITIONAL PROVISIONS

IT IS FURTHER ORDERED that Defendant shall provide to the Department of Justice

copies of all of the reports, assessments, notifications, certifications, and other documents required

or requested under Parts VII.E.2.e, VIII.A, VIII.H, IX, XI.A, XI.B, XII.A, and XIII of the

Decision and Order set forth in Attachment A.  Such documents shall be furnished to the Director

of the Department of Justice's Consumer Protection Branch.  Defendant agrees that the

Department of Justice shall have the same rights as the Commission (as given in the Decision and

Order set forth in Attachment A) to request such documents, subject to any applicable law or

regulation.  Furthermore, Defendant agrees that the Department of Justice shall have the same

rights as the Commission to engage in compliance monitoring as provided by Part XV of the

Decision and Order set forth in Attachment A, as well as the same right as the Associate Director

for Enforcement for the Bureau of Consumer Protection at the Commission provided under

Part VIII.B to approve the person(s) selected to conduct the Assessments described in Part VIII of

the Decision and Order set forth in Attachment A, subject to any applicable law or regulation.  For

purposes of this paragraph, "Defendant" shall have the same definition and scope as the definition

of "Respondent" in Paragraph Q on page 4 of the Decision and Order set forth in Attachment A.

## IV.   CONTINUING JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction in this matter for

purposes of construction, modification, and enforcement of this Stipulated Order.


SO ORDERED this ___ day of _____, 2019.



_____

UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

**FOR THE UNITED STATES**

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

DAVID M. MORRELL
Deputy Assistant Attorney General

Dated: July 23, 2019

GUSTAV W EYLER (997162)
Director
Consumer Protection Branch

ANDREW E. CLARK
Assistant Director
LISA K. HSIAO (444890)
Senior Litigation Counsel
PATRICK R. RUNKLE
JASON LEE
Trial Attorneys
Consumer Protection Branch
U .S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 532-4892
Fax: (202) 514-8742
Lisa.K.Hsiao@usdoj.gov
Patrick.R.Runkle@usdoj.gov
Jason.Lee3@usdoj.gov
*Counsel for the United States*

Dated: July 23, 2019

**FOR FEDERAL TRADE COMMISSION**

JAMES A. KOHM (426342)
Associate Director for Enforcement

LAURA KOSS (441848)
Assistant Director for Enforcement

ROBIN L. MOORE (987108)
REENAH L. KIM (478611)
LINDA HOLLERAN KOPP (472355)
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, NW,
Mail Stop CC-9528
Washington, DC 20580
(202) 326-2167 (Moore) -2272 (Kim), -2267
(Kopp), -3197 (fax)
*rmoore@ftc.gov; rkim1@ftc.gov;*
*lkopp@ftc.gov*

*Counsel for Federal Trade Commission*

**FOR DEFENDANT**
**FACEBOOK, INC.**

Dated: July 23, 2019

_____
MARK ZUCKERBERG
Chief Executive Officer
Facebook, Inc.

Dated: July 23, 2019

_____
COLIN STRETCH
Vice President
Facebook, Inc.

Dated: July 23, 2019

_____
M. SEAN ROYALL
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. NW
Washington, DC 20036
(202) 955-8500 (telephone)
(202) 467-0539 (facsimile)
SRoyall@gibsondunn.com
_Counsel for Facebook, Inc._

8

**[182 3109]**

**UNITED STATES OF AMERICA**
**FEDERAL TRADE COMMISSION**

| | |
|---|---|
| *In the Matter of*<br><br>**FACEBOOK, Inc.,**<br>*a corporation.* | **Docket No. C-4365** |

**DECISION AND ORDER**

The Federal Trade Commission ("Commission") initiated an investigation of certain acts and practices of the Respondent named in the caption. The Commission's Bureau of Consumer Protection ("BCP") prepared and furnished to Respondent a draft Complaint. BCP proposed to present the draft Complaint to the Commission for its consideration. If issued by the Commission, the draft Complaint would charge the Respondent with violations of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a)(1) and (*l*), 53(b), and 56(a)(1).

The Commission considered the matter and determined that it had reason to believe that Respondent has violated the Decision and Order the Commission previously issued in the matter *In re Facebook, Inc.*, C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012) and the FTC Act, and that a Complaint should issue stating its charges in that respect. After due consideration, the Commission issues its Complaint, makes the following Findings, and issues the following Order:

**FINDINGS**

1.      This Court has jurisdiction over this matter.

2.      The Complaint charges violations of Section 5 of the FTC Act, 15 U.S.C. § 45, and violations of Parts I and IV of an order previously issued by the Commission, 15 U.S.C. § 56(a)(1).

3.      Respondent waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear its own costs and attorney fees.

4.      Respondent and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

5.     Respondent neither admits nor denies any of the allegations in the Complaint, except as specifically stated in the Decision and Order.  Only for purposes of this action, Respondent admits the facts necessary to establish jurisdiction.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.     "**Affected Facial Recognition User**" means any User who has a "Tag Suggestions" setting as of the effective date of this Order, and any User who signs up for Respondent's service after the effective date of this Order and has received the "Tag Suggestions" setting.

B.     "**Clear(ly) and Conspicuous(ly)**" means that a required disclosure is difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.     In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a video or television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.     A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.     An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.     In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.     The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6.     The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7.     The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8.     When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable

members of that group.

C.    "**Covered Incident**" means any instance in which Respondent has verified or otherwise confirmed that the Covered Information of 500 or more Users was or was likely to have been accessed, collected, used, or shared by a Covered Third Party in violation of Respondent's Platform Terms.

D.    "**Covered Information**" means information from or about an individual consumer including, but not limited to:  (a) a first or last name; (b) geolocation information sufficient to identify a street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging User identifier or a screen name; (d) a mobile or other telephone number; (e) photos and videos; (f) Internet Protocol ("IP") address, User ID, or other persistent identifier that can be used to recognize a User over time and across different devices, websites or online services; (g) a Social Security number; (h) a driver's license or other government issued identification number; (i) financial account number; (j) credit or debit information; (k) date of birth; (l) biometric information; (m) any information combined with any of (a) through (l) above; or (n) Nonpublic User Information.

E.    "**Covered Third Party**" means any individual or entity that uses or receives Covered Information obtained by or on behalf of Respondent outside of a User-initiated transfer of Covered Information as part of a data portability protocol or standard, other than:  (1) a service provider of Respondent that (i) uses the Covered Information for and at the direction of Respondent and no other individual or entity and for no other purpose; and (ii) does not disclose the Covered Information, or any individually identifiable information derived from such Covered Information, except for, and at the direction of, Respondent, for the purpose of providing services requested by a User and for no other purpose; or (2) any entity that uses the Covered Information only as reasonably necessary:  (i) to comply with applicable law, regulation, or legal process, or (ii) to enforce Respondent's terms of use, or (iii) to detect, prevent, or mitigate fraud or security vulnerabilities.

F.    "**Facial Recognition Template**" means data, such as a unique combination of numbers or other alphanumeric characters, that is used to predict if the face of a specific User is represented in an image or other visual content.

G.    "**Independent Director**" means a member of the Board of Directors other than an executive officer or employee of Respondent or any other individual having a relationship that, in the opinion of the Independent Nominating Committee, would interfere with the exercise of independent judgment in carrying out the responsibilities of such director.

H.    "**Independent Privacy Committee**" means a committee of Respondent's Board of Directors, consisting of Independent Directors, all of whom meet the Privacy and Compliance Baseline Requirements.

I.    "**Independent Nominating Committee**" means a committee of Respondent's Board of Directors, consisting of Independent Directors, the charter of which will encompass, among other things, approving for nomination individuals to the Respondent's Board of Directors and to the

Independent Privacy Committee.

J.      "**Integrity**" means the protection of information from unauthorized destruction, corruption, or falsification.

K.      "**Nonpublic User Information**" means any User profile information (*i.e.*, information that a User adds to or is listed on a User's Facebook profile), or User-generated content (*e.g.*, status updates, photos), that is restricted by one or more Privacy Setting(s).

L.      "**Platform Terms**" means Respondent's written terms, policies, and procedures relating to the privacy, confidentiality, or Integrity of Covered Information that apply to Covered Third Parties.

M.      "**Principal Executive Officer**" shall mean Mark Zuckerberg for so long as he serves as Chief Executive Officer or President of Respondent, or such other officer (regardless of title) that is designated in Respondent's Bylaws or by resolution of the Board of Directors as having the duties of the principal executive officer of Respondent, acting solely in his official capacity on behalf of Respondent; or if Mark Zuckerberg no longer serves in such a position, then such other individual serving as the Chief Executive Officer of Respondent, or such other officer (regardless of title) that is designated in Respondent's Bylaws or by resolution of the Board of Directors as having the duties of the principal executive officer of Respondent, acting solely in his or her official capacity on behalf of Respondent.  In the event that Mark Zuckerberg is not the Principal Executive Officer and such position is jointly held by two or more persons, then each of such persons shall be deemed to be a Principal Executive Officer.

N.      "**Privacy and Compliance Baseline Requirements**" shall refer to the requirements that, in the opinion of the Independent Nominating Committee, a member of the Independent Privacy Committee has (1) the ability to understand corporate compliance and accountability programs and to read and understand data protection and privacy policies and procedures, and (2) such other relevant privacy and compliance experience reasonably necessary to exercise his or her duties on the Independent Privacy Committee.

O.      "**Privacy Setting**" includes any control or setting provided by Respondent that allows a User to restrict which individuals or entities can access or view Covered Information.

P.      "**Representatives**" means Respondent's officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

Q.      "**Respondent**" means Facebook, Inc. ("Facebook"), its successors and assigns, acting directly, or through any corporation, company, subsidiary, division, affiliate, website, or other device that it directly or indirectly controls.  For purposes of Parts VII and VIII, Respondent means Facebook, and its successors and assigns, and WhatsApp Inc., and its successors and assigns.

R.      "**User**" means an identified individual from whom Respondent has obtained information

4

for the purpose of providing access to Respondent's products and services.

## I.     PROHIBITION AGAINST MISREPRESENTATIONS

IT IS ORDERED that Respondent, including Representatives of Respondent, in connection with any product or service, shall not misrepresent in any manner, expressly or by implication, the extent to which Respondent maintains the privacy or security of Covered Information, including, but not limited to:

A.     Its collection, use, or disclosure of any Covered Information;

B.     The extent to which a consumer can control the privacy of any Covered Information maintained by Respondent and the steps a consumer must take to implement such controls;

C.     The extent to which Respondent makes or has made Covered Information accessible to third parties;

D.     The steps Respondent takes or has taken to verify the privacy or security protections that any third party provides;

E.     The extent to which Respondent makes or has made Covered Information accessible to any third party following deletion or termination of a User's account with Respondent or during such time as a User's account is deactivated or suspended; and

F.     The extent to which Respondent is a member of, adheres to, complies with, is certified by, is endorsed by, or otherwise participates in any privacy or security program sponsored by a government or any self-regulatory or standard-setting organization, including but not limited to the EU-U.S. Privacy Shield framework, the Swiss-U.S. Privacy Shield framework, and the APEC Cross-Border Privacy Rules.

## II.     CHANGES TO SHARING OF NONPUBLIC USER INFORMATION

IT IS FURTHER ORDERED that Respondent and its Representatives, in connection with any product or service, in or affecting commerce, prior to any sharing of a User's Nonpublic User Information by Respondent with any Covered Third Party, which materially exceeds the restrictions imposed by a User's Privacy Setting(s), shall:

A.     Clearly and Conspicuously disclose (such as in a stand-alone disclosure or notice) to the User, separate and apart from any "privacy policy," "data use policy," "statement of rights and responsibilities" page, or other similar document:  (1) the categories of Nonpublic User Information that will be disclosed to such Covered Third Parties, (2) the identity or specific categories of such Covered Third Parties, and (3) that such sharing exceeds the restrictions imposed by the Privacy Setting(s) in effect for the User; and

B.     Obtain the User's affirmative express consent.

Nothing in Part II will (1) limit the applicability of Part I of this Order; or (2) require

Respondent to obtain affirmative express consent for sharing of a User's Nonpublic User Information initiated by another User authorized to access such information, provided that such sharing does not materially exceed the restrictions imposed by a User's Privacy Setting(s). Respondent may seek modification of this Part pursuant to 15 U.S.C. § 45(b) and 16 C.F.R. § 2.51(b) to address relevant developments that affect compliance with this Part, including, but not limited to, technological changes and changes in methods of obtaining affirmative express consent.

## III.  DELETION OF INFORMATION

IT IS FURTHER ORDERED that Respondent and its Representatives, in connection with any product or service, must ensure that Covered Information cannot be accessed by any Covered Third Party from servers under Respondent's control after a reasonable period of time, not to exceed thirty (30) days, from the time that the User has deleted such information or deleted or terminated his or her account, except as required by law or where necessary to protect the Facebook website or its Users from fraud or illegal activity.  Nothing in this Part shall be construed to require Respondent to restrict access to any copy of Covered Information that has been posted to Respondent's websites or services by a User other than the User who deleted such information or deleted or terminated such account.

Additionally, Respondent and its Representatives shall further implement procedures designed to ensure that Covered Information entered by the User (such as User-generated content) is deleted from servers under Respondent's control, or is de-identified such that it is no longer associated with the User's account or device, within a reasonable period of time (not to exceed 120 days) from the time that the User has deleted such information, or his or her account, except (1) as required by law; (2) where necessary for the safety and security of Respondent's products, services, and Users, including to prevent fraud or other malicious activity; (3) where stored solely for backup or disaster recovery purposes (subject to a retention period necessary to provide a reliable service); or (4) where technically infeasible given Respondent's existing systems.  If a User deletes an individual piece of Covered Information but does not delete his or her account, nothing in this paragraph shall be construed to require deletion or de-identification of metadata (*e.g.*, logs of User activity) that may remain associated with the User's account after the User has deleted such information.  Respondent may seek modification of this paragraph pursuant to 15 U.S.C. § 45(b) and 16 C.F.R. § 2.51(b) to address relevant developments that affect compliance with this paragraph, including, but not limited to, technological changes or changes in methods of deleting data.

### IV. LIMITATIONS ON THE USE OR SHARING OF TELEPHONE NUMBERS SPECIFICALLY PROVIDED TO ENABLE ACCOUNT SECURITY FEATURES

IT IS FURTHER ORDERED that Respondent and its Representatives, in connection with any product or service, shall not use for the purpose of serving advertisements, or share with any Covered Third Party for such purpose, any telephone number that Respondent has identified through its source tagging system as being obtained from a User prior to the effective date of this Order for the specific purpose of enabling an account security feature designed to protect against unauthorized account access (*i.e.*, two-factor authentication, password recovery, and login alerts). Nothing in Part IV will limit Respondent's ability to use such telephone numbers if obtained separate and apart from a User enabling such account security feature and in a manner consistent with the requirements of this Order.

### V. COVERED INFORMATION AND USER PASSWORD SECURITY

IT IS FURTHER ORDERED that Respondent and its Representatives, in connection with any product or service, must implement, and thereafter maintain, a comprehensive information security program that is designed to protect the security of Covered Information. In addition to any security-related measures associated with Respondent's Privacy Program under Part VII of this Order, the information security program must contain safeguards appropriate to Respondent's size and complexity, the nature and scope of Respondent's activities, and the sensitivity of the Covered Information. Specifically with respect to the collection, storage, transit, or use of User passwords, such safeguards shall include:

A. Not requesting or requiring, as part of the User log-in, authentication, or account creation process, User passwords to independent, third-party consumer applications, websites, or other services;

B. Cryptographically protecting or otherwise securing User passwords when stored and when in transit over the Internet or other similar transmission channel; and

C. Implementing regular automated scans designed to detect whether any User passwords are stored in plaintext within Respondent's data warehouse, and cryptographically protecting, deleting, or otherwise rendering unreadable any such passwords.

## VI.   FACIAL RECOGNITION TEMPLATES

IT IS FURTHER ORDERED that Respondent and its Representatives, in connection with any product or service, in or affecting commerce, shall not create any new Facial Recognition Templates, and shall delete any existing Facial Recognition Templates within ninety (90) days from the effective date of this Order, for any Affected Facial Recognition User, unless Respondent Clearly and Conspicuously discloses (such as in a stand-alone disclosure or notice), separate and apart from any "privacy policy," "data policy," "statement of rights and responsibilities" page, or other similar documents, how Respondent will use, and to the extent applicable, share, the Facial Recognition Template for such User, and obtains such User's affirmative express consent.

## VII.   MANDATED PRIVACY PROGRAM

IT IS FURTHER ORDERED that Respondent, in connection with any product, service, or sharing of Covered Information, shall establish and implement, and thereafter maintain a comprehensive privacy program ("Privacy Program") that protects the privacy, confidentiality, and Integrity of the Covered Information collected, used, or shared by Respondent.  To satisfy this requirement, Respondent must, within 180 days of the effective date of this Order, at a minimum:

A.      Document in writing the content, implementation, and maintenance of the Privacy Program that includes:  (1) the documented risk assessment required under Part VII.D. of this Order; (2) the documented safeguards required under Part VII.E. of this Order, including any known alternative procedures that would mitigate the identified risks to the privacy, confidentiality, or Integrity of the Covered Information, but which were not implemented and each reason such procedure(s) were not implemented; (3) a description of the training required under Part VII.G. of this Order; and (4) a description of the procedures adopted for implementing and monitoring the Privacy Program, including procedures used for evaluating and adjusting the Privacy Program as required under Part VII.J. of this Order;

B.      Provide the written program required under Part VII.A. of this Order, and any evaluations thereof or adjustments thereto, to the Principal Executive Officer and to the Independent Privacy Committee created in response to Part X of this Order at least once every twelve (12) months;

C.      Designate a qualified employee or employees to coordinate and be responsible for the Privacy Program ("Designated Compliance Officer(s)"), one of whom will be the Chief Privacy Officer for Product, subject to the reasonable approval of the Independent Privacy Committee, and who may only be removed from such position by Respondent with an affirmative vote of a majority of the Independent Privacy Committee;

D.      Assess and document, at least once every twelve (12) months, internal and external risks in each area of its operation (*e.g.*, employee training and management; developer operations; partnerships with Covered Third Parties; sharing of Covered Information with Covered Third Parties or Facebook-owned affiliates; product research, design, and development; and product marketing and implementation) to the privacy, confidentiality, or Integrity of Covered Information that could result in the unauthorized access, collection, use, destruction, or disclosure of such information.  Respondent shall further assess and document internal and external risks as described above as they relate to a Covered Incident, promptly following verification or

confirmation of such an incident, not to exceed thirty (30) days after the incident is verified or otherwise confirmed;

E.      Design, implement, maintain, and document safeguards that control for the material internal and external risks identified by Respondent in response to Part VII.D.  Each safeguard shall be based on the volume and sensitivity of the Covered Information that is at risk, and the likelihood that the risk could be realized and result in the unauthorized access, collection, use, destruction, or disclosure of the Covered Information.

     1.      Specifically with respect to any Covered Third Party that obtains or otherwise has access to Covered Information from Respondent for use in an independent, third-party consumer application or website, such safeguards shall include:

          a.      Requiring an annual self-certification by each Covered Third Party that certifies:  (i) its compliance with each of Respondent's Platform Terms; and (ii) the purpose(s) or use(s) for each type of Covered Information to which it requests or continues to have access, and that each specified purpose or use complies with Respondent's Platform Terms;

          b.      Denying or terminating access to any type of Covered Information that the Covered Third Party fails to certify pursuant to Part VII.E.1.a.(ii) above, or, if the Covered Third Party fails to complete the annual self-certification, denying or terminating access to all Covered Information unless the Covered Third Party cures such failure within a reasonable time, not to exceed thirty (30) days;

          c.      Monitoring Covered Third Party compliance with Respondent's Platform Terms through measures including, but not limited to, ongoing manual reviews and automated scans, and regular assessments, audits, or other technical and operational testing at least once every twelve (12) months; and

          d.      Enforcing against any Covered Third Party violations of Respondent's Platform Terms based solely on the severity, nature, and impact of the violation; the Covered Third Party's malicious conduct or history of violations; and applicable law;

     2.      Specifically with respect to Respondent's collection, use, or sharing of Covered Information in any new or modified product, service, or practice, such safeguards shall include:

          a.      Prior to implementing each new or modified product, service, or practice, (i) conducting a privacy review that assesses the risks to the privacy, confidentiality, and Integrity of the Covered Information, the safeguards in place to control such risks, and the sufficiency of the User notice and, if necessary, consent; and (ii) documenting a description of each reviewed product, service, or practice that was ultimately implemented; any safeguards being implemented to control for the identified risks; and the decision or recommendation made as a result of the

review (*e.g.*, whether the practice was approved, approved contingent upon safeguards or other recommendations being implemented, or rejected);

b.      For each new or modified product, service, or practice that presents a material risk to the privacy, confidentiality, or Integrity of the Covered Information (*e.g.*, a completely new product, service, or practice that has not been previously subject to a privacy review; a material change in the sharing of Covered Information with a Facebook-owned affiliate; a modified product, service, or practice that includes a material change in the collection, use, or sharing of Covered Information; a product, service, or practice directed to minors; or a product, service, or practice involving health, financial, biometric, or other similarly sensitive information), producing a written report ("Privacy Review Statement") that describes:

(i)      The type(s) of Covered Information that will be collected, and how that Covered Information will be used, retained, and shared;

(ii)      The notice provided to Users about, and the mechanism(s), if any, by which Users will consent to, the collection of their Covered Information and the purposes for which such information will be used, retained, or shared by Respondent;

(iii)      Any risks to the privacy, confidentiality, or Integrity of the Covered Information;

(iv)      The existing safeguards that would control for the identified risks to the privacy, confidentiality, and Integrity of the Covered Information and whether any new safeguards would need to be implemented to control for such risks; and

(v)      Any other known safeguards or other procedures that would mitigate the identified risks to the privacy, confidentiality, and Integrity of the Covered Information that were not implemented, such as minimizing the amount or type(s) of Covered Information that is collected, used, and shared; and each reason that those alternates were not implemented;

c.      The Designated Compliance Officer(s) shall deliver a quarterly report ("Quarterly Privacy Review Report") to the Principal Executive Officer and to the Assessor that provides:  (i) a summary of the Privacy Review Statements generated during the prior fiscal quarter under Part VII.E.2.b, including a detailed discussion of the material risks to the privacy, confidentiality, and Integrity of the Covered Information that were identified and how such risks were addressed; (ii) an appendix with each Privacy Review Statement generated during the prior fiscal quarter under Part VII.E.2.b; and (iii) an appendix that lists all privacy decisions generated during the prior fiscal quarter under Part VII.E.2.a;

d.      The appendices required under Part VII.E.2.c.(ii) and (iii) shall be provided to the Assessor no fewer than twenty-one (21) days in advance of the quarterly meeting of the Independent Privacy Committee as specified in Part X.A.5.  A copy of the summary in the Quarterly Privacy Review Report required under VII.E.2.c.(i) shall be provided to Assessor no fewer than fourteen (14) days in advance of the quarterly meeting; and

e.      A copy of the Quarterly Privacy Review Report shall also be furnished, upon request, to the Commission;

3.      Specifically with respect to Respondent's employees' access to Covered Information maintained in Respondent's data warehouse(s), such safeguards shall include designing, implementing, and maintaining access policies and controls that limit employee access to any table(s) or other comparable data storage units known to contain Covered Information to only those employees with a business need to access such Covered Information;

4.      Specifically with respect to Respondent's sharing of Covered Information with any other Facebook-owned affiliate, Respondent shall design, implement, maintain, and document safeguards that control for risks to the privacy, confidentiality, and Integrity of such Covered Information, based on the volume and sensitivity of such Covered Information that is at risk, and the likelihood that the risk could be realized and result in the unauthorized access, collection, use, destruction, or disclosure of the Covered Information; and

5.      Specifically with respect to facial recognition, such safeguards shall include:

a.      Prior to using or sharing any Facial Recognition Template for a User in a manner that materially exceeds the types of uses or sharing disclosed to that User at the time that User's consent was previously obtained,

(i)      Clearly and Conspicuously disclosing (such as in a stand-alone disclosure or notice), separate and apart from any "privacy policy," "data policy," "statement of rights and responsibilities" page, or other similar document, how Respondent will use or, to the extent applicable, share, such Facial Recognition Template; and

(ii)     Obtaining the User's affirmative express consent;

b.      Nothing in this provision shall limit Respondent's ability to use Facial Recognition Templates for fraud prevention or remediation, or protecting the safety, reliability and security of Respondent's platform or Users, so long as Respondent discloses these types of uses in Respondent's privacy policy or similar document;

F.     Assess, monitor, and test, at least once every twelve (12) months and promptly (not to exceed thirty (30) days) following the resolution of a Covered Incident, the effectiveness of any safeguards put in place pursuant to Part VII.E. of this Order to address the risks to the privacy, confidentiality, or Integrity of Covered Information, and modify the Privacy Program based on the results;

G.     Establish regular privacy training programs for all employees on at least an annual basis, updated to address any internal or external risks identified by Respondent in Part VII.D. of this Order and safeguards implemented pursuant to Part VII.E. of this Order, that includes training on the requirements of this Order;

H.     Select and retain service providers capable of safeguarding Covered Information they receive from Respondent, and contractually require service providers to implement and maintain safeguards for Covered Information;

I.     Consult with, and seek appropriate guidance from, independent, third-party experts on data protection and privacy in the course of establishing, implementing, maintaining, and updating the Privacy Program; and

J.     Evaluate and adjust the Privacy Program in light of any material changes to Respondent's operations or business arrangements, a Covered Incident, new or more efficient technological or operational methods to control for the risks identified in Part VII.D. of this Order, and any other circumstances that Respondent knows or has reason to believe may have a material impact on the effectiveness of the Privacy Program.  Respondent may make this evaluation and adjustment to the Privacy Program at any time, but must, at a minimum, evaluate the Privacy Program at least once every twelve (12) months and modify the Privacy Program as necessary based on the results.

## VIII.   INDEPENDENT PRIVACY PROGRAM ASSESSMENTS

IT IS FURTHER ORDERED that, in connection with compliance with Part VII of this Order titled Mandated Privacy Program, Respondent must obtain initial and biennial assessments ("Assessments"):

A.     The Assessment must be obtained from one or more qualified, objective, independent third-party professionals ("Assessor(s)"), selected by the Respondent, subject to the reasonable approval of the Independent Privacy Committee and subject to Part VIII.B, who:  (1) uses procedures and standards generally accepted in the profession; (2) conducts an independent review of the Mandated Privacy Program; and (3) retains all documents relevant to each Assessment for five (5) years after completion of such Assessment and furnishes such documents to the Commission within ten (10) days of receipt of a written request from a representative of the Commission.  No documents may be withheld by the Assessor on the basis of a claim of confidentiality, proprietary or trade secrets, work product protection, attorney client privilege, statutory exemption, or any similar claim;

B.     For each Assessment, Respondent must provide the Associate Director for Enforcement for the Bureau of Consumer Protection at the Federal Trade Commission ("Associate Director") with the name(s) and affiliation(s) of the person(s) selected to conduct the Assessment, which the

Associate Director shall have the authority to approve;

C.      The reporting period for the Assessments must cover:  (1) the first 180 days after the Privacy Program has been put in place for the initial Assessment; and (2) each two-year period thereafter for twenty (20) years after issuance of the Order for the biennial Assessments;

D.      Each Assessment must:  (1) determine whether Respondent has implemented and maintained the Privacy Program required by Part VII.A-J of this Order, titled Mandated Privacy Program; (2) assess the effectiveness of Respondent's implementation and maintenance of each subpart in Part VII of this Order; (3) identify any gaps or weaknesses in the Privacy Program; and (4) identify specific evidence (including, but not limited to, documents reviewed, sampling and testing performed, and interviews conducted) examined to make such determinations, assessments, and identifications, and explain why the evidence that the Assessor examined is sufficient to justify the Assessor's findings.  To the extent that Respondent revises, updates, or adds one or more safeguards required under Part VII.E. of this Order in the middle of an Assessment period, the Assessment shall assess the effectiveness of the revised, updated, or added safeguard(s) for the time period in which it was in effect, and provide a separate statement detailing the basis for each revised, updated, or additional safeguard;

E.      Respondent and its Representatives must disclose all material facts to the Assessor(s), and must not misrepresent in any manner, expressly or by implication, any fact material to the Assessor(s)' (1) determination of whether Respondent has implemented and maintained the Mandated Privacy Program required by Part VII of this Order; (2) assessment of the effectiveness of the implementation and maintenance of subparts VII.A-J of this Order; or (3) identification of any gaps or weaknesses to the Mandated Privacy Program;

F.      Respondent and its Representatives, whether acting directly or indirectly, must provide or otherwise make available to the Assessor all information and material in their possession, custody, or control that is relevant to the Assessment for which there is no reasonable claim of privilege;

G.      No finding of any Assessment shall rely primarily on assertions or attestations by Respondent's management.  The Assessment shall be signed by the Assessor and shall state that the Assessor conducted an independent review of the Mandated Privacy Program, and did not rely primarily on assertions or attestations by Respondent's management;

H.      Each Assessment must be completed within sixty (60) days after the end of the reporting period to which the Assessment applies.  Unless otherwise directed by a Commission representative in writing, Respondent must submit each Assessment to the Commission within ten (10) days after the Assessment has been completed via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580. The subject line must begin, "*In re Facebook, Inc.*, FTC File No. 182-3109."  Each Assessment shall be retained by Respondent until this Order is terminated, and shall be provided to the Associate Director within ten (10) days of Request; and

I.       The Assessor may only be removed by Respondent from such position, subject to Part VIII.B, with the affirmative vote of a majority of the Independent Privacy Committee.

## IX.       COVERED INCIDENT REPORTS

IT IS FURTHER ORDERED that Respondent must submit a report within thirty (30) days following Respondent's verification or confirmation of a Covered Incident, and subsequently updated every thirty (30) days until the incident is fully investigated and any remediation efforts are fully implemented, to the Assessor(s) and to the Commission, that includes, to the extent possible:

A.       The date, estimated date, or estimated date range when the Covered Incident occurred;

B.       An overview of the facts relating to the Covered Incident, including the causes of the Covered Incident;

C.       A description of each type of Covered Information that was accessed, collected, used, destroyed, or shared without the User's authorization or consent;

D.       The number of Users whose Covered Information was accessed, collected, used, destroyed, or shared without the User's authorization or consent; and

E.       An overview of the acts, if any, that Respondent has taken to date to remediate the Covered Incident and protect Covered Information from further exposure or access.

Unless otherwise directed by a Commission representative in writing, all reports to the Commission pursuant to this Order must be emailed to Debrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580. The subject line must begin, "*In re Facebook, Inc.*, FTC File No. 182-3109."

## X.       MANDATED INDEPENDENT PRIVACY COMMITTEE AND OTHER GOVERNANCE MATTERS

IT IS FURTHER ORDERED that:

A.       Within one hundred and twenty (120) days after entry of this Order, Respondent shall create the Independent Privacy Committee, including adopting a new committee charter or amending the charter of an existing committee. The adopted or amended charter for such committee shall include the following qualifications, authority, and responsibilities, including:

1.       The committee shall hold at least four regularly-scheduled meetings each year;

2.       Each member of the committee shall be an Independent Director, and each of the members of the committee shall meet the Privacy and Compliance Baseline Requirements;

3.       Each quarter, the Respondent shall cause the committee to receive a briefing from

management regarding (i) the state of the Privacy Program, (ii) Respondent's compliance with the Order, and (iii) material risks to the privacy, confidentiality, and Integrity of the Covered Information that have been discovered since the most recent meeting of the committee or that were raised by management in a prior meeting with the committee and continue to persist;

4.      On at least an annual basis, management shall conduct a review for the committee of the Privacy Program and discuss Respondent's assessment of material risks to the privacy, confidentiality, and Integrity of the Covered Information and the steps Respondent has taken or plans to take to monitor or mitigate such risks, including Respondent's procedures and any related policies with respect to risk assessment and risk management;

5.      The committee shall meet with the Assessor at least quarterly, and at the conclusion of each biennial Assessment;

      a.      At each quarterly meeting, the Assessor shall review with management and the committee (i) the Assessor's ongoing assessment of the Privacy Program, and (ii) any material risks to the privacy, confidentiality, and Integrity of the Covered Information that have been identified by the Assessor since the Assessor's most recent meeting with the committee, or that were raised by the Assessor in a prior meeting with the committee and continue to persist;

      b.      At each quarterly meeting, the committee (together with any other Independent Directors in attendance) shall meet with the Assessor in an executive session without management present to discuss matters involving the Assessment or other privacy-related issues or risks, as appropriate; and

      c.      At the meeting to review the biennial Assessment with the Assessor, the Assessor and the committee shall review the various elements of the Assessment, as well as (1) any material issues raised by the most recent Assessment or material unresolved issues from prior Assessments, and (2) in an executive session without management present, any problems or difficulties with management.  Following the review of the biennial Assessment (at either the same meeting or the following meeting), management shall review with the committee its proposed remediation plans to address any such issues raised in the Assessment; and

6.      The committee shall evaluate the independence of the Assessor, and the Assessor shall not be appointed or removed by Respondent, subject to Part VIII.B, without the prior approval of a majority of the committee;

B.      Within one hundred and twenty (120) days after entry of this Order, Respondent shall create the Independent Nominating Committee, including adopting a new committee charter or amending the charter of an existing committee to provide that such committee shall have the following authority and responsibilities, including:

1.      The committee shall have the sole authority to recommend the appointment of directors, or the nomination of candidates for election, to Respondent's Board of Directors,

such that Respondent's Board of Directors may not approve any such appointment or nomination in the absence of a favorable recommendation from the committee;

2.     The committee shall have the sole authority to recommend the appointment of directors to, or the removal of directors from, the Independent Privacy Committee, such that Respondent's Board of Directors may not approve any such appointment or removal in the absence of a favorable recommendation from the committee; and

3.     The committee shall determine whether the members of the Independent Privacy Committee qualify as Independent Directors and whether each member of the Independent Privacy Committee meets the Privacy and Compliance Baseline Requirements. The foregoing determinations shall be made prior to, or concurrent with, the formation of the Independent Privacy Committee for the initial members; and prior to, or concurrent with, the appointment of each new director to the Independent Privacy Committee for future members;

C.     Within one hundred and eighty (180) days after entry of this Order, Respondent shall adopt and file an amendment to Respondent's Certificate of Incorporation (the "Charter Amendment") in accordance with applicable Delaware law modifying the provisions of Article VI, Section 4 thereof with respect to the removal of directors as set forth in the form attached hereto as Exhibit 1, for the purpose of adding a new Article VI, Section 4(b) (hereafter "Supplemental Removal Provision"). Respondent shall not further alter or amend the Supplemental Removal Provision of Respondent's Certificate of Incorporation for the term of the Order. Notwithstanding the foregoing, in the event that, prior to the effectiveness of the Charter Amendment, any person commences any legal or administrative proceeding or action (an "Action"), or any governmental or regulatory entity or body, or any court, tribunal, or judicial body, in each case whether federal, state, or local, issues or grants any order, judgment, decision, decree, injunction, or ruling that has the effect of delaying, restraining, enjoining, prohibiting, or otherwise preventing the approval, filing, or effectiveness of the Charter Amendment (individually or collectively, a "Restraint") within 180 days after entry of this Order, that time period shall be extended and Respondent shall be deemed to be in compliance with the Order so long as: (a) Respondent diligently pursues in good faith the favorable resolution of such Action, and (b) Respondent adopts and files the Charter Amendment in accordance with applicable Delaware law as promptly as reasonably practicable following the resolution of the Action and at such time as such Restraint (if any) is withdrawn, vacated, or terminated; and

D.     Nothing in this Order shall be construed to expand, modify, or alter the fiduciary duties of the members of the Respondent's Board of Directors or any committee thereof.

## XI.    CERTIFICATIONS

IT IS FURTHER ORDERED that Respondent shall:

A.     Within forty-five (45) days after the end of each full fiscal quarter (but in no event later than the first meeting of the Independent Privacy Committee with respect to such fiscal quarter (as provided in Part X.A)) following the anniversary of the effective date of this Order, provide the Commission with its certification, signed by the Principal Executive Officer and the Designated

Compliance Officer(s) on behalf of Respondent, that, with respect to such fiscal quarter: (1) Respondent has established, implemented, and maintained a Privacy Program that complies in all material respects with the requirements of Part VII of this Order; and (2) Respondent is not aware of any material noncompliance with Part VII that has not been corrected or disclosed to the Commission. In making this certification on behalf of Respondent, the Principal Executive Officer shall rely, and be entitled to rely, solely on the following: (a) his or her personal knowledge; (b) sub-certifications regarding compliance with Part VII, provided by knowledgeable personnel charged with implementing the Privacy Program; and (c) the Principal Executive Officer's review of the summaries in the Quarterly Privacy Review Report required under Part VII.E.2.c.(i) for such fiscal quarter, as well as any material issues raised in Covered Incident Reports required under Part IX for such fiscal quarter. The Designated Compliance Officer(s) shall rely, and be entitled to rely, solely on the following: (a) his or her personal knowledge; (b) sub-certifications regarding compliance with Part VII, provided by knowledgeable personnel charged with implementing the Privacy Program; (c) material issues identified in the Quarterly Privacy Review Report required under Part VII.E.2.c.; and (d) material issues raised in the Covered Incident Reports required under Part IX for such fiscal quarter; and

B.      Within forty-five (45) days after the end of the first full fiscal quarter (but in no event later than the first meeting of the Independent Privacy Committee with respect to such fiscal quarter (as provided in Part X.A.)) following the anniversary of the effective date of this Order and every year thereafter, provide the Commission with its certification, signed by the Principal Executive Officer and the Designated Compliance Officer(s) on behalf of Respondent, that: (1) Respondent has established, implemented, and maintained the requirements of this Order in all material respects; and (2) Respondent is not aware of any material noncompliance with this Order that has not been corrected or disclosed to the Commission. In making this certification on behalf of Respondent, the Principal Executive Officer shall rely, and be entitled to rely, solely on the following: (a) his or her personal knowledge; (b) sub-certifications regarding compliance with Part VII of this Order, provided by knowledgeable personnel charged with implementing the Privacy Program; and (c) the Principal Executive Officer's review of the written program required under Part VII.A. of this Order and the summaries in the Quarterly Privacy Review Reports required under Part VII.E.2.c.(i) for the preceding year, as well as any material issues raised in Covered Incident Reports required under Part IX for the preceding year. The Designated Compliance Officer(s) shall rely, and be entitled to rely, solely on the following: (a) his or her personal knowledge; (b) sub-certifications regarding compliance with Part VII, provided by knowledgeable personnel charged with implementing the Privacy Program; (c) material issues identified in the Quarterly Privacy Review Reports required under Part VII.E.2.c. for the preceding year; and (d) material issues raised in the Covered Incident Reports required under Part IX for the preceding year.

Unless otherwise directed by a Commission representative in writing, Respondent shall submit all certifications to the Commission pursuant to this Order via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "*In re Facebook, Inc*., FTC File No. 182-3109."

## XII. ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Respondent obtain acknowledgments of receipt of this Order:

A.    Respondent, within seven (7) days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury;

B.    For five (5) years after entry of this Order, Respondent must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Part titled Compliance Reporting.  Delivery must occur within seven (7) days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities; and

C.    From each individual or entity to which Respondent delivered a copy of this Order, Respondent must obtain, within thirty (30) days, a signed and dated acknowledgment of receipt of this Order.

## XIII. COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Respondent make timely submissions to the Commission:

A.    One hundred eighty (180) days after entry of this Order, Respondent must submit a compliance report, sworn under penalty of perjury, which:  (1) identifies the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Respondent; (2) identifies all of Respondent's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (3) describes the activities of each business; (4) describes in detail whether and how Respondent is in compliance with each Part of this Order; and (5) provides a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission;

B.    For twenty (20) years after entry of this Order, Respondent must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in the following: (1) any designated point of contact; (2) Respondent's corporate structure; or (3) the structure of any entity that Respondent has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order;

C.    Respondent must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Respondent within fourteen (14) days of its filing;

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and reasonable belief, the foregoing is true and correct.  Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature; and

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin: "*In re Facebook, Inc.*, FTC File No. 182-3109."

## XIV.    RECORDKEEPING

IT IS FURTHER ORDERED that Respondent must create certain records for twenty (20) years after entry of the Order, and retain each such record for five (5) years.  Specifically, Respondent must create and retain the following records:

A.      All widely-disseminated statements by Respondent or its Representatives that describe the extent to which Respondent maintains and protects the privacy, security, and confidentiality of any Covered Information, including, but not limited to, any statement related to a change in any website or service controlled by Respondent that relates to the privacy of such information, along with all materials relied upon in making such statements, and a copy of each materially different Privacy Setting made available to Users (including screenshots/screencasts of Privacy Settings and the User interfaces, consent flows, and paths a User must take to reach such settings);

B.      Records sufficient to identify the types of Covered Information that Respondent provides or makes available to any Covered Third Party that is subject to the requirements of Part VII.E.1., including records identifying:  (1) the specific data fields to which access was granted; (2) the means by which the information was provided or made available; (3) the identity of the Covered Third Party to which access was granted; (4) the self-certifications provided by the Covered Third Party (as described in Part VII.E.1); and (5) the date(s) when access was provided;

C.      All consumer complaints directed at Respondent or forwarded to Respondent by a Covered Third Party that relate to the conduct prohibited by this Order and any responses to such complaints;

D.      Any documents, prepared by or on behalf of Respondent, that contradict, qualify, or call into question Respondent's compliance with this Order;

E.      Each materially different document relating to Respondent's attempt to obtain the consent of Users referred to in Part II titled Changes To Sharing Of Covered Information, along with documents and information sufficient to show each User's consent; and documents sufficient to demonstrate, on an aggregate basis, the number of Users for whom each such Privacy Setting was in effect at any time Respondent has attempted to obtain and/or been required to obtain such consent;

F.     All materials relied upon to prepare the Assessment, whether prepared by or on behalf of Respondent, including but not limited to all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, for the compliance period covered by such Assessment; and

G.     All records necessary to demonstrate full compliance with each Part of this Order, including all submissions to the Commission.

## XV.     COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Respondent's compliance with this Order:

A.     Within fourteen (14) days of receipt of a written request from a representative of the Commission, Respondent must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69;

B.     For matters concerning this Order, the Commission is authorized to communicate directly with Respondent.  Respondent must permit representatives of the Commission to interview any employee or other person affiliated with Respondent who has agreed to such an interview.  The person interviewed may have counsel present; and

C.     The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Respondent or any individual or entity affiliated with Respondent, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XVI.     ORDER EFFECTIVE DATES

IT IS FURTHER ORDERED that this Order is final and effective upon the date of its publication on the Commission's website (ftc.gov) as a final order.  This Order will terminate 20 years from the date of its issuance, or 20 years from the most recent date that the United States or the Commission files a complaint (with or without an accompanying settlement) in federal court alleging any violation of this Order, whichever comes later; *provided, however,* that the filing of such a complaint will not affect the duration of:

A.     Any Part in this Order that terminates in less than 20 years;

B.     This Order's application to any Respondent that is not named as a defendant in such complaint; and

    C.  This Order if such complaint is filed after the Order has terminated pursuant to this Part.

*Provided, further,* that if such complaint is dismissed or a federal court rules that the Respondent did not violate any Part of the Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Order will terminate according to this Part as though the complaint had never been filed, except that the Order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

By the Commission.

April Tabor
Acting Secretary

SEAL:
ISSUED:

Exhibit 1 to
Attachment A

## ARTICLE VI: MATTERS RELATING TO THE BOARD OF DIRECTORS

**4.** **Term and Removal.**

(a)    Each director shall hold office until such director's successor is elected and qualified, or until such director's earlier death, resignation or removal. Any director may resign at any time upon notice to the corporation given in writing or by any electronic transmission permitted in the corporation's Bylaws or in accordance with applicable law. No decrease in the number of directors constituting the Whole Board shall shorten the term of any incumbent director.

(b)    Notwithstanding anything in this Section 4 of this Article VI to the contrary, subject to the rights of the holders of any series of Preferred Stock with respect to directors elected thereby, from and after the effectiveness of the Classified Board, no director may be removed except for cause and only by the affirmative vote of the holders of at least a majority of the voting power of the then-outstanding shares of capital stock of the corporation then entitled to vote at an election of directors voting together as a single class.

(c)    For so long as the [Federal Trade Commission Decision & Order] (the "***Order***") remains in effect, (i) no director serving on the Independent Privacy Committee, as that term is defined in the Order (any such director, a "***Privacy Committee Delegate***"), shall be removed solely for reasons related to actions taken in good faith in furtherance of such Privacy Committee Delegate's duties as a member of the Independent Privacy Committee as set forth in the Order (a "***Privacy Reason***"), except by the affirmative vote of the holders of at least two-thirds of the voting power of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class, and (ii) no Privacy Committee Delegate shall be removed for reasons other than a Privacy Reason with the intent to circumvent the requirements of clause (i) above, except by the affirmative vote of the holders of at least two-thirds of the voting power of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class.

## LOCAL RULE 7(k) CERTIFICATION:
## Names of Persons to Be Served with Proposed Order

Pursuant to LCvR 7(k), the following attorneys are entitled to be notified of the entry of the foregoing Stipulated Order:

M. SEAN ROYALL
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
phone: (214) 698-3256
fax: (214) 571-2923
email: SRoyall@gibsondunn.com

LISA K. HSIAO
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
phone: (202) 532-4892
fax: (202) 514-8742
email: Lisa.K.Hsiao@usdoj.gov

# EXHIBIT D

ERIN E. SCHNEIDER (Cal. Bar No. 216114)
TRACY L. DAVIS (Cal. Bar No. 184129)
  davistl@sec.gov
ROBERT L. TASHJIAN (Cal. Bar No. 191007)
  tashjianr@sec.gov
MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
  meyerhoferm@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>FACEBOOK, INC.<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### SUMMARY OF THE ACTION

1.      For more than two years, Facebook made misleading statements in its required public filings about the misuse of its users' data. From 2016 until mid-March 2018, Facebook presented the risk of misuse of its users' data as merely hypothetical. In fact, Facebook had already become aware by December 2015 that a researcher had improperly sold information related to tens of millions of Facebook users to data analytics firm Cambridge Analytica.

2.      Since its initial public offering in 2012, Facebook has warned investors that one of the material risks to its business was the fact that independent developers who create applications for its platform might misuse personal data obtained from Facebook users.

3.      In June 2014, an academic researcher and Cambridge Analytica entered into an agreement, through affiliated companies, whereby Cambridge Analytica would pay for the researcher to collect data on Facebook users. At Cambridge Analytica's expense, the researcher developed a personality survey that obtained data from U.S. Facebook users, including their names, birthdates, gender, location, and their affinities, or "page likes." From the summer of 2014 through the spring of 2015, the researcher transferred data relating to approximately 30 million Facebook users in the United States to Cambridge Analytica.

4.      Facebook learned about the collaboration between the researcher and Cambridge Analytica when it investigated a report published in the British press in December 2015. Within days of the press report, both the researcher and Cambridge Analytica privately confirmed to Facebook that the researcher had transferred personality profiles based on Facebook user data to Cambridge Analytica. Facebook determined that the transfer violated its policy that prohibits developers, like the researcher, from selling or transferring its users' data, and told the researcher and Cambridge Analytica to delete the data.

5.      In June 2016, the researcher told Facebook that, in addition to transferring Cambridge Analytica personality profiles for approximately 30 million of its users, he had also, for those same users, sold Cambridge a substantial quantity of the underlying Facebook data from which he had derived those profiles.

6.      In its quarterly and annual reports filed between January 28, 2016 and March 16, 2018 (the "relevant period"), Facebook did not disclose that a researcher had, in violation of the company's policies, transferred data relating to approximately 30 million Facebook users to Cambridge Analytica. Instead, Facebook misleadingly presented the potential for misuse of user data as merely a hypothetical investment risk. Moreover, when asked by reporters in 2017 about its investigation into the Cambridge Analytica matter, Facebook falsely claimed the company found no evidence of wrongdoing, thereby reinforcing the misleading statements in its periodic filings.

7.     Facebook did not disclose that a researcher had improperly transferred data for millions of Facebook users to Cambridge Analytica until March 16, 2018, when the company— for the first time—publicly acknowledged on its website that it had learned of the violation of its policy in 2015. The price of Facebook shares declined substantially following the company's disclosure.

8.     Based on the foregoing conduct, and the conduct described below, Facebook violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") and Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 12b-20, 13a-1, 13a-13, and 13a-15(a) thereunder.

**JURISDICTION AND VENUE**

9.     The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

11.     Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

12.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Facebook employees who participated in the events alleged in this complaint worked in the company's headquarters, which is located in Menlo Park, California. In addition, the relevant offers and sales of Facebook securities took place in this District.

13. Under Rule 3-2(d) of the Civil Local Rules, this civil action should be assigned to the San Francisco Division because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in San Mateo County.

## DEFENDANT

14. **Facebook, Inc.,** a Delaware corporation based in Menlo Park, California, is an Internet platform that allows its users to share photos and other digital content with their "friends" on-line. Since its initial public offering in 2012, Facebook's Class A common stock has been registered under Section 12(b) of the Exchange Act and trades on the Nasdaq Global Select Market.

## RELEVANT ENTITY

15. **Cambridge Analytica** ("Cambridge") was a data analytics and advertising firm affiliated with an entity in the United Kingdom known as the SCL Group. The firm and its affiliated entities filed for bankruptcy protection in the United States and the United Kingdom in 2018. These organizations are collectively referred to as "Cambridge."

## FACTUAL ALLEGATIONS

### *Overview of Facebook's Business*

16. Facebook derives substantially all of its revenue from advertising aimed at its users. More than 2.3 billion people used the company's Facebook service on a monthly basis in the first quarter of 2019, and more than 2.7 billion people regularly used its broader family of services, which include Facebook, Instagram, and other services. The company generated more than $55.8 billion in revenue in its 2018 fiscal year and had a market capitalization of more than $500 billion as of March 31, 2019.

17. Since it filed for its initial public offering in 2012, Facebook has acknowledged in its periodic filings with the Commission that the size of its user base and level of its user engagement are critical to its financial success. Facebook has recognized that its users' willingness to engage with its services depends in part on users believing they have control over the way their data is shared. The "Risk Factor" disclosures in Facebook's periodic filings warned

1  investors that concerns relating to data privacy and sharing could result in Facebook failing to

2  retain or add users or in users decreasing their level of engagement, which could significantly

3  harm its business, revenue, and financial results.

4        18.     One of the ways Facebook engages users is to allow unaffiliated software

5  developers to create applications (or "apps") that can access information that users share on

6  Facebook. Facebook originally permitted developers to gather information from many app users'

7  friends in addition to the app user. Facebook deactivated this permission in April 2014 but

8  developers of existing apps were allowed to continue to collect data relating to an app user's

9  friends until April 2015.

10        19.     Developers who create Facebook apps must consent to Facebook's "Platform

11  Policy," a set of rules governing what developers are allowed to do with the apps they create and

12  the data that they gather. Since at least 2012, the Platform Policy has prohibited developers from

13  selling user data or transferring user data to anyone who intends to profit from the data. The

14  Platform Policy is maintained and updated by Facebook's policy group, which works with others

15  in the company to establish rules that govern, among other things, user privacy. Facebook also

16  established a "Developer Operations" group within the company to prevent and address

17  violations of the Platform Policy.

18                  ***The Sale of Facebook Data to Cambridge Analytica***

19        20.     In November 2013, an academic researcher in the United Kingdom created a

20  Facebook app in connection with his studies. In doing so, he agreed to abide by Facebook's

21  Platform Policy. Initially, the researcher used the app only for his own research.

22        21.     In January 2014, Cambridge approached the researcher about a possible business

23  relationship. Cambridge was exploring a new model of election campaigning by targeting

24  advertising based on voters' personalities, and both Cambridge and the researcher were familiar

25  with an academic study that correlated an individual's personality with Facebook "likes."

26        22.     Pursuant to a June 2014 agreement between Cambridge and the researcher, the

27  researcher would collect data from the users of his Facebook app and their friends, use that

28

1    information to create personality "scores" for both app users and their friends, and then match

2    these personality scores to individuals in Cambridge's U.S. voter database. Cambridge would

3    provide the researcher with funding to help recruit users to download and use the researcher's

4    app.

5         23.    The researcher configured his app to deliver a standard academic personality

6    survey to app users. In addition to the survey results, the app obtained the name, birthdate,

7    gender, location, and Facebook page likes both for the app users and the app users' friends.[1]

8         24.    In the summer and early fall of 2014, a business entity created and controlled by

9    the researcher retained a surveying firm to recruit and pay approximately 270,000 Facebook

10   users to download the researcher's app and take the personality survey. This enabled the

11   researcher to collect Facebook user data from both the 270,000 app users and many app users'

12   friends, which collectively amounted to tens of millions of Facebook users. From the survey

13   responses, the researcher created personality scores for all 270,000 app users. Then, by analyzing

14   the correlations between survey responses and page likes, the researcher derived "predicted"

15   personality scores for the survey-takers' tens of millions of friends. The researcher matched the

16   personality scores against Cambridge's database of American voters in 11 states, and transferred

17   this matched data back to Cambridge, in violation of the Platform Policy. Cambridge used the

18   scores to target advertisements in connection with its political consultancy services. Cambridge

19   paid the researcher's business entity for the costs associated with the work done by the surveying

20   firm.

21        25.    In January 2015, the researcher and Cambridge signed a follow-on agreement.

22   Pursuant to the agreement, Cambridge paid the researcher's business entity £200,000 GBP, and

23   the researcher, in violation of the Platform Policy, gave Cambridge the previously-collected

24

25   [1] On Facebook, "pages" are profiles that businesses or other organizations create in order to
     have a presence on Facebook. Organizations use Facebook pages to share information about
26   products, services, and events. Individuals register their affinity to a particular organization by
     "liking" the organization's Facebook page. "Page likes," accordingly, represent a set of
27   affinities connecting particular individuals to particular organizations.

28

COMPLAINT
*SEC v. FACEBOOK, INC.*                          -6-

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2800
SAN FRANCISCO, CA 94104 l (415) 705-2500

1  names, birthdays, gender, location, personality scores, and an agreed-upon number of page likes

2  for approximately 30 million Facebook users in all 50 states. By the end of May 2015, the

3  researcher had transferred this information to Cambridge.

4  26.  The researcher also entered into a separate agreement with another entity,

5  "Company A." Pursuant to that agreement, the researcher provided Facebook demographic data

6  and all page likes relating to approximately 30 million U.S. Facebook users to Company A in the

7  fall of 2014.

8  ***Facebook's Investigation into Cambridge Analytica's Use of Facebook Data***

9  27.  On December 11, 2015, the British newspaper *The Guardian* published an article

10  about the researcher and Cambridge reporting that the researcher had obtained Facebook data

11  from tens of millions of Facebook users and used this data to create personality profiles for

12  Cambridge's use in American elections.

13  28.  The newspaper contacted Facebook before publishing its report and shared the

14  allegations they intended to publish. Facebook provided the following quote attributable to a

15  company spokesperson: "We are carefully investigating this situation. To be clear, misleading

16  people or misusing their information is a direct violation of our policies and we will take swift

17  action against companies that do, including banning those companies from Facebook and

18  requiring them to destroy all improperly collected data." The *Guardian* included the company's

19  statement in the article published on December 11, 2015.

20  29.  The day the *Guardian* article was published, a Facebook employee with

21  responsibility for interpreting and administering the company's Platform Policy contacted both

22  the researcher and Cambridge. Within days, both the researcher and Cambridge confirmed to

23  Facebook that the researcher had used a Facebook app to collect user data and then used that data

24  to create personality scores, which were then transferred to Cambridge.

25  30.  The Facebook employee concluded that the researcher's transfer of personality

26  scores derived from Facebook user data to Cambridge violated the company's Platform Policy.

27  This conclusion was shared with others in Facebook's communications, legal, operations, policy,

28

privacy, and research groups. The employee told the researcher and Cambridge to delete the personality scores and told the researcher to delete all of the Facebook data that his app had collected, and Cambridge subsequently told Facebook that it had deleted the data received from the researcher.

31.     Six months later, in June 2016, Facebook and the researcher signed a settlement agreement. In a certification attached to that agreement, the researcher reported—contrary to his and Cambridge's representations in December 2015—that, in addition to the personality scores, he had also transferred actual U.S. Facebook user data, including names, birthdays, location, and certain page likes, to Cambridge. He also represented that he deleted all the Facebook data his app had collected.

32.     Almost a year later, in April 2017, Cambridge provided Facebook with a similar certification reporting that Cambridge had received from the researcher underlying raw Facebook user data in addition to the personality scores, as well as that it had deleted that data.

33.     All told, more than 30 Facebook employees in different corporate groups including senior managers in Facebook's communications, legal, operations, policy, and privacy groups, learned that the researcher had transferred information to Cambridge in violation of Facebook's Platform Policy. However, as discussed more fully below, Facebook had no specific policies or procedures in place to assess or analyze this information for the purposes of making accurate disclosures in Facebook's periodic filings.

### *Red Flags Raised About Cambridge Analytica's Other Potential Misuse of User Data*

34.     At the time of the December 2015 *Guardian* article, Facebook was already familiar with Cambridge and had suspicions that Cambridge had misused user data. In September 2015, employees in Facebook's political advertising group requested an investigation into possible "scraping"—the automated and unauthorized aggregation of Facebook user data— by Cambridge. After the *Guardian* article was published in December 2015, these employees reiterated their concern about scraping. The political advertising employees recognized Cambridge as a well-known firm within the political advertising space and a client of Facebook's

advertising business, and had described it as a "sketchy (to say the least) data modeling company that has penetrated our market deeply."

35.    Throughout 2016, red flags were raised to Facebook suggesting that Cambridge was potentially misusing Facebook user data. Following the *Guardian* article, several Facebook employees became aware of media reports on Cambridge's use of personality profiles to target advertising in the summer and fall of 2016. Facebook lawyers and employees in the company's political advertising group saw and discussed an October 27, 2016, article in *The Washington Post* reporting that Cambridge combined psychological tests with "likes" on "social-media sites." Employees responsible for coordinating Facebook's response to the Guardian article also circulated a link to a video of a marketing presentation by Cambridge's chief executive officer about the firm's ability to target voters based on personality. As an additional indication to Facebook that Cambridge might have been misusing Facebook user data, some employees on Facebook's political advertising team knew from August 2016 through November 2016 that Cambridge named Facebook and Instagram advertising audiences by personality trait for certain clients that included advocacy groups, a commercial enterprise, and a political action committee.

36.    Despite Facebook's suspicions about Cambridge and the red flags raised after the Guardian article, Facebook did not consider how this information should have informed the risk disclosures in its periodic filings about the possible misuse of user data.

### *Facebook's Misleading Public Filings*

37.    Since the time of its initial public offering in 2012, Facebook has warned investors about the potential for misuse of its users' data by developers and the possible consequent financial effect on the company's business. For example, in the Risk Factor disclosures in its Form 10-Q filed on October 30, 2014, Facebook cautioned that "Improper access to or disclosure of user information, or violation of our terms of service or policies, could harm our reputation and adversely affect our business." In the same Form 10-Q, the company advised that if developers "fail to comply with our terms and policies . . . our users' data may be

1  improperly accessed or disclosed." This, the company acknowledged, "could have a material and

2  adverse effect on our business, reputation, or financial results."

3      38.    Facebook modified this language beginning in January 2015 and continued to

4  warn investors about the possibility that third parties might improperly access or misuse its users'

5  data. For example, in its Form 10-K filed on January 28, 2016, only weeks after it had confirmed

6  that the researcher had improperly transferred personality scores derived from Facebook user

7  data to Cambridge in violation of its Platform Policy, Facebook cautioned that "Any failure to

8  prevent or mitigate security breaches and improper access to or disclosure of our data or user

9  data could result in the loss or misuse of such data, which could harm our business and

10  reputation and diminish our competitive position." The company further asserted that if

11  "developers fail to adopt or adhere to adequate data security practices . . . our data or our users'

12  data may be improperly accessed, used, or disclosed."[2]

13      39.    During the relevant period, Facebook's Risk Factor disclosures misleadingly

14  suggested that the company faced merely the risk of such misuse and any harm to its business

15  that might flow from such an incident. This hypothetical phrasing, repeated in each of its

16  periodic filings during the relevant period, created the false impression that Facebook had not

17  suffered a significant episode of misuse of user data by a developer.

18      40.    The company's processes and procedures around the drafting of its periodic

19  reports on Forms 10-K and 10-Q, including but not limited to its Risk Factor disclosures, failed

20  to bring the researcher's sale of data from tens of millions of Facebook users to Cambridge to the

21  attention of the individuals with primary responsibility for drafting and approving those reports.

22  Although protecting user data is critical to Facebook's business, and Facebook had identified the

23  potential for improper access to and misuse of user data as a significant risk, Facebook did not

24

25

26  [2] During the relevant period, Facebook filed three annual reports on Form 10-K for the fiscal

27  years ended December 31, 2015, December 31, 2016, and December 31, 2017, and six
   quarterly reports on Form 10-Q for each fiscal quarter in 2016 and 2017.

28

maintain disclosure controls and procedures designed to analyze or assess incidents involving misuse of user data for potential disclosure in the company's periodic filings.

41.     During the relevant period, Facebook identified trends and events for possible disclosure through a series of quarterly meetings to prepare for the company's earnings announcements. This process relied on the employees and managers who attended these meetings to identify issues that might need to be disclosed. Although several employees in Facebook's legal, policy, and communications groups who attended these meetings during the relevant period were aware of the researcher's improper transfer of data to Cambridge, that incident was never discussed. Facebook also did not share information regarding the incident with its independent auditors and outside disclosure counsel in order to assess the company's disclosure obligations.

42.     Facebook had no specific mechanism to summarize or report violations of its Platform Policy to employees responsible for ensuring the accuracy of Facebook's filings with the Commission. For example, the Facebook employees responsible for monitoring violations of the company's Platform Policy were not provided with the draft disclosures pertaining to the misuse of user data.

43.     As a result, Facebook senior management and relevant legal staff did not assess the scope, business impact, or legal implications of the researcher's improper transfer of data to Cambridge, including whether or how it should have been disclosed in Facebook's public filings or whether it rendered, or would render, any statements made by the company in its public filings misleading.

44.     Based on the foregoing, Facebook filed materially misleading periodic reports with the Commission. Facebook knew, or should have known, that its Risk Factor disclosures in its annual reports on Form 10-K for the fiscal years ended December 31, 2015, December 31, 2016, and December 31, 2017, and in its quarterly reports on Form 10-Q filed in 2016 and 2017, as incorporated into its Form S-8 registration statements, were materially misleading.

45.     The Risk Factor disclosures were incorporated by reference into Facebook's registration statements on Forms S-8 filed with the Commission on May 21, 2012 and February 1, 2013. These statements registered sales of shares of Facebook common stock under the company's employee and officer equity incentive plans, and incorporated future periodic reports filed with the Commission, including those filed during the relevant period.

46.     During the relevant period, Facebook received approximately $29 million in cash proceeds from the exercise of employee stock options. Facebook also granted restricted stock units to more than 17,000 new employees during the relevant period who, in some cases, agreed to accept lower salaries in exchange for additional equity compensation.

### Facebook's Statements to the Press Reinforced Its Misleading Filings

47.     Beginning in November 2016, reporters asked Facebook about the investigation that the company said it was conducting in the December 2015 *Guardian* article. These inquiries were referred to Facebook's communications group, which was aware that the company had confirmed that the researcher had improperly transferred personality profiles based on U.S. user data to Cambridge in violation of Facebook's policy, and had told both parties to delete the data.

48.     The communications group initially responded to the press inquiries indirectly. For example, beginning in February 2017, the communications group pointed reporters to Cambridge's public statement that it "does not use data from Facebook" and "does not obtain data from Facebook profiles or Facebook likes." This was misleading because it suggested that Facebook was unaware that Cambridge had improperly obtained Facebook user data.

49.     On at least two subsequent occasions in March 2017, Facebook's communications group provided the following quote to reporters: "Our investigation to date has not uncovered anything that suggests wrongdoing." This was misleading because Facebook had, in fact, determined that the researcher's transfer of user data to Cambridge violated the company's Platform Policy. The quote served to reinforce the misleading impression in Facebook's periodic filings that the company was not aware of any material developer misuse of

user data. The on-line publication *The Intercept* included the quote, attributed to a Facebook spokesperson, in an article dated March 30, 2017.

### Facebook's Acknowledgement of the Cambridge Analytica Incident

50.     In March 2018, *The New York Times* and *Guardian* contacted Facebook and informed the company that the publications planned to run stories about the researcher's improper transfer of data to Cambridge, including that Facebook had told the researcher and Cambridge to delete their Facebook data. Reporters from the *Times* suggested that Cambridge had not deleted the data, contrary to its representations to Facebook.

51.     After the close of market on Friday, March 16, 2018, Facebook preempted the newspapers' publication by a post on its own online Facebook "newsroom." The company publicly acknowledged, for the first time, that it had confirmed that the researcher had transferred user data to Cambridge, in violation of its Platform Policy, and that the company had told the researcher and Cambridge to delete the data in December 2015. When the market opened on Monday, March 19, 2018, the price of Facebook's shares fell five percent, from $185.09 to $172.56, and continued to decline throughout the week, closing at $159.39 per share on March 23, 2018.

### FIRST CLAIM FOR RELIEF

*Violations of Sections 17(a)(2) and (3) of the Securities Act*

52.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 51, above.

53.     By engaging in the conduct described above, Defendant Facebook, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

(1)     obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(2)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

54.    By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) (2) and Section 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

**SECOND CLAIM FOR RELIEF**

*Violations of Section 13(a) of the Exchange Act and*

*Rules 12b-20, 13a-1 and 13a-13 Thereunder*

55.    The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 51, above.

56.    Defendant has at all relevant times been an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*].

57.    As described above, Defendant's filings with the Commission, including its reports filed on Forms 10-K and Forms 10-Q, reflected misleading statements concerning the improper access to and misuse of its users' personal information.

58.    Based on the conduct alleged above, Defendant violated, and unless restrained and enjoined will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the Commission periodic reports with information that is accurate and not misleading.

**THIRD CLAIM FOR RELIEF**

*Violations of Rule 13a-15(a) of the Exchange Act*

59.    The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 51, above.

60.    Defendant failed to maintain controls and procedures designed to ensure that information required to be disclosed in the reports that it files or submits pursuant to the

Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the Commission's rules and forms.

61.     Defendant also failed to maintain controls and procedures designed to ensure that information required to be disclosed in the reports that it files or submits pursuant to the Exchange Act is accumulated and communicated to its management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

62.     By reason of the foregoing, Defendant violated Rule 13a-15(a) of the Exchange Act [17 C.F.R. § 240.13a-15(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently enjoin Defendant Facebook from directly or indirectly violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)], and Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-13, and 13a-15(a) [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, and 240.13a-15(a)] thereunder.

### II.

Issue an order requiring Defendant Facebook to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### III.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

# IV.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: July 19, 2019                    Respectfully submitted,

_/s/ Matthew G. Meyerhofer_
Matthew G. Meyerhofer
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II.    BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| 1 | U.S. Government Plaintiff | 3 | Federal Question *(U.S. Government Not a Party)* |
| 2 | U.S. Government Defendant | 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                                           *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.    NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| | 340 Marine | | | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 740 Railway Labor Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | 751 Family and Medical Leave Act | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 790 Other Labor Litigation | 861 HIA (1395ff) | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 360 Other Personal Injury | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 862 Black Lung (923) | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | 490 Cable/Sat TV |
| 190 Other Contract | | | 462 Naturalization Application | 864 SSID Title XVI | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | **FEDERAL TAX SUITS** | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS–Third Party 26 USC § 7609 | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V.    ORIGIN *(Place an "X" in One Box Only)*

| 1 | Original Proceeding | 2 | Removed from State Court | 3 | Remanded from Appellate Court | 4 | Reinstated or Reopened | 5 | Transferred from Another District *(specify)* | 6 | Multidistrict Litigation–Transfer | 8 | Multidistrict Litigation–Direct File |

## VI.    CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII.   REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    Yes    No

## VIII.  RELATED CASE(S), IF ANY *(See instructions):*

JUDGE

DOCKET NUMBER

## IX.    DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**    **SAN FRANCISCO/OAKLAND**    **SAN JOSE**    **EUREKA-MCKINLEYVILLE**

DATE

SIGNATURE OF ATTORNEY OF RECORD

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.

(1) <u>Original Proceedings</u>. Cases originating in the United States district courts.

(2) <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

<u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** <u>Example:</u> U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

<u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

<u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX.** **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

ATTACHMENT TO CIVIL COVER SHEET

*Securities and Exchange Commission, Plaintiff*

*v.*

*Facebook, Inc., Defendant*

Section I, Part C: Attorneys

<u>Attorneys for Plaintiff</u>

Erin E. Schneider (Cal. Bar No. 216114)
Tracy L. Davis (Cal. Bar No. 184129)
Robert L. Tashjian (Cal. Bar No. 191007)
Matthew G. Meyerhofer (Cal. Bar No. 268559)

SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

<u>Attorneys for Defendant</u>

Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: (202) 663-6000

# EXHIBIT E

## Press Release

# Facebook to Pay $100 Million for Misleading Investors About the Risks It Faced From Misuse of User Data

**FOR IMMEDIATE RELEASE**
**2019-140**

*Washington D.C., July 24, 2019* — The Securities and Exchange Commission today announced charges against Facebook Inc. for making misleading disclosures regarding the risk of misuse of Facebook user data. For more than two years, Facebook's public disclosures presented the risk of misuse of user data as merely hypothetical when Facebook knew that a third-party developer had actually misused Facebook user data. Public companies must identify and consider the material risks to their business and have procedures designed to make disclosures that are accurate in all material respects, including not continuing to describe a risk as hypothetical when it has in fact happened.

Facebook has agreed to pay $100 million to settle the charges.

According to the SEC's complaint, in 2014 and 2015, the now-defunct advertising and data analytics company, Cambridge Analytica, paid an academic researcher, through a company he controlled, to collect and transfer data from Facebook to create personality scores for approximately 30 million Americans. In addition to the personality scores, the researcher, in violation of Facebook's policies, also transferred to Cambridge Analytica the underlying Facebook user data, including names, genders, locations, birthdays, and "page likes." Cambridge Analytica used this information in connection with its political advertising activities.

The SEC's complaint alleges that Facebook discovered the misuse of its users' information in 2015, but did not correct its existing disclosure for more than two years. Instead, Facebook continued to tell investors that "our users' data may be improperly accessed, used or disclosed." *(emphasis added)* According to the SEC complaint, Facebook reinforced this false impression when it told news reporters who were investigating Cambridge Analytica's use of Facebook user data that it had discovered no evidence of wrongdoing. When the company finally did disclose the incident in March 2018, its stock price dropped.

The complaint further alleges that during this two-year period, Facebook had no specific policies or procedures in place to assess the results of their investigation for the purposes of making accurate disclosures in Facebook's public filings.

"Public companies must accurately describe the material risks to their business," said Stephanie Avakian, Co-Director of the SEC's Enforcement Division. "As alleged in our complaint, Facebook presented the risk of misuse of user data as hypothetical when they knew user data had in fact been misused. Public companies must have procedures in place to make accurate disclosures about material business risks."

"We allege that Facebook exacerbated its disclosure failures when it misled reporters who asked the company about its investigation into Cambridge Analytica," said Erin E. Schneider, Director of the SEC's San Francisco Regional Office. "This gave further weight to Facebook's misleading statements in its public filings."

Without admitting or denying the SEC's allegations, Facebook has agreed to the entry of a final judgment ordering a $100 million penalty and permanently enjoining it from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 and Section 13(a) of the Securities Exchange Act of 1934, and Rules 12b-20, 13a-1, 13a-13, and 13a-15(a) thereunder.

The SEC's investigation was conducted by Matthew Meyerhofer and Robert Tashjian and supervised by Tracy L. Davis and Erin Schneider of the San Francisco office.

### ###

## Related Materials

- SEC Complaint