JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
MARK C. MOLUMPHY (SBN 168009)
mmolumphy@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
GINA STASSI (SBN 261263)
gstassi@cpmlegal.com
TYSON REDENBARGER (SBN 294424)
tredenbarger@cpmlegal.com
ANYA THEPOT (SBN 318430)
athepot@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE FACEBOOK, INC. SHAREHOLDER DERIVATIVE PRIVACY LITIGATION** | Lead Case No. 4:18-cv-01792-HSG |
| This Document Relates to: | **PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |
| **ALL ACTIONS** | Judge:     Hon. Haywood S. Gilliam, Jr. |
| | Date Action Filed: March 22, 2018 |

1

**<u>TABLE OF CONTENTS</u>**

2

Page

I.    SUMMARY OF THE ACTION --------------------------------------------------------1

II.   JURISDICTION AND VENUE -----------------------------------------------------5

III.  PARTIES ---------------------------------------------------------------------------7

    A.    Plaintiffs --------------------------------------------------------------- 7

    B.    Nominal Defendant ------------------------------------------------- 7

    C.    Individual Defendants ---------------------------------------------- 7

IV.   FACTUAL BACKGROUND ----------------------------------------------------10

    A.    Background of the Company and Its Business---------------------------- 10

        1.    Facebook's Advertising Business is the Source of Substantially All of Its Revenue ---------------------------------------------------11

        2.    Facebook's Success Depends Upon User Trust, Which Defendants Cultivated By Promising That Users Control Their Data ------------------ 12

    B.    Facebook's Practices Respecting User Data Were the Subject of an FTC Investigation and a 20-Year Consent Order Entered in 2012 ------------------------- 14

    C.    Defendants Announced Changes to Facebook's Policies That Were Supposedly Implemented in 2014 to Protect User Privacy ------------------------------------ 17

    D.    The Cambridge Analytica Incident Revealed Rampant Privacy Violations at Facebook and That Defendants Failed to Comply with the FTC Consent Order --- 18

        1.    The Sale of Facebook Data to Cambridge Analytica ------------------------ 18

        2.    Facebook's Investigation into Cambridge Analytica's Use of Facebook Data Began in 2015----------------------------------------------------20

        3.    Red Flags Were Subsequently Raised About Cambridge Analytica's Other Potential Misuse of Facebook User Data -------------------------------- 21

        4.    *The Guardian* and *The New York Times* Run Exposés on the Sale of Facebook User Data to Cambridge Analytica -------------------------------- 23

    E.    Defendants Admit Cambridge Analytica Obtained User Data in Violation of Facebook's Policies in a "Facebook Newsroom" Post on March 16, 2018---------- 23

    F.    Facebook's 1Q18 Financial Results Suggested That Users Were Unconcerned About the Privacy Abuses Revealed by the Cambridge Analytica Scandal --------- 30

    G.    Following Reports of Facebook's Data-Sharing Agreements, Defendants Admit Certain Companies Still Had Access to User Data in June 2018---------------------- 34

    H.    Facebook's 2Q18 Financial Results Reveal the Effects of the Data-Sharing Scandal on Facebook's User Engagement, Advertising Revenues, and Earnings, Leading to a $100 Billion Loss in Facebook's Value-------------------------------------------36

    I.    Additional Reports That Facebook User Data Has Been Compromised and Further Revelations of Facebook's Data Sharing Practices Continue in 2018---------------- 39

ii

J.    Defendants Announce Changes to Facebook's Platform in Early 2019 in a Belated Attempt to Mitigate Their Privacy Abuses and Reputational Harm -------------------42

K.    Facebook Announces Its 1Q19 Financial Results – and Expected Losses of $3-$5 Billion as A Result of the Anticipated Settlement With the FTC ----------------------45

L.    Facebook's Internal Investigation Reveals "Tens of Thousands of Apps" Continued to Access User Data After the Changes to Its Policies in 2014-------------------------46

V.    FEDERAL REGULATORS CONFIRM DEFENDANTS' VIOLATIONS OF LAW --------------------------------------------------------------------------------47

    A.    The FTC and DOJ Charged Facebook With Violations of the 2012 Consent Order and the FTC Act, Resulting in an "Unprecedented" $5 Billion Penalty--------------------47

        1.    Facebook Violated the Consent Order Through "Deceptive Privacy Settings and Statements" – i.e., the "Very Same Conduct … That Led to the 2012 Order" ------------------------------------------------------------51

        2.    Facebook Violated the 2012 Consent Order by "Fail[ing] to Maintain a Reasonable Privacy Program" ---------------------------------------------53

        3.    Facebook Violated the Consent Order by "Fail[ing[ to Implement and Maintain Appropriate Safeguards and Controls Over Third-Party … Access to User Data"--------------------------------------------------------54

        4.    Facebook Violated the Consent Order By Misrepresenting the Extent to Which Users Could Control Their Data -----------------------------------57

            a.    The FTC Found "Facebook Falsely Announced That Third-Party Developers Would No Longer Be Able to Access [User] Data"-----------57

            b.    The FTC Found Facebook "Did Not Tell Users That Sharing with Their Friends Allowed Third-Party Developers to Access Their [Friends' Data]"----------------------------------------------------------58

    B.    The FTC and DOJ Required Facebook to Implement Internal Controls and Reforms Designed to Increase Board Oversight and Remove Zuckerberg's "Unfettered Control" Over "Decisions Affecting User Privacy"-------------------------------------61

    C.    The SEC Charged Facebook with Violating Federal Securities Laws and Imposed a $100 Million Penalty-----------------------------------------------------------------------------69

        1.    The SEC Found That Defendants' Statements in Facebook's Public Filings Were Materially False and Misleading When Made----------------71

        2.    The SEC Found That Defendants' Statements to the Press Reinforced Facebook's Misleading Public Filings -----------------------------------73

    D.    The FTC Reportedly May Seek an Injunction Against Facebook, and Other Regulators Are Also Investigating the Company, Due to Antitrust Concerns ------75

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ---------------------------------------------------------------------------76

    A.    Defendants Made Materially False and Misleading Statements About the Company's Data Security and Privacy Policies----------------------------------------------77

    B.    Defendants Made Materially False and Misleading Statements Concerning Risks to Facebook's Business---------------------------------------------------------------------------78

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

C.     Defendants Made Materially False and Misleading Statements About Facebook's Investigation and Response After Learning About the Transfer of User Data to Cambridge Analytica --------------------------------------------------------------- 81

D.     Defendants Made Materially False and Misleading Statements Concerning Notifying Facebook Users Whose Accounts Were Compromised Or At Risk Of Being Compromised ------------------------------------------------------------- 82

E.     Defendants Made Materially False and Misleading Statements Concerning Facebook's Response to Other Reported Instances Of Data Misuse ---------------- 82

F.     Defendants Made Materially False and Misleading Statements Concerning Facebook Users' Knowledge or Consent to Providing Information to Kogan ------ 84

G.     Defendants Made Materially False and Misleading Statements Regarding their Compliance with the FTC Consent Decree----------------------------------------- 87

H.     Defendants Made Materially False and Misleading Statements Concerning Facebook's Critical DAU and MAU Metrics --------------------------------------- 92

I.     Defendants Made Materially False and Misleading Statements About the Impact of the Scandal on Facebook's Business and 1Q18 Financial Results ------------------- 94

J.     Defendants Made Materially False and Misleading Statements That Facebook Does Not "Sell" Users' Data ------------------------------------------------------------ 96

**VII. DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14A-9 BY ISSUING MATERIALLY MISLEADING PROXY STATEMENTS** ------------------------------------------------------------------------**100**

A.     The Board Issued the Materially Misleading Proxy Statement in 2017 Soliciting the Directors' Re-Election to Facebook's Board ------------------------------------- 101

B.     The Board Issued the Materially Misleading Proxy Statement in 2018 Recommending a Vote Against Shareholder Proposals on the Basis of Directors' Statements About Facebook's Privacy Practices and Board Oversight of Risks - 102

1.     The Board's Statements about Stockholder Proposal #4 Regarding a Risk Oversight Committee Are Materially Misleading-------------------------- 104

2.     The Board's Statements about Stockholder Proposal #6 Regarding a Content Governance Report Are Materially Misleading ------------------ 105

**VIII. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10B-5 BY AUTHORIZING AND EFFECTUATING MANIPULATIVE SHARE REPURCHASES AND OTHER TRANSACTIONS IN FACEBOOK SECURITIES** ------------------------------------------------------------------------**108**

A.     Defendants Made Materially False and Misleading Statements and Omissions That Caused Facebook's Stock Price to Trade At Artificially Inflated Prices During the Relevant Period-------------------------------------------------------------------- 108

B.     Defendants Authorized, Effectuated and Approved Manipulative Share Repurchases Totaling More Than $24 Billion ------------------------------------- 110

1.     The Board Approved a $6 Billion Share Repurchase Program That Commenced in 2017----------------------------------------------------- 110

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

      2.     The Board Increased the Authorization by an Additional $9 Billion in April 2018----------------------------------------------------------------------- 111

      3.     The Board Approved Another $9 Billion Increase to the Share Repurchase Authorization in April 2018 ---------------------------------------------- 111

C.    While Causing Facebook to Repurchase Shares at Artificially Inflated Prices, Certain Defendants Sold Their Own Shares of Facebook Stock -------------------- 115

D.    Facebook Suffered Economic Loss and Other Damages As a Result of Defendants' Manipulation of the Market for Facebook Stock Through False and Misleading Statements and Omissions, Repurchases, and Insider Sales ------------------------ 119

      1.     Market Efficiency------------------------------------------------------ 120

      2.     Loss Causation and Damages ------------------------------------------ 122

IX.    **ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER** -------------------**128**

A.    Defendants Oversaw an Illegal Business Strategy Based on "Reciprocity" – *i.e.*, Granting Access to Facebook User Data in Exchange for Something of Value -- 129

      1.     The FTC Found That Defendants Immediately Violated the FTC Consent Order After It Was Entered in 2012------------------------------------ 130

      2.     Facebook's Internal Documents Confirm Defendants' Decision to Exchange Data for Reciprocal Value -------------------------------- 132

B.    Defendants Continued to Allow "Whitelisted" Third-Party Apps to Access User Data While Representing That Facebook's More Restrictive Policies Prohibited Such Unauthorized Access-------------------------------------------------------- 136

      1.     The FTC Found "Financial Considerations Influenced Facebook's Decisions Regarding Whether to Restrict … Access to User Data"----- 138

      2.     The FTC Found That "Facebook Was Aware That Giving Millions of Third-Party Developers Access to [User] Data Posed Privacy Risks" -- 139

C.    Defendants Received Multiple "Red Flag" Warnings of Potential Violations of Facebook's Policies (and the FTC Consent Order) Throughout the Relevant Period ------------------------------------------------------------------- 140

      1.     Facebook's Adjudicated Violations of Foreign Privacy Laws ----------- 142

      2.     Warnings From Facebook Employees ------------------------------------- 144

      3.     Facebook's Chief Information Security Officer Resigned After His 2017 Warnings to the Board Were Ignored ------------------------------------- 145

      4.     Defendant Andreessen Admitted That He Consciously Disregarded Warnings From Whistleblower Wylie in 2016 and 2018 ---------------- 147

D.    Defendants Agreed to Pay a $5 Billion Penalty to Resolve Claims That They Personally Violated the FTC Consent Order and Section 5 of the FTC Act------- 148

E.    Defendants Personally Benefited From Their Insider Sales of Facebook Stock and Other Transactions in Facebook Securities During the Relevant Period While Facebook's Stock Price Was Artificially Inflated By Their Misrepresentations-- 150

X.......**INDIVIDUAL DEFENDANTS' COMPENSATION AND STOCK OWNERSHIP** -------------------------------------------------------------------------------**152**

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

XI.   DAMAGES TO FACEBOOK --------------------------------------------------------------155

XII.  DERIVATIVE AND DEMAND ALLEGATIONS ---------------------------------------156

    A.   Demand Was Futile Because Defendant Zuckerberg Controls Facebook and Its Board -------------------------------------------------------------------------------------- 156

        1.   Defendants Have Admitted That Facebook is a "Controlled Company" and That Zuckerberg Controls Voting Decisions, Including the Election of Directors----------------------------------------------------------------------------- 159

        2.   SEC Commissioner Commentary Confirms That Facebook's Dual Class Stock Structure and Zuckerberg's Voting Control Effectively Negates the Board's Ability to Exercise Effective Oversight ---------------------------- 164

        3.   The Abrupt Resignation of Facebook's Lead Independent Director, and Her Actions and Statements on Behalf of the Board, Further Demonstrates Zuckerberg's Domination and Control ------------------------------------- 167

    B.   Demand Was Also Futile Because Facebook's Board Lacks the Requisite "Disinterestedness" and Independence to Consider a Demand---------------------- 168

        1.   The Entire Board is Interested With Respect to the 2012 Consent Order Violations and 2019 Settlement------------------------------------------------- 168

        2.   Defendant Zuckerberg is Interested ------------------------------------------ 175

        3.   Defendant Sandberg is Interested, and Also Lacks Independence------- 178

        4.   Defendant Thiel is Interested, and Also Lacks Independence----------- 181

        5.   Defendant Andreessen is Interested, and Also Lacks Independence ---- 184

        6.   Defendant Chenault is Interested, and Also Lacks Independence ------- 187

        7.   Defendant Zients is Interested, and Also Lacks Independence----------- 187

        8.   Defendant Alford is Interested, and Also Lacks Independence ---------- 188

    C.   The Share Repurchases, and Insider Sales and Awards of Stock During the Relevant Period, Are Interested Transactions Subject to Entire Fairness Review ----------- 190

XIII. DERIVATIVE CLAIMS -----------------------------------------------------------------------194

    FIRST CAUSE OF ACTION
    Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 ----------------- 194

    SECOND CAUSE OF ACTION
    Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5----------------- 197

    THIRD CAUSE OF ACTION
    Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5----------------- 201

    FOURTH CAUSE OF ACTION
    Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) ------------- 207

    FIFTH CAUSE OF ACTION
    Violations of Section 20A of the Exchange Act------------------------------------------- 211

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1

SIXTH CAUSE OF ACTION
Violations of Section 20(a) of the Exchange Act------------------------------------------ 214

2

**XIV. PRAYER FOR RELIEF** --------------------------------------------------------------------**215**

3

**XV.  JURY DEMAND** ----------------------------------------------------------------------------**216**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Jeremiah F. Hallisey, Ronald Martin, Natalie Ocegueda, James Karon, and The Gloria Stricklin Trust (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this shareholder derivative action on behalf of nominal Defendant Facebook, Inc. ("Facebook" or the "Company"), asserting claims for violations of federal securities laws against certain current and former officers and directors of Facebook (the "Defendants"), and allege as follows:

## I.   <u>SUMMARY OF THE ACTION</u>

1.      Facebook operates a website (www.facebook.com) and smartphone application ("app") that allow Facebook users to connect with "friends."  The Company was founded in 2004 by defendant MarkZuckerberg ("Zuckerberg"), Facebook's Chief Executive Officer ("CEO"), Chairman of the Board, and largest stockholder.  Zuckerberg is the public face of the Company. He regularly communicates with its users and investors through his personal Facebook page and he remains primarily responsible for development of the Company's products.

2.      Nearly a decade ago, the U.S. Federal Trade Commission ("FTC") began investigating Facebook's information-sharing practices, privacy settings, and representations regarding the use of their personal information shared on the Company's "social networking" website.  The FTC found that Facebook had deceived its users, and initially charged both the Company and defendant Zuckerberg with violating Section 5 of the FTC Act, but ultimately reached a settlement with Facebook and did not charge Zuckerberg individually.

3.      In 2012, Facebook consented to entry of an FTC administrative order (the "Consent Order") to resolve the FTC complaint that Facebook had engaged in deceptive trade practices in violation of Section 5 of the FTC Act.  The Consent Order required Facebook – including the Company's officers and members of its Board of Directors (the "Board") – not to "misrepresent in any manner, expressly or by implication, . . . the extent to which a consumer can control the privacy of any covered information maintained by [Facebook] and the steps a consumer must take to implement such controls; [and] the extent to which [Facebook] makes or has made covered information accessible to third parties."  *See* Consent Order §§ I.B, C, *In the Matter of Facebook, Inc.*, Dkt. No. C-4365, 2012 FTC LEXIS 135 (July 27, 2012).  The Consent Order also required

- 1 -

1   Facebook to maintain a privacy program reasonably designed to address the risks of giving app

2   developers access to user data.  *Id.*, §IV.

3          4.      Following a yearlong investigation by the FTC, on July 24, 2019, the U.S.

4   Department of Justice ("DOJ"), acting upon notification and authorization to the Attorney General

5   by the FTC, filed a Complaint for Civil Penalties, Injunction, and Other Relief against Facebook

6   (the "FTC 2019 Complaint").   The FTC 2019 Complaint alleged that Facebook violated the 2012

7   Consent Order in multiple ways: (1) by maintaining deceptive settings that misled users about how

8   to protect their information from being shared by Facebook with third-party developers of apps

9   used by their Facebook Friends (*See* FTC 2019 Complaint, Counts 1, 2); (2) by promising to stop

10  giving app developers access to the data of app users' Friends starting in 2014, when in fact many

11  app developers continued to have such access past that date, with access for some lasting through

12  June 2018 (*id.*, Count 3); (3) by inconsistently enforcing its privacy policies against app developers

13  who violated those policies, taking less severe action against app developers that generated

14  significant revenue for Facebook (*id.*, Count 4); and (4) by implying to approximately 60 million

15  users that they could "turn on" facial-recognition technology associated with their posted photos

16  and videos when, in fact, that technology was "on" for those users by default (*id.*, Count 5).  In

17  addition, the FTC 2019 Complaint further alleged that Facebook violated Section 5 of the FTC Act

18  by using phone numbers provided to enable two-factor authentication—an enhanced account-

19  security tool—for advertising purposes (*id.*, Count 6).

20         5.      To resolve the charges that the Company violated the Consent Order, Facebook was

21  required to pay a ***$5 billion civil penalty*** and consented to entry of a stipulated order that imposes

22  significant injunctive relief, primarily in the form of an amended administrative order" entered by

23  the FTC (the "Amended FTC Order").  In a press release announcing the settlement, the FTC

24  explained that the new order imposes "unprecedented new restrictions" on Facebook's business

25  operations "from the corporate board-level down," and "creates ***greater accountability at the***

26  ***board of directors level***" by "***removing unfettered control by Facebook's CEO Mark Zuckerberg***

27  over decisions affecting user privacy."

28
PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

6.      Also on July 24, 2019, following an investigation of Facebook that was prompted by the same facts as this lawsuit, the U.S. Securities and Exchange Commission ("SEC") filed a complaint ("SEC Complaint, *see* page 70" against Facebook for violating federal securities laws, and SEC rules, by making misrepresentations in Facebook's public filings and by failing to implement and maintain adequate internal controls.  The SEC found that, "[f]or more than two years, Facebook made misleading statements in its required public filings about the misuse of its users' data."  In particular, "from 2016 until mid-March 2018, Facebook presented the risk of misuse of Facebook users' data as merely hypothetical" when, "[i]n fact, Facebook had already become aware by December 2015 that a researcher had improperly sold information related to tens of millions of Facebook users to data analytics firm Cambridge Analytica."

7.      Since its initial public offering in 2012, Facebook has warned investors that one of the material risks to its business was the fact that independent developers who create applications for its platform might misuse personal data obtained from Facebook users.  SEC Complaint, ¶2.

8.      In June 2014, an academic researcher and Cambridge Analytica entered into an agreement, through affiliated companies, whereby Cambridge Analytica would pay for the researcher to collect data on Facebook users.  At Cambridge Analytica's expense, the researcher, Dr. Aleksandr Kogan ("Kogan"), developed a personality survey that obtained data from U.S. Facebook users, including their names, birthdates, gender, location, and their affinities, or "page likes."  From the summer of 2014 through the spring of 2015, Kogan transferred data relating to approximately 30 million Facebook users in the United States to Cambridge Analytica.  SEC Complaint, ¶3.

9.      Facebook learned about the collaboration between Kogan and Cambridge Analytica when it investigated a report published in the British press in December 2015.  Within days of the press report, both Kogan and Cambridge Analytica privately confirmed to Facebook that Kogan had transferred personality profiles based on Facebook user data to Cambridge Analytica.  Facebook determined that the transfer violated its policy that prohibits developers, like Kogan,

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   from selling or transferring its users' data, and told Kogan and Cambridge Analytica to delete the

2   data.  SEC Complaint, ¶4.

3        10.   In June 2016, Kogan told Facebook that, in addition to transferring Cambridge

4   Analytica personality profiles for approximately 30 million of its users, he had also, for those same

5   users, sold Cambridge a substantial quantity of the underlying Facebook data from which he had

6   derived those profiles.  SEC Complaint, ¶5.

7        11.   In Facebook's quarterly and annual reports filed between January 28, 2016 and

8   March 16, 2018, Defendants did not disclose that a researcher had, in violation of the Company's

9   policies, transferred data relating to approximately 30 million Facebook users to Cambridge

10  Analytica.  Instead, Defendants misleadingly presented the potential for misuse of Facebook user

11  data as merely a hypothetical investment risk.  Moreover, when asked by reporters in 2017 about

12  its investigation into the Cambridge Analytica matter, Facebook representatives falsely claimed the

13  Company found no evidence of wrongdoing, thereby reinforcing the misleading statements in

14  Facebook's periodic filings.  SEC Complaint, ¶6.

15       12.   Defendants did not disclose that a researcher had improperly transferred data for

16  millions of Facebook users to Cambridge Analytica until March 16, 2018, when Defendants—for

17  the first time—publicly acknowledged on Facebook's website that the Company had learned of the

18  violation of its policy in 2015.  SEC Complaint, ¶7.

19       13.   The price of Facebook shares declined substantially following this disclosure.

20       14.   On March 17, 2018, *The New York Times* and *The Guardian*'s *Observer* reported

21  that Cambridge Analytica, a data firm retained to assist the Trump election campaign, had

22  accessed and retained the information of 50 million users of Facebook's social networking

23  website, without their authorization and informed consent.  According to the *Observer*, a

24  whistleblower had revealed that Cambridge Analytica utilized Facebook's app developer platform

25  to obtain the personal information of Facebook users in early 2014, to create a system to profile

26  U.S. voters and target certain of those individuals with personalized political advertisements.

27  Christopher Wylie ("Wylie"), a Canadian data analytics expert who worked with Cambridge

28

- 4 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1  Analytica and researcher Kogan to create the dataset, told the *Observer*, "We exploited Facebook
2  to harvest millions of people's profiles.  And built models to exploit what we knew about them and
3  target their inner demons. That was the basis the entire company was built on."

4        15.    Cambridge Analytica collected user data collected through an application or "app"
5  called "thisisyourdigitallife" designed by Kogan and his company, Global Science Research
6  ("GSR").  GSR, in collaboration with Cambridge Analytica, created the app, which was a
7  personality test, with the collected data supposedly to be used for academic purposes.
8  Approximately 270,000 people downloaded the app using their Facebook login credentials.

9        16.    Facebook subsequently confirmed that Cambridge Analytica had access to and may
10 have used the personal information of at least 50 million Facebook users – later increased to at
11 least 87 million users – most of whom are U.S. citizens.

12       17.    Facebook's stock price tumbled, and the Company lost ***$50 billion*** in market value
13 in the first two days following public revelation of the Cambridge Analytica scandal.  When the
14 market opened on Monday, March 19, 2018, the price of Facebook's shares fell five percent, from
15 $185.09 to $172.56, and continued to decline throughout the week, closing at $159.39 per share on
16 March 23, 2018.

17       18.    Plaintiff Shareholders seek to recover on behalf of Facebook, the damages caused
18 by Defendants' wrongdoing, and other equitable remedies for Facebook.  Shareholder Plaintiffs,
19 on behalf of Facebook, are entitled to such relief; in light of Defendants' wrongdoing that is
20 ongoing and is continuing to cause harm to Facebook, demand on Facebook's Board was clearly
21 futile, and is excused, because Defendants are liable for their wrongful conduct and will not pursue
22 litigation or take any other action to recover for Facebook an appropriate remedy for the
23 wrongdoing and claims alleged herein.

24                    **II.      <u>JURISDICTION AND VENUE</u>**

25       19.    This Court has subject matter jurisdiction over this action under Article III of the
26 United States Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of
27 the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder, over

28
- 5 -

1   which the Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. §

2   78aa.  This Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

3        20.     In addition, the Court has jurisdiction over all the causes of action alleged in this

4   Complaint pursuant to 28 U.S.C. § 1332 because complete diversity between the Plaintiffs and

5   each of the named Defendants exists, and because the amount in controversy exceeds $75,000.

6        21.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §

7   1332(d)(2)(A) because the aggregate claims are in excess of $75,000, exclusive of interest and

8   costs, and most members of the proposed class are citizens of states different from Defendants.

9   This Court also has subject-matter jurisdiction over their federal claims under 28 U.S.C. § 1331.

10       22.     This Court has personal jurisdiction over Defendants because they reside or are

11   headquartered in this district, and because Defendants have directed its complained-of conduct

12   from its headquarters in this district.

13       23.     Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the events

14   giving rise to the claims alleged in the Consolidated Complaint took place within this district.

15       24.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and

16   22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e)

17   and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

18       25.     Defendants, directly or indirectly, made use of the means and instrumentalities of

19   interstate commerce or of the mails in connection with the acts, transactions, practices, and courses

20   of business alleged in this Complaint.

21       26.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15

22   U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts, transactions,

23   practices, and courses of business that form the basis for the violations alleged in this complaint

24   occurred in this District.  Defendants, and Facebook employees who participated in the events

25   alleged in this Complaint, worked in and/or attended meetings at the Company's headquarters,

26   which is located in Menlo Park, California.  In addition, the relevant offers and sales of Facebook

27   securities took place in this District.

28

### III.     PARTIES

#### A.     Plaintiffs

27.     Plaintiff **Jeremiah F. Hallisey** is a current shareholder of Facebook stock, and has continuously held his Facebook stock since July 2013.

28.     Plaintiff **Ronald Martin** is a current shareholder of Facebook stock and has continuously held his Facebook stock since 2012.

29.     Plaintiff **Natalie Ocegueda** is a current shareholder of Facebook stock and has continuously held her Facebook stock since May 21, 2012.  Plaintiff Ocegueda is also a current user of Facebook's social networking website user and was a user at the time of the events alleged herein.

30.     Plaintiff **James Karon**, a resident of Georgia, is a current shareholder of Facebook stock and has continuously held his Facebook stock since March 22, 2017.

31.     Plaintiff **The Gloria Stricklin Trust** is a current shareholder of Facebook stock and has continuously held its Facebook stock since May 2012.

#### B.     Nominal Defendant

32.     Facebook, Inc. is a Delaware corporation with its principal place of business located at 1 Hacker Way, Menlo Park, California.  Facebook owns three of the world's largest social networks, including Facebook, Instagram, and WhatsApp.  Since its initial public offering in 2012, Facebook's Class A common stock has been registered under Section 12(b) of the Exchange Act and trades on the Nasdaq Global Select Market under the symbol "FB."

#### C.     Individual Defendants

33.     Defendant **Mark Zuckerberg** ("Zuckerberg") is the founder and CEO of Facebook and Chairman of the Board.  According to Facebook's website, Zuckerberg "is responsible for setting the overall direction and product strategy for the company" and "leads the design of Facebook's service and development of its core technology and infrastructure."  Zuckerberg is the Company's controlling stockholder with ownership of Facebook voting shares representing more than 60% of Facebook's voting power.  Zuckerberg is named as a defendant in the federal securities fraud class action against Facebook arising from the same events as this Complaint, *In re*

- 7 -

1   *Facebook, Inc. Securities Litigation*, Case No. 18-cv-01725-EJD (N.D. Cal.) (the "Securities Class

2   Action").

3       34.    Defendant **Sheryl Sandberg** ("Sandberg") is Facebook's Chief Operating Officer

4   ("COO") since 2008 and a Facebook director since 2012.  According to Facebook's website,

5   Sandberg is responsible for "overseeing the firm's business operations."  Prior to joining Facebook

6   in 2008, Sandberg was Vice President of Global Online Sales and Operations at Google, Inc.

7   ("Google").  Sandberg is named as a defendant in the Securities Class Action.

8       35.    Defendant **David M. Wehner** ("Wehner") is Facebook's Chief Financial Officer

9   ("CFO") since June 2014 and was Facebook's Vice President, Corporate Finance and Business

10  Planning from November 2012 to June 2014.  According to Facebook's website, Wehner "leads

11  the finance, facilities and information technology teams."  Prior to joining Facebook in 2012,

12  Wehner was CFO of Zynga Inc.  Wehner is named as a defendant in the Securities Class Action.

13      36.    Defendant **Jan L. Koum** ("Koum") is a co-founder of WhatsApp, Inc.

14  ("WhatsApp"), a Facebook subsidiary, and was CEO of WhatsApp and a Facebook director until

15  April 2018.  Koum was a security and infrastructure engineer at Yahoo Inc. from 1998 until 2007,

16  and, in 2009, he designed and launched the WhatsApp mobile messaging service.  Koum joined

17  Facebook's Board when WhatsApp was acquired by Facebook in 2014, and in April 2018, Koum

18  resigned as CEO of WhatsApp and left his position on Facebook's Board.

19      37.    Defendant **Peter A. Thiel** ("Thiel") is a Facebook director since April 2005 and is

20  Chair of the Compensation, Nominating & Governance Committee.  Thiel is the co-founder of

21  PayPal, Inc. ("PayPal"), an online payment company, where he served as CEO, President and

22  Chairman of its board of directors until it was acquired by eBay, Inc. ("eBay") in 2002.  Thiel is

23  also a founder of Palantir Technologies ("Palantir"), a secretive analytical software company, of

24  Thiel Capital, an investment firm, and of Thiel Capital, a venture capital firm, and he is a Partner

25  of Thiel Capital since 2011 and a Partner of Thiel Capital since 2005.

26      38.    Defendant **Marc L. Andreessen** ("Andreessen") is a Facebook director since June

27  2008 and is a Member of the Audit & Risk Oversight Committee and a Member of the

28
- 8 -

1  Compensation, Nominating & Governance Committee.  Andreessen is a co-founder and has been a

2  General Partner of Andreessen Horowitz, a venture capital firm, since July 2009 and was a

3  member of the boards of directors of eBay from September 2008 to October 2014, Hewlett-

4  Packard Company from September 2009 to October 2015, and Hewlett Packard Enterprise

5  Company from November 2015 to April 2018.

6        39.     Defendant **Kenneth I. Chenault** ("Chenault") is a Facebook director since

7  February 2018 and is a Member of the Audit & Risk Oversight Committee.  Chenault is Chairman

8  and a Managing Director at General Catalyst, a venture capital firm.

9        40.     Defendant **Jeffrey D. Zients** ("Zients") is a Facebook director since May 2018 and

10  is Chair of the Audit & Risk Oversight Committee.  Zients is the CEO of the Cranemere Group

11  Limited, a diversified holding company.

12        41.     Defendant **Peggy Alford** ("Alford") is a Facebook director since May 2019.  Prior

13  to joining Facebook's Board in 2019, Alford was CFO and Head of Operations for the Chan

14  Zuckerberg Initiative, a philanthropic organization.  Alford also held a variety of senior positions

15  at PayPal from May 2011 to August 2017, at Rent.com, an eBay company from October 2005 to

16  March 2009, and at eBay from 2002 to 2005.

17        42.     Defendant **Susan D. Desmond-Hellmann** ("Desmond-Hellman") was a Facebook

18  director from March 2013 until October 2019 and was Facebook's Lead Independent Director and

19  a Member of the Compensation & Governance Committee.  Desmond-Hellmann was also a

20  member of Facebook's Audit Committee until May 2018.

21        43.     Defendant **Reed Hastings** ("Hastings") was a Facebook director from June 2011

22  until May 2019 and was Chair of the Compensation & Governance Committee.  Hastings is CEO

23  and Chairman of the board of directors of Netflix, Inc. ("Netflix"), a provider of an Internet

24  subscription service for movies and television shows, since 1999, and previously was a member of

25  the board of directors of Microsoft Corporation from March 2007 to November 2012.

26        44.     Defendant **Erskine B. Bowles** ("Bowles") was a Facebook director from September

27  2011 until May 2019 and was a Member of the Audit & Risk Oversight Committee.

28

45.     The defendants identified above in ¶¶ 33-44 are collectively referred to as "Individual Defendants" and, together with nominal defendant Facebook, as "Defendants."

## IV.     FACTUAL BACKGROUND

### A.  Background of the Company and Its Business

46.     Facebook was founded in 2004 by Defendant Zuckerberg while he was a student at Harvard University.  Today, Facebook operates a social-networking service through its website, www.facebook.com, and its mobile applications.  Through its service, Facebook collects and maintains vast amounts of consumer information.  As of 2018, Facebook had more than 2.2 billion monthly active users worldwide.  Although Facebook's users are critical to the Company's business, they are not its customers or the source of its revenue; Facebook is essentially an advertising company that connects its customers –  sellers and advertisers of goods and services – with its users, generating revenue primarily through the sale of advertisements that are targeted to Facebook users based on their demographics and various other information.

47.     Facebook's success is driven by the Company's possession of the data uploaded to its platform by billions of Facebook users.  Facebook requires users to register and create a Facebook "Profile" showing personal information, before they can join the "social networking" website and interact with "Friends" who also have Facebook accounts and profiles.  Facebook users may join user groups, message each other, and post status updates or other content that can be viewed by other Facebook users and shared with their friends.  Facebook users can also interact with a wide selection of applications including social games or other services like the photo-sharing app Instagram.  By doing so, Facebook users provide their personal information to Facebook, including not just their demographic and personal information, but also the people they have "friended," the pages and posts they have visited and those that they have "followed" or "liked."  Together, this data gives Facebook, and marketers in general, insight into the products or services that would interest a particular user.  This information allows Facebook to target and market advertising to users most likely to purchase their products and services, giving Facebook's

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

targeting advertising business a significant advantage over traditional advertising, and generating billions of dollars in revenue for Facebook.

### 1. Facebook's Advertising Business is the Source of Substantially All of Its Revenue

48.     Facebook derives substantially all of its revenue from advertising aimed at its users. More than 2.3 billion people used the company's social media website, www.facebook.com, on a monthly basis in the first quarter of 2019, and more than 2.7 billion people regularly used its broader family of products and services, which include Instagram and WhatsApp.  The Company generated more than $55.8 billion in revenue in its 2018 fiscal year and had a market capitalization of more than $500 billion as of March 31, 2019.

49.     Facebook offers advertising services to its customers that include or have included at various points in time, among other things, assisting customers in developing and creating advertisements and advertising strategies, obtaining information about Facebook users from the Company's website and third party sources, compiling user data and maintaining databases of information about Facebook users, developing a marketing and advertising strategy to target and exclude certain groups of Facebook users from receiving advertisements, tracking and evaluating the effectiveness of advertisements and user targeting strategies, implementing advertising campaigns, and delivering advertisements to Facebook users, including via News Feed.

50.     Facebook's customers (advertisers) can use Facebook's targeted advertising services to direct their ads to users with specific attributes.  Facebook applies its own algorithm to categorize Facebook users and to determine which users and groups of users will be targeted to receive advertisements via its advertising platform.  As stated on Facebook's website: "With our powerful audience selection tools, you can target people who are right for your business.  Using what you know about your customers—like demographics, interests and behaviors—you can connect with people similar to them."

51.     Facebook also provides detailed analytical data to advertisers on how their ad campaigns are performing, including among certain groups of Facebook users with specified

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

attributes and characteristics that the advertiser seeks to target.  By monitoring this data and providing this information to its customers on an ongoing basis, Facebook captures consumer behavior, profile, preferences, lifestyle, and other attributes which allow Facebook to run targeted ads.  This enables advertisers to specify the groups of users that will be targeted to receive the advertisements.

### 2. Facebook's Success Depends Upon User Trust, Which Defendants Cultivated By Promising That Users Control Their Data

52.     Given the importance of user data to the success of the Company's targeted advertisements, Facebook's financial performance depends on its success in attracting active users to its platform.  As Defendants acknowledged in Facebook's 2017 Annual Report on Form 10-K, "*[t]he size of our user base and our users' level of engagement are critical to our success.*  Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products, particularly for Facebook and Instagram."

53.     One of the ways Facebook engages users is by allowing unaffiliated software developers to create applications (or "apps") on Facebook's platform.  Facebook obtains information about app users and activities, and the app developers can also receive information about Facebook users, via Facebook's platform.

54.     Defendants have long recognized that maintaining user trust is critically important to Facebook's brand, and repeatedly emphasized in public statements their commitment to protecting user privacy.  For instance, a June 21, 2013 blog post entitled "Important Message from Facebook's White Hat Program" states: "At Facebook, we take people's privacy seriously, and we strive to protect people's information to the very best of our ability. We implement many safeguards, hire the brightest engineers and train them to ensure we have only high-quality code behind the scenes of your Facebook experiences.  We even have teams that focus exclusively on preventing and fixing privacy related technical issues before they affect you. . . . . *Your trust is the*

*most important asset we have, and we are committed to improving our safety procedures and keeping your information safe and secure.*"

55.     Defendants have also recognized that Facebook users' willingness to engage with the Company's products and services depends in part on users believing they have control over the way their data is shared.  The "Risk Factor" disclosures in Facebook's periodic filings warned investors that concerns relating to data privacy and sharing could result in Facebook failing to retain or add users or in users decreasing their level of engagement, which could significantly harm the Company's business, revenue, and financial results.

56.     As Defendants have repeatedly acknowledged, Facebook's reputation as a trustworthy platform for sharing personal information is essential to the Company's success.  For example, in Facebook's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 ("2017 Form 10-K"), Defendants stated: "If people do not perceive our products to be . . . trustworthy, we may not be able to attract or retain users . . ."

57.     Defendant Zuckerberg also has explicitly represented that Facebook users "have control over how [their] information is shared" and that "*we do not share [users'] personal information with people or services [they] don't want*;" and "*we do not and never will sell any of [Facebook's users] information to anyone*."  Defendant Sandberg has likewise spoken publicly about Facebook's privacy controls, stating for example that "[p]rivacy is of the utmost concern and importance to Facebook and it's important to us that the people who use our service know that we are very protective of them.  *It is their data, they have control of it, they share it.*"

58.     Indeed, Defendants are well aware that if Facebook is unable to attract new users or keep existing ones, the Company would fail or be significantly less profitable.  To cultivate this critical user trust, Defendants repeatedly assured the public that the Company respected privacy and that users sharing on Facebook had control over their personal data.

59.     For example, as Sandberg stated on March 22, 2018 in a CNBC Interview, users' belief that their personal data is protected, "goes to the core of our service" and maintaining users' belief that their data was safe is "the most important thing we can do for running this company."

- 13 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   Zuckerberg likewise stressed that "The No. 1 thing that people care about is privacy and the

2   handling of their data . . . So I think it's a pretty big deal."  Further, Sandberg represented in

3   October 2017 that "[w]hen [users] share on Facebook, you need to know that no one is going to

4   steal your data, no one is going to get your data that shouldn't have it . . . and that you are

5   controlling who you share with."

6          60.     As detailed below, Defendants' statements were false.  Defendants' entire business

7   model depended upon granting third parties, including app developers and competitor companies,

8   access to Facebook user data in order to promote growth and increase profits. Defendants

9   expanded Facebook's access to and use of data about its users through partnership agreements and

10  "whitelisting" of certain third-party companies.  Facebook also made numerous acquisitions,

11  including of Instagram in 2012, and of WhatsApp in 2014, which substantially increased

12  Facebook's user base and access to data.

13         **B.     Facebook's Practices Respecting User Data Were the Subject of an FTC
                    Investigation and a 20-Year Consent Order Entered in 2012**

14         61.     In 2011, following an investigation by the FTC, Facebook was forced to agree to

15  the terms of a consent order that was subsequently entered by a federal court (the "Consent

16  Order"), in order to resolve the FTC's Complaint against Facebook alleging that the claims

17  Facebook made about its privacy practices were unfair and deceptive, and violated federal law.

18         62.     According to the FTC Complaint, the Company had allegedly failed to disclose to

19  Facebook users that "a user's choice to restrict profile information to 'Only Friends' or 'Friends of

20  Friends' would be ineffective as to certain third parties;" that the company's "Privacy Wizard" tool

21  for controlling access to user information "did not disclose adequately that users no longer could

22  restrict access to their newly-designated (publicly available information) via their Profile Privacy

23  Settings, Friends' App Settings, or Search Privacy Settings, or that their existing choices to restrict

24  access to such information via these settings would be overridden;" and that, after making changes

25  to its privacy policy, Facebook "failed to disclose, or failed to disclose adequately, that the

26

27

28
PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   December Privacy Changes overrode existing user privacy settings that restricted access to a user's

2   Name, Profile Picture, Gender, Friend List, Pages, or Networks."

3        63.    The FTC's Complaint listed a number of instances in which Facebook allegedly

4   made promises that it did not keep, including:

5             (a)    In December 2009, Facebook changed its website so certain information

6   that users may have designated as private – such as their Friends List – was made public.

7   Facebook didn't warn users that this change was coming, or get their approval in advance.

8             (b)    Facebook represented that third-party apps that users installed would have

9   access only to user information that they needed to operate.  In fact, the apps could access nearly

10  all of users' personal data – which the apps didn't need.

11            (c)    Facebook told users they could restrict sharing of data to limited audiences –

12  for example with "Friends Only."  In fact, selecting "Friends Only" did not prevent their

13  information from being shared with third-party applications their friends used.

14            (d)    Facebook had a "Verified Apps" program and the Company claimed that it

15  certified the security of participating apps.  It didn't.

16            (e)    Facebook promised users that it would not share their personal information

17  with advertisers.  It did.

18            (f)    Facebook claimed that when users deactivated or deleted their accounts,

19  their photos and videos would be inaccessible.  But Facebook allowed access to the content, even

20  after users had deactivated or deleted their accounts.

21            (g)    Facebook claimed that it complied with the U.S.- EU Safe Harbor

22  Framework that governs data transfer between the U.S. and the European Union.  It didn't.

23       64.    On November 29, 2011, the FTC announced that Facebook and the agency had

24  reached an agreement on the terms of the Consent Order relating to the FTC's charges that the

25  company had "deceived consumers by telling them they could keep their information on Facebook

26  private, and then repeatedly allowing it to be shared and made public."

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

65.     The FTC Consent Order required that Facebook must not "misrepresent in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information," including "the extent to which [Facebook] makes or has made covered information accessible to third parties;" that prior to sharing of a user's nonpublic information, the company will "obtain the user's affirmative express consent;" and the company would "establish and implement, and thereafter maintain, a comprehensive privacy program that is reasonably designed to (1) address privacy risks related to the development and management of new and existing products and services for consumers, and (2) protect the privacy and confidentiality of covered information," among other stipulations.

66.     Facebook had specific obligations under the FTC Consent Order and was:

(a)     barred from making misrepresentations about the privacy or security of consumers' personal information;

(b)     required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

(c)     required to prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;

(d)     required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

(e)     required, every two years for the next 20 years after entry of the Consent Decree, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of consumers' information is protected.

67.     Part I of the Consent Decree provided that Facebook, "in connection with any product or service . . . shall not misrepresent in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information, including, but not limited to: .

- 16 -

1  . . (B) the extent to which a consumer can control the privacy of any covered information

2  maintained by [Facebook] and the steps a consumer must take to implement such controls; [and ]

3  (C) the extent to which [Facebook] makes or has made covered information accessible to third

4  parties . . . ."

5          68.     Part IV of the Consent Decree additionally ordered Facebook to "establish and

6  implement, and thereafter maintain, a comprehensive privacy program that is reasonably designed

7  to (1) address privacy risks related to the development and management of new and existing

8  products and services for consumers, and (2) protect the privacy and confidentiality of covered

9  information."

10         69.     At the time it was entered, David Vladeck, the former FTC Director who worked on

11  the agency's enforcement action against Facebook, explained, "[t]he FTC Consent Decree put

12  Facebook on notice" that its representations concerning its privacy practices needed to be

13  completely accurate and that any representations would receive significant regulatory scrutiny.  As

14  FTC Chairman Jon Leibowitz stated in the FTC's press release announcing the settlement and

15  terms of the Consent Order on November 29, 2011, "***Facebook is obligated to keep the promises***

16  ***about privacy that it makes to its hundreds of millions of users***… Facebook's innovation does not

17  have to come at the expense of consumer privacy…"

18      **C.     Defendants Announced Changes to Facebook's Policies That Were Supposedly
                 Implemented in 2014 to Protect User Privacy**

19         70.     On November 15, 2013, Facebook announced that it had finalized changes to its

20  policies regarding its collection, use, and sharing of Facebook user data.  According to Facebook

21  Chief Privacy Officer Erin Egan ("Egan"), user feedback on draft versions of Facebook's updated

22  data use policy and statement of rights and responsibilities had revealed that despite what the

23  Company believed to be improvements in how it explains its policies, it could go further in

24  providing users clarity.  Facebook eventually adopted a version that indicated that by creating a

25  Facebook Profile, users grant the Company permission to use their information and likeness in

26

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   connection with advertising or sponsored content served by Facebook, without compensation.

2   According to Egan, this changed nothing about the Company's advertising policies and practices.

3        71.    On May 22, 2014, Defendants announced an expanded "privacy checkup" tool that

4   would enable users to review the privacy of "key pieces of information" on their profiles, as well

5   as a change to the default sharing setting for new members' first post from "public" to "friends."

6   First-time posters will also see a reminder to choose an audience for their first post, although the

7   Company stressed that the new default "friend" setting will apply even if they don't make an

8   audience choice.  "Users will also still be able to change the intended audience of a post at any

9   time, and can change the privacy of their past posts as well," Facebook's website post added.

10        72.    On November 13, 2014, Defendants announced Facebook would give users more

11   information about how their data is being collected and used, rolling out privacy policy changes

12   that allow the site to do more with location and transactional data and implementing new controls

13   that enable users to limit the ads they see.  In a Facebook Newsroom post, Egan detailed the latest

14   round of changes to the site's terms of service, data policy and cookies policy aimed at more

15   clearly explaining how Facebook's new and existing services work, as well as a new feature that

16   applies users' choices about what ads they want to see to every device they are using.  Facebook

17   also unveiled a new interactive feature, called Privacy Basics, that walks users through the most

18   commonly asked questions about how they can control their information on Facebook, including

19   how to choose an audience for a post and who can see comments left on posts.  "***Protecting***

20   ***people's information and providing meaningful privacy controls are at the core of everything we***

21   ***do, and we believe today's announcement is an important step***," Egan wrote.

22       **D.**    **The Cambridge Analytica Incident Revealed Rampant Privacy Violations at**
           **Facebook and That Defendants Failed to Comply with the FTC Consent Order**

23

24        **1.**   **The Sale of Facebook Data to Cambridge Analytica**

25        73.    In November 2013, Kogan, an academic researcher in the United Kingdom created

26   a Facebook app in connection with his studies.  In doing so, he agreed to abide by Facebook's

27   Platform Policy.  Initially, Kogan used the app only for his own research.

28

74.     In January 2014, Cambridge Analytica approached Kogan about a possible business relationship.  Cambridge Analytica was exploring a new model of election campaigning by targeting advertising based on voters' personalities, and both Cambridge Analytica and Kogan were familiar with an academic study that correlated an individual's personality with Facebook "likes."

75.     Pursuant to a June 2014 agreement between Cambridge Analytica and Kogan, Kogan would collect data from the users of his Facebook app and their friends, use that information to create personality "scores" for both app users and their friends, and then match these personality scores to individuals in Cambridge Analytica's U.S. voter database.  Cambridge Analytica would provide Kogan with funding to help recruit users to download and use his app.

76.     Kogan configured his app to deliver a standard academic personality survey to app users.  In addition to the survey results, the app obtained the name, birthdate, gender, location, and Facebook page likes both for the app users and the app users' friends.

77.     In the summer and early fall of 2014, GSR, a business entity created and controlled by Kogan, retained a surveying firm to recruit and pay approximately 270,000 Facebook users to download the researcher's app and take the personality survey.  This enabled Kogan to collect Facebook user data from both the 270,000 app users and many app users' friends, which collectively amounted to tens of millions of Facebook users.  From the survey responses, Kogan created personality scores for all 270,000 app users.  Then, by analyzing the correlations between survey responses and page likes, Kogan derived "predicted" personality scores for the survey-takers' tens of millions of friends.  Kogan matched the personality scores against Cambridge Analytica's database of American voters in 11 states, and transferred this matched data back to Cambridge Analytica, in violation of the Platform Policy.  Cambridge Analytica used the scores to target advertisements in connection with its political consultancy services.  Cambridge Analytica paid GSR for the costs associated with the work done by the surveying firm.  SEC Complaint, ¶24.

78.     In January 2015, Kogan and Cambridge Analytica signed a follow-on agreement.  Pursuant to the agreement, Cambridge Analytica paid GSR £200,000 GBP.  Kogan, in violation of

- 19 -

the Platform Policy, gave Cambridge Analytica the previously-collected names, birthdays, gender, location, personality scores, and an agreed-upon number of page likes for approximately 30 million Facebook users in all 50 states.  By the end of May 2015, Kogan had transferred this information to Cambridge Analytica.  SEC Complaint, ¶25.

79.     Kogan also entered into a separate agreement with another entity, "Company A." Pursuant to that agreement, the researcher provided Facebook demographic data and all page likes relating to approximately 30 million U.S. Facebook users to Company A in the fall of 2014. SEC Complaint, ¶26.

**2. Facebook's Investigation into Cambridge Analytica's Use of Facebook Data Began in 2015**

80.     On December 11, 2015, the British newspaper *The Guardian* published an article about Kogan and Cambridge Analytica reporting that Kogan had obtained Facebook data from tens of millions of Facebook users and used this data to create personality profiles for Cambridge Analytica's use in American elections.  SEC Complaint, ¶27.

81.     The newspaper contacted Facebook before publishing its report and shared the allegations they intended to publish.  Facebook provided the following quote attributable to a Company spokesperson: "We are carefully investigating this situation. To be clear, misleading people or misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data." *The Guardian* included the Company's statement in the article published on December 11, 2015.  SEC Complaint, ¶28.

82.     According to the SEC, on the same day that the *Guardian* article was published, a Facebook employee with responsibility for interpreting and administering the Company's Platform Policy contacted both Kogan and Cambridge Analytica.  Within days, both Kogan and Cambridge Analytica confirmed to Facebook that Kogan had used a Facebook app to collect user data and then used that data to create personality scores, which were then transferred to Cambridge Analytica.  SEC Complaint, ¶29.  The Facebook employee concluded that the researcher's transfer

- 20 -

of personality scores derived from Facebook user data to Cambridge Analytica violated the Company's Platform Policy.  This conclusion was shared with others in Facebook's communications, legal, operations, policy, privacy, and research groups.  The employee told Kogan and Cambridge Analytica to delete the personality scores and told Kogan to delete all of the Facebook data that his app had collected, and Cambridge Analytica subsequently told Facebook that it had deleted the data received from the researcher.  *Id.*, ¶30.

83.     Six months later, in June 2016, Facebook and Kogan signed a settlement agreement.  In a certification attached to that agreement, Kogan reported—contrary to his and Cambridge Analytica's representations in December 2015—that, in addition to the personality scores, he had also transferred actual U.S. Facebook user data, including names, birthdays, location, and certain page likes, to Cambridge Analytica.  Kogan also represented that he deleted all the Facebook data his app had collected.  SEC Complaint, ¶31.

84.     Almost a year later, in April 2017, Cambridge Analytica provided Facebook with a similar certification reporting that Cambridge Analytica had received from Kogan underlying raw Facebook user data in addition to the personality scores, as well as that it had deleted that data.  SEC Complaint, ¶32.

85.     The SEC's investigation revealed that more than 30 Facebook employees in different corporate groups, including senior managers in Facebook's communications, legal, operations, policy, and privacy groups, learned that the researcher had transferred information to Cambridge Analytica in violation of Facebook's Platform Policy.  However, as the SEC found, "***Facebook had no specific policies or procedures in place to assess or analyze this information for the purposes of making accurate disclosures in Facebook's periodic filings***."  SEC Complaint, ¶33.

### 3.   Red Flags Were Subsequently Raised About Cambridge Analytica's Other Potential Misuse of Facebook User Data

86.     At the time of the December 2015 *Guardian* article, Facebook was already familiar with Cambridge Analytica and had suspicions that Cambridge Analytica had misused user data.

According to the SEC, in September 2015, employees in Facebook's political advertising group requested an investigation into possible "scraping"—the automated and unauthorized aggregation of Facebook user data—by Cambridge Analytica.  And, after the *Guardian* article was published in December 2015, these employees reiterated their concern about scraping.  The political advertising employees recognized Cambridge Analytica as a well-known firm within the political advertising space and a client of Facebook's advertising business, and had described it as a "sketchy (to say the least) data modeling company that has penetrated our market deeply."  SEC Complaint, ¶34.

87.     Throughout 2016, red flags were raised to Facebook suggesting that Cambridge Analytica was potentially misusing Facebook user data.  Following the *Guardian* article, the SEC found that several Facebook employees became aware of media reports on Cambridge Analytica's use of personality profiles to target advertising in the summer and fall of 2016.  Facebook lawyers and employees in the company's political advertising group saw and discussed an October 27, 2016, article in *The Washington Post* reporting that Cambridge Analytica combined psychological tests with "likes" on "social-media sites."  Employees responsible for coordinating Facebook's response to the *Guardian* article also circulated a link to a video of a marketing presentation by Cambridge Analytica's chief executive officer about the firm's ability to target voters based on personality.  As an additional indication to Facebook that Cambridge Analytica might have been misusing Facebook user data, the SEC found that some employees on Facebook's political advertising team knew from August 2016 through November 2016 that Cambridge Analytica named Facebook and Instagram advertising audiences by personality trait for certain clients that included advocacy groups, a commercial enterprise, and a political action committee.  SEC Complaint, ¶35.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

### 4. *The Guardian* and *The New York Times* Run Exposés on the Sale of Facebook User Data to Cambridge Analytica

88.     On March 12, 2018, reporters from *The Guardian* contacted Facebook and informed the Company of its planned exposé of Cambridge Analytica and Facebook's data harvesting.

89.     *The New York Times* also contacted Facebook in March 2018 and informed the Company that the publication planned to run a story about Kogan's improper transfer of data to Cambridge Analytica, including that Facebook had told Kogan and Cambridge Analytica to delete their Facebook data.  Reporters from the *Times* suggested that Cambridge Analytica had not deleted the data, contrary to its representations to Facebook.  SEC Complaint, ¶50.

90.     Instead of providing a comment for the stories, Facebook initially threatened to sue *The Guardian* to prevent from publishing the story.  Campbell Brown, Facebook's head of news partnerships, acknowledged at a conference in London later that month it was "not our wisest move."

91.     The Company also attempted to put its own spin on the stories by issuing its own statement ahead of their publication, which seemingly came out of nowhere when it was posted to the Company's own website after the close of market on Friday, March 16, 2018.

92.     On March 16, 2018, in a post to Facebook's own online "Newsroom," the Company publicly acknowledged, for the first time, that it had confirmed that Kogan had transferred Facebook user data to Cambridge Analytica, in violation of Facebook's Platform Policy, and had told Kogan and Cambridge Analytica to delete the data in December 2015.  When the market opened on Monday, March 19, 2018, the price of Facebook's shares fell five percent, from $185.09 to $172.56, and continued to decline throughout the week, closing at $159.39 per share on March 23, 2018.  SEC Complaint, ¶51.

### E. Defendants Admit Cambridge Analytica Obtained User Data in Violation of Facebook's Policies in a "Facebook Newsroom" Post on March 16, 2018

93.     On March 16, 2018, Facebook announced in a post to the "Facebook Newsroom" page on its website that the Company had confirmed that Kogan had transferred Facebook user

data to Cambridge Analytica, in violation of Facebook's Platform Policy, and had told Kogan and Cambridge Analytica to delete the data in December 2015.  This was the first time that the Company publicly acknowledged the transfer of user data to Cambridge Analytica.  SEC Complaint, ¶51.

94.     The March 16, 2018 Facebook Newsroom post reported that an app developer named Aleksandr Kogan had "violated Facebook's platform policy" by "passing information on" about its users to third parties, including a company called Cambridge Analytica.  Facebook said that although Kogan had "gained access to this information in a legitimate way and through the proper channels," he violated Facebook's policies when he shared this information with Cambridge Analytica without Facebook users' consent.  As a result, Kogan's app was removed from Facebook and "all parties" who received the data from Kogan were required to certify that it had been destroyed in 2015 or 2016.

95.     According to Facebook, "Facebook obtained written certifications from Dr. Kogan, GSR, and other third parties declaring that all such data they had obtained was accounted for and destroyed.  In March 2018, after Mr. Milner's testimony, Facebook received information from the media suggesting that the certifications we [Facebook] received may not have been accurate…  As part of our investigation, we have hired a forensic auditor to understand what information Cambridge Analytica had and whether it has been destroyed."  Facebook also announced that it was suspending Cambridge Analytica, its parent company, and Wylie, the whistleblower who had provided evidence to *The Guardian*, the U.K.'s National Crime Agency's cybercrime unit, and the Information Commissioner's Office, of the information that Kogan and Cambridge Analytica had obtained about 50 million Facebook users.

96.     Wylie said that the Company was aware of the volume of data that was obtained by Kogan's app.  "Their security protocols were triggered because Kogan's apps were pulling this enormous amount of data, but apparently Kogan told them it was for academic uses," Wylie said. "So they were like: 'Fine.'"

97.     The evidence Wylie supplied to U.K. and U.S. authorities included a letter from Facebook lawyers sent to him in August 2016, asking him to destroy any data he held that had been collected by GSR, the company set up by Kogan to "harvest" the profiles.  "Because this data was obtained and used without permission, and because GSR was not authorized to share or sell it to you, it cannot be used legitimately in the future and must be deleted immediately," the letter said.  According to Wylie, Facebook did not pursue a response when the letter initially went unanswered for weeks because Wylie was travelling, nor did it follow up with forensic checks on his computers or storage.  "That to me was the most astonishing thing.  They waited two years and did absolutely nothing to check that the data was deleted.  All they asked me to do was tick a box on a form and post it back."

98.     Instead of accepting the uncomfortable glare of the spotlight and accepting responsibility for any mistakes it might have made, the Company went into "PR crisis mode," quickly seizing upon Kogan and Wylie as convenient scapegoats.  "***This was a scam — and a fraud***," Paul Grewal, Facebook's Vice President and Deputy General Counsel, said in Facebook's initial statement responding to the *New York Times* report.  He added that the company was suspending Cambridge Analytica, Wylie and Kogan, a Russian American academic from Facebook.

99.     The following day, Facebook published an addendum to the March 16, 2018 Facebook Newsroom post, asserting that "The claim that this is a data breach is completely false." Facebook stated that the affected users had "chose to sign up to [Kogan's] app," "everyone involved gave their consent," and "[p]eople knowingly provided their information" to Kogan.  In reality, only around 270,000 users had provided consent – but over 87 million users had their data harvested and misused.  The addendum, published at 9:50 a.m. PDT, was plainly intended as a response to articles by the *The New York Times* and *The Guardian* about the data breach, which had been published earlier the same day.

100.     Alex Stamos ("Stamos"), Facebook's Chief Security Officer at the time, likewise stated in a Twitter post on March 17, 2018, "The researcher in question, Aleksandr Kogan, enticed

- 25 -

1  several hundred thousand individuals to use Facebook to login to his personality quiz in 2014.  He

2  lied to those users and he lied to Facebook about what he was using that data for."

3      101.    On March 17, 2018, *The New York Times* reported that the Cambridge Analytica

4  incident was "one of the largest data leaks in the social network's history.  The breach allowed the

5  company to exploit the private social media activity of a huge swath of the American electorate,

6  developing techniques that underpinned its work on President Trump's campaign in 2016."  As

7  described by the *Times*:

8       Interviews with a half-dozen former employees and contractors, and a review of
        the firm's emails and documents, have revealed that Cambridge not only relied on
9       the private Facebook data but still possesses most or all of the trove.

10                                          * * *

11      The data Cambridge collected from profiles, a portion of which was viewed by
        The Times, included details on users' identities, friend networks and "likes." Only
12      a tiny fraction of the users had agreed to release their information to a third party.

13                                          * * *

14      Mr. Grewal, the Facebook deputy general counsel, said in a statement that both
15      Dr. Kogan and "SCL Group and Cambridge Analytica certified to us that they
        destroyed the data in question."
16
        But copies of the data still remain beyond Facebook's control. The Times viewed
17      a set of raw data from the profiles Cambridge Analytica obtained.

18      While Mr. Nix has told lawmakers that the company does not have Facebook data,
        a former employee said that he had recently seen hundreds of gigabytes on
19      Cambridge servers, and that the files were not encrypted.

20      102.    The *Times* article noted that "the full scale of the data leak involving Americans has

21  not been previously disclosed – and Facebook, until now, has not acknowledged it."  The

22  newspaper went on to report that Facebook at first "downplayed" the issue, but had subsequently

23  "posted a statement expressing alarm and promising to take action."

24      103.    Reaction to the disclosures was swift and severe.  On March 18, 2018, numerous

25  elected officials in the United States and Europe called for investigations into Facebook,

26

27

28
                                          - 26 -

demanding that Zuckerberg testify to Congress and Parliament to explain how the breach had occurred and why affected users were not informed.

104.    On March 19, 2018, CNN reported that:

> *The Cambridge Analytica scandal has done immense damage to the brand*, sources across the company believe.  It will now take a Herculean effort to restore public trust in Facebook's commitment to privacy and data protection, they said.

> No one has provided an adequate explanation for why Facebook did not disclose Kogan's violation to the more than 50 million users who were affected when the company first learned about it in 2015.

105.    Others agreed.  One prominent tech reporter wrote on March 17, 2018, "[T]he story here isn't how this data was used. . . .  The problem here is how Facebook, the biggest social network, chose to stay silent and not inform the affected users. . . .  [T]the problem is Facebook's silence on the matter until it was pushed by the whistleblower who made the details public. . .  In its press release, Facebook blamed everything on how it was lied to by a researcher and takes no charge of its policies that allowed such behavior or says anything about why the affected users weren't informed."

106.    Investors and stock analysts recognized that the disclosures and the firestorm of criticism they engendered had fundamentally altered the value proposition for the Company.  For example, in explaining the removal of its Buy recommendation on the Company on March 20, 2018, William O'Neill & Co. wrote:

> Facebook was aware of the privacy breach two years ago. This lack of disclosure could be viewed as a violation of privacy laws in the U.K. and many U.S. states, raising further questions . . . .

> Furthermore, the increased scrutiny adds to the criticism of Russian social media influence in the 2016 election and will likely bring further backing for social media regulation, which could add uncertainty to share performance.

107.    An article on *Seeking Alpha* similarly noted on March 19, 2018:

> The importance of this incident cannot be overstated for Facebook on both the user privacy front but also more importantly on Facebook's business model front. If Cambridge Analytica was able to acquire information on tens of millions of Facebook users so quickly and easily, and then keep the information for years

- 27 -

without Facebook suspecting otherwise, then that shows a serious flaw in Facebook's ability to keep exclusive control over its information.

108.    Over the next several days, additional details emerged regarding the number of Facebook users affected by the sale of user data to Cambridge Analytica, and Defendants' knowledge that Kogan had transferred the data to Cambridge Analytica in violation of Facebook's policies.

109.    These disclosures caused the price of Facebook stock to decline precipitously. Facebook shares fell nearly 7% on Monday, March 19, 2018 – the first trading day after the news broke – and fell an additional 2.5% the next trading day amid additional disclosures of the nature and extent of the risks that had been concealed from investors.  As additional details of Facebook's concealment were disclosed, and the negative news continued to mount, Facebook's shares continued to decline.  Within a week, Facebook's stock was trading around $150/share, a stunning drop of nearly 18% in value from its price (~$185) just before news of the Cambridge Analytica scandal broke, reflecting an extraordinary loss of more than $100 billion in market capitalization in just one week.

110.    On March 20, 2018, *The Guardian* reported its interview with a former Facebook employee, Sandy Parakilas ("Parakilas"), who was a platforms operations manager at Facebook between 2011 and 2012.  Parakilas said that he had warned senior executives at Facebook about his concerns that developers were regularly violating Facebook's platform policies on multiple occasions, but that they had essentially ignored his concerns.  For example, Parakilas reported that a developer was using Facebook data to automatically generate profiles of children without their (or their parents') consent, and that another was seeking to gain access to a user's private Facebook messages and photos.  In an op-ed piece, Parakilas wrote about the response of Facebook management (or lack thereof) to these reports, "At a company that was deeply concerned about protecting its users, this situation would have been met with a robust effort to cut off developers who were making questionable use of data.  But when I was at Facebook, the typical reaction I recall looked like this: try to put any negative press coverage to bed as quickly as

- 28 -

1  possible, with no sincere efforts to put safeguards in place or to identify and stop abusive

2  developers.  When I proposed a deeper audit of developers' use of Facebook's data, one executive

3  asked me, "Do you really want to see what you'll find?"  Parakilas responded, "The message was

4  clear:  The company just wanted negative stories to stop.  It didn't really care how the data was

5  used."

6        111.    According to Parakilas, Facebook did not conduct regular audits; although his

7  primary responsibilities were over policy and compliance for Facebook apps and data protection,

8  Parakilas said that "during my 16 months in that role at Facebook, I do not remember a single

9  physical audit of a developer's storage."  Parakilas also said that when he told his superiors that

10  "more audits of developers and a more aggressive enforcement regime" were needed, they did not

11  directly respond, because "[e]ssentially, they did not want to do that."   According to Parakilas,

12  "the company felt that it would be in a worse legal position if it investigated and understood the

13  extent of abuse, and it did not."  In subsequent testimony to the DCMS Committee, Parakilas

14  declined to identify the Facebook executives he warned publicly by name when asked.  The

15  DCMS Committee Chair commented, "***it sounds like they turned a blind eye because they did not***

16  ***want to find out that truth.***"  Parakilas agreed, stating, "That was my impression, yes."

17        112.    On March 27, 2018, whistleblower Wylie testified before a U.K. Parliamentary

18  Committee that the data that Kogan's app had obtained via Facebook formed the "foundational

19  dataset" for Cambridge Analytica and its targeting models.  Wylie's testimony also suggested

20  Facebook found out about the data harvesting project as early as July 2014 —around the time

21  Kogan had told him that he had spoken to Facebook engineers after his app's data collection rate

22  had been throttled by the platform.  "He told me that he had a conversation with some engineers at

23  Facebook," said Wylie.  "So Facebook would have known from that moment about the project

24  because he had a conversation with Facebook's engineers — or at least that's what he told me…

25  Facebook's account of it is that they had no idea until the *Guardian* first reported it at the end of

26  2015 — and then they decided to send out letters.  They sent letters to me in August 2016 asking

27  do you know where this data might be, or was it deleted?"  When asked whether Facebook made

28

any efforts to retrieve or delete data, Wylie responded, "No they didn't."  It was not until

Facebook's image was threatened in 2018, "after I went public and then they made me suspect

number one" that Wylie said he had heard anything from the Company.  Wylie said that he

suspected that when Facebook looked at what happened in 2016, "they went if we make a big deal

of this this might be optically not the best thing to make a big fuss about. . . . So I don't think they

pushed it in part because if you want to really investigate a large data breach that's going to get out

and that might cause problems.  So my impression was they wanted to push it under the rug."  He

added, "[a]ll kinds of people [had] access to the data.  *It was everywhere*."

113.    Wylie also discussed a connection between Cambridge Analytica and Palantir, a

company known for providing government agencies and organizations with analytics, security, and

other data management solutions, which was co-founded in 2003 by **Defendant Thiel**.  According

to Wylie, Palantir staff helped Cambridge Analytica build models based on the Facebook data.

"That was not an official contract between Palantir and Cambridge Analytica but there were

Palantir staff who would come into the office and work on the data," Wylie stated.  "And we

would go and meet with Palantir staff at Palantir.  So, just to clarify, Palantir didn't officially

contract with Cambridge Analytica.  But there were Palantir staff who helped build the models that

we were working on."  Initially in response to a request for comment on Wylie's testimony,

*TechCrunch* reported on March 27, 2018 that a Palantir spokesperson had denied the connection

entirely in an emailed statement: "Palantir has never had a relationship with Cambridge Analytica

nor have we ever worked on any Cambridge Analytica data."  According to *The New York Times*,

Palantir subsequently issued a revised statement: "We learned today that an employee, in 2013-

2014, engaged in an entirely personal capacity with people associated with Cambridge Analytica,"

a Palantir representative said.  We are looking into this and will take the appropriate action."

### F.  Facebook's 1Q18 Financial Results Suggested That Users Were Unconcerned About the Privacy Abuses Revealed by the Cambridge Analytica Scandal

114.    When Facebook reported its first quarter results on April 25, 2018, investors were

buoyed by revenues, earnings and DAU/MAU metrics that were all in line with estimates.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1    **Defendant Sandberg** told investors "It was a great quarter for our business.  Q1 ad revenue grew

2    50% year-over-year.  Mobile ad revenue was $10.7 billion, up 60% from last year and contributed

3    approximately 91% of total ad revenue.  Revenue growth was broad-based across regions,

4    marketer segments and verticals."

5         115.     **Defendant Sandberg** further assured the market that there would not be a

6    significant business impact from the March revelations regarding Cambridge Analytica, stating

7    "we think the investigatory work we're doing into APIs is very important and we don't expect it

8    have an impact on revenue."  And **Defendant Zuckerberg** commented that "Despite the important

9    issues that we faced . . . our community and our business continued to grow really well," while

10   **Defendant Wehner** assured investors that Facebook was "committed to transparency."

11        116.     As *The New York Times* reported on April 25, 2018: "Despite it all, the Facebook

12   juggernaut marches on.  The social network is undergoing its worst crisis in its 14-year history as it

13   faces a torrent of criticism about its privacy practices and the way it handles user data.  But on

14   Wednesday, Facebook showed that – as with past scandals – the controversy is so far doing little to

15   hurt its bottom line.  The results sent Facebook's shares up more than 7 percent in aftermarket

16   trading on Wednesday.

17        117.     The Company's 1Q18 results together with management's assurances on the 1Q18

18   conference call led many analysts to conclude that the disclosures concerning Cambridge

19   Analytica had not impacted user's engagement with the platform.  *See, e.g.*, Jason Helfstein,

20   Strong 1Q Suggests Cambridge Analytica Soon to Be a Distant Memory; Maintain Outperform,

21   $225 PT, Oppenheimer (Apr. 25, 2018) ("Most positive takeaway was constructive tone from

22   mgmt"); Sam Kemp, Strong Q1 + Cambridge Analytica & GDPR Set to Fade From Focus,

23   Remain OW, PiperJaffray (Apr. 25, 2018) ("Incremental news around impacts from the recent

24   Cambridge Analytica (CA) debacle were nil and, alongside mgmt commentary downplaying

25   GDPR impact, will likely accelerate the fading relevance of these topics from investor focus.").

26        118.     Bolstered by the 1Q18 results and Defendants' assurances of the strength of

27   Facebook's business in the face of the firestorm of criticism it was facing over its user data and

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   privacy practices, the Company's stock price began to recover.  The price of Facebook's share rose

2   more than 9% immediately after 1Q18 results were released, and by late May the shares had

3   recovered to the levels they were trading at before *The Guardian* and *The New York Times* articles

4   about the Cambridge Analytica data breach broke.

5         119.    Thereafter, Defendants continued to tout the 1Q18 results as a sign that the

6   Company had weathered the storm, while assuring investors that there was no reason to be

7   concerned that the past user privacy scandals or new privacy regulations would have a negative

8   impact on Facebook's business.

9         120.    In April 2018, Facebook shareholders made various proposals in response to the

10   Cambridge Analytica scandal.  For example, shareholders proposed that "Facebook's Board issue

11   a report discussing the merits of establishing a Risk Oversight Board Committee."

12         121.    In support of this proposal, on April 17, 2018, Facebook investors noted the fact

13   that the Company faced "significant financial, reputational and regulatory risk" from events like

14   "The Cambridge Analytica scandal and the misuse of data to influence elections around the

15   world," which "cost Facebook investors $90 billion in market value between March 16th and

16   March 17th.", 210 Facebook shareholders also proposed that "Facebook issue a report to

17   shareholders . . . [inter alia] assessing the risks posed by content management controversies

18   (including election interference . . .) to the company's finances operations and reputation."  In

19   support of this proposal, on May 17, 2018, Facebook investors, including the Illinois State

20   Treasurer explained that "Facebook's controversies have a direct impact on the Company's market

21   value" including because "[f]ollowing the Cambridge Analytica disclosures, Facebook shares lost

22   approximately $100 billion in market value."  Defendants opposed both stockholder proposals,

23   assuring investors that Facebook's risk oversight was fine and that there was no need for the

24   requested report.

25         122.    During Facebook's annual meeting on May 31, 2018, Natasha Lamb, managing

26   partner of activist investor Arjuna Capital, said: "From political subterfuge, fake news, hate speech

27   and sexual harassment, it is clear that content that violates Facebook's own terms of service poses

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1  a risk to the Company's market value and brand.  Last year, at this very meeting, we highlighted

2  the risk posed by fake news propagated over the platform.  And while our board opposed

3  reporting, we learned [six] months later and only through congressional testimony that 126 million

4  Americans may have viewed Russian propaganda prior to the 2016 U.S. presidential election.

5  Four months later, we learned that 87 million Americans data was compromised by Cambridge

6  Analytica with the intent to manipulate users for political gain.  In the wake of that scandal,

7  Facebook's market value dropped nearly $100 billion.  And while today's proposal is broader, I'm

8  surprised to see a similar reaction from our board, a recommendation to vote against greater

9  transparency and accountability to investors.  Fines and regulation by governments, lost

10  advertising revenue and a soured brand may further impact investment returns.  In fact, users may

11  leave the social media platform if they feel its content lacked integrity."

12       123.    Following comments like these, Zuckerberg took to the stage to tout the Company's

13  1Q18 results ("that shows a lot of good continued momentum" in the business) and assure

14  investors that users were not changing their behavior in the wake of the scandals, and were still

15  opting in to share their data with Facebook (the "vast majority of people say yes, they want that

16  data used").  The shareholders proposals were defeated.

17       124.    As the first quarter drew to a close, investors and market analysts were justifiably

18  concerned over the impact that Facebook's past misrepresentations concerning the Cambridge

19  Analytica data breach and the use of its platform to further election interference and other political

20  activities by Russia would have on the Company's users and advertisers.  The impending launch of

21  the General Data Protection Regulation ("GDPR") in the E.U. added to these concerns.

22       125.    Nevertheless, analysts were cautiously optimistic that Facebook's promises of quick

23  and decisive action to combat the threats would help it rebound quickly from the negative

24  disclosures.  As a Morningstar analyst wrote on March 26, 2018:

25           Facebook's latest data breach issue, which surfaced 11 days ago and involved
26           Cambridge Analytica, was followed on March 25 by the Federal Trade
            Commission's announcement of an investigation into the company's abilities and
27           willingness to protect user information.  While this recent development may have

28

- 33 -

1
2
3

brought forth further doubts regarding Facebook and its user growth and engagement, along with more demand for a GDPR type of regulation in the U.S., we remain confident that the firm is more likely to endure the short-term impact of the data breach issue and at this point do not expect a significant long-term negative effect on Facebook's platform and operations.

4

**G. Following Reports of Facebook's Data-Sharing Agreements, Defendants Admit Certain Companies Still Had Access to User Data in June 2018**

5
6

126.     While the market was reassured by defendants' comments, questions surrounding Facebook's privacy practices continued to swirl.

7
8
9
10
11
12
13

127.     On June 3, 2018, *The New York Times* reported that Facebook had entered into agreements over the past decade with at least 60 device makers, including Apple, Amazon, BlackBerry, Microsoft and Samsung, that allowed them to access vast amounts of Facebook users' personal information, including data about friends who had blocked such third-party access.  These data-sharing partnerships, which began as far back as 2007, gave companies and device manufacturers the ability to offer "features" of the social network, such as messaging, "like" buttons and address books, on their own websites and mobile devices.

14
15
16
17
18

128.     The following day, House Judiciary Committee member David Cicilline ("Cicilline") (D-R.I.), stated that Defendant Zuckerberg had "lied to Congress" when he testified before several committees in April of 2018 and stated that Facebook users have "complete control" over who sees their data.  Cicilline also questioned whether Facebook's data-sharing practices violated the FTC Consent Order.

19
20
21
22

129.     On June 8, 2018, Facebook responded to inquiries from numerous journalists seeking a response to *The New York Times*' and *The Wall Street Journal*'s reporting about whitelisting and other unauthorized sharing of users' data.  Facebook issued the same statement to multiple outlets in response, which read:

23
24
25
26

For the most part this is a rehash of last week-end's *New York Times* story – namely that we built a set of device integrated APIs used by around 60 companies to create Facebook-like experiences.  In April 2018, we announced that we were winding these down.  In terms of our Platform APIs, the Journal has confused two points.  In 2014, all developers were given a year to switch to the new, more restricted version of the API. . . . Per our testimony to Congress 'We required

27
28

developers to get approval from Facebook before they could request any data beyond a user's public profile, friend list, and email address.'

130.    Journalists were skeptical of this response.  Axios, after reviewing a timeline of Facebook's half disclosures, concluded that "Each new admission – even of the kinds of small bugs and problems that are common across the industry – reinforces a view in Washington that Facebook has been unwilling to come fully clean."

131.    On June 27, 2018, *The Wall Street Journal* reported that Facebook could not track where the data it had improperly disseminated – not just to Cambridge Analytica, but to developers and others writ large – had ended up.

132.    On June 29, 2018, Facebook provided its written responses to outstanding questions asked of Zuckerberg by the members of the U.S. House of Representatives when he appeared before them to testify on April 11, 2018.  In a 747-page document, the Company admitted that Facebook gave dozens of companies special access to user data, contrasting with the Company's prior public statements.  Facebook disclosed that it was still allowing third parties to access the personal information of Facebook users' friends, such as their name, gender, birth date, current city or hometown, photos and page likes, including over 60 app developers, and also stated that "early records may have been deleted from our system," and that "it is possible" that Facebook had failed to identify other developers who had also received extended access to users' friends' data. Facebook also admitted that it shared information about its users with 52 hardware and software makers, including such large United States corporations as Amazon, Apple Inc., and Microsoft Corp., as well as Chinese firms such as Huawei Technologies Co. and Alibaba Group.

133.    On July 1, 2018, after reviewing Facebook's responses to written questions from members of Congress, *The Wall Street Journal*, based in part on its earlier investigations in combination with a review of Facebook's answers and earlier discussions, concluded that Facebook's responses contradicted Zuckerberg's previous statements to Congress:

Facebook . . . disclosed it gave dozens of companies special access to user data, detailing for the first time a spate of deals that contrasted with the social network's

previous public statements that it restricted personal information to outsiders in 2015.

\* \* \*

The disclosure follows a *Journal* article in June that reported Facebook struck customized data-sharing deals that gave select companies such as Nissan Motor Co. access to user records for their apps well after the point in 2015 when it said it walled off that information.  Nissan is listed in Friday's document.

134.   On July 2, 2018, the *Washington Post* reported that the SEC, FTC, and FBI had joined the DOJ "in its inquiries about the two companies" (Facebook and Cambridge Analytica) and were investigating what Facebook knew years ago and what it failed to tell "users or investors," as well as whether there were "discrepancies in more recent accounts" such as in Defendant Zuckerberg's testimony before Congress.  In a statement, Facebook acknowledged the ongoing investigations of "the social network's public statements about Cambridge Analytica" and stated that it was cooperating with authorities.

135.   On July 11, 2018, *The Wall Street Journal* reported that the SEC was also investigating whether Facebook adequately warned investors in a timely manner about the possible misuse and improper collection of user data.

136.   Following these reports, Facebook released its earnings report for the second quarter of 2018 on July 25, 2018.

**H. Facebook's 2Q18 Financial Results Reveal the Effects of the Data-Sharing Scandal on Facebook's User Engagement, Advertising Revenues, and Earnings, Leading to a $100 Billion Loss in Facebook's Value**

137.   Prior to the release of Facebook's earnings and financial results for the second quarter of 2018 ("2Q2018"), the Company's share price was hovering around $210 and many investors and analysts, buoyed by the Company's 1Q18 earnings report and Defendants' assurances regarding the continued strength of the business in the wake of the scandal, remained bullish on the Company.

138.   Investors and analysts were therefore stunned when Facebook released its earnings and financial results for the second quarter on July 25, 2018.  The Company missed revenue estimates, offered a weak sales forecast for future quarters and reported a decline of users in

- 36 -

1   Europe, and reduced guidance going forward, all as a substantial result of the fallout of the

2   disclosures concerning Facebook's privacy practices, including its misrepresentations about its

3   efforts to prevent and address events like the Cambridge Analytica data breach or the Russian

4   attempts to influence election results in the U.S.

5       139.    The Company reported having 1.47 billion average daily active users in June and

6   quarterly revenues of $13.2 billion, both of which were below average analyst estimates as

7   compiled by *Bloomberg*.  The revenue miss was Facebook's first since 2015.  In addition, the

8   company reported that, after years of growth, its active user base (MAU and DAU) had declined in

9   Europe, was flat in the U.S. and Canada, and was decelerating worldwide.

10      140.    During the 2Q18 conference call on July 25, 2018, **Defendant Wehner** told

11  investors to expect revenue growth rates to decelerate in the second half of the year "by high single

12  digit percentages from prior quarters sequentially."  Wehner said that one of the driving factors in

13  the Company's declining revenue growth was that users were sharing less data with the Company

14  and advertisers were reducing their spending on the platform in the wake of the privacy

15  disclosures:

16          In terms of what is driving the deceleration, . . . it's a combination of factors. . .
17          And then finally, we're giving people who use the . . . services more choice around
            privacy. And that's coming both in terms of impacts that could be ongoing from
18          things like GDPR as well as other product options that we're providing that could
            have an impact on revenue growth.
19

20      141.    As **Defendant Wehner** explained, users exercising their right to opt out of data

21  sharing under the new European regulations, reduced ad spending based on less reliance on

22  Facebook's data to support targeted advertising, and new product features that would give users

23  even more control over data sharing and content viewing in the wake of the Cambridge Analytica

24  and Russian interference investigations all contributed to driving the lowered growth estimates:

25          We do think that there will be some modest impact [from GDPR].  And I don't
            want to overplay these factors, but you've got a couple things going on.  You've
26          got the impact of the opt-outs.  And while we're very pleased with the vast
            majority of people opting into the third-party data use, some did not.  So that'll
27          [sic] have a small impact on revenue growth.  And then we're also seeing some

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

impact from how advertisers are using their own data for targeting, so again, that'll [sic] have a modest impact on growth.  And then in addition, we're continuing to focus our product development around putting privacy first, and that's going to, we believe, have some impact on revenue growth.  So it's really a combination of kind of how we're approaching privacy as well as GDPR and the like.  So I think all of those factors together are one of the factors that we're talking about . . .

142.    Market reaction to the Company's 2Q18 earnings report and conference call was swift and severe, causing the price of Facebook's common stock to drop by nearly 19% on July 26, 2018, another staggering loss of $120 billion in market capitalization that was the largest such one-day drop in U.S. history.

143.    In addition, the quarterly results reflected – for the first time – the economic impact of the damage caused to the Company's reputation by the disclosure of its past misrepresentations of the risks arising from the Cambridge Analytica data breach and what Facebook had done to address it.  As *The New York Times* reported on July 25, 2018:

> Facebook reported on Wednesday that growth in digital advertising sales and in the number of its users had decelerated in the second quarter.  The company's leaders, including its chief executive, Mark Zuckerberg, added that the trajectory was not likely to improve anytime soon, especially as Facebook spends to improve the privacy and security of users.
>
> Facebook has grappled with months of scrutiny over Russian misuse of the platform in the 2016 American presidential campaign and the harvesting of its users' data through the political consulting firm Cambridge Analytica. The results were among the first signs that the issues had pierced the company's image and would have a lasting effect on its moneymaking machine.

144.    Following the 2Q18 earnings release, Facebook's stock fell more than 23 percent in after-hours trading, losing over $120 billion in market value.

145.    *The Los Angeles Times* reported on July 26, 2018:

> Facebook Inc. saw the first signs of user disenchantment in the midst of public scandals over privacy and content, with second-quarter revenue and average daily visitors missing analysts' projections.
>
> Its stock sank as much as 25% in extended trading.

* * *

- 38 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

The company's user growth fell short of expectations in the same quarter Chief Executive Mark Zuckerberg testified for 10 hours in Congress on data privacy issues. It also came as Europe implemented strict new data laws, which Facebook had warned could lead to fewer daily visitors in that region. The company also was bombarded by public criticism over its content policies, especially in countries such as Myanmar and Sri Lanka where misinformation has led to violence.

"The core Facebook platform is declining," said Brian Wieser, an analyst at Pivotal Research Group.

146.    On September 5, 2018, the Pew Research Center issued a report it conducted from May 29 to June 11, 2018, in the aftermath of the Cambridge Analytica scandal.  The report, entitled "Americans are changing their relationship with Facebook," documented changes in Facebook user engagement in previous 12 months, and revealed substantial disengagement by Facebook users in that period, including that more than half (54%) of Facebook users had changed their privacy settings to share less with Facebook, 42% had taken extended breaks from engaging with Facebook, while more than a quarter (26%) had deleted the Facebook app from their cell phones.  "All told, some 74% of Facebook users say they have taken at least one of these three actions in the past year," with disengagement particularly pronounced among the younger users coveted by advertisers, the report stated.

### I.    Additional Reports That Facebook User Data Has Been Compromised and Further Revelations of Facebook's Data Sharing Practices Continue in 2018

147.    The bad news continued when, on September 28, 2018, Facebook announced that 50 million users had been compromised in a massive data breach that put their entire accounts in the hands of unknown rogue actors.  An additional 40 million users also had their accounts reset due to uncertainty about the scope of the breach.  Once inside Facebook's security wall, the attackers stood in Facebook users' shoes – with complete and total control over their profiles, accounts, and social media interactions.  The attackers also gained access to any apps or services that the victims had linked to their Facebook account using the "Facebook Login" feature, putting users of thousands of other apps at risk of having their accounts hijacked and misused.

1    148.   In October 2018, the Company's image was further tarnished when academics

2  discovered that Facebook was using contact information that users had provided for security

3  purposes, such as for two-factor identification logins, to engage in ad targeting.  On October 30,

4  2018, Facebook announced its financial results for the third quarter of 2018, and Facebook's CFO,

5  Defendant Wehner, stated that the Company would not be providing revenue guidance for 2019.

6  Facebook's Form 10-Q for the third quarter of 2018, filed the following day, disclosed that the

7  Company's operating expenses had significantly risen as the number of Facebook's employees had

8  increased to 33,606 from 23,165 in the same period for the previous year, and would continue to

9  rise, as the Company "expect[s] such headcount growth to continue for the foreseeable future."

10    149.   And, on November 15, 2018, *The New York Times* published a bombshell report

11  following an investigation that revealed **Defendant Zuckerberg** and **Defendant Sandberg**

12  "ignored warning signs and then sought to conceal them from public view" over the past three

13  years and "passed off security and policy decisions to subordinates."  The report found that

14  Facebook tried to "deflect blame" and "mask" the extent of the Cambridge Analytica scandal.  The

15  report indicates that Facebook knew about Russian activity on the platform as early as spring 2016,

16  more than a year before the company alerted the public, and Sandberg clashed with Stamos over

17  how to handle the problem.  ***The report revealed that the Audit Committee was briefed by Stamos***

18  ***and Stretch regarding Russian activity on Facebook, and the entire Board was also informed at***

19  ***the quarterly Board meeting held on September 6, 2017.***

20    150.   Stamos published an opinion piece in *The Washington Post* two days later, stating

21  that Defendant Sandberg "felt blindsided" by his report to the Board about Russian activity on

22  Facebook, and noting that "Facebook should have responded to these threats much earlier and

23  handled disclosure in a more transparent manner."

24    151.   In response to the *Times* story, Facebook's "Lead Independent Director" **Defendant**

25  **Desmond-Hellman**, issued the following statement on behalf of the entire Board, in support of

26  Defendants Zuckerberg and Sandberg on November 15, 2018: "As Mark and Sheryl made clear to

27  Congress, the company was too slow to spot Russian interference, and too slow to take action.  As

28

- 40 -

a board we did indeed push them to move faster.  But to suggest that they knew about Russian interference and either tried to ignore it or prevent investigations into what had happened is grossly unfair.  In the last eighteen months Facebook, with the full support of this board, has invested heavily in more people and better technology to prevent misuse of its services, including during elections.  As the U.S. mid-term showed, they have made considerable progress and we support their continued to efforts to fight abuse and improve security."

152.    By November 16, 2018, Facebook's stock price had fallen to new 2-year lows. Defendants continued to affirmatively deny that Facebook's practices violated the FTC Consent Order, or any other law or regulation, despite a multitude of foreign government investigations that resulted in findings and adjudicated violations of law by Facebook.  While Defendants' false and misleading statements allowed Facebook to evade lawmakers, and avoid making any changes to its platform or policies that could affect its ability to obtain and share user data, by the end of 2018, Facebook had incurred substantial fines, penalties and other costs as a result of Defendants' illegal business practices, and they have caused even more serious damage to Facebook's brand and reputation.  At the same time, however, Defendants personally profited from Facebook's increasing user base and record revenues attained as a direct result of their violations of the federal securities laws.

153.    By December of 2018, Facebook's stock price was languishing at around $123, well below its all-time high just a few months earlier of $218 in July of 2018.

154.    On January 30, 2019, Facebook announced its financial results for the fourth quarter of 2018, and on January 31, 2019, Facebook filed its Annual Report on Form 10-K for 2018.  Facebook reported revenue growth of 26 percent year over year, the Company's lowest since its 2012 IPO.

**J. Defendants Announce Changes to Facebook's Platform in Early 2019 in a Belated Attempt to Mitigate Their Privacy Abuses and Reputational Harm**

155.   In response to the negative publicity surrounding the Company, in early 2019, Defendants announced sweeping revisions to the Facebook platform that they intended would make Facebook more "privacy-focused."

156.   On March 6, 2019, Defendant Zuckerberg announced specifically that Facebook's "vision and principles" would support a newly "privacy-focused messaging and social networking platform."  In a statement posted on Facebook's website, Zuckerberg admitted that Facebook's privacy practices had been too lax, stating, "I understand that many people don't think Facebook can or would even want to build this kind of privacy-focused platform – because frankly we don't currently have a strong reputation for building privacy protective services, and we've historically focused on tools for more open sharing."  Zuckerberg also stated that Facebook "plann[ed] to rebuild more of our services" to comport with the following principles:

(a) "People should have . . . clear control over who can communicate with them and confidence that no one else can access what they share"

(b) "People's private communications should be secure.  End-to-end encryption prevents anyone – including us – from seeing what people share on our services."

(c) "People . . . should not have to worry about what they share coming back to hurt them later. So we won't keep messages or stories around for longer than necessary to deliver the service or longer than people want them."

(d) "People should expect that we will do everything we can to keep them safe on our services within the limits of what's possible in an encrypted service."

(e)  "People should be able to use any of our apps to reach their friends, and they should be able to communicate across networks easily and securely."

(f) "People should expect that we won't store sensitive data in countries with weak records on human rights like privacy and freedom of expression in order to protect data from being improperly accessed."

- 42 -

157.     Facebook's critics, and former employees of the Company, remained skeptical of Defendants' apologies and their announcements in early 2019 of planned changes to make Facebook's platform more "privacy-focused."  As *BuzzFeed News* reported on February 22, 2019, in an article entitled "Former Facebook Employees Say The Company's Recent Prioritization Of Privacy Is All About Optics":

> Facebook has long portrayed itself as an advocate for user rights. But former employees and critics say the company's true ethos has often been in opposition to this. Facebook's communications around privacy have historically been opportunistic and protectionist, deployed to cover up for the last transgression from its "move fast and break things" ideology — from the 2007 Beacon program, which allowed companies to track purchases by Facebook users without their consent, to the 2010 loophole that allowed advertisers to access people's personal Facebook information without permission.

> As Facebook dealt with fallout from Cambridge Analytica, compliance with Europe's new General Data Protection Regulation (GDPR), and renewed attention on how it tracks all internet users following Zuckerberg's ten hours of congressional testimony in April, the company's ask-forgiveness-not-permission playbook was in plain view. It took out full-page newspaper apologies, placed its chief executive on podcasts and televised interviews, and sent Sandberg to meet with state attorneys general and lawmakers behind closed doors.  "***My worry is that Facebook is doing anything it can to garner goodwill and diffuse concern***," said Ashkan Soltani, the FTC's chief technologist from October 2014 to November 2015. "***I'm not sure of the sincerity of those actions since, historically, the company uses privacy selectively and strategically***."

> Five former employees who spoke with *BuzzFeed News* said they are skeptical of that goodwill effort, with three noting that the external messaging and marketing around privacy has only become a focus for executives during the last 12 months. "***They have a long-running strategy of using communications to disagree and push this counter-narrative against any criticism," one Facebook employee said.*** "They're playing the same game they've always played, but the challenge for them is that the world has changed and privacy concerns are increasing dramatically."

> Two people who used to work at Facebook said that it's hard to take the company's apologies and commitments to privacy seriously after witnessing its attempt to get ahead of outlets preparing to publish stories about Cambridge Analytica. Last March, the *New York Times*, the *Guardian*, and the *Observer* were readying stories about a former employee at the political consulting firm who had evidence that Cambridge Analytica had illicitly obtained data on millions of Facebook users and deployed that information for American political campaigns. The outlets, according to multiple people familiar with the situation, had been in

- 43 -

communication with Facebook about their stories for at least a week, and the company's public relations team was well-aware that the pieces would be published on the weekend.  In response, Facebook's communications team decided to get ahead of the stories, publishing a blog post from the company's deputy general counsel the preceding Friday about suspending accounts associated with Cambridge Analytica.  "We were essentially scooping the news," one source said, explaining that Facebook was trying to soften the blow of any future story on the matter.

Another former employee noted that Facebook's executives historically only took privacy seriously if problems affected the key metrics of daily active users, which totaled 1.52 billion accounts in December, or monthly active users, which totaled 2.32 billion accounts. Both figures increased by over 9% year-over-year in December.  "If it came down to user privacy or MAU growth, Facebook always chose the latter," the person said. That source pointed to internal Facebook emails obtained and released by a UK parliamentary inquiry that showed, among other things, the company's then–deputy chief privacy officer Yul Kwon discussing how to allow Facebook's Android app to read a phone's call logs without triggering a permission pop-up.

Ironically, Facebook's leaders were worried about the public relations scenario that could have occurred if Android's permissions did appear, as they were intended, to ask users to consent to the app reading their call logs. Instead of asking for less access, however, they sought a workaround so that they could still suck up the data without making people aware that they were doing so.  *"This is a pretty high risk thing to do from a PR perspective but it appears that the growth team will charge ahead and do it,"* one Facebook employee, Michael LeBeau, wrote in early 2015. *"We think the risk of PR fallout here is high."*

The fallout, however, came more than three years after those emails, after U.K. parliamentarians obtained them and used them to bolster their case that Facebook operated as a "digital gangster" with little regard for law or scrutiny in a report earlier this month.  *"It is evident that Facebook intentionally and knowingly violated both data privacy and anti-competition laws,"* the House of Commons *Digital, Culture, Media, and Sport (DCMS) Committee wrote* in what is perhaps the strongest rebuke of the company by a governing body to date.

Many of the former Facebook insiders who spoke with *BuzzFeed News* struggled to understand why there have been few management changes after that past year. "Certain leaders have been making bad calls," one said, leaving the company in "crisis after crisis." Yet aside from an executive shuffle where leaders were reorganized into different positions in May, few people, besides policy and communications head Elliot Schrage, have been shown the door. (And even Schrage still technically remains at the company in a special projects advisory role.)  *"There's an abdication of responsibility by the two at the top that runs deep — all the way down to junior leadership looking the other way,"* another former employee said.

- 44 -

1
2

The UK's DCMS committee agreed. "The management structure of Facebook is opaque to those outside the business and this seemed to be designed to conceal knowledge of and responsibility for specific decisions," it wrote in December.

3      158.   Indeed, Defendants' efforts were too little, too late.  Despite the planned changes,

4   just a few months after they were announced, the FTC and DOJ charged Facebook with violations

5   of Parts I and IV of the Consent Order, 15 U.S.C. § 56(a)(1), *and* additional violations of Section 5

6   of the FTC Act, 15 U.S.C. §45.

7           **K.   Facebook Announces Its 1Q19 Financial Results – and Expected Losses of $3-**
            **$5 Billion as A Result of the Anticipated Settlement With the FTC**

8      159.   On April 24, 2019, Facebook announced its earnings results for the first quarter of

9   2019 — and announced that it was preparing for a settlement with the FTC in the range of $3-5

10   billion, which would be the largest ever fine by the FTC.  "In the first quarter of 2019, we recorded

11   an accrual of $3 billion in connection with the ongoing inquiry of the FTC," a Facebook

12   spokesperson said in a statement.  "This matter remains unresolved, and *we estimate that the*

13   *associated range of loss is between $3 billion and $5 billion*."  Without the accrual, Facebook's

14   earnings per share would have been $1.89 — significantly higher than the actual amount of $0.85.

15      160.   During Facebook's earnings conference call that was held on April 24, 2019,

16   **Defendant Sandberg** stated, "We're making significant investments in safety and security while

17   continuing to grow our community and our business.  This quarter once again shows that we can

18   do both.  As we prepare to build more services around our privacy roadmap, we're changing the

19   way we run the company.  We are committed to earning back trust through the actions we take.  A

20   key part of earning back trust is increasing transparency."

21      161.   The FTC later announced its settlement with Facebook, and of its administrative

22   complaints against Cambridge Analytica, its former Chief Executive Officer Alexander Nix, and

23   Kogan, which alleged they used false and deceptive tactics to harvest personal information from

24   tens of millions of Facebook users for voter profiling and targeting.  The FTC settlement

25   agreements with Nix and Kogan restrict how they conduct any business in the future and require

26

27

28
                                           - 45 -

them to delete or destroy any personal information they collected.  Cambridge Analytica has filed

for bankruptcy and has not settled the FTC's allegations.

**L.  Facebook's Internal Investigation Reveals "Tens of Thousands of Apps" Continued to Access User Data After the Changes to Its Policies in 2014**

162.    Defendants later disclosed in a Facebook Newsroom post that the Company's

previously-announced internal investigation of  "apps that had access to large amounts of

information before we changed our platform policies in 2014" had identified "***millions of apps***"

that "had access to large amounts of information before [the Company] changed [its] platform

policies in 2014" and "***tens of thousands of apps***" that had continued "inappropriately sharing data

obtained from [Facebook], making data publicly available without protecting people's identity or

[doing] something else that was in clear violation of [the Company's] policies" after the changes

that Defendants announced in 2014.  The September 22, 2019 Facebook Newsroom post, entitled

"An Update on Our App Investigation and Audit," stated, in relevant part:

> To date, this investigation has addressed millions of apps.  Of those, tens of
> thousands have been suspended for a variety of reasons while we continue to
> investigate…. [W]e are far from finished…. We've also improved the ways we
> investigate and enforce against potential privacy violations that we find….
> [W]e've made widespread improvements to how we evaluate and set policies for
> all developers that build on our platforms. We've removed a number of APIs, the
> channels that developers use to access various types of data. We've grown our
> teams dedicated to investigating and enforcing against bad actors. This will allow
> us to, on an annual basis, review every active app with access to more than basic
> user information. And when we find violators, we'll take a range of enforcement
> actions….   And we will not allow apps on Facebook that request a
> disproportionate amount of information from users relative to the value they
> provide.

163.    The post identified one of the suspended apps, myPersonality, which had "shared

information with researchers and companies with only limited protection in place" – the same

issue that enabled Kogan to obtain Facebook user data that was sold to Cambridge Analytica.  The

post stated that Facebook had suspended developers for other similar violations, including "using

quiz apps to scrape users' data off our platform[,]" and for "inappropriately sharing data obtained

- 46 -

from us, making data publicly available without protecting people's identity or something else that was in clear violation of our policies."

164.    On September 20, 2019, a state court in Massachusetts unsealed documents in the Massachusetts Attorney General action against Facebook, which showed the Company had suspended 69,000 apps, approximately 10,000 of which involved potential violations of Facebook's policies related to misappropriation of user data.

165.    *The New York Times* described the results of the Company's investigation as "a tacit admission that the scale of [Facebook's] data privacy issues was far larger than it had previously acknowledged.  The disclosures about app suspensions renew questions about whether people's personal information on Facebook is secure, even after the company has been under fire for more than a year for its privacy practices."

## V.    FEDERAL REGULATORS CONFIRM DEFENDANTS' VIOLATIONS OF LAW

166.    After the Cambridge Analytica incident and other revelations about Facebook's data-sharing agreements described above, multiple U.S. government officials, federal regulators including the FTC, DOJ, SEC, and FBI, and various state attorneys general commenced investigations of Facebook that have resulted in fines, penalties, and other damages to Facebook. The findings by the FTC, as charged by the DOJ, that Facebook violated the 2012 Consent Order and engaged in other violations of the FTC Act, and the SEC's findings and charges that Facebook violated federal securities laws, based on the evidence uncovered in the course of the agencies' respective investigations, are set forth below.

### A.    The FTC and DOJ Charged Facebook With Violations of the 2012 Consent Order and the FTC Act, Resulting in an "Unprecedented" $5 Billion Penalty

167.    Following a yearlong investigation of whether Facebook's data-sharing practices, privacy policies, and representations to consumers violated the Consent Order, the FTC issued a Decision and Order finding that Facebook had "violated the Decision and Order the Commission previously issued in the matter *In re Facebook, Inc.*, C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012) and the FTC Act, and that a Complaint should issue stating its charges in that respect."

1    *See U.S. v. Facebook, Inc.*, Case No. 19-cv-2184 (D.C.), Dkt. No. 2-1, Attachment A (Decision

2    and Order) at 1.  On June 12, 2019, **Defendant Zuckerberg** signed an acknowledgement, on

3    Facebook's behalf, of the FTC's Decision and Order.

4        168.    The FTC's charges are detailed in the Complaint for Civil Penalties, Injunction, and

5    Other Relief that was filed by the DOJ on July 24, 2019, in the action that it brought against

6    Facebook "to obtain civil penalties, an injunction, and other equitable relief for violations of a

7    2012 order previously issued by the [FTC] for violations of Section 5(a) of the FTC Act." *See*

8    *U.S. v. Facebook, Inc.*, Case No. 19-cv-2184 (D.C.), Dkt. No. 1 (the "FTC 2019 Complaint"), ¶1.

9        169.    The FTC and DOJ charged that Facebook violated the 2012 Consent Order by: (i)

10    misrepresenting the extent to which users could control the privacy of their data and the extent to

11    which Facebook made user data accessible to third parties, in violation of Part I.B. and Part I.C. of

12    the Consent Order, during the period <u>from December 2012 through April 2014</u> (FTC 2019

13    Complaint, ¶¶155-165); (ii) misrepresenting the extent to which Facebook made user data

14    accessible to third parties, in violation of Part I.B. and Part I.C. of the Consent Order, during the

15    period <u>from April 30, 2015, to at least June 2018</u> (FTC 2019 Complaint, ¶¶166-175); (iii) failing to

16    implement and maintain a reasonable privacy program, in violation of Part IV of the Consent

17    Order, during the period <u>from 2012 to the present</u> (FTC 2019 Complaint, ¶¶176-182); and (iv)

18    misrepresenting the extent to which users could control the privacy of their data with regard to

19    Facebook's facial-recognition technology, in violation of Part I.B. of the Consent Order, during the

20    period <u>from April 2018 through the present</u> (FTC 2019 Complaint, ¶¶183-186).

21        170.    In addition to violations of the 2012 Consent Order, the FTC and DOJ charged that

22    "Facebook also engaged in deceptive practices in violation of Section 5(a) of the FTC Act."  2019

23    FTC Complaint, ¶13.  Specifically, "[b]etween November 2015 and March 2018, Facebook asked

24    its users to provide personal information to take advantage of security measures on the Facebook

25    website or mobile application, including a two-factor authentication measure that encouraged

26    provision of users' phone numbers" but "Facebook did not effectively disclose that such

27    information would also be used for advertising." *Id.*, ¶13.  *See also id.*, ¶¶187-190.

28

171.     On the same day the FTC 2019 Complaint was filed, the FTC announced in a press release that Facebook had agreed to "pay a **_record-breaking $5 billion penalty_** and submit to new restrictions and a modified corporate structure that will hold the company accountable for the decisions it makes about its users' privacy," in order to "settle [the] charges that [Facebook] violated a 2012 FTC order by deceiving users about their ability to control the privacy of their information."  The FTC press release stated, in relevant part:

> Facebook, Inc. will pay a record-breaking $5 billion penalty, and submit to new restrictions and a modified corporate structure that will hold the company accountable for the decisions it makes about its users' privacy, to settle Federal Trade Commission charges that the company violated a 2012 FTC order by deceiving users about their ability to control the privacy of their personal information.

> The $5 billion penalty against Facebook is the largest ever imposed on any company for violating consumers' privacy and almost 20 times greater than the largest privacy or data security penalty ever imposed worldwide. It is one of the largest penalties ever assessed by the U.S. government for any violation.

> The settlement order announced today also imposes unprecedented new restrictions on Facebook's business operations and creates multiple channels of compliance. **_The order requires Facebook to restructure its approach to privacy from the corporate board-level down, and establishes strong new mechanisms to ensure that Facebook executives are accountable for the decisions they make about privacy, and that those decisions are subject to meaningful oversight._**

> "Despite repeated promises to its billions of users worldwide that they could control how their personal information is shared, Facebook undermined consumers' choices," said FTC Chairman Joe Simons.  "The magnitude of the $5 billion penalty and sweeping conduct relief are unprecedented in the history of the FTC. The relief is designed not only to punish future violations but, more importantly, to change Facebook's entire privacy culture to decrease the likelihood of continued violations. The Commission takes consumer privacy seriously, and will enforce FTC orders to the fullest extent of the law."

172.     The terms of the settlement agreement are set forth in a Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief ("Stipulated Order"), which was filed on July 24, 2019 concurrently with the FTC 2019 Complaint.  *See U.S. v. Facebook, Inc.*, Case No. 19-cv-2184 (D.C.), Dkt. No. 2-1.  The Stipulated Order was personally signed by **Defendant**

**Zuckerberg** on July 23, 2019 and was also signed by Facebook Vice President Colin Stretch and

an attorney from Gibson, Dunn & Crutcher LLP, on behalf of the defendant Company.

173.    In the FTC press release announcing the settlement, the FTC discussed its findings

that Facebook violated the Consent Order, as well as Section 5 of the FTC Act.  The press release,

entitled "FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook,"

stated, in relevant part:

> Following a yearlong investigation by the FTC, the Department of Justice will file
> a complaint on behalf of the Commission alleging that ***Facebook repeatedly used
> deceptive disclosures and settings to undermine users' privacy preferences in
> violation of its 2012 FTC order.*** These tactics allowed the company to share users'
> personal information with third-party apps that were downloaded by the user's
> Facebook "friends." The FTC alleges that many users were unaware that
> Facebook was sharing such information, and therefore did not take the steps
> needed to opt out of sharing.  In addition, the FTC alleges that ***Facebook took
> inadequate steps to deal with apps that it knew were violating its platform
> policies.***
>
> *              *              *
>
> Alleged Violations of 2012 Order
>
> The settlement stems from alleged violations of the FTC's 2012 settlement order
> with Facebook.  Among other things, the 2012 order prohibited Facebook from
> making misrepresentations about the privacy or security of consumers' personal
> information, and the extent to which it shares personal information, such as names
> and dates of birth, with third parties. It also required Facebook to maintain a
> reasonable privacy program that safeguards the privacy and confidentiality of user
> information.
>
> The FTC alleges that Facebook violated the 2012 order by deceiving its users
> when the company shared the data of users' Facebook friends with third-party app
> developers, even when those friends had set more restrictive privacy settings.
>
> In May 2012, Facebook added a disclosure to its central "Privacy Settings" page
> that information shared with a user's Facebook friends could also be shared with
> the apps used by those friends.  The FTC alleges that ***four months after the 2012
> order was finalized in August 2012, Facebook removed this disclosure from the
> central "Privacy Settings" page, even though it was still sharing data from an
> app user's Facebook friends with third-party developers.***
>
> Additionally, Facebook launched various services such as "Privacy Shortcuts" in
> late 2012 and "Privacy Checkup" in 2014 that claimed to help users better manage
> their privacy settings. These services, however, allegedly failed to disclose that

even when users chose the most restrictive sharing settings, Facebook could still share user information with the apps of the user's Facebook friends—unless they also went to the "Apps Settings Page" and opted out of such sharing.  The FTC alleges the company did not disclose anywhere on the Privacy Settings page or the "About" section of the profile page that Facebook could still share information with third-party developers on the Facebook platform about an app users Facebook friends.

*Facebook announced in April 2014 that it would stop allowing third-party developers to collect data about the friends of app users ("affected friend data"). Despite this promise, the company separately told developers that they could collect this data until April 2015* if they already had an existing app on the platform.  The FTC alleges that *Facebook waited until at least June 2018 to stop sharing user information with third-party apps* used by their Facebook friends.

In addition, the complaint alleges that Facebook improperly policed app developers on its platform. The FTC alleges that, *as a general practice, Facebook did not screen the developers or their apps before granting them access to vast amounts of user data.*  Instead, Facebook allegedly only required developers to agree to Facebook's policies and terms when they registered their app with the Facebook Platform.  The company claimed to rely on administering consequences for policy violations that subsequently came to its attention after developers had already received data about Facebook users. The complaint alleges, however, that *Facebook did not enforce such policies consistently and often based enforcement of its policies on whether Facebook benefited financially* from its arrangements with the developer, and that this practice violated the 2012 order's requirement to maintain a reasonable privacy program.

The FTC also alleges that Facebook misrepresented users' ability to control the use of facial recognition technology with their accounts. *According to the complaint, Facebook's data policy, updated in April 2018, was deceptive* to tens of millions of users who have Facebook's facial recognition setting called "Tag Suggestions" because that setting was turned on by default, and the updated data policy suggested that users would need to opt-in to having facial recognition enabled for their accounts.

> 1.     **Facebook Violated the Consent Order Through "Deceptive Privacy Settings and Statements" – i.e., the "Very Same Conduct … That Led to the 2012 Order"**

174.    The FTC found that Facebook violated the Consent Order through its "deceptive privacy settings and statements" regarding users' ability to restrict "the sharing of their information to their Facebook Friends, when, in fact, third-party developers could access and collect their data through their Friends' use of third-party developers' apps."  FTC 2019

**PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

Complaint, ¶9.  The FTC also found that Facebook violated the 2012 Consent Order and its "promises [to] users that they can control the privacy of their information through Facebook's privacy settings" by "subvert[ing] users' privacy choices *to serve its own business interests*" and continuing to allow third party developers to obtain Facebook user data until "at least June 2018." FTC 2019 Complaint, ¶4 (emphasis added).  The following paragraphs are quoted directly from the FTC 2019 Complaint.

175.    Beginning at least as early as 2010, every Facebook user who installed an app ("App User") agreed to Facebook sharing with the third-party developer of the installed app both information about the App User and the App User's Facebook Friends.  Facebook's default settings were set so that Facebook would share with the third-party developer of an App User's app not only the App User's data, but also data of the App User's Facebook Friends ("Affected Friends"), even if those Affected Friends had not themselves installed the app.  Affected Friends could only avoid this sharing by finding and opting out of it via settings on Facebook's Applications page, which was located on Facebook's website and mobile applications, separate and apart from Facebook's Privacy Settings page.  Third-party developers that received user and Affected Friend information could use that information to enhance the in-app experience or target advertising to App Users and their Affected Friends.  In the wrong hands, user and Affected Friend data could be used for identity theft, phishing, fraud, and other harmful purposes.  FTC 2019 Complaint, ¶5.

176.    In 2012, after an FTC investigation, Facebook settled allegations that its practice of sharing Affected Friends' data with third-party developers of apps was deceptive.  The resulting Commission Order, among other things, prohibits Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information accessible to third parties.  *See* Commission Order, Parts I.B. & C.  FTC 2019 Complaint, ¶6.

177.    In the wake of the FTC's initial investigation, Facebook retained the separate opt-out sharing setting on its Applications page, but it added a disclaimer to its Privacy Settings page,

warning users that information shared with Facebook Friends could also be shared with the apps those Friends used.  However, ***four months after the 2012 Order was finalized, Facebook removed this disclaimer—even though it was still sharing Affected Friends data with third-party developers and still using the same separate opt-out setting that undermined users' privacy choices before entry of the Commission Order.***  FTC 2019 Complaint, ¶7 (emphasis added).

178.    At its F8 conference in April 2014 — one theme of which was user trust — Facebook announced that it would stop allowing third-party developers to collect data about Affected Friends.  Facebook also told third-party developers that existing apps could only continue to collect Affected Friend data for one year, or until April 2015.  But, ***after April 2015, Facebook had private arrangements with dozens of developers, referred to as "Whitelisted Developers," that allowed those developers to continue to collect the data of Affected Friends, with some of those arrangements lasting until June 2018***.  FTC 2019 Complaint, ¶8 (emphasis added).

179.    At least tens of millions of American users relied on Facebook's deceptive privacy settings and statements to restrict the sharing of their information to their Facebook Friends, when, in fact, third-party developers could access and collect their data through their Friends' use of third-party developers' apps.  ***Facebook knew or should have known that its conduct violated the 2012 Order because it was engaging in the very same conduct that the Commission alleged was deceptive in Count One of the original Complaint that led to the 2012 Order.***  FTC 2019 Complaint, ¶9 (citing to Exhibit B, *In re Facebook, Inc.*, C-4365, 2012 FTC LEXIS 136 (F.T.C. July 27, 2012)) (emphasis added).

**2.    Facebook Violated the 2012 Consent Order by "Fail[ing] to Maintain a Reasonable Privacy Program"**

180.    The FTC found that Facebook violated the 2012 Consent Order because it "failed to maintain a reasonable privacy program that safeguarded the privacy, confidentiality, and integrity of user information, as required by Part IV of the 2012 Order."  FTC 2019 Complaint, ¶10.  As the FTC explained, "[t]he requirement in the 2012 Order that Facebook maintain a reasonable privacy program was vitally important because Facebook had allowed millions of third-party developers to

- 53 -

1   access and collect massive troves of consumer data about both App Users and their Facebook

2   Friends, and Facebook failed to track that data in an organized, systematic way." *Id.*, ¶10.  The

3   following paragraphs are quoted directly from the FTC 2019 Complaint.

4        181.   As a general practice, Facebook did not vet third-party developers before granting

5   them access to consumer data; instead, developers simply had to check a box agreeing to comply

6   with Facebook's policies and terms and conditions, including those designed to protect consumer

7   information.  This made Facebook's enforcement of its policies, terms, and conditions acutely

8   important.  FTC 2019 Complaint, ¶11.

9        182.   Facebook's enforcement of its policies, terms, and conditions, however, was

10  inadequate and was influenced by the financial benefit that violator third-party app developers

11  provided to Facebook.  This conduct was unreasonable.  Facebook never disclosed this disparate

12  enforcement practice to the third-party assessor charged by the 2012 Order with assessing the

13  implementation and effectiveness of Facebook's privacy program, nor did Facebook disclose its

14  enforcement practices to the Commission in its biennial assessment reports mandated by the 2012

15  Order.   FTC 2019 Complaint, ¶12 (citing FTC 2012 Consent Order, Part V) (emphasis added).

16      **3.      Facebook Violated the Consent Order by "Fail[ing[ to Implement and
            Maintain Appropriate Safeguards and Controls Over Third-Party …
17          Access to User Data"**

18      183.   The FTC found that "Facebook routinely granted third-party developers broad

19  permissions to access user and Affected Friend data without first performing any checks on

20  whether such permissions were consistent with a Facebook Platform policy requiring that apps

21  request only data necessary to run the app or to enhance the user's app experience."   FTC 2019

22  Complaint, ¶120.  In addition, the FTC found that "Facebook did not consistently enforce its

23  Platform Policies" but rather, "took into account the financial benefit that Facebook considered the

24  developer to offer to Facebook, such as through a commercial partnership."  FTC 2019 Complaint,

25  ¶123.  The following paragraphs are quoted directly from the FTC 2019 Complaint.

26      184.   To address concerns associated with Facebook's sharing of user and Affected

27  Friend data with the more than 36 million third-party apps on the Facebook Platform in 2012, Part

28

- 54 -

1  IV of the Commission Order required Facebook to implement and maintain a comprehensive

2  privacy program reasonably designed to address privacy risks and protect the privacy and

3  confidentiality of covered information.  FTC 2019 Complaint, ¶114.

4      185.   Part V of the Commission Order required Facebook to obtain initial and biennial

5  assessments from an independent third-party professional that, among other things, set forth

6  Facebook's specific privacy controls and explained how those controls met or exceeded Part IV's

7  requirements.  FTC 2019 Complaint, ¶115.

8      186.   In the initial and biennial assessment reports required by the Commission Order,

9  Facebook claimed that it had implemented certain controls and procedures to address the privacy

10  risks created by the extensive access to user data it provided to third-party developers.  FTC 2019

11  Complaint, ¶116.

12     187.   Facebook's assessment reports also claimed that it had monitoring controls in place

13  to detect material misuse of the Platform by third-party developers.  FTC 2019 Complaint, ¶117.

14     188.   Other than requiring third-party developers to agree to Facebook's policies and

15  terms when they registered their app with the Platform ("Platform Policies"), however, Facebook

16  generally did not screen the third-party developers or their apps before granting them access to

17  vast amounts of user data through Graph API V1.  FTC 2019 Complaint, ¶118.

18     189.   For example, while Facebook used an automated tool to check that apps had an

19  active link to a privacy policy, it did not actually review the app's privacy policy to confirm that it,

20  in fact, complied with Facebook's policies.   FTC 2019 Complaint, ¶119.

21     190.   Similarly, Facebook routinely granted third-party developers broad permissions to

22  access user and Affected Friend data without first performing any checks on whether such

23  permissions were consistent with a Facebook Platform policy requiring that apps request only data

24  necessary to run the app or to enhance the user's app experience.   FTC 2019 Complaint, ¶120.

25     191.   The Platform Policies outlined a number of privacy obligations and restrictions,

26  such as limits on an app's use of data received through Facebook, requirements that an app obtain

27  consent for certain data uses, and restrictions on selling or transferring user data.  For example,

28

third-party developers were specifically prohibited from transferring, directly or indirectly, any data—including aggregate, anonymous, or derivative data—to any ad network or data broker. FTC 2019 Complaint, ¶121.

192.   According to Facebook, these policies ensured that users' personal information was disclosed only to third-party developers who agreed to protect the information in a manner consistent with Facebook's privacy program.  FTC 2019 Complaint, ¶122.

193.   To enforce its Platform Policies, Facebook relied on administering consequences for policy violations that came to its attention after third-party developers had already received the data.  But Facebook did not consistently enforce its Platform Policies.  Rather, the severity of consequences that Facebook administered to third-party developers for violating the company's Platform Policies, and the speed with which such measures were effectuated, took into account the financial benefit that Facebook considered the developer to offer to Facebook, such as through a commercial partnership.  FTC 2019 Complaint, ¶123.

194.   Facebook did not inform its third-party assessor that it was engaging in this practice, and the differential enforcement model was not noted in any of the company's Part V assessments.  FTC 2019 Complaint, ¶124.

195.   As reported in the *Wall Street Journal*, Facebook's Vice President of Product Partnerships acknowledged that, for many years, the company's emphasis was on growth.  It was only after March 2018, after Facebook had been giving third-party developers access to user data through the Graph API for years, that Facebook began a "massive cultural shift" to focus more on "enforcement as a key component" of its system.  FTC 2019 Complaint, ¶125.

196.   The full scale of unauthorized collection, use, and disclosure of consumer information resulting from Facebook's conduct is unknown due, at least in part, to the company's lack of recordkeeping.  FTC 2019 Complaint, ¶126.

197.   In March 2018, Facebook announced it had launched an internal investigation into the potential misuse of user data by third-party developers.  But, due to various issues, including the company's own lack of an organized system or technical means for tracking all the massive

- 56 -

troves of user data it released to third-party developers, Facebook could neither ascertain where most of the data went after it was pulled from the Platform, nor determine how the data had been used.  FTC 2019 Complaint, ¶127.

### 4. Facebook Violated the Consent Order By Misrepresenting the Extent to Which Users Could Control Their Data

198.    The FTC found that Facebook made "clear statements" in its "communications with users address[ing], among other things, the privacy controls that Facebook made available on its Platform" that were false and misleading because, among other things, "Facebook did not disclose … to its users" the fact that "third-party developers that had a preexisting app on the Facebook Platform as of April 2014 could still access and collect [User] Friend data until 2015."  FTC 2019 Complaint, ¶¶99-100.  The FTC also found that Facebook made misrepresentations relating to the changes to Facebook's privacy settings that were made in September 2014.  FTC 2019 Complaint, ¶¶101-105.  The following paragraphs are quoted directly from the FTC 2019 Complaint.

### a. The FTC Found "Facebook Falsely Announced That Third-Party Developers Would No Longer Be Able to Access [User] Data"

199.    In 2013, Facebook conducted a survey that showed that its users were concerned about sharing their data with apps, believed apps asked for unnecessary information or permissions, and were concerned about the information apps used for marketing.  FTC 2019 Complaint, ¶93.

200.    Similarly, based on research Facebook conducted, Facebook employees discussed that certain categories of data requests—the user's activities, birthday, education history, list of interests, religious and political affiliation, page "likes," photos, videos, hometown, relationship preferences, work history, current city, status messages, and check-ins—were sensitive and, accordingly, should require review after Graph API V2 was introduced.  FTC 2019 Complaint, ¶94.

201.    As one employee explained, "Perm[ission]s like user relationships, work history, and relationship details (which indicates the user's gender preferences) can be perceived as really

sensitive.  It's really bad for user trust whenever these perm[ission]s are asked for. . . ."  FTC 2019 Complaint, ¶94.

202.    In April 2014, Facebook announced that it was deprecating (i.e., discontinuing) Graph API V1 and replacing it with Graph API V2.  FTC 2019 Complaint, ¶96.

203.    At Facebook's April 30, 2014 F8 Conference, Facebook announced that it would no longer allow third-party developers to collect Affected Friend data. In the keynote address, Facebook explained:

> [W]e've also heard that sometimes you can be surprised when one of your friends shares some of your data with an app. . . . So now we're going to change this, and ***we're going to make it so that now, everyone has to choose to share their own data with an app themselves***…. [W]e think this is a really important step for giving people power and control over how they share their data with apps.
>
> (emphasis added).  Facebook posted a video of this keynote address on its YouTube channel in May 2014.  FTC 2019 Complaint, ¶97 (emphasis in original).

204.    On April 30, 2014, Facebook also issued a press release in which it stated:

> **Putting people first**: We've heard from people that they are worried about sharing information with apps, and they want more control over their data.  We are giving people more control over these experiences so they can be confident pressing the blue button.

FTC 2019 Complaint, ¶98.

205.    Despite these clear statements, Facebook gave third-party developers with a preexisting, approved app at least one year of continued access to Affected Friends' data.  In other words, third-party developers that had a preexisting app on the Facebook Platform as of April 2014 could still access and collect Affected Friend data until April 2015.  Facebook did not disclose this fact to its users.  FTC 2019 Complaint, ¶100.

**b.  The FTC Found Facebook "Did Not Tell Users That Sharing with Their Friends Allowed Third-Party Developers to Access Their [Friends' Data]"**

206.    In September 2014, Facebook launched "Privacy Checkup."  Facebook publicized Privacy Checkup as a means to help users "be in control" of what they shared and with whom they shared it.  FTC 2019 Complaint, ¶101.  (Citing Exhibit E, Facebook press release.)

- 58 -

207.   Privacy Checkup purported to allow users to restrict who could see their posts and "review and edit the privacy of key pieces of information," on the user's profile, as shown in the below figures:



PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

FTC 2019 Complaint, ¶102.

208.     The Privacy Checkup tool highlighted the apps that users installed, but it did not list the apps that had access to users' Profile Information based on their Friends' consent.  FTC 2019 Complaint, ¶103.

209.     The Privacy Checkup tool also included a link to the Facebook user's About page, where Profile Information such as birthdate, hometown, religious views, political views, interests (*e.g.*, sports teams, music, movies), public page "likes," relationships, and relationship details were displayed.  These settings also purported to allow users to restrict who could see their data.  FTC 2019 Complaint, ¶104.

210.     Facebook did not disclose anywhere on these pages that, when users shared their Profile Information with Friends, Facebook could continue to share that information with millions of third-party developers of their Friends' installed apps.  FTC 2019 Complaint, ¶105.

**B. The FTC and DOJ Required Facebook to Implement Internal Controls and Reforms Designed to Increase Board Oversight and Remove Zuckerberg's "Unfettered Control" Over "Decisions Affecting User Privacy"**

211.     In addition to the record-setting $5 billion penalty for violating the 2012 Consent Order, the DOJ sought injunctive relief against Facebook in the form of the Amended FTC Order. The  FTC required Facebook to agree to reopen the original proceeding and to an amended order that imposes what it referred to as "unprecedented restrictions on [the Company's] business operations" and requires the Company to implement reforms from the "corporate board-level down," including specific controls and reporting procedures that are designed to "prevent Facebook from deceiving its users about privacy in the future."

212.     In its press release announcing the settlement, the FTC noted that the Amended FTC Order "overhauls the way the company makes privacy decisions" and is specifically designed to address deficiencies in Board oversight of management that allowed Defendant Zuckerberg "*unfettered control*" over decisions that caused Facebook's privacy abuses, and to create "*greater accountability at the board of directors level*."  In addition, the Amended FTC Order requires Defendant Zuckerberg to personally certify to the FTC on an annual basis that Facebook is in compliance with its terms, and subjects Zuckerberg to individual civil and criminal penalties and personal liability if the Company is not in overall compliance with the order.  The FTC press release stated, in relevant part:

> New Facebook Order Requirements
>
> To prevent Facebook from deceiving its users about privacy in the future, the FTC's new 20-year settlement order overhauls the way the company makes privacy decisions by boosting the transparency of decision making and holding Facebook accountable via overlapping channels of compliance.
>
> ***The order creates greater accountability at the board of directors level.***  It establishes an independent privacy committee of Facebook's board of directors, ***removing unfettered control by Facebook's CEO Mark Zuckerberg over decisions*** affecting user privacy.  Members of the privacy committee must be independent and will be appointed by an independent nominating committee. Members can only be fired by a supermajority of the Facebook board of directors.

The order also improves accountability at the individual level. Facebook will be required to designate compliance officers who will be responsible for Facebook's privacy program. These compliance officers will be subject to the approval of the new board privacy committee and can be removed only by that committee—not by Facebook's CEO or Facebook employees. Facebook CEO Mark Zuckerberg and designated compliance officers must independently submit to the FTC quarterly certifications that the company is in compliance with the privacy program mandated by the order, as well as an annual certification that the company is in overall compliance with the order. Any false certification will subject them to individual civil and criminal penalties.

(Emphasis added.)

213. The Amended FTC Order remains in effect, and requires Facebook to maintain the privacy program and other mandated reforms, for the next 20 years.

214. Under the Amended FTC Order, Facebook:

(a) is prohibited from making further misrepresentations about Facebook's "collection, use or disclosure of [user personal information," the "extent to which a consumer can control the privacy of [user personal information]," "the extent to which [Facebook] makes or has made [user personal information] accessible to third parties," and the "steps [Facebook] takes or has taken to verify the privacy or security protections that any third party provides" (see Amended FTC Order, Section I, "Prohibition Against Misrepresentations");

(b) is required to obtain "affirmative express consent" from users prior to sharing their personal information with third parties (see Amended FTC Order, Section II, "Changes To Sharing Of Nonpublic User Information");

(c) is required to implement a "comprehensive privacy program" that includes the appointment of a "Chief Privacy Officer," mandatory documentation and reporting requirements, and periodic privacy audits at least every 12 months (see Amended FTC Order, Section VII, "Mandated Privacy Program"); and

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

(d) is required to establish an "Independent Privacy Committee" of the Board comprised solely of independent directors charged with overseeing Facebook's privacy program and its compliance with the Stipulated Order, including an evaluation of "material risks to the privacy, confidentiality, and Integrity" of Facebook user data, the Company's risk assessment and risk management procedures, and the third-party assessor's evaluation and biennial reports, based upon specified reporting procedures and periodic briefings from management (*see* Amended FTC Order, Section X, "Mandated Independent Privacy Committee And Other Governance Matters").

215.    The Amended FTC Order specifically requires Facebook to implement enhancements to Board oversight of Facebook's privacy practices through establishment of a new committee of independent directors and specific reporting procedures.  Section X of the Amended FTC Order states:

**X.    MANDATED   INDEPENDENT   PRIVACY   COMMITTEE   AND OTHER GOVERNANCE MATTERS**

IT IS FURTHER ORDERED that:

A.    Within one hundred and twenty (120) days after entry of this Order, Respondent shall create the Independent Privacy Committee, including adopting a new committee charter or amending the charter of an existing committee.  The adopted or amended charter for such committee shall include the following qualifications, authority, and responsibilities, including:

1.    The committee shall hold at least four regularly-scheduled meetings each year;

2.    Each member of the committee shall be an Independent Director, and each of the members of the committee shall meet the Privacy and Compliance Baseline Requirements;

3.    Each quarter, the Respondent shall cause the committee to receive a briefing from management regarding (i) the state of the Privacy Program, (ii) Respondent's compliance with the Order, and (iii) material risks to the privacy, confidentiality, and Integrity of the Covered Information that have been discovered since the most

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

recent meeting of the committee or that were raised by management in a prior meeting with the committee and continue to persist;

4.     On at least an annual basis, management shall conduct a review for the committee of the Privacy Program and discuss Respondent's assessment of material risks to the privacy, confidentiality, and Integrity of the Covered Information and the steps Respondent has taken or plans to take to monitor or mitigate such risks, including Respondent's procedures and any related policies with respect to risk assessment and risk management;

5.     The committee shall meet with the Assessor at least quarterly, and at the conclusion of each biennial Assessment;

a.     At each quarterly meeting, the Assessor shall review with management and the committee (i) the Assessor's ongoing assessment of the Privacy Program, and (ii) any material risks to the privacy, confidentiality, and Integrity of the Covered Information that have been identified by the Assessor since the Assessor's most recent meeting with the committee, or that were raised by the Assessor in a prior meeting with the committee and continue to persist;

b.     At each quarterly meeting, the committee (together with any other Independent Directors in attendance) shall meet with the Assessor in an executive session without management present to discuss matters involving the Assessment or other privacy-related issues or risks, as appropriate; and

c.     At the meeting to review the biennial Assessment with the Assessor, the Assessor and the committee shall review the various elements of the Assessment, as well as (1) any material issues raised by the most recent Assessment or material unresolved issues from prior Assessments, and (2) in an executive session without management present, any problems or difficulties with management.  Following the review of the biennial Assessment (at either the same meeting or the following meeting), management shall review with the committee its proposed remediation plans to address any such issues raised in the Assessment; and

6.     The committee shall evaluate the independence of the Assessor, and the Assessor shall not be appointed or removed by Respondent, subject to Part VIII.B, without the prior approval of a majority of the committee;

B.     Within one hundred and twenty (120) days after entry of this Order, Respondent shall create the Independent Nominating Committee, including adopting a new committee charter or amending the charter of an existing committee to provide that such committee shall have the following authority and responsibilities, including:

1. The committee shall have the sole authority to recommend the appointment of directors, or the nomination of candidates for election, to Respondent's Board of Directors, such that Respondent's Board of Directors may not approve any such appointment or nomination in the absence of a favorable recommendation from the committee;

- 64 -

2.      The committee shall have the sole authority to recommend the appointment of directors to, or the removal of directors from, the Independent Privacy Committee, such that Respondent's Board of Directors may not approve any such appointment or removal in the absence of a favorable recommendation from the committee; and

3.      The committee shall determine whether the members of the Independent Privacy Committee qualify as Independent Directors and whether each member of the Independent Privacy Committee meets the Privacy and Compliance Baseline Requirements.  The foregoing determinations shall be made prior to, or concurrent with, the formation of the Independent Privacy Committee for the initial members; and prior to, or concurrent with, the appointment of each new director to the Independent Privacy Committee for future members;

C.      Within one hundred and eighty (180) days after entry of this Order, Respondent shall adopt and file an amendment to Respondent's Certificate of Incorporation (the "Charter Amendment") in accordance with applicable Delaware law modifying the provisions of Article VI, Section 4 thereof with respect to the removal of directors as set forth in the form attached hereto as Exhibit 1, for the purpose of adding a new Article VI, Section 4(b) (hereafter "Supplemental Removal Provision").  Respondent shall not further alter or amend the Supplemental Removal Provision of Respondent's Certificate of Incorporation for the term of the Order.  Notwithstanding the foregoing, in the event that, prior to the effectiveness of the Charter Amendment, any person commences any legal or administrative proceeding or action (an "Action"), or any governmental or regulatory entity or body, or any court, tribunal, or judicial body, in each case whether federal, state, or local, issues or grants any order, judgment, decision, decree, injunction, or ruling that has the effect of delaying, restraining, enjoining, prohibiting, or otherwise preventing the approval, filing, or effectiveness of the Charter Amendment (individually or collectively, a "Restraint") within 180 days after entry of this Order, that time period shall be extended and Respondent shall be deemed to be in compliance with the Order so long as: (a) Respondent diligently pursues in good faith the favorable resolution of such Action, and (b) Respondent adopts and files the Charter Amendment in accordance with applicable Delaware law as promptly as reasonably practicable following the resolution of the Action and at such time as such Restraint (if any) is withdrawn, vacated, or terminated; and

D.      Nothing in this Order shall be construed to expand, modify, or alter the fiduciary duties of the members of the Respondent's Board of Directors or any committee thereof.

216.    The Amended FTC Order also contains a provision specifically entitled, "Article VI: Matters Relating to the Board of Directors," which states as follows:

- 65 -

**ARTICLE VI: MATTERS RELATING TO THE BOARD OF DIRECTORS**

4.      Term and Removal.

(a)      Each director shall hold office until such director's successor is elected and qualified, or until such director's earlier death, resignation or removal. Any director may resign at any time upon notice to the corporation given in writing or by any electronic transmission permitted in the corporation's Bylaws or in accordance with applicable law. No decrease in the number of directors constituting the Whole Board shall shorten the term of any incumbent director.

(b)      Notwithstanding anything in this Section 4 of this Article VI to the contrary, subject to the rights of the holders of any series of Preferred Stock with respect to directors elected thereby, from and after the effectiveness of the Classified Board, no director may be removed except for cause and only by the affirmative vote of the holders of at least a majority of the voting power of the then-outstanding shares of capital stock of the corporation then entitled to vote at an election of directors voting together as a single class.

(c)      For so long as the [Federal Trade Commission Decision & Order] (the "***Order***") remains in effect, (i) no director serving on the Independent Privacy Committee, as that term is defined in the Order (any such director, a "***Privacy Committee Delegate***"), shall be removed solely for reasons related to actions taken in good faith in furtherance of such Privacy Committee Delegate's duties as a member of the Independent Privacy Committee as set forth in the Order (a "***Privacy Reason***"), except by the affirmative vote of the holders of at least two-thirds of the voting power of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class, and (ii) no Privacy Committee Delegate shall be removed for reasons other than a Privacy Reason with the intent to circumvent the requirements of clause (i) above, except by the affirmative vote of the holders of at least two-thirds of the voting power of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class.

(Emphasis in original.)

217.      The FTC released a "Fact Sheet on 2019 FTC Order with Facebook" summarizing the settlement agreement, which is posted on its website. In the Fact Sheet, the FTC noted that the $5 billion penalty and the restrictions on Facebook's business operations that are required by the Amended FTC Order are both "unprecedented," in amount and scope, respectively, and reiterated

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

that the Amended FTC Order is designed "to **restructure [the Company's] approach to privacy from the corporate board-level down**, … to **ensure that Facebook executives are accountable** for the decisions they make about privacy, and … are subject to **meaningful oversight**" by Facebook's Board.  The Fact Sheet described the terms of the injunctive relief in the Amended FTC Order as follows:

- The order requires Facebook to create an independent privacy committee created within the company's board of directors that will have the sole focus of overseeing privacy at Facebook.

- The privacy committee will review all material privacy issues and decisions.

- It can remove privacy compliance officers (and, subject to FTC approval, the assessor).

- It must be independent (Facebook management cannot be members of the privacy committee).

- Members must be appointed by an independent nominating committee and can only be removed without cause by supermajority of voting shares, not by the CEO or other employees.

- It must meet with the independent assessor quarterly, without management present, to be briefed about any new or continuing material privacy risk.

- Under the order, designated compliance officers and other high-level Facebook staff have new responsibilities to carry out Facebook's privacy program. This includes:

- Conducting privacy reviews and documenting all privacy decisions;

- Certifying compliance with the FTC order; and

- Giving reports to the independent assessor, Facebook CEO, and the FTC.

- CEO Mark Zuckerberg is made more accountable for Facebook's privacy program.

- He must certify Facebook's compliance with FTC order—exposing him, personally, to civil and criminal penalties.

- He must review material privacy risks and decisions each quarter.

- He does not control the independent privacy committee or assessor.

- Facebook must create an enhanced privacy program with greater oversight and transparency.  It must:

- Conduct and document privacy reviews of each new or modified product, service, or practice;

- Share written privacy reviews with the assessor, Facebook CEO, and (upon request) the FTC;

- Carry out closer oversight of third-party developers and terminate them as appropriate;

- Expand the program to cover other services that share Facebook covered information, including WhatsApp and Instagram; and

- Submit incident reports to the assessor and the FTC.

- Facebook must have a stronger and more independent assessor.

- The assessor can be approved or removed only by the independent privacy committee and the FTC.

- Facebook must give the assessor all relevant privacy information.

- The assessor must "look under the hood" to judge the effectiveness of Facebook's privacy program—not rely solely on what management says.

- It must meet regularly and in private with the board committee and send reports to the FTC.

- Facebook must create a comprehensive data security program and must encrypt user passwords.

- Facebook cannot use phone numbers it received specifically for security purposes for advertising.

- Facebook cannot ask for passwords to other third-party accounts when people sign up for Facebook accounts.

- Facebook must not create, or delete any existing, facial recognition templates for new and existing users who have its "Tag Suggestions" setting, unless it obtains the user's affirmative express consent. It also must obtain affirmative consent before using facial recognition technology in a manner that materially exceeds prior disclosures to users.

- Facebook must delete from its servers personal information deleted by users.

- Facebook must implement strict employee-access controls to user information.

- 68 -

- In addition to prohibiting misrepresentations about the collection or disclosure of information, the order prohibits Facebook from misrepresenting how it uses personal information.

218.    The FTC Fact Sheet and press release announcing the settlement make clear that the Amended FTC Order is designed to remedy prior violations of the 2012 Consent Order that were allowed by the supposedly "independent" assessor that Facebook self-selected, which failed to conduct any independent investigation, audit, or fact-gathering in connection with its assessments and provided three biannual reports to the FTC certifying as to Facebook's compliance with 2012 Consent Order solely based upon the assertions of its management.  For example, the FTC noted in its press release announcing the settlement that the Amended FTC Order "strengthens external oversight of Facebook" through new requirements applicable to the third-party assessor, stating:

> The order also strengthens external oversight of Facebook. The order enhances the independent third-party assessor's ability to evaluate the effectiveness of Facebook's privacy program and identify any gaps. ***The assessor's biennial assessments of Facebook's privacy program must be based on the assessor's independent fact-gathering, sampling, and testing, and must not rely primarily on assertions or attestations by Facebook management.***  The order prohibits the company from making any misrepresentations to the assessor, who can be approved or removed by the FTC.  Importantly, the independent assessor will be required to report directly to the new privacy board committee on a quarterly basis.  The order also authorizes the FTC to use the discovery tools provided by the Federal Rules of Civil Procedure to monitor Facebook's compliance with the order.

**C.    The SEC Charged Facebook with Violating Federal Securities Laws and Imposed a $100 Million Penalty**

219.    On July 24, 2019, the SEC filed a complaint against Facebook (dated as of July 19, 2019) for violations of Sections 17(a)(2) and (3) of the Securities Act of 1933 (the "Securities Act"), violations of Section 13(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 12b-20, 13a-1 and 13a-13 thereunder, and violations of Rule 13a-15(a) of the Exchange Act. *See SEC v. Facebook, Inc.*, Case No. 19-cv-04241 (N.D. Cal.), Dkt. No. 1.

220.    The SEC charged that Facebook violated the Securities Act because "Facebook, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1 transportation or communication in interstate commerce or by use of the mails, (1) obtained money

2 or property by means of untrue statements of material fact or by omitting to state a material fact

3 necessary in order to make the statements made, in light of the circumstances under which they

4 were made, not misleading; and  (2) engaged in transactions, practices, or courses of business which

5 operated or would operate as a fraud or deceit upon purchasers.  SEC Complaint, ¶53.  In particular,

6 the SEC found that "[f]rom 2016 until mid-March 2018, Facebook presented the risk of misuse of

7 its users' data as merely hypothetical" when "[i]n fact, Facebook had already become aware by

8 December 2015 that [Kogan] had improperly sold information related to tens of millions of

9 Facebook users to data analytics firm Cambridge Analytica."  *Id.*, ¶1.  The SEC charged that

10 Facebook violated the Exchange Act because Facebook's "filings with the [SEC], including its

11 reports filed on Forms 10-K and Forms 10-Q, reflected misleading statements concerning the

12 improper access to and misuse of its users' personal information.  *Id.*, ¶57.

13      221.    The SEC also charged that Facebook violated the Exchange Act by "fail[ing] to

14 maintain controls and procedures designed to ensure that information required to be disclosed in

15 the reports that it files or submits pursuant to the Exchange Act is recorded, processed,

16 summarized, and reported, within the time periods specified in the Commission's rules and forms"

17 and "fail[ing] to maintain controls and procedures designed to ensure that information required to

18 be disclosed in the reports that it files or submits pursuant to the Exchange Act is accumulated and

19 communicated to its management, including its principal executive and principal financial officers,

20 or persons performing similar functions, as appropriate to allow timely decisions regarding

21 required disclosure."  SEC Complaint, ¶¶60-61.

22      222.    Facebook consented to the entry of a final judgment to resolve the SEC action,

23 which was entered on August 22, 2019.  *See SEC v. Facebook, Inc.*, Case No. 19-cv-04241 (N.D.

24 Cal.), Dkt. No. 11 (the "SEC Final Judgment").   The SEC Final Judgment specifically enjoined

25 Defendants from violating the Securities Act and Exchange Act as alleged in the SEC Complaint,

26 and required Facebook to pay a $100 million penalty.  *Id.*  The following allegations are based on

27 the allegations in the SEC complaint.

28

**1.   The SEC Found That Defendants' Statements in Facebook's Public Filings Were Materially False and Misleading When Made**

223.    Facebook's public filings with the SEC state that the Company posts material that it considers to be disclosures that are required to comply with SEC regulations and are subject to federal securities laws because they are communications to investors, on Facebook's "social networking" website including in the "Facebook Newsroom" and on "Mark Zuckerberg's Facebook page."  These communications to investors are posted on Facebook's "social networking" website, the same website that the Company uses to communicate with its users, as opposed to the "Facebook for Developers" website that the Company uses to communicate with app developers, or the "Facebook for Business" website that the Company uses to communicate with marketers and advertisers.

224.    As the SEC found, "[s]ince the time of its initial public offering in 2012, Facebook has warned investors about the potential for misuse of its users' data by developers and the possible consequent financial effect on the Company's business."   SEC Complaint, ¶2.

225.    For example, in the Risk Factor disclosures in Facebook's Form 10-Q filed on October 30, 2014, Defendants cautioned that "Improper access to or disclosure of user information, or violation of our terms of service or policies, could harm our reputation and adversely affect our business."  In the same Form 10-Q, Defendants advised that if developers "fail to comply with our terms and policies . . . our users' data may be improperly accessed or disclosed."  This, Defendants acknowledged, "could have a material and adverse effect on our business, reputation, or financial results."  *See* SEC Complaint, ¶37.

226.    Defendants modified this language beginning in January 2015 and continued to warn investors in Facebook's periodic filings about the possibility that third parties might improperly access or misuse its users' data.  For example, in Facebook's 2015 Annual Report on Form 10-K filed with the SEC on January 28, 2016, only weeks after the Company had confirmed that Kogan had improperly transferred personality scores derived from Facebook user data to Cambridge in violation of its Platform Policy, Defendants cautioned that "Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data could result

- 71 -

1    in the loss or misuse of such data, which could harm our business and reputation and diminish our

2    competitive position."  Defendants further asserted that if "developers fail to adopt or adhere to

3    adequate data security practices . . . our data or our users' data may be improperly accessed, used,

4    or disclosed." SEC Complaint, ¶38.

5         227.    During the relevant period, Facebook filed three annual reports on Form 10-K for

6    the fiscal years ended December 31, 2015, December 31, 2016, and December 31, 2017, and six

7    quarterly reports on Form 10-Q for each fiscal quarter in 2016 and 2017.  The SEC found that

8    Facebook's Risk Factor disclosures in its periodic filings throughout the relevant period

9    "misleadingly suggested that the Company faced merely the risk of such misuse and any harm to

10   its business that might flow from such an incident.  This hypothetical phrasing, repeated in each of

11   its periodic filings during the relevant period, created the false impression that Facebook had not

12   suffered a significant episode of misuse of user data by a developer."  SEC Complaint, ¶39.

13        228.    The SEC also found that "[t]he Company's processes and procedures around the

14   drafting of its periodic reports on Forms 10-K and 10-Q, including but not limited to its Risk

15   Factor disclosures, failed to bring [Kogan's] sale of data from tens of millions of Facebook users

16   to Cambridge [Analytica] to the attention of the individuals with primary responsibility for

17   drafting and approving those reports.  Although protecting user data is critical to Facebook's

18   business, and Facebook had identified the potential for improper access to and misuse of user data

19   as a significant risk, Facebook did not maintain disclosure controls and procedures designed to

20   analyze or assess incidents involving misuse of user data for potential disclosure in the

21   [C]ompany's periodic filings."  SEC Complaint, ¶40.

22        229.    According to the SEC Complaint, "[d]uring the relevant period, Facebook identified

23   trends and events for possible disclosure through a series of quarterly meetings to prepare for the

24   [C]ompany's earnings announcements.  This process relied on the employees and managers who

25   attended these meetings to identify issues that might need to be disclosed.  Although several

26   employees in Facebook's legal, policy, and communications groups who attended these meetings

27   during the relevant period were aware of [Kogan's] improper transfer of data to Cambridge

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1 [Analytica], that incident was never discussed.  Facebook also did not share information regarding

2 the incident with its independent auditors and outside disclosure counsel in order to assess the

3 [C]ompany's disclosure obligations."  SEC Complaint, ¶41.

4      230.  The SEC also found that "Facebook had no specific mechanism to summarize or

5 report violations of its Platform Policy to employees responsible for ensuring the accuracy of

6 Facebook's filings with the [SEC].  For example, the Facebook employees responsible for

7 monitoring violations of the [C]ompany's Platform Policy were not provided with the draft

8 disclosures pertaining to the misuse of user data.  As a result, Facebook senior management and

9 relevant legal staff did not assess the scope, business impact, or legal implications of [Kogan's]

10 improper transfer of data to Cambridge [Analytica], including whether or how it should have been

11 disclosed in Facebook's public filings or whether it rendered, or would render, any statements

12 made by the [C]ompany in its public filings misleading."  SEC Complaint, ¶¶42-43.

13      231.  Based on the foregoing, Facebook filed materially misleading periodic reports with

14 the SEC.  According to the SEC, "Facebook knew, or should have known, that its Risk Factor

15 disclosures in its annual reports on Form 10-K for the fiscal years ended December 31, 2015,

16 December 31, 2016, and December 31, 2017, and in its quarterly reports on Form 10-Q filed in

17 2016 and 2017, as incorporated into its Form S-8 registration statements, were materially

18 misleading."  SEC Complaint, ¶44.

19      232.  The Risk Factor disclosures were incorporated by reference into Facebook's

20 registration statements on Forms S-8 filed with the SEC on May 21, 2012 and February 1, 2013.

21 These statements registered sales of shares of Facebook common stock under the Company's

22 employee and officer equity incentive plans, and incorporated future periodic reports filed with the

23 SEC, including those filed during the relevant period. SEC Complaint, ¶45.

**2.  The SEC Found That Defendants' Statements to the Press Reinforced Facebook's Misleading Public Filings**

25      233.  Beginning in November 2016, reporters asked Facebook about the investigation

26 that the Company said it was conducting in the December 2015 *Guardian* article.  These inquiries

- 73 -

1    were referred to Facebook's communications group, which was aware that the Company had

2    confirmed that Kogan had improperly transferred personality profiles based on U.S. user data to

3    Cambridge Analytica in violation of Facebook's policy, and had told both parties to delete the

4    data. SEC Complaint, ¶47.

5          234.    The communications group initially responded to the press inquiries indirectly.  For

6    example, beginning in February 2017, the communications group pointed reporters to Cambridge

7    Analytica's public statement that it "does not use data from Facebook" and "does not obtain data

8    from Facebook profiles or Facebook likes."  As the SEC found, "[t]his was misleading because it

9    suggested that Facebook was unaware that Cambridge [Analytica] had improperly obtained

10   Facebook user data."  SEC Complaint, ¶48.

11         235.    On at least two subsequent occasions in March 2017, Facebook's communications

12   group provided the following quote to reporters: "Our investigation to date has not uncovered

13   anything that suggests wrongdoing."  As the SEC found, "[t]his was misleading because Facebook

14   had, in fact, determined that [Kogan's] transfer of user data to Cambridge [Analytica] violated the

15   [C]ompany's Platform Policy.  The quote served to reinforce the misleading impression in

16   Facebook's periodic filings that the [C]ompany was not aware of any material developer misuse of

17   user data."  The on-line publication *The Intercept* included the quote, attributed to a Facebook

18   spokesperson, in an article dated March 30, 2017.  SEC Complaint, ¶ 49.

19         236.    Importantly, in subsequent court filings in the SEC action, the SEC acknowledged

20   that "in addition to the SEC action, there are three matters pending before this Court that

21   apparently concern the same transactions and events that are alleged in the Commission's

22   complaint, *SeeIn re Facebook, Inc. Securities Litigation*, Case No.18-cv-01725-EJD (N.D. Cal.)

23   the *Securities* matter [], assigned to Judge Davila; ***a matter captioned In re Facebook, Inc.***

24   ***Shareholder Derivative Privacy Litigation, Case No. 18-cv-01792-HSG (N.D. Cal.) (the***

25   ***"Derivative" matter), assigned to Judge Gilliam***; and *In Re: Facebook, Inc. Consumer Privacy*

26   *User Profile Litigation*, Case No. 18-md-02843-VC (N.D. Cal.) (the "*Privacy*" matter), assigned to

27   Judge Chhabria.  *See SEC v. Facebook, Inc.*, Case No. 19-cv-04241 (N.D. Cal.), Dkt. No. 9 at 2.

28

The SEC stated that "[t]he *Securities*, *Derivative*, and *Privacy* matters all concern, to some degree, Facebook's interactions with Cambridge Analytica and therefore may be considered "related" [to the SEC action] within the meaning of the Court's Local Rules.

**D.    The FTC Reportedly May Seek an Injunction Against Facebook, and Other Regulators Are Also Investigating the Company, Due to Antitrust Concerns**

237.    On May 31, 2019, *Bloomberg* reported that the U.S. Department of Justice ("DOJ") and the FTC are investigating Google for potential antitrust violations, and on June 3, 2019, *Bloomberg* reported that the FTC will also investigate potential antitrust violations by Facebook to determine whether Facebook's practices harm competition in the digital market.  On this news, Facebook's stock price fell 7.5 percent.

238.    Together, Google and Facebook dominate the online advertising market, capturing approximately 60 percent of its sales.  It is not surprise that, before joining Facebook in 2008, Defendant Sandberg was the head of Google's advertising business.  Multiple other U.S. and foreign government agencies also subsequently announced investigations of Facebook and other tech giants like Apple and Google, which are virtually Facebook's (and each other's) only competition, for potential antitrust violations.

239.    On December 12, 2019, *The Wall Street Journal* reported that the FTC is considering seeking a preliminary injunction against Facebook over antitrust concerns.

240.    On this news, Facebook's stock price fell 2.7%, down from $202.35 to close at $196.75 at the end of the trading day.

241.    According to the *Journal*, the injunction would likely seek to block Facebook from enforcing policies around how its apps interact with each other and work with potential rivals.  It could even seek to keep Facebook from pushing forward with its plans to integrate its three messaging services, in case the agency later attempts to unwind its past acquisitions of Instagram and WhatsApp as a potential remedy.

242.    Facebook originally announced in January 2019 its plans to integrate the Company's three messaging apps, Facebook's Messenger, WhatsApp and Instagram, and encrypt

- 75 -

all three from end-to-end.  Law enforcement officials raised concerns that Facebook's plans could make it harder for investigators to detect instances of child exploitation online and become a safe haven for criminals, and many criticized the wisdom of allowing Facebook to acquire Instagram and WhatsApp in the first place.  "This is why there should have been far more scrutiny during Facebook's acquisitions of Instagram and WhatsApp which now clearly seem like horizontal mergers that should have triggered antitrust scrutiny,"  Representative Ro Khanna (D – Cal.) wrote on Twitter at the time.

243.    One source reportedly told the *Journal* that the FTC would seek the injunction on the grounds of "interoperability" rules that govern how digital platforms interact with one another based on concerns that Facebook's policies limit other services' ability to compete.  Some officials were concerned further integration of Facebook's apps could make it harder to unwind later on.

244.    In response to these reports, Senator Richard Blumenthal (D-Conn.) tweeted that injunctions "must only be the start."  "Facebook's rapacious consolidation & integration of Instagram, WhatsApp & Oculus is an affront to our antitrust laws," Blumenthal wrote.  "The FTC & DOJ cannot continue to leave Facebook's provocations & anti-competitive conduct unchallenged.  Action is overdue."

245.    Facebook has also become the subject of broader scrutiny of politicians, many of whom have weighed in with plans to either break up or further regulate Facebook.  The Company is currently facing an antitrust investigation from a coalition of state attorneys general.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

246.    Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), which prohibits "us[ing] or employ[ing], in connection with the purchase or sale of any security... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Defendants also violated SEC Rule 10b–5, promulgated thereunder, which makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   statements made, in the light of the circumstances under which they were made, not misleading, ...

2   in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5.

3       247.    Facebook's public filings with the SEC indicate that the Company posts material

4   that it considers to be disclosures that are required to comply with SEC regulations and are subject

5   to federal securities laws because they are communications to investors, on Facebook's "social

6   networking" website including in the "Facebook Newsroom" and on "Mark Zuckerberg's

7   Facebook page."

8       248.    These communications to investors are posted on Facebook's "social networking"

9   website, the same website that the Company uses to communicate with its users, as opposed to the

10  "Facebook for Developers" website that the Company uses to communicate with app developers,

11  or the "Facebook for Business" website that the Company uses to communicate with marketers

12  and advertisers.

13      **A.   Defendants Made Materially False and Misleading Statements About the
            Company's Data Security and Privacy Policies**

14      249.    On March 17, 2018, Facebook provided a statement to *The Washington Post*, which

15  appeared in the publication that same day: "We respected the privacy settings that people had in

16  place.  Privacy and data protections are fundamental to every decision we make."

17      250.    This statement was materially false and/or misleading because, when it was made:

18  (a) Facebook had not respected the privacy settings that people had in place, but rather, after

19  Defendants announced changes to Facebook's policies in April 2014 that supposedly restricted

20  third parties from accessing Facebook user data without their consent.  Yet the Company

21  continued to secretly provide Facebook user data to third parties pursuant to partnership

22  agreements with nearly sixty companies, including mobile device manufacturers, that were still in

23  effect as late as June 2018, and through "whitelisting" practices that granted access to certain apps

24  and developers that spent significant amounts of money advertising on Facebook or had other

25  close relationships with Defendants; (b) Defendants were overriding user privacy settings to

26  provide Facebook users' friends' data to third parties; and (c) The decision to announce the

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

changes to Facebook's policies in 2014 was primarily  motivated by Defendants' concerns about increased competition from apps and developers that were able to access Facebook user data but did not provide the Company with "reciprocal" access to data or spend a significant amount on advertising on Facebook, and it was not user privacy or data protections that were fundamental to this decision, but rather, the perceived competitive threat that such apps and developers posed to Facebook's business.

251.   The March 17, 2018 statement was also materially false and/or misleading because it omitted to state material facts necessary to make it, in the light of the circumstances under which it was made, not misleading, including that: (a) Defendants did not respect the privacy settings that people had in place, (b) Defendants were overriding user privacy settings to provide Facebook users' friends' data to third parties; (c) after Defendants announced changes to Facebook's policies in April 2014, that supposedly restricted third parties from accessing Facebook user data without their consent, the Company continued to secretly provide Facebook user data to third parties pursuant to partnership agreements with nearly sixty companies, including mobile device manufacturers, that were still in effect as late as June 2018, and through "whitelisting" practices that granted access to certain apps and developers that spent significant amounts of money advertising on Facebook or had other close relationships with Defendants; and (d) the decision to announce the changes to Facebook's policies in 2014 was primarily  motivated by Defendants' concerns about increased competition from apps and developers that were able to access Facebook user data but did not provide the Company with "reciprocal" access to data or spend a significant amount on advertising on Facebook, and it was not user privacy or data protections that were fundamental to this decision, but rather, the perceived competitive threat that such apps and developers posed to Facebook's business.

**B. Defendants Made Materially False and Misleading Statements Concerning Risks to Facebook's Business**

252.   On February 3, 2017, Facebook filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 with the SEC (the "2016 Form 10-K"), which was signed by

Defendants Zuckerberg, Sandberg, Wehner, Koum, Andreessen, Bowles, Desmond-Hellman, Hastings, and Thiel, among others. Facebook's 2016 Form 10-K included the following statements concerning risks facing the Company:

> "Security breaches and improper access to or disclosure of our data or user data, or other hacking and phishing attacks on our systems, could harm our reputation and adversely affect our business";

> "Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data could result in the loss or misuse of such data, which could harm our business and reputation and diminish our competitive position"; and

> "We provide limited information to . . . third parties based on the scope of services provided to us. However, if these third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data may be improperly accessed, used, or disclosed."

253.    The "risk factor" disclosures in Facebook's 2016 Form 10-K were materially false and misleading because, when they were made: (a) Defendants did not disclose, but knew, or consciously or recklessly disregarded, that Kogan sold Facebook user data to Cambridge Analytica, in violation of Facebook's policies; (b) Defendants misleadingly presented the potential for improper access to or disclosure of Facebook user data as merely a hypothetical investment risk; (c) Defendants misleadingly presented the potential for transfer or sale of Facebook user data, and other misuse of Facebook user data in violation of Facebook's policies, as merely a hypothetical investment risk; (d) Defendants created the false impression that Facebook had not suffered a significant episode of improper access to or disclosure of user data by a developer; (e) Defendants created the false impression that Facebook had not suffered a significant episode of misuse of user data by a developer; (f) after Defendants announced changes to Facebook's policies in April 2014 that supposedly restricted third parties from accessing Facebook user data without their consent, the Company continued to secretly provide Facebook user data to third parties pursuant to partnership agreements with nearly sixty companies, including mobile device manufacturers, that were still in effect as late as June 2018, and through "whitelisting" practices that granted access to certain apps and developers that spent significant amounts of money

1   advertising on Facebook or had other close relationships with Defendants; and (g) Defendants

2   were overriding user privacy settings to provide third parties with access to Facebook user data,

3   including their friends' data.

4        254.   The SEC confirmed that the "risk factor" disclosures and statements in Facebook's

5   2016 Form 10-K described above were materially misleading, charging in the SEC Complaint that:

6   (i) "In its quarterly and annual reports filed between January 28, 2016 and March 16, 2018 [i.e.,

7   including those set forth above], Facebook did not disclose that a researcher [i.e., Kogan] had, in

8   violation of the company's policies, transferred data relating to approximately 30 million

9   Facebook users to Cambridge Analytica. Instead, Facebook misleadingly presented the potential

10  for misuse of user data as merely a hypothetical risk"; (ii) "Facebook's Risk Factor disclosures

11  [including those set forth above] misleadingly suggested that the company faced merely the risk of

12  [user data] misuse and any harm to its business that might flow from such an incident;" and (iii)

13  "Facebook knew, or should have known, that its Risk Factor disclosures in its annual reports on

14  Form 10-K for the fiscal years ended . . . December 31, 2016 and December 31, 2017, and in its

15  quarterly reports on Form 10-Q filed in . . . 2017 . . . were materially misleading."

16       255.   The "risk factor" disclosures and statements in Facebook's 2016 Form 10-K

17  described above were also materially false and misleading because the 2016 Form 10-K omitted to

18  state material facts necessary to make them, in the light of the circumstances under which they

19  were made, not misleading, including that: (a) Facebook learned in 2015 that Kogan had

20  transferred and sold Facebook user data to Cambridge Analytica in violation of Facebook's

21  policies; (b) Facebook had in fact suffered a significant episode of improper access to or disclosure

22  of Facebook user data caused by a developer, i.e., Kogan, which involved more than 85 million

23  Facebook users; (c) Facebook had in fact suffered a significant episode of misuse of user data

24  caused by a developer; (d) after Defendants announced changes to Facebook's policies in April

25  2014 that supposedly restricted third parties from accessing Facebook user data without their

26  consent, the Company continued to secretly provide Facebook user data to third parties pursuant to

27  partnership agreements with nearly sixty companies, including mobile device manufacturers, that

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

were still in effect as late as June 2018, and through "whitelisting" practices that granted access to certain apps and developers that spent significant amounts of money advertising on Facebook or had other close relationships with Defendants; and (e) Defendants were overriding user privacy settings to provide third parties with access to Facebook user data, including their friends' data.

### C. Defendants Made Materially False and Misleading Statements About Facebook's Investigation and Response After Learning About the Transfer of User Data to Cambridge Analytica

256.    On March 4, 2017, Facebook made the following statement through an authorized spokesperson to reporters from *The Guardian* with the knowledge and expectation that it would be communicated to the public, as it was on that date in an article titled, Watchdog to launch inquiry into misuse of data in politics, "Our investigation to date has not uncovered anything that suggests wrongdoing with respect to Cambridge Analytica's work on the [Brexit] and Trump campaigns."

257.    On March 30, 2017, Facebook made the following statement through an authorized spokesperson to a reporter from *The Intercept* with the knowledge and expectation that it would be communicated to the public, as it was on that date in an article titled Facebook Failed To Protect 30 Million Users From Having Their Data Harvested By A Trump Campaign Affiliate, "Our investigation to date has not uncovered anything that suggests wrongdoing" with respect to Cambridge Analytica.

258.    The statements concerning Facebook's investigation into Cambridge Analytica described above were materially false and misleading because, when they were made: (a) Facebook did not disclose, but knew or recklessly disregarded, that Facebook learned by no later than December 2015 that Kogan had transferred and sold Facebook user data to Cambridge Analytica; and (b) Facebook's investigation into the Cambridge Analytica matter had found evidence of wrongdoing because Facebook had determined that Kogan had transferred and/or sold Facebook user data to Cambridge Analytica without their consent in violation of Facebook's policies.

**D. Defendants Made Materially False and Misleading Statements Concerning Notifying Facebook Users Whose Accounts Were Compromised Or At Risk Of Being Compromised**

259.    On April 27, 2017, a Facebook Newsroom post entitled "Information Operations and Facebook" discussed the steps that Facebook was supposedly taking to "help[] people protect their accounts from compromise."  The document stated:

> We notify our users with context around the status of their account and actionable recommendations if we assess they are at increased risk of future account compromise by sophisticated actors or when we have confirmed their accounts have been compromised.

260.    This statement was materially false and misleading because it omitted to state material facts necessary to make it, in the light of the circumstances under which it was made, not misleading, including that Facebook did not notify users whose accounts contained personal information that had been compromised or who were at risk of having their accounts or their personal information compromised.  Facebook did not take any steps to notify users whose information was transferred or accessed by Kogan or Cambridge Analytica – or any of the other app developers who gained unauthorized access to user information in violation of Facebook's policies – upon learning of the misappropriation of Facebook user data in at least 2015.  To the contrary, it was not until the misappropriation of Facebook user data was publicly revealed by *The Guardian* and *The New York Times* in March 2018 that **Defendant Zuckerberg** admitted Defendants made a conscious decision *not* to notify the tens of millions of users whose data was compromised when Kogan improperly sold that data to Cambridge Analytica.  Defendants later admitted that they "should have" informed users whose accounts and personal information was compromised or exposed in the Cambridge Analytica scandal, but they "didn't do enough" to notify affected users.

**E. Defendants Made Materially False and Misleading Statements Concerning Facebook's Response to Other Reported Instances Of Data Misuse**

261.    On or about February 16, 2017, Facebook made the following statement and provided the following information to *BuzzFeed News*, with the knowledge and expectation that it

would be communicated to the public, as it was on that date in an article entitled "The Truth About

The Trump Data Team That People Are Freaking Out About":

> [A]s a general rule, Andy Stone, a Facebook spokesperson, said, "Misleading people or misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data."

262. On or about June 8, 2017, Facebook provided the following statement to *Newsweek*, which appeared in the publication on that same date, in an article entitled "How Big Data Mines Personal Info to Craft Fake News and Manipulate Voters":

> Misleading people or misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data.

263. The statements set forth above were materially false and misleading because they omitted to state material facts necessary to make them, in the light of the circumstances under which they were made, not misleading, including that: (a) Facebook did not take swift action against third parties who had misused user information; and (b) Facebook could not and did not "require" data misusers to "destroy" or "delete" improperly collected data.

264. On March 16, 2018, Defendants posted a statement to the Facebook Newsroom entitled "Suspending Cambridge Analytica and SCL Group From Facebook," which stated:

> **We are committed to vigorously enforcing our policies to protect people's information.** We will take whatever steps are required to see that this happens. We will take legal action if necessary to hold them responsible and accountable for any unlawful behavior.
>
> * * *
>
> On an ongoing basis, **we also do a variety of manual and automated checks to ensure compliance with our policies and a positive experience for users.** These include steps such as random audits of existing apps along with the regular and proactive monitoring of the fastest growing apps.

- 83 -

We enforce our policies in a variety of ways - from working with developers to fix the problem, to suspending developers from our platform, to pursuing litigation.

265.    The March 16, 2018 statement was also materially false and misleading because it omitted to state material facts necessary to make them, in the light of the circumstances under which it was made, not misleading, including that: (a) Defendants did not "vigorously enforce [Facebook's] policies" and nor did they "take whatever steps are required" against third parties who had misused user information; and (b) Defendants did not require or confirm that the data sold to Cambridge Analytica had in fact been destroyed – even after Cambridge Analytica had been exposed as a liar and Facebook was confronted with multiple red flags that the data was not deleted.

### F.  Defendants Made Materially False and Misleading Statements Concerning Facebook Users' Knowledge or Consent to Providing Information to Kogan

266.    On March 16, 2018, in a Facebook Newsroom post entitled "Suspending Cambridge Analytica and SCL Group From Facebook," Facebook stated "[i]n 2015, we learned that [Kogan] lied to us and violated our Platform Policies by passing data … to SCL/Cambridge Analytica [and] Christopher Wylie of Eunoia Technologies Inc."  Facebook explained that "[a]pproximately 270,000 people downloaded the app" and "[i]n so doing, they gave their consent for Kogan to access [their data]."  The post asserted that "[w]hen [Facebook] learned of the violation in 2015" it had "demanded certification from Kogan and all parties he had given data to that the information had been destroyed."  Alluding to the prior media contacts, the article asserted that "Several days ago, we received reports that, contrary to the certifications we were given, not all data was deleted."  The post also stated that the Company was "moving aggressively to determine the accuracy of the claims" and asserted it was "committed to vigorously enforcing our policies to protect people's information" and "will take whatever steps are required to see that this happens," including taking legal action "to hold [violators] responsible and accountable for" their actions.  Referring to Zuckerberg's April 2014 announcement that access to user friend data would

- 84 -

1  be shut-off, the post further stated: "In 2014 . . . we made an update to ensure that each person

2  decides what information they want to share about themselves, including their friend list."

3      267.    Facebook further stated in the March 16, 2018 Facebook Newsroom post:

4          ***We are committed to vigorously enforcing our policies to protect people's
   information.*** We will take whatever steps are required to see that this happens.
5          We will take legal action if necessary to hold them responsible and accountable
   for any unlawful behavior.
6

7                                    * * *

8          On an ongoing basis, ***we also do a variety of manual and automated checks to
   ensure compliance with our policies and a positive experience for users.*** These
9          include steps such as random audits of existing apps along with the regular and
   proactive monitoring of the fastest growing apps.
10

11         We enforce our policies in a variety of ways - from working with developers to
   fix the problem, to suspending developers from our platform, to pursuing
12         litigation.

13     268.    On March 17, 2018, Facebook provided an addendum to the March 16, 2018

14 Facebook Newsroom post which stated:

15         The claim that this is a data breach is completely false. Aleksandr Kogan requested
   and gained access to information from users who chose to sign up to his app, and
16         ***everyone involved gave their consent. People knowingly provided their
   information***, no systems were infiltrated, and no passwords or sensitive pieces of
17         information were stolen or hacked.

18

19     269.    On March 21, 2018, **Defendant Zuckerberg** posted an update to his personal

20 Facebook.com page, which Facebook uses to disseminate public information regarding the

21 Company and to comply with its disclosure obligations under SEC rules, which stated, in relevant

22 part:

23         In 2015, we learned from journalists at The Guardian that Kogan had shared data
   from his app with Cambridge Analytica. It is against our policies for developers
24         to share data without people's consent, so we immediately banned Kogan's app
   from our platform….
25

26         The good news is that the most important actions to prevent this from happening
   again today we have already taken years ago…. In 2014, to prevent abusive apps,
27         we announced that we were changing the entire platform to dramatically limit the
   data apps could access... In this case, we already took the most important steps a

28

few years ago in 2014 to prevent bad actors from accessing people's information in this way.

270.    Also on March 21, 2018, **Defendant Zuckerberg** told CNN: "You can't share data in a way that that people don't know or don't consent to.  We immediately banned Kogan's app."

271.    The statements set forth above were materially false and/or misleading when made, because: (a) they suggested that Kogan was banned because Facebook did not allow user data to be shared with third party app developers like Kogan, at least not without their knowledge and informed consent; (b) Kogan did not obtain Facebook user data with their knowledge and informed consent; and (c) despite knowing that Cambridge Analytica had "lied" in 2015, Facebook waited many months after first learning about the improper data access to request certifications from Cambridge Analytica, Kogan and Wylie, and made no effort to determine how much user data had been compromised, what that data contained, what users were affected, who else had access to their data, how that data was being used, or whether the data had been destroyed.

272.    The statements set forth above were also materially false and/or misleading because they omitted to state material facts necessary to make it, in the light of the circumstances under which it was made, not misleading, including that: (a) after Facebook announced in April 2014 that access to "user friends' data" was discontinued, Facebook continued to secretly provide that user friend data to numerous third parties, including app developers, "whitelisted" third parties, mobile device makers and others; (b) Facebook was overriding users' privacy settings in order to provide user friend data to these whitelisted third parties; (c) Kogan did not obtain Facebook user data with their knowledge and informed consent; and (d) despite knowing that Cambridge Analytica had "lied" in 2015, Facebook waited many months after first learning about the improper data access to request certifications from Cambridge Analytica, Kogan and Wylie, and made no effort to determine how much user data had been compromised, what that data contained, what users were affected, who else had access to their data, how that data was being used, or whether the data had been destroyed.

- 86 -

**G. Defendants Made Materially False and Misleading Statements Regarding their Compliance with the FTC Consent Decree**

273.    The 2012 FTC Consent Order has been in effect since it was entered in 2012.  As Defendant Zuckerberg explained in testimony to the Senate Commerce Committee on June 8, 2012, the FTC Consent Order obligated Facebook "not to misrepresent the extent to which it maintains the privacy or security" of user data.

274.    Following its entry, Defendants repeatedly made public statements and assurances that Facebook was in compliance with the FTC Consent Order.  In addition, after the March 2018 disclosures regarding Cambridge Analytica, Defendants engaged in an aggressive public relations campaign to reassure the market that Facebook had not violated the FTC Consent Order.

275.    On February 2, 2017, Facebook filed its 2016 Form 10-K with the SEC, which stated:

> Violation of existing or future regulatory orders or **consent decrees** could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations.

276.    On July 26, 2017, on Facebook's earnings call for the second quarter of 2017, **Defendant Sandberg** stated, "[W]e respect local laws and regulations . . . Certainly, regulation is always an area of focus that we work hard to make sure that we are explaining our business clearly and making sure regulators know the steps we take to protect privacy as well as *making sure that we're in compliance*."

277.    On March 17, 2018, Facebook made the following statement and provided the following information to a reporter for *The Washington Post*, with the knowledge and expectation that it would be communicated to the public, as it was on that date, "We reject any suggestion of violation of the consent decree."

278.    On March 18, 2018, in a *Washington Post* article, Facebook stated, "We reject any suggestion of violation of the Consent Decree.  We respected the privacy settings that people had in place."

- 87 -

279.    On April 4, 2018, **Defendant Zuckerberg** stated, "You asked about the FTC Consent Order.  We've worked hard to make sure that we comply with it."

280.    On April 5, 2018, in an interview with NPR, **Defendant Sandberg** stated, "The FTC Consent Decree was important.  And we've taken every step we know how to make sure we're in accordance with it."

281.    On April 10, 2018, in response to questions about the FTC Consent Decree from the Joint Senate Commerce and Judiciary Committees, **Defendant Zuckerberg** stated that they had changed Facebook in 2014 "so that that way it just massively restricts the amount of – of data access that a developer could get."  On the same day, during Zuckerberg's live testimony before the Joint Commerce and Judiciary Committees of the U.S. Senate, he stated, "Our view is that – is that believe that *we are in compliance with the consent order*, but I think we have a board responsibility to protect people's privacy even beyond that."

282.    On June 8, 2018, in response to written questions submitted by the Senate Commerce Committee whether the 2012 FTC Consent Order was implicated by Facebook's recent disclosures around Cambridge Analytica, **Defendant Zuckerberg** stated that it was not because: Facebook accurately represented the operation of its developer Platform and the circumstances under which people could share data (including friends data) with developers [and] honored the restrictions of all privacy settings that covered developer access to data.

283.    As described above, these statements were materially false and misleading.  Far from respecting the restrictions on privacy settings, Facebook was secretly sharing massive amounts of user data with third parties and actively overriding users' privacy settings as described above.  Facebook was secretly overriding users' privacy settings in order to share information about users' friends with a wide array of "whitelisted" third-party app developers and major corporations.  Thus, Defendants' statements regarding user control, including in the context of the 2012 FTC Consent Order, were materially false and misleading.

284.     Defendants' statements suggesting that Facebook complied with, or had not violated, the FTC Consent Order were materially false and misleading for least the following reasons:

285.     **_First_**, the public statements of Defendants and others do not comply with Section I of the Order, which prohibits Facebook from misrepresenting any of its privacy settings.  The FTC evaluates misrepresentations based on what consumers reasonably understand.  In its Complaint, the FTC found that Facebook had misrepresented the extent of access that third-party apps had to user data.  After the Order went into effect, Facebook continued to grant third-party apps the same level of access to user data as it had before, without ever correcting its misrepresentation.  GSR, the company that transferred data to Cambridge Analytica, acquired its data from Facebook in June 2014, two years after the Order went into effect.

286.     **_Second_**, the Board failed to implement and revise Facebook's policies and terms of use to ensure they complied with Section II of the Order, which required Facebook to obtain affirmative express consent and give its users clear and prominent notice before disclosing their previously collected information with third parties in a way that exceeds the restrictions imposed by their privacy settings.  As the FTC found, Facebook granted third-party apps access to user data by overriding users' privacy settings.  After the Order went into effect, Facebook never clearly and prominently disclosed this practice to users and did not retroactively seek users' express affirmative consent to continue disclosing their previously-collected data to third-party apps.

287.     On April 19, 2018, Senator Blumenthal sent a letter to the FTC, noting that Facebook by default continued to provide access to personal and non-public data to third-party apps even after the FTC Consent Order was entered in 2012.  As he did at the Senate hearing earlier that month, Senator Blumenthal specifically called out Facebook for failing to notice that Kogan submitted terms of service for his app that explicitly stated that he reserved the right to sell user data and would collect profile information from the friends of those who downloaded the app.  "***Even the most rudimentary oversight would have uncovered these problematic terms of***

*service*," Blumenthal wrote.  "This **willful blindness** left users vulnerable to the actions of Cambridge Analytica."

288.    According to PwC's Initial Assessment Report, which is based on Management Assertions, Facebook's Privacy Program was routinely monitored, reviewed, and improved.  The report states, in relevant part:

> **Monitoring Activities**: Members of Facebook's Legal team periodically review the Privacy Program to ensure it, including the controls and procedures contained therein, remains effective.  These legal team members also will serve as point of contacts for control owners and will update the Privacy Program to reflect any changes or updates surfaced.

> **Monitoring**: Facebook's Privacy Program is designed with procedures for evaluating and adjusting the Privacy Program in light of the results of testing and monitoring of the program as well as other relevant circumstances.  The Privacy XFN Team assesses risks and controls on an on-going basis through weekly meetings and review processes. Members of Facebook's legal team support the Privacy Program and serve as points of contact for all relevant control owners to communicate recommended adjustments to the Privacy Program based on regular monitoring of the controls for which they are responsible, as well as any internal or external changes that affect those controls.

289.    The "Management Assertions" and other statements in PwC's reports about Facebook's Privacy Program are misleading and contradict Defendants' own representations.   For example, defendant Sandberg admitted in an interview with Recode Media on <u>May 30, 2018</u> that Facebook had not audited Cambridge Analytica to ensure they had actually deleted the data. "**Looking back, we definitely wish we had put more controls in place**.  We got legal certification that Cambridge Analytica didn't have the data, **we didn't audit them**," she said.

290.    **_Third_**, Facebook was required under Section IV of the Order to establish a "comprehensive privacy program" that would: "(1) address privacy risks related to the development and management of new and existing products and services, and (2) protect the privacy and confidentiality of covered information."  The privacy program must be designed to prevent "unauthorized collection, use, or disclosure of covered information."  PwC's Initial Assessment Report, which is based on Management Assertions, states that "Facebook has

1    implemented technical, physical, and administrative security controls designed to protect user data

2    from unauthorized access, as well as to prevent, detect, and respond to security threats and

3    vulnerabilities."  But defendant Zuckerberg admitted in testimony before Congress and the British

4    Parliament that Facebook failed to read the terms and conditions of the GSR app which sold the

5    data to Cambridge Analytica.

6          291.    Senator Blumenthal, in his letter to the FTC sent on April 19, 2018, noted that

7    although the FTC explicitly put Facebook on notice about the privacy risks of third-party apps

8    with the Consent Order, the Company has "***continued to turn a blind eye***" to other outside parties

9    that collect data from its users, and its procedures for verifying that new apps comply with its

10   remain "murky," Senator Blumenthal said in his letter.  Indeed, as *The New York Times* reported

11   on June 3, 2018, and Facebook later acknowledged in its responses to questions posed to

12   Zuckerberg during his Congressional testimony, the Company continued to allow others besides

13   "third party apps" to access Facebook user data, including device manufacturers and other

14   companies that Facebook had data-sharing agreements with in effect until at least June 2018.

15         292.    ***Fourth***, the 2012 FTC Consent Order prohibited Facebook from misrepresenting

16   the privacy or security of "covered information" - broadly defined to include "photos and videos."

17   The 2012 FTC Consent Order also required Facebook to "give its users a clear and prominent

18   notice and obtain their affirmative express consent" before disclosing previously-collected

19   information.  Election Privacy Information Center ("EPIC"), and other consumer privacy groups

20   have alleged that since early 2018, Facebook has been routinely scanning photos, posted by users,

21   for biometric facial matches without the consent of either the image subject or the person who

22   uploaded the photo, in violation of these provisions (among other laws).

23         293.    Defendants not only had the ability (and responsibility) to change Facebook's

24   policies and practices with respect to third party developer access to user information, they were

25   also well aware of, and facilitated, this activity through Facebook's unlawful business practices

26   and inadequate privacy policies which they knew could cause substantial damage to Facebook and

27   violate the FTC Consent Order.

28

294.     ___Fifth___, in certifying the adequacy of Facebook's privacy program and related internal controls and procedures, PwC simply relied on "Management Assertions" about Facebook's privacy program and certified, based on these representations, that Facebook's monitoring procedures, policies and internal controls were effective.

### H. Defendants Made Materially False and Misleading Statements Concerning Facebook's Critical DAU and MAU Metrics

295.     On May 3, 2017, Facebook filed a Form 8-K with the SEC attaching as an exhibit the Company's press release issued that same day entitled, "Facebook Reports First Quarter 2017 Results," in which they stated, "Daily active users (DAUs) – DAUs were 1.28 billion on average for March 2017, an increase of 18% year-over-year. Monthly active users (MAUs) – MAUs were 1.94 billion as of March 31, 2017, an increase of 17% year-over-year."  That same day, Zuckerberg posted an update to his personal Facebook.com page, in which he stated, "Our community now has more than 1.9 billion people, including almost 1.3 billion people active every day."

296.     On July 26, 2017, Facebook filed a Form 8-K with the SEC attaching as an exhibit the Company's press release issued that same day entitled, "Facebook Reports Second Quarter 2017 Results."   The press release stated, "Daily active users (DAUs) – DAUs were 1.32 billion on average for June 2017, an increase of 17% year-over-year. Monthly active users (MAUs) – MAUs were 2.01 billion as of June 30, 2017, an increase of 17% year-over-year."388 The same day, Zuckerberg posted an update to his personal Facebook.com page, in which he stated, "Our community is now more than 2 billion people, including more than 1.3 billion people who use Facebook every day."

297.     On November 1, 2017, Facebook filed a Form 8-K with the SEC attaching as an exhibit the Company's press release issued that same day, entitled "Facebook Reports Third Quarter 2017 Results."   The press release stated, "Daily active users (DAUs) – DAUs were 1.37 billion on average for September 2017, an increase of 16% year-over-year. Monthly active users (MAUs) – MAUs were 2.07 billion as of September 30, 2017, an increase of 16% year-over-year."

1    That same day, Zuckerberg posted an update to his personal Facebook.com page, in which he

2    stated, "Our community continues to grow, now with nearly 2.1 billion people using Facebook

3    every month, and nearly 1.4 billion people using it daily.  Instagram also hit a big milestone this

4    quarter, now with 500 million daily actives."

5          298.    On January 31, 2018, Facebook filed a Form 8-K with the SEC attaching as an

6    exhibit the Company's press release issued that same day, entitled "Facebook Reports Fourth

7    Quarter and Full Year 2017 Results."  The press release stated, "Daily active users (DAUs) –

8    DAUs were 1.40 billion on average for December 2017, an increase of 14% year-over-year.

9    Monthly active users (MAUs) – MAUs were 2.13 billion as of December 31, 2017, an increase of

10   14% year-over-year."  That same day, Zuckerberg posted an update to his personal Facebook.com

11   page, in which he stated, "Our community continues to grow with more than 2.1 billion people

12   now using Facebook every month and 1.4 billion people using it daily. Our business grew 47%

13   year-over-year to $40 billion."

14         299.    All of the above DAU and MAU figures were materially false and misleading

15   because they failed to account for the number of fake accounts on Facebook.  In May 15, 2018,

16   Facebook announced for the first time that it had deleted a total of 1.277 billion fake accounts

17   during the period from Q4 2017 to Q2 2018.

18         300.    The statements about Facebook's DAU and MAU metrics described above were

19   also materially false and/or misleading because they omitted to state material facts necessary to

20   make them, in the light of the circumstances under which they were made, not misleading,

21   including that Defendants had knowingly or recklessly misrepresented Facebook's privacy

22   practices, including by violating Parts I.B and I.C of the 2012 FTC Consent Order, which, when

23   revealed, would (and did) erode user trust in Facebook and cause a decline in daily and monthly

24   active users.  Further, given their privacy abuses, Defendants omitted the fact that they knew or

25   recklessly ignored that active user engagement metrics were not accurate or reliable indicators of

26   the health or strength of Facebook's business.

27

28
                                          - 93 -

301.     In addition, the statements about Facebook's DAU and MAU metrics described above were materially false and/or misleading because they omitted to state material facts necessary to make them, in the light of the circumstances under which they were made, not misleading, including the fact that Facebook was using an incorrect methodology to calculate duplicate accounts and the fact that hundreds of millions of the accounts were fake.  Indeed, Facebook eventually revealed that it had deleted a total of 1.277 billion fake accounts during the period from Q4 2017 to Q2 2018.

**I.    Defendants Made Materially False and Misleading Statements About the Impact of the Scandal on Facebook's Business and 1Q18 Financial Results**

302.     On April 25, 2018, Defendants published a press release entitled, "Facebook Reports First Quarter 2018 Results," in which they stated, "Daily active users (DAUs) – DAUs were 1.45 billion on average for March 2018, an increase of 13% year-over-year.  Monthly active users (MAUs) – MAUs were 2.20 billion as of March 31, 2018, an increase of 13% year-over-year."  That same day, Defendant Zuckerberg posted an update to his personal Facebook.com page, in which he stated, "Despite facing important challenges, our community continues to grow.  More than 2.2 billion people now use Facebook every month and more than 1.4 billion people use it daily."

303.     On May 1, 2018, **Defendant Zuckerberg** gave his keynote address at Facebook's annual F8 Developer Conference.  In that appearance, Zuckerberg stated:

> ***I also want to talk about data privacy***. And what happened with Cambridge Analytica was a major breach of trust. An app developer took data that people had shared with them and sold it. So we need to make sure that this never happens again, so we're taking a number of steps here.

> First, as you all know we're restricting the data that developers will be able to request from people.  Now the good news here is that back in 2014, we already made a major change to how the platform works to prevent people from sharing a lot of their friends' information. So this specific situation could not happen again today.

304.     On May 31, 2018, Facebook held its Annual Stockholders Meeting.  At this event, **Defendant Zuckerberg** stated,

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

So we recently went through this process of rolling out our flows and settings for GDPR compliance, first, in Europe, and we're going to do it around the world. And one of the settings that we ask people proactively to make a decision on is, do you want your ads, for how we do ad targeting, to be informed by the other apps and websites that you use? ***People have to proactively make a decision. Yes or no. Do they want that data used? And the majority, I think we can even say vast majority of people say, yes, they want that data used.*** Because if they're going to see ads, you want to see good ads, right? So I think that this is one of the core questions that society faces and individuals face across the different services that we use, are how do we want our data to be used and where? . . . This is going to be a core thing that we need to think about going forward, but we think about it very deeply as this is a – just a core part of the value that we're trying to provide.

305.    On June 8, 2018, Facebook provided additional responses to questions posed to the Company by the members of the Senate Committee on Commerce, Science, and Transportation. In their responses to these questions, Defendants stated:

Privacy is at the core of everything we do, and our approach to privacy starts with our commitment to transparency and control. Our threefold approach to transparency includes, first, whenever possible, providing information on the data we collect and use and how people can control it in context and in our products. Second, we provide information about how we collect and use data in our user agreements and related educational materials. And third, we enable people to learn more about the specific data we have about them through interactive tools such as Download Your Information, which lets people download a file containing data that they may want to take to another service, and Access Your Information, a tool we are launching that will let people more easily access and manage their data on Facebook.

Our approach to control is based on the belief that people should be able to choose who can see what they share and how their data shapes their experience on Facebook.  People can control the audience for their posts and the apps that can receive their data. They can see and delete the history of their activities on Facebook, and, if they no longer want to use Facebook, they can delete their account and the data associated with it.  Of course, we recognize that controls are only useful if people know how to find and use them. That is why we continuously deliver in-product educational videos in people's News Feeds on important privacy topics. We are also inviting people to take our Privacy Checkup – which prompts people to review key data controls – and we are sharing privacy tips in education campaigns off of Facebook, including through ads on other websites. To make our privacy controls easier to find, we are launching a new settings menu that features core privacy settings in a single place. We are always working to help people understand and control how their data shapes their experience on Facebook.

* * *

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Like many other free online services, we sell advertising space to third parties. Doing so enables us to offer our services to consumers for free. This is part of our mission to give people the power to build community and bring the world closer together.

\* \* \*

We maintain our commitment to privacy by not telling advertisers who users are or selling people's information to anyone. That has always been true. We think **_relevant advertising and privacy are not in conflict, and we're committed to doing both well._**

We believe targeted advertising creates value for people and advertisers who use Facebook. Being able to target ads to the people most likely to be interested in the products, service or causes being advertised enables businesses and other organizations to run effective campaigns at reasonable prices.

\* \* \*

We do not have a "business reason" to compromise the personal data of users; we have a business reason to protect that information.

\* \* \*

**_We believe that everyone has the right to expect strong protections for their information_**, and that we also need to do our part to help keep our community safe, in a way that's consistent with people's privacy expectations.

**J.   Defendants Made Materially False and Misleading Statements That Facebook Does Not "Sell" Users' Data**

306.   On or about November 27, 2017, Defendants posted a notification on Facebook.com titled "Our Advertising Principles," in which they stated in relevant part: "We don't sell your data.  We don't sell personal information like your name, Facebook posts, email address, or phone number to anyone.  Protecting people's privacy is central to how we've designed our ad system."

307.   On January 31, 2018, during Facebook's earnings call for the second quarter of 2017, **Defendant Sandberg** stated in relevant part, "These principles are our commitment to the people who use our services.  They are: We build for people first.  We don't sell your data."

308. On March 22, 2018, during an interview on the CNBC television program "Closing Bell," **Defendant Sandberg** again stated, "We provide a free service that's an ad-based business model, and in order to do that, we do not sell your data."

309. On April 4, 2018, during a teleconference with members of the press, **Defendant Zuckerberg** stated:

> There are other internet companies or data brokers or folks that might try to track and sell data, *but we don't buy and sell*. [. . .] The second point, which I touched on briefly there: for some reason *we haven't been able to kick this notion for years that people think we will sell data to advertisers. We don't. That's not been a thing that we do.  Actually it just goes counter to our own incentives*. . . And we're going to use data to make those services better . . . but *we're never going to sell your information*.

310. The same day, Defendants posted a notification on Facebook.com titled, "We're Making Our Terms and Data Policy Clearer, Without New Rights to Use Your Data on Facebook," in which they stated in relevant part: "What we share: We will never sell your information to anyone.  We have a responsibility to keep people's information safe and secure, and we impose strict restrictions on how our partners can use and disclose data."

311. On April 5, 2018, **Defendant Sandberg** stated during an interview on National Public Radio:

> It's a good opportunity to remind everyone what we say all the time, but we need to keep saying so people understand it – which is that *we don't sell data, period*, . . . And again, *we do not sell data, ever*.

312. The same day, during an interview with PBS NewsHour, **Defendant Sandberg** stated, "We do not sell data or give your personal data to advertisers, period."

313. On April 10, 2018, **Defendant Zuckerberg** appeared to testify before the Joint Commerce, Science, and Transportation and Judiciary Committees of the United States Senate, during which he stated, "I want to be clear.  We don't sell information.  So regardless of whether we could get permission to do that, that's just not a thing we're going to go do."  Zuckerberg further stated, "Well, Senator, once again, we don't sell any data to anyone.  We don't sell it to

- 97 -

advertisers, and we don't sell it to developers."  During the same hearing, Zuckerberg stated, "We don't sell data to anyone."

314.    On April 11, 2018, **Defendant Zuckerberg** appeared before the Energy and Commerce Committee of the United States House of Representatives, during which hearing he stated, "Mr. Chairman, you're right that we don't sell any data. . . . There is a common misperception, as you say, that is just reported – often keeps on being reported, that, for some reason, we sell data.  I can't be clearer on this topic.  We don't sell data."  And he reiterated, "Congressman, we don't sell people's data.  So I think that's an important thing to clarify up front."

**315.**    On April 25, 2018, during Facebook's earnings call for the first quarter of 2018, **Defendant Zuckerberg** stated, "We use the information you provide and that we receive from websites to target ads for advertisers, but we don't tell them who you are.  ***We don't sell your information to advertisers or anyone else***."

316.    **Defendant Sandberg** likewise stated during the April 25, 2018 earnings call: "At Facebook, we have always built privacy protection into our ads system. [. . .] ***We don't sell your information to advertisers or anyone else.***"

317.    On May 24, 2018, defendants posted to Facebook.com their follow up to Zuckerberg's testimony before the European Parliament, in which they stated in relevant part, "We don't tell advertisers who you are; and we don't sell your data."

318.    On June 29, 2018, Defendants filed written responses to additional questions posed to them by the Energy and Commerce Committee of the U.S. House of Representatives, in which they stated, "Facebook does not sell people's information to anyone, and we never will."  Defendants further stated, "When the individual is a Facebook user, we are also able to use this information to personalize their experiences on Facebook, whether or not they are logged out, but we will not target ads to users relying on this information unless the user allows this in their privacy settings.  We don't sell or share this information with third parties."

319.    On July 18, 2018, in an interview with *Recode*, **Defendant Zuckerberg** stated:

- 98 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

> ***We don't sell data.*** . . . So while it may seem like a small difference to you, this distinction on "selling data," I actually think to people it's like the whole game, right? So ***we don't sell data, we don't give the data to anyone else***, but overwhelmingly people do tell us that if they're going to see ads on Facebook, they want the ads to be relevant; they don't want bad ads.

320.    The above statements suggesting that Facebook did not sell user data were materially false and/or misleading when made, because at the time they were made, Defendants were using Facebook user data for commercial purposes, including as consideration for a reciprocal exchange of value with third party app developers and other companies who were "whitelisted" for secret access to user friend data, in exchange for reciprocal benefits.  For Defendants, this "reciprocity" came in various forms, including an equivalent exchange of data between an app or developer and Facebook, or payment by an app or developer to Facebook in significant sums spent on advertising with Facebook, or through other relationships with Defendants that were perceived as enhancing Facebook's brand and platform to make it more attractive to users, such as in the case of the dozens of large companies and device manufacturers that Facebook had partnership agreements with or whitelisted until as late as June 2018.

321.    Indeed, as noted by *Slate¸* Facebook's whitelisting "private agreements were conditional on the third party sending over its own valuable user data to Facebook, or on the company making big advertising purchases with Facebook," which constitutes a "business in selling or bartering data."

322.    Defendants' statements described above were also materially false and misleading because they omitted to state material facts necessary to make them, in the light of the circumstances under which they were made, not misleading, including the fact that defendants were using user friend data as consideration for a reciprocal exchange of value with third party app developers and other companies who were "whitelisted" for secret access to user friend data. Thus, defendants engaged in selling user friend data in exchange for reciprocal benefits. For defendants, "reciprocity" came in various forms, including an exchange of data between an app developer and Facebook, by Facebook requiring the third party to spend substantial sums on advertising at

- 99 -

Facebook or by a third party enhancing Facebook's brand and platform to make it more attractive to users, as in the case of the dozens of companies, including major device manufacturers, that Facebook "whitelisted" and allowed to access user data until as late as June 2018.

## VII.   DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9 BY ISSUING MATERIALLY MISLEADING PROXY STATEMENTS

323.   Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Facebook to issue materially misleading proxy statements in 2017, 2018, and 2019 that omitted and failed to disclose material facts concerning the misappropriation and sale of Facebook user data to Cambridge Analytica, and that contained other material misrepresentations concerning the Board's oversight and enforcement of Facebook's policies, the Company's compliance with 2012 FTC Consent Order, and various other laws.  Defendants' failure to accurately state and/or disclose these and other material facts likewise constitutes a breach of trust, and of their fiduciary duties owed to Facebook.

324.   The Exchange Act requires publicly traded companies to disclose to shareholders "material information," the kind of information that an investor would want to know to protect their investment.  The SEC issued guidance on public reporting of cybersecurity incidents, noting that the commission "encourages companies to continue to use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters."

325.   Facebook's 2017 and 2018 Proxy Statements did not mention the Cambridge Analytica incident, and it was not disclosed in any of Facebook's Form 8-K or Form 6-K filings.

326.   Instead, Facebook's 2017 and 2018 Proxy Statements contained only general and vague statements about *potential* risks to user privacy and data security, which were materially false and/or misleading when made because at the time, such risks had already come to fruition and had been reported to the Company, as Defendants later admitted, by at least December 2015.

327.   In addition, Facebook's 2017 and 2018 Proxy Statements contained general and vague statements and certifications as to the adequacy of the Company's internal controls and reporting systems and their purported sufficiency and compliance with applicable laws, which

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

were materially false and/or misleading when made because at the time, assuming for the sake of pleading purposes only that Facebook's Board did not know that user data had already been obtained by Cambridge Analytica or other third parties without Facebook's authorization and/or in violation of Facebook's policies, then the Company's internal controls and reporting systems in effect at the time were not sufficient to inform their disclosures with regard to material risks to Facebook's business (among other things).

328. Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Facebook to issue the 2017 Proxy Statement that failed to disclose the Cambridge Analytica incident and deliberately concealed Facebook's advertising practices and corporate policies that which allowed and perpetuated Facebook's violations of user privacy and other laws. Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

329. Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Facebook to issue the 2018 Proxy Statement that failed to disclose the Cambridge Analytica incident or the seriously deficient privacy policies that allowed it to occur and caused serious harm and damages to Facebook. Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

**A.      The Board Issued the Materially Misleading Proxy Statement in 2017 Soliciting the Directors' Re-Election to Facebook's Board**

330. On April 14, 2017, Defendants caused Facebook to file the 2017 Proxy Statement in connection with the 2017 annual stockholders meeting to be held on June 1, 2017.

331. The 2017 Proxy Statement omitted any disclosures regarding (i) the Cambridge Analytica leak; (ii) Defendants' knowledge that Facebook's internal controls and systems were inadequate and ineffective to protect user information; (iii) Defendants' knowledge of data security failures that had actually materialized and had not been disclosed; (iv) the fact that Facebook's internal controls and systems were inadequate to ensure that the Company complied with applicable notification and disclosure requirements concerning the Cambridge Analytica leak; (v)

the fact that Defendants failed to maintain appropriate policies and procedures to detect and prevent data security leaks and to protect user information; and (vi) the fact that Defendants failed to appropriately address Facebook's privacy practices and misleading claims regarding same as required by the FTC consent order; and (vii) as a result, Facebook may be in violation of the consent order.

332. The 2017 Proxy Statement harmed Facebook by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors. As a result of the false or misleading statements in the 2017 Proxy Statement, Facebook stockholders voted to re-elect all of the Defendants to the Board.

333. The statements in the 2017 Proxy Statement conveyed that the Company's corporate governance structure was "effective" and provided "oversight of management and Board accountability." In reality, Facebook's corporate government structure allowed senior executives and the Board to sidestep real accountability and instead continue perpetuating the data security practices that led to the Cambridge Analytica leak, and fail to disclose or notify users of the leak.

334. The 2017 Proxy Statement, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to re-elect all of the Defendants to the Board while they were breaching their fiduciary duties to Facebook and deliberately concealing material information concerning the Cambridge Analytica leak and its effects on the Company's business and reputation.

**B.     The Board Issued the Materially Misleading Proxy Statement in 2018 Recommending a Vote Against Shareholder Proposals on the Basis of Directors' Statements About Facebook's Privacy Practices and Board Oversight of Risks**

335. Facebook's Board, including all of the Defendants, caused Facebook to issue and file with the SEC the materially misleading 2018 Proxy Statement soliciting their re-election to Facebook's Board, in advance of the Annual Stockholder Meeting on May 31, 2018.

- 102 -

336.    The 2018 Proxy Statement contained the following representations concerning the Board's role in risk oversight, on page 16:

> **"Board Role in Risk Oversight"**
> Our board of directors as a whole has responsibility for overseeing our risk management and believes that a thorough and strategic approach to risk oversight is critical. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by regular reports from our management team, including senior personnel that lead a variety of functions across the business, and from our internal audit department, as well as input from external advisors, as appropriate. These reports are designed to provide timely visibility to the board of directors and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.
>
> The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit committee has the responsibility for overseeing our major financial, legal, and regulatory risk exposures, which span a variety of areas including litigation, regulatory compliance, reputational and policy matters, platform integrity efforts, financial reporting, cybersecurity, and international operations. Our audit committee also oversees the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Finally, our audit committee oversees our internal audit function. Our compensation & governance committee evaluates risks arising from our corporate governance and compensation policies and practices, as more fully described in "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment." The audit committee and the compensation & governance committee provide reports to the full board of directors regarding these and other matters.

337.    The 2018 Proxy Statement contains two proposals that the Board recommends voting FOR: Proposal One: Election of Directors; and Proposal Two: Ratification of Appointment of Ernst & Young LLP.  The Proxy Statement also includes five "Stockholder Proposals" that the Board recommends voting AGAINST: Proposal Three: Stockholder Proposal Regarding Change in Stockholder Voting; Proposal Four: Stockholder Proposal Regarding a Risk Oversight Committee; Proposal Five: Stockholder Proposal Regarding Simple Majority Vote; Proposal Six: Stockholder Proposal Regarding a Content Governance Report ; and Proposal Seven: Stockholder Proposal

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Regarding Median Pay by Gender (collectively, the "Stockholder Proposals").  The Board's rationale underlying its recommendation is explained in the "Opposing Statement" to each of the Stockholder Proposals (3-7).

**1. The Board's Statements about Stockholder Proposal #4 Regarding a Risk Oversight Committee Are Materially Misleading**

338.    Stockholder Proposal Four in the 2018 Proxy Statement states, "Shareholders request Facebook's Board issue a report discussing the merits of establishing a Risk Oversight Board Committee" ("Proposal Four") (2018 Proxy Statement at 51).

339.    The Supporting Statement notes that "Facebook's Board has chosen not to establish a separate Risk Oversight Committee" and instead has delegated risk oversight responsibility to the Company's Audit Committee, but the Audit Committee Charter "does not capture the particular challenges faced by Facebook."  (2018 Proxy Statement at 51)  In particular, the Supporting Statement notes that the Company's current practices "appear to be significantly challenging the *ability to understand its impact on society and may be creating numerous financial risks* which could present material challenges to the company and its shareholders[,]" as illustrated by the following (among other things):

> (e)  Research linking Facebook to depression and other mental health issues;
>
> (f)  Since 2011, Facebook has been operating under a 20 year Federal Trade Commission settlement agreement regarding user privacy practices;
>
> (g)  Investigations into Russian meddling in U.S. elections and its role in proliferating "fake news";
>
> (h)  Media coverage which demonstrated that its *systems enabled advertisers to target users with offensive terms* and other unintended consequences of its products;
>
> (i)  Concerns over censorship in Myanmar and India;
>
> (j)  Growing public and policy attention to the anti-competitive implications of platform monopolies;

- 104 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

(k) Smugglers reportedly using Facebook to broadcast the abuse and torture of migrants to extort ransom money from their families;

(l) Criticism from the Congressional Black Caucus over diversity and race relations; and

(m) The purported use of Facebook as a platform to incite terrorism.

340.    The proponents of Proposal Four cited "the growing concern that Facebook's Board lacks a strategic approach to risk" and noted that "[u]nintended consequences seem to emerge daily, and indicated that Facebook's Board needs stronger governance and risk oversight mechanisms to address these challenges and provide a "big picture" perspective." (2018 Proxy Statement at 51.)

341.    In the 2018 Proxy Statement, Facebook's Board recommended a vote AGAINST Proposal Four because it stated that the "board of directors and [its] committees currently spend a significant amount of time on matters relating to risk oversight as part of their existing duties" and "it is inefficient to establish a separate risk oversight committee that would likely be comprised of some or all of the same directors that are already overseeing these matters." (2018 Proxy Statement at 52.)

342.    The Board's rationale was based on its representation in the Proxy Statement "that our current approach to risk oversight ensures that we identify, evaluate, and address our unique risks…. through regular engagement with key members of management and appropriate delegation to our current board committees."  (2018 Proxy Statement at 52.)

343.    The Board's Opposing Statement to Proposal Four also reiterated the "Board Role in Risk Oversight" excerpt that appeared in the 2018 Proxy Statement at page 16.  (*See* 2018 Proxy Statement at 52.)

**2.   The Board's Statements about Stockholder Proposal #6 Regarding a Content Governance Report Are Materially Misleading**

344.    Stockholder Proposal Six in the 2018 Proxy Statement stated, "Shareholders request Facebook issue a report to shareholders …. reviewing the efficacy of its enforcement of its terms

- 105 -

1  of service related to content policies and assessing the risks posed by content management

2  controversies (including election interference, fake news, hate speech, sexual harassment, and

3  violence) to the company's finances, operations and reputation." (Proxy Statement at 55)

4      345.   In the 2018 Proxy Statement, Facebook's Board recommends a vote AGAINST

5  Proposal Six because the "board of directors believes that the preparation of the report

6  contemplated by this proposal is unnecessary and not beneficial to our stockholders." (Proxy

7  Statement at 56). The Board's rationale is based on "the breadth of our previous disclosures

8  concerning our content policies" and "significantly enhanced transparency around ads." (Proxy

9  Statement at 56)

10     346.   The Board's Opposing Statement to Proposal Six also highlights the "significantly

11  increased transparency around our policies" and that Facebook's "Community Standards help us

12  ensure people feel safe when using Facebook" (2018 Proxy Statement at 56) and contains the

13  following false and misleading statements:

14          a.   We publish these [Community] [S]tandards to help people understand what type of

15               sharing is allowed on Facebook…." (2018 Proxy Statement at 56).

16          b.   "We also release a twice-annual Transparency Report with information on

17               *government* requests for account data, content restrictions based on local law, and

18               information about internet disruptions…" (2018 Proxy Statement at 56). "In 2017,

19               we launched our Hard Questions blog to further enhance transparency and provide

20               detail on how we address complex issues facing our platform" and the blog has

21               already "covered how we counter … the Russian ads we shared with Congress."

22               (2018 Proxy Statement at 56).

23     347.   "In October 2017, we announced that we will add a feature that will allow people to

24  view all ads a Page is running on Facebook…." We also announced that we will require more

25  thorough documentation from advertisers who want to run election-related ads." (Proxy Statement

26  at 56) "we regularly disclose risks and developments relating to content management matters in

27  our financial reporting and filings with the SEC…." (2018 Proxy Statement at 56).

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

348.    The Board's rationale underlying its recommendations explained in the "Opposing Statement" to each of the Stockholder Proposals is based on materially misleading statements and omissions that fail to disclose *any* of the relevant facts alleged herein regarding Facebook's user privacy practices, the Cambridge Analytica scandal, and Facebook's violations of user privacy and data security laws as alleged herein.  Thus, Defendants are liable for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection with their issuance of the materially false and misleading 2018 Proxy Statement and solicitations and recommendations therein.

349.    As a result of the misleading statements and the Board's recommendations and solicitations in the 2017 Proxy Statement and the 2018 Proxy Statement, and Defendants' other violations of law alleged above and herein, Facebook has suffered damages.

350.    Facebook has been harmed as a result of the solicitation and re-election of directors who have breached their fiduciary duties and caused damage to Facebook from their misconduct alleged herein.  Further, Facebook will continue to suffer damages and harm because it has been deprived of meaningful corporate governance reforms not adopted as a result of Defendants' improper recommendations against the shareholder proposals, and Defendants will not adopt such reforms as evidenced by these very acts.

351.    Facebook's minority shareholders have also been harmed because they are deprived of their right to a fully informed stockholder vote on the matters presented in the 2018 Proxy Statement.

352.    On May 31, 2018, Facebook held its annual meeting to vote on an array of proposals that aim to make the social media platform more accountable to Facebook, According to Financial Time.  All six proposals from shareholders were rejected, including the one that proposed one share equal to one vote in an attempt to override CEO Mark Zuckerberg's overriding voting power, and the one that advocates to set a simple majority vote instead of the current supermajority vote.

353.    According to *Reuters*, roughly 1.29 billion votes were cast "for" a proposal that would have the company move to a structure of one vote per share and do away with the

supermajority shares, while 4.74 billion shares were voted "against" the proposal.  *Reuters* further reported, setting aside the roughly 4.48 billion votes controlled by Zuckerberg and other insiders as of April that presumably would have been voted against the proposal, about 83 percent of shares voted by outsiders supported the proposal.  All voting results were hit back at the dominance of the insiders and directors whose supervoting power alone gets to decide the outcome of the vote.  One shareholder described Facebook as a "corporate dictatorship", another who was removed from the annual meeting, argued "shareholder democracy is already lacking at Facebook," according to the *Guardian*.

## VIII.   DEFENDANTS VIOLATED SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 BY AUTHORIZING AND EFFECTUATING MANIPULATIVE SHARE REPURCHASES AND OTHER TRANSACTIONS IN FACEBOOK SECURITIES

354.    Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), which prohibits "us[ing] or employ[ing], in connection with the purchase or sale of any security... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).

355.    Defendants also violated SEC Rule 10b–5, promulgated thereunder, which makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, ... in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5.

356.    Defendants also violated Section 10(b) of the Exchange Act prohibiting the "use or employ, in connection with the purchase or sale of any security...[of] any manipulative or deceptive device or contrivance in contravention of" SEC Rule 10b–5(a) and (c), promulgated thereunder.

### A.  Defendants Made Materially False and Misleading Statements and Omissions That Caused Facebook's Stock Price to Trade At Artificially Inflated Prices During the Relevant Period

357.    The 2012 FTC Consent Decree was in effect throughout the Relevant Period.  As Zuckerberg explained in testimony to the Senate Commerce Committee on June 8, 2012, the FTC

- 108 -

1  Consent Decree obligated Facebook "not to misrepresent the extent to which it maintains the
2  privacy or security" of user data.

3      358.   At various times during the Relevant Period, Defendants made public assurances
4  that they were complying with the FTC Consent Decree.  In particular, after the March 2018
5  disclosures regarding Cambridge Analytica, Defendants engaged in an aggressive public relations
6  campaign to reassure the market that Facebook had not violated the FTC Consent Decree.

7      359.   The revelations about Cambridge Analytica's misappropriation of user data,
8  coupled with the growing concern about Russian involvement in the 2016 presidential campaign –
9  and Facebook's inattention to Russian fake-news feeds – drew unwanted attention to Facebook's
10  business model: monetizing personal user data.  Thus, Defendants' initial public statements in
11  response to the Cambridge Analytica scandal denied any wrongdoing by Facebook and suggested
12  that Kogan had *obtained* the data in violation of Facebook's policies.

13      360.   Neither Facebook's CEO Defendant Zuckerberg, nor its COO Defendant Sandberg,
14  made any public statement initially in response to the reports regarding the misappropriation of
15  Facebook user data by Kogan and Cambridge Analytica.  Instead, in a comment to *The Guardian*,
16  a "Facebook spokeswomen" stated, "Mark, Sheryl and their teams are working around the clock to
17  get all the facts and take the appropriate action moving forward, because they understand the
18  seriousness of this issue.  ***The entire company is outraged we were deceived.***  We are committed
19  to vigorously enforcing our policies to protect people's information and will take whatever steps
20  are required to see that this happens."

21      361.   Facebook was not deceived, at least not by Kogan or Cambridge Analytica.  The
22  Company's public (minority) shareholders, users of its ubiquitous social networking website, and
23  the public in general were, however, deceived by Defendants, who deliberately misrepresented the
24  nature of Facebook's business and failed to disclose material information about the Company's
25  platform, which allowed any third party developer to obtain information *from* Facebook about its
26  users that could be used for various undisclosed (often nefarious) purposes, just like Cambridge
27  Analytica had done.  Defendants also made false and misleading statements about the Company's

28

- 109 -

practices with respect to the security of user data, its dependence on obtaining user data, and critical associated risks to the Company's core advertising business and its revenues.

**B.  Defendants Authorized, Effectuated and Approved Manipulative Share Repurchases Totaling More Than $24 Billion**

362.    Throughout the relevant period, Defendants issued, and caused the Company to issue, statements that, as detailed herein, were materially false or misleading when made. Defendants' misrepresentations artificially inflated the price of Facebook shares, causing the Company to purchase shares at artificially inflated prices, through its share repurchase program and subsequent increases to authorizations that were approved by Facebook's Board.

**1.    The Board Approved a $6 Billion Share Repurchase Program That Commenced in 2017**

363.    On November 18, 2016, after the Company admittedly had learned of the sale of Facebook user data to Cambridge Analytica in violation of its policies, Facebook's Board authorized the Company to repurchase $6 billion of its own shares of Class A common stock.  The share repurchases that took place pursuant to the authorization began in 2017, and were the first in Facebook's history since becoming a public company.

364.    Facebook's 2016 Annual Report on Form 10-K was filed with the SEC on February 2 or 3, 2017 (the "2016 Form 10-K") and was signed by Defendants Zuckerberg, Wehner, Sandberg, and Thiel (on February 2, 2017), Hastings and Koum (on January 31, 2017) Andreessen and Bowles (on January 30, 2017), and Desmond-Hellman (on January 29, 2017).  The 2016 Form 10-K stated, in relevant part:

> In November 2016, our board of directors authorized a $6.0 billion share repurchase program of our Class A common stock commencing in 2017 and does not have an expiration date.  The timing and actual number of shares repurchased depend on a variety of factors, including price, general business and market conditions, and other investment opportunities, through open market purchases or privately negotiated transactions including through the use of trading plans intended to qualify under Rule 10b5-1 under the Securities Exchange Act of 1934, as amended (Exchange Act).

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

365.    During 2017, Defendants caused Facebook to spend more than $1 billion in cash to repurchase and retire millions of shares of Class A common stock.  By the second quarter of 2018, Facebook completed repurchases under the original authorization

366.    According to Facebook's 2017 Annual Report on Form 10-K filed with the SEC on February 1, 2018, Facebook repurchased approximately 13 million shares of its Class A common shares for an aggregate amount of approximately $2.07 billion in 2017.

367.    Defendants subsequently disclosed that the Company "completed repurchases under the original authorization to purchase up to $6.0 billion of our Class A common stock during the second quarter of 2018" – i.e., Facebook spent nearly $**4 billion** repurchasing shares of its stock in just a few months – right before the Cambridge Analytica incident was publicly revealed at the end of March 2018.

**2.    The Board Increased the Authorization by an Additional $9 Billion in April 2018**

368.    In April 2018, Facebook's Board increased the authorization for the share repurchases by an __**additional** **$9 billion**__.  Facebook completed repurchases under this authorization *before* the year's end.

**3.    The Board Approved Another $9 Billion Increase to the Share Repurchase Authorization in April 2018**

369.    In December 2018, Facebook's Board approved yet __**another** **$9 billion**__ increase for the share repurchase authorization.

370.    Defendants disclosed the authorization increases in the Company's 2018 Annual Report on Form 10-K filed with the SEC on January 31, 2019 (the "2018 Form 10-K").  The 2018 Form 10-K, which was signed by **Defendants Zuckerberg**, **Wehner**, **Andreessen**, **Bowles**, **Chenault**, **Desmond-Hellman**, **Hastings**, **Sandberg**, **Thiel**, and **Zients**, stated in relevant part:

> In November 2016, our board of directors authorized a share repurchase program that commenced in January 2017 and does not have an expiration date. We completed repurchases under the original authorization to purchase up to $6.0 billion of our Class A common stock during the second quarter of 2018.

In April 2018, the authorization for the repurchase of our Class A common stock was increased by an additional $9.0 billion, and we completed repurchases under this authorization during the fourth quarter of 2018.

In December 2018, our board of directors authorized an additional $9.0 billion of repurchases under this program, all of which remained available for future repurchases as of December 31, 2018. The timing and actual number of shares repurchased depend on a variety of factors, including price, general business and market conditions, and other investment opportunities, and shares may be repurchased through open market purchases or privately negotiated transactions, including through the use of trading plans intended to qualify under Rule 10b5-1 under the Exchange Act.

371.     Defendants also disclosed in the 2018 Form 10-K that substantially all of Facebook's "cash used in financing activities during 2018" and the majority in 2017 was spent on share repurchases.  The 2018 Form 10-K stated, in relevant part:

Cash used in financing activities during 2018 consisted of $12.88 billion paid for repurchases of our Class A common stock, and $3.21 billion of taxes paid related to net share settlement of equity awards, offset by a $500 million overdraft in cash pooling entities. The increase in cash used in financing activities during 2018 compared to 2017 was mostly due to an increase in repurchases of our Class A common stock, partially offset by an increase in overdraft balances in cash pooling entities.

Cash used in financing activities during 2017 mostly consisted of $3.25 billion of taxes paid related to net share settlement of equity awards, and $1.98 billion paid for repurchases of our Class A common stock.  The increase in cash used in financing activities during 2017 compared to 2016 was mostly due to taxes paid related to net share settlement of equity awards and repurchases of our Class A common stock that commenced in 2017.

372.     Facebook began repurchasing shares of its Class A common stock, pursuant to the Board's third authorization of an additional $9 billion, in 2019.

373.     In conducting these share repurchases, Defendants falsely signaled to the public that they believed Facebook shares were undervalued and that the repurchases were the best use of the Company's cash.  The share repurchases also had the effect of growing the Company's earnings per share—as share repurchases lower the number of shares outstanding, on which earnings per share are based—as well as its return on assets, return on equity, and other metrics.  Together, these actions helped inflate Facebook's share price.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

374. During the time of the share repurchases, Defendants knowingly or recklessly made materially false or misleading statements and/or failed to disclose material information regarding the Company's data-sharing practices and the Cambridge Analytica incident. Defendants also made false or misleading statements or omissions relating to its internal controls and risks in Facebook's SEC filings. For example, Facebook's 2015, 2016 and 2017 Annual Reports signed by Defendants each contain approximately 20 pages of risk disclosures, yet the only reference to the unauthorized use of user information refers to the mere risk of it happening in the future, obfuscating the fact that such unauthorized use had already occurred and on a massive scale impacting tens of millions of Facebook users. The Annual Reports falsely contain certifications that Facebook's internal controls are effective. Defendants' SEC filings also falsely represented that Facebook maintained robust privacy policies and risk management system to protect user data, and that the Board and senior executives had overall and ultimate responsibility for the management of risk.

375. Defendants' statements (including those contained in Facebook's SEC filings described above) were materially false and misleading, and failed to disclose material information, for the reasons stated above, including the fact that Facebook had already experienced the unauthorized access and use of user information, deviated from its own stated policy to restrict access to user information, and failed to implement and maintain adequate risk controls at the Company.

376. In repurchasing shares in connection with the stock repurchase program, Facebook relied on Defendants' false or misleading statements, which were reflected in the stock price of Facebook's shares that were trading in the market, and Facebook paid the market price for shares of Facebook stock that the Company repurchased in the open market during the relevant period, pursuant to the stock repurchase program and authorizations that were approved by Facebook's Board.

377. The price of Facebook's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.

Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on Facebook, which repurchased shares at artificially inflated prices.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Facebook stock fell as the prior artificial inflation dissipated.

378.    On February 1, 2018, Facebook filed with the SEC a Registration Statement on Form S-8 which registered 42,000,000 shares of Facebook Class A common stock that were reserved for issuance under Facebook's 2012 Equity Incentive Plan for sale at a proposed maximum offering price per share of $185.01, which was estimated based on the average of the high and low prices of Facebook common stock as reported on NASDAQ on January 30, 3018, for a proposed maximum aggregate offering price of $7,770,420,000.00.  The Registration Statement stated that it "shall also cover any additional shares of Facebook Class A common stock that become issuable in respect of the securities identified [in the Registration Statement] by reason of any stock dividend, stock split, recapitalization or other similar transaction effected without [Facebook's] receipt of consideration that results in an increase in the number of the outstanding shares of the [Facebook] Class A common stock."

379.    The Board did not even attempt to justify or explain its rationale for approving the increased authorizations, or the program, without any restrictions or requirements that would suggest the share repurchases were authorized based on an informed and good-faith decision by the Board that it was in the best interests of Facebook and was fair to its minority (non-interested) shareholders, and was not effectuated for any self-interested, self-dealing, or similar improper purpose.  Instead, Defendants stated only vaguely in the 2018 Form 10-K that "[t]he timing and actual number of shares repurchased depend on a variety of factors, including price, general business and market conditions, and other investment opportunities, and shares may be repurchased through open market purchases or privately negotiated transactions…"

380.    Further, Defendants acknowledged in the 2018 Form 10-K that "[t]he program could affect the trading price of our stock" – without any further explanation.  This statement by Defendants admitting that the share repurchases could affect the market price of Facebook stock,

- 114 -

together with the false and misleading statements that Defendants made that caused Facebook's stock to trade at artificially inflated prices, is effectively an admission that Defendants' conduct alleged herein could and did manipulate the market for Facebook stock.

381.    Defendants disclosed for the first time in Facebook's 2018 Form 10-K that the share repurchase program "***will*** diminish [the Company's] cash reserves." Yet, at the same time, Defendants acknowledged there is no obligation to repurchase any shares under the program, and admitted it may not "enhance long-term stockholder value." The 2018 Form 10-K stated, in relevant part, under the heading "Risk Factors":

> **We cannot guarantee that our share repurchase program will be fully consummated or that it will enhance long-term stockholder value. Share repurchases could also increase the volatility of the trading price of our stock and will diminish our cash reserves.**
>
> Although our board of directors has authorized a share repurchase program that commenced in 2017 and does not have an expiration date, the program does not obligate us to repurchase any specific dollar amount or to acquire any specific number of shares of our Class A common stock. We cannot guarantee that the program will be fully consummated or that it will enhance long-term stockholder value. The program could affect the trading price of our stock and increase volatility, and any announcement of a termination of this program may result in a decrease in the trading price of our stock. **In addition, this program will diminish our cash reserves.**

2018 Form 10-K at 27 (second emphasis added).

### C.  While Causing Facebook to Repurchase Shares at Artificially Inflated Prices, Certain Defendants Sold Their Own Shares of Facebook Stock

382.    At the same time Facebook was repurchasing shares of its stock in 2017, 2018, and 2019, certain of the Individual Defendants took advantage of the artificial inflation of Facebook's shares caused by the false and misleading statements and omissions described above, selling over $1 billion worth of their own personally held shares, as set forth below.

383.    Specifically, Defendants Zuckerberg, Sandberg, and Koum (the "Insider Selling Defendants") sold or otherwise disposed of Facebook shares through self-interested transactions, earning billions of dollars in proceeds, while in possession of material, non-public information. At the time of these stock transactions in 2017, 2018, and 2019, all of the Insider Selling Defendants

- 115 -

1  knew about or recklessly disregarded material, non-public information regarding the Cambridge

2  Analytica incident and Facebook's data-sharing practices and violations of user privacy, the FTC

3  Consent Order, and various other laws, as described above.

4    384. All of the Defendants knew or recklessly disregarded that these and other relevant

5  facts were necessary to make Defendants' statements truthful and not misleading, but were not

6  disclosed by Defendants.  While these and other material facts were concealed from Facebook

7  shareholders and the public, the Insider Selling Defendants sold or otherwise disposed of Facebook

8  common stock on the basis of that information, thereby breaching their fiduciary duties.

9    385. At the time of these stock transactions, each of the Individual Defendants was in

10  possession of and had access to material, non-public information regarding, among other things: (i)

11  Facebook's violations and/or potential violations of various state, federal and foreign laws; (ii)

12  Facebook's failure to comply with the terms of the FTC consent order; (iii) Facebook's policies

13  relating to user privacy and the use of Facebook's platform, changes to those policies and the

14  reasons for such changes, violations of those policies, and the Company's failure to monitor

15  compliance with those policies and to enforce those policies; (iv) Facebook's undisclosed data

16  collection practices and its use of user data for targeted advertising and other commercial

17  purposes; (v) Facebook's platform design and the ability of third party apps to obtain user and non-

18  user data via Facebook's platform; (vi) Facebook's data-sharing agreements with third party

19  companies and device manufacturers, and the ability of those companies to obtain user and non-

20  user data via Facebook's platform; and (vii) Facebook's targeted advertising business and revenues

21  derived therefrom.  Thus, the Individual Defendants' knew or should have known that Facebook's

22  stock was artificially inflated due to the failure to disclose material information regarding the

23  foregoing, at the time the Insider Selling Defendants sold their shares of Facebook stock and

24  Facebook repurchased shares of its stock, pursuant to the program and increased authorizations

25  that the Individual Defendants approved and/or effectuated, as alleged herein.

26    386. The Exchange Act requires publicly traded companies to disclose to shareholders

27  "material information," the kind of information that an investor would want to know to protect

28

- 116 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

their investment.  The SEC issued guidance on public reporting of cybersecurity incidents, noting that the commission "encourages companies to continue to use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters."  In the 2017 and 2018 Proxy Statements, Facebook did not mention the Cambridge Analytica incident, and also did not mention these facts in any of its Form 8-K or Form 6-K filings.  Instead, Facebook made general statements in their most recent proxy statement and annual report on Form 10-K about potential, not actual, user privacy and data security risks, and certified that the Company's internal controls were adequate and complied with applicable laws (which necessarily include the FTC Consent Order).  By trading while in possession of this material, non-public information, the Insider Selling Defendants breached their fiduciary duties.

387.    Defendants were required to disclose to shareholders "material information," the kind of information that an investor would want to know to protect their investment.  The SEC issued guidance on public reporting of cybersecurity incidents, noting that the commission "encourages companies to continue to use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters."

388.    In the 2017 and 2018 Proxy Statements, Facebook did not mention the Cambridge Analytica incident, and also did not mention these facts in any of its Form 8-K or Form 6-K filings.  Instead, Facebook made general statements in their most recent Proxy Statement and annual report on Form 10-K about potential, not actual, user privacy and data security risks, and certified that the Company's internal controls were adequate and complied with applicable laws (which necessarily include the FTC Consent Order).

389.    In addition, the financial statements and information in Facebook's public filings with the SEC, including in the 2018 Proxy Statement, were materially false and misleading because Facebook's revenue and other financial metrics were overstated due to Defendants' omissions of material information and failure to sufficiently and/or accurately account for stock-based compensation expense, amounts that were significant and material to understanding Facebook's true financial condition.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

390.     During the relevant period of conduct alleged herein, Defendants knew that the material facts and information described above were not publicly disclosed and that Facebook's minority shareholders and the public had no way of knowing that Facebook's financial statements and public filings were materially false and misleading and, as a result, shares of Facebook's Class A common stock were trading at artificially inflated prices.  While these and other material facts were concealed from Facebook shareholders and the public, the Insider Selling Defendants sold or otherwise disposed of their shares of Facebook common stock.

391.     According to Facebook's 2018 Proxy Statement, **Defendant Koum** held approximately **14.2 million shares** of Facebook Class A common stock.  Beginning in 2017, at the same time when Facebook was repurchasing shares of its Class A common stock in the open market, **Defendant Koum** sold more than twice that amount, or approximately **34.2 million shares** of his personally held Facebook stock, at an average price of $158.52 per share, as set forth in the chart below.

392.     According to the 2018 Proxy Statement, **Defendant Sandberg** held approximately **3.5 million shares** of Facebook stock, including 1.5 million shares of Class A common stock held indirectly through a trust, and an additional 2 million shares of Facebook Class B stock.  Beginning in 2017, at the same time when Facebook was repurchasing shares of its Class A common stock in the open market, **Defendant Sandberg** sold almost twice that amount, or **nearly 7 million shares** of her personally held Facebook stock, at an average price of $155.78 per share, as set forth in the chart below.

393.     According to Facebook's Form 10-Q filed with the SEC on August 30, 2018, **Defendant Zuckerberg** indirectly held approximately **11.92 million** Class A shares through a series of funds.  On July 25, 2018, while Facebook's stock price was trading at around its all-time high, **Defendant Zuckerberg** sold 240,000 shares of Facebook Class A common stock at an average price of **$216.71 per share**, near its all-time high of approximately $223 per share earlier that month, for total proceeds of just over $52 million.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   394.   The Insider Selling Defendants' sales of their Facebook shares described above

2   were unusual in timing and/or amount, particularly in that they occurred at the same time as

3   Facebook was repurchasing shares of its common stock in the open market.

4   395.   Throughout the relevant period in 2017, 2018 and 2019, the Company's stock price

5   was trading at prices that were artificially inflated by the materially false and misleading

6   statements and omissions described above, as shown in the following chart:



FACEBOOK, INC. STOCK PRICE CHART

23   **D. Facebook Suffered Economic Loss and Other Damages As a Result of Defendants' Manipulation of the Market for Facebook Stock Through False and Misleading Statements and Omissions, Repurchases, and Insider Sales**

25   396.   Defendants' misconduct and violations of law alleged herein have caused Facebook

26   to suffer economic loss, and other damages and harm, including to its reputation, and Facebook

1  will continue to suffer damages and harm as a result of these wrongful acts for the foreseeable

2  future.

3      397.    Facebook's users and current and potential investors in the Company's securities

4  consider Facebook's ability to protect its users' personal information, and to maintain adequate

5  internal controls and reporting procedures designed to ensure that violations of Facebook's policies

6  are timely discovered, properly addressed and enforced by the Company, material information.

7  Defendants' failures to protect user data and to maintain and enforce policies respecting same has

8  harmed Facebook, as users are less likely to visit websites that knowingly permit or encourage

9  unscrupulous behavior, and investors are less likely to invest in companies that lack internal

10  controls and fail to timely disclose material information.  Thus, Facebook's ability to attract

11  customers and investors is now impaired due to Defendants' misconduct and violations of law

12  alleged herein.

13      398.    Further, as a direct and proximate result of Defendants' misconduct and violations

14  of law alleged herein, Facebook has expended and will continue to expend significant additional

15  money, including costs incurred in repurchasing shares of Facebook stock at prices that were

16  artificially inflated by Defendants' false and misleading statements; and costs incurred in

17  connection with substantial compensation and benefits paid in cash and in shares of Facebook

18  stock, to Defendants who are responsible for the violations of law alleged herein.

19      399.    Facebook and its minority shareholders suffered damages as a result of the

20  misrepresentations and omissions alleged herein when the circumstances, events and conditions

21  concealed from investors became known to the market, or  the risks arising  from those

22  circumstances, conditions and events manifested,  causing  declines in the market price of

23  Facebook common stock, which trades in an efficient market.

24          **1.    Market Efficiency**

25      400.    Through the efficient operation of the markets in which Facebook common stock

26  was publicly traded, the Company and its minority shareholders may be presumed to have relied

27  upon each of the false and misleading statements alleged herein.

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

401.    At all relevant times, the market for Facebook's Class A common stock was an efficient market for the following reasons (among others):

(a)    Facebook's Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Global Select Market, a highly efficient and automated market;

(b)    As a regulated issuer, Facebook filed periodic public reports with the SEC and the NASDAQ and was, at all times alleged herein, eligible to file a Form S-3 with the SEC;

(c)    Facebook, through the Officer Defendants, and through Facebook employees authorized to speak on behalf of, or as a representative of or spokesperson for the Company, while under Defendants' control and acting at or while subject to their direction, regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, Facebook News Room posts and other publications on the Company's website, and through other wide-ranging public statements and disclosures, such as through earnings conference calls, at investor and industry events, and in various media reports, interviews, and communications with securities analysts, the financial press and other similar reporting services.

(d)    During the relevant period, Facebook was followed by securities analysts employed by major brokerage firms.  Analysts employed by each of these firms regularly wrote reports based upon the publicly available information disseminated by Defendants about Facebook. These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(e)    During the relevant period, the average daily trading volume of Facebook common stock was greater than 20 million shares.

402.    Through the foregoing mechanisms, the information publicly disseminated by Defendants about the Company and its operations, and  the import thereof, became widely available to and was acted upon by investors in the public marketplace such that, as a result of

- 121 -

their transactions in Facebook Class A common stock, the information disseminated by Defendants, including the false and misleading statements described herein, became incorporated into and were reflected by the market price of Facebook's Class A common stock.

403.    Under these circumstances, all purchasers of Facebook's common stock during the Relevant Period, including the Company itself, are presumed to have relied upon the false and misleading statements and material omissions alleged herein.

### 2.    Loss Causation and Damages

404.    Facebook and its minority shareholders during the relevant period suffered economic losses as a direct and proximate result of Defendants' wrongdoing and fraud alleged herein.  Facebook and its minority shareholders during the Relevant Period suffered similar injury as a result of: (i) the Company's repurchase of shares of Facebook Class A common stock in the open market; (ii) the Company's repurchase of shares directly and indirectly from Defendants; (iii) the Company's repurchase of shares through privately negotiated transactions (including with Defendants and various persons, entities, organizations, and companies affiliated with, related to, owned or controlled by Defendants); and (iv) through the contemporaneous sale or conversion of shares pursuant to investor agreements, trading plans, employment agreements, equity compensation plans, and various equity and stock-based compensation awards to Facebook employees, executives and/or directors, through (a) transactions effectuated by, for, or on behalf of Individual Defendants, or that benefited Individual Defendants, (b) the contemporaneous sale or conversion of shares pursuant to Company policies and practices respecting stock-based compensation awards, including the automatic sale or conversion of shares and the automatic or accelerated vesting or exercise of stock options and restricted stock units, (c) awards of shares or other stock-based compensation to Defendants, and (d) awards of shares or other stock-based compensation that the Board authorized, approved, and/or recommended for approval by Facebook shareholders; at the same time as Facebook was repurchasing shares of its stock as set forth above.

405.    The misrepresentations and omissions alleged herein impacted the public trading price for Facebook's common stock by causing it to trade at a price higher than it would have had

the facts, risks and conditions concealed by Defendants' fraud become known sooner than it did. The impact on Facebook's stock price occurred by increasing the trading price of Facebook stock at the time of the misrepresentation or by preventing a price decline that would have occurred at that time with the full disclosure of the truth, or both.

406.    The facts, risks and conditions concealed from investors by Defendants' scheme to defraud reached the market through a series of partial disclosures.  Though each of the disclosures was incomplete, each revealed some of the falsity of Defendants' statements regarding user control over data, the Cambridge Analytica matter, and other elements of Defendants' fraud alleged herein, including the concealed materialization of risks to its operations, leading to price declines that partially corrected Facebook's stock price by reducing the extent to which it had been inflated by Defendants' fraud scheme, thereby injuring Facebook and its minority shareholders during the relevant period that: (i) purchased shares of Facebook stock in the open market at prices that had been artificially inflated by the fraudulent course of business and misleading statements and omissions alleged herein; (ii) purchased shares of Facebook stock from Defendants, directly (*i.e.*, by Facebook from Individual Defendants in privately negotiated transactions, including transactions in Facebook securities by Individual Defendants or involving the sale, transfer, conversion, or issuance of shares of Facebook stock by or to Individual Defendants) or indirectly (i.e., by Facebook of any shares owned, obtained or acquired by or from Individual Defendants including pursuant to any stock options, restricted stock units, or other stock-based compensation awarded to Individual Defendants or that was obtained or acquired pursuant to or as the result of any such award); or (iii) experienced dilution of their ownership or equity interest and suffered economic loss as a result of: (a) the issuance of additional shares of Facebook stock that were sold in the open market during the Relevant Period; (b) the sale of shares of Facebook stock by Individual Defendants in the open market; or (c) the exercise of stock options or conversion of shares or an interest in Facebook securities obtained or acquired through an award of stock or stock-based compensation to Individual Defendants during the Relevant Period.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

407.    The disclosures that impacted the price of Facebook's common stock include those identified in the chart below, which identifies each event, the change in Facebook's stock   price on the day of the event, and, for purposes of comparison, the percentage change during the same time period in the Standard & Poor's 500 Stock Index ("S&P 500"), one of the market indices to which Facebook compares its stock performance in its annual reports to the SEC:

| | | Facebook | | S&P 500 |
|---|---|---|---|---|
| Date | Event | $ Δ | % Δ | % Δ |
| 3/19/18 | *NYT & Guardian* reports | ($12.53 | (6.8%) | (1.4%) |
| 3/20/18 | Continuing revelations of extent of "data breach" and lax enforcement, and of regulatory and user backlash | ($4.41) | (2.6%) | 0.15% |
| 3/22/18 | | ($4.50) | (2.7%) | (2.5%) |
| 3/23/18 | | ($5.50) | (3.3%) | (2.1%) |
| 3/27/18 | | ($7.84) | (4.9%) | (1.7%) |
| 4/26/18 | 1Q18 Earnings Release | $14.47 | 9.1% | 1.0% |
| 7/26/18 | 2Q18 Earnings Release | ($41.24 | (19.0% | (0.3%) |

408.    On Monday, March 19, 2018, following the numerous disclosures over the preceding weekend regarding the misuse of Facebook user data – including the press release issued by Facebook after the market closed on Friday, March 16, 2018 and the articles published by *The New York Times* and *The Guardian* on Saturday, March 17, 2018 which caused the price of Facebook common stock to decline -- Facebook shares opened at $177.01, down 4.4% from the previous Friday's closing price.  Over the course of the day, as additional news regarding the extent of the data breach emerged, Facebook's stock price continued to decline, to close at $172.56, a 6.8% decline from the prior Friday's closing price on volume of 88 million shares, more than four times the average trading volume during the Relevant Period.

409.    The price of Facebook common stock continued to decline thereafter as a result of additional disclosures of material information regarding the extent of the data breach, Defendants' misrepresentations about Facebook's response to that breach, and the magnitude of the risks facing the Company.  By the close of the market on March 27, 2018, the price of Facebook common stock had declined to $152.22 as a result of such disclosures, completing a stunning 17.8%

- 124 -

1   ($32.87) decline in the price of its shares immediately before the Company's failure to retrieve

2   user data from Cambridge Analytica and other third parties was disclosed.

3       410.   On March 21, 2018, Defendants Zuckerberg and Sandberg began conducting media

4   interviews designed to assure investors, users and the public that Defendants were taking

5   responsibility for their actions, were doing everything they could to correct the problem, and that

6   Cambridge Analytica had deceived them into believing that it had destroyed the purloined user

7   data in 2015.

8       411.   As a result of Defendants' public relations campaign, the decline in Facebook's

9   share price was temporarily halted, and Facebook's stock closed at $169.39, less than a percentage

10   point higher than its closing price on March 20.

11       412.   However, as additional details emerged concerning the scope of the data breach, the

12   risks facing the Company, and increased calls for government investigations, Facebook's stock

13   price resumed its decline, closing at $159.39 on Friday, March 23, 2018, an overall decline of

14   $25.70 per share (14%) from the closing price the prior Friday before the scandal broke.

15       413.   On March 27, 2018, the price of Facebook common stock fell by $7.84 per share, a

16   4.9% decline from the prior day's close.  This decline was the result of continuing revelations of

17   the extent of the data breach and the risks to the Company, including the FTC's confirmation that

18   it had opened an investigation into Facebook's compliance with the 2012 Consent Order.

19       414.   On April 26, 2018, Facebook's stock price rocketed upwards by 9% as the

20   Company reported 1Q18 earnings which, together with the statements made by Defendants on the

21   earnings call that day, led many analysts and investors to believe that the data breach had only had

22   a negligible impact on user engagement with Facebook's platform.

23       415.   On July 26, 2018, however, Facebook announced its earnings for the second quarter

24   of 2018.   This announcement revealed the true extent of the damage from the Cambridge

25   Analytica scandal and caused Facebook's stock to plummet by 19%.  Defendants revealed that the

26   data privacy scandal had caused a far greater impact on the Company than they had previously

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   represented, resulting in dramatically lowered user engagement, substantially decreased

2   advertising revenue and earnings, and reduced growth expectations going forward.

3        416.   The decline in user engagement, advertising revenues, and guidance for the

4   remainder of the year – alongside the increased spending that Facebook was required to undertake

5   to protect user data from being exploited – were the result of Defendants' concealment of the risks

6   arising from the Cambridge Analytica data breach;  Defendants' false assurances about the

7   adequacy of the Company's prior response to that incident; and the utter inadequacy of the

8   measures that Defendants had implemented to prevent similar events from occurring in the future

9   or to curtail the harm if they did.

10        417.   Facebook's quarterly results were a direct and proximate result of the concealed

11   decision by Defendants to grow Facebook's targeted advertising business – and its revenues – at

12   the expense of protecting user privacy and the Company's compliance with the FTC Consent

13   Order and the law.

14        418.   The Company's costs ballooned to $7.4 billion, a 50% increase from the prior year.

15   Much of the increase resulted from measures imposed to protect user data from exploitation,

16   including to provide the level of protection that Defendants had previously, and falsely, asserted it

17   was already providing.  Capital expenditures similarly rose 133% from the prior year, reflecting

18   spending on infrastructure necessary to render Facebook's services safe for users.

19        419.   Investors and analysts explicitly connected the historic decline in Facebook's

20   market capitalization to the Cambridge Analytica scandal  –  and related privacy concerns,

21   including the recent implementation of GDPR in Europe, that had shaken the Company over the

22   previous months.

23        420.   For instance, on July 26, 2018, CFRA issued a report noting, "[w]e lower our EPS

24   estimates for 2018 to $7.29 from $7.42 and 2019 to $8.24 from $8.63, given what we see as FB's

25   efforts to invest significantly to respond to the Cambridge Analytica revelations."  (*See* Scott

26   Kessler, CFRA Reiterates Hold Opinion on Shares of Facebook, Inc., CFRA (July 26, 2018)).

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

421.     Cowen similarly noted that the decline in advertising revenue that Facebook was bringing in was driven in part by "privacy via features that could reduce ad targeting capabilities (like clearing user history) and GDPR impact on users in Europe (as some users don't opt in for tracking usage)."  (John Blackledge, Nick Yako, et al., *2Q18 Results: 2H18 Ad Rev Decel and L-T Margin Forecast Worse Than Expected*, Cowen (July 26, 2018).)

422.     Wells Fargo noted its concern over the negative impact "of the continued efforts around security and privacy, both from the standpoint of GDPR implementation as well as new services and controls that offer more ways for users to opt out of ads," and its report also mentioned the magnitude of the "Security & Privacy efforts" that Facebook was now being forced to impose.  (Ken Sena, Peter Stabler, et al., *FB: Coming Up Against Scale*, Wells Fargo Securities (July 22, 2018).)

423.     Additionally, J.P. Morgan's report on July 26, 2018, stated, "FB is seeing some headwinds from data & privacy related issues.  For 2H18, FB also called out privacy as likely to drag on revenue growth.  FB is giving users more choices around privacy & how their data is used, & we believe advertisers are also being more cautious around targeting consumers."  (*See* Doug Anmuth, Ashwin Kesireddy, et al., *Major Reset Stories & Data/Privacy Drag on N-T Revs Heavy Investments Continue; Remain OW, PT to $205 Dropping from AFL*, J.P. Morgan (July 26, 2018).)

424.     Macquarie's analysts similarly described their "concerns re LT trends/headlines are forcing significant changes to user privacy/data concerns.  In 3Q, we expect that users globally may be offered options that go well beyond GDPR changes.  Such changes are likely a key driver of the 4Q revenue guidance."  (*See* Benjamin Schachter, Ed Alter & Angela Newell, *2Q'18 Bombshell Guidance; Structural Shifts*, Macquarie Research (July 26, 2018).)

425.     Barclays issued a research report titled "FB Throws Some Napalm on the Fire" that stated:

> Key Take-Away: Either Core Is Imploding or FB Wants Self-Inflicted Pain
>
> We haven't seen this disastrous a print since the 1Q16 LNKD-massacre that brought the entire NASDAQ down.  The two theories we could come up with as to why FB is guiding revenue down severely with 3Q and 4Q now expected to

both decelerate high single digits sequentially are: 1) they don't want to create the perception of getting rich while their product presents issues for society (but why didn't this happen on the Jan/April calls?), or 2) there are more serious engagement problems with core Facebook that have materialized recently that they are trying to fix.

426.    Journalists and commentators also connected Facebook's earnings report for the second quarter of 2018 to the privacy scandals that had ensnared the Company earlier in the year.

427.    For example, CNBC headlined its July 25, 2018 video report on Facebook's earnings miss, "Facebook shares collapse as a result of Cambridge Analytica." *Bloomberg* likewise noted on July 25, 2018, "Facebook Takes Historic Plunge as Scandals Finally Take a Toll." *The New York Times* similarly headlined its story, "Facebook starts paying a price for scandals."

428.    CNET.com's reporting also suggested that the July 2018 stock price collapse was the inevitable result of the Company's response to the Cambridge Analytica privacy scandal, noting, "Until now . . . there was a sense that the vast majority of users didn't fully understand Facebook's business.  But the ongoing scandals have caused many people to take another look."

429.    Reporting for *Forbes* in a July 29, 2018 article titled "Profit Versus Privacy: Facebook's Stock Collapse and its Empty 'Privacy First' Policy," Kalev Leetaru described, "At the center of [Facebook's] pessimistic outlook?  The increasing impact of the profit versus privacy battle at the center of the Cambridge Analytica story and the growing inability of Facebook to control its platform and protect it from harmful misuse."

## IX.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

430.    Gathering user data was Facebook's self-proclaimed goal from the time it launched its platform in 2007, and the Company's business has grown along with Facebook's user base. Facebook monetizes user data by selling advertisements targeted specifically to its users, and the Company's unique ability to offer targeted advertising services, which depend upon the data Facebook gathers from its users, has allowed it to dominate the online advertising market. Defendants knew that Facebook's business depends on maintaining user trust and confidence in

the security of their personal information that they share on Facebook.  Moreover, each of the Individual Defendants was required to ensure that Facebook maintained adequate internal controls and procedures to monitor and enforce violations of Facebook's policies, pursuant to the terms of the Consent Order that was entered in 2012 after the FTC found in 2011 that Facebook made misrepresentations about the extent to which it protected user privacy and falsely stated that it did not provide advertisers with information about Facebook users without their consent (among other things).

### A. Defendants Oversaw an Illegal Business Strategy Based on "Reciprocity" – *i.e.*, Granting Access to Facebook User Data in Exchange for Something of Value

431.    In 2012, Defendants Zuckerberg and Sandberg, with the Board's knowledge and approval, implemented a business strategy that was designed to leverage Facebook's user data and transition the Company's collapsing desktop advertising business to mobile.  Defendants' strategy involved granting access to Facebook's users or their data, in exchange for something of value, such as payment for Facebook's targeted advertising services, or significant sums or amounts spent on advertising with Facebook, providing their own data to Facebook, or providing something else of roughly equivalent value, such as an important relationship or partnership that increased Facebook's visibility or access to users or that enhanced its brand or reputation.  The strategy, known as "reciprocity," meant that Facebook allowed third parties, including app developers and other large companies that Facebook partnered with, such as Amazon and Apple, to access and obtain Facebook user data, and Facebook was also given access to their data, and obtained additional information about Facebook users, all without their knowledge or informed consent.

432.    Defendants' decision to share Facebook user data with third parties in exchange for "reciprocity" significantly increased Facebook's access to information, both about its users and about persons who were not Facebook users, through mobile devices and features that were implemented or used on mobile devices that gathered and provided additional information about users.  Facebook obtained or was provided this information, as well as other data concerning users, pursuant to its partnerships and agreements with mobile device manufacturers and other

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

companies, which allowed the Company to further refine its algorithm and enhance its ability to recognize, track, and target users – with advertising, messaging, and for potentially nefarious purposes – all without their knowledge and consent.

433. Defendants' "reciprocity" strategy was highly profitable. By the fourth quarter of 2013, Facebook's total revenue for the quarter was $2.59 billion, $1 billion more than in the same quarter the previous year, with revenue from advertising of $2.34 billion, up 76 percent from the previous year. The majority of the Company's advertising revenue (53 percent) came from targeted advertisements that Facebook delivered to smartphones, tablets, and other mobile devices, with many of those ads highly targeted by gender, age and other user demographics.

### 1. The FTC Found That Defendants Immediately Violated the FTC Consent Order After It Was Entered in 2012

434. The FTC Consent Order specifically required Facebook to implement and maintain policies designed to ensure that user data was protected and that third parties could only access user data through Facebook's platform if they complied with its policies and obtained the express consent of Facebook users. Facebook was also prohibited from "making any further deceptive privacy claims," and from "misrepresent[ing] in any manner, expressly or by implication, the extent to which it maintains privacy or security of [user] information," and required to accurately describe its practices with respect to the "collection [and] disclosure of any [user] information" and "the extent to which [Facebook] makes or has made [user] information accessible to third parties" (among other things).

435. Despite the 2012 FTC Consent Order, the FTC found that Facebook secretly continued giving third party app developers access to user friends' data regardless of how users set their Privacy Settings. And, Defendants falsely represented throughout the relevant period while the FTC Consent Order was in effect that Facebook protected the personal information of its users by ensuring that third parties could only access user data if they complied with Facebook's policies and obtained the express consent of Facebook users.

436.     In 2013, Defendants acknowledged internally that it was improper for Facebook to give third-party app developers to access user friends' data.  As an internal Facebook document dating from August 2013 explains:

> Users should not be able to act as a proxy to access personal information about friends that have not expressed any intent in using the app.

437.     Defendants' belated acknowledgement was long overdue.  As the 2019 FTC Complaint charges: "Facebook knew or should have known that its conduct violated the 2012 [Consent Order] because it was engaging in the very same conduct that the [FTC] alleged was deceptive in Count One of the original Complaint that led to the 2012 [Consent Order]."

438.     The problem for Facebook was that completely cutting off this practice – and providing users with actual control over their data – would significantly limit Facebook's ability to profit from its vast store of user data.  Defendants did not want to completely give up on monetizing this data.

439.     Accordingly, Defendants – including Zuckerberg and Sandberg – decided to continue providing access to user friend data to a wide array of third parties who would, in exchange, provide reciprocal value to Facebook.  As discussed below, and confirmed in internal Facebook documents, this "reciprocity" became the "fundamental principle that govern[ed]" the Facebook Platform from 2014 and continued through mid-2018.

440.     The way it worked was that Defendants would exchange user friend data as consideration for a reciprocal exchange of value with third party app developers and other companies who were "whitelisted" for secret access to user friend data.

441.     In this way, Defendants engaged in selling user friend data in exchange for reciprocal benefits.  For Defendants, "reciprocity" came in various forms, including an exchange of data between a whitelisted app developer and Facebook, by Facebook requiring the third party to spend substantial sums on advertising at Facebook or by a third party enhancing Facebook's brand and platform to make it more attractive to users, as in the case of the dozens of major phone device makers that Facebook whitelisted during the Relevant Period.

**2.    Facebook's Internal Documents Confirm Defendants' Decision to Exchange Data for Reciprocal Value**

442.    Internal Facebook documents made public in connection with ligation between Facebook and an app developer, Six4Three (the "Six4Three Documents") confirm that Defendants supplied user friend data in exchange for reciprocal value.

443.    An internal Facebook memo explaining the policies for Facebook's Platform 3.0 rollout (which indicates that the memo was created in the period from mid-2013 to early 2014), states:

> The fundamental principle that governs Platform usage is a simple concept: reciprocity. Reciprocity involves an equitable value exchange between a 3rd party developer and Facebook. This value exchange involves one of the following from developers: high-quality experiences that FB users can use to tell great stories to their friends and family on FB and/or monetary value in the from of revenue sharing or direct payment. In return, Facebook offers a developers [sic] access to our platform.

444.    Defendants implemented internal systems and app review procedures to ensure that certain third parties were able to access additional information about Facebook users that others were not, the amount of which was roughly equivalent to, and based upon, their own individual provision of payment, data, or another benefit to Facebook. For example, the same internal memo regarding the Platform 3.0 rollout indicates that: "During app review, we examine the APIs that app uses in order to determine what [is] the appropriate level of reciprocity. The guideline for this review is '***take data, give data***.'"

445.    Internal Company correspondence indicates that Facebook's internal systems allowed it to increase access by a particular app to additional features with information about Facebook users that only "whitelisted" apps were permitted to access. For example, emails dating from September 2013 state that "the capability will remain to give access features which are publicly deprecated [i.e., discontinued] but available to whitelisted apps." This included "apps that have been whitelisted for… friends" (including Netflix, which was listed as an example).

446.    Facebook directly tied third parties' access to data to the amount they spent on the Company's advertising services. For example, an email string dated September 23, 2013 shows

Ime Archibong, Facebook's Director of Global Product Partnerships, and Konstanitinos Papamiltiadis, Facebook's Director of Developer Platform and Programs, discussing the fact that Facebook was requiring third-party app developers to "spend on [advertising at Facebook] *at least $250K a year to maintain access to the data*."  Otherwise, Facebook employees would "[c]ommunicate in one-go to all apps that don't spend that those permission[s] will be revoked."

447.    Defendants Zuckerberg and Sandberg were involved in discussions about the Company's policies and the decision to exchange Facebook users' data, and that of their friends, for reciprocal value from third parties.  Internal Facebook documents dating from October 30, 2012 show Facebook employees discussing, for example, "*a series of conversations w/ Mark [Zuckerberg] for months about the Platform Business Model*."  These discussions included the fact that Facebook would "remove/*whitelist access* to the Stream APIS and Search APIs and potentially other APIs that might leak the friend graph" and that "[w]e are going to require that all platform partners agree to data reciprocity."

448.    Similarly, a November 16, 2012 message from Mike Vernal to Defendant Zuckerberg states: "Mark – We didn't get to meet this week... I wanted to check whether you'd prefer discuss any of these meetings via Messenger in the interim.  Some of the topics that are queued up: Platform 3.0…. And, obviously there is the PBM conversation which comes down to deciding between: free friends, paid coeff and total reciprocity for all; free friends, paid coeff, categorical reciprocity for all, and total reciprocity for big guys / competitors; paid friends, categorical reciprocity for all, total reciprocity for big guys / competitors.  I think the ball is in your court on this one, but let me know if you need any more data from us."

449.    Internal Company documents confirm that both Zuckerberg and Sandberg understood the value of Facebook users' data and approved of the strategy of "full reciprocity" in order to maximize the value of Facebook.

450.    In an email dated November 19, 2012, Zuckerberg wrote:

> The quick summary is that *I think we should go with full reciprocity and access to app friends* for no charge.  Full reciprocity means that apps are required to give any user connects to FB a prominent option to share all of their social content

- 133 -

within that service (ie all content that is visible to more than a few people, but excluding 1:1 or smaller group messages) back to Facebook…   The last question is whether we should include app friends (ie the user's friends who are also using third app).  Ultimately, it seems like this data is what developers want most and if we pulled this out of the package them most of the value position falls apart.

451.   Zuckerberg also explained in the email that "full reciprocity" would "increase the value of our network…[by]… increas[ing] sharing back into Facebook."   Defendant Sandberg responded, stating, "I like full reciprocity and this is the heart of why."

452.   The deposition testimony of Facebook employees confirms, "[t]he fundamental principle that governs platform usage is a simple concept: reciprocity."  As one Facebook employee explained, "Reciprocity involves an equitable value exchange between a third-party developer and Facebook."  Further, the employee noted that, "when considering the implications of reciprocity, it is important to note that a second order principle quickly emerges: competitive access."  According to the employee, "We maintained a small list of strategic competitors that Mark personally reviewed… Any usage beyond that specified is not permitted without Mark level sign-off."  When asked whether "that mean[s] that Mark Zuckerberg personally reviewed this small list of strategic competitors, and that he personally had to sign off on whether or not these strategic competitors would have access to data?"  the Facebook employee responded unequivocally, "Yes.  I believe so."

453.   The Six4Three Documents indicate that Defendants' decisions to restrict or grant access to user data was based on the apps' spending on Facebook advertisements and developers' personal relationships with Zuckerberg and Sandberg.  For example, in an email dated December 16, 2013, a Facebook employee wrote:

In prep for Platform Simplification, we're putting together a list of developers who we think could be noisy and negative in press about the changes we're making. Primarily we think it will be a list of the usual suspects from past policy enforcements.  We'd love to pull from your historic knowledge on the topic.  Is there anybody you'd add to the list below?  We're going to build plans around how we manage and communicate with each of these developers. *There are also comms plans in the works for working with developers who are high ad spenders and friends of Mark/Sheryl.*

- 134 -

1  The email goes on to list such developers and companies including iLike, Rock You, Zynga, Path,

2  Flipboard, Slide, Social Fixer, SocialCam, Viddy, BranchOut, Vince, Voxer, Message Me, Lulu,

3  Anil Dash, Super Cell, Kabam, Wash Post, Guardian WSJ, Jason Calacanis, Circle, Bang with

4  friends, Tinder, Social Roullete, App Wonder, Ark, Vintage Camera, and Girls Around Me.

5  454.   The Six4Three Documents also include an internal Facebook email exchange from

6  November 2012 in which a Facebook employee suggested that his team "identify our top 20

7  developers and put together a straw man for how we will enforce reciprocity with each of them.

8  We need this for the meeting with Mark [Zuckerberg] on Monday to help ground the discussion

9  about what 'full reciprocity' actually mean…."  The same day, those employees discussed whether

10  the team would classify the developers who would be required to engage in reciprocity with

11  Facebook by "a specific criterion, e.g., MAU)" or "based on the … partners which Mark

12  [Zuckerberg] focues on."  Vernal responded that the team should focus on "the apps that Mark

13  [Zuckerberg] knows, loves, and is concerned about."

14  455.   Additional internal Facebook documents show that Defendant Zuckerberg was

15  personally involved in granular decisions to grant or ban third parties from having access to users'

16  friends' data.

17  456.   For example, one of the apps that Facebook "whitelisted" due to such relationships

18  was Tinder, a dating app.  In an email, Defendant Zuckerberg discussed the fact that a Tinder co-

19  founder wanted to meet with him, and noted the probable reason why: "He probably just wants to

20  make sure we won't turn off their API."  Thereafter, Facebook "whitelisted" Tinder, and the app

21  continued to secretly access Facebook users' friends' data.

22  457.   By contrast, Zuckerberg specifically approved shutting down Twitter's "friends API

23  access" because Twitter, a competitor, had launched the "Vine" video app that allowed users to

24  "find friends via FB."  A January 24, 2013 email from a Facebook employee stated, "Unless

25  anyone raised objections, we will down their friends API access today."  Zuckerberg replied,

26  "Yup, go for it."

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

458.     Internal Facebook documents also confirm that Defendant Sandberg was also responsible for decision-making and implementation of the "full reciprocity" strategy and Facebook's privacy policy and practices.  An internal Facebook email from 2012 with the subject "Facebook Daily News – Friday Morning" stated, "Earlier this week, Facebook's new advertising policies raised some privacy concerns.  The new Custom Audiences advertising feature allows marketers to target their ad or sponsored story to a specific set of users using phone numbers or email addresses posted on the site.  Facebook COO Sheryl Sandberg defended the new feature and stated that "we never sell user information, we don't make money when you share more, and we do not give your information to marketers."

459.     Further, in connection with his testimony to the U.K. Parliamentary Committee about Facebook's improper whitelisting practices, Ashkan Soltani identified Defendant Sandberg as the Facebook executive responsible for making the decision to engage in this practice.  Soltani testified:

> My understanding is that a lot of these decisions [including whitelisting and overriding privacy settings] are [Ms. Sandberg's].  She is the one who makes the monetization calls and makes the priorities, and that is who I would want to see up here testifying on these business decisions, and specifically on the monetization and decisions of what to prioritize.

**B.  Defendants Continued to Allow "Whitelisted" Third-Party Apps to Access User Data While Representing That Facebook's More Restrictive Policies Prohibited Such Unauthorized Access**

460.     Defendants continued to use Facebook's "whitelisting" practice as a bargaining chip with third parties even after the FTC Consent Order was entered in 2012, while at the same time representing publicly that Facebook's supposedly more restrictive policies were adopted for the protection of its users and as privacy enhancements.

461.     An internal Company email dating from October 2013 shows that before Facebook supposedly cut off third parties' access to users' friends' data in 2014, the Company divided apps into "'three buckets: existing competitors, possible future competitors, [or] developers that we have alignment with on business models.'"

462.     After Facebook supposedly cut off access to friends' data, and announced that change publicly, the developers who fell into the "alignment" bucket were able to regain access privately by agreeing to make mobile advertising purchases or provide reciprocal user data from their sites.  Facebook executives who worked on the plan reportedly referred to it as the "'Switcharoo Plan.'"

463.     An October 22, 2013 discussion between Facebook employees Ilya Sukhar and Eddie O' Neil reflects the internal dismay over such the upcoming change.  Sukhar stated, "*I just spoke to [Papamiltiadis]…. He is livid about this whole thing.  Thinks 'Protect the Graph' is flawed. Thinks we will just whitelist all of our friends and that'll alienate general devs….* I would say his take is like mine 3 months ago, certainly less informed but fundamentally correct. We are eroding the value of platform for unclear reasons…"  O'Neil responded, "Ah – got it. *Agree that Platform constantly changes things and burns partners*…  Agree repetition will help – so will giving them context into the problems facing platform, esp. the scope of data leakage."

464.     An email dated December 2, 2013 demonstrates that another Facebook employee internally complained that the new plan to "group apps into buckets based on how scared we are of them" made them feel "unethical" and "like a bad person."

465.     Facebook employees pointed to Zuckerberg as being intimately involved in the discussions and decision-making around these changes to the platform.  For instance, one Facebook employee wrote in an email dated August 25, 2013, that he shared his concerns about changes to the platform "in every single meeting I have with… Zuck."

466.     Another Facebook employee, Douglas Purdy, similarly noted in an instant message conversation with other Facebook employees on October 15, 2013, "[W]e have spent hours and hours with [Z]uck, etc. about this."

467.     The charges brought by the DOJ, and the FTC's findings in the 2019 FTC Complaint, confirm that Defendants' decisions and representations regarding the changes to Facebook policies were a direct and proximate cause of the violations of the Consent Order.  For example, the FTC found that "Facebook made several changes to the Privacy Settings and Apps

- 137 -

1  Settings pages throughout 2013 and 2014.  However, none of the changes sought to inform users

2  that sharing data with their Friends also allowed Facebook to share that data with any of the more

3  than one million third-party developers whose apps could be used by their Friends."  FTC 2019

4  Complaint, ¶87.

5       468.    The DOJ's charges and FTC's findings also confirm that Defendants not only

6  violated the Consent Order, but also engaged in, approved, authorized, and/or allowed other

7  similar deceptive practices and additional violations of the FTC Act.

8       469.    Importantly, the FTC 2019 Complaint indicates that its findings concern many of

9  the same statements that Defendants also made and specifically directed to investors, via the same

10  channels that the FTC 2019 Complaint identifies as the "various means" through which "Facebook

11  communicates with its users …, including keynote addresses during F8 conferences, videos on

12  Facebook's YouTube channel, and Facebook Newsroom."  FTC 2019 Complaint, ¶95.

13       **1.**    **The FTC Found "Financial Considerations Influenced Facebook's Decisions Regarding Whether to Restrict … Access to User Data"**

14       470.    The FTC found that "[e]ven though Facebook acknowledged the data-privacy risks

15  associated with the data access it gave to third-party developers, on numerous occasions, while

16  determining whether to continue granting a particular developer access to user data, it considered

17  how large a financial benefit the developer would provide to Facebook, such as through spending

18  money on advertisements or offering reciprocal data-sharing arrangements."  FTC 2019

19  Complaint, ¶88.  The following paragraphs are quoted directly from the FTC 2019 Complaint.

20       471.    At one point in 2013, for instance, Facebook considered whether to maintain or

21  remove data permissions for third-party developers based on whether the developer spent at least

22  $250,000 in mobile advertising with Facebook.  FTC 2019 Complaint, ¶89.

23       472.    As internal Facebook documents explained, Facebook would contact apps spending

24  more than $250,000 on advertising and ask them to confirm the need for the data they were

25  accessing, while Facebook would terminate access for apps spending less than $250,000.  FTC

26  2019 Complaint, ¶90.

27

28                                       - 138 -

473.     Similarly, during the transition to the second version of Graph API ("Graph API V2"), when preparing to implement changes to the Platform to remove third-party developers' access to Affected Friend data, ***Facebook explicitly evaluated whether apps affected by the changes spent money on advertising with Facebook, generated revenue for the company, or otherwise offered something of value such as reciprocal access to user data***.  FTC 2019 Complaint, ¶91 (emphasis added).

### 2.     The FTC Found That "Facebook Was Aware That Giving Millions of Third-Party Developers Access to [User] Data Posed Privacy Risks"

474.     The FTC found that "Facebook was aware of the privacy risks posed by allowing millions of third-party developers to access and collect Affected Friend data ***for nearly two years*** before it changed the Graph API to remove third-party developers' access to that data."  FTC 2019 Complaint, ¶81.  The following paragraphs are quoted directly from the FTC 2019 Complaint.

475.     By August 2013, Facebook had decided to remove third-party developers' access to Affected Friend data.  As an internal document explained:

> We are removing the ability for users to share data that belongs to their friends who have not installed the app. Users should not be able to act as a proxy to access personal information about friends that have not expressed any intent in using the app.

FTC 2019 Complaint, ¶81.

476.     In September 2013, Facebook audited a set of apps to determine whether to revoke their data permissions.  That audit revealed that over a 30-day period, the audited apps were making hundreds of millions of requests to the Graph API for a variety of data, including Affected Friends' work histories, photos, videos, statuses, "likes," interests, events, education histories, hometowns, locations, relationships, and birthdays.  FTC 2019 Complaint, ¶82.

477.     In some instances, the apps called for data about Affected Friends in numbers that greatly exceeded the number of the apps' monthly active users.  For example, one app highlighted in the audit made more than 450 million requests for data—roughly 33 times its monthly active users.  FTC 2019 Complaint, ¶83.

- 139 -

478.    Indeed, the volume of data acquired by the audited apps led one Facebook employee to comment, "I must admit, I was surprised to find out that we are giving out a lot here for no obvious reason."  FTC 2019 Complaint, ¶84.

479.    This was not the only instance in which an examination of apps showed massive amounts of Affected Friends' data being accessed.  ***A mere month after the September 2013 audit, while discussing upcoming Platform changes, senior Facebook management employees observed that third-party developers were making more than 800 billion calls to the API per month and noted that permissions for Affected Friends' data were being widely misused.***  FTC 2019 Complaint, ¶85 (emphasis added).

480.    Likewise, in 2014, when discussing changes that would be made to the Platform, Facebook senior management employees considered reports showing that, every day, more than 13,000 apps were requesting Affected Friends' data.  FTC 2019 Complaint, ¶86.

### C. Defendants Received Multiple "Red Flag" Warnings of Potential Violations of Facebook's Policies (and the FTC Consent Order) Throughout the Relevant Period

481.    Despite Facebook's many assurances to the contrary – including its April 2014 false promise to eliminate third-party sharing of data – Facebook's deliberately lax privacy practices continued even after the Company learned of the sale of user data to Cambridge Analytica. Defendants received multiple red flag warnings of Facebook's privacy abuses, including red flags indicating that Facebook's own policies had been violated, were not enforced consistently, and were inadequate to detect and prevent wrongdoing, as well as other indications that the Company was not complying with the Consent Order.

482.    Facebook acquired WhatsApp, a mobile messaging service co-founded by defendant Koum, the co-founder and then CEO of WhatsApp, in 2014.  In the press release announcing the acquisition, dated February 9, 2014, Defendant Zuckerberg stated, "I've known Jan [Koum] for a long time and I'm excited to partner with him and his team to make the world more open and connected."  Defendant Koum said, "WhatsApp's extremely high user engagement and rapid growth are driven by the simple, powerful and instantaneous messaging capabilities we

- 140 -

1   provide.  We're excited and honored to partner with Mark and Facebook as we continue to bring

2   our product to more people around the world."  Defendant Koum stayed on as WhatsApp's CEO

3   after the acquisition, and according to Facebook's website, he was "responsible for setting the

4   overall direction and strategy for WhatsApp."

5        483.   On April 30, 2018, Defendant Koum publicly announced his departure from

6   WhatsApp and resignation from Facebook's board of directors.  According to the *Washington*

7   *Post*, which spoke to "people familiar with internal discussions" over Koum's departure, there

8   were tensions with Facebook over WhatsApp's end-to-end encryption, which ensures that

9   messages can't be intercepted and read by anyone outside of the conversation, including by

10  WhatsApp or Facebook. WhatsApp executives believed that Facebook's desire to make it easier

11  for businesses to use its tools would require weakening some of the encryption.  "Koum's exit is

12  highly unusual at Facebook," *The Washington Post* reported.  "The inner circle of management, as

13  well as the board of directors, has be fiercely loyal during the scandals that have rocked media

14  giant.   In addition, Koum is the sole founder of a company acquitted by Facebook to serve on its

15  board. Only two other Facebook executives, Zuckerberg and Chief Operating Officer Sheryl

16  Sandberg, are members of the board."  Koum did not give any reasons for his exit.  Nevertheless,

17  he explained that he deeply cared about the privacy of communication in 2014 when he sold

18  WhatsApp to Facebook, stating in a blog post, "respect for your privacy is coded into our DNA,

19  and we built WhatsApp around the goal of knowing as little about you as possible… If partnering

20  with Facebook meant that we had to change our values, we wouldn't have done it."

21       484.   Brian Acton ("Acton"), who co-founded WhatsApp with Koum in 2009, left

22  Facebook in November of 2018.  At the time, *Techcrunch* reported:

23         Both Acton and defendant Koum are purportedly big believers in

24         privacy, and that's the reason why WhatsApp insisted no ads and
       operated independently even though Facebook scrapped the 99-cent

25         annual charge to prevent WhatsApp from generating revenue,
       according to the *Washington Post*.

26

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

> Sandy Parakilas, a former Facebook manager, told *the New York Times*, "Jan and Brian's departures mean that Facebook, WhatsApp and Instagram are all controlled even more tightly by a single person – Mark Zuckerberg; this centralized control is bad for the users of all of these products."

5

> **1.      Facebook's Adjudicated Violations of Foreign Privacy Laws**

6

> **a.   The German Supreme Court Declared Facebook's "Friend Finder" Feature Unlawful in 2016.**

7

8

9

10

11

12

13

14

15

16

17

18

485.    In February 2016, the German Supreme Court declared the Friend Finder feature on Facebook to be unlawful.  The court found that the service, which allows the social networking giant to access users' contacts and send emails to non-users, was not adequately explained to consumers and amounted to harassing advertising.  Facebook's users did not provide the same information to Facebook that was ultimately used for targeting advertisements – while it was developed with user data, this data was aggregated and ultimately new information was generated through Facebook's algorithm that was used for targeting purposes.  Because this was not the same information that Facebook users had provided, they did not (and could not) know the information existed, let alone was being shared or used for any purpose.  Facebook's users did not, because they could not, consent to such information being shared with third parties or used for targeted advertising.  Thus, Facebook's users did not implicitly or explicitly consent to Facebook's practices.

19

20

21

22

23

24

25

26

486.    <u>**The Spanish Agency for Data Protection Fined Facebook €1.2 Million Euros in 2017**</u>.  On September 11, 2017, the Spanish Agency for Data Protection ("AEPD") announced that it had fined Facebook €1.2 million euros for violating data protection regulations following its investigation to determine whether the data processing carried out by the Company complied with the data protection regulations.  The AEPD stated that its investigation made it possible to verify that Facebook does not inform the users in a comprehensive and clear way about the data that it will collect and the treatments that it will carry out with them, but that it is limited to giving some examples.  In particular, the AEPD found that Facebook collects other data derived from the

27

28

1  interaction carried out by users on the platform and on third-party sites without them being able to

2  clearly perceive the information that Facebook collects about them or with what purpose they are

3  going to use it.  The AEPD also found that the privacy policy of Facebook contains generic and

4  unclear expressions, and requires access to a multitude of different links to know it.  Further, the

5  AEPD concluded that the Company makes an inaccurate reference to the use it will make of the

6  data it collects, so that a Facebook user with an average knowledge of the new technologies does

7  not become aware of the data collection or storage and subsequent treatment, or what they will be

8  used for.

9       487.    **The French Data Protection Authority Fined Facebook its Maximum**

10  **Allowable Fine in 2017**.  In May 2017, the French Data Protection Authority fined Facebook its

11  maximum allowable fine of €150,000 for similar violations claimed by the Spanish authorities.

12  "Facebook proceeded to a massive compilation of personal data of internet users in order to

13  display targeted advertising," complained the Commission Nationale de l'Informatique et des

14  Libertés.  "It collected data on the browsing activity of internet users on third-party websites, via

15  the 'datr' cookie, without their knowledge."

16       488.    **The European Commission fined Facebook €110 million for Misleading**

17  **Statements Regarding the WhatsApp Acquisition**. "for providing incorrect or misleading

18  information during the Also in May 2017, the European Commission announced in a press release

19  that it had fined Facebook €110 million "for providing incorrect or misleading information during

20  the Commission's 2014 investigation under the EU Merger Regulation of Facebook's acquisition of

21  WhatsApp."  The press release, dated May 18, 2017, explained:

22

23           When Facebook notified the acquisition of WhatsApp in 2014, it
             informed the Commission that it would be unable to establish reliable
24           automated matching between Facebook users' accounts and
             WhatsApp users' accounts. It stated this both in the notification form
25           and in a reply to a request of information from the Commission.
             However, in August 2016, WhatsApp announced updates to its terms
26           of service and privacy policy, *including the possibility of linking*
             *WhatsApp users' phone numbers with Facebook users' identities*.

27

28
                                   - 143 -

489.    The European Commission found that, "***contrary to Facebook's statements in the 2014 merger review process, the technical possibility of automatically matching Facebook and WhatsApp users' identities already existed in 2014, and that Facebook staff were aware of such a possibility***."  The Commission said the decision was "based on a number of elements going beyond automated user matching" and was "unrelated to either ongoing national antitrust procedures or privacy, data protection or consumer protection issues," but noted that those issues "may arise following the August 2016 update of WhatsApp terms of service and privacy policy." In its reply to the Commission's Statement of Objections, Facebook acknowledged its infringement of the rules.

490.    **A German Court Found Facebook's Default Settings are Illegal and Facebook's Terms of Service are Invalid to Obtain Consent in 2018.**  On February 12, 2018, a German court found that Facebook's failure to obtain users' informed consent before collecting their data was illegal.  The Berlin Regional Court found that Facebook flouted Germany's data protection law by turning data sharing settings on by default.  One preactivated setting on Facebook's smartphone app shared users' locations to the people they are chatting with, the court said.  The Company also pre-ticked a box authorizing search engines to show links to user profiles in search results, making it easier for anyone to find someone's personal profile, the ruling said. The court found that eight clauses in Facebook's terms of service were invalid, including a declaration that users consented to the company using their names and profile pictures "for commercial, sponsored or related content" or sending their data to the United States.

## 2.    Warnings From Facebook Employees

491.    **Sandy Parakilas warned senior executives of potential violations of Facebook's policies that were occurring in 2011 and 2012.**  Sandy Parakilas ("Parakilas"), who was a platforms operations manager at Facebook between 2011 and 2012.  Parakilas said that he had warned senior executives at Facebook about his concerns that developers were regularly violating Facebook's platform policies on multiple occasions, but that they had essentially ignored his concerns.  For example, Parakilas reported that a developer was using Facebook data to

- 144 -

automatically generate profiles of children without their (or their parents') consent, and that another was seeking to gain access to a user's private Facebook messages and photos.  In an op-ed piece, Parakilas wrote about the response of Facebook management (or lack thereof) to these reports, "At a company that was deeply concerned about protecting its users, this situation would have been met with a robust effort to cut off developers who were making questionable use of data.  But when I was at Facebook, the typical reaction I recall looked like this: try to put any negative press coverage to bed as quickly as possible, with no sincere efforts to put safeguards in place or to identify and stop abusive developers.  When I proposed a deeper audit of developers' use of Facebook's data, one executive asked me, "Do you really want to see what you'll find?" Parakilas responded, "The message was clear: The company just wanted negative stories to stop. It didn't really care how the data was used."  Parakilas said that when he told his superiors that "more audits of developers and a more aggressive enforcement regime" were needed, they did not directly respond, because "[e]ssentially, they did not want to do that."   According to Parakilas, ***"the company felt that it would be in a worse legal position if it investigated and understood the extent of abuse, and it did not."***  In subsequent testimony to the DCMS Committee, Parakilas declined to identify the Facebook executives he warned publicly by name when asked.  The DCMS Committee Chair commented, "it sounds like they turned a blind eye because they did not want to find out that truth."  Parakilas agreed, stating, "That was my impression, yes."

### 3. Facebook's Chief Information Security Officer Resigned After His 2017 Warnings to the Board Were Ignored

492.    In December 2017, Alex Stamos, Facebook's Chief Information Security Officer, was forced out of his position as a result of "internal disagreements over how the social network should deal with its role in spreading disinformation."

493.    Tellingly, Stamos' departure was not reported by Facebook until March 19, 2018 – after it was publicly revealed that the Company had failed to verify that user data had been deleted by Cambridge Analytica and other third parties or notify the affected users that their privacy had been compromised.  *The New York Times* reported that Stamos had clashed with top executives,

including Defendant Sandberg, because he had "advocated more disclosure around Russian

interference."  According to the article, the Company wanted to handle Stamos' departure quietly

because unnamed Facebook "executives thought his departure would look bad" in light of the

circumstances surrounding the investigations into Russian hacking and his early warnings to

Sandberg and others, which were ignored.

494.    A follow-up article in *The New York Times* subsequently reported:

> After a breach of the Democratic National Committee in June 2016, Mr. Stamos
> pulled together a team to investigate Russian interference on Facebook. The
> findings pit him against executives in the company's legal and communications
> groups. While Mr. Stamos argued to disclose more, others said that by proactively
> disclosing what they had found, Facebook had become a target for further public
> ire, according to seven current and former Facebook employees.

495.    In an internal memo circulated at Facebook on March 23, 2018 in response to *The*

*New York Times report*, Stamos acknowledged that he had disagreements with other executives

over information security.  Although Stamos denied that he had been forced out, he went on to

criticize the corporate culture at Facebook with respect to the protection of user data:

> We need to build a user experience that conveys honesty and respect, not one
> optimized to get people to click yes to giving us more access.  We need to
> intentionally not collect data where possible, and to keep it only as long as we are
> using it to serve people.

* * *

> We need to find and stop adversaries who will be copying the playbook they saw
> in 2016. ***We need to listen to people (including internally) when they tell us a***
> ***feature is creepy or point out a negative impact we are having in the world.*** We
> need to deprioritize short-term growth and revenue and to explain to Wall Street
> why that is ok. We need to be willing to pick sides when there are clear moral or
> humanitarian issues. And we need to be open, honest and transparent about
> challenges and what we are doing to fix them.

496.    On April 9, 2018, *Business Insider* reported that Facebook employees had begun

"quitting or asking to switch departments over ethical concerns."  According to the article,

"dissatisfied Facebook engineers are reportedly attempting to switch divisions to work on

Instagram or WhatsApp, rather than continue work on the platform responsible for the Cambridge

- 146 -

Analytica scandal."  As the article explained, once "it became evident that Facebook's core product might be to blame" for the privacy abuses and unauthorized use and transfer of millions of users' data that had occurred and was widely reported to have been used by Cambridge Analytica and the Trump campaign in connection with the 2016 presidential election, "engineers working on it reportedly found it increasingly difficult to stand by what it built."

### 4. Defendant Andreessen Admitted That He Consciously Disregarded Warnings From Whistleblower Wylie in 2016 and 2018

497.    On March 16, 2019, *The Guardian* published another story by Carol Cadwalladr, the same reporter who initially broke the Cambridge Analytica story, concerning Facebook's response to earlier reports that "a meeting was hosted at the office of Facebook board member and confidant of its CEO Mark Zuckerberg, Marc Andreessen with Christopher Wylie, the Cambridge Analytica whistleblower, in the summer of 2016 just as the data firm started working for the Trump campaign."  The article, entitled "Facebook faces fresh questions over when it knew of data harvesting," stated that "Silicon Valley insiders have told the *Observer* that Facebook board member Marc Andreessen, the founder of the venture capital firm Andreessen Horowitz and one of the most influential people in Silicon Valley, attended a meeting with Wylie held in Andreessen Horowitz's office two years before he came forward as a whistleblower. . . Individuals who attended the meeting with Wylie and Andreessen claim it was set up to learn what Cambridge Analytica was doing with Facebook's data and how technologists could work to 'fix' it.  It is unclear in what capacity Andreesen Horowitz hosted and who attended the meeting but it is nonetheless a hugely embarrassing revelation for Facebook. . ."

498.    *The Guardian* article, which was written by Carol Cadwalladr, the same investigative reporter who initially broke the Cambridge Analytica story, stated, in relevant part:

> *During the period in 2016 in which Facebook said that it was investigating the data abuse by Cambridge Analytica, Christopher Wylie was invited to a meeting at the firm, Andreessen Horowitz.*
>
> Wylie, the young Canadian data scientist, would go on to expose the scandal in the *Observer* a year ago.  He revealed then how Cambridge Analytica worked with a Cambridge University academic, Aleksandr Kogan, to harvest Facebook data

from users, without their consent, in order to model their personalities and target them politically.

A Silicon Valley technologist with knowledge of the meeting at Andreessen Horowitz said: *"There were people who were very concerned by the reports of what Cambridge Analytica was doing with data, and the meeting was set up to try and find out as much about the exploit as possible in order to figure out possible solutions.* That's why Wylie was invited.  They wanted his knowledge. He was asked a lot of questions including about the company's contacts with Russian entities."

It is understood that a Facebook group was formed, of which Wylie was a member, and it is believed Andreessen remained in touch with Wylie until the *Observer* broke the story of his involvement in March last year.

*A Valley insider who attended the meeting said "The weird thing is that there was no follow-up.*  The idea was to reverse-engineer the problem to find solutions. But we never learned of any follow-up with Facebook's security team or any attempt to put the information into action."

Andreessen Horowitz declined to answer any of the *Observer*'s questions. Facebook has repeatedly refused to tell members of Congress and the British parliamentary fake news inquiry when senior executives learned of the data abuse. It also declined to answer the *Observer*'s questions.

Following publication of this article, Marc Andreessen issued the following statement: "The suggestion that I had or hosted a meeting involving Christopher Wylie is flatly and totally untrue.  I have never met Wylie in my life.  *After the election of 2016, a mutual colleague suggested by email that I meet with Wylie*, but that meeting never took place. *Later, in early 2018, Wylie reached out to me on Twitter and asked for a meeting, which I turned down."*

The company added that it had "no record" of any meeting in its office.

A spokesman said: "Facebook was not aware of the transfer of data from Kogan/GSR [Kogan's business Global Science Research] to Cambridge Analytica until December 2015. When Facebook learned about Kogan's breach of Facebook's data use policies, we took action."

### D.  Defendants Agreed to Pay a $5 Billion Penalty to Resolve Claims That They Personally Violated the FTC Consent Order and Section 5 of the FTC Act

499.    As noted, **Defendant Zuckerberg** personally signed the Stipulated Order on Facebook's behalf on July 23, 2019, together with Facebook's Vice President Colin Stretch and an attorney from Gibson, Dunn & Crutcher LLP.  The Stipulated Order states, in relevant part:

The parties have consented to entry of this Stipulated Order to resolve any and all claims that *Defendant, its officers, and directors, prior to June 12, 2019, violated*

*the Commission's Decision and Order* in In re Facebook, Inc., C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012). Furthermore, this Stipulated Order resolves all consumer-protection claims known by the FTC prior to June 12, 2019, that *Defendant, its officers, and directors violated Section 5 of the FTC Act*. The FTC and the United States specifically reserve all other claims.  For purposes of this paragraph, "Defendant" shall mean Facebook, Inc., its successors and assigns, acting directly, or through any corporation, company, subsidiary, division, affiliate, website, or other device that it directly or indirectly controls.

THEREFORE, IT IS ORDERED as follows:

FINDINGS

[omitted]

3. The Complaint states a claim upon which relief may be granted against Defendant under Sections 5(a), 5(l), 13(b), and 16(a)(1) of the FTC Act, 15 U.S.C. §§ 45(a), 45(l), 52, 53(b), and 56(a)(1), including for violations of Parts I and IV of the Commission's Decision and Order in *In re Facebook, Inc.*, C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012).

4. Defendant's activities are "in or affecting commerce," as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

 [omitted]

6. Defendant neither admits nor denies any of the allegations in the Complaint, except as specifically stated in the Decision and Order set forth in Attachment A. Only for purposes of this action, Defendant admits the facts necessary to establish jurisdiction.

7. Defendant and Plaintiff waive all rights to appeal or otherwise challenge or contest the validity of this Stipulated Order.

Stipulated Order at 1-2.

500.    The Decision and Order set forth in Attachment A to the Stipulated Order states, under a similar heading entitled "FINDINGS":

2. The Complaint charges violations of Section 5 of the FTC Act, 15 U.S.C. § 45, and violations of Parts I and IV of an order previously issued by the Commission, 15 U.S.C. § 56(a)(1).

[omitted]

5. Respondent neither admits nor denies any of the allegations in the Complaint, except as specifically stated in the Decision and Order. Only for purposes of this action, Respondent admits the facts necessary to establish jurisdiction.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

501.    Defendants' refusal to admit any of the allegations in the FTC 2019 Complaint notwithstanding, the charges brought by the DOJ, the FTC's findings in the 2019 FTC Complaint, and the terms of the Amended FTC Order confirm that, as a result of the Board's failure to adequately monitor and oversee the Company's compliance with the 2012 Consent Order, the privacy abuses persisted and misrepresentations continued to be made by Defendants in violation of the Consent Order, and other similar deceptive practices were also allowed to occur that caused further violations of law.

**E.    Defendants Personally Benefited From Their Insider Sales of Facebook Stock and Other Transactions in Facebook Securities During the Relevant Period While Facebook's Stock Price Was Artificially Inflated By Their Misrepresentations**

502.    During the Relevant Period, certain of the Defendants took advantage of the artificial inflation of Facebook's shares caused by the Defendants' false or misleading statements and omissions that failed to disclose the Cambridge Analytica incident or the nature and extent to which the Company's internal controls and policies had permitted the breach to occur. Specifically, Defendants Zuckerberg, Sandberg, and Koum (the "Insider Selling Defendants") collectively sold or otherwise disposed of nearly $1.5 billion worth of their personally-held shares of Facebook stock during that time, all while in the possession of material, non-public information. At the time of these stock transactions in 2018, all of the Insider Selling Defendants knew about or recklessly disregarded material, non-public information regarding the Cambridge Analytica scandal and Facebook's advertising practices, violations of user privacy and data security laws, and other damages to Facebook caused by Defendants' actions (or conscious inaction) in connection with the practices described above.

503.    For example, the IRS summons indicates that Facebook executives testified under oath about their communications and presentations to the Board beginning in at least 2009 regarding "advertising operations and revenues[.]"

504.    Further, a former Facebook employee testified under oath that he had participated in a sale of stock by Facebook employees and had seen a valuation in connection with that

permitted sale.  According to the employee, whose name is redacted from the documents obtained by Plaintiff in this case, a valuation amount was communicated to all employees who were eligible to sell their stock.

505.   All of the Defendants knew or recklessly disregarded that these and other relevant facts were necessary to make Defendants' statements truthful and not misleading, but were not disclosed by Defendants.  While these and other material facts were concealed from Facebook shareholders and the public, the Insider Selling Defendants sold or otherwise disposed of Facebook common stock on the basis of that information, thereby breaching their fiduciary duties.  In particular:

> (a) Defendant Zuckerberg sold 5,423,200 of his Facebook shares for proceeds of over $978 million.
>
> (b) Defendant Sandberg sold 196,684 of her Facebook shares for proceeds of over $35 million.
>
> (c) Defendant Koum sold 2,485,347 of his Facebook shares for proceeds of over $442 million.

506.   The Exchange Act requires publicly traded companies to disclose to shareholders "material information," the kind of information that an investor would want to know to protect their investment.  The SEC issued guidance on public reporting of cybersecurity incidents, noting that the commission "encourages companies to continue to use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters."  In the 2017 and 2018 Proxy Statements, Facebook did not mention the Cambridge Analytica incident, and also did not mention these facts in any of its Form 8-K or Form 6-K filings.  Instead, Facebook made general statements in their most recent Proxy Statement and annual report on Form 10-K about potential, not actual, user privacy and data security risks, and certified that the Company's internal controls were adequate and complied with applicable laws (which necessarily include the FTC Consent Decree).  By trading while in possession of this material, non-public information, the Insider Selling Defendants breached their fiduciary duties.

# X.    INDIVIDUAL DEFENDANTS' COMPENSATION AND STOCK OWNERSHIP

507.    During the relevant period when they were breaching their fiduciary duties owed to Facebook, including by making materially false and misleading statements, by authorizing and/or effectuating manipulative share repurchases, and through their insider sales of stock and other transactions in Facebook securities and violations of law described below, the Individual Defendants received compensation, including stock awards.

508.    Facebook executives, including Defendants Zuckerberg, Sandberg, and Wehner, received compensation that was based on performance targets and metrics that rewarded them for achieving performance goals and encouraged their pursuit of profit through an unlawful business strategy.  According to the 2018 Proxy Statement, Facebook's "[e]xecutive compensation is based on contributions to number of advertisers, delivery of a strategic long-range plan, growth in user engagement, recruiting and developing teams to drive product development in "new initiatives." (2018 Proxy Statement at 24).

509.    Worse, in 2017, the Compensation & Governance Committee members effectively ceded their oversight responsibilities to Defendant Sandberg and Defendant Wehner, appointing them as the sole members of a new "Equity Subcommittee" with the "authority to review and approve grants of RSUs to employees and consultants."

510.    Defendants received compensation as set forth in the following charts:

## Officer Compensation

|  | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| *Zuckerberg* | 2018 | 1 | -- | -- | 22,554,542 | **22,554,543** |
|  | 2017 | 1 | -- | -- | 8,852,365 | **8,852,366** |
|  | 2016 | 1 | -- | -- | 5,765,831 | **5,765,832** |
|  | 2015 | 1 | -- | -- | 5,037,840 | **5,037,841** |
|  |  |  |  |  |  |  |
| *Sandberg* | 2018 | 843,077 | 638,310 | 18,423,523 | 3,823,508 | **23,728,418** |
|  | 2017 | 795,769 | 640,378 | 21,072,431 | 2,687,643 | **25,196,221** |
|  | 2016 | 738,077 | 1,293,635 | 19,908,426 | 2,609,319 | **24,549,457** |
|  | 2015 | 715,385 | 1,265,193 | 15,465,667 | 1,252,724 | **18,698,969** |
|  |  |  |  |  |  |  |
| *Wehner* | 2018 | 753,846 | 499,494 | 18,423,523 | 9,250 | **19,686,113** |

- 152 -

| | Year | | | | | |
|---|---|---|---|---|---|---|
| | 2017 | 711,539 | 633,317 | 21,072,431 | 9,000 | **22,426,287** |
| | 2016 | 662,692 | 940,421 | 14,931,596 | 9,566 | **16,544,275** |
| | 2015 | 665,385 | 653,365 | 15,465,667 | 9,000 | **16,793,417** |

### Director Compensation

| | Fiscal Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|---|
| Andreessen | 2018 | 70,000 | 321,194 | **391,194** |
| | 2017 | 70,000 | 299,151 | **369,151** |
| | 2016 | 90,000 | 296,006 | **386,006** |
| | 2015 | 70,000 | 304,922 | **374,922** |
| Bowles | 2018 | 100,000 | 321,194 | **421,194** |
| | 2017 | 100,000 | 299,151 | **399,151** |
| | 2016 | 120,000 | 296,006 | **416,006** |
| | 2015 | 100,000 | 304,922 | **404,922** |
| Chenault | 2018 | 58,139 | 404,695 | **462,834** |
| Desmond-Hellman | 2018 | 107,000 | 321,194 | **428,194** |
| | 2017 | 70,000 | 299,151 | **369,151** |
| | 2016 | 90,000 | 296,006 | **386,006** |
| | 2015 | 70,000 | 304,922 | **374,922** |
| Hastings | 2018 | 50,000 | 321,194 | **371,194** |
| | 2017 | 50,000 | 299,151 | **349,151** |
| | 2016 | 50,000 | 296,006 | **346,006** |
| | 2015 | 50,000 | 304,922 | **354,922** |
| Thiel | 2018 | 50,000 | 321,194 | **371,194** |
| | 2017 | 50,000 | 299,151 | **349,151** |
| | 2016 | 50,000 | 296,006 | **346,006** |
| | 2015 | 50,000 | 304,922 | **354,922** |
| Zients | 2018 | 41,028 | 321,194 | **362,222** |

511.    During the relevant period, Defendants also approved other self-interested transactions that allowed certain Individual Defendants to obtain personal financial benefits that

- 153 -

1  were material to Defendants, and were not equally shared by Facebook's minority (non-interested)

2  shareholders.

3         512.    When Facebook acquired WhatsApp in 2014, the acquisition agreement also

4  provided for an additional $3 billion in restricted stock units ("RSUs") to be granted to

5  WhatsApp's founders, including Defendant Koum, and other WhatsApp employees that would

6  vest over four years subsequent to closing.  The Class A common stock and RSUs issued to

7  WhatsApp shareholders and employees upon closing represented approximately 7.9% of Facebook

8  shares then outstanding.

9         513.    Defendant Koum was granted approximately 24.9 million RSUs in connection with

10 the merger agreement, including approximately 7 million unvested shares that were granted to

11 Koum as an "inducement award."  These RSUs remained unvested as of March 31, 2018.

12        514.    The unvested RSUs that were granted to Koum were set to vest incrementally until

13 late 2018, with 1.9 million shares to vest on May 15, 2018 and in August 2018, plus a final tranche

14 of 2.1 million shares that would be issued in November 2018, and were contingent on him still

15 being employed through those dates.

16        515.    However, as reported by Defendants in Facebook's Form 8-K dated April 30, 2018,

17 Defendant Koum informed the Board in connection with his resignation as CEO of WhatsApp that

18 he would not stand for re-election to the Board at the 2018 Annual Meeting.  Accordingly, at the

19 time of his resignation in April 2018, Defendant Koum would have forfeit 5.8 million shares,

20 worth approximately $997.5 million as of the date of the announcement.  However, the

21 "inducement award" was "subject to acceleration if [Koum's] employment is terminated without

22 'cause' or if the [he] resigns for 'good reason'."

23        516.    According to Facebook's Form 10-Q for the quarterly period ending March 31,

24 2018, as of that date, Facebook had $10.82 billion of unrecognized share-based compensation

25 expense, substantially all of which was related to RSUs.  Included in this amount were 7 million

26 unvested shares that had been granted to Defendant Koum as the "inducement award" in

27

28                                         - 154 -

1   connection with the WhatsApp acquisition in 2014.  The "inducement award" was subject to

2   acceleration pursuant to the terms of Koum's employment agreement.

3

4                              **XI.    DAMAGES TO FACEBOOK**

5          517.    Defendants' misconduct alleged herein wrought extreme reputational damage upon

6   the Company.  This is especially harmful to Facebook because the Company is built on user trust.

7          518.    Defendants breached user trust by acting in direct contravention of the Company's

8   publicly-touted credo.  This reputational harm undoubtedly translates into long-term damage to the

9   Company.

10         519.    Defendants' illegal practices alleged herein and failures to timely address, remedy,

11  or disclose them also severely damaged Facebook's reputation within the business community and

12  in the capital markets, as evidenced by the more than $50 billion loss in market value after the

13  Cambridge Analytica incident, and more than $100 billion loss in market value after the second

14  quarter 2018 earnings announcement.  Facebook's users and current and potential investors

15  consider the Company's ability to protect its users' personal information, and to implement

16  adequate controls to ensure the Company complies with its legal obligations and timely and

17  properly detects any potential violations of law or user privacy.  Defendants' breaches of their duty

18  of oversight, including their failure to implement and maintain adequate internal controls or a

19  reasonable privacy program, caused Facebook to violate federal securities laws, SEC rules, the

20  FTC Consent Order, and the FTC Act, and resulted in Facebook paying a ***$5 billion penalty*** to

21  resolve the FTC 2019 Complaint, and a ***$100 million penalty*** to resolve the SEC charges, among

22  others. Thus, Facebook's ability to attract users and investors is now impaired.

23         520.    Further, as a direct and proximate result of Defendants' actions, Facebook has

24  expended and will continue to expend significant additional money, including: costs incurred in

25  defending against, and the potential settlement of, civil and criminal legal proceedings brought

26  against the Company related to the unauthorized sharing and use of users' personal information;

27

28

1    and costs incurred from the substantial compensation and benefits paid to Defendants, who are

2    responsible for the scheme.

3    **XII.   DERIVATIVE AND DEMAND ALLEGATIONS**

4         521.    At the time this Complaint was filed, Facebook's Board consisted of seven (7)

5    members, including Defendants Zuckerberg, Sandberg, Andreessen, Thiel, Chenault, Zients and

6    Alford.

7         522.    Plaintiffs did not make a demand on Facebook's Board of Directors to institute this

8    action against Defendants because, for the reasons detailed above and as set forth further below,

9    any such demand would have been futile.

10        523.    The facts detailed in this Complaint demonstrate that the Defendants affirmatively

11   adopted, implemented, and condoned a business strategy based on deliberate and widespread

12   violations of applicable law, which is not a legally protected business decision and can in no way

13   be considered a valid exercise of business judgment, and/or consciously disregarded numerous red

14   flags of misconduct throughout the relevant period, subjecting them to a substantial likelihood of

15   liability as to Plaintiffs' claims against them in this action.  Moreover, Defendant Zuckerberg

16   dominates and controls the Board, and a majority of the directors are beholden to Zuckerberg

17   and/or lack independence from him.  For all of these reasons, a demand on the Board was futile,

18   and is therefore excused, under applicable Delaware law.

19        **A.    Demand Was Futile Because Defendant Zuckerberg Controls Facebook and Its Board**

20        524.    Demand was futile, and therefore excused, because **Defendant Zuckerberg**

21   dominates and controls the entire Board by virtue of his controlling voting power, and because a

22   majority of the directors lack independence from him, as explained further below.

23        525.    *First*, Defendant Zuckerberg is the clear public face of Facebook.  As the founder of

24   Facebook, and its CEO, Zuckerberg has admitted, "***I started Facebook, I run it, and I'm***

25   ***responsible for what happens here.***"

26

27

- 156 -

28

1       526.    *Second*, Defendant Zuckerberg is Facebook's largest stockholder.  According to the

2   Company's definitive proxy statement filed with the SEC on April 12, 2019 ("2019 Proxy

3   Statement"), as of March 31, 2019, defendant Zuckerberg owned 398,319,062 shares of Class B,

4   stock.  (2019 Proxy Statement at 41.)

5       527.    *Third*, Defendant Zuckerberg occupies a number of important positions at

6   Facebook.  Zuckerberg has been Facebook's Chief Executive Officer since 2004, and Chairman of

7   the Board since 2012.  He also plays a key role in the design of all Facebook's products.

8   Facebook's website states that "Mark [Zuckerberg] is responsible for setting the overall direction

9   and product strategy for the company.  He leads the design of Facebook's service and development

10  of its core technology and infrastructure."

11      528.    *Fourth*, Defendant Zuckerberg has the power to remove individuals at Facebook

12  who challenge his control of Facebook, including directors (through his voting control) and

13  employees (through his actual control as the Company's CEO and Chief Operating Decision

14  Maker).  Defendant Zuckerberg has historically caused the Company to enter into unfair

15  transactions to maintain his control of the Company and advance his own personal interests.  For

16  example, in April 2016, Zuckerberg announced a plan to issue new "Class C" shares with no

17  voting rights that would allow him to sell the majority of his shares for billions of dollars, while

18  simultaneously retaining total control over decision-making.  Although Defendant Desmond-

19  Hellmann initially objected to the share reclassification, legal briefs filed in the case show fellow

20  directors, including **Defendant Andreessen**, eventually swayed her to vote in his favor, despite

21  her own views that it was not in the best interests of the Company and its minority shareholders.

22      529.    *Fifth*, both Facebook, Defendant Zuckerberg, and the rest of the Board have made a

23  multitude of concessions regarding Zuckerberg's powerful influence and control over the

24  Company and Facebook's Board.  For example, Defendants have admitted, including in

25  Facebook's 2016 Annual Report on Form 10-K filed with the SEC on February 3, 2017, which

26  was signed by **Defendants Zuckerberg**, **Sandberg**, **Wehner**, **Koum**, **Andreessen**, **Bowles**,

27  **Desmond-Hellman**, **Hastings**, and **Thiel**, as follows:

28

- 157 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

**Our CEO has control over key decision making as a result of his control of a majority of the voting power of our outstanding capital stock.**

Mark Zuckerberg, our founder, Chairman, and CEO, is able to exercise voting rights with respect to a majority of the voting power of our outstanding capital stock and therefore *has the ability to control the outcome of matters submitted to our stockholders for approval, including the election of directors* and any merger, consolidation, or sale of all or substantially all of our assets. This concentrated control could delay, defer, or prevent a change of control, merger, consolidation, or sale of all or substantially all of our assets that our other stockholders support, or conversely *this concentrated control could result in the consummation of such a transaction that our other stockholders do not support. This concentrated control* could also discourage a potential investor from acquiring our Class A common stock, which has limited voting power relative to the Class B common stock, or if issued, our Class C capital stock, which will generally have no voting power, *and might harm the trading price of our Class A common stock* and, if issued, our Class C capital stock. *In addition, Mr. Zuckerberg has the ability to control the management and major strategic investments of our company as a result of his position as our CEO and his ability to control the election or replacement of our directors.* In the event of his death, the shares of our capital stock that Mr. Zuckerberg owns will be transferred to the persons or entities that he has designated. As a board member and officer, Mr. Zuckerberg owes a fiduciary duty to our stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of our stockholders. *As a stockholder, even a controlling stockholder, Mr. Zuckerberg is entitled to vote his shares, and shares over which he has voting control as governed by a voting agreement, in his own interests, which may not always be in the interests of our stockholders generally.* Moreover, since our Class C capital stock, if issued, will generally have no voting power, the issuance of the Class C capital stock, including in connection with future financings, acquisitions, or the issuance of future equity awards, could have the effect of prolonging the duration of Mr. Zuckerberg's ability to exercise voting rights with respect to a majority of the voting power of our outstanding capital stock and therefore his ability to control the outcome of matters submitted to our stockholders for approval, including the election of directors, and any merger, consolidation, or sale of all or substantially all of our assets. We believe that Mr. Zuckerberg's continued control of a majority of the voting power of our outstanding capital stock is beneficial to us and is in the best interests of our stockholders. In the event that Mr. Zuckerberg no longer controls a majority of the voting power, whether as a result of the disposition of some or all his shares of Class A or Class B common stock or otherwise, our business or the trading price of our Class A common stock and, if issued, our Class C capital stock may be adversely affected.

(Emphasis added.)

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

530.     *Sixth*, Defendant Zuckerberg is the dominant force behind Facebook's core business strategy that depends upon monetizing user data, including through the "reciprocity" policy and other practices that the FTC, DOJ, and SEC found Defendants misrepresented, failed to disclose, and allowed in violation of the 2012 Consent Order, the FTC Act, and/or federal securities laws. Indeed, an early draft of the FTC's first administrative complaint against Facebook reveals that the FTC initially sought to charge **Defendant Zuckerberg** with violations of the FTC Act, in addition to the Company. This, along with the Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter regarding the settlement, and the FTC mandated provisions in the Amended FTC Order that are specifically designed to increase accountability and enhance Board oversight of Facebook's privacy practices, confirms that Zuckerberg's conduct and unfettered decision-making authority was a substantial contributing factor that caused Facebook's violations of law that gave rise to the initial FTC complaint and Consent Order entered in 2012. Accordingly, Zuckerberg is interested, and could not impartially evaluate any demand concerning the similar allegations and claims herein.

531.     *Seventh*, as detailed below, a majority of the directors are not independent from Defendant Zuckerberg. Because he dominates and controls the entire Board, and because he is interested, demand was futile, and is excused, as to the entire Board.

       **1.**    **Defendants Have Admitted That Facebook is a "Controlled Company" and That Zuckerberg Controls Voting Decisions, Including the Election of Directors**

532.     There is no question that Defendant Zuckerberg controls Facebook in his role as the Company's CEO, and that he controls the entire Board by virtue of his majority voting power and ownership of shares, and by proxies and agreements giving him voting rights in perpetuity including as to a shares of Facebook Class B stock constituting a majority of the Company's voting shares and/or rights.

533.     Facebook's website states that "Mark [Zuckerberg] is responsible for setting the overall direction and product strategy for the company. He leads the design of Facebook's service and development of its core technology and infrastructure." Defendant Zuckerberg is also

- 159 -

1  responsible for Facebook's policies, according to Defendant Sandberg.  In a May 30, 2018

2  interview with Recode Media, Defendant Sandberg stated, "Mark has said very clearly on

3  Cambridge Analytica that he designed the platform and he designed the policies, and he holds

4  himself responsible."  Defendant Zuckerberg directs and controls the Company's business and is

5  personally liable for the wrongdoing and damage cause to Facebook as alleged herein.

6  Accordingly, Defendant Zuckerberg lacks the requisite "disinterestedness" to consider a demand.

7       534.    Facebook's status as a "controlled" company is inherent in its corporate governance

8  and capital (dual-class) structure, and the role that Zuckerberg has played in recruiting and

9  retaining the current directors cannot be understated.  It is Zuckerberg alone who has the power to

10 elect (and remove) any director from Facebook's Board, by virtue of his share ownership, controls

11 a majority of Facebook's outstanding voting power, or 57.7% of the total voting power, according

12 to the Company's 2019 Proxy Statement.  Zuckerberg's control of Facebook is like a dictatorship,

13 and he directs and is responsible for the activities of Facebook's employees.

14      535.    According to Facebook's 2019 Proxy Statement:

15      **Because Mr. Zuckerberg controls a majority of our outstanding voting power,**
        **we are a "controlled company"** under the corporate governance rules of the
16      NASDAQ Stock Market LLC (NASDAQ).  **Therefore, we are not required to**
        **have a majority of our board of directors be independent,** nor are we required to
17      have a compensation committee or an independent nominating function.  In light
        of our status as a controlled company, our board of directors has determined not
18      to have an independent nominating function and to have the full board of directors
        be directly responsible for nominating members of our board.
19

20      536.    The 2018 Form 10-K further stated:

21      **Our CEO has control over key decision making as a result of his control of a majority**
        **of the voting power of our outstanding capital stock.**
22

23          Mark Zuckerberg, our founder, Chairman, and CEO, is able to exercise voting rights
        with respect to a majority of the voting power of our outstanding capital stock and therefore
24      has the ability to control the outcome of matters submitted to our stockholders for approval,
        including the election of directors and any merger, consolidation, or sale of all or
25      substantially all of our assets. This concentrated control could delay, defer, or prevent a
        change of control, merger, consolidation, or sale of all or substantially all of our assets that
26      our other stockholders support, or conversely this concentrated control could result in the
        consummation of such a transaction that our other stockholders do not support. This
27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

concentrated control could also discourage a potential investor from acquiring our Class A common stock, which has limited voting power relative to the Class B common stock, and might harm the trading price of our Class A common stock. **In addition, Mr. Zuckerberg has the ability to control the management and major strategic investments of our company as a result of his position as our CEO and his ability to control the election or replacement of our directors.** In the event of his death, the shares of our capital stock that Mr. Zuckerberg owns will be transferred to the persons or entities that he has designated. As a board member and officer, Mr. Zuckerberg owes a fiduciary duty to our stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of our stockholders. As a stockholder, even a controlling stockholder, Mr. Zuckerberg is entitled to vote his shares, and shares over which he has voting control as governed by a voting agreement, in his own interests, which may not always be in the interests of our stockholders generally.

***The dual class structure of our common stock and a voting agreement between certain stockholders have the effect of concentrating voting control with our CEO and certain other holders of our Class B common stock; this will limit or preclude your ability to influence corporate matters.***

Our Class B common stock has ten votes per share and our Class A common stock has one vote per share. Stockholders who hold shares of Class B common stock, including certain of our executive officers, employees, and directors and their affiliates, together hold a substantial majority of the voting power of our outstanding capital stock. Because of the ten-to-one voting ratio between our Class B and Class A common stock, the holders of our Class B common stock collectively control a majority of the combined voting power of our common stock and therefore are able to control all matters submitted to our stockholders for approval so long as the shares of Class B common stock represent at least 9.1% of all outstanding shares of our Class A and Class B common stock. This concentrated control will limit or preclude your ability to influence corporate matters for the foreseeable future.

Transfers by holders of Class B common stock will generally result in those shares converting to Class A common stock, subject to limited exceptions, such as certain transfers effected for estate planning or charitable purposes. The conversion of Class B common stock to Class A common stock will have the effect, over time, of increasing the relative voting power of those holders of Class B common stock who retain their shares in the long term. If, for example, Mr. Zuckerberg retains a significant portion of his holdings of Class B common stock for an extended period of time, he could, in the future, continue to control a majority of the combined voting power of our outstanding capital stock.

***Our status as a "controlled company" could make our Class A common stock less attractive to some investors or otherwise harm our stock price.***

Because we qualify as a "controlled company" under the corporate governance rules for Nasdaq-listed companies, we are not required to have a majority of our board of directors be independent, nor are we required to have a compensation committee or an independent nominating function. In light of our status as a controlled company, our board of directors determined not to have a separate and independent nominating function and

- 161 -

1
2
3
4
5

chose to have the full board of directors be directly responsible for nominating members of our board, and in the future we could elect not to have a majority of our board of directors be independent or not to have a compensation committee. **Accordingly, should the interests of our controlling stockholder differ from those of other stockholders, the other stockholders may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance rules for Nasdaq-listed companies.** Our status as a controlled company could make our Class A common stock less attractive to some investors or otherwise harm our stock price.

6
7
8
9
10
11

537.    In an interview with *Recode Media* on May 30, 2018, Defendant Sandberg acknowledged that Defendant Zuckerberg's voting control allows him unlimited discretion with regard to his decision-making, given he has no fear of losing his position.  "You know, in terms of the business, we don't make decisions for the short run. We don't have to and we shouldn't.  I don't think any company should have to. But we have founder control and protections in place, and we're very clear that we're gonna make the investments we need to make."

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

538.    On June 26, 2018, a group of six of Facebook's largest shareholders publicly asked to remove Zuckerberg from his chairman position and to replace him with an independent executive.  The shareholders also want to get rid of Facebook's dual-class share structure, which they believe hands over too much power to Zuckerberg and his team of executives.  Facebook unsurprisingly objected, "We believe that our capital structure is in the best interests of our stockholders and that our current corporate governance structure is sound and effective."  This has been a common rhetoric from Zuckerberg and Facebook, as he has long faced criticism over the dual-class share structure, but he has ultimately refused to consider making any changes.  Even independent investors have called for Zuckerberg to step down as chairman and for Facebook to dissolve its dual-class stock structure.  Neither of these has happened.  Zuckerberg habitually ignores the protests, objections, and suggestions of both shareholders and independent investors, and continues to benefit financially in the form of billions of dollars due to Facebook's top-heavy corporate governance structure.  Clearly, Zuckerberg's decision-making rationale does not take into consideration the opinions of shareholders, and he instead prioritizes his own power and control over the long-term interests of the Company.

28

- 162 -

539.     Defendant Zuckerberg has always dominated and controlled Facebook and its Board, and his aspirations were even larger all the way back in 2005.  Former Facebook employee Kate Losse ("Losse"), a speechwriter for Zuckerberg until 2005, recalls that Zuckerberg would end weekly Friday all-hands meeting by raising his fist with a slight smile and saying, "Domination!"  Losse confirmed that Zuckerberg created an atmosphere at Facebook that discouraged questioning power and standing up to management, stating: "But the question I was afraid to ask him was this: If we were to achieve our goal, why should the world trust Facebook or Zuckerberg to shape and manage this new global meta-society?  Could Zuckerberg, who wields considerable power over Facebook's share structure, develop the self-awareness and responsibility to manage it?  If my co-workers were asking themselves these same questions, I didn't see it being discussed on our internal forum pages or in conversations around the office."

540.     Losse noted that most employees were afraid of losing their lucrative jobs and that "internal conversations stayed focused on technical and growth questions; questions that can be answered with metrics — how fast are we growing and what technical roadblocks can we remove — rather than introspection."  While Losse recalls this being the atmosphere back in 2005, it seems to have manifested into Zuckerberg's push for the growth-at-all-costs model introduced in 2008.  Zuckerberg's style of responding to questioning from members of the U.S. Congress and the U.K. Parliament reflects this culture: rather than speaking about possible internal improvement, Zuckerberg deflected questions and avoided answering them directly by purposely focusing on explaining Facebook in technical terms.

541.     The results of the 2019 Annual Meeting of Facebook's shareholders confirm that Defendant Zuckerberg continues to dominate and control the Board.  Defendant Zuckerberg directs and controls the Company's business and is personally responsible for the damage caused to Facebook as a result of the illegal business practices and data sharing that led to the Cambridge Analytica scandal.  Yet, Defendant Zuckerberg cannot be removed from Facebook's Board because he has majority voting power., and he will not vote to change Facebook's current dual-class stock structure providing him the majority vote.  This structure gives Zuckerberg the power

- 163 -

1   to remove any director that may attempt to change it, or otherwise challenge his control of the

2   Company as CEO, or as its largest stockholder owning the majority of shares with voting rights.

3   Accordingly, Zuckerberg lacks the requisite "disinterestedness" to consider a demand.

**2.     SEC Commissioner Commentary Confirms That Facebook's Dual Class Stock Structure and Zuckerberg's Voting Control Effectively Negates the Board's Ability to Exercise Effective Oversight**

542.     Facebook's dual class stock structure has long met with criticism from leading corporate governance experts and proxy advisory firms.  Recently, in an interview by Recode Media's Kara Swisher ("Swisher") on a November 2019 episode of her podcast, *Recode Decode*, SEC commissioner Robert Jackson ("Jackson") commented on Zuckerberg's effective control in perpetuity:

> Swisher:     … So, talk a little bit about this Commissioner Jackson, where we are with dual class stock.
>
> Jackson:     This has been a real focus for me, because one of the things I found when I dug into the data on this, dual class stock has a justification, which is that a visionary founder needs time to make their vision real.  We just talked about how activists and others can really put pressure, short term pressure on a CEO.  So, there's some value to dual class.  The question is how long should it be before the CEO is held accountable?  I made an argument in a speech last year where I said, "Not forever."
>
> You see, a lot of the dual class structures we have now, as you point out, not only gives the current founder control, but their kids and their kids' kids.  This kind of perpetual dual class stock, I'll tell you, troubles me for two reasons.  First of all, the data show that the value of dual class goes away after a short period of time.
>
> Swisher:     Right.  I always say this, one of the things I think people don't understand the word dual class sometimes.  I mean they're not stupid, but it's not an easy concept, but *I always say you cannot fire Mark Zuckerberg.  He's unfireable by the board.  There's no power.  The board has no power. He has all the power and people are like, "What?  Like what?  What do you mean you can't, everyone can be fired."  I'm like, "He can't actually be fired.*  I'm not sure what he could do.  I mean Donald Trump can get fired faster than one of these CEOs.
>
> Jackson:      I agree. I absolutely agree.
>
> Swisher:     But explain dual class for people who don't understand it.  So what happened? What happens to the mechanism going to place?
>
> Jackson:     So when the company comes public, they've got two classes of shares.  One, the managers get, each share gets 10 votes, a hundred votes. The rest,

- 164 -

1   the common investors get, public investors get and they get one vote and the math
    works out such that you can't win an election against the people with the higher
2   votes.

3   Swisher:       In anything.

4   Jackson:       For anything.  And what's so, again, for a few years, does that make
    sense? Maybe in some cases, but **not only can you not fire Mark Zuckerberg, you**
5   **can't fire his kids or his kid's kids.**   And a lot of people who are for this, here's
    their best argument, Kara.  They say, "Look, when the company becomes public,
6   investors know the deal,"

7   Swisher:       Right.

8   Robert:        They know that this is the story.

9   Swisher:       But they want the stock, but go ahead.  Yeah, go ahead.

10  Jackson:       And they want the stock. Exactly.  My answer to that is how are you
    supposed to price forever?  I don't know how old Mark Zuckerberg to take an
11  example.  I don't know how old his kids are, but how are investors supposed to
    know if they make a good CEO?  The idea that you can price that at the IPO stage
12  strikes me as fanciful and I got to tell you, I've been, I gave the speech over a year
13  ago.  I haven't heard a good defense for perpetual dual class stock.…

14                        *      *      *

15  Jackson:       … And the problem I see is that right now, nobody is in the business
    of telling founders no.  When that happens …
16
    Swisher:       I am.  But it's a small business, it doesn't make any money.
17
    Jackson:       Well look, it's not an easy thing to do.
18
    Swisher:       Yeah.
19
    Jackson:       Look, I --
20
    Swisher:       That was easy.  But go ahead.  Keep going.
21
    Jackson:       I was a corporate lawyer.  It's not an easy board meeting.  I've been
22  there to say to a CEO, "I understand this is what you want to do, but you shouldn't
    and here's why."  But we need more institutions prepared to do that.  And Kara,
23  I'll tell you, when I was on Wall Street, the stock exchanges played a significant
    role in corporate governance.  They required director independence, et cetera. But
24  since I left the street, they went private.  They are now private profit making
25  entities.  It turns out telling CEOs no is not that profitable.

26  Swisher:       No because they want new, they want all kinds of new business
    essentially of all different kinds of, whether it's a follow in fundings or public
27  offerings or different things like that.

28
                        - 165 -

Jackson:      That's right.   So the stock exchanges have exited the business of corporate accountability.

*      *      *

… And so, look, when I made my sort of pitch on dual class, BlackRock and the council of institutional investors petitioned the stock exchanges to develop a limit and that firm, those firms came out against it because they'd much rather be able to tell their clients they can do whatever they'd like and I think we're going to live to regret this because WeWork is one example of how the market is not comfortable with intergenerational control of widely important public companies.

Swisher:      It wasn't just that, it was also decision making in terms of what to buy and what not to buy.   It was, it looked like one of the things it gets to is the entity that is actually supposed to do its job is the board.   Is the actual board, which is supposed to say, "You want to buy a surf wave company?  No, we're not buying a surf wave company.   No.   Very nice.   Buy it yourself with your own cash if you'd like to surf so much," or if they hear rumblings, which they never do, of problems, behavioral problems or anything else, like an Uber or whatever, they step in.

But they tend not to step in any more.   They tend to be one, because the people appoint them and they're in their debt or two, they have no power.   Because the board's, I mean, let me just get the, am I correct?  **The board of Facebook has no power to speak of.**

Jackson:      Well, let's just be clear.

Swisher:      Okay.

Jackson:      They're direct- they're public company directors.   Their fiduciary [duty] is to the shareholders.

Swisher:      Yes.

Jackson:      But the person who elects them by majority hammerlock control is the CEO they oversee.   So just to be clear, they do have some authority, but it's limited by the fact that the person who's in- who they're supposed to be overseeing chooses them.

Swisher:      In theory, when people have dual class, they can do what, if the board suddenly gets a conscience and says, "This is the CEO is not acceptable," and it's hard to get to that. A firing is hard to get to.

Jackson:      That's right.   But there's going to be a meeting next year where you have to be reelected.   I don't like your chances. *Here's the thing here.  None of this ever happens because everybody understands before the fact that it could and they act accordingly.*

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

3.     **The Abrupt Resignation of Facebook's Lead Independent Director, and Her Actions and Statements on Behalf of the Board, Further Demonstrates Zuckerberg's Domination and Control**

543.    Since this action was commenced, two Facebook Board members have abruptly "resigned" from their positions as directors, Defendant Koum in April 2018 and former Lead Independent Director Defendant Desmond-Hellman in October 2019.

544.    On October 30, 2019, Defendants issued a press release filed with the SEC on Form 8-K, announcing that "[o]n October 27, 2019, [Defendant] Desmond-Hellman informed Facebook that she will resign as a member of the Board of Directors of Facebook [] effective as of October 30, 2019."  The press release also indicated that "[t]he Board … appointed [Defendant] Andreessen to replace [Defendant] Desmond-Hellman as a member of the Compensation & Governance Committee of the Board []," but "did not immediately appoint a new lead independent director of the Board [and] expect to name a replacement over the coming months."  Defendant Desmond-Hellmann is chief executive of the Gates Foundation, and formerly served as an executive at Genentech and as a director at Procter & Gamble.  It is no coincidence that, as one of the newest Facebook directors, she was also one of the only members of Facebook's Board that did not have extensive experience and a background in tech entrepreneurship.  Defendant Zuckerberg has surrounded himself with Silicon Valley entrepreneurs on Facebook's Board who have interests that are closely aligned with his, making it extremely difficult for new directors and shareholders alike to protest his decisions, because he usually does not face much if any opposition in policy matters.

545.    While acting in her former role as Facebook's Lead Independent Director, Defendant Desmond-Hellman made a public statement on behalf of the entire Board following the Cambridge Analytica incident stating that the Board supported both Defendants Zuckerberg and Sandberg.  This statement was the Board's only comment about the revelations, confirming once again that the directors will not take any position against Zuckerberg, even in a statement, let alone commence litigation against him.

- 167 -

**B. Demand Was Also Futile Because Facebook's Board Lacks the Requisite "Disinterestedness" and Independence to Consider a Demand**

546.    Demand on the Facebook Board was also futile because a majority of the directors lack the requisite disinterestedness and independence to consider a demand. Each of the Director Defendants faces a substantial likelihood of personal liability for the violations of federal securities law alleged against him or her in this Complaint and, herefore, lacks "disinterestedness." In addition, each of the Director Defendants lacks independence from Facebook's controlling shareholder, Defendant Zuckerberg, and he faces a substantial likelihood of liability and is, therefore, an interested director with respect to a demand.

**1.    The Entire Board is Interested With Respect to the 2012 Consent Order Violations and 2019 Settlement**

547.    The entire Board had the duty to ensure Facebook's privacy practices were designed to protect user information and disclose any violations of user privacy in accordance with applicable law. Facebook's internal controls and systems had the ability to detect and report suspicious activity at the developer level, yet failed to prevent violations of user privacy on multiple occasions, in violation of various applicable laws, regulations, and the FTC consent order. The Board's duty was heightened by the fact that the FTC imposed affirmative obligations with respect to the Company's user privacy practices in the 2011 Consent Order. The Board failed to fulfill that duty, and its failure is even more egregious in light of the many blatant warnings both before and during the relevant period that Facebook's privacy policies did not comply with applicable laws, and moreover, that the same practices which violated the law and user trust was the Company's primary source of revenue. Given the Board's awareness and deliberate concealment of the extent to which Facebook's business model and revenue depends upon its targeted advertisements, which requires the Company to collect, store, and share massive amounts of user data, and Facebook's failure to disclose or notify users of these practices, it is clear the Board either deliberately or recklessly permitted the Company to pursue profit at the expense of complying with the law.

548.    The entire Board knowingly approved, permitted, and/or oversaw Facebook's illegal business strategy of pursuing profit through monetizing Facebook user data at the expense of complying with the law.  Given the extent to which Facebook's core business model and revenues depended upon monetizing user data, and in light of their obligations under the Consent Order in effect since 2012, the Director Defendants either acted knowingly, or in conscious disregard of their fiduciary duties, when they failed to implement and maintain adequate internal controls and reporting procedures that were required by: (i) SEC rules; (ii) the 2012 Consent Order; and/or (iii) the *Caremark* line of cases under Delaware law, and when they made the false and misleading statements and omissions described above.

549.    **First**, Facebook's entire Board was aware of how the Company was monetizing user data.  The Board approved acquisitions that expanded the functionality and reach of the Facebook platform and enables it to obtain additional user data.  Facebook executives apprised the Board at least quarterly regarding Facebook's "advertising operations and revenues."  In addition, certain directors' affiliated companies, including WhatsApp (**Defendant Koum**), which became a subsidiary of Facebook following its acquisition by the Company in 2014, and Netflix (**Defendant Hastings**) entered into partnerships with Facebook that included the sharing of Facebook information.  The Board also received many other "red flag" warnings that would have alerted the directors of violations (or potential violations) of the Consent Order that were occurring at Facebook, some of which began only four months after it was entered in 2012.  Defendants therefore knew (or consciously disregarded) Facebook's practices that violated the law and contradicted Defendants' public statements, as set forth above.

550.    Defendants repeatedly emphasized the importance of maintaining user trust in their public statements, and the Board acknowledged its specific responsibility for overseeing the substantial risks that a breach, like the Cambridge Analytica incident, posed to the Company.  According to Facebook's preliminary proxy statement, filed with the SEC on or about April 14, 2017 (the "2017 Proxy Statement"):

Our board of directors as a whole has responsibility for overseeing our risk management.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

The board of directors exercises this oversight responsibility directly and through its committees. ***The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of directors about the identification and assessment of key risks and our risk mitigation strategies.***

The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit committee has the responsibility for overseeing our major financial and accounting risk exposures as well as legal and regulatory risk exposures. Our audit committee also oversees the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Finally, our audit committee oversees our internal audit function. Our compensation & governance committee evaluates risks arising from our compensation policies and practices, as more fully described in "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment." The audit committee and the compensation & governance committee provide reports to the full board of directors regarding these and other matters.

551.    Notwithstanding their significant obligations as members of the Board or corporate officers, and (for some of the Defendants) as members of committees charged with overseeing Facebook's risk exposure, corporate governance, and other critical aspects of the Company's business and operations, Defendants maintained policies that allowed Kogan and other third party app developers to obtain mass amounts of Facebook user information without verification as to the nature of its use, and upon learning that 50 million users' personal information had been misappropriated and used by Cambridge Analytica, failed to notify users or disclose anything about the incident, or its significant impact on the Company, publicly and to investors.  Worse, Defendants affirmatively misrepresented and concealed these facts from the Company's regulators, including the independent assessor that was required to review Facebook's privacy program and submit reports of its assessment to the FTC, pursuant to the Consent Order, and made materially false and misleading statements and omissions in Facebook's periodic reports filed with the SEC.

552.    <u>**Second**</u>, the entire Board was well aware of the FTC Consent Order and the obligations placed on Facebook, as ***each director personally received a copy of the Consent Order on <u>September 12, 2012</u>***, according to the Facebook Compliance Report that was submitted to the

- 170 -

FTC by Facebook's in-house attorneys on November 13, 2012, **and the directors who joined the Board after that date also received a copy of the Consent Order within thirty (30) days after their appointment as directors**. Moreover, each of the directors was specifically obligated to oversee the Company's compliance with its terms. However, Defendants failed to comply with the FTC Consent Order, and permitted Facebook to violate numerous federal, state and foreign laws, as detailed herein.

553.   The directors' knowledge of, or willful blindness to, the wrongdoing occurring at Facebook, their failure to monitor, govern or oversee Facebook's management, and their failure to implement and maintain a reasonable system of internal controls and reporting procedures was a breach of their fiduciary duties owed to Facebook, and a violation of the Board's duties and obligations under the Consent Order. As a result of the Board's sustained and systemic failure of oversight for more than seven years, Facebook failed to comply with the Consent Order, failed to implement and maintain internal controls required by SEC rules, and violated the FTC Act, the Securities Act, and the Exchange Act (among other laws and regulations).

554.   The Dissenting Statement of FTC Commissioner Rohit Chopra discussed the Individual Defendants' role in Facebook's violations, stating:

> Corporate executive officers and directors serving on corporate boards play a critical role in ensuring compliance with applicable law and regulation. This is particularly important when a corporation becomes subject to an administrative agency order.
>
> Two individuals simultaneously serve as executive officers and members of Facebook's board of directors: Mark Zuckerberg and Sheryl Sandberg. Zuckerberg is the Founder, Chief Executive Officer, and Chairman of the Board of Directors of Facebook. Sandberg is the Chief Operating Officer and is a member of the Board of Directors of Facebook.
>
> A.   *Officers and Directors Are Bound by Agency Orders and Can Be Liable for Order Violations*
>
> **FTC orders bind both the named corporation and its officers and directors, regardless of whether they are named individually. And officers and directors cannot avoid responsibility under these orders simply by burying their heads in the sand as their subordinates break the law. Instead, they are bound "… to take**

*all reasonable steps to effect compliance." Failure to do so can expose them to liability for wrongdoing.*

There are good reasons the law imposes this heightened obligation. Were it not to, "we would be putting a premium on ignorance and offering a sanctuary for those remiss in performing their duties as corporate officers…" Moreover, through active participation in prohibited activity or through willful blindness toward others' misconduct, corporate executives can often enjoy significant financial gains from violating an order. Failing to hold them accountable only encourages other officers to be similarly neglectful in discharging their legal obligations.

In my view, it is appropriate to charge officers and directors personally when there is reason to believe that they have meaningfully participated in unlawful conduct, or negligently turned a blind eye toward their subordinates doing the same. *There is precedent for the FTC not only charging individuals officers with order violations but also holding them personally liable for civil penalties, even when they were not named in the original order.* This is a reasonable approach that should not be limited to cases involving smaller firms.

    B.    *Investigating the Role of Individuals is Critical in Cases Involving Order Violations*

Because the law imposes affirmative obligations on officers and directors whose firms are under order, uncovering their role in potential violations is critical to any investigation. It is especially critical in this investigation, which involved a firm that is tightly controlled by its founder, CEO, and Chairman, Mark Zuckerberg. *Given the structure of his ownership and his special voting rights, it is hard to imagine that any of the core decisions at issue were made without his input.* Whether Zuckerberg took all reasonable steps to ensure compliance with the 2012 order is an essential determination we should evaluate carefully before pursuing any resolution, including, for example, by thoroughly reviewing documents in his custody and examining him under oath.

In fact, in their discussion of the investigation and proposed settlement, the Commissioners supporting this outcome do not cite a single deposition of Zuckerberg or any other Facebook officer or director. The FTC Act does not include special exemptions for executives of the world's largest corporations, but this settlement sends the unfortunate message that they are subject to another set of rules.

Chopra Dissent at 11-12 (internal footnotes and citations omitted).

    555.    The directors' failure to monitor the Company's compliance with applicable laws, regulations, and the Consent Order was a breach of their duty of oversight. As a result of Defendants' breaches of fiduciary duty, including the Board's failure of oversight and the Officer Defendants' abuse of their decision-making authority and control of Facebook, Defendants made

1   misrepresentations that violated federal securities laws and the Consent Order, and Facebook was

2   forced to pay a $100 million penalty to resolve the SEC Complaint, as well as a record-breaking $5

3   billion penalty to settle the charges by the FTC and DOJ that Facebook violated the Consent

4   Order, which constituted the "largest ever imposed on any company for violating consumers'

5   privacy" and was "almost 20 times greater than the largest privacy or data security penalty ever

6   imposed worldwide."  In these circumstances, under applicable Delaware law, demand was futile

7   (and is thus, excused).

8        556.  **Finally**, the entire Board is interested because Defendants approved the settlement

9   agreement with the FTC and DOJ, which personally benefited the Individual Defendants in a

10  manner that was unique to the Individual Defendants and was not shared by Facebook's minority

11  stockholders.  Specifically, Defendants, who were responsible for causing the violations and

12  damages to Facebook, agreed to the settlement provision that contains a release of "any claims"

13  that the FTC or DOJ might have brought against Facebook's officers and directors, *i.e.*, the

14  Individual Defendants, for violating the Consent Order before June 2019.  Two FTC

15  Commissioners filed dissenting statements regarding the settlement, both of whom identified the

16  release as a primary reason for their dissent.  In the "Executive Summary" portion of the

17  Dissenting Statement by FTC Commissioner Rohit Chopra ("Chopra"), he noted that "Given the

18  many public reports of problems at Facebook, it is hard to know how wide the range of conduct

19  left unaddressed in the proposed Complaint or settlement may be."  He went on, stating:

20  
21        ***The grant of immunity for Facebook's officers and directors is a giveaway.***
           Facebook's officers and directors were legally bound to ensure compliance with
22        the 2012 order, yet the proposed settlement grants a gift of immunity for their
           failure to do so. The Commissioners supporting this settlement do not point to any
23        documents or sworn testimony to justify this immunity.

24  *See* Dissenting Statement of Commissioner Rohit Chopra, *In re Facebook, Inc.*, FTC File No.

25  1823109, July 24, 2019 ("Chopra Dissent") at 1.

26       557.  FTC Commissioner Rebecca Kelly Slaughter likewise said in her Dissenting

27  Statement, "my deepest concern with this [Amended FTC] order is that its release of Facebook and

28

its officers from legal liability is far too broad…. Rather than accepting this settlement," Slaughter stated, "I believe we should have initiated litigation against Facebook and its CEO Mark Zuckerberg. The Commission would better serve the public interest and be more likely to effectively change Facebook by fighting for the right outcome in a public court of law."  Slaughter Dissent at 2.

558.     In her Dissenting Statement, Commissioner Slaughter further noted with regard to the release:

> *By far my biggest concern with the terms of the settlement is the release of liability, in particular the commitment that the order resolves "any and all claims that Defendant, its officers, and directors, prior to June 12, 2019, violated the Commission's July 27, 2012 order." I am also uncomfortable with the inclusion of "officers and directors" in the release from "any [Section 5] claim known by the FTC."*
>
> *I would have preferred to name Mr. Zuckerberg in the complaint and in the order.* I disagree with the decision to omit him now, and I strenuously object to the choice to release him and all other executives from any potential liability for their roles to date.
>
> *I am concerned that a release of this scope is unjustified by our investigation and unsupported by either precedent or sound public policy.* To the contrary, in every recent major federal settlement, if there was a liability release, it was cabined to the offenses described in the complaint.
>
> *Furthermore, many of those releases were accompanied by admissions of civil or criminal liability, which is entirely different from a settlement that explicitly disclaims liability….*
>
> Facebook's course of conduct also strongly counsels against this expansive release. Hardly a week passes without a news story revealing some potentially illegal conduct by Facebook. To wait to resolve this case until we were aware of the entire universe of potential violations would be to wait forever. To be sure, not all news stories bear out violations upon further investigation. But I do not believe it is appropriate for the Commission to foreclose the possibility of that investigation.
>
> It would be dramatically better—and better grounded in precedent—to release only the company itself and only with respect to liability under the order and Section 5 for the behavior described in the complaint.

## 2.     Defendant Zuckerberg is Interested

559.     **Defendant Zuckerberg** was personally involved in developing Facebook's platform and was responsible for its activity, to a degree that reflects far more than his supervisory role of the Company as CEO.  In that role, Zuckerberg specifically instructed Facebook employees to override user privacy settings, and to prepare for and circumvent the blocks that he anticipated other websites would implement.

560.     As FTC Commissioner Rebecca Kelly Slaughter ("Slaughter") noted in her Dissenting Statement regarding the settlement: "For years, … Facebook provided [user] data not only to [their] friends but also to any of the millions of third-party apps that those friends used. This was precisely the type of misleading conduct that the Federal Trade Commission's 2012 order sought to prevent. Yet *evidence suggests that Facebook's practices violated the [2012 Consent] order early and often*…  The evidence the Commission amassed in its investigation more than justified initiating litigation against Facebook and Mr. Zuckerberg alleging violations of the Commission's order."  Slaughter went on, "I will not recite the facts before the Commission, other than to note that there was *extremely compelling evidence of a series of significant, substantial order violations and law violations*. In addition to the evidence the Commission reviewed against Facebook, I believe there was sufficient evidence to name Mr. Zuckerberg in a lawsuit."  *See* Dissenting Statement of Commissioner Rebecca Kelly Slaughter, *In the Matter of FTC vs. Facebook*, July 24, 2019 ("Slaughter Dissent") at 1.

561.     Slaughter believed the evidence was sufficient to charge Zuckerberg, notwithstanding what Commissioner Chopra described as the FTC's "limited visibility into the full range of potential violations" that might have occurred.  That Chopra attributed this "limited visibility" to Defendants' apparent lack of "cooperation and candor" with the FTC in the course of its investigation, specifically with regard to "Zuckerberg's files," is further telling of his role (and bad faith).  Chopra stated:

> As Commission staff undertook an investigation, I requested periodic briefings on the status and any findings or conclusions. Based on the material presented to me, I was very concerned about Facebook's cooperation and candor in its dealings

- 175 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3

with the Commission and its staff. In my view, there were multiple inconsistencies and deficiencies in Facebook's responses to questions.  I questioned whether the company's document productions were truly complete. I believe that Facebook struggled to answer many requests for data, and ***I ascertained that the company was resistant to providing documents from Zuckerberg's files.***

4
5
6
7

It became clear to me that the agency would have limited visibility into the full range of potential violations of the 2012 order, as well as potential violations of law that fell outside the scope of the order. ***Nonetheless, despite what I see as our limited visibility into key aspects of the company's conduct, the Commission and its staff found strong evidence that Facebook violated the terms of the 2012 order…***

8

Chopra Dissent at 6.

9
10
11

562.    In her Dissenting Statement, Slaughter also discussed other reasons why, in her view, **Defendant Zuckerberg** should have been personally named as a defendant in the FTC 2019 Complaint.  Slaughter stated:

12
13
14
15
16
17

Mr. Zuckerberg co-founded Facebook in 2004 and is Facebook's Chairman and Chief Executive Officer. Unlike most publicly traded companies, he also controls a majority of the company's voting shares. In that way, Facebook resembles the closely held corporations against which the Commission frequently pursues individual liability more than it does a typical publicly held firm. ***As Mr. Zuckerberg has stated on numerous occasions, "I started Facebook, and at the end of the day I'm responsible for what happens on our platform."*** Mark Zuckerberg,    Facebook    (March    21,    2018), https://www.facebook.com/zuck/posts/10104712037900071 (updating Facebook users on "the Cambridge Analytica situation").

18
19
20
21
22
23
24
25
26
27

At the April 30, 2014, F8 Conference, Mr. Zuckerberg publicly announced that Facebook would no longer allow third-party developers to access to "friend" data. *See* [FTC 2019 Complaint] ¶¶ 111–113; Facebook F8 Developers Conference 2014    -    Keynote    1,    YouTube    (May    1,    2014), https://www.youtube.com/watch?v=DVu311G5qvI    (11:09–12:04).    In    fact, Facebook continued to allow millions of third-party developers access to "friend" data for at least another year. [FTC 2019 Complaint] ¶ 116. After a year had passed, Facebook allowed some companies to retain access for months, or even years. *See id*. ¶¶ 126–129. Mr. Zuckerberg has publicly affirmed that Facebook's data privacy failings were his responsibility: "But it's clear now that we didn't do enough to prevent these tools from being used for harm, as well. That goes for . . . developers and data privacy. We didn't take a broad enough view of our responsibility, and that was a big mistake. It was my mistake, and I'm sorry. I started Facebook, I run it, and I'm responsible for what happens here." Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing Before the S. Comm. on the Judiciary and the S. Comm. on Commerce, Science & Transportation, 115th Cong. 1 (2018) (testimony of Mark Zuckerberg, Chairman

28

- 176 -

and       Chief       Executive       Officer,       Facebook),
https://www.judiciary.senate.gov/imo/media/doc/04-10-
18%20Zuckerberg%20Testimony.pdf.

Slaughter Dissent at 6-7, n. 15.

563.    Commissioner Chopra likewise noted in his Dissenting Statement:

> Despite being a public company, Mark Zuckerberg retains **unusual control** over the firm, given his stake in a class of shares with special voting rights. Zuckerberg is also Chairman of the Board of Directors. He and Chief Operating Officer Sheryl Sandberg serve simultaneously as executive officers and voting board members.

564.    Slaughter believed the evidence was sufficient to charge Zuckerberg, even notwithstanding what Commissioner Chopra described as the FTC's "limited visibility into the full range of potential violations" that might have occurred.  That Chopra attributed this "limited visibility" to Defendants' apparent lack of "cooperation and candor" with the FTC in the course of its investigation, specifically with regard to "Zuckerberg's files," is further telling of his role (and bad faith).  Chopra stated:

> As Commission staff undertook an investigation, I requested periodic briefings on the status and any findings or conclusions. Based on the material presented to me, I was very concerned about Facebook's cooperation and candor in its dealings with the Commission and its staff. In my view, there were multiple inconsistencies and deficiencies in Facebook's responses to questions.  I questioned whether the company's document productions were truly complete. I believe that Facebook struggled to answer many requests for data, and **I ascertained that the company was resistant to providing documents from Zuckerberg's files.**
>
> It became clear to me that the agency would have limited visibility into the full range of potential violations of the 2012 order, as well as potential violations of law that fell outside the scope of the order. Nonetheless, despite what I see as our limited visibility into key aspects of the company's conduct, the Commission and its staff found strong evidence that Facebook violated the terms of the 2012 order…

Chopra Dissent at 6.

565.    Former Facebook employees confirmed that **Defendant Zuckerberg** was and is responsible for Facebook's policies.  Parakilas said that shortly after he arrived at the company's Silicon Valley headquarters in 2011, he was told that any decision to ban an app required the personal approval of Zuckerberg.  Defendant Sandberg also stated in a May 30, 2018 interview

1   with *Recode Media*, "Mark has said very clearly on Cambridge Analytica that he designed the

2   platform and he designed the policies, and he holds himself responsible."

3          566.    **Defendant Zients** is the Chair, and **Defendant Andreessen** and **Defendant**

4   **Chenault** are members of Facebook's Audit & Risk Oversight Committee (formerly the Audit

5   Committee).  Before they left the Board, Defendant Bowles was the former Chair, and Defendant

6   Desmond-Hellmann was a former member of the Audit Committee.  The Audit and Risk Oversight

7   Committee ("Audit Committee") is charged with overseeing the Company's legal and regulatory

8   risk exposure, the integrity of the Company's financial statements, and the adequacy and reliability

9   of disclosures to its stockholders, including the Company's internal controls.

10          567.    The members of Facebook's Audit Committee failed to meet their obligations as

11   provided in the Audit Committee Charter, in addition to their duties imposed by law.  Despite the

12   numerous regulatory fines, investigations, and reports finding fundamental failings in the

13   Company's internal controls, they did not cause Facebook to remediate those control deficiencies.

14   The Audit Committee's deliberate failure of oversight constituted breaches of their fiduciary duties

15   to Facebook and has resulted in significant harm to the Company.  The SEC charged Facebook

16   with violations of the Securities Act, the Exchange Act, and SEC rules, and imposed a $100

17   million penalty, for making materially false and misleading statements and omissions in its public

18   filings with the SEC, and failing to implement and maintain adequate internal controls.  The Audit

19   Committee members were directly responsible for approving Facebook's materially false and

20   misleading SEC filings, and for Facebook's failure to maintain adequate internal controls.

21          **3.    Defendant Sandberg is Interested, and Also Lacks Independence**

22          568.    Defendant Sandberg joined Facebook in 2008 as COO and took over business

23   operations.  Sandberg oversees sales management, business development, human resources,

24   marketing, public policy, privacy and communications.  Defendant Sandberg, in her role as COO

25   since 2008, is responsible for directing and approving the illegal acts committed by Facebook

26   employees.  Moreover, Sandberg has been at Facebook since its early days, and has overseen the

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Company's meteoric rise, based upon the illegal business practices she implemented along with Zuckerberg since the launch of Facebook's platform in 2008.

569.     Facebook was running a $561 million deficit and struggling through a period of stagnant growth at the time of Sandberg's hire in 2008. Her job, in essence, was to make the company profitable, and she accomplished this by directing Facebook toward advertising as its main business.  She took on the project of integrating ads into the News Feed on both the desktop and mobile versions of Facebook.  Since user data and advertising operations go hand in hand, Sandberg has an elevated responsibility to protect user information, especially since Facebook has incredible access to the user data of billions of customers.  The data that Facebook collects on users funnels directly toward targeted ads.

570.     Before she was hired by Defendant Zuckerberg, Defendant Sandberg served as Google's vice president of global online sales, where she learned how to profit from user data through targeted advertising.  When she was brought on at Facebook in 2008, Sandberg advised Zuckerberg to either make users pay or to make advertisers pay, in regard to Facebook's overarching business model.  Together with the other Defendants, they decided that advertisers would pay.  From there, Sandberg determined that brand advertising would become Facebook's sole source of revenue, demonstrating her close personal and business relationship with Zuckerberg, and her significant influence on Facebook's business and decisions overall.  One year later, Facebook generated a profit for the first time.

571.     In 2009, Facebook generated $225 million in revenue from ad sales, and the following year, brand advertising skyrocketed to $2 billion in sales.  This concept of maximizing brand advertising that is attributable to Sandberg is consistent with Facebook's growth-at-all costs strategy introduced in 2008 and cemented her dedication and loyalty to Defendant Zuckerberg.

572.     Defendant Sandberg has well-established connections with Defendant Zuckerberg and has a significant influence on his decisions.  When Zuckerberg was considering hiring Sandberg, the two spent months speaking for several hours a week to determine whether she would be a good fit for the position.  To this day, Sandberg and Zuckerberg have twice-weekly meetings

1    to give each other feedback and to work through disagreements, which has been going on for a

2    decade now.  She has been deemed Zuckerberg's second-in-command, giving her significant

3    control in the direction that Facebook takes.

4         573.    Defendant Sandberg has admitted that she is personally responsible for Facebook's

5    lax data privacy controls.  In an interview with Bloomberg, she stated, "I feel deeply personally

6    responsible, because a lot of mistakes were made…what we didn't do until recently and what we

7    are doing now is just take a broader view looking to be more restrictive in ways data could be

8    misused. We also didn't build our operations fast enough -- and that's on me."  Compounding this

9    issue, Sandberg promises policy changes on data security but still does not seem to have a grasp of

10   the severity of the issue.  On April 5, 2018, she told the Financial Times, "To this day, we still

11   don't know what data Cambridge Analytica has."

12        574.    Recode Media interviewed Defendant Sandberg and Mike Schroepfer, Facebook's

13   Chief Technology Officer, on May 30, 2018.  When asked why nobody had been fired, and who

14   should have been fired, with regard to the Cambridge Analytica scandal, Sandberg stated, "So,

15   Mark has said very clearly on Cambridge Analytica that he designed the platform and he designed

16   the policies, and he holds himself responsible. ***The controls in the company and this are under***

17   ***me, I hold myself responsible for the ones we didn't have***.  And look, Schroep[fer] and I are here,

18   we run the company."  She acknowledged that the Company  had insufficient internal controls,

19   stating, "we always had some controls in place but I don't think they were enough."  She further

20   admitted that Facebook had not audited Cambridge Analytica to ensure they had actually deleted

21   the data.  "Looking back, we definitely wish we had put more controls in place.  We got legal

22   certification that Cambridge Analytica didn't have the data, we didn't audit them," she admitted.

23        575.    Despite admitting she was personally responsible for failing to establish adequate

24   internal controls, Defendant Sandberg has continued to defend Facebook's advertising business

25   that relies on the mass collection of Facebook users' data, saying that it benefits consumers.

26   Sandberg uses "consumer benefit" as a guised rationale for continuing its overreaching advertising

27   business, when the de facto purpose is to generate profit.  This is not surprising, as Sandberg has

28

1  demonstrated a track record of prioritizing profitability, and she was the direct beneficiary of

2  Facebook's manipulation of consumers' personal data in the Cambridge Analytica incident.

3      576.    Indeed, Defendant Sandberg's compensation is based off of Facebook's

4  profitability, and specifically, targets that are related to increasing advertising revenues.

5  According to Facebook's 2017 Proxy Statement, Sandberg received $631,731 for the First Half

6  2016 bonus, which reflected her "overall leadership and execution on business priorities, her

7  contribution to growing revenue, continued strong growth in the number of advertisers on our

8  [Facebook's] platform, and her leadership in key policy matters." Sandberg received $661,904 for

9  the Second Half 2016 bonus. These bonuses were the highest among those handed out to

10  Facebook's Board of Directors, highlighting her influence in policy decisions and her established

11  power as a long-standing member of Facebook's Board.

12      577.    More recently, in an interview with NBC's Today show, Sandberg said that users

13  who wanted to stop Facebook from making money off their personal data would have to pay for

14  the privilege.  Today's Savannah Guthrie asked, "Could you come up with a tool that said, 'I do

15  not want Facebook to use my personal profile data to target me for advertising.'?  Could you have

16  an opt-out button – 'Please don't use my profile data for advertising'?"  Sandberg responded, "We

17  have different forms of opt-out.  We don't have an opt-out at the highest level. That would be a

18  paid product."  Clearly, Sandberg has a personal financial interest in Facebook continuing to earn

19  revenues based on the personal information and data it obtains and generates about Facebook's

20  users and non-users and will not act to change its business model.  Her compensation is directly

21  tied to Facebook's revenues that are generated from the sale of targeted advertising services, and

22  she has acted and will continue to prioritize profitability over complying with the law.  Demand is,

23  therefore, futile as to Defendant Sandberg.

24      **4.    Defendant Thiel is Interested, and Also Lacks Independence**

25      578.    Defendant Thiel was one of the early investors in Facebook and is its longest-

26  standing Board member besides Zuckerberg.  Thiel co-founded PayPal, Inc., and has been a

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Partner of the Founders Fund, a venture capital firm that strives to keep founders in control of the companies they have created, since 2005.  Thiel also co-founded Palantir in 2003.

579.     Defendant Thiel has been instrumental to Facebook's business strategy over the years.  He has been known to personally engage in secretive politically-motivated litigation tactics, most notably with regard to Gawker, a gossip website that owned Valleywag, a blog specifically concerning Silicon Valley gossip.  Angered by a 2007 post on Valleywag headlined "Peter Thiel Is Totally Gay, People" and other stories published on Gawker's website, he secretly financed a lawsuit filed by Terry Bollea (the real name of the wrestler Hulk Hogan) against Gawker for posting an excerpt from a sex tape showing Mr. Hogan with a friend's wife.  After Hogan won a $140 million judgment against Gawker, the site went bankrupt.  Gawker founder Nick Denton described Thiel to *Vanity Fair* as "interesting — and scary."

580.     *The New York Times* reported on Thiel's connections to Palantir and Cambridge Analytica in an article published on January 11, 2017.  According to The *Times*, Thiel was "a member of the Trump transition team" and had "dressed as Hulk Hogan for the 'Villains and Heroes' annual costume party last month, hosted on Long Island by the Mercer family, who were big Trump donors."  Thiel, who was reportedly advising the Trump transition team on "science," had recently organized a meeting with tech executives, including Palantir's CEO, Alex Karp, and other executives who were described as "anti-Trump" but had "sort of changed their minds."

581.     When asked by the reporter if he was concerned about conflicts of interest in relation to Trump and the tech meeting, Thiel said: "I don't want to dismiss ethical concerns here, but I worry that 'conflict of interest' gets overly weaponized in our politics.  I think in many cases, when there's a conflict of interest, it's an indication that someone understands something way better than if there's no conflict of interest.  If there's no conflict of interest, it's often because you're just not interested."  Thiel also reportedly said in response to a comment by the reporter that Barack Obama had avoided "any ethical shadiness" during his eight-year term as president, "But there's a point where no corruption can be a bad thing.  It can mean that things are too boring."

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

582.     Defendant Thiel's other comments during the interview are telling as to his knowledge of Facebook's illicit business practices and are similarly unsettling as to his membership on Facebook's Board.  For instance, The *Times* reporter commented that "Mr. Thiel and Mr. Trump are strange bedfellows, given that much of Mr. Thiel's billions came from being one of the original investors in Facebook and Mr. Trump recently said it's better to send important messages by courier."  In response, Thiel stated, "Well, one does have to be very careful with what one says in an email."

583.     In the interview, Thiel acknowledged the reports of Russian hacking, stating, "There's a strong circumstantial case that Russia did this thing."  When asked if he was worried about the relationship between Vladimir V. Putin and then-President elect Trump, Thiel responded, "But should Russia be allied with the West or with China?"  "There are these really bad dictators in the Middle East, and we got rid of them and in many cases there's even worse chaos."  Thiel also stated, "It's the people behind the red-eyed robots that you need to be scared of."  When asked about the "incestuous amplification of the Facebook news feed," Thiel cryptically responded, "There's nobody you know who knows anybody.  There's nobody you know who knows anybody who knows anybody, ad infinitum."

584.     The *Times* reporter pointed out that Thiel is a "social-media visionary" yet he "rarely updates his Facebook page and doesn't tweet," which Thiel reportedly said is "because you always want to get things exactly right" and "if you start doing it, you have to do it a lot."  According to the reporter, Thiel also "wondered if his most famous investment, Facebook, contributes to herd mentality."

585.     Defendant Thiel will not institute any litigation against Zuckerberg because he is beholden to him.  Thiel has greatly benefited by his relationship with Zuckerberg and his seat on the Facebook Board.  The Founders Fund gets "good deal flow" from this high profile association, and further demonstrates that Thiel has a personal bias in favor of keeping founders in control of the companies they created and will not act to remove Zuckerberg from his position.  Thiel's venture capital fund, The Founders Fund, is marketed on the principle that company founders

- 183 -

1  should have long-term control of the companies they create.  In fact, the Fund's website touts

2  Facebook as a primary example of that maxim, stating that "we have often tried to ensure that

3  founders can continue to run their businesses through voting control mechanisms, as Peter Thiel

4  did with Mark Zuckerberg and Facebook."

5        586.   In addition to the past connections which demonstrate that Defendant Thiel lacks

6  independence from Defendant Zuckerberg, Thiel has a current personal and financial interest in

7  remaining on Facebook's Board.  According to the 2018 Proxy Statement, the Facebook shares

8  owned by the Founders Fund – i.e., Defendants Thiel and Andreesen – are to be released from

9  escrow in connection with the Oculus acquisition.  Thiel stands to gain substantially from the

10  vesting of stock in connection therewith.

11        587.   The foregoing facts demonstrate that Defendant Thiel is interested and lacks

12  independence due to his close relationship with Defendant Zuckerberg and will not take any action

13  against Zuckerberg or that will threaten his prestigious and lucrative position as a Facebook

14  director.  Demand was futile as to Defendant Thiel.

### 5.   Defendant Andreessen is Interested, and Also Lacks Independence

16        588.   Defendant Andreessen lacks independence due to his unusually close personal and

17  business relationships and his "sense of owingness" to Defendant Zuckerberg, and to other

18  interested directors, due to his receipt of personal and financial benefits not shared with other

19  (minority) shareholders of Facebook, which were approved by the Board or that Defendant

20  Andreessen received due to his position on Facebook's Board, or as a result of his close personal

21  and business relationships with Defendant Zuckerberg and other directors who approved various

22  transactions from which Andreessen personally benefited.

23        589.   Andreessen received personal financial or reputational benefits from various

24  transactions, payments and/or compensation that Facebook's entire Board approved, including

25  Facebook's acquisition of Oculus VR.

26

27

28

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

590.    Defendant Andreessen is beholden to Facebook's Board, and especially to its founder, CEO, controlling director and shareholder with a majority of voting rights, Defendant Zuckerberg due to their unusually close business and personal relationships.  Andreessen feels a "sense of owingness" for past personal reputational and financial benefits that he received as a result of his position on Facebook's Board or from transactions that were approved by Zuckerberg and/or the Board.  Andreessen has greatly benefited by his relationship with Zuckerberg and his seat on the Facebook Board.  The Founders Fund gets "good deal flow" from this high-profile association.  Moreover, according to the 2018 Proxy Statement, the Facebook shares owned by the Founders Fund – i.e., Defendants Thiel and Andreesen – are to be released from escrow in connection with the Oculus acquisition. (2018 Proxy Statement at 39.)

591.    Andreessen also lacks independence because he is beholden to Defendant Zuckerberg and to Facebook's Board due to the substantial personal financial benefits he has received from highly lucrative deals between Andreessen or his firm, on the one hand, and Facebook or Facebook subsidiaries or Defendant Zuckerberg, on the other, that he has made with Zuckerberg in the past few years.  In particular, Andreessen Horowitz has seen two of its portfolio companies purchased by Facebook – Instagram and Oculus VR –now Facebook subsidiaries.

592.    Andreessen turned his firm's $250,000 investment in Instagram into $78 million when the $1 billion acquisition by Facebook closed.  Andreessen would not have even been able to invest in Oculus VR without Zuckerberg.  Andreessen had declined to invest in the company previously, but desperately wanted to invest by the fall of 2013, according to an October 2015 *Vanity Fair* article.  When Oculus VR's CEO seemed reluctant to allow the investment, Andreessen reportedly had Zuckerberg talk to the CEO about Andreessen.  Andreessen Horowitz got the deal and Andreessen became one of four board members for the fledgling company.  Not very long after, Zuckerberg offered $2 billion for Facebook to acquire Oculus VR.

593.    Andreessen knows that his firm's access to the best investments – its "deal flow" – relies heavily on his relationship with Zuckerberg and Facebook.  In a May 18, 2015 *New Yorker* article titled "Tomorrow's Advance Man," Andreessen reportedly said that "Deal flow is

- 185 -

1  everything.  If you're in a second-tier firm, you never get a chance at that great company."

2  Andreessen Horowitz saw its biggest successes after "logo shopping" to add Facebook to the

3  firm's portfolio in 2010.  Within two years of that investment, "Andreessen Horowitz was the talk

4  of the town."

5       594.    According to a December 8, 2016 article posted on Deal Breaker, "Marc

6  Andreessen and Mark Zuckerberg Are BFFs, and Pesky Board Negotiations Can't Change That,"

7  Andreessen was one of Zuckerberg's first friends – and funders – in the Valley.  In return,

8  Zuckerberg gave him a seat on the Board in 2008, and the two have remained tight since.  The

9  dispute goes back to when Zuckerberg wanted to sell a bunch of shares, but maintain voting

10  control of the company.  To do so would require a stock split that would dilute other voting shares,

11  potentially to the detriment of other stakeholders.  The proposal was controversial, so the Board

12  created a Special Committee to represent shareholders on the matter, composed of Susan

13  Desmond-Hellmann, Erskine Bowles and, of course, Zuckerberg's close friend Andreessen.  While

14  on the committee, Andreessen slipped Zuckerberg information about their progress and concerns,

15  helping Zuckerberg negotiate against them, according to court documents.

16       595.    When the time came for the Committee to ask Zuckerberg questions on a

17  conference call, Andreessen warned the Facebook founder about what he would be asked before

18  directors posed the questions.  While the committee grilled Zuckerberg about why he wanted a

19  special class of stock, Andreessen sent the CEO text messages to explain which of his arguments

20  weren't working and why, according to messages quoted in court filings. During one March 4 call,

21  Andreessen gave Zuckerberg live updates, both negative ("This line of argument is not helping.")

22  and positive ("NOW WE'RE COOKING WITH GAS"), according to texts provided by

23  Facebook's lawyers and cited in court filings.  "Andreessen even told Zuckerberg that he was

24  working to protect Zuckerberg's personal interests through the Special Committee process,"

25  according to the filings.  When the two prevailed over Defendant Bowles, who reportedly had

26  initially looked askance at the whole deal, Defendant Andreessen texted Defendant Zuckerberg,

27

28
PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

"The cat's in the bag and the bag's in the river." "Does that mean the cat's dead?" Zuckerberg replied, dumbfounded.  Andreessen answered, "Mission accomplished [smiley face]".

**6.  Defendant Chenault is Interested, and Also Lacks Independence**

596.    On January 18, 2018, Facebook announced that the Company added a new member to its board of directors: Ken Chenault ("Chenault"), then CEO of American Express.  Chenault is the first new director since Defendant Koum joined Facebook's Board in 2014.

597.    Defendant Zuckerberg announced the new appointment in a Facebook post, claiming he's been "trying to recruit Ken for years."  "He has unique expertise in areas I believe Facebook needs to learn and improve — customer service, direct commerce, and building a trusted brand," Zuckerberg added.  "Adding someone to our board is one of the most important decisions our board makes.  It's a long process that I take very seriously since this is the group that ultimately governs Facebook.  Ken and I have had dinners discussing our mission and strategy for years, and he has already helped me think through some of the bigger issues I'm hoping we take on this year."

598.    Defendant Chenault lacks independence from Zuckerberg and is beholden to Zuckerberg because he appointed Chenault to Facebook's Board.  Chenault has received, and continues to receive, lucrative compensation and benefits, including personal reputational benefits and prestige that is associated with and is solely the result of his position on Facebook's Board.  He will not commence litigation against Zuckerberg or take any other action that would threaten his position and the lucrative compensation and benefits that he receives as a Facebook director.

**7.  Defendant Zients is Interested, and Also Lacks Independence**

599.    In 2018, Defendant Zuckerberg selected Defendant Zients to replace Defendant Koum as a director on Facebook's Board, after the 2018 Proxy Statement was issued and before the stockholder meeting, but no vote was required.  Defendant Zuckerberg thus effectively unilaterally appointed Zients to the Board for the entire year.

600.    Defendant Zients lacks independence from Zuckerberg and is beholden to Zuckerberg because he appointed Zients to Facebook's Board.  Zients has received, and continues

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

to receive, lucrative compensation and benefits, including personal reputational benefits and prestige that is associated with and is solely the result of his position on Facebook's Board. He will not commence litigation against Zuckerberg or take any other action that would threaten his position and the lucrative compensation and benefits that he receives as a Facebook director.

### 8.   Defendant Alford is Interested, and Also Lacks Independence

601.   On April 12, 2019, Facebook issued a press release announcing that Defendant Alford had been nominated for election to Facebook's Board at the Company's annual meeting of stockholders to be held on May 30, 2019. Alford is Senior Vice President, Core Markets of PayPal Holdings, Inc., a digital payments company, since March 2019, and she previously held a variety of other senior positions at PayPal from May 2011 until September 2017, when she began working for Defendant Zuckerberg at his "philanthropic organization."

602.   Alford was Chief Financial Officer and Head of Operations at the Chan Zuckerberg Initiative until February 2019, when she left so that she could join Facebook's Board. Alford's background is in finance, and in her position as Chief Financial Officer and Head of Operations for the Chan Zuckerberg Initiative, she was able to oversee and manage the financial and accounting intricacies associated with the massive amounts of shares of Facebook stock that Defendant Zuckerberg began offloading to the organization in 2017. Defendant Zuckerberg did this with the blessing of Facebook's Board, to avoid tax consequences, while at the same time retaining his majority voting power, through his continued voting and decision-making control with respect to those shares.

603.   When Facebook's Board originally announced the planned sell-off by Zuckerberg of his shares in a Form 8-K that Facebook filed with the SEC in September 2017, Defendants disclosed that Zuckerberg anticipated selling 35 million to 75 million shares of Facebook stock over a period of approximately 18 months from the date of the announcement, or until approximately March 2019. However, the Board subsequently disclosed in Item 9B of Facebook's 2018 Form 10-K that Zuckerberg "intends to continue to sell shares of Facebook stock from time

- 188 -

to time, primarily to continue to fund his philanthropic initiatives" – providing further evidence of Zuckerberg's domination and control over Facebook and its Board.

604.    Alford has a long history in the tech industry, and over the years she has worked with, and for, other companies founded by Facebook directors besides Defendant Zuckerberg, including current Board member Defendant Thiel.  Defendant Thiel is a co-founder of PayPal, which was acquired by eBay in 2002.  Alford was eBay's Marketplace Controller and Director of Accounting Policy from 2002 until 2005, and she held various officer positions at Rent.com, another eBay Inc. company, from 2005 until 2011, when she began working for PayPal Holdings.

605.    Thus, it is no surprise that when Facebook announced that Alford would join Facebook's Board in the April 12, 2019 press release, she paid lip service to the Board's "drive and desire to face hard issues head-on" and specifically named Zuckerberg in her statement that was quoted in the press release:  "I look forward to working with Mark and the other directors as the company builds new and inspiring ways to help people connect and build community."

606.    Defendant Zuckerberg likewise expressed his admiration for Alford in the press release and alluded to their close working relationship, stating, "Peggy is one of those rare people who's an expert across many different areas - from business management to finance operations to product development.  I know she will have great ideas that help us address both the opportunities and challenges facing our company."

607.    Defendant Alford lacks independence from Zuckerberg and is beholden to Zuckerberg because he appointed Alford to Facebook's Board.  Alford has received and continues to receive lucrative compensation and benefits, including personal reputational benefits and prestige that is associated with and is solely the result of her position on Facebook's Board, and she will not commence litigation against Zuckerberg or take any other action that would threaten her position and the lucrative compensation and benefits that she receives as a Facebook director.

608.    For all of the foregoing reasons, demand on Facebook's Board was futile, and therefore, excused.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

### C. The Share Repurchases, and Insider Sales and Awards of Stock During the Relevant Period, Are Interested Transactions Subject to Entire Fairness Review

609. By 2019, the Board had authorized Facebook to repurchase up to $24 billion of shares of its Class A common stock, pursuant to a program that had no other restrictions or requirements respecting the timing, number, or price of shares to be repurchased, and no apparent business justification. The Board allowed Facebook's management full discretion and authority to determine the total number of shares to repurchase, the timing and price of any share repurchases, and whether they would be purchased in the open market, or through "privately negotiated transactions," including from Facebook's officers and directors (Defendants).

610. The Board's approval of the share repurchase program and subsequent authorizations was not a good faith, valid exercise of business judgment. The Board approved the repurchase program which allowed Defendant Zuckerberg to effectuate self-interested and/or self-dealing transactions, at Facebook's expense, for entrenchment or other similar purposes.

611. The repurchase program and the "privately negotiated transactions" through which it was effectuated were self-interested or involved self-dealing by Defendants Zuckerberg and Sandberg, and were not approved by the Board after any independent review or evaluation of whether the program itself, or the significant outlay of cash by Facebook that the Company spent to repurchase its shares under the program, was in the best interests of the Company, let alone fair to the minority (non-interested) shareholders.

612. Under the share repurchase program and authorizations, Facebook paid cash to purchase its shares, primarily from Defendants, that were subsequently retired, in order to decrease the outstanding number of shares with voting rights and further entrench Defendant Zuckerberg (and to a lesser extent, other Individual Defendants) in their positions.

613. Facebook spent at least $15 billion (mostly in cash) to repurchase shares of its stock in 2017 and 2018, and the Board approved yet another $9 billion increase to the authorization in December 2018. This allowed Defendant Zuckerberg unfettered discretion to decide whether and

1  when to repurchase shares of its Class A common stock, how many shares to purchase, the price

2  per share, and the amount of shares to be repurchased by Facebook.

3      614.    The Board did not even attempt to justify or explain its rationale for approving the

4  increased authorizations, or the program, without any restrictions or requirements that would

5  suggest the share repurchases were authorized based on an informed and good-faith decision by

6  the Board that it was in the best interests of Facebook and was fair to its minority (non-interested)

7  shareholders, and was not effectuated for any self-interested, self-dealing, or similar improper

8  purpose.

9      615.    Thus, the Board effectively gave Defendant Zuckerberg the green light to sell

10  massive amounts of his shares to the Company, at any time and for any price, and without any

11  analysis or requirement concerning the fairness of the transaction to Facebook and its minority

12  (non-interested) shareholders.

13      616.    This perpetuated Defendant Zuckerberg's control of the Company, including his

14  majority voting power, which the Board has allowed him to retain through other transactions that

15  they have allowed or approved in the past.  Defendants have done so for their own self-interested

16  or entrenchment purposes, and/or because they lack independence from Zuckerberg, and depend

17  on his continued goodwill and/or friendship for their positions at the Company, which are highly

18  lucrative and provide the Individual Defendants with significant financial and/or personal

19  reputational benefits.  For example, in April 2016, the Board approved a share reclassification plan

20  ("Reclassification Plan") whereby a new class of publicly-listed, non-voting Class C capital stock

21  would be created.  The Reclassification Plan was designed to allow Zuckerberg to generate cash by

22  selling his shares of Facebook stock while at the same time maintaining his voting control (and

23  actual control) of Facebook.  However, a shareholder challenged the Reclassification Plan in an

24  action in Delaware Chancery Court, and documents filed in that case explain how the

25  Reclassification Plan was approved by a Special Committee of the Board in April 2016, including

26  Defendant Andreessen, who shared private information with Zuckerberg about the Special

27  Committee's confidential deliberations.  The supposedly independent Special Committee's

28

- 191 -

1    conduct respecting approval of the Reclassification Plan failed to pass muster, and ultimately, it

2    was abandoned by the Board.

3           617.    Court filings in the Delaware litigation explain the background and purpose of the

4    Reclassification Plan, which are substantially similar to the effects that the share repurchase

5    program, together with Zuckerberg's insider sales, will have if they continue at the current pace.

6    The Reclassification Plan was developed in 2015, after Zuckerberg publicly announced that he

7    planned to donate 99% of his wealth and would begin to sell large amounts of his Facebook stock

8    in the near future.  At the time, Zuckerberg controlled over 60% of Facebook's voting power

9    primarily through his massive Class B holdings, while holding fewer than 17% of Facebook's total

10   outstanding shares.  Zuckerberg had contemplated selling at least $2 to $3 billion worth of his

11   shares annually, until he learned that selling more than $3 to $4 billion might cede control to the

12   Company's Class A stockholders.  The Reclassification Plan, under which Facebook would issue a

13   new non-voting share class of its stock (Class C), was intended to preserve Zuckerberg's majority

14   control of the Company notwithstanding his pledge to liquidate his holdings in furtherance of his

15   personal philanthropic interests.

16          618.    Here, too, the share repurchases that began in 2017 have primarily involved large

17   amounts of shares that are in similarly large amounts to shares that Zuckerberg has sold, for the

18   same purpose of funding his personal "philanthropic" initiatives" that was previously disclosed

19   prior to the Reclassification Plan.  Facebook's 2018 Form 10-K stated as follows:

20          In September 2017, we filed a Current Report on Form 8-K announcing that Mark
            Zuckerberg anticipated selling 35 million to 75 million shares of Facebook stock
21          over a period of approximately 18 months from the date of the announcement in
            order to fund the philanthropic initiatives of Mr. Zuckerberg and his wife, Priscilla
22          Chan, in education, science and advocacy. Mr. Zuckerberg has informed us that
            following such time period he intends to continue to sell shares of Facebook stock
23          from time to time, primarily to continue to fund his philanthropic initiatives. Any
            sale of shares beneficially owned by Mr. Zuckerberg will be conducted pursuant
24          to a trading plan established pursuant to Rule 10b5-1 under the Exchange Act and
            will be disclosed publicly in accordance with the rules established by the U.S.
25          Securities and Exchange Commission under Section 16 of the Exchange Act.
26

27

28
PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

619.     Moreover, following their repurchase, Defendants subsequently caused nearly all the shares that Facebook repurchased pursuant to the share repurchase program and increased authorizations to be retired.  And, although the Reclassification Plan did not pan out in his favor, many of Zuckerberg's fellow directors were then willing to approve the plan despite its lack of fairness to the minority shareholders, and currently remain on the Board as a result of their past willingness to cede to Zuckerberg's wishes.  Accordingly, the same directors are similarly willing to approve of this alternative tactic to allow Zuckerberg to sell his shares, as Defendants announced previously, but without explaining the additional element of the new scheme. Zuckerberg will sell his shares ***back to Facebook*** through a fraudulent, manipulative, and deceptive "share repurchase program" that is part of Defendants' overall scheme involving their insider sales of stock, undisclosed "privately negotiated transactions" benefiting Zuckerberg and other Individual Defendants, and misrepresentations and omissions that artificially inflated the price of Facebook's stock.  Allowing Zuckerberg to sell his shares for far greater proceeds than if the true facts about Facebook's violations had been disclosed.

620.     Because a majority of the directors received personal benefits not shared by Facebook's minority (non-interested) shareholders, in connection with the share repurchase scheme effectuated through Defendants' insider sales of stock and other similarly illicit, undisclosed, and/or interested transactions involving Facebook securities, these are interested transactions subject to entire fairness review.  Or, alternatively, demand was futile as to the directors on Facebook's Board who are interested respecting the share repurchases and insider stock transactions, because the Board's approval and/or authorization of such transactions was uninformed, unreasonable, and/or not in good faith.  For the same reasons explained above, and because it was not reviewed and approved by independent directors or by a majority of Facebook's (non-interested) shareholders, and is not entitled to the protections of the business judgment rule presumption.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

# XIII.    DERIVATIVE CLAIMS

## FIRST CAUSE OF ACTION

### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

### (Against the Individual Defendants)

621.    Plaintiffs incorporate and reallege the allegations set forth above at ¶¶1-245, as though fully set forth herein, except to the extent they plead any reckless or knowing conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Defendants.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

622.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

623.    Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2017 and 2018 Proxy Statements.  The 2017 and 2018 Proxy Statements contained proposals to Facebook's stockholders urging them to re-elect the members of the Board and vote against stockholder proposals for the Company to adopt a policy to require the Company to disclose information about its political dealings and Facebook's connections to the "disinformation campaign" that occurred during the 2016 election.  The 2017 and 2018 Proxy Statements, however, misstated or failed to disclose (i) *any* facts whatsoever regarding the Cambridge Analytica scandal, including the fact that Facebook and Defendants learned of the Cambridge Analytica leak, and knew that Facebook

- 194 -

faced significant reputational harm when the truth would inevitably unfold; (ii) that the Company's privacy practices allowed third parties to access user data and that of their friends; (iii) that the Company obtained information about non-Facebook users and information about Facebook users from other sources; (iv) that Facebook's core advertising business was premised on violations of data privacy laws and also violated user trust; and (v) that the Company's illegal business strategy was permitted by the Board and allowed to continue by virtue of deficiencies in Facebook's internal and disclosure controls that were known to the Board when the Proxy Statements were filed.  Thus, the 2017 and 2018 Proxy Statement soliciting materials were materially false and misleading.  By reasons of the conduct alleged in this Complaint, the Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of the Defendants' wrongful conduct, Facebook misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Facebook's recommendation to re-elect the directors who are members of the current Board, and voting against stockholder proposals for the Company to create a risk management committee and increase Board oversight of related issues.  This includes Facebook's failure to disclose information about its political dealings and Facebook's connections to the "disinformation campaign" that occurred during the 2016 presidential election.

624.    The 2017 and 2018 Proxy Statement soliciting materials were materially false and misleading because they falsely stated that the Company's Board of Directors maintained effective internal controls and exercised adequate risk oversight over management and also failed to disclose to the Company's shareholders material deficiencies in the Company's internal controls relating to user privacy and data security, and with respect to the Board's oversight of risk management.

625.    The Board also knowingly agreed to include the false statements in the 2017 and 2018 Proxy Statements since it believed that, had it admitted its own ineffectiveness in oversight of risk management, such admission would have led to the Defendants' own personal liability for

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1    breaching their fiduciary duties as Board members.  Thus, the Board acted in bad faith and in a

2    disloyal manner.

3         626.   By reason of the conduct alleged herein, Defendants, who caused the issuance of

4    the 2017 and 2018 Proxy Statements, violated Section 14(a) of the Exchange Act.  As a direct and

5    proximate result of these Defendants' wrongful conduct, Defendants misled and/or deceived

6    Facebook shareholders by falsely portraying material facts concerning the Company's core

7    advertising business and illegal business strategy, and regarding the Board's risk oversight and the

8    Company's internal controls.  As a result of the false statements and material omissions, Facebook

9    shareholders were deceived. The false statements and material omissions were material because

10   there is a substantial likelihood that a reasonable shareholder would consider the information

11   important in deciding how to vote with respect to the matters contained in the Proxy Statements,

12   which were submitted for shareholder approval at the 2017 and 2018 annual meetings.

13        627.   The misleading information contained in the 2017 and 2018 Proxy Statements was

14   material to Facebook's stockholders in determining whether or not to elect the Defendants to the

15   Board and how to vote with respect to the stockholder proposals, which was material to the

16   integrity of the directors that were proposed for election to the Board and their oversight of the

17   Company.  The proxy-solicitation process in connection with the Proxy Statements was an

18   essential link in (i) the re-election of nominees to the Board and (ii) the decision not to approve the

19   proposal requiring the Company to disclose information about its political dealings and

20   Facebook's connections to the "disinformation campaign" that occurred during the 2016 election.

21        628.   Plaintiff, on behalf of Facebook, thereby seeks injunctive and equitable relief

22   because the conduct of the Defendants named herein interfered with Plaintiff's voting rights and

23   choices at the 2017 annual meeting.  Plaintiffs do not seek any monetary damages for the proxy

24   law violations.

25        629.   This action was timely as it commenced within three years of the date of the 2017

26   and 2018 Proxy Statements, and within one year from the time Plaintiff discovered, or reasonably

27   could have discovered, the facts on which this claim is based.

28

- 196 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

**SECOND CAUSE OF ACTION**

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

**(Against All Individual Defendants for False and Misleading Statements and Omissions)**

630.    Plaintiffs incorporate and reallege each of the allegations set forth above, as though fully set forth herein.

631.    During the relevant period, while Facebook was repurchasing shares of its stock pursuant to the Board's authorization, the Officer Defendants made, authorized, disseminated, and approved the statements specified above.  This includes statements in Facebook's public filings with the SEC, which they knew, or recklessly disregarded, were false and/or misleading in that they contained misrepresentations or omissions of material fact and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

632.    In connection with Facebook's repurchases of Facebook shares, Defendants made, disseminated, and/or approved the materially false and misleading statements and omissions described above.  This includes in Facebook's SEC filings, which they knew or recklessly disregarded were false, incorrect, or misleading because they misrepresented and/or failed to disclose material facts or information that was required to be disclosed, and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants' course of conduct described herein were designed to artificially inflate the price of the Company's common stock.

633.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to these statements.  Defendants engaged in a scheme to defraud Facebook by causing the Company to purchase at least $2 billion in shares of Facebook stock at artificially inflated prices.

634.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of

- 197 -

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Facebook in connection with the Bank's purchases of Facebook stock during the Relevant Period.

635.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally, or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Facebook stock, which were intended to, and did, (a) deceive Facebook; (b) artificially inflate and maintain the market price of Facebook stock; and (c) cause Facebook to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, Defendants were in possession of material, adverse non-public information.

636.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

637.    As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants, or were so obvious that Defendants should have been aware of them. Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

638.    Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

639.    As a result of Defendants' misconduct, Facebook has and will suffer damages in that it paid artificially inflated prices for shares of Facebook common stock purchased as part of the repurchase program that was authorized by the Board, and suffered losses when the previously undisclosed facts were disclosed beginning in March 2018.  Facebook would not have purchased these shares at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

640.    At the time of the share repurchases described above, Facebook was under the control of the Individual Defendants, and Facebook repurchased the shares at artificially inflated prices, as described above, at their direction or while under their control, pursuant to the Board's authorization.

641.    Facebook would not have repurchased the shares of its common stock at the prices it paid, or at all, if it were not under the Individual Defendants' control and subject to their direction and authorization.

642.    Facebook would not have purchased the shares of its common stock in the open market at the prices it paid, or at all, were it not under the Individual Defendants' control and subject to their direction and authorization while they knew or recklessly disregarded that the market prices had been artificially and falsely inflated by their false and misleading statements and/or omissions.

643.    Facebook suffered damages in that, in reliance on the Individual Defendants who owed and owe Facebook fiduciary duties of loyalty and care, and while under their control, Facebook paid artificially inflated prices for Facebook common stock.

644.    Facebook would not have purchased the shares of its common stock at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.  Or, alternatively, if the Individual Defendants' knowledge is imputed to Facebook, Facebook would not have purchased the shares of its common stock at the prices it paid, or at all, if it were not under the control of the Individual Defendants while they were breaching their fiduciary duties owed to Facebook and its minority shareholders, including by

- 199 -

causing or allowing Facebook to repurchase shares of its stock at market prices that were artificially inflated by the Individual Defendants' false and misleading statements and omissions, or as part of the Individual Defendants' market manipulation scheme or fraudulent and deceptive acts, practices, and/or course of business that were designed to, and did, operate as a fraud on the market, and on Facebook's minority shareholders, including Plaintiffs, who were not aware that the market prices had been artificially and falsely inflated by Defendants' conduct described above.

645.    At all relevant times, the Individual Defendants owed and owe fiduciary duties to Facebook and its minority shareholders, including under Delaware, California, and federal common law.

646.    The Individual Defendants' conduct described herein constituted a breach of their fiduciary duties owed to Facebook and its minority shareholders, and was the direct and proximate cause of the economic losses and other damages and harm to Facebook described above, including the losses and damages that Facebook suffered in connection with its purchases of shares of Facebook common stock during the relevant period.

647.    At the time of the share repurchases described above, Facebook and its minority shareholders, including Plaintiffs, reasonably relied on the Individual Defendants not to breach their fiduciary duties that they owed to Facebook, including by the Individual Defendants' fraud scheme that was designed to, and did, manipulate the market for Facebook securities, and by their acts, practices, or course of business that operated as a fraud on the market.

648.    As a direct and proximate result of Defendants' wrongful conduct, Facebook suffered damages in connection with its purchases of shares of Facebook stock.  Among other things, Facebook suffered damages in that, in reliance on the Individual Defendants who owed and owe Facebook fiduciary duties of loyalty and care and while under their control, Facebook paid artificially inflated prices for Facebook common stock.  By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

649.     Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

### THIRD CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

### (Against All Individual Defendants for Manipulative Share Repurchases/Scheme Liability)

650.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

651.     Nominal Defendant Facebook is now, and at all relevant times mentioned in this Complaint was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Mateo County, California.  At all times mentioned in this complaint, Facebook was an issuer of securities and was the issuer of the shares described in this complaint.

652.     Beginning in January of 2017, on various dates throughout 2017, Facebook repurchased $6 billion worth of shares of its Class A common stock at regular market prices.  At the same time the Individual Defendants sold their personally held shares of Facebook Class A common stock into the open market at market prices, and the Individual Defendants caused Facebook to sell and Facebook sold shares of its Class A common stock to the public pursuant to its Registration Statement on Form 8-A filed with the SEC on May 13, 2012, including any amendments or reports filed for the purpose of updating such description.

653.     The Individual Defendants offered to sell, and sold, the shares of Facebook stock described above by means of written and oral communications. This included, and expressly incorporated, statements that were materially misleading, untrue or incorrect and/or contained omissions of material fact that failed to disclose information that was necessary to make the statements made.  In light of the circumstances under which they were made, not misleading, in that the Individual Defendants signed, authorized, approved, disseminated, issued, caused Facebook to issue, and/or issued on Facebook's behalf, statements that were materially false, misleading and/or incorrect.  Or that omitted and failed to disclose material facts and information

- 201 -

that was necessary to make the statements in Facebook's public filings with the SEC, press releases, conference calls with securities analysts and investors, in Facebook Newsroom posts, on Mark Zuckerberg's Facebook page, to various media outlets, in live and written testimony to Congress and various other government agencies, and that were provided to Facebook's regulators, not misleading, including facts and information regarding, among other things: (i) the misappropriation of user information by Cambridge Analytica and other third parties; (ii) Defendants' knowledge that Facebook's internal controls and systems were inadequate and ineffective to protect user data; (iii) Defendants' knowledge of data security failures that had actually materialized and had not been disclosed; (iv) the fact that Facebook's internal controls and systems were inadequate to ensure that the Company complied with applicable notification and disclosure requirements, including with respect to the Cambridge Analytica incident; (v) the fact that Defendants failed to maintain appropriate policies and procedures to detect and prevent violations of Facebook's policies; and (vi) the fact that Defendants failed to appropriately address Facebook's privacy practices and misleading claims regarding the same as required by the FTC Consent Order; and (vii) the fact that, as a result of the foregoing, Facebook was liable for damages, including fines and penalties, and various other costs incurred in connection with adjudicated violations and potential violations of various U.S. and foreign laws, regulations, and the FTC Consent Order.

654.    In connection with Facebook's repurchases of Facebook shares, Defendants disseminated or approved false or misleading statements about Facebook as described above, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

655.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements. Defendants engaged in a scheme to defraud

1    Facebook by causing the Company to purchase at least $2 billion in shares of Facebook stock at

2    artificially inflated prices.

3         656.    The Individual Defendants violated Section 10(b) of the Exchange Act and SEC

4    Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud Facebook and its

5    minority shareholders, and the public market for Facebook stock, by causing the Company to

6    repurchase its shares at market prices; (b) made untrue statements of material facts or omitted to

7    state material facts necessary in order to make the statements made, in light of the circumstances

8    under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of

9    business that operated as a fraud or deceit upon Facebook and its minority shareholders, and the

10   public market for Facebook stock, including by causing the Company to repurchase shares in the

11   open market and/or from Individual Defendants during the relevant period while Defendants were

12   making materially false and misleading statements and omissions that caused Facebook's stock to

13   trade at higher prices than it would have had it not been for such statements and omissions by

14   Defendants.

15        657.    Defendants, individually and in concert, directly and indirectly, by the use of means

16   or instrumentalities of interstate commerce or of the mails, engaged and participated in a

17   continuous course of conduct that operated as a fraud and deceit upon the Company and its

18   minority shareholders, and the investing public; made various false or misleading statements of

19   material facts and omitted to state material facts necessary in order to make the statements made,

20   in light of the circumstances under which they were made, not misleading; made the above

21   statements intentionally or with a severely reckless disregard for the truth; and employed devices

22   and artifices to defraud in connection with the purchase and sale of Facebook stock, which were

23   intended to, and did, (a) deceive Facebook; (b) artificially inflate and maintain the market price of

24   Facebook stock; and (c) cause Facebook to purchase the Company's stock at artificially inflated

25   prices and suffer losses when the true facts became known.  Throughout the Relevant Period,

26   Defendants were in possession of material, adverse non-public information.

27

28
PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

658.   Defendants were among the senior management and the directors of the Company, and were therefore, directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

659.   As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them. Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

660.   Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

661.   As a result of Defendants' misconduct, Facebook suffered damages in connection with its purchases of Facebook stock, in that it paid artificially inflated prices for Facebook common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts were disclosed beginning in March 2018.  Facebook would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company' s stock price caused by Defendants' false or misleading statements.

662.   As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Facebook stock. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

663.   During the relevant period, each of the Individual Defendants: (i) approved Facebook's stock repurchase program in 2016 and/or increases to the amount of the original share repurchase authorization and subsequent authorizations in 2017, 2018 and/or 2019; or (ii) approved, authorized and/or effectuated share repurchases by Facebook or sold their own personally-held shares of Facebook Class A common stock during the same time that the Company was repurchasing its shares in 2017, 2018 and/or 2019.  Pursuant to these authorizations and

- 204 -

1    approvals, Facebook repurchased hundreds of thousands of shares of its Class A common stock

2    during the relevant period in the open market and from Individual Defendants, directly and

3    indirectly, including at regular market prices, for total purchase prices of at least $6 billion in

4    2017, at least $9 billion in 2018, and up to $9 billion in 2019.

5          664.    In connection with Facebook's share repurchases, the Individual Defendants made,

6    or caused to be made, by or on behalf of Facebook false and misleading statements and/or

7    omissions as described above, which the Individual Defendants knew or recklessly disregarded

8    were materially false, misleading and/or incorrect and were intended to deceive or defraud the

9    public (including Plaintiff and Facebook's minority shareholders) and to manipulate the market for

10   Facebook securities by artificially inflating the market price of shares of Facebook Class A

11   common stock.  Those false and misleading statements or omissions were made, authorized or

12   approved by the Individual Defendants intentionally, as part of a course of conduct that was

13   intended to, and did, manipulate the market for Facebook securities by artificially inflating the

14   price of Facebook's common stock.

15         665.    At the same time that the price of Facebook's common stock was artificially

16   inflated due to the false and misleading statements or omissions as described above, the Individual

17   Defendants caused Facebook to repurchase millions of shares of its Class A common stock,

18   including in the open market, at prices that were higher than the prices that Facebook would have

19   paid for the shares had the Company's stock price not been artificially inflated due to the false and

20   misleading statements or omissions that the Individual Defendants made or caused to be made by

21   or on behalf of Facebook as described above.

22         666.    The Individual Defendants engaged in a scheme that deceived or defrauded

23   Facebook by causing the Company to purchase shares of its stock at artificially inflated prices that

24   were higher than the price Facebook would have paid for its shares, had its stock price not been

25   artificially inflated due to the Individual Defendants' false and misleading statements or omissions

26   as described above.

27

28
                                     - 205 -

667.     The Individual Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they engaged in acts, practices, and/or a course of business that manipulated the market for Facebook stock, and thereby operated as a fraud or deceit upon Facebook in connection with its share repurchases during the relevant period.

668.     As described above, the Individual Defendants acted with intent to deceive, manipulate, or defraud the market, by issuing materially false and misleading statements and omissions, including in Facebook's proxy statements, quarterly and annual reports, and other public filings with the SEC, in press releases and on conference calls with analysts and investors, and in Facebook Newsroom posts, on Mark Zuckerberg's Facebook page, and on other pages of Facebook's website, to various media outlets, in live and written testimony to Congress and other government agencies, and to Facebook's regulators. These statements contained omissions and misrepresentations that the Individual Defendants knew: (i) were misleading; (ii) failed to disclose material facts and information that was required to be disclosed under applicable laws and regulations, or that the Individual Defendants knew was necessary to make Defendants' statements not misleading; and/or (iii) caused Facebook's stock price to trade at higher prices than if the omitted facts were disclosed, or if the facts had been disclosed truthfully, including material facts and information related to the Company's core advertising business, advertising services, policies, practices, and internal controls, including relating to user privacy, information, and data security.

669.     Defendants' statements were false and misleading because they failed to state, or omitted material facts and did not disclose information regarding, among other things: (i) the misappropriation of user information by Cambridge Analytica and other third parties; (ii) Defendants' knowledge that Facebook's internal controls and systems were inadequate and ineffective to protect user data; (iii) Defendants' knowledge of data security failures that had actually materialized and had not been disclosed; (iv) the fact that Facebook's internal controls and systems were inadequate to ensure that the Company complied with applicable notification and disclosure requirements, including with respect to the Cambridge Analytica incident; (v) the fact

- 206 -

that Defendants failed to maintain appropriate policies and procedures to detect and prevent violations of Facebook's policies; and (vi) the fact that Defendants failed to appropriately address Facebook's privacy practices and misleading claims regarding same as required by the FTC Consent Decree; and (vii) Facebook's violations and potential violations of various U.S. and foreign laws and regulations, including the FTC Consent Order.

670.     In connection with the share repurchases, the Individual Defendants acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The Individual Defendants caused Facebook to expend corporate funds to repurchase shares of its stock while it was trading at prices that were artificially inflated by the false and misleading statements that the Individual Defendants issued with intent to deceive, manipulate, or defraud, which were made in connection with the purchase or sale of Facebook stock, as described above. Facebook's repurchases of its shares of its common stock while it was trading at artificially inflated prices were approved and/or authorized by the Individual Defendants for an improper purpose, i.e., to manipulate the market for Facebook securities.

671.     The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, the materially false and misleading statements and omissions that artificially inflated Facebook's stock price and manipulated the market for Facebook securities, and for approving the share repurchase program and/or share repurchase authorization(s) pursuant to which the share repurchases described above were effectuated by or on behalf of Facebook.

672.     Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

### FOURTH CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)

### (Against Insider Selling Defendants Zuckerberg, Sandberg, and Koum)

673.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

- 207 -

674. At the time of the stock sales set forth above, each of defendants Zuckerberg, Sandberg, and Koum (the "Insider Selling Defendants") knew or recklessly disregarded the information described in this Complaint regarding the breach and illicit data sharing and sold Facebook common stock on the basis of that information.

675. The information described above was non-public information concerning the Company's unlawful conduct associated with its business strategy to generate revenues through targeted advertising. The information was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Facebook common stock.

676. At all relevant times hereto, defendants Zuckerberg, Sandberg, and Koum were officers, directors, or controlling persons of Facebook. As a result of their positions and relationships with Facebook, the Insider Selling Defendants had access, directly or indirectly, to material information about Facebook's business and financial condition. Including among other things: (i) the misappropriation of user information by Cambridge Analytica and other third parties; (ii) Defendants' knowledge that Facebook's internal controls and systems were inadequate and ineffective to protect user data; (iii) Defendants' knowledge of data security failures that had actually materialized and had not been disclosed; (iv) the fact that Facebook's internal controls and systems were inadequate to ensure that the Company complied with applicable notification and disclosure requirements, including respect to the Cambridge Analytica incident; (v) the fact that Defendants failed to maintain appropriate policies and procedures to detect and prevent violations of Facebook's policies; and (vi) the fact that Defendants failed to appropriately address Facebook's privacy practices and misleading claims regarding the same as required by the FTC Consent Order; and (vii) the fact that, as a result of the foregoing, Facebook was liable for damages, including fines and penalties, and various other costs incurred in connection with adjudicated violations and potential violations of various U.S. and foreign laws, regulations, and the FTC Consent Order, which would significantly affect the market price of Facebook's securities, was not generally available to the public, and which the Insider Selling Defendants knew was not intended to be available to the public.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

677.     The Insider Selling Defendants' conduct as described above was in violation of section 25402 of the Corporations Code, which prohibits an officer or a director of an issuer from purchasing or selling a security of the issuer in California at a time when he or she knows material information about the issuer gained from the relationship which would significantly affect the market price of the security, is not generally available to the public, and which he or she knows is not intended to be generally available to the public.

678.     At the time Facebook repurchased or sold the shares of its stock from or to defendants Zuckerberg, Sandberg, and/or Koum as described above, the shares would have had a market value in an amount to be determined after discovery that is greater than if the information known to defendants Zuckerberg, Sandberg, and Koum had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

679.     Insider Selling Defendants Zuckerberg, Sandberg, and Koum sold Facebook securities at a time when they possessed and/or knew material information about Facebook — gained from their relationships at Facebook — which was not generally available to the public. Had such information been publicly available, it would have significantly reduced the market price of Facebook stock at that time.

680.     Insider Selling Defendants Zuckerberg, Sandberg, and Koum knew these facts were not intended to be available to the public.  At the time of the Insider Selling Defendants' sales, each of the Insider Selling Defendants had actual knowledge of material, adverse, non-public information and sold their Facebook common stock.

681.     At the time the Insider Selling Defendants—Zuckerberg, Sandberg, and Koum— sold their Facebook common stock as set forth in this Complaint, by reason of their high executive or directorship positions with Facebook, these Defendants had access to highly material information regarding the Company, including the information set forth in this Complaint. Further, the Insider Selling Defendants received millions of dollars of proceeds from trading on material, non-public information, which information was an asset of, and belonged exclusively to, Facebook.

682.     At the time of the Insider Selling Defendants' sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of Facebook shares at that time.

683.     The information described above was non-public information concerning the Company's unlawful conduct associated with its business strategy to generate revenues through targeted advertising.  The information was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Facebook common stock.

684.     The Insider Selling Defendants' sales of their shares of Facebook common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

685.     As a result of Defendants' misconduct, Facebook has and will suffer damages in that it paid artificially inflated prices for Facebook common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts were disclosed beginning in March 2018.  Facebook would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

686.     As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Facebook stock.  By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

687.     At the time of their sales of stock as alleged herein, each of the Insider Selling Defendants owed fiduciary duties to Facebook and its minority shareholders under Delaware, California, and/or federal common law.

688.     The Insider Selling Defendants' sales of their shares of Facebook common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

689.     Because the use of the Company's proprietary information for their own gain constitutes a breach of the Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

690.     Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

691.     Plaintiffs, on behalf of Facebook, have no adequate remedy at law.

**FIFTH CAUSE OF ACTION**

**Violations of Section 20A of the Exchange Act**

**(Against Insider Selling Defendants Zuckerberg, Sandberg, and Koum)**

692.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.  As set forth in the paragraphs above and below, Insider Selling Defendants Zuckerberg, Sandberg, and  Koum committed underlying violations of §10(b) and Rule 10b-5 thereunder by selling Facebook common stock while in possession of material nonpublic information about the Company's deficient privacy protections and material risks to the Company and, consequently, are liable to Facebook as a contemporaneous purchaser of that stock under section 20A of the Exchange Act.

693.     Under section 20A of the Exchange Act, " [a]ny person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. §78t-1(a).

694.     Throughout the relevant period while Facebook was repurchasing shares of its stock at prices that were artificially inflated by Defendants' false and misleading statements, Insider Selling Defendants Zuckerberg, Sandberg, and Koum were in possession of material nonpublic information regarding, among other things, Facebook's data-sharing practices, misrepresentations to users, and material risks to the Company described above.

- 211 -

695.     Defendant Zuckerberg sold nearly *44 million shares* of his Facebook Class A common stock in 2017, 2018, and 2019, for total proceeds of *over $8 billion*, contemporaneously with the Company's share repurchases during the same period, while in possession of material, non-public information.  Zuckerberg's stock sales during the relevant period are set forth in Attachment A to this Complaint.

696.     Defendant Sandberg sold over *5 million shares* of her Facebook Class A common stock in 2017, 2018, and 2019, for total proceeds of *over $790 million*, contemporaneously with the Company's share repurchases during the same period, while in possession of material, non-public information.  Sandberg's stock sales during the relevant period are set forth in Attachment B to this Complaint.

697.     Defendant Koum sold over *22 million shares* of his Facebook Class A common stock in 2017 and 2018, for total proceeds of *over $3.6 billion*, contemporaneously with the Company's share repurchases during the same period, while in possession of material, non-public information.  Koum's stock sales during the relevant period are set forth in Attachment C to this Complaint.

698.     Contemporaneously with Defendant Zuckerberg and Defendant Sandberg's sales of stock, pursuant to Defendants' authorization and at their direction, Facebook repurchased a total of approximately 13 million shares of its Class A common stock for $2.07 billion in 2017, approximately 79 million shares of its Class A common stock for $12.93 billion in 2018, and at least 27.8 million shares of its Class A common stock for approximately $4.97 billion reported thus far in 2019, as shown in the below chart.

- 212 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

| FACEBOOK, INC. | | | DEFENDANT ZUCKERBERG | | DEFENDANT SANDBERG | |
|---|---|---|---|---|---|---|
| | Shares Repurchased | Aggregate Purchase Amount | Shares Sold | Total Value | Shares Sold | Total Value |
| | | Retired | ($) | | ($) | |
| 1Q2017 | 2,000,000 | Y | $228,000,000 | 2,393,303 | $225,517,126 | 1,539,942 | $208,000,977 |
| 2Q2017 | 3,000,000 | Y | $408,000,000 | 1,732,757 | $258,830,281 | 853,982 | $127,140,458 |
| 3Q2017 | 7,000,000 | Y | $104,000,000,000 | 1,389,841 | $233,579,612 | 68,443 | $11,265,101 |
| 4Q2017 | 5,840,000 | Y | $858,530 | 1,078,911 | $191,246,863 | 59,443 | $10,454,660 |
| **2017** | **13,000,000** | **Y** | **$2,070,000,000** | **6,594,812** | **$909,173,882** | **2,521,810** | **$356,861,197** |
| | | | | | | | |
| 1Q2018 | 11,000,000 | Y | $191,000,000,000 | 6,778,285 | $1,199,323,222 | 196,684 | $35,119,362 |
| 2Q2018 | 29,000,000 | Y | $513,000,000,000 | 12,866,254 | $2,355,595,970 | 361,683 | $65,574,825 |
| 3Q2018 | 54,000,000 | Y | $939,000,000,000 | 8,850,615 | $16,318,478,647 | 306,683 | $55,274,330 |
| 4Q2018 | | | | N/A | N/A | 361,686 | $51,830,394 |
| **2018** | **79,000,000** | **Y** | **$12,930,000,000** | **28,495,154** | **$19,873,397,839** | **1,226,736** | **$207,798,912** |
| | | | | | | | |
| 1Q2019 | 3,100,000 | Y | $521,000,000 | N/A | N/A | 366,357 | $58,363,567 |
| 2Q2019 | 9,300,000 | Y | $1,650,000,000 | 1,289,370 | $229,248,830 | 370,043 | $66,937,233 |
| 3Q2019 | 15,400,000 | Y | $2,800,000,000 | 5,034,637 | $930,462,620 | 379,014 | $70,874,365 |
| *4Q2019* | *unreported* | | *unreported* | 3,528,333 | $658,010,246 | 159,016 | $29,553,741 |
| **2019** | **27,800,000** | **Y** | **$4,971,000,000** | **9,852,340** | **$1,817,721,697** | **1,274,430** | **$225,728,908** |

15

16    699.    Tens of thousands of other members of the public, if not more, also purchased

17 shares of Facebook Class A common stock contemporaneously with the Insider Selling

18 Defendants' sales of their stock during the relevant period while Facebook was repurchasing

19 shares of its Class A common stock in the open market, pursuant to Defendants' authorization and

20 at their direction.

21    700.    Facebook and its minority (non-interested) shareholders who purchased shares of

22 Facebook Class A common stock contemporaneously with the share repurchases and Insider

23 Selling Defendants' sales of their shares of Facebook stock suffered damages because: (i)

24 Facebook paid artificially inflated prices as a result of the defendants' violations of section 10(b)

25 and 20(a) of the Exchange Act, as alleged herein; (ii) Facebook, while under the control of the

26 Individual Defendants and pursuant to their authorization and direction, repurchased shares of its

27 Class A common stock at market prices that were artificially inflated by Defendants' fraud

28

- 213 -

1  scheme, and false and misleading statements and omissions, described above, and (a) was entitled

2  to rely and/or reasonably relied on the Individual Defendants not to breach their fiduciary duties

3  owed to Facebook and its minority shareholders, including through violations of the federal

4  securities laws that are alleged herein and/or (b) relied on the integrity of the market; and (iii)

5  Facebook would not have repurchased shares of its common stock at the prices that it paid, or at

6  all, if the market prices had not been artificially inflated by Defendants' fraud scheme, false and

7  misleading statements, or omissions, as alleged herein, but for it being under the control and at the

8  direction of Individual Defendants.

9        701.    Plaintiffs, on behalf of Facebook, have no adequate remedy at law.

10                        **SIXTH CAUSE OF ACTION**

11              **Violations of Section 20(a) of the Exchange Act**

12                        **(Against All Defendants)**

13        702.    Plaintiffs incorporate by reference and reallege each and every allegation contained

14  above, as though fully set forth in this paragraph.

15        703.    As alleged herein, Defendants violated section 10(b) and section 14(a) of the

16  Exchange Act.

17        704.    At all relevant times, each of the Individual Defendants acted as controlling persons

18  of other Defendants, including Facebook and its employees, within the meaning of section 20(a) of

19  the 1934 Act.  By virtue of their positions and their power to control the Company, and their

20  knowledge or possession of, or access to, material, non-public information about Facebook, the

21  Individual Defendants had the power and ability to control the actions of Facebook and its

22  employees, including public statements issued by, on behalf of, and about Facebook, and the

23  Company's share repurchases.  The Individual Defendants controlled Facebook and its other

24  executive officers and employees, including Officer Defendants.

25        705.    By reason of such conduct, the Individual Defendants are liable for damages to

26  Facebook caused by the other Defendants' violations of law alleged herein, pursuant to section

27  20(a) of the 1934 Act.

28
                                    - 214 -

1   706.   Plaintiffs, on behalf of Facebook, have no adequate remedy at law.

2                    **XIV.        PRAYER FOR RELIEF**

3         WHEREFORE, Plaintiffs request that the Court enter a judgment as follows:

4   A.   Determining that this action is a proper derivative action maintainable under the law

5         and that demand was excused as futile;

6   B.   Declaring that Defendants have breached their fiduciary duties to Facebook;

7   C.   Determining and awarding to Facebook the damages sustained by it as a result of the

8         violations set forth above from each Defendant, jointly and severally, together with

9         prejudgment and post-judgment interest thereon;

10  D.   Directing Facebook to take all necessary actions to reform and improve its corporate

11        governance and internal procedures to comply with applicable laws and to protect the

12        Company and its stockholders from a repeat of the damaging events described in this

13        Complaint, including putting forward for a stockholder vote resolutions for

14        amendments to the Company's by-laws or articles of incorporation, and taking such

15        other actions as may be necessary to place before stockholders for a vote the

16        following corporate governance policies:

17              i.    a proposal to strengthen Board oversight and supervision of

18                    Facebook's data security practices;

19              ii.   a proposal to strengthen the Company's disclosure controls to ensure

20                    material information is adequately and timely disclosed to the SEC

21                    and the public; and

22              iii.  a proposal to strengthen the Board's supervision of operations and

23                    develop and implement procedures for greater stockholder input into

24                    the policies and guidelines of the Board;

25  E.   Extraordinary equitable or injunctive relief as permitted by law or equity, including

26        attaching, impounding, imposing a constructive trust on, or otherwise restricting

27        Defendants' assets so as to assure that Plaintiffs, on behalf of Facebook, have an

28

- 215 -

1    effective remedy;

2    F.   Awarding to Facebook restitution from Defendants, and each of them, and ordering

3         disgorgement of all profits, benefits, and other compensation obtained by Defendants,

4         including the proceeds of insider transactions made in violation of state securities

5         laws;

6    G.   Declaring that the 2017 and 2018 Proxy Statements contained materially false and

7         misleading statements;

8    H.   Canceling the votes to re-elect the Defendants to the Board in connection with the

9         annual shareholder meeting in 2017 and 2018, and ordering Defendants to disgorge to

10        the Company all compensation they received for service on the Board following the

11        invalid election;

12   I.   Awarding to Plaintiffs costs and disbursements related to this action, including

13        reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

14   J.   Granting such other and further relief as the Court deems just and proper.

15                          **XV.     JURY DEMAND**

16        Plaintiffs respectfully demand a trial by jury on all issues so triable.

17   Dated: December 17, 2019          **COTCHETT, PITRE & McCARTHY, LLP**

18                                     _____/s/ Joseph W. Cotchett_____
19                                          **JOSEPH W. COTCHETT**
                                          *Lead Counsel for Plaintiffs*
20
                                       **BOTTINI & BOTTINI, INC.**
21                                     FRANCIS A. BOTTINI
                                       fbottini@bottinilaw.com
22                                     YURY A. KOLESNIKOV
                                       ykolesnikov@bottinilaw.com
23                                     BOTTINI & BOTTINI, INC.
                                       7817 Ivanhoe Avenue, Suite 102
24                                     La Jolla, CA 92037
                                       Telephone: (858) 914-2001
25                                     Facsimile: (858) 914-2002
26
27                                     *Attorneys for Plaintiff Natalie Ocegueda*

28                                          - 216 -
     PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

**BERMAN TABACCO**
JOSEPH J. TABACCO, JR. (SBN 75484)
jtabacco@bermantabacco.com
DANIEL E. BARENBAUM (SBN 209261)
dbarenbaum@bermantabacco.com
A. CHOWING POPPLER (SBN 272870)
cpoppler@bermantabacco.com
BERMAN TOBACCO
44 Montgomery Street, Suite 650
San Francisco, CA. 94104
Tel: (415) 433-3200
Fax: (415) 433-6382

*Attorneys for Plaintiff Gloria Stricklin Trust*

**DEREK G. HOWARD LAW FIRM, INC.**
DEREK G. HOWARD (SBN 118082)
derek@derekhowardlaw.com
DEREK G. HOWARD LAW FIRM, INC.
42 Miller Avenue
Mill Valley, CA. 94941
Telephone: (415) 432-7192
Facsimile: (415) 524-2419

*Attorneys for Plaintiff James Karon*

**STULL, STULL & BRODY**
PATRICE L. BISHOP
pbishop@ssbla.com
STULL, STULL & BRODY
9430 W. Olympic Blvd., Suite 400
Beverley Hills, CA. 90212
Telephone: (3310) 209-2468
Facsimile: (310) 209-2087

*Attorney for Plaintiff Ronald*

- 217 -

PLAINTIFFS' FIRST AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JENKINS MULLIGAN & GABRIEL LLP**
DANIEL J. MULLIGAN (SBN 103129)
dan@jmglawoffice.com
LARRY W. GABRIEL (SBN 68329)
lgabriel@bg.law
JENKINS MULLIGAN & GABRIEL LLP
10085 Carroll Canyon Road, Suite 210
San Diego, CA. 92131
Telephone: (858) 527-1792
Facsimile: (858) 527-1793

*Attorneys for Plaintiff James Karo*

- 218 -

# ATTACHMENT A

| Defendant Zuckerberg's Insider Sales of Facebook Class A Common Stock | | | |
|---|---|---|---|
| *SALE DATE* | *SHARES SOLD* | *PRICE PER SHARE* | *TOTAL SALE VALUE* |
| 11/8/2019 | 48,835 | 190.4359 | $9,299,937.18 |
| | 36,618 | 191.4922 | $7,012,061.38 |
| | 7,547 | 192.0498 | $1,449,399.84 |
| | 10,220 | 190.4548 | $1,946,448.06 |
| | 7,745 | 191.547 | $1,483,531.52 |
| | 1,035 | 192.1343 | $198,859.00 |
| | 1,075 | 190.4295 | $204,711.71 |
| | 730 | 191.5844 | $139,856.61 |
| | 45 | 192.14 | $8,646.30 |
| | 1,227 | 190.4062 | $233,628.41 |
| | 973 | 191.5102 | $186,339.42 |
| | 50 | 192.12 | $9,606.00 |
| 11/7/2019 | 25,266 | 190.1239 | $4,803,670.46 |
| | 16,438 | 191.1122 | $3,141,502.34 |
| | 43,496 | 192.128 | $8,356,799.49 |
| | 9,800 | 192.9786 | $1,891,190.28 |
| | 5,443 | 190.1477 | $1,034,973.93 |
| | 4,450 | 191.3598 | $851,551.11 |
| | 8,125 | 192.3028 | $1,562,460.25 |
| | 982 | 193.1991 | $189,721.52 |
| | 403 | 190.0415 | $76,586.72 |
| | 452 | 190.9989 | $86,331.50 |
| | 817 | 192.148 | $156,984.92 |
| | 178 | 193.1493 | $34,380.58 |
| | 611 | 190.1873 | $116,204.44 |
| | 910 | 191.5764 | $174,334.52 |
| | 509 | 192.307 | $97,884.26 |
| | 220 | 193.0554 | $42,472.19 |
| 11/6/2019 | 64,955 | 191.8838 | $12,463,812.23 |
| | 25,614 | 192.7886 | $4,938,087.20 |
| | 4,431 | 193.7744 | $858,614.37 |

| | | | |
|---|---|---|---|
| | 12,761 | 191.8680 | $2,448,427.55 |
| | 5,560 | 192.7671 | $1,071,785.08 |
| | 679 | 193.9853 | $131,716.02 |
| | 1,292 | 191.9230 | $247,964.52 |
| | 434 | 192.8225 | $83,684.97 |
| | 124 | 194.0300 | $24,059.72 |
| | 1,492 | 191.8688 | $286,268.25 |
| | 628 | 192.9564 | $121,176.62 |
| | 130 | 194.0300 | $25,223.90 |
| | 3,434 | 191.9157 | $659,038.51 |
| | 1,254 | 192.8910 | $241,885.31 |
| | 67 | 194.0300 | $13,000.01 |
| 11/5/2019 | 81,872 | 194.1901 | $15,898,731.87 |
| | 13,836 | 195.1246 | $2,699,743.97 |
| | 260 | 195.6737 | $50,875.16 |
| | 16,934 | 194.2088 | $3,288,731.82 |
| | 2,290 | 195.2233 | $447,061.36 |
| | 1,576 | 194.2209 | $306,092.14 |
| | 474 | 195.2972 | $92,570.87 |
| | 1,928 | 194.2627 | $374,538.49 |
| | 522 | 195.3384 | $101,966.64 |
| | 6,301 | 194.1955 | $1,223,625.85 |
| | 1,999 | 195.3225 | $390,449.68 |
| 11/4/2019 | 22,193 | 194.4980 | $4,316,494.11 |
| | 53,161 | 195.2757 | $10,381,051.49 |
| | 25,118 | 196.2313 | $4,928,937.79 |
| | 4,528 | 197.0379 | $892,187.61 |
| | 9,189 | 194.7218 | $1,789,298.62 |
| | 8,828 | 195.5431 | $1,726,254.49 |
| | 3,762 | 196.5763 | $739,520.04 |
| | 321 | 197.1794 | $63,294.59 |
| | 987 | 194.6214 | $192,091.32 |
| | 831 | 195.5776 | $162,524.99 |
| | 232 | 196.5917 | $45,609.27 |
| | 1,366 | 194.7023 | $265,963.34 |
| | 984 | 195.9050 | $192,770.52 |
| | 100 | 197.0400 | $19,704.00 |
| | 5,505 | 194.8991 | $1,072,919.55 |

| | 2,533 | 195.9999 | $496,467.75 |
|---|---|---|---|
| | 262 | 197.0250 | $51,620.55 |
| 11/1/2019 | 7,872 | 190.7376 | $1,501,486.39 |
| | 10,078 | 191.4787 | $1,929,722.34 |
| | 53,211 | 192.5991 | $10,248,390.71 |
| | 23,839 | 193.4783 | $4,612,329.19 |
| | 3,154 | 191.1024 | $602,736.97 |
| | 6,563 | 192.3823 | $1,262,605.03 |
| | 7,843 | 193.0621 | $1,514,186.05 |
| | 1,440 | 193.8195 | $279,100.08 |
| | 313 | 191.2265 | $59,853.89 |
| | 1,232 | 192.7283 | $237,441.27 |
| | 305 | 193.5725 | $59,039.61 |
| | 277 | 191.0449 | $52,919.44 |
| | 1,428 | 192.6615 | $275,120.62 |
| | 545 | 193.5064 | $105,460.99 |
| | 654 | 190.7264 | $124,735.07 |
| | 885 | 191.6578 | $169,617.15 |
| | 4,941 | 192.7645 | $952,449.39 |
| | 1,020 | 193.6756 | $197,549.11 |
| 10/31/2019 | 2,372 | 192.0402 | $455,519.35 |
| | 2,881 | 193.0732 | $556,243.89 |
| | 964 | 194.0255 | $187,040.58 |
| | 336 | 195.4765 | $65,680.10 |
| | 1,747 | 196.6353 | $343,521.87 |
| | 21,784 | 191.9076 | $4,180,515.16 |
| | 36,752 | 192.7383 | $7,083,518.00 |
| | 19,801 | 193.8154 | $3,837,738.74 |
| | 4,736 | 194.6893 | $922,048.52 |
| | 7,134 | 195.7677 | $1,396,606.77 |
| | 5,201 | 196.7940 | $1,023,525.59 |
| | 1,025 | 197.8341 | $202,779.95 |
| | 4,897 | 191.9470 | $939,964.46 |
| | 6,587 | 192.7130 | $1,269,400.53 |
| | 4,521 | 193.7654 | $876,013.37 |
| | 748 | 194.9591 | $145,829.41 |
| | 1,398 | 195.8546 | $273,804.73 |
| | 876 | 196.8656 | $172,454.27 |

|  | 430 | 197.8860 | $85,090.98 |
|---|---|---|---|
|  | 760 | 192.1322 | $146,020.47 |
|  | 414 | 193.0257 | $79,912.64 |
|  | 334 | 194.1837 | $64,857.36 |
|  | 100 | 195.3050 | $19,530.50 |
|  | 316 | 196.6000 | $62,125.60 |
|  | 126 | 197.8563 | $24,929.89 |
|  | 924 | 192.0880 | $177,489.31 |
|  | 601 | 193.2771 | $116,159.54 |
|  | 251 | 194.3931 | $48,792.67 |
|  | 181 | 195.3100 | $35,351.11 |
|  | 493 | 196.9071 | $97,075.20 |
| 10/30/2019 | 10,879 | 186.6939 | $2,031,042.94 |
|  | 52,465 | 187.6122 | $9,843,074.07 |
|  | 25,199 | 188.4936 | $4,749,850.23 |
|  | 6,153 | 189.4095 | $1,165,436.65 |
|  | 304 | 190.2620 | $57,839.65 |
|  | 2,652 | 186.7576 | $495,281.16 |
|  | 10,319 | 187.6627 | $1,936,491.40 |
|  | 4,075 | 188.4823 | $768,065.37 |
|  | 1,954 | 189.3099 | $369,911.54 |
|  | 185 | 186.7129 | $34,541.89 |
|  | 1,236 | 187.7780 | $232,093.61 |
|  | 313 | 188.8916 | $59,123.07 |
|  | 116 | 190.0700 | $22,048.12 |
|  | 747 | 187.1650 | $139,812.26 |
|  | 1,292 | 188.1190 | $243,049.75 |
|  | 92 | 189.0600 | $17,393.52 |
|  | 119 | 190.0700 | $22,618.33 |
|  | 929 | 186.8375 | $173,572.04 |
|  | 4,459 | 187.7576 | $837,211.14 |
|  | 1,572 | 188.8246 | $296,832.27 |
|  | 540 | 190.0068 | $102,603.67 |
| 10/29/2019 | 44,750 | 189.1964 | $8,466,538.90 |
|  | 39,326 | 189.9012 | $7,468,054.59 |
|  | 8,629 | 191.0026 | $1,648,161.44 |
|  | 2,295 | 191.9661 | $440,562.20 |
|  | 9,913 | 189.1952 | $1,875,492.02 |

| | | | |
|---|---|---|---|
| | 7,193 | 189.9580 | $1,366,367.89 |
| | 1,464 | 191.0445 | $279,689.15 |
| | 430 | 191.9905 | $82,555.92 |
| | 1,060 | 189.2279 | $200,581.57 |
| | 574 | 190.1102 | $109,123.25 |
| | 216 | 191.3125 | $41,323.50 |
| | 1,503 | 189.2593 | $284,456.73 |
| | 467 | 190.1866 | $88,817.14 |
| | 280 | 191.2528 | $53,550.78 |
| | 4,403 | 189.2412 | $833,229.00 |
| | 2,171 | 190.1060 | $412,720.13 |
| | 926 | 191.4208 | $177,255.66 |
| 10/28/2019 | 10,928 | 185.8481 | $2,030,948.04 |
| | 13,299 | 186.9210 | $2,485,862.38 |
| | 23,387 | 187.8619 | $4,393,526.26 |
| | 36,022 | 188.8132 | $6,801,429.09 |
| | 11,364 | 189.3805 | $2,152,120.00 |
| | 2,347 | 185.9405 | $436,402.35 |
| | 2,838 | 187.0433 | $530,828.89 |
| | 4,698 | 187.9292 | $882,891.38 |
| | 9,117 | 188.9872 | $1,722,996.30 |
| | 278 | 185.7463 | $51,637.47 |
| | 627 | 187.5072 | $117,567.01 |
| | 707 | 188.7632 | $133,455.58 |
| | 238 | 189.4028 | $45,077.87 |
| | 396 | 186.2717 | $73,763.59 |
| | 615 | 187.4742 | $115,296.63 |
| | 844 | 188.6215 | $159,196.55 |
| | 395 | 189.3395 | $74,789.10 |
| | 1,127 | 185.9316 | $209,544.91 |
| | 1,234 | 187.1007 | $230,882.26 |
| | 2,371 | 188.1586 | $446,124.04 |
| | 2,768 | 189.0852 | $523,387.83 |
| 10/25/2019 | 10,086 | 185.7198 | $1,873,169.90 |
| | 10,555 | 186.4350 | $1,967,821.43 |
| | 38,468 | 187.8428 | $7,225,936.83 |
| | 35,891 | 188.4167 | $6,762,463.78 |
| | 3,445 | 185.9706 | $640,668.72 |

| | | | |
|---|---|---|---|
| | 1,867 | 187.1079 | $349,330.45 |
| | 10,476 | 188.0744 | $1,970,267.41 |
| | 3,212 | 188.6019 | $605,789.30 |
| | 351 | 185.9431 | $65,266.03 |
| | 230 | 186.8924 | $42,985.25 |
| | 1,269 | 188.2555 | $238,896.23 |
| | 460 | 185.9305 | $85,528.03 |
| | 693 | 187.5421 | $129,966.68 |
| | 1,097 | 188.2372 | $206,496.21 |
| | 1,462 | 185.7955 | $271,633.02 |
| | 944 | 186.9984 | $176,526.49 |
| | 4,899 | 188.1882 | $921,933.99 |
| | 195 | 188.7951 | $36,815.04 |
| 10/24/2019 | 17,712 | 183.4654 | $3,249,539.16 |
| | 16,235 | 184.2499 | $2,991,297.13 |
| | 48,998 | 185.5357 | $9,090,878.23 |
| | 12,055 | 186.2493 | $2,245,235.31 |
| | 3,462 | 183.4792 | $635,204.99 |
| | 3,387 | 184.3068 | $624,247.13 |
| | 10,442 | 185.5638 | $1,937,657.20 |
| | 1,709 | 186.3571 | $318,484.28 |
| | 284 | 183.3090 | $52,059.76 |
| | 468 | 184.5199 | $86,355.31 |
| | 1,018 | 185.6583 | $189,000.15 |
| | 80 | 186.3700 | $14,909.60 |
| | 553 | 183.5090 | $101,480.48 |
| | 377 | 184.5306 | $69,568.04 |
| | 1,142 | 185.5760 | $211,927.79 |
| | 178 | 186.3200 | $33,164.96 |
| | 1,575 | 183.5316 | $289,062.27 |
| | 1,591 | 184.4586 | $293,473.63 |
| | 3,765 | 185.5884 | $698,740.33 |
| | 569 | 186.3762 | $106,048.06 |
| 10/23/2019 | 4,437 | 182.5856 | $810,132.31 |
| | 14,973 | 183.7018 | $2,750,567.05 |
| | 34,965 | 184.5597 | $6,453,129.91 |
| | 33,239 | 185.4800 | $6,165,169.72 |
| | 7,386 | 186.1550 | $1,374,940.83 |

| | | | |
|---|---|---|---|
| | 1,007 | 182.5358 | $183,813.55 |
| | 4,171 | 183.8907 | $767,008.11 |
| | 6,789 | 184.7908 | $1,254,544.74 |
| | 6,833 | 185.6666 | $1,268,659.88 |
| | 200 | 186.2775 | $37,255.50 |
| | 16 | 182.1000 | $2,913.60 |
| | 550 | 183.7334 | $101,053.37 |
| | 862 | 184.9501 | $159,426.99 |
| | 422 | 185.7797 | $78,399.03 |
| | 19 | 182.1000 | $3,459.90 |
| | 558 | 183.7573 | $102,536.57 |
| | 1,183 | 184.9637 | $218,812.06 |
| | 490 | 185.7804 | $91,032.40 |
| | 367 | 182.5996 | $67,014.05 |
| | 2,012 | 183.8689 | $369,944.23 |
| | 2,762 | 184.8624 | $510,589.95 |
| | 2,359 | 185.7411 | $438,163.25 |
| 10/22/2019 | 289 | 182.1254 | $52,634.24 |
| | 2,522 | 183.3996 | $462,533.79 |
| | 690 | 184.3987 | $127,235.10 |
| | 527 | 185.4465 | $97,730.31 |
| | 289 | 186.7460 | $53,969.59 |
| | 621 | 188.8680 | $117,287.03 |
| | 2,562 | 189.9133 | $486,557.87 |
| | 4,823 | 182.2935 | $879,201.55 |
| | 28,192 | 183.4158 | $5,170,858.23 |
| | 11,494 | 184.3200 | $2,118,574.08 |
| | 5,383 | 185.4018 | $998,017.89 |
| | 4,730 | 186.5617 | $882,436.84 |
| | 1,577 | 187.3310 | $295,420.99 |
| | 5,859 | 188.8501 | $1,106,472.74 |
| | 29,485 | 189.8277 | $5,597,069.73 |
| | 900 | 190.5249 | $171,472.41 |
| | 1,766 | 182.6178 | $322,503.03 |
| | 5,199 | 183.5452 | $954,251.49 |
| | 1,800 | 184.4006 | $331,921.08 |
| | 1,169 | 185.6120 | $216,980.43 |
| | 922 | 186.7472 | $172,180.92 |

| | | | |
|---|---|---|---|
| | 323 | 187.8126 | $60,663.47 |
| | 2,234 | 189.3082 | $422,914.52 |
| | 4,812 | 189.9516 | $914,047.10 |
| | 102 | 182.2500 | $18,589.50 |
| | 798 | 183.7836 | $146,659.31 |
| | 147 | 186.0900 | $27,355.23 |
| | 100 | 187.4550 | $18,745.50 |
| | 200 | 189.3625 | $37,872.50 |
| | 503 | 190.1988 | $95,670.00 |
| | 531 | 182.8660 | $97,101.85 |
| | 489 | 183.9671 | $89,959.91 |
| | 166 | 185.3559 | $30,769.08 |
| | 179 | 186.7278 | $33,424.28 |
| | 450 | 189.5365 | $85,291.43 |
| | 435 | 190.1385 | $82,710.25 |
| 10/21/2019 | 10,868 | 187.4164 | $2,036,841.44 |
| | 27,791 | 188.2030 | $5,230,349.57 |
| | 56,341 | 189.2666 | $10,663,469.51 |
| | 2,585 | 187.5418 | $484,795.55 |
| | 5,244 | 188.3040 | $987,466.18 |
| | 11,171 | 189.2940 | $2,114,603.27 |
| | 316 | 187.4672 | $59,239.64 |
| | 779 | 188.5954 | $146,915.82 |
| | 755 | 189.4160 | $143,009.08 |
| | 419 | 187.4063 | $78,523.24 |
| | 591 | 188.5275 | $111,419.75 |
| | 1,240 | 189.2943 | $234,724.93 |
| | 1,344 | 187.4089 | $251,877.56 |
| | 2,256 | 188.4202 | $425,075.97 |
| | 3,900 | 189.3292 | $738,383.88 |
| 10/18/2019 | 242 | 184.1100 | $44,554.62 |
| | 2,066 | 185.7734 | $383,807.84 |
| | 1,882 | 186.4919 | $350,977.76 |
| | 880 | 187.8847 | $165,338.54 |
| | 682 | 189.6097 | $129,313.82 |
| | 1,548 | 190.4728 | $294,851.89 |
| | 200 | 191.3450 | $38,269.00 |
| | 4,836 | 184.5227 | $892,351.78 |

| | | | |
|---|---|---|---|
| | 15,977 | 185.7782 | $2,968,178.30 |
| | 31,939 | 186.3131 | $5,950,654.10 |
| | 11,514 | 187.6063 | $2,160,098.94 |
| | 4,942 | 188.3779 | $930,963.58 |
| | 9,536 | 189.6819 | $1,808,806.60 |
| | 14,592 | 190.5969 | $2,781,189.96 |
| | 1,664 | 191.2040 | $318,163.46 |
| | 973 | 184.5607 | $179,577.56 |
| | 5,296 | 185.9112 | $984,585.72 |
| | 4,664 | 186.4702 | $869,697.01 |
| | 2,502 | 187.8384 | $469,971.68 |
| | 676 | 188.9032 | $127,698.56 |
| | 2,443 | 189.9653 | $464,085.23 |
| | 2,446 | 190.7702 | $466,623.91 |
| | 787 | 185.9638 | $146,353.51 |
| | 277 | 186.8256 | $51,750.69 |
| | 241 | 188.0787 | $45,326.97 |
| | 545 | 190.4229 | $103,780.48 |
| | 170 | 184.5950 | $31,381.15 |
| | 1,045 | 186.1406 | $194,516.93 |
| | 258 | 187.6568 | $48,415.45 |
| | 153 | 188.6550 | $28,864.22 |
| | 617 | 190.3677 | $117,456.87 |
| | 7 | 190.8000 | $1,335.60 |
| 10/17/2019 | 40,750 | 189.4997 | $7,722,112.78 |
| | 54,250 | 190.3396 | $10,325,923.30 |
| | 8,120 | 189.4982 | $1,538,725.38 |
| | 10,880 | 190.3425 | $2,070,926.40 |
| | 800 | 189.5408 | $151,632.64 |
| | 1,050 | 190.3566 | $199,874.43 |
| | 1,000 | 189.5410 | $189,541.00 |
| | 1,250 | 190.3542 | $237,942.75 |
| | 3,300 | 189.5394 | $625,480.02 |
| | 4,200 | 190.3499 | $799,469.58 |
| 10/16/2019 | 17,116 | 187.6596 | $3,211,981.71 |
| | 38,885 | 188.6286 | $7,334,823.11 |
| | 38,999 | 189.2348 | $7,379,967.97 |
| | 3,740 | 187.6797 | $701,922.08 |

| | 7,360 | 188.6260 | $1,388,287.36 |
|---|---|---|---|
| | 7,900 | 189.2164 | $1,494,809.56 |
| | 480 | 187.7896 | $90,139.01 |
| | 1,100 | 188.8695 | $207,756.45 |
| | 270 | 189.4078 | $51,140.11 |
| | 600 | 189.7704 | $113,862.24 |
| | 1,500 | 188.9080 | $283,362.00 |
| | 150 | 189.4467 | $28,417.01 |
| | 2,000 | 187.7800 | $375,560.00 |
| | 5,000 | 188.9142 | $944,571.00 |
| | 500 | 189.5020 | $94,751.00 |
| 10/15/2019 | 267 | 184.2157 | $49,185.59 |
| | 947 | 185.3168 | $175,495.01 |
| | 700 | 186.6482 | $130,653.74 |
| | 858 | 188.1616 | $161,442.65 |
| | 4,052 | 189.3453 | $767,227.16 |
| | 676 | 189.9501 | $128,406.27 |
| | 3,134 | 184.0539 | $576,824.92 |
| | 6,521 | 185.4935 | $1,209,603.11 |
| | 7,897 | 186.4465 | $1,472,368.01 |
| | 4,732 | 187.3717 | $886,642.88 |
| | 12,415 | 188.3846 | $2,338,794.81 |
| | 54,162 | 189.3501 | $10,255,580.12 |
| | 6,139 | 190.0244 | $1,166,559.79 |
| | 622 | 183.9654 | $114,426.48 |
| | 1,438 | 185.5264 | $266,786.96 |
| | 1,912 | 186.6073 | $356,793.16 |
| | 2,566 | 188.2117 | $482,951.22 |
| | 11,291 | 189.3338 | $2,137,767.94 |
| | 1,171 | 190.0205 | $222,514.01 |
| | 16 | 183.8000 | $2,940.80 |
| | 254 | 185.2577 | $47,055.46 |
| | 166 | 186.7525 | $31,000.92 |
| | 456 | 188.5515 | $85,979.48 |
| | 727 | 189.4208 | $137,708.92 |
| | 231 | 190.0971 | $43,912.43 |
| | 20 | 183.8000 | $3,676.00 |
| | 267 | 185.2439 | $49,460.12 |

| | | | |
|---|---|---|---|
| | 258 | 186.6496 | $48,155.60 |
| | 725 | 188.6993 | $136,806.99 |
| | 980 | 189.5751 | $185,783.60 |
| 10/14/2019 | 56,981 | 183.4222 | $10,451,580.38 |
| | 33,019 | 183.9790 | $6,074,802.60 |
| | 11,252 | 183.4278 | $2,063,929.61 |
| | 6,248 | 183.9565 | $1,149,360.21 |
| | 1,648 | 183.5369 | $302,468.81 |
| | 102 | 184.2675 | $18,795.29 |
| | 1,606 | 183.4347 | $294,596.13 |
| | 544 | 184.0319 | $100,113.35 |
| | 5,293 | 183.4547 | $971,025.73 |
| | 1,807 | 183.9942 | $332,477.52 |
| 10/11/2019 | 7,788 | 182.5924 | $1,422,029.61 |
| | 9,761 | 183.7218 | $1,793,308.49 |
| | 26,036 | 184.7361 | $4,809,789.10 |
| | 50,217 | 185.6098 | $9,320,767.33 |
| | 537 | 186.2952 | $100,040.52 |
| | 1,474 | 182.5101 | $269,019.89 |
| | 2,494 | 183.8156 | $458,436.11 |
| | 6,528 | 184.9251 | $1,207,191.05 |
| | 8,247 | 185.7095 | $1,531,546.25 |
| | 102 | 182.6137 | $18,626.60 |
| | 420 | 183.9618 | $77,263.96 |
| | 1,300 | 185.4020 | $241,022.60 |
| | 28 | 185.9750 | $5,207.30 |
| | 145 | 182.6009 | $26,477.13 |
| | 470 | 183.8397 | $86,404.66 |
| | 1,002 | 185.1761 | $185,546.45 |
| | 633 | 185.9564 | $117,710.40 |
| | 701 | 182.6532 | $128,039.89 |
| | 1,212 | 184.0245 | $223,037.69 |
| | 3,868 | 185.1682 | $716,230.60 |
| | 1,719 | 185.8416 | $319,461.71 |
| 10/10/2019 | 46,114 | 179.9060 | $8,296,185.28 |
| | 31,503 | 180.9126 | $5,699,289.64 |
| | 12,383 | 181.4327 | $2,246,681.12 |
| | 9,302 | 179.9261 | $1,673,672.58 |

| | | | |
|---|---|---|---|
| | 7,033 | 181.0067 | $1,273,020.12 |
| | 1,165 | 181.4978 | $211,444.94 |
| | 807 | 179.8655 | $145,151.46 |
| | 675 | 180.7520 | $122,007.60 |
| | 268 | 181.4137 | $48,618.87 |
| | 1,057 | 179.8318 | $190,082.21 |
| | 1,093 | 181.0436 | $197,880.65 |
| | 4,035 | 179.9719 | $726,186.62 |
| | 4,065 | 181.0947 | $736,149.96 |
| 10/9/2019 | 22,702 | 178.6779 | $4,056,345.69 |
| | 55,801 | 179.5700 | $10,020,185.57 |
| | 11,497 | 180.4216 | $2,074,307.14 |
| | 4,345 | 178.6693 | $776,318.11 |
| | 10,791 | 179.5505 | $1,937,529.45 |
| | 2,364 | 180.3785 | $426,414.77 |
| | 538 | 178.7864 | $96,187.08 |
| | 1,109 | 179.6304 | $199,210.11 |
| | 103 | 180.4373 | $18,585.04 |
| | 589 | 178.6793 | $105,242.11 |
| | 1,371 | 179.5811 | $246,205.69 |
| | 190 | 180.5498 | $34,304.46 |
| | 1,920 | 178.7259 | $343,153.73 |
| | 4,588 | 179.6173 | $824,084.17 |
| | 592 | 180.5211 | $106,868.49 |
| 10/72019 | 7,000 | 178.7975 | $1,251,582.50 |
| | 49,461 | 179.8412 | $8,895,125.59 |
| | 33,539 | 180.5729 | $6,056,234.49 |
| | 1,500 | 178.7840 | $268,176.00 |
| | 9,800 | 179.8669 | $1,762,695.62 |
| | 6,200 | 180.6005 | $1,119,723.10 |
| | 140 | 178.8129 | $25,033.81 |
| | 1,050 | 179.8591 | $188,852.06 |
| | 560 | 180.6502 | $101,164.11 |
| | 600 | 179.3523 | $107,611.38 |
| | 1,450 | 180.2369 | $261,343.51 |
| | 100 | 180.8300 | $18,083.00 |
| | 600 | 178.8333 | $107,299.98 |
| | 4,300 | 179.8648 | $773,418.64 |

| | | | |
|---|---|---|---|
| | 2,200 | 180.6686 | $397,470.92 |
| | 55,738 | 178.4565 | $9,946,808.40 |
| | 31,715 | 179.0956 | $5,680,016.95 |
| | 2,547 | 180.0473 | $458,580.47 |
| | 11,314 | 178.4707 | $2,019,217.50 |
| | 5,750 | 179.0957 | $1,029,800.28 |
| | 436 | 180.1471 | $78,544.14 |
| | 1,297 | 178.4967 | $231,510.22 |
| | 344 | 179.0644 | $61,598.15 |
| | 109 | 180.1100 | $19,631.99 |
| | 1,569 | 178.4933 | $280,055.99 |
| | 581 | 178.9982 | $103,997.95 |
| | 3,926 | 178.4227 | $700,487.52 |
| | 3,174 | 179.0793 | $568,397.70 |
| 10/4/2019 | 16,815 | 178.7399 | $3,005,511.42 |
| | 43,923 | 179.8076 | $7,897,689.21 |
| | 29,262 | 180.5925 | $5,284,497.74 |
| | 3,040 | 178.6991 | $543,245.26 |
| | 8,599 | 179.7904 | $1,546,017.65 |
| | 5,861 | 180.5844 | $1,058,405.17 |
| | 934 | 179.5686 | $167,717.07 |
| | 816 | 180.4243 | $147,226.23 |
| | 807 | 179.2348 | $144,642.48 |
| | 1,343 | 180.2977 | $242,139.81 |
| | 1,652 | 178.7630 | $295,316.48 |
| | 3,411 | 179.9536 | $613,821.73 |
| | 2,037 | 180.6406 | $367,964.90 |
| 10/3/2019 | 25,884 | 175.4906 | $4,542,398.69 |
| | 16,473 | 176.5582 | $2,908,443.23 |
| | 5,148 | 177.3515 | $913,005.52 |
| | 25,448 | 178.7992 | $4,550,082.04 |
| | 17,047 | 179.3539 | $3,057,445.93 |
| | 5,116 | 175.5268 | $897,995.11 |
| | 2,951 | 176.5374 | $520,961.87 |
| | 1,089 | 177.3036 | $193,083.62 |
| | 5,423 | 178.8329 | $969,810.82 |
| | 2,921 | 179.3709 | $523,942.40 |
| | 589 | 175.6621 | $103,464.98 |

| | | | |
|---|---|---|---|
| | 312 | 177.0429 | $55,237.38 |
| | 849 | 179.0275 | $151,994.35 |
| | 655 | 175.5023 | $114,954.01 |
| | 466 | 176.7673 | $82,373.56 |
| | 842 | 178.9044 | $150,637.50 |
| | 187 | 179.6337 | $33,591.50 |
| | 2,162 | 175.5811 | $379,606.34 |
| 10/2/2019 | 54,338 | 175.2772 | $9,524,212.49 |
| | 3,806 | 176.2142 | $670,671.25 |
| | 10,729 | 175.2821 | $1,880,601.65 |
| | 618 | 176.2581 | $108,927.51 |
| | 1,157 | 175.3027 | $202,825.22 |
| | 1,322 | 175.2934 | $231,737.87 |
| | 4,214 | 175.2680 | $738,579.35 |
| | 300 | 176.3150 | $52,894.50 |
| 10/1/2019 | 30,471 | 175.6772 | $5,353,059.96 |
| | 28,068 | 176.3423 | $4,949,575.68 |
| | 11,702 | 177.2934 | $2,074,687.37 |
| | 6,372 | 178.4491 | $1,137,077.67 |
| | 13,387 | 179.3972 | $2,401,590.32 |
| | 6,743 | 175.6988 | $1,184,737.01 |
| | 4,667 | 176.4009 | $823,263.00 |
| | 2,115 | 177.3161 | $375,023.55 |
| | 1,346 | 178.4592 | $240,206.08 |
| | 2,629 | 179.4172 | $471,687.82 |
| | 846 | 175.7053 | $148,646.68 |
| | 560 | 177.0246 | $99,133.78 |
| | 344 | 179.3157 | $61,684.60 |
| | 991 | 175.7317 | $174,150.11 |
| | 696 | 176.7332 | $123,006.31 |
| | 151 | 178.1732 | $26,904.15 |
| | 312 | 179.3288 | $55,950.59 |
| | 3,218 | 175.7345 | $565,513.62 |
| | 1,946 | 176.5744 | $343,613.78 |
| | 501 | 177.6487 | $89,002.00 |
| | 1,149 | 179.0360 | $205,712.36 |
| | 286 | 179.6000 | $51,365.60 |
| 9/30/2019 | 53,889 | 177.4946 | $9,565,006.50 |

| | | | |
|---|---|---|---|
| | 36,111 | 178.1242 | $6,432,242.99 |
| | 14,195 | 177.6371 | $2,521,558.63 |
| | 3,305 | 178.2533 | $589,127.16 |
| | 1,364 | 177.6095 | $242,259.36 |
| | 386 | 178.3581 | $68,846.23 |
| | 1,415 | 177.4697 | $251,119.63 |
| | 735 | 178.1740 | $130,957.89 |
| | 5,054 | 177.5628 | $897,402.39 |
| | 2,046 | 178.2059 | $364,609.27 |
| 9/27/2019 | 11,452 | 176.2403 | $2,018,303.92 |
| | 23,465 | 177.1227 | $4,156,184.16 |
| | 28,475 | 178.2052 | $5,074,393.07 |
| | 21,525 | 179.1324 | $3,855,824.91 |
| | 5,083 | 180.1124 | $915,511.33 |
| | 2,503 | 176.3018 | $441,283.41 |
| | 4,369 | 177.1575 | $774,001.12 |
| | 5,945 | 178.2207 | $1,059,522.06 |
| | 3,904 | 179.2403 | $699,754.13 |
| | 779 | 180.1384 | $140,327.81 |
| | 224 | 176.1079 | $39,448.17 |
| | 493 | 177.1552 | $87,337.51 |
| | 711 | 178.2386 | $126,727.64 |
| | 305 | 179.3526 | $54,702.54 |
| | 17 | 180.5000 | $3,068.50 |
| | 704 | 176.8103 | $124,474.45 |
| | 856 | 178.1231 | $152,473.37 |
| | 569 | 179.2867 | $102,014.13 |
| | 21 | 180.5000 | $3,790.50 |
| | 983 | 176.0673 | $173,074.16 |
| | 2,242 | 177.3546 | $397,629.01 |
| | 2,316 | 178.4276 | $413,238.32 |
| | 1,487 | 179.3740 | $266,729.14 |
| | 72 | 180.5000 | $12,996.00 |
| 9/26/2019 | 23,551 | 178.3034 | $4,199,223.37 |
| | 33,959 | 179.3850 | $6,091,735.22 |
| | 30,672 | 180.0894 | $5,523,702.08 |
| | 1,818 | 180.9554 | $328,976.92 |
| | 4,457 | 178.3010 | $794,687.56 |

| | | | |
|---|---|---|---|
| | 6,031 | 179.3435 | $1,081,620.65 |
| | 6,828 | 180.0780 | $1,229,572.58 |
| | 184 | 181.0200 | $33,307.68 |
| | 486 | 178.2973 | $86,652.49 |
| | 1,032 | 179.6466 | $185,395.29 |
| | 232 | 180.2595 | $41,820.20 |
| | 433 | 178.2797 | $77,195.11 |
| | 900 | 179.2595 | $161,333.55 |
| | 795 | 180.0838 | $143,166.62 |
| | 22 | 181.0200 | $3,982.44 |
| | 1,633 | 178.2810 | $291,132.87 |
| | 2,869 | 179.3493 | $514,553.14 |
| | 2,524 | 180.1862 | $454,789.97 |
| | 74 | 181.0200 | $13,395.48 |
| | 23,551 | 178.3034 | $4,199,223.37 |
| | 33,959 | 179.3850 | $6,091,735.22 |
| | 30,672 | 180.0894 | $5,523,702.08 |
| | 1,818 | 180.9554 | $328,976.92 |
| | 4,457 | 178.3010 | $794,687.56 |
| | 6,031 | 179.3435 | $1,081,620.65 |
| | 6,828 | 180.0780 | $1,229,572.58 |
| | 184 | 181.0200 | $33,307.68 |
| | 486 | 178.2973 | $86,652.49 |
| | 1,032 | 179.6466 | $185,395.29 |
| | 232 | 180.2595 | $41,820.20 |
| | 433 | 178.2797 | $77,195.11 |
| | 900 | 179.2595 | $161,333.55 |
| | 795 | 180.0838 | $143,166.62 |
| | 22 | 181.0200 | $3,982.44 |
| | 1,633 | 178.2810 | $291,132.87 |
| | 2,869 | 179.3493 | $514,553.14 |
| | 2,524 | 180.1862 | $454,789.97 |
| | 74 | 181.0200 | $13,395.48 |
| 9/25/2019 | 6,207 | 178.5672 | $1,108,366.61 |
| | 25,015 | 179.5961 | $4,492,596.44 |
| | 17,143 | 180.4282 | $3,093,080.63 |
| | 15,915 | 181.5234 | $2,888,944.91 |
| | 21,933 | 182.6889 | $4,006,915.64 |

| | | | |
|---|---|---|---|
| | 3,787 | 183.1210 | $693,479.23 |
| | 1,614 | 178.6942 | $288,412.44 |
| | 5,569 | 179.7435 | $1,000,991.55 |
| | 2,749 | 180.7423 | $496,860.58 |
| | 3,222 | 181.6794 | $585,371.03 |
| | 4,346 | 182.8407 | $794,625.68 |
| | 865 | 179.5719 | $155,329.69 |
| | 479 | 181.6839 | $87,026.59 |
| | 406 | 182.8799 | $74,249.24 |
| | 229 | 178.7128 | $40,925.23 |
| | 853 | 179.8255 | $153,391.15 |
| | 482 | 181.5984 | $87,530.43 |
| | 586 | 182.7945 | $107,117.58 |
| | 568 | 178.6764 | $101,488.20 |
| | 2,637 | 179.7247 | $473,934.03 |
| | 1,021 | 180.9446 | $184,744.44 |
| | 1,191 | 181.9766 | $216,734.13 |
| | 1,683 | 182.8291 | $307,701.38 |
| 9/24/2019 | 715 | 181.2592 | $129,600.33 |
| | 200 | 181.9950 | $36,399.00 |
| | 99 | 183.3050 | $18,147.20 |
| | 471 | 185.3436 | $87,296.84 |
| | 637 | 186.7696 | $118,972.24 |
| | 128 | 188.0000 | $24,064.00 |
| | 2,001 | 181.0752 | $362,331.48 |
| | 942 | 181.9804 | $171,425.54 |
| | 251 | 183.2560 | $45,997.26 |
| | 1,041 | 185.0296 | $192,615.81 |
| | 2,049 | 186.3524 | $381,836.07 |
| | 724 | 187.1273 | $135,480.17 |
| | 492 | 188.0000 | $92,496.00 |
| | 23,128 | 181.1264 | $4,189,091.38 |
| | 12,848 | 181.8487 | $2,336,392.10 |
| | 3,052 | 182.9864 | $558,474.49 |
| | 3,324 | 184.4521 | $613,118.78 |
| | 12,330 | 185.2194 | $2,283,755.20 |
| | 20,660 | 186.3032 | $3,849,024.11 |
| | 14,377 | 186.9801 | $2,688,212.90 |

| | | | |
|---|---|---|---|
| | 2,516 | 187.9164 | $472,797.66 |
| | 3,980 | 181.0048 | $720,399.10 |
| | 3,187 | 181.8101 | $579,428.79 |
| | 302 | 183.0784 | $55,289.68 |
| | 687 | 184.2054 | $126,549.11 |
| | 2,607 | 185.2712 | $483,002.02 |
| | 4,727 | 186.3941 | $881,084.91 |
| | 2,396 | 187.0783 | $448,239.61 |
| | 273 | 187.9929 | $51,322.06 |
| | 686 | 181.4048 | $124,443.69 |
| | 100 | 182.1450 | $18,214.50 |
| | 186 | 184.6003 | $34,335.66 |
| | 430 | 186.0130 | $79,985.59 |
| | 326 | 186.8025 | $60,897.62 |
| | 122 | 188.0000 | $22,936.00 |
| 9/23/2019 | 12,327 | 185.8283 | $2,290,705.45 |
| | 57,355 | 186.7682 | $10,712,090.11 |
| | 16,610 | 187.6864 | $3,117,471.10 |
| | 6,711 | 188.8667 | $1,267,484.42 |
| | 1,997 | 189.4289 | $378,289.51 |
| | 2,520 | 185.8626 | $468,373.75 |
| | 11,179 | 186.7771 | $2,087,981.20 |
| | 3,728 | 187.6663 | $699,619.97 |
| | 1,573 | 189.0748 | $297,414.66 |
| | 354 | 186.0992 | $65,879.12 |
| | 1,074 | 186.8675 | $200,695.70 |
| | 200 | 187.7850 | $37,557.00 |
| | 222 | 189.1675 | $41,995.19 |
| | 170 | 185.2750 | $31,496.75 |
| | 1,589 | 186.7636 | $296,767.36 |
| | 263 | 187.8638 | $49,408.18 |
| | 228 | 189.2361 | $43,145.83 |
| | 1,368 | 185.9883 | $254,431.99 |
| | 3,984 | 186.8323 | $744,339.88 |
| | 1,206 | 187.7503 | $226,426.86 |
| | 942 | 189.2424 | $178,266.34 |
| 9/20/2019 | 8,968 | 189.0704 | $1,695,583.35 |
| | 30,980 | 189.7877 | $5,879,622.95 |

| | | | |
|---|---|---|---|
| | 34,146 | 190.9114 | $6,518,860.66 |
| | 16,079 | 191.8627 | $3,084,960.35 |
| | 4,827 | 192.6801 | $930,066.84 |
| | 2,460 | 189.1607 | $465,335.32 |
| | 5,695 | 189.8313 | $1,081,089.25 |
| | 7,364 | 190.9602 | $1,406,230.91 |
| | 3,006 | 192.1165 | $577,502.20 |
| | 475 | 192.7545 | $91,558.39 |
| | 720 | 189.6503 | $136,548.22 |
| | 751 | 190.8821 | $143,352.46 |
| | 379 | 192.1428 | $72,822.12 |
| | 833 | 189.5533 | $157,897.90 |
| | 801 | 190.6712 | $152,727.63 |
| | 516 | 191.6824 | $98,908.12 |
| | 100 | 192.5700 | $19,257.00 |
| | 1,654 | 189.2321 | $312,989.89 |
| | 1,492 | 189.9528 | $283,409.58 |
| | 3,344 | 190.9936 | $638,682.60 |
| | 1,010 | 192.2963 | $194,219.26 |
| 9/19/2019 | 10,550 | 188.8176 | $1,992,025.68 |
| | 56,614 | 189.7155 | $10,740,553.32 |
| | 27,836 | 190.5536 | $5,304,250.01 |
| | 3,560 | 189.0018 | $672,846.41 |
| | 10,900 | 189.8146 | $2,068,979.14 |
| | 4,540 | 190.6117 | $865,377.12 |
| | 480 | 188.9452 | $90,693.70 |
| | 1,050 | 189.8934 | $199,388.07 |
| | 320 | 190.6650 | $61,012.80 |
| | 600 | 188.9500 | $113,370.00 |
| | 1,200 | 189.8498 | $227,819.76 |
| | 450 | 190.6278 | $85,782.51 |
| | 2,630 | 189.0707 | $497,255.94 |
| | 3,770 | 190.0173 | $716,365.22 |
| | 1,100 | 190.6955 | $209,765.05 |
| 9/18/2019 | 12,898 | 186.8115 | $2,409,494.73 |
| | 57,050 | 187.6678 | $10,706,447.99 |
| | 25,052 | 188.3416 | $4,718,333.76 |
| | 1,853 | 186.6910 | $345,938.42 |

| | | | |
|---|---|---|---|
| | 10,626 | 187.5694 | $1,993,112.44 |
| | 6,521 | 188.3194 | $1,228,030.81 |
| | 719 | 187.2638 | $134,642.67 |
| | 1,131 | 188.0828 | $212,721.65 |
| | 843 | 187.0665 | $157,697.06 |
| | 1,248 | 188.0826 | $234,727.08 |
| | 159 | 188.7982 | $30,018.91 |
| | 2,348 | 187.1248 | $439,369.03 |
| | 4,565 | 187.9545 | $858,012.29 |
| | 587 | 188.6655 | $110,746.65 |
| 9/16/2019 | 60,533 | 186.1724 | $11,269,573.89 |
| | 34,467 | 187.1699 | $6,451,184.94 |
| | 12,510 | 186.2004 | $2,329,367.00 |
| | 6,490 | 187.1987 | $1,214,919.56 |
| | 1,142 | 186.2540 | $212,702.07 |
| | 708 | 187.2159 | $132,548.86 |
| | 1,623 | 186.3143 | $302,388.11 |
| | 627 | 187.2382 | $117,398.35 |
| | 4,768 | 186.2192 | $887,893.15 |
| | 2,732 | 187.1722 | $511,354.45 |
| | 60,323 | 186.0257 | $11,221,628.30 |
| | 26,923 | 186.8501 | $5,030,565.24 |
| | 7,754 | 187.9316 | $1,457,221.63 |
| | 12,491 | 186.0330 | $2,323,738.20 |
| | 4,873 | 186.8248 | $910,397.25 |
| | 1,636 | 187.9123 | $307,424.52 |
| | 1,410 | 186.1894 | $262,527.05 |
| | 341 | 187.1432 | $63,815.83 |
| | 99 | 188.1000 | $18,621.90 |
| | 1,913 | 186.2572 | $356,310.02 |
| | 171 | 187.0655 | $31,988.20 |
| | 166 | 188.1000 | $31,224.60 |
| | 4,603 | 186.0001 | $856,158.46 |
| | 2,193 | 186.8087 | $409,671.48 |
| | 704 | 187.8227 | $132,227.18 |
| 9/12/2019 | 42,811 | 187.9474 | $8,046,216.14 |
| | 39,384 | 188.8924 | $7,439,338.28 |
| | 9,855 | 189.6120 | $1,868,626.26 |

| | | | |
|---|---|---|---|
| | 2,950 | 190.5321 | $562,069.70 |
| | 8,560 | 187.9542 | $1,608,887.95 |
| | 7,740 | 188.8857 | $1,461,975.32 |
| | 2,160 | 189.6278 | $409,596.05 |
| | 540 | 190.5415 | $102,892.41 |
| | 790 | 187.9583 | $148,487.06 |
| | 800 | 188.9280 | $151,142.40 |
| | 260 | 189.9008 | $49,374.21 |
| | 950 | 188.0440 | $178,641.80 |
| | 900 | 188.9608 | $170,064.72 |
| | 400 | 189.9395 | $75,975.80 |
| | 3,248 | 187.9989 | $610,620.43 |
| | 2,921 | 188.9040 | $551,788.58 |
| | 1,031 | 189.6790 | $195,559.05 |
| | 300 | 190.5400 | $57,162.00 |
| | 75,439 | 187.1860 | $14,121,124.65 |
| | 19,561 | 187.7429 | $3,672,438.87 |
| | 15,556 | 187.2083 | $2,912,212.31 |
| | 3,444 | 187.7516 | $646,616.51 |
| | 1,850 | 187.2367 | $346,387.90 |
| | 1,977 | 187.1887 | $370,072.06 |
| | 273 | 187.8175 | $51,274.18 |
| | 6,290 | 187.2206 | $1,177,617.57 |
| | 1,210 | 187.8062 | $227,245.50 |
| 9/11/2019 | 17,028 | 186.5912 | $3,177,274.95 |
| | 31,907 | 187.7638 | $5,990,979.57 |
| | 42,898 | 188.5174 | $8,087,019.43 |
| | 3,167 | 189.2246 | $599,274.31 |
| | 3,492 | 186.6758 | $651,871.89 |
| | 7,349 | 187.8296 | $1,380,359.73 |
| | 8,063 | 188.6203 | $1,520,845.48 |
| | 96 | 189.2969 | $18,172.50 |
| | 400 | 186.5097 | $74,603.88 |
| | 807 | 187.9148 | $151,647.24 |
| | 643 | 188.6941 | $121,330.31 |
| | 432 | 186.4918 | $80,564.46 |
| | 1,244 | 188.0434 | $233,925.99 |
| | 574 | 188.8153 | $108,379.98 |

| | | | |
|---|---|---|---|
| | 1,941 | 186.6668 | $362,320.26 |
| | 3,043 | 187.9687 | $571,988.75 |
| | 2,227 | 188.6715 | $420,171.43 |
| | 289 | 189.4000 | $54,736.60 |
| 9/10/2019 | 22,734 | 185.1176 | $4,208,463.52 |
| | 8,618 | 186.2487 | $1,605,091.30 |
| | 53,685 | 187.0509 | $10,041,827.57 |
| | 9,963 | 187.7551 | $1,870,604.06 |
| | 4,403 | 185.1197 | $815,082.04 |
| | 5,275 | 186.5325 | $983,958.94 |
| | 8,751 | 187.2690 | $1,638,791.02 |
| | 571 | 187.9343 | $107,310.49 |
| | 383 | 185.2931 | $70,967.26 |
| | 610 | 186.6858 | $113,878.34 |
| | 857 | 187.3817 | $160,586.12 |
| | 430 | 185.0634 | $79,577.26 |
| | 785 | 186.5586 | $146,448.50 |
| | 1,035 | 187.4173 | $193,976.91 |
| | 1,592 | 185.0539 | $294,605.81 |
| | 2,711 | 186.5678 | $505,785.31 |
| | 3,197 | 187.4305 | $599,215.31 |
| 9/9/2019 | 26,510 | 186.6763 | $4,948,788.71 |
| | 36,504 | 187.4087 | $6,841,167.18 |
| | 31,986 | 188.5251 | $6,030,163.85 |
| | 6,160 | 186.7216 | $1,150,205.06 |
| | 6,660 | 187.4757 | $1,248,588.16 |
| | 6,180 | 188.5335 | $1,165,137.03 |
| | 640 | 186.7541 | $119,522.62 |
| | 660 | 187.5755 | $123,799.83 |
| | 550 | 188.5421 | $103,698.16 |
| | 750 | 186.7207 | $140,040.53 |
| | 900 | 187.5344 | $168,780.96 |
| | 600 | 188.5313 | $113,118.78 |
| | 2,200 | 186.7193 | $410,782.46 |
| | 3,200 | 187.5254 | $600,081.28 |
| | 2,100 | 188.5403 | $395,934.63 |
| 9/6/2019 | 39,167 | 187.0627 | $7,326,684.77 |
| | 51,233 | 187.6978 | $9,616,321.39 |

| | | | |
|---|---|---|---|
| | 2,750 | 188.7342 | $519,019.05 |
| | 1,850 | 189.8519 | $351,226.02 |
| | 7,812 | 187.0635 | $1,461,340.06 |
| | 9,968 | 187.7036 | $1,871,029.48 |
| | 880 | 188.8232 | $166,164.42 |
| | 340 | 189.8779 | $64,558.49 |
| | 660 | 187.0405 | $123,446.73 |
| | 970 | 187.6710 | $182,040.87 |
| | 10 | 188.8150 | $1,888.15 |
| | 120 | 190.1867 | $22,822.40 |
| | 1,150 | 187.1379 | $215,208.59 |
| | 850 | 187.8229 | $159,649.47 |
| | 150 | 189.4967 | $28,424.51 |
| | 100 | 190.2100 | $19,021.00 |
| | 4,300 | 187.2117 | $805,010.31 |
| | 2,400 | 187.8504 | $450,840.96 |
| | 100 | 188.8200 | $18,882.00 |
| | 700 | 190.1007 | $133,070.49 |
| 9/5/2019 | 6,563 | 188.7884 | $1,239,018.27 |
| | 16,350 | 189.9612 | $3,105,865.62 |
| | 71,437 | 190.5890 | $13,615,106.39 |
| | 650 | 191.2869 | $124,336.49 |
| | 1,540 | 188.7949 | $290,744.15 |
| | 8,658 | 190.2141 | $1,646,873.68 |
| | 8,802 | 190.7539 | $1,679,015.83 |
| | 220 | 188.6318 | $41,499.00 |
| | 240 | 189.8138 | $45,555.31 |
| | 1,370 | 190.5574 | $261,063.64 |
| | 20 | 191.1700 | $3,823.40 |
| | 350 | 188.7643 | $66,067.51 |
| | 1,100 | 190.2616 | $209,287.76 |
| | 800 | 190.7802 | $152,624.16 |
| | 1,300 | 188.9477 | $245,632.01 |
| | 5,600 | 190.4602 | $1,066,577.12 |
| | 600 | 191.0583 | $114,634.98 |
| 9/4/2019 | 15,811 | 184.7174 | $2,920,566.81 |
| | 17,953 | 185.3182 | $3,327,017.64 |
| | 31,919 | 186.7469 | $5,960,774.30 |

| | | | |
|---|---|---|---|
| | 29,317 | 187.2539 | $5,489,722.59 |
| | 4,793 | 184.8582 | $886,025.35 |
| | 2,725 | 185.7649 | $506,209.35 |
| | 10,421 | 186.9963 | $1,948,688.44 |
| | 1,061 | 187.5291 | $198,968.38 |
| | 583 | 184.9913 | $107,849.93 |
| | 244 | 186.1165 | $45,412.43 |
| | 1,023 | 186.9842 | $191,284.84 |
| | 696 | 184.9215 | $128,705.36 |
| | 289 | 185.9934 | $53,752.09 |
| | 1,265 | 187.1261 | $236,714.52 |
| | 2,444 | 184.9119 | $451,924.68 |
| | 706 | 185.7280 | $131,123.97 |
| | 4,350 | 187.0275 | $813,569.63 |
| 9/3/2019 | 33,100 | 182.5881 | $6,043,666.11 |
| | 29,228 | 183.8206 | $5,372,708.50 |
| | 21,503 | 184.5784 | $3,968,989.34 |
| | 6,622 | 185.3347 | $1,227,286.38 |
| | 6,481 | 182.5903 | $1,183,367.73 |
| | 6,407 | 183.8702 | $1,178,056.37 |
| | 4,536 | 184.8112 | $838,303.60 |
| | 264 | 185.4200 | $48,950.88 |
| | 703 | 182.5308 | $128,319.15 |
| | 457 | 183.7935 | $83,993.63 |
| | 488 | 184.5904 | $90,080.12 |
| | 202 | 185.3696 | $37,444.66 |
| | 907 | 182.6375 | $165,652.21 |
| | 992 | 184.1173 | $182,644.36 |
| | 351 | 185.1116 | $64,974.17 |
| | 2,886 | 182.6424 | $527,105.97 |
| | 3,048 | 184.0712 | $561,049.02 |
| | 1,566 | 185.0910 | $289,852.51 |
| 8/30/2019 | 46,372 | 183.9635 | $8,530,755.42 |
| | 27,813 | 185.0560 | $5,146,962.53 |
| | 18,213 | 185.6997 | $3,382,148.64 |
| | 2,602 | 186.7035 | $485,802.51 |
| | 9,057 | 183.9785 | $1,666,293.27 |
| | 6,620 | 185.1492 | $1,225,687.70 |

|  | 2,732 | 185.7421 | $507,447.42 |
|---|---|---|---|
|  | 591 | 186.6792 | $110,327.41 |
|  | 982 | 183.9631 | $180,651.76 |
|  | 738 | 185.3150 | $136,762.47 |
|  | 130 | 186.7800 | $24,281.40 |
|  | 1,131 | 183.9726 | $208,073.01 |
|  | 725 | 185.0598 | $134,168.36 |
|  | 394 | 186.1875 | $73,357.88 |
|  | 3,426 | 183.9283 | $630,138.36 |
|  | 2,671 | 185.0611 | $494,298.20 |
|  | 879 | 185.7957 | $163,314.42 |
|  | 524 | 186.7800 | $97,872.72 |
| 8/29/2019 | 18,671 | 184.2364 | $3,439,877.82 |
|  | 52,805 | 185.2593 | $9,782,617.34 |
|  | 23,524 | 185.6874 | $4,368,110.40 |
|  | 3,791 | 184.2065 | $698,326.84 |
|  | 13,840 | 185.3611 | $2,565,397.62 |
|  | 1,369 | 185.8491 | $254,427.42 |
|  | 525 | 184.3706 | $96,794.57 |
|  | 1,325 | 185.4351 | $245,701.51 |
|  | 519 | 184.4718 | $95,740.86 |
|  | 1,731 | 185.4242 | $320,969.29 |
|  | 1,512 | 184.0587 | $278,296.75 |
|  | 5,068 | 185.3107 | $939,154.63 |
|  | 920 | 185.7747 | $170,912.72 |
| 8/28/2019 | 6,930 | 179.8046 | $1,246,045.88 |
|  | 43,556 | 180.8993 | $7,879,249.91 |
|  | 39,514 | 181.4126 | $7,168,337.48 |
|  | 1,377 | 179.9392 | $247,776.28 |
|  | 12,030 | 181.0195 | $2,177,664.59 |
|  | 4,093 | 181.5240 | $742,977.73 |
|  | 179 | 179.8058 | $32,185.24 |
|  | 1,394 | 181.2339 | $252,640.06 |
|  | 177 | 181.7014 | $32,161.15 |
|  | 200 | 179.7400 | $35,948.00 |
|  | 755 | 180.9753 | $136,636.35 |
|  | 1,195 | 181.3618 | $216,727.35 |
|  | 1,465 | 180.1667 | $263,944.22 |

|  | 5,329 | 181.2065 | $965,649.44 |
|---|---|---|---|
|  | 303 | 181.8600 | $55,103.58 |
| 8/26/2019 | 33,632 | 178.9935 | $6,019,909.39 |
|  | 56,368 | 179.6432 | $10,126,127.90 |
|  | 7,833 | 179.0438 | $1,402,450.09 |
|  | 9,667 | 179.6964 | $1,737,125.10 |
|  | 732 | 178.9786 | $131,012.34 |
|  | 1,018 | 179.6474 | $182,881.05 |
|  | 1,713 | 179.3029 | $307,145.87 |
|  | 437 | 179.9326 | $78,630.55 |
|  | 3,317 | 179.1046 | $594,089.96 |
|  | 3,783 | 179.7302 | $679,919.35 |
| 8/27/2019 | 33,204 | 181.7063 | $6,033,375.99 |
|  | 36,357 | 182.4435 | $6,633,098.33 |
|  | 20,439 | 183.4668 | $3,749,877.93 |
|  | 9,550 | 181.8601 | $1,736,763.96 |
|  | 5,723 | 182.8264 | $1,046,315.49 |
|  | 2,227 | 183.6387 | $408,963.38 |
|  | 1,043 | 181.9082 | $189,730.25 |
|  | 564 | 182.9309 | $103,173.03 |
|  | 143 | 183.8900 | $26,296.27 |
|  | 1,446 | 181.9158 | $263,050.25 |
|  | 439 | 182.9261 | $80,304.56 |
|  | 265 | 183.7346 | $48,689.67 |
|  | 3,867 | 181.8791 | $703,326.48 |
|  | 2,360 | 182.8542 | $431,535.91 |
|  | 873 | 183.7519 | $160,415.41 |
| 8/23/2019 | 2,700 | 177.4759 | $479,184.93 |
|  | 1,300 | 178.3771 | $231,890.23 |
|  | 800 | 179.6300 | $143,704.00 |
|  | 1,500 | 180.9790 | $271,468.50 |
|  | 400 | 181.6850 | $72,674.00 |
|  | 400 | 182.7925 | $73,117.00 |
|  | 22,812 | 177.2712 | $4,043,910.61 |
|  | 27,380 | 178.0599 | $4,875,280.06 |
|  | 2,300 | 178.8224 | $411,291.52 |
|  | 7,523 | 179.5678 | $1,350,888.56 |
|  | 8,800 | 180.5931 | $1,589,219.28 |

| | | | |
|---|---|---|---|
| | 15,081 | 181.3408 | $2,734,800.60 |
| | 5,604 | 182.6278 | $1,023,446.19 |
| | 500 | 183.0290 | $91,514.50 |
| | 5,047 | 177.3334 | $895,001.67 |
| | 4,827 | 178.1318 | $859,842.20 |
| | 1,067 | 179.2209 | $191,228.70 |
| | 1,700 | 180.1394 | $306,236.98 |
| | 3,759 | 181.2523 | $681,327.40 |
| | 1,100 | 182.7095 | $200,980.45 |
| | 640 | 177.4628 | $113,576.19 |
| | 350 | 178.3059 | $62,407.07 |
| | 180 | 179.5844 | $32,325.19 |
| | 220 | 180.7335 | $39,761.37 |
| | 240 | 181.3708 | $43,528.99 |
| | 120 | 182.6555 | $21,918.66 |
| | 700 | 177.3843 | $124,169.01 |
| | 500 | 178.2658 | $89,132.90 |
| | 200 | 179.5600 | $35,912.00 |
| | 600 | 181.0061 | $108,603.66 |
| | 150 | 182.7867 | $27,418.01 |
| 8/22/2019 | 14,647 | 180.7439 | $2,647,355.90 |
| | 41,823 | 181.5722 | $7,593,894.12 |
| | 21,157 | 182.4055 | $3,859,153.16 |
| | 12,373 | 183.6101 | $2,271,807.77 |
| | 3,824 | 180.8602 | $691,609.40 |
| | 8,860 | 181.7221 | $1,610,057.81 |
| | 2,466 | 182.6004 | $450,292.59 |
| | 2,350 | 183.6041 | $431,469.64 |
| | 814 | 181.2291 | $147,520.49 |
| | 701 | 182.1225 | $127,667.87 |
| | 235 | 183.6136 | $43,149.20 |
| | 992 | 181.2251 | $179,775.30 |
| | 780 | 182.0074 | $141,965.77 |
| | 292 | 183.3155 | $53,528.13 |
| | 86 | 184.0800 | $15,830.88 |
| | 1,861 | 180.9553 | $336,757.81 |
| | 3,655 | 181.7759 | $664,390.91 |
| | 649 | 182.7201 | $118,585.34 |

| | 935 | 183.5842 | $171,651.23 |
| 8/21/2019 | 19,607 | 183.6102 | $3,600,045.19 |
| | 58,115 | 184.9312 | $10,747,276.69 |
| | 14,844 | 185.4352 | $2,752,600.11 |
| | 3,726 | 183.5934 | $684,069.01 |
| | 11,973 | 184.9346 | $2,214,221.97 |
| | 2,510 | 185.4744 | $465,540.74 |
| | 414 | 183.5538 | $75,991.27 |
| | 1,436 | 185.0597 | $265,745.73 |
| | 701 | 183.8327 | $128,866.72 |
| | 1,549 | 185.0705 | $286,674.20 |
| | 5,936 | 184.9485 | $1,097,854.30 |
| | 115 | 185.8350 | $21,371.03 |
| | 1,449 | 183.5187 | $265,918.60 |
| 8/20/2019 | 2,154 | 183.2730 | $394,770.04 |
| | 55,114 | 184.2534 | $10,154,941.89 |
| | 32,890 | 185.0695 | $6,086,935.86 |
| | 1,049 | 185.7588 | $194,860.98 |
| | 4,795 | 183.8989 | $881,795.23 |
| | 10,564 | 184.6204 | $1,950,329.91 |
| | 2,461 | 185.3822 | $456,225.59 |
| | 32 | 182.6550 | $5,844.96 |
| | 1,270 | 184.2581 | $234,007.79 |
| | 548 | 185.2856 | $101,536.51 |
| | 168 | 182.6550 | $30,686.04 |
| | 1,473 | 184.2814 | $271,446.50 |
| | 609 | 185.2008 | $112,787.29 |
| | 3,530 | 184.0981 | $649,866.29 |
| | 3,669 | 184.9673 | $678,645.02 |
| | 301 | 185.6300 | $55,874.63 |
| 8/19/2019 | 14,808 | 185.6316 | $2,748,832.73 |
| | 74,047 | 186.4384 | $13,805,204.20 |
| | 6,145 | 187.1658 | $1,150,133.84 |
| | 3,448 | 185.7163 | $640,349.80 |
| | 14,559 | 186.4725 | $2,714,853.13 |
| | 993 | 187.1179 | $185,808.07 |
| | 635 | 185.8346 | $118,004.97 |
| | 1,215 | 186.4868 | $226,581.46 |

| | 1,403 | 186.0519 | $261,030.82 |
|---|---|---|---|
| | 847 | 186.8119 | $158,229.68 |
| | 1,561 | 185.6633 | $289,820.41 |
| | 5,702 | 186.4527 | $1,063,153.30 |
| | 237 | 187.3985 | $44,413.44 |
| 8/15/2019 | 14,175 | 180.7088 | $2,561,547.24 |
| | 37,634 | 181.7193 | $6,838,824.14 |
| | 38,191 | 182.5078 | $6,970,155.39 |
| | 3,212 | 180.7456 | $580,554.87 |
| | 7,155 | 181.7520 | $1,300,435.56 |
| | 7,133 | 182.5109 | $1,301,850.25 |
| | 845 | 181.3230 | $153,217.94 |
| | 905 | 182.4908 | $165,154.17 |
| | 709 | 181.3557 | $128,581.19 |
| | 1,256 | 182.2376 | $228,890.43 |
| | 185 | 183.1050 | $33,874.43 |
| | 1,498 | 180.9200 | $271,018.16 |
| | 2,422 | 181.7412 | $440,177.19 |
| | 3,180 | 182.5042 | $580,363.36 |
| 8/16/2019 | 29,759 | 183.0994 | $5,448,855.04 |
| | 56,201 | 183.7599 | $10,327,490.14 |
| | 4,194 | 184.7432 | $774,812.98 |
| | 10,105 | 183.2510 | $1,851,751.36 |
| | 7,059 | 183.9295 | $1,298,358.34 |
| | 405 | 184.9316 | $74,897.30 |
| | 1,129 | 183.3145 | $206,962.07 |
| | 621 | 184.0775 | $114,312.13 |
| | 100 | 185.0000 | $18,500.00 |
| | 1,996 | 183.4348 | $366,135.86 |
| | 254 | 184.9515 | $46,977.68 |
| | 5,747 | 183.4591 | $1,054,339.45 |
| | 1,353 | 184.2497 | $249,289.84 |
| | 400 | 185.0000 | $74,000.00 |
| 8/14/2019 | 2,600 | 180.0028 | $468,007.28 |
| | 1,900 | 180.9116 | $343,732.04 |
| | 400 | 182.1175 | $72,847.00 |
| | 900 | 183.6144 | $165,252.96 |
| | 1,000 | 184.7820 | $184,782.00 |

| | | | |
|---|---|---|---|
| | 700 | 185.6814 | $129,976.98 |
| | 25,356 | 180.8329 | $4,585,199.01 |
| | 32,468 | 179.9643 | $5,843,080.89 |
| | 5,535 | 181.9355 | $1,007,012.99 |
| | 4,651 | 183.1681 | $851,914.83 |
| | 9,800 | 183.9558 | $1,802,766.84 |
| | 9,871 | 184.9626 | $1,825,765.82 |
| | 3,019 | 185.6074 | $560,348.74 |
| | 6,099 | 179.9457 | $1,097,488.82 |
| | 1,200 | 181.8908 | $218,268.96 |
| | 1,100 | 183.2191 | $201,541.01 |
| | 2,000 | 184.0690 | $368,138.00 |
| | 4,901 | 180.8510 | $886,350.75 |
| | 2,180 | 185.1275 | $403,577.95 |
| | 240 | 185.7992 | $44,591.81 |
| | 632 | 179.9926 | $113,755.32 |
| | 460 | 180.8454 | $83,188.88 |
| | 120 | 182.0700 | $21,848.40 |
| | 180 | 183.4656 | $33,023.81 |
| | 220 | 184.4873 | $40,587.21 |
| | 238 | 185.6871 | $44,193.53 |
| | 700 | 179.9393 | $125,957.51 |
| | 600 | 180.7542 | $108,452.52 |
| | 150 | 182.0967 | $27,314.51 |
| | 250 | 183.5920 | $45,898.00 |
| | 300 | 184.6050 | $55,381.50 |
| | 250 | 185.6860 | $46,421.50 |
| 8/13/2019 | 4,980 | 185.8115 | $925,341.27 |
| | 4,857 | 187.1929 | $909,195.92 |
| | 15,067 | 188.2602 | $2,836,516.43 |
| | 14,046 | 189.1064 | $2,656,188.49 |
| | 51,547 | 190.0731 | $9,797,698.09 |
| | 4,503 | 190.8824 | $859,543.45 |
| | 803 | 185.7880 | $149,187.76 |
| | 1,066 | 187.2443 | $199,602.42 |
| | 3,156 | 188.2288 | $594,050.09 |
| | 2,513 | 189.0945 | $475,194.48 |
| | 10,457 | 190.0635 | $1,987,494.02 |

| | | | |
|---|---|---|---|
| | 1,005 | 190.8617 | $191,816.01 |
| | 127 | 185.5200 | $23,561.04 |
| | 149 | 187.2700 | $27,903.23 |
| | 664 | 188.7412 | $125,324.16 |
| | 395 | 189.7908 | $74,967.37 |
| | 515 | 190.3741 | $98,042.66 |
| | 134 | 185.5200 | $24,859.68 |
| | 200 | 187.2778 | $37,455.56 |
| | 475 | 188.5947 | $89,582.48 |
| | 1,441 | 190.1164 | $273,957.73 |
| | 612 | 185.2927 | $113,399.13 |
| | 326 | 187.0801 | $60,988.11 |
| | 1,700 | 188.3040 | $320,116.80 |
| | 2,595 | 189.6400 | $492,115.80 |
| | 2,267 | 190.3229 | $431,462.01 |
| 8/12/2019 | 28044 | 185.2395 | $5,194,856.54 |
| | 35709 | 185.9874 | $6,641,424.07 |
| | 31145 | 186.996 | $5,823,990.42 |
| | 102 | 187.58 | $19,133.16 |
| | 7086 | 185.3443 | $1,313,349.71 |
| | 6693 | 186.1732 | $1,246,057.23 |
| | 5221 | 187.1023 | $976,861.11 |
| | 582 | 185.3637 | $107,881.67 |
| | 766 | 186.1127 | $142,562.33 |
| | 502 | 186.983 | $93,865.47 |
| | 955 | 185.3216 | $176,982.13 |
| | 570 | 186.2802 | $106,179.71 |
| | 725 | 186.997 | $135,572.83 |
| | 3283 | 185.3728 | $608,578.90 |
| | 2424 | 186.3457 | $451,701.98 |
| | 1793 | 187.0389 | $335,360.75 |
| 8/9/2019 | 25032 | 187.813 | $4,701,335.02 |
| | 50522 | 188.6934 | $9,533,167.95 |
| | 15170 | 189.5941 | $2,876,142.50 |
| | 4276 | 190.4468 | $814,350.52 |
| | 4897 | 187.786 | $919,588.04 |
| | 10760 | 188.7301 | $2,030,735.88 |
| | 2246 | 189.4876 | $425,589.15 |

| | | | |
|---|---|---|---|
| | 1097 | 190.4394 | $208,912.02 |
| | 811 | 187.9555 | $152,431.91 |
| | 761 | 188.938 | $143,781.82 |
| | 278 | 190.2553 | $52,890.97 |
| | 850 | 187.963 | $159,768.55 |
| | 953 | 188.8682 | $179,991.39 |
| | 447 | 190.1362 | $84,990.88 |
| | 2581 | 187.8802 | $484,918.80 |
| | 3744 | 188.7782 | $706,785.58 |
| | 1141 | 189.8387 | $216,605.96 |
| | 34 | 190.47 | $6,475.98 |
| 8/8/2019 | 400 | 184.92 | $73,968.00 |
| | 900 | 186.1444 | $167,529.96 |
| | 1000 | 186.863 | $186,863.00 |
| | 1200 | 188.1142 | $225,737.04 |
| | 3400 | 189.2744 | $643,532.96 |
| | 600 | 189.9767 | $113,986.02 |
| | 4800 | 184.9078 | $887,557.44 |
| | 9316 | 185.8663 | $1,731,530.45 |
| | 7900 | 186.7013 | $1,474,940.27 |
| | 13550 | 187.8767 | $2,545,729.29 |
| | 30600 | 188.9838 | $5,782,904.28 |
| | 29834 | 189.6344 | $5,657,552.69 |
| | 1020 | 184.9075 | $188,605.65 |
| | 2120 | 186.014 | $394,349.68 |
| | 1440 | 186.9208 | $269,165.95 |
| | 3180 | 187.9997 | $597,839.05 |
| | 8100 | 189.1714 | $1,532,288.34 |
| | 3140 | 189.8317 | $596,071.54 |
| | 60 | 184.8133 | $11,088.80 |
| | 180 | 185.77 | $33,438.60 |
| | 280 | 186.6621 | $52,265.39 |
| | 300 | 187.9612 | $56,388.36 |
| | 720 | 189.163 | $136,197.36 |
| | 310 | 189.7578 | $58,824.92 |
| | 100 | 184.8 | $18,480.00 |
| | 400 | 186.2458 | $74,498.32 |
| | 200 | 187.0025 | $37,400.50 |

| | 450 | 188.2578 | $84,716.01 |
| --- | --- | --- | --- |
| | 1100 | 189.3946 | $208,334.06 |
| 8/7/2019 | 6743 | 181.9387 | $1,226,812.65 |
| | 11197 | 182.9203 | $2,048,158.60 |
| | 19730 | 183.9439 | $3,629,213.15 |
| | 35395 | 185.066 | $6,550,411.07 |
| | 21935 | 185.6475 | $4,072,177.91 |
| | 1701 | 182.1503 | $309,837.66 |
| | 2699 | 183.1639 | $494,359.37 |
| | 3226 | 184.1821 | $594,171.45 |
| | 9215 | 185.2308 | $1,706,901.82 |
| | 2159 | 185.7155 | $400,959.76 |
| | 248 | 182.4646 | $45,251.22 |
| | 438 | 183.7524 | $80,483.55 |
| | 902 | 185.2749 | $167,117.96 |
| | 262 | 185.7602 | $48,669.17 |
| | 265 | 182.0227 | $48,236.02 |
| | 330 | 183.3072 | $60,491.38 |
| | 461 | 184.3288 | $84,975.58 |
| | 1194 | 185.2938 | $221,240.80 |
| | 819 | 182.3363 | $149,333.43 |
| | 997 | 183.138 | $182,588.59 |
| | 2761 | 184.63 | $509,763.43 |
| | 2923 | 185.491 | $542,190.19 |
| 8/6/2019 | 36344 | 183.7149 | $6,676,934.33 |
| | 50598 | 184.6364 | $9,342,232.57 |
| | 6258 | 185.3393 | $1,159,853.34 |
| | 9334 | 183.8677 | $1,716,221.11 |
| | 8472 | 184.7822 | $1,565,474.80 |
| | 654 | 185.4188 | $121,263.90 |
| | 881 | 183.7982 | $161,926.21 |
| | 967 | 184.772 | $178,674.52 |
| | 2 | 185.455 | $370.91 |
| | 934 | 183.6503 | $171,529.38 |
| | 954 | 184.5608 | $176,071.00 |
| | 362 | 185.1629 | $67,028.97 |
| | 3260 | 183.7199 | $598,926.87 |
| | 4013 | 184.6799 | $741,120.44 |

| | | | |
|---|---|---|---|
| | 227 | 185.32 | $42,067.64 |
| 8/5/2019 | 1300 | 180.2862 | $234,372.06 |
| | 1100 | 181.2709 | $199,397.99 |
| | 1800 | 182.305 | $328,149.00 |
| | 1400 | 193.3586 | $270,702.04 |
| | 1400 | 184.2561 | $257,958.54 |
| | 500 | 185.04 | $92,520.00 |
| | 11600 | 180.1526 | $2,089,770.16 |
| | 14545 | 180.9153 | $2,631,413.04 |
| | 21812 | 182.0378 | $3,970,608.49 |
| | 18970 | 182.9326 | $3,470,231.42 |
| | 17640 | 183.9471 | $3,244,826.84 |
| | 5883 | 184.8901 | $1,087,708.46 |
| | 3000 | 180.223 | $540,669.00 |
| | 2500 | 181.1642 | $452,910.50 |
| | 5000 | 182.2339 | $911,169.50 |
| | 3100 | 183.1847 | $567,872.57 |
| | 3200 | 184.1041 | $589,133.12 |
| | 840 | 184.9281 | $155,339.60 |
| | 240 | 180.2167 | $43,252.01 |
| | 280 | 180.9964 | $50,678.99 |
| | 370 | 182.0703 | $67,366.01 |
| | 420 | 182.9667 | $76,846.01 |
| | 380 | 184.0063 | $69,922.39 |
| | 160 | 185.0163 | $29,602.61 |
| | 250 | 180.037 | $45,009.25 |
| | 350 | 180.84 | $63,294.00 |
| | 500 | 182.0015 | $91,000.75 |
| | 500 | 183.096 | $91,548.00 |
| | 450 | 184.1489 | $82,867.01 |
| | 200 | 185.02 | $37,004.00 |
| 4/18/2019 | 87176 | 178.0311 | $15,520,039.17 |
| | 7824 | 178.7621 | $1,398,634.67 |
| | 11848 | 178.0401 | $2,109,419.10 |
| | 1152 | 178.7826 | $205,957.56 |
| 4/17/2019 | 63876 | 178.8017 | $11,421,137.39 |
| | 29244 | 179.7743 | $5,257,319.63 |
| | 1880 | 180.5342 | $339,404.30 |

| | 8580 | 178.7788 | $1,533,922.10 |
| | 4420 | 179.805 | $794,738.10 |
| 4/16/2019 | 46352 | 179.136 | $8,303,311.87 |
| | 48648 | 179.7305 | $8,743,529.36 |
| | 10813 | 179.3563 | $1,939,379.67 |
| | 2187 | 179.9334 | $393,514.35 |
| 4/15/2019 | 25431 | 177.6261 | $4,517,209.35 |
| | 40645 | 178.4615 | $7,253,567.67 |
| | 26011 | 179.7189 | $4,674,668.31 |
| | 2913 | 180.2254 | $524,996.59 |
| | 4891 | 177.7387 | $869,319.98 |
| | 4192 | 178.5855 | $748,630.42 |
| | 3917 | 179.8076 | $704,306.37 |
| 4/12/2019 | 61436 | 178.8086 | $10,985,285.15 |
| | 33564 | 179.2051 | $6,014,839.98 |
| | 9627 | 178.8282 | $1,721,579.08 |
| | 3373 | 179.2382 | $604,570.45 |
| | 7583 | 178.8389 | $1,356,135.38 |
| | 3167 | 179.2309 | $567,624.26 |
| | 9622 | 178.8303 | $1,720,705.15 |
| | 3878 | 179.2348 | $695,072.55 |
| | 11444 | 178.8522 | $2,046,784.58 |
| | 3356 | 179.2743 | $601,644.55 |
| 4/11/2019 | 11/30/2132 | 177.5748 | $15,106,643.39 |
| | 9928 | 178.1545 | $1,768,717.88 |
| | 11761 | 177.5887 | $2,088,620.70 |
| | 1239 | 178.1563 | $220,735.66 |
| | 9619 | 177.551 | $1,707,863.07 |
| | 1131 | 178.1494 | $201,486.97 |
| | 12745 | 177.6008 | $2,263,522.20 |
| | 755 | 178.2651 | $134,590.15 |
| | 14373 | 177.6092 | $2,552,777.03 |
| | 427 | 178.1791 | $76,082.48 |
| 4/10/2019 | 64060 | 177.2237 | $11,352,950.22 |
| | 30217 | 177.9194 | $5,376,190.51 |
| | 723 | 178.7253 | $129,218.39 |
| | 10302 | 177.2845 | $1,826,384.92 |
| | 2698 | 178.1077 | $480,534.57 |

| | | | |
|---|---|---|---|
| 4/9/2019 | 5349 | 176.1041 | $941,980.83 |
| | 35189 | 177.2952 | $6,238,840.79 |
| | 31533 | 178.2166 | $5,619,704.05 |
| | 22929 | 178.7633 | $4,098,863.71 |
| | 792 | 176.1506 | $139,511.28 |
| | 5590 | 177.3144 | $991,187.50 |
| | 5213 | 178.4507 | $930,263.50 |
| | 1405 | 178.8087 | $251,226.22 |
| 4/5/2019 | 83562 | 175.5664 | $14,670,679.52 |
| | 11438 | 176.5957 | $2,019,901.62 |
| | 11799 | 175.5919 | $2,071,808.83 |
| | 1201 | 176.6768 | $212,188.84 |
| 4/4/2019 | 42433 | 176.0552 | $7,470,550.30 |
| | 43036 | 177.1027 | $7,621,791.80 |
| | 9531 | 177.7271 | $1,693,916.99 |
| | 5663 | 176.0396 | $996,912.25 |
| | 6114 | 177.0858 | $1,082,702.58 |
| | 1223 | 177.8415 | $217,500.15 |
| | 4934 | 176.1138 | $868,945.49 |
| | 5465 | 177.2271 | $968,546.10 |
| | 351 | 177.82 | $62,414.82 |
| | 6199 | 176.0698 | $1,091,456.69 |
| | 6594 | 177.1738 | $1,168,284.04 |
| | 707 | 177.7442 | $125,665.15 |
| | 6837 | 176.0599 | $1,203,721.54 |
| | 7289 | 177.1679 | $1,291,376.82 |
| | 674 | 177.8254 | $119,854.32 |
| 4/3/2019 | 33408 | 175.0962 | $5,849,613.85 |
| | 11860 | 176.7457 | $2,096,204.00 |
| | 13041 | 177.4754 | $2,314,456.69 |
| | 5000 | 175.0846 | $875,423.00 |
| | 2000 | 176.796 | $353,592.00 |
| | 1480 | 177.5251 | $262,737.15 |
| | 4300 | 175.0984 | $752,923.12 |
| | 1600 | 176.8406 | $282,944.96 |
| | 1100 | 177.6145 | $195,375.95 |
| | 5300 | 175.0812 | $927,930.36 |
| | 1900 | 176.7942 | $335,908.98 |

|  |  |  |  |
|---|---|---|---|
|  | 1600 | 177.5331 | $284,052.96 |
|  | 5731 | 175.0884 | $1,003,431.62 |
|  | 2300 | 176.8343 | $406,718.89 |
|  | 1600 | 177.5975 | $284,156.00 |
| 8/31/2018 | 78126 | 175.5996 | $13,718,894.35 |
|  | 8124 | 176.5406 | $1,434,215.83 |
|  | 98570 | 175.5973 | $17,308,625.86 |
|  | 9780 | 176.5707 | $1,726,861.45 |
|  | 400 | 177.125 | $70,850.00 |
| 8/30/2018 | 6739 | 176.2615 | $1,187,826.25 |
|  | 20886 | 177.3965 | $3,705,103.30 |
|  | 20299 | 178.2273 | $3,617,835.96 |
|  | 38326 | 179.1698 | $6,866,861.75 |
|  | 9400 | 176.3724 | $1,657,900.56 |
|  | 25620 | 177.4295 | $4,545,743.79 |
|  | 24590 | 178.2111 | $4,382,210.95 |
|  | 49140 | 179.1611 | $8,803,976.45 |
|  | 700 | 176.2229 | $123,356.03 |
|  | 2289 | 177.4839 | $406,260.65 |
|  | 1900 | 178.4947 | $339,139.93 |
|  | 3111 | 179.2269 | $557,574.89 |
|  | 800 | 176.1275 | $140,902.00 |
|  | 2299 | 177.4286 | $407,908.35 |
|  | 1801 | 178.2444 | $321,018.16 |
|  | 4100 | 179.1773 | $734,626.93 |
| 8/29/2018 | 67404 | 175.562 | $11,833,581.05 |
|  | 18846 | 176.1112 | $3,318,991.68 |
|  | 68112 | 175.456 | $11,950,659.07 |
|  | 40638 | 176.0239 | $7,153,259.25 |
|  | 5314 | 175.4717 | $932,456.61 |
|  | 2686 | 176.0379 | $472,837.80 |
|  | 7000 | 175.5383 | $1,228,768.10 |
|  | 2000 | 176.0988 | $352,197.60 |
| 8/28/2018 | 35600 | 176.6562 | $6,288,960.72 |
|  | 48409 | 177.2137 | $8,578,738.00 |
|  | 2241 | 178.0724 | $399,060.25 |
|  | 43239 | 176.6452 | $7,637,961.80 |
|  | 62801 | 177.2033 | $11,128,544.44 |

| | 2710 | 178.0812 | $482,600.05 |
|---|---|---|---|
| 8/27/2018 | 7800 | 176.2967 | $1,375,114.26 |
| | 62850 | 177.3819 | $11,148,452.42 |
| | 15600 | 178.0902 | $2,778,207.12 |
| | 9000 | 176.2801 | $1,586,520.90 |
| | 77512 | 177.3648 | $13,747,900.38 |
| | 22238 | 178.0731 | $3,959,989.60 |
| 8/24/2018 | 13324 | 173.7611 | $2,315,192.90 |
| | 16676 | 174.4037 | $2,908,356.10 |
| | 33359 | 173.7027 | $5,794,548.37 |
| | 56641 | 174.3613 | $9,875,998.39 |
| 8/23/2018 | 8150 | 173.239 | $1,411,897.85 |
| | 17850 | 174.3331 | $3,111,845.84 |
| | 21310 | 175.0549 | $3,730,419.92 |
| | 24522 | 173.2374 | $4,248,127.52 |
| | 52596 | 174.3171 | $9,168,382.19 |
| | 18782 | 175.0509 | $3,287,806.00 |
| 8/22/2018 | 21600 | 172.8034 | $3,732,553.44 |
| | 8400 | 173.6665 | $1,458,798.60 |
| | 63611 | 172.803 | $10,992,171.63 |
| | 26289 | 173.6527 | $4,565,155.83 |
| | 100 | 174.18 | $17,418.00 |
| 8/21/2018 | 2200 | 172.0145 | $378,431.90 |
| | 25400 | 173.1027 | $4,396,808.58 |
| | 2400 | 173.8067 | $417,136.08 |
| | 6323 | 171.965 | $1,087,334.70 |
| | 72864 | 173.0646 | $12,610,179.01 |
| | 10813 | 173.6946 | $1,878,159.71 |
| 8/20/2018 | 6647 | 171.6708 | $1,141,095.81 |
| | 18239 | 172.4292 | $3,144,936.18 |
| | 4814 | 173.1267 | $833,431.93 |
| | 300 | 174.09 | $52,227.00 |
| | 20421 | 171.9651 | $3,511,699.31 |
| | 64379 | 172.7075 | $11,118,736.14 |
| | 5200 | 173.7796 | $903,653.92 |
| 8/17/2018 | 16600 | 172.7448 | $2,867,563.68 |
| | 9850 | 173.7011 | $1,710,955.84 |
| | 10200 | 174.7 | $1,781,940.00 |

| | 1100 | 175.7345 | $193,307.95 |
|---|---|---|---|
| | 46441 | 172.7065 | $8,020,662.57 |
| | 33117 | 173.6208 | $5,749,800.03 |
| | 19692 | 174.4976 | $3,436,206.74 |
| | 3300 | 175.5748 | $579,396.84 |
| | 4000 | 172.7393 | $690,957.20 |
| | 2200 | 173.6877 | $382,112.94 |
| | 1600 | 174.4864 | $279,178.24 |
| | 200 | 175.795 | $35,159.00 |
| | 4295 | 172.7419 | $741,926.46 |
| | 2305 | 173.6799 | $400,332.17 |
| | 2200 | 174.508 | $383,917.60 |
| | 200 | 175.6 | $35,120.00 |
| 8/16/2018 | 6785 | 174.7607 | $1,185,751.35 |
| | 10612 | 175.5814 | $1,863,269.82 |
| | 8803 | 176.8019 | $1,556,387.13 |
| | 21332 | 177.9251 | $3,795,498.23 |
| | 28136 | 178.7119 | $5,028,238.02 |
| | 7048 | 179.8585 | $1,267,642.71 |
| | 136 | 180.3863 | $24,532.54 |
| | 13714 | 174.5501 | $2,393,780.07 |
| | 15799 | 175.4514 | $2,771,956.67 |
| | 11205 | 176.6803 | $1,979,702.76 |
| | 18321 | 177.7133 | $3,255,885.37 |
| | 43271 | 178.5092 | $7,724,271.59 |
| | 10391 | 179.3208 | $1,863,322.43 |
| | 4996 | 180.2043 | $900,300.68 |
| | 1110 | 174.5966 | $193,802.23 |
| | 1000 | 175.523 | $175,523.00 |
| | 800 | 176.775 | $141,420.00 |
| | 1680 | 177.9079 | $298,885.27 |
| | 2710 | 178.6847 | $484,235.54 |
| | 700 | 179.905 | $125,933.50 |
| | 1450 | 174.6624 | $253,260.48 |
| | 1000 | 175.618 | $175,618.00 |
| | 900 | 176.84 | $159,156.00 |
| | 2400 | 177.9825 | $427,158.00 |
| | 2750 | 178.8147 | $491,740.43 |

| | | | |
|---|---|---|---|
| | 500 | 180.1846 | $90,092.30 |
| 8/15/2018 | 5100 | 175.9265 | $897,225.15 |
| | 22069 | 176.5612 | $3,896,529.12 |
| | 20808 | 177.7435 | $3,698,486.75 |
| | 27684 | 178.7282 | $4,947,911.49 |
| | 10939 | 179.7788 | $1,966,600.29 |
| | 3400 | 180.4806 | $613,634.04 |
| | 4300 | 175.7221 | $755,605.03 |
| | 30804 | 176.4768 | $5,436,191.35 |
| | 22333 | 177.6001 | $3,966,343.03 |
| | 38839 | 178.5634 | $6,935,223.89 |
| | 15953 | 179.5549 | $2,864,439.32 |
| | 7771 | 180.3311 | $1,401,352.98 |
| 8/14/2018 | 13534 | 179.3076 | $2,426,749.06 |
| | 16000 | 180.3662 | $2,885,859.20 |
| | 56280 | 181.0821 | $10,191,300.59 |
| | 4186 | 181.7949 | $760,993.45 |
| | 17121 | 179.2891 | $3,069,608.68 |
| | 18208 | 180.2674 | $3,282,308.82 |
| | 77414 | 181.0517 | $14,015,936.30 |
| | 7257 | 181.7749 | $1,319,140.45 |
| 8/13/2018 | 12750 | 180.139 | $2,296,772.25 |
| | 52741 | 180.7682 | $9,533,895.64 |
| | 23209 | 182.0191 | $4,224,481.29 |
| | 1300 | 182.4854 | $237,231.02 |
| | 5102 | 179.9225 | $917,964.60 |
| | 72902 | 180.6278 | $13,168,127.88 |
| | 22435 | 181.5301 | $4,072,627.79 |
| | 19561 | 182.2029 | $3,564,070.93 |
| 8/10/2018 | 49960 | 180.2483 | $9,005,205.07 |
| | 36940 | 180.9933 | $6,685,892.50 |
| | 3100 | 182.0071 | $564,222.01 |
| | 76122 | 180.2929 | $13,724,256.13 |
| | 40678 | 181.1011 | $7,366,830.55 |
| | 3200 | 182.0429 | $582,537.28 |
| 8/9/2018 | 10001 | 182.8913 | $1,829,095.89 |
| | 29988 | 184.2042 | $5,523,915.55 |
| | 32232 | 185.0285 | $5,963,838.61 |

| | | | |
|---|---|---|---|
| | 17779 | 185.8756 | $3,304,682.29 |
| | 13720 | 182.8775 | $2,509,079.30 |
| | 46086 | 184.2468 | $8,491,198.02 |
| | 40152 | 185.1283 | $7,433,271.50 |
| | 20042 | 185.9486 | $3,726,781.84 |
| 8/8/2018 | 17716 | 184.4973 | $3,268,554.17 |
| | 49283 | 185.4966 | $9,141,828.94 |
| | 23001 | 186.0922 | $4,280,306.69 |
| | 23722 | 184.5049 | $4,376,825.24 |
| | 65578 | 185.4984 | $12,164,614.08 |
| | 30700 | 186.0943 | $5,713,095.01 |
| 8/7/2018 | 41528 | 184.15 | $7,647,381.20 |
| | 25274 | 185.1701 | $4,679,989.11 |
| | 12100 | 186.5146 | $2,256,826.66 |
| | 10148 | 187.0371 | $1,898,052.49 |
| | 950 | 188.0647 | $178,661.47 |
| | 55110 | 184.1502 | $10,148,517.52 |
| | 33897 | 185.1664 | $6,276,585.46 |
| | 16107 | 186.489 | $3,003,778.32 |
| | 13286 | 187.0203 | $2,484,751.71 |
| | 1600 | 188.0163 | $300,826.08 |
| | 3600 | 184.1755 | $663,031.80 |
| | 2300 | 185.2148 | $425,994.04 |
| | 1900 | 186.7279 | $354,783.01 |
| | 200 | 187.945 | $37,589.00 |
| | 4098 | 184.1332 | $754,577.85 |
| | 2602 | 185.1999 | $481,890.14 |
| | 2100 | 186.6957 | $392,060.97 |
| | 200 | 187.45 | $37,490.00 |
| 8/6/2018 | 1387 | 178.9505 | $248,204.34 |
| | 300 | 179.9767 | $53,993.01 |
| | 600 | 181.3733 | $108,823.98 |
| | 1300 | 182.9908 | $237,888.04 |
| | 3200 | 183.9345 | $588,590.40 |
| | 1800 | 185.0033 | $333,005.94 |
| | 413 | 185.6913 | $76,690.51 |
| | 13400 | 178.976 | $2,398,278.40 |
| | 2200 | 179.8295 | $395,624.90 |

| | | | |
|---|---|---|---|
| | 4450 | 180.9871 | $805,392.60 |
| | 3050 | 182.0357 | $555,208.89 |
| | 15800 | 183.1282 | $2,893,425.56 |
| | 29917 | 184.0042 | $5,504,853.65 |
| | 17250 | 185.0718 | $3,192,488.55 |
| | 3933 | 185.7042 | $730,374.62 |
| | 17700 | 9715 | $171,955,500.00 |
| | 3000 | 179.8467 | $539,540.10 |
| | 5900 | 180.975 | $1,067,752.50 |
| | 3700 | 181.9689 | $673,284.93 |
| | 19515 | 183.0867 | $3,572,936.95 |
| | 40250 | 183.9623 | $7,404,482.58 |
| | 23867 | 185.0357 | $4,416,247.05 |
| | 6068 | 185.6888 | $1,126,759.64 |
| | 1300 | 179.0135 | $232,717.55 |
| | 200 | 180.01 | $36,002.00 |
| | 400 | 181.125 | $72,450.00 |
| | 800 | 182.6175 | $146,094.00 |
| | 2100 | 183.584 | $385,526.40 |
| | 2000 | 184.4185 | $368,837.00 |
| | 1200 | 185.3829 | $222,459.48 |
| 8/3/2018 | 23592 | 176.8844 | $4,173,056.76 |
| | 58108 | 177.7926 | $10,331,172.40 |
| | 8300 | 178.4234 | $1,480,914.22 |
| | 27302 | 176.8177 | $4,827,476.85 |
| | 67650 | 177.6624 | $12,018,861.36 |
| | 25048 | 178.337 | $4,466,985.18 |
| 8/2/2018 | 1900 | 170.7367 | $324,399.73 |
| | 6308 | 171.9631 | $1,084,743.23 |
| | 7390 | 173.0171 | $1,278,596.37 |
| | 3900 | 174.0936 | $678,965.04 |
| | 17430 | 175.3054 | $3,055,573.12 |
| | 50339 | 175.938 | $8,856,542.98 |
| | 2733 | 176.6526 | $482,791.56 |
| | 5300 | 170.6729 | $904,566.37 |
| | 17924 | 171.9515 | $3,082,058.69 |
| | 21046 | 172.9398 | $3,639,691.03 |
| | 9860 | 173.7979 | $1,713,647.29 |

| | | | |
|---|---|---|---|
| | 14904 | 174.7478 | $2,604,441.21 |
| | 42631 | 175.7585 | $7,492,760.61 |
| | 8335 | 176.5293 | $1,471,371.72 |
| 8/1/2018 | 10423 | 171.5984 | $1,788,570.12 |
| | 7100 | 172.2349 | $1,222,867.79 |
| | 3604 | 173.4937 | $625,271.29 |
| | 12323 | 174.2711 | $2,147,542.77 |
| | 2100 | 175.0099 | $367,520.79 |
| | 35563 | 171.6142 | $6,103,115.79 |
| | 17961 | 172.1921 | $3,092,742.31 |
| | 13700 | 173.4688 | $2,376,522.56 |
| | 33627 | 174.3285 | $5,862,144.47 |
| | 999 | 174.999 | $174,824.00 |
| 7/31/2018 | 9900 | 171.082 | $1,693,711.80 |
| | 7213 | 171.9826 | $1,240,510.49 |
| | 13662 | 172.8749 | $2,361,816.88 |
| | 2975 | 173.8735 | $517,273.66 |
| | 18706 | 170.9473 | $3,197,740.19 |
| | 25941 | 171.6427 | $4,452,583.28 |
| | 47214 | 172.8118 | $8,159,136.33 |
| | 9389 | 173.8444 | $1,632,225.07 |
| 7/30/2018 | 3400 | 167.4109 | $569,197.06 |
| | 12668 | 168.2613 | $2,131,534.15 |
| | 7238 | 169.3225 | $1,225,556.26 |
| | 4422 | 170.326 | $753,181.57 |
| | 2590 | 171.1455 | $443,266.85 |
| | 1100 | 172.6636 | $189,929.96 |
| | 1096 | 173.6923 | $190,366.76 |
| | 2764 | 175.1554 | $484,129.53 |
| | 4500 | 167.126 | $752,067.00 |
| | 36142 | 168.1108 | $6,075,860.53 |
| | 24116 | 169.1126 | $4,078,319.46 |
| | 15505 | 170.0572 | $2,636,736.89 |
| | 9469 | 171.0017 | $1,619,215.10 |
| | 2800 | 172.2171 | $482,207.88 |
| | 3900 | 173.2844 | $675,809.16 |
| | 2018 | 174.1206 | $351,375.37 |
| | 3400 | 175.1165 | $595,396.10 |

| | | | |
|---|---|---|---|
| 7/27/2018 | 5500 | 173.5873 | $954,730.15 |
| | 18708 | 174.9014 | $3,272,055.39 |
| | 21258 | 175.3526 | $3,727,645.57 |
| | 9170 | 176.5924 | $1,619,352.31 |
| | 27629 | 177.6063 | $4,907,084.46 |
| | 3782 | 178.1999 | $673,952.02 |
| | 3800 | 179.8742 | $683,521.96 |
| | 14921 | 173.5715 | $2,589,860.35 |
| | 20199 | 174.6612 | $3,527,981.58 |
| | 25310 | 175.373 | $4,438,690.63 |
| | 13141 | 176.6174 | $2,320,929.25 |
| | 34991 | 177.5973 | $6,214,307.12 |
| | 7418 | 178.2388 | $1,322,175.42 |
| | 3601 | 179.8038 | $647,473.48 |
| 7/26/2018 | 1950 | 174.1915 | $339,673.43 |
| | 33650 | 175.2959 | $5,898,707.04 |
| | 27500 | 176.2649 | $4,847,284.75 |
| | 15950 | 177.2634 | $2,827,351.23 |
| | 9350 | 178.1971 | $1,666,142.89 |
| | 1050 | 179.1648 | $188,123.04 |
| | 550 | 179.9064 | $98,948.52 |
| | 6600 | 174.2695 | $1,150,178.70 |
| | 41000 | 175.3015 | $7,187,361.50 |
| | 36700 | 176.2505 | $6,468,393.35 |
| | 19700 | 177.2339 | $3,491,507.83 |
| | 13500 | 178.141 | $2,404,903.50 |
| | 1600 | 178.9813 | $286,370.08 |
| | 900 | 179.8822 | $161,893.98 |
| 7/25/2018 | 21100 | 214.9205 | $4,534,822.55 |
| | 19601 | 215.8466 | $4,230,809.21 |
| | 13200 | 217.0047 | $2,864,462.04 |
| | 40849 | 217.839 | $8,898,505.31 |
| | 2750 | 218.4078 | $600,621.45 |
| | 31797 | 214.9342 | $6,834,262.76 |
| | 27100 | 215.8525 | $5,849,602.75 |
| | 19200 | 216.9844 | $4,166,100.48 |
| | 60303 | 217.8332 | $13,135,995.46 |
| | 4100 | 218.4047 | $895,459.27 |

| | | | |
|---|---|---|---|
| 7/24/2018 | 17100 | 213.4242 | $3,649,553.82 |
| | 35524 | 214.0915 | $7,605,386.45 |
| | 34177 | 215.2315 | $7,355,966.98 |
| | 10699 | 215.8574 | $2,309,458.32 |
| | 28836 | 213.4611 | $6,155,364.28 |
| | 51265 | 214.1417 | $10,977,974.25 |
| | 49320 | 215.2658 | $10,616,909.26 |
| | 13079 | 215.8794 | $2,823,486.67 |
| | 2966 | 213.643 | $633,665.14 |
| | 2134 | 214.5617 | $457,874.67 |
| | 2900 | 215.4816 | $624,896.64 |
| | 2700 | 213.5693 | $576,637.11 |
| | 2590 | 214.3415 | $555,144.49 |
| | 3310 | 215.3221 | $712,716.15 |
| | 400 | 216.03 | $86,412.00 |
| 7/23/2018 | 21436 | 209.6893 | $4,494,899.83 |
| | 42292 | 210.6639 | $8,909,397.66 |
| | 33772 | 211.1944 | $7,132,457.28 |
| | 31100 | 209.7056 | $6,521,844.16 |
| | 61098 | 210.6633 | $12,871,106.30 |
| | 50302 | 211.1919 | $10,623,374.95 |
| | 1800 | 209.7444 | $377,539.92 |
| | 4300 | 210.7508 | $906,228.44 |
| | 1900 | 211.2834 | $401,438.46 |
| | 2000 | 209.7145 | $419,429.00 |
| | 4700 | 210.7435 | $990,494.45 |
| | 2300 | 211.267 | $485,914.10 |
| 7/20/2018 | 9900 | 209.1665 | $2,070,748.35 |
| | 70568 | 209.9468 | $14,815,525.78 |
| | 17032 | 210.7947 | $3,590,255.33 |
| | 13886 | 209.1733 | $2,904,580.44 |
| | 103177 | 209.9447 | $21,661,464.31 |
| | 25437 | 210.7905 | $5,361,877.95 |
| 7/18/2018 | 30270 | 209.2419 | $6,333,752.31 |
| | 59430 | 209.9078 | $12,474,820.55 |
| | 7800 | 210.7101 | $1,643,538.78 |
| | 37739 | 209.201 | $7,895,036.54 |
| | 90561 | 209.8559 | $19,004,760.16 |

| | | | |
|---|---|---|---|
| | 14200 | 210.6707 | $2,991,523.94 |
| 7/17/2018 | 4608 | 205.1467 | $945,315.99 |
| | 12363 | 206.5057 | $2,553,029.97 |
| | 22435 | 207.5096 | $4,655,477.88 |
| | 19157 | 208.5107 | $3,994,439.48 |
| | 32836 | 209.3304 | $6,873,573.01 |
| | 6101 | 210.1576 | $1,282,171.52 |
| | 7048 | 205.2622 | $1,446,687.99 |
| | 14090 | 206.4396 | $2,908,733.96 |
| | 34945 | 207.4581 | $7,249,623.30 |
| | 23197 | 208.3816 | $4,833,827.98 |
| | 48693 | 209.2099 | $10,187,057.66 |
| | 14527 | 210.0675 | $3,051,650.57 |
| 7/16/2018 | 69633 | 207.4823 | $14,447,615.00 |
| | 27867 | 208.1606 | $5,800,811.44 |
| | 103398 | 207.4898 | $21,454,030.34 |
| | 39102 | 208.1445 | $8,138,866.24 |
| 7/13/2018 | 77256 | 207.1891 | $16,006,601.11 |
| | 20244 | 207.7498 | $4,205,686.95 |
| | 115530 | 207.1946 | $23,937,192.14 |
| | 26970 | 207.743 | $5,602,828.71 |
| 7/12/2018 | 13338 | 203.9192 | $2,719,874.29 |
| | 6308 | 204.8551 | $1,292,225.97 |
| | 56139 | 205.8982 | $11,558,919.05 |
| | 21715 | 206.5353 | $4,484,914.04 |
| | 15380 | 203.8765 | $3,135,620.57 |
| | 10765 | 204.6607 | $2,203,172.44 |
| | 76108 | 205.8497 | $15,666,808.97 |
| | 40247 | 206.4856 | $8,310,425.94 |
| 7/11/2018 | 13806 | 202.5426 | $2,796,303.14 |
| | 69894 | 203.336 | $14,211,966.38 |
| | 13800 | 204.0351 | $2,815,684.38 |
| | 17161 | 202.5342 | $3,475,689.41 |
| | 105103 | 203.3264 | $21,370,214.62 |
| | 20236 | 204.0339 | $4,128,830.00 |
| | 1342 | 202.559 | $271,834.18 |
| | 5708 | 203.3715 | $1,160,844.52 |
| | 950 | 204.0726 | $193,868.97 |

| | | | |
|---|---|---|---|
| | 1300 | 202.4569 | $263,193.97 |
| | 6400 | 203.3367 | $1,301,354.88 |
| | 1300 | 204.0538 | $265,269.94 |
| 7/10/2018 | 18800 | 202.9405 | $3,815,281.40 |
| | 68126 | 203.8288 | $13,886,040.83 |
| | 10574 | 204.4971 | $2,162,352.34 |
| | 24129 | 202.8807 | $4,895,308.41 |
| | 101766 | 203.8019 | $20,740,104.16 |
| | 16605 | 204.4706 | $3,395,234.31 |
| | 1300 | 202.8538 | $263,709.94 |
| | 5800 | 203.8072 | $1,182,081.76 |
| | 900 | 204.5156 | $184,064.04 |
| | 1999 | 202.9947 | $405,786.41 |
| | 6301 | 203.8734 | $1,284,606.29 |
| | 700 | 204.5752 | $143,202.64 |
| 7/9/2018 | 13901 | 202.9258 | $2,820,871.55 |
| | 33621 | 203.7148 | $6,849,095.29 |
| | 47415 | 204.7525 | $9,708,339.79 |
| | 2563 | 205.4633 | $526,602.44 |
| | 18810 | 202.8886 | $3,816,334.57 |
| | 50381 | 203.6897 | $10,262,090.78 |
| | 68305 | 204.7402 | $13,984,779.36 |
| | 5004 | 205.435 | $1,027,996.74 |
| 7/6/2018 | 5406 | 198.2681 | $1,071,837.35 |
| | 14584 | 199.6142 | $2,911,173.49 |
| | 25479 | 200.2269 | $5,101,581.19 |
| | 9600 | 201.4408 | $1,933,831.68 |
| | 23156 | 202.5023 | $4,689,143.26 |
| | 19275 | 203.2782 | $3,918,187.31 |
| | 7149 | 198.2955 | $1,417,614.53 |
| | 13817 | 199.4887 | $2,756,335.37 |
| | 44040 | 200.1798 | $8,815,918.39 |
| | 13200 | 201.4061 | $2,658,560.52 |
| | 32574 | 202.4745 | $6,595,404.36 |
| | 31720 | 203.2496 | $6,447,077.31 |
| 7/5/2018 | 29725 | 194.728 | $5,788,289.80 |
| | 23321 | 195.5385 | $4,560,153.36 |
| | 14405 | 196.6443 | $2,832,661.14 |

| | | | |
|---|---|---|---|
| | 27043 | 197.525 | $5,341,668.58 |
| | 3006 | 198.3981 | $596,384.69 |
| | 39504 | 194.7199 | $7,692,214.93 |
| | 37648 | 195.5333 | $7,361,437.68 |
| | 19701 | 196.6441 | $3,874,085.41 |
| | 41821 | 197.5276 | $8,260,801.76 |
| | 3826 | 198.4095 | $759,114.75 |
| 7/3/2018 | 44662 | 193.1992 | $8,628,662.67 |
| | 34714 | 193.8048 | $6,727,739.83 |
| | 11624 | 194.8271 | $2,264,670.21 |
| | 60138 | 193.2025 | $11,618,811.95 |
| | 47097 | 193.8064 | $9,127,700.02 |
| | 14365 | 194.8294 | $2,798,724.33 |
| 7/2/2018 | 7201 | 193.0081 | $1,389,851.33 |
| | 23900 | 194.1535 | $4,640,268.65 |
| | 38515 | 194.9293 | $7,507,701.99 |
| | 23406 | 195.9715 | $4,586,908.93 |
| | 4478 | 197.0609 | $882,438.71 |
| | 6937 | 192.9193 | $1,338,281.18 |
| | 20363 | 193.9106 | $3,948,601.55 |
| | 65338 | 194.8044 | $12,728,129.89 |
| | 37495 | 195.8506 | $7,343,418.25 |
| | 10595 | 196.6911 | $2,083,942.20 |
| | 1772 | 197.3341 | $349,676.03 |
| 6/29/2018 | 12141 | 194.6897 | $2,363,727.65 |
| | 53856 | 195.6031 | $10,534,400.55 |
| | 26239 | 196.4736 | $5,155,270.79 |
| | 4466 | 197.2869 | $881,083.30 |
| | 16421 | 194.6891 | $3,196,989.71 |
| | 80546 | 195.6108 | $15,755,667.50 |
| | 37454 | 196.4734 | $7,358,714.72 |
| | 5492 | 197.2942 | $1,083,539.75 |
| 6/28/2018 | 6800 | 193.9111 | $1,318,595.48 |
| | 30598 | 194.931 | $5,964,498.74 |
| | 43680 | 195.7624 | $8,550,901.63 |
| | 16422 | 196.6694 | $3,229,704.89 |
| | 9575 | 193.9823 | $1,857,380.52 |
| | 41487 | 194.9274 | $8,086,953.04 |

| | | | |
|---|---|---|---|
| | 65601 | 195.7478 | $12,841,251.43 |
| | 25837 | 196.6709 | $5,081,386.04 |
| | 705 | 194.0714 | $136,820.34 |
| | 2900 | 195.0152 | $565,544.08 |
| | 3495 | 195.8789 | $684,596.76 |
| | 900 | 196.7733 | $177,095.97 |
| | 1100 | 194.1891 | $213,608.01 |
| | 3831 | 195.16 | $747,657.96 |
| | 3269 | 196.0605 | $640,921.77 |
| | 800 | 196.8725 | $157,498.00 |
| 6/27/2018 | 4457 | 196.3582 | $875,168.50 |
| | 12000 | 197.396 | $2,368,752.00 |
| | 19596 | 198.2679 | $3,885,257.77 |
| | 32144 | 199.3682 | $6,408,491.42 |
| | 29303 | 200.1362 | $5,864,591.07 |
| | 6180 | 196.354 | $1,213,467.72 |
| | 20015 | 197.41 | $3,951,161.15 |
| | 27494 | 198.2944 | $5,451,906.23 |
| | 47825 | 199.3952 | $9,536,075.44 |
| | 40986 | 200.1466 | $8,203,208.55 |
| | 400 | 196.32 | $78,528.00 |
| | 1200 | 197.5509 | $237,061.08 |
| | 1800 | 198.4937 | $357,288.66 |
| | 3300 | 199.5808 | $658,616.64 |
| | 1300 | 200.3392 | $260,440.96 |
| | 290 | 196.0752 | $56,861.81 |
| | 1400 | 197.3291 | $276,260.74 |
| | 1700 | 198.3441 | $337,184.97 |
| | 3310 | 199.4258 | $660,099.40 |
| | 2300 | 200.1888 | $460,434.24 |
| 6/26/2018 | 23450 | 196.8377 | $4,615,844.07 |
| | 52392 | 197.7878 | $10,362,498.42 |
| | 21658 | 198.4926 | $4,298,952.73 |
| | 39078 | 196.8942 | $7,694,231.55 |
| | 78232 | 197.8605 | $15,479,022.64 |
| | 25190 | 198.5456 | $5,001,363.66 |
| 6/25/2018 | 16661 | 193.8923 | $3,230,439.61 |
| | 18689 | 194.5385 | $3,635,730.03 |

|  | 14579 | 195.6359 | $2,852,175.79 |
|---|---|---|---|
|  | 21031 | 196.7533 | $4,137,918.65 |
|  | 10349 | 197.9001 | $2,048,068.13 |
|  | 13247 | 198.5904 | $2,630,727.03 |
|  | 2944 | 199.8882 | $588,470.86 |
|  | 21235 | 193.8752 | $4,116,939.87 |
|  | 31100 | 194.5917 | $6,051,801.87 |
|  | 20320 | 195.6239 | $3,975,077.65 |
|  | 28902 | 196.6908 | $5,684,757.50 |
|  | 15771 | 197.734 | $3,118,462.91 |
|  | 20282 | 198.5378 | $4,026,743.66 |
|  | 4890 | 199.8578 | $977,304.64 |
| 6/22/2018 | 35323 | 200.0319 | $7,065,726.80 |
|  | 23965 | 200.6882 | $4,809,492.71 |
|  | 38212 | 201.8027 | $7,711,284.77 |
|  | 57138 | 200.0603 | $11,431,045.42 |
|  | 34223 | 200.8115 | $6,872,371.96 |
|  | 51139 | 201.8333 | $10,321,553.13 |
| 6/21/2018 | 12965 | 200.6046 | $2,600,838.64 |
|  | 41723 | 201.6682 | $8,414,202.31 |
|  | 42112 | 202.5904 | $8,531,486.92 |
|  | 700 | 203.1971 | $142,237.97 |
|  | 18252 | 200.5826 | $3,661,033.62 |
|  | 63329 | 201.6503 | $12,770,311.85 |
|  | 59637 | 202.5768 | $12,081,072.62 |
|  | 1282 | 203.1881 | $260,487.14 |
| 6/20/2018 | 8830 | 199.3599 | $1,760,347.92 |
|  | 6400 | 200.5341 | $1,283,418.24 |
|  | 31880 | 201.4404 | $6,421,919.95 |
|  | 39439 | 202.3437 | $7,980,233.18 |
|  | 10951 | 203.1556 | $2,224,756.98 |
|  | 13924 | 199.3567 | $2,775,842.69 |
|  | 10771 | 200.581 | $2,160,457.95 |
|  | 43822 | 201.4547 | $8,828,147.86 |
|  | 58850 | 202.3508 | $11,908,344.58 |
|  | 15133 | 203.1665 | $3,074,518.64 |
| 6/19/2018 | 9239 | 194.4287 | $1,796,326.76 |
|  | 39916 | 195.4257 | $7,800,612.24 |

| | 23927 | 196.1912 | $4,694,266.84 |
| | 23618 | 197.3593 | $4,661,231.95 |
| | 800 | 197.8775 | $158,302.00 |
| | 11132 | 194.3848 | $2,163,891.59 |
| | 59714 | 195.4154 | $11,669,035.20 |
| | 33433 | 196.1443 | $6,557,692.38 |
| | 37021 | 197.339 | $7,305,687.12 |
| | 1200 | 197.845 | $237,414.00 |
| 6/18/2018 | 6642 | 194.6934 | $1,293,153.56 |
| | 2499 | 195.7203 | $489,105.03 |
| | 5050 | 196.8691 | $994,188.96 |
| | 33467 | 197.9981 | $6,626,402.41 |
| | 47042 | 198.7617 | $9,350,147.89 |
| | 2800 | 199.4211 | $558,379.08 |
| | 8089 | 194.6699 | $1,574,684.82 |
| | 5177 | 195.7622 | $1,013,460.91 |
| | 7192 | 196.8688 | $1,415,880.41 |
| | 46104 | 197.9733 | $9,127,361.02 |
| | 79138 | 198.7355 | $15,727,530.00 |
| | 4300 | 199.4251 | $857,527.93 |
| 6/15/2018 | 34694 | 195.5124 | $6,783,107.21 |
| | 61632 | 196.0567 | $12,083,366.53 |
| | 3674 | 196.8981 | $723,403.62 |
| | 82936 | 195.6168 | $16,223,674.92 |
| | 62754 | 196.2043 | $12,312,604.64 |
| | 4310 | 196.9231 | $848,738.56 |
| 6/14/2018 | 14729 | 193.4093 | $2,848,725.58 |
| | 26010 | 194.5951 | $5,061,418.55 |
| | 8130 | 195.6085 | $1,590,297.11 |
| | 45310 | 196.4949 | $8,903,183.92 |
| | 5821 | 197.0682 | $1,147,133.99 |
| | 19398 | 193.4049 | $3,751,668.25 |
| | 35166 | 194.5865 | $6,842,828.86 |
| | 13060 | 195.5961 | $2,554,485.07 |
| | 71460 | 196.4878 | $14,041,018.19 |
| | 10916 | 197.0619 | $2,151,127.70 |
| | 1243 | 193.3616 | $240,348.47 |
| | 2400 | 194.6242 | $467,098.08 |

| | | | |
|---|---|---|---|
| | 2000 | 196.0775 | $392,155.00 |
| | 2357 | 196.7627 | $463,769.68 |
| | 1410 | 193.3984 | $272,691.74 |
| | 2600 | 194.5981 | $505,955.06 |
| | 1600 | 195.9156 | $313,464.96 |
| | 3390 | 196.6844 | $666,760.12 |
| 6/13/2018 | 41406 | 192.4553 | $7,968,804.15 |
| | 40859 | 193.4139 | $7,902,698.54 |
| | 10235 | 194.1579 | $1,987,206.11 |
| | 53234 | 192.4621 | $10,245,527.43 |
| | 59163 | 193.3915 | $11,441,621.31 |
| | 15103 | 194.1615 | $2,932,421.13 |
| | 3553 | 192.4565 | $683,797.94 |
| | 3847 | 193.4532 | $744,214.46 |
| | 600 | 194.2833 | $116,569.98 |
| | 3945 | 192.4483 | $759,208.54 |
| | 4092 | 193.4057 | $791,416.12 |
| | 963 | 194.1836 | $186,998.81 |
| 6/12/2018 | 78448 | 192.2088 | $15,078,395.94 |
| | 14052 | 192.9281 | $2,711,025.66 |
| | 106275 | 192.1996 | $20,426,012.49 |
| | 21225 | 192.9095 | $4,094,504.14 |
| 6/11/2018 | 20354 | 189.387 | $3,854,783.00 |
| | 12818 | 189.9736 | $2,435,081.60 |
| | 23281 | 191.5389 | $4,459,217.13 |
| | 36047 | 192.0538 | $6,922,963.33 |
| | 28152 | 189.4061 | $5,332,160.53 |
| | 16604 | 189.9862 | $3,154,530.86 |
| | 33870 | 191.563 | $6,488,238.81 |
| | 48874 | 192.0538 | $9,386,437.42 |
| 6/8/2018 | 4840 | 187.1729 | $905,916.84 |
| | 23817 | 188.0901 | $4,479,741.91 |
| | 63843 | 189.0287 | $12,068,159.29 |
| | 6510 | 187.2193 | $1,218,797.64 |
| | 32116 | 188.1002 | $6,041,026.02 |
| | 88874 | 189.0287 | $16,799,736.68 |
| 6/7/2018 | 31355 | 187.4307 | $5,876,889.60 |
| | 40851 | 188.1348 | $7,685,494.71 |

| | | | |
|---|---|---|---|
| | 15700 | 189.5117 | $2,975,333.69 |
| | 4594 | 190.5676 | $875,467.55 |
| | 37585 | 187.382 | $7,042,752.47 |
| | 62705 | 188.098 | $11,794,685.09 |
| | 20193 | 189.4898 | $3,826,367.53 |
| | 6630 | 190.4579 | $1,262,735.88 |
| | 387 | 190.8733 | $73,867.97 |
| 6/6/2018 | 33913 | 189.8451 | $6,438,216.88 |
| | 49081 | 190.6268 | $9,356,153.97 |
| | 8006 | 191.4651 | $1,532,869.59 |
| | 1500 | 192.253 | $288,379.50 |
| | 49541 | 189.8697 | $9,406,334.81 |
| | 64515 | 190.6522 | $12,299,926.68 |
| | 12644 | 191.5542 | $2,422,011.30 |
| | 800 | 192.3263 | $153,861.04 |
| 6/5/2018 | 51077 | 193.1282 | $9,864,409.07 |
| | 39120 | 194.2586 | $7,599,396.43 |
| | 2503 | 194.8172 | $487,627.45 |
| | 69603 | 193.1172 | $13,441,536.47 |
| | 49397 | 194.1971 | $9,592,754.15 |
| | 8900 | 194.7369 | $1,733,158.41 |
| 6/4/2018 | 24229 | 192.1602 | $4,655,849.49 |
| | 58771 | 193.2006 | $11,354,592.46 |
| | 9500 | 193.7251 | $1,840,388.45 |
| | 33238 | 192.1925 | $6,388,094.32 |
| | 83856 | 193.2202 | $16,202,673.09 |
| | 10406 | 193.7204 | $2,015,854.48 |
| | 2300 | 192.1765 | $442,005.95 |
| | 5500 | 193.272 | $1,062,996.00 |
| | 200 | 193.83 | $38,766.00 |
| | 2400 | 192.124 | $461,097.60 |
| | 6100 | 193.2315 | $1,178,712.15 |
| | 500 | 193.784 | $96,892.00 |
| 6/1/2018 | 25611 | 192.6711 | $4,934,499.54 |
| | 64041 | 193.7533 | $12,408,155.09 |
| | 2848 | 194.2198 | $553,137.99 |
| | 36237 | 192.6925 | $6,982,598.12 |
| | 88863 | 193.7725 | $17,219,205.67 |

| | | | |
|---|---|---|---|
| | 2400 | 194.3267 | $466,384.08 |
| | 2600 | 192.7308 | $501,100.08 |
| | 5300 | 193.8136 | $1,027,212.08 |
| | 100 | 194.46 | $19,446.00 |
| | 2300 | 192.6613 | $443,120.99 |
| | 6500 | 193.7444 | $1,259,338.60 |
| | 200 | 194.375 | $38,875.00 |
| 5/31/2018 | 4000 | 187.814 | $751,256.00 |
| | 29611 | 189.3537 | $5,606,952.41 |
| | 10271 | 189.9397 | $1,950,870.66 |
| | 30583 | 191.529 | $5,857,531.41 |
| | 18035 | 192.1851 | $3,466,058.28 |
| | 5408 | 187.8985 | $1,016,155.09 |
| | 38828 | 189.3262 | $7,351,157.69 |
| | 15715 | 189.8891 | $2,984,107.21 |
| | 37178 | 191.4918 | $7,119,282.14 |
| | 30371 | 192.1107 | $5,834,594.07 |
| 5/30/2018 | 19622 | 185.8204 | $3,646,167.89 |
| | 9762 | 186.5876 | $1,821,468.15 |
| | 63116 | 187.7063 | $11,847,270.83 |
| | 26550 | 185.8165 | $4,933,428.08 |
| | 13778 | 186.6185 | $2,571,229.69 |
| | 87172 | 187.7062 | $16,362,724.87 |
| 5/29/2018 | 25103 | 184.5389 | $4,632,480.01 |
| | 55822 | 185.6129 | $10,361,283.30 |
| | 11575 | 186.2892 | $2,156,297.49 |
| | 26510 | 184.4647 | $4,890,159.20 |
| | 54291 | 185.3902 | $10,065,019.35 |
| | 45899 | 185.9801 | $8,536,300.61 |
| | 800 | 186.7913 | $149,433.04 |
| 5/25/2018 | 65231 | 184.9645 | $12,065,419.30 |
| | 27269 | 185.838 | $5,067,616.42 |
| | 95183 | 184.9754 | $17,606,513.50 |
| | 32317 | 185.8555 | $6,006,292.19 |
| 5/24/2018 | 45913 | 185.8177 | $8,531,448.06 |
| | 46587 | 186.3126 | $8,679,745.10 |
| | 72542 | 185.8491 | $13,481,865.41 |
| | 54958 | 186.3589 | $10,241,912.43 |

| | | | |
|---|---|---|---|
| 5/23/2018 | 14000 | 182.7533 | $2,558,546.20 |
| | 19682 | 183.8694 | $3,618,917.53 |
| | 30896 | 184.6243 | $5,704,152.37 |
| | 20009 | 185.8251 | $3,718,174.43 |
| | 7913 | 186.566 | $1,476,296.76 |
| | 17689 | 182.7878 | $3,233,333.39 |
| | 29514 | 183.8999 | $5,427,621.65 |
| | 40648 | 184.6416 | $7,505,311.76 |
| | 28186 | 185.8299 | $5,237,801.56 |
| | 11463 | 186.5537 | $2,138,465.06 |
| 5/22/2018 | 63260 | 184.1004 | $11,646,191.30 |
| | 29240 | 184.8513 | $5,405,052.01 |
| | 80673 | 184.0654 | $14,849,108.01 |
| | 46287 | 184.788 | $8,553,282.16 |
| 5/21/2018 | 35038 | 183.9316 | $6,444,595.40 |
| | 56862 | 184.55 | $10,493,882.10 |
| | 600 | 185.2283 | $111,136.98 |
| | 48606 | 183.9427 | $8,940,718.88 |
| | 78394 | 184.5488 | $14,467,518.63 |
| | 500 | 185.22 | $92,610.00 |
| | 4050 | 184.0104 | $745,242.12 |
| | 3950 | 184.6308 | $729,291.66 |
| | 6098 | 184.1098 | $1,122,701.56 |
| | 2902 | 184.7458 | $536,132.31 |
| 5/18/2018 | 90300 | 183.0706 | $16,531,275.18 |
| | 2200 | 183.7332 | $404,213.04 |
| | 124544 | 183.0694 | $22,800,195.35 |
| | 2956 | 183.8071 | $543,333.79 |
| | 7900 | 183.0849 | $1,446,370.71 |
| | 100 | 183.62 | $18,362.00 |
| | 9000 | 183.0797 | $1,647,717.30 |
| 5/17/2018 | 41849 | 183.0734 | $7,661,438.72 |
| | 50651 | 183.6306 | $9,301,073.52 |
| | 40937 | 182.972 | $7,490,324.76 |
| | 86563 | 183.5773 | $15,891,001.82 |
| 5/16/2018 | 82074 | 183.3747 | $15,050,295.13 |
| | 10426 | 183.9217 | $1,917,567.64 |
| | 113671 | 183.3662 | $20,843,419.32 |

| | | | |
|---|---|---|---|
| | 13829 | 183.9253 | $2,543,502.97 |
| 5/15/2018 | 71079 | 183.8331 | $13,066,672.91 |
| | 21421 | 184.5456 | $3,953,151.30 |
| | 97460 | 183.8271 | $17,915,789.17 |
| | 30040 | 184.5629 | $5,544,269.52 |
| 5/14/2018 | 72305 | 186.8422 | $13,509,625.27 |
| | 20195 | 187.5404 | $3,787,378.38 |
| | 101690 | 186.8458 | $19,000,349.40 |
| | 25810 | 187.5245 | $4,840,007.35 |
| 5/11/2018 | 18257 | 184.8304 | $3,374,448.61 |
| | 9391 | 185.7437 | $1,744,319.09 |
| | 59852 | 186.7108 | $11,175,014.80 |
| | 5000 | 187.8558 | $939,279.00 |
| | 24317 | 184.8142 | $4,494,126.90 |
| | 11408 | 185.6501 | $2,117,896.34 |
| | 84668 | 186.6964 | $15,807,210.80 |
| | 7107 | 187.8464 | $1,335,024.36 |
| 5/10/2018 | 12151 | 183.1181 | $2,225,068.03 |
| | 17237 | 183.9656 | $3,171,015.05 |
| | 45305 | 185.2744 | $8,393,856.69 |
| | 17771 | 185.8155 | $3,302,127.25 |
| | 15529 | 183.0764 | $2,842,993.42 |
| | 23464 | 183.9617 | $4,316,477.33 |
| | 63766 | 185.2723 | $11,814,073.48 |
| | 24741 | 185.8104 | $4,597,135.11 |
| 5/9/2018 | 13139 | 179.52 | $2,358,713.28 |
| | 23074 | 180.3809 | $4,162,108.89 |
| | 17604 | 181.2993 | $3,191,592.88 |
| | 35383 | 182.3842 | $6,453,300.15 |
| | 3300 | 182.8597 | $603,437.01 |
| | 17500 | 179.4967 | $3,141,192.25 |
| | 32594 | 180.3979 | $5,879,889.15 |
| | 24346 | 181.3393 | $4,414,886.60 |
| | 50660 | 182.4172 | $9,241,255.35 |
| | 2400 | 182.8788 | $438,909.12 |
| 5/8/2018 | 44724 | 177.7194 | $7,948,322.45 |
| | 47776 | 178.5011 | $8,528,068.55 |
| | 61492 | 177.7146 | $10,928,026.18 |

|  | 66008 | 178.4977 | $11,782,276.18 |
|---|---|---|---|
| 5/7/2018 | 34749 | 177.7546 | $6,176,794.60 |
|  | 51862 | 178.7896 | $9,272,386.24 |
|  | 5889 | 179.2537 | $1,055,625.04 |
|  | 47801 | 177.7623 | $8,497,215.70 |
|  | 72799 | 178.794 | $13,016,024.41 |
|  | 6900 | 179.2597 | $1,236,891.93 |
|  | 3200 | 177.7642 | $568,845.44 |
|  | 4500 | 178.8242 | $804,708.90 |
|  | 300 | 179.3233 | $53,796.99 |
|  | 3550 | 177.7062 | $630,857.01 |
|  | 4750 | 178.7765 | $849,188.38 |
|  | 700 | 179.27 | $125,489.00 |
| 5/4/2018 | 1895 | 173.3625 | $328,521.94 |
|  | 5500 | 174.6551 | $960,603.05 |
|  | 32883 | 175.7857 | $5,780,361.17 |
|  | 52222 | 176.4041 | $9,212,174.91 |
|  | 5600 | 173.4306 | $971,211.36 |
|  | 12172 | 174.5609 | $2,124,755.27 |
|  | 50635 | 175.8478 | $8,904,053.35 |
|  | 59093 | 176.4414 | $10,426,451.65 |
|  | 400 | 173.1313 | $69,252.52 |
|  | 900 | 174.5244 | $157,071.96 |
|  | 3090 | 175.8479 | $543,370.01 |
|  | 3610 | 176.4415 | $636,953.82 |
|  | 600 | 173.4158 | $104,049.48 |
|  | 1100 | 174.7364 | $192,210.04 |
|  | 3667 | 175.9059 | $645,046.94 |
|  | 3633 | 176.4726 | $641,124.96 |
| 5/3/2018 | 5200 | 172.7871 | $898,492.92 |
|  | 8477 | 173.6435 | $1,471,975.95 |
|  | 52876 | 174.8842 | $9,247,176.96 |
|  | 10727 | 175.3659 | $1,881,150.01 |
|  | 19900 | 172.8773 | $3,440,258.27 |
|  | 26920 | 173.8226 | $4,679,304.39 |
|  | 66453 | 174.7839 | $11,614,914.51 |
|  | 8977 | 175.5053 | $1,575,511.08 |
| 5/2/2018 | 7500 | 174.829 | $1,311,217.50 |

| | | | |
|---|---|---|---|
| | 15964 | 176.038 | $2,810,270.63 |
| | 49737 | 176.7542 | $8,791,223.65 |
| | 19299 | 177.6303 | $3,428,087.16 |
| | 10100 | 174.6853 | $1,764,321.53 |
| | 24794 | 176.0409 | $4,364,758.07 |
| | 67829 | 176.7807 | $11,990,858.10 |
| | 24777 | 177.6379 | $4,401,334.25 |
| 5/1/2018 | 9510 | 170.9146 | $1,625,397.85 |
| | 18955 | 171.8441 | $3,257,304.92 |
| | 6637 | 172.5117 | $1,144,960.15 |
| | 1148 | 173.8207 | $199,546.16 |
| | 28283 | 170.8955 | $4,833,437.43 |
| | 55458 | 171.8261 | $9,529,131.85 |
| | 21665 | 172.5006 | $3,737,225.50 |
| | 3344 | 173.831 | $581,290.86 |
| 4/27/2018 | 11200 | 173.2032 | $1,939,875.84 |
| | 14282 | 174.3055 | $2,489,431.15 |
| | 27268 | 175.0525 | $4,773,331.57 |
| | 3228 | 175.9277 | $567,894.62 |
| | 3000 | 176.8931 | $530,679.30 |
| | 31321 | 173.1708 | $5,423,882.63 |
| | 41428 | 174.2039 | $7,216,919.17 |
| | 34073 | 174.9744 | $5,961,902.73 |
| | 6828 | 175.8816 | $1,200,919.56 |
| | 4400 | 176.9167 | $778,433.48 |
| 4/26/2018 | 1200 | 171.4633 | $205,755.96 |
| | 6200 | 172.4908 | $1,069,442.96 |
| | 8783 | 173.2963 | $1,522,061.40 |
| | 8458 | 174.3703 | $1,474,824.00 |
| | 60781 | 175.4227 | $10,662,367.13 |
| | 1500 | 175.9947 | $263,992.05 |
| | 3700 | 171.4732 | $634,450.84 |
| | 20493 | 172.4705 | $3,534,437.96 |
| | 23828 | 173.3305 | $4,130,119.15 |
| | 24875 | 174.3784 | $4,337,662.70 |
| | 51039 | 175.4375 | $8,954,154.56 |
| | 1700 | 176.05 | $299,285.00 |
| 4/25/2018 | 2661 | 156.8812 | $417,460.87 |

| | | | |
|---|---|---|---|
| | 5400 | 158.0744 | $853,601.76 |
| | 9201 | 159.144 | $1,464,283.94 |
| | 18188 | 159.8884 | $2,908,050.22 |
| | 800 | 160.8325 | $128,666.00 |
| | 6630 | 156.8612 | $1,039,989.76 |
| | 16408 | 158.0005 | $2,592,472.20 |
| | 23329 | 159.0295 | $3,709,999.21 |
| | 59683 | 159.838 | $9,539,611.35 |
| | 2700 | 160.6841 | $433,847.07 |
| 4/24/2018 | 4918 | 159.005 | $781,986.59 |
| | 11075 | 159.7668 | $1,769,417.31 |
| | 4057 | 161.0232 | $653,271.12 |
| | 3500 | 161.7934 | $566,276.90 |
| | 2600 | 163.1227 | $424,119.02 |
| | 2800 | 163.8421 | $458,757.88 |
| | 5500 | 165.0129 | $907,570.95 |
| | 1800 | 165.6961 | $298,252.98 |
| | 10568 | 158.8561 | $1,678,791.26 |
| | 37540 | 159.6927 | $5,994,863.96 |
| | 11800 | 160.8397 | $1,897,908.46 |
| | 11577 | 161.6164 | $1,871,033.06 |
| | 8300 | 162.9837 | $1,352,764.71 |
| | 9255 | 163.7983 | $1,515,953.27 |
| | 12580 | 164.9432 | $2,074,985.46 |
| | 7130 | 165.6267 | $1,180,918.37 |
| 4/23/2018 | 15461 | 165.7404 | $2,562,512.32 |
| | 10379 | 166.737 | $1,730,563.32 |
| | 9187 | 167.7645 | $1,541,252.46 |
| | 1223 | 168.2958 | $205,825.76 |
| | 42927 | 165.7177 | $7,113,763.71 |
| | 27918 | 166.5785 | $4,650,538.56 |
| | 30705 | 167.5811 | $5,145,577.68 |
| | 7200 | 168.2221 | $1,211,199.12 |
| 4/20/2018 | 14121 | 166.4189 | $2,350,001.29 |
| | 19328 | 167.2868 | $3,233,319.27 |
| | 2801 | 168.094 | $470,831.29 |
| | 45393 | 166.4228 | $7,554,430.16 |
| | 54988 | 167.2787 | $9,198,321.16 |

| | | | |
|---|---|---|---|
| | 8369 | 168.0715 | $1,406,590.38 |
| | 3500 | 166.4628 | $582,619.80 |
| | 3800 | 167.297 | $635,728.60 |
| | 700 | 168.0557 | $117,638.99 |
| | 3795 | 166.4606 | $631,717.98 |
| | 4405 | 167.3254 | $737,068.39 |
| | 800 | 168.0488 | $134,439.04 |
| 4/19/2018 | 13357 | 165.9989 | $2,217,247.31 |
| | 12969 | 166.7805 | $2,162,976.30 |
| | 9924 | 167.6656 | $1,663,913.41 |
| | 38600 | 166.0241 | $6,408,530.26 |
| | 39066 | 166.7852 | $6,515,630.62 |
| | 31084 | 167.6661 | $5,211,733.05 |
| | 3000 | 166.0133 | $498,039.90 |
| | 2992 | 166.8451 | $499,200.54 |
| | 2008 | 167.7002 | $336,742.00 |
| | 3400 | 166.0362 | $564,523.08 |
| | 3100 | 166.8161 | $517,129.91 |
| | 2500 | 167.6792 | $419,198.00 |
| 4/18/2018 | 28891 | 166.6991 | $4,816,103.70 |
| | 7359 | 167.3953 | $1,231,862.01 |
| | 49849 | 166.4939 | $8,299,554.42 |
| | 58801 | 167.1121 | $9,826,358.59 |
| | 100 | 167.94 | $16,794.00 |
| 4/17/2018 | 4312 | 166.148 | $716,430.18 |
| | 18100 | 168.2675 | $3,045,641.75 |
| | 9438 | 167.3719 | $1,579,655.99 |
| | 4400 | 168.8675 | $743,017.00 |
| | 9800 | 166.2905 | $1,629,646.90 |
| | 32000 | 167.4396 | $5,358,067.20 |
| | 57150 | 168.346 | $9,620,973.90 |
| | 9800 | 168.9099 | $1,655,317.02 |
| 4/16/2018 | 8400 | 164.126 | $1,378,658.40 |
| | 25416 | 164.9275 | $4,191,797.34 |
| | 2434 | 165.6033 | $403,078.43 |
| | 20570 | 164.0736 | $3,374,993.95 |
| | 80658 | 164.8907 | $13,299,754.08 |
| | 7522 | 165.5487 | $1,245,257.32 |

| | | | |
|---|---|---|---|
| 4/13/2018 | 25850 | 164.4436 | $4,250,867.06 |
| | 10400 | 165.2774 | $1,718,884.96 |
| | 63730 | 164.443 | $10,479,952.39 |
| | 45020 | 165.1762 | $7,436,232.52 |
| 4/12/2018 | 11108 | 163.8343 | $1,819,871.40 |
| | 20342 | 164.5721 | $3,347,725.66 |
| | 2800 | 165.4039 | $463,130.92 |
| | 2000 | 167.021 | $334,042.00 |
| | 33383 | 163.8221 | $5,468,873.16 |
| | 61967 | 164.5526 | $10,196,830.96 |
| | 9000 | 165.368 | $1,488,312.00 |
| | 4400 | 166.8854 | $734,295.76 |
| 4/11/2018 | 10563 | 164.1409 | $1,733,820.33 |
| | 5708 | 165.1215 | $942,513.52 |
| | 6080 | 166.2398 | $1,010,737.98 |
| | 8499 | 167.1216 | $1,420,366.48 |
| | 5400 | 167.8817 | $906,561.18 |
| | 19690 | 163.9329 | $3,227,838.80 |
| | 24052 | 164.7558 | $3,962,706.50 |
| | 12686 | 165.8346 | $2,103,777.74 |
| | 28982 | 166.8208 | $4,834,800.43 |
| | 22740 | 167.7619 | $3,814,905.61 |
| | 600 | 468.5333 | $281,119.98 |
| 4/10/2018 | 200 | 162.715 | $32,543.00 |
| | 300 | 163.8833 | $49,164.99 |
| | 936 | 164.7656 | $154,220.60 |
| | 200 | 165.605 | $33,121.00 |
| | 3825 | 157.9588 | $604,192.41 |
| | 4853 | 159.3845 | $773,492.98 |
| | 13698 | 160.2835 | $2,195,563.38 |
| | 6098 | 161.3556 | $983,946.45 |
| | 1300 | 162.0146 | $210,618.98 |
| | 1230 | 163.5458 | $201,161.33 |
| | 2700 | 164.5637 | $444,321.99 |
| | 2546 | 165.3218 | $420,909.30 |
| | 9105 | 157.9006 | $1,437,684.96 |
| | 5808 | 158.8921 | $922,845.32 |
| | 29933 | 159.9005 | $4,786,301.67 |

| | | | |
|---|---|---|---|
| | 29300 | 160.6508 | $4,707,068.44 |
| | 13611 | 161.6789 | $2,200,611.51 |
| | 1900 | 162.89 | $309,491.00 |
| | 3700 | 163.8351 | $606,189.87 |
| | 12488 | 164.8425 | $2,058,553.14 |
| | 2905 | 165.5157 | $480,823.11 |
| | 1000 | 157.8245 | $157,824.50 |
| | 730 | 159.1677 | $116,192.42 |
| | 3300 | 160.22 | $528,726.00 |
| | 1500 | 161.4333 | $242,149.95 |
| | 100 | 162.19 | $16,219.00 |
| | 400 | 163.78 | $65,512.00 |
| | 770 | 164.8013 | $126,897.00 |
| | 200 | 165.64 | $33,128.00 |
| | 1300 | 157.9158 | $205,290.54 |
| | 1100 | 159.4209 | $175,362.99 |
| | 3420 | 160.2894 | $548,189.75 |
| | 1544 | 161.4776 | $249,321.41 |
| 4/9/2018 | 2600 | 156.8642 | $407,846.92 |
| | 7422 | 158.0751 | $1,173,233.39 |
| | 12528 | 159.0938 | $1,993,127.13 |
| | 13700 | 159.9417 | $2,191,201.29 |
| | 7800 | 156.9005 | $1,223,823.90 |
| | 17969 | 157.9674 | $2,838,516.21 |
| | 37164 | 158.9791 | $5,908,299.27 |
| | 45817 | 159.8897 | $7,325,666.38 |
| | 400 | 156.9025 | $62,761.00 |
| | 1689 | 157.9893 | $266,843.93 |
| | 2811 | 159.0815 | $447,178.10 |
| | 3100 | 159.9261 | $495,770.91 |
| | 400 | 156.6575 | $62,663.00 |
| | 1500 | 157.8092 | $236,713.80 |
| | 2800 | 158.8686 | $444,832.08 |
| | 4200 | 159.8271 | $671,273.82 |
| | 100 | 160.46 | $16,046.00 |
| 4/6/2018 | 9732 | 157.5157 | $1,532,942.79 |
| | 7131 | 158.5994 | $1,130,972.32 |
| | 13287 | 159.4485 | $2,118,592.22 |

| | | | |
|---|---|---|---|
| | 5600 | 160.5375 | $899,010.00 |
| | 500 | 161.228 | $80,614.00 |
| | 26842 | 157.5114 | $4,227,921.00 |
| | 23951 | 158.5729 | $3,797,979.53 |
| | 39437 | 159.4351 | $6,287,642.04 |
| | 15620 | 160.4832 | $2,506,747.58 |
| | 2900 | 161.1262 | $467,265.98 |
| 4/5/2018 | 1003 | 157.2762 | $157,748.03 |
| | 8624 | 158.3792 | $1,365,862.22 |
| | 20223 | 159.2497 | $3,220,506.68 |
| | 4800 | 160.0075 | $768,036.00 |
| | 1600 | 161.2932 | $258,069.12 |
| | 4800 | 157.4875 | $755,940.00 |
| | 24400 | 158.4172 | $3,865,379.68 |
| | 61488 | 159.2697 | $9,793,175.31 |
| | 13380 | 160.0445 | $2,141,395.41 |
| | 4682 | 161.2918 | $755,168.21 |
| 4/4/2018 | 2200 | 151.0868 | $332,390.96 |
| | 9234 | 152.0286 | $1,403,832.09 |
| | 9200 | 153.0691 | $1,408,235.72 |
| | 8497 | 154.0189 | $1,308,698.59 |
| | 7119 | 155.2401 | $1,105,154.27 |
| | 8214 | 151.178 | $1,241,776.09 |
| | 25039 | 152.0558 | $3,807,325.18 |
| | 28016 | 153.0795 | $4,288,675.27 |
| | 26000 | 154.0795 | $4,006,067.00 |
| | 21481 | 155.2647 | $3,335,241.02 |
| 4/3/2018 | 2400 | 151.5275 | $363,666.00 |
| | 3928 | 152.7116 | $599,851.16 |
| | 1300 | 153.6192 | $199,704.96 |
| | 10697 | 154.8941 | $1,656,902.19 |
| | 13725 | 155.8171 | $2,138,589.70 |
| | 4200 | 156.6243 | $657,822.06 |
| | 5876 | 151.4624 | $889,993.06 |
| | 9413 | 152.4201 | $1,434,730.40 |
| | 7000 | 153.2754 | $1,072,927.80 |
| | 11163 | 154.4697 | $1,724,345.26 |
| | 43932 | 155.3223 | $6,823,619.28 |

| | | | |
|---|---|---|---|
| | 30311 | 156.2143 | $4,735,011.65 |
| | 1055 | 157.1118 | $165,752.95 |
| 4/2/2018 | 7799 | 154.9019 | $1,208,079.92 |
| | 14155 | 155.4919 | $2,200,987.84 |
| | 9196 | 156.5718 | $1,439,834.27 |
| | 3800 | 157.6208 | $598,959.04 |
| | 1300 | 158.5285 | $206,087.05 |
| | 27696 | 154.9218 | $4,290,714.17 |
| | 43992 | 155.5865 | $6,844,561.31 |
| | 24500 | 156.6421 | $3,837,731.45 |
| | 8800 | 157.6302 | $1,387,145.76 |
| | 3762 | 158.6326 | $596,775.84 |
| 3/29/2018 | 5500 | 154.9941 | $852,467.55 |
| | 2400 | 155.9175 | $374,202.00 |
| | 1600 | 157.0206 | $251,232.96 |
| | 4301 | 158.0227 | $679,655.63 |
| | 5950 | 158.7975 | $944,845.13 |
| | 9769 | 159.5831 | $1,558,967.30 |
| | 5130 | 160.4854 | $823,290.10 |
| | 1600 | 161.2538 | $258,006.08 |
| | 11757 | 154.9394 | $1,821,622.53 |
| | 8740 | 155.6923 | $1,360,750.70 |
| | 4752 | 156.7784 | $745,010.96 |
| | 10598 | 157.7456 | $1,671,787.87 |
| | 30564 | 158.8319 | $4,854,538.19 |
| | 27908 | 159.8566 | $4,461,277.99 |
| | 13731 | 160.8286 | $2,208,337.51 |
| | 700 | 161.3586 | $112,951.02 |
| 3/28/2018 | 3600 | 151.7935 | $546,456.60 |
| | 13239 | 152.9751 | $2,025,237.35 |
| | 11000 | 153.8109 | $1,691,919.90 |
| | 5911 | 154.9428 | $915,866.89 |
| | 500 | 155.5089 | $77,754.45 |
| | 7336 | 151.6243 | $1,112,315.86 |
| | 24391 | 152.7084 | $3,724,710.58 |
| | 44930 | 153.5291 | $6,898,062.46 |
| | 16893 | 154.5913 | $2,611,510.83 |
| | 4300 | 155.4307 | $668,352.01 |

| | 4000 | 155.0323 | $620,129.20 |
| | 4100 | 155.0378 | $635,654.98 |
| 3/27/2018 | 400 | 162.135 | $64,854.00 |
| | 1100 | 155.3255 | $170,858.05 |
| | 1100 | 156.365 | $172,001.50 |
| | 700 | 157.8657 | $110,505.99 |
| | 1601 | 158.8157 | $254,263.94 |
| | 900 | 159.7511 | $143,775.99 |
| | 1233 | 160.9624 | $198,466.64 |
| | 400 | 162.21 | $64,884.00 |
| | 2450 | 151.5753 | $371,359.49 |
| | 2200 | 152.5098 | $335,521.56 |
| | 1700 | 153.7153 | $261,316.01 |
| | 3100 | 154.624 | $479,334.40 |
| | 2700 | 155.6893 | $420,361.11 |
| | 4200 | 156.5643 | $657,570.06 |
| | 4200 | 157.9698 | $663,473.16 |
| | 6400 | 158.9597 | $1,017,342.08 |
| | 2000 | 160.009 | $320,018.00 |
| | 4900 | 161.0118 | $788,957.82 |
| | 1300 | 162.2223 | $210,888.99 |
| | 5100 | 151.3953 | $772,116.03 |
| | 7597 | 152.3538 | $1,157,431.82 |
| | 5611 | 153.6271 | $862,001.66 |
| | 9533 | 154.6916 | $1,474,675.02 |
| | 6768 | 155.7362 | $1,054,022.60 |
| | 9411 | 156.4853 | $1,472,683.16 |
| | 6200 | 157.7619 | $978,123.78 |
| | 24732 | 158.7298 | $3,925,705.41 |
| | 8703 | 159.7464 | $1,390,272.92 |
| | 13398 | 160.8025 | $2,154,431.90 |
| | 6019 | 161.5902 | $972,611.41 |
| | 1981 | 162.4861 | $321,884.96 |
| | 1100 | 155.27 | $170,797.00 |
| | 800 | 156.4156 | $125,132.48 |
| | 700 | 157.7246 | $110,407.22 |
| | 1600 | 158.8481 | $254,156.96 |
| | 602 | 159.9648 | $96,298.81 |

| | 1100 | 160.9273 | $177,020.03 |
|---|---|---|---|
| 3/26/2018 | 700 | 149.6971 | $104,787.97 |
| | 2240 | 150.8044 | $337,801.86 |
| | 1000 | 151.711 | $151,711.00 |
| | 1703 | 152.7721 | $260,170.89 |
| | 2800 | 154.0596 | $431,366.88 |
| | 7100 | 155.0316 | $1,100,724.36 |
| | 10400 | 156.0047 | $1,622,448.88 |
| | 5000 | 157.071 | $785,355.00 |
| | 1300 | 158.1931 | $205,651.03 |
| | 800 | 158.9213 | $127,137.04 |
| | 2707 | 160.443 | $434,319.20 |
| | 500 | 160.9 | $80,450.00 |
| | 2679 | 149.8708 | $401,503.87 |
| | 6400 | 150.8966 | $965,738.24 |
| | 4050 | 151.787 | $614,737.35 |
| | 4900 | 152.8252 | $748,843.48 |
| | 8501 | 154.0888 | $1,309,908.89 |
| | 23467 | 155.1054 | $3,639,858.42 |
| | 29568 | 156.0732 | $4,614,772.38 |
| | 14413 | 157.0737 | $2,263,903.24 |
| | 4800 | 158.1215 | $758,983.20 |
| | 2600 | 158.9331 | $413,226.06 |
| | 5272 | 160.1585 | $844,355.61 |
| | 2100 | 160.8531 | $337,791.51 |
| 3/23/2018 | 4052 | 159.7008 | $647,107.64 |
| | 2800 | 160.5 | $449,400.00 |
| | 3300 | 161.8421 | $534,078.93 |
| | 4117 | 162.7411 | $670,005.11 |
| | 7082 | 163.7837 | $1,159,916.16 |
| | 9700 | 164.7795 | $1,598,361.15 |
| | 3699 | 165.4783 | $612,104.23 |
| | 1500 | 166.6535 | $249,980.25 |
| | 15389 | 159.8186 | $2,459,448.44 |
| | 6902 | 160.7335 | $1,109,382.62 |
| | 12338 | 161.9796 | $1,998,504.30 |
| | 13507 | 162.9791 | $2,201,358.70 |
| | 24599 | 164.0409 | $4,035,242.10 |

| | 29432 | 165.0085 | $4,856,530.17 |
|---|---|---|---|
| | 5000 | 165.9149 | $829,574.50 |
| | 1583 | 166.762 | $263,984.25 |
| 3/22/2018 | 1800 | 164.5006 | $296,101.08 |
| | 10013 | 165.4459 | $1,656,609.80 |
| | 12405 | 166.4116 | $2,064,335.90 |
| | 7032 | 167.2996 | $1,176,450.79 |
| | 2400 | 168.2883 | $403,891.92 |
| | 2300 | 169.417 | $389,659.10 |
| | 300 | 170.12 | $51,036.00 |
| | 5000 | 164.5142 | $822,571.00 |
| | 28510 | 165.4162 | $4,716,015.86 |
| | 34996 | 166.3916 | $5,823,040.43 |
| | 23466 | 167.2976 | $3,925,805.48 |
| | 7678 | 168.1779 | $1,291,269.92 |
| | 7300 | 169.3099 | $1,235,962.27 |
| | 1800 | 170.055 | $306,099.00 |
| | 300 | 164.3567 | $49,307.01 |
| | 1700 | 165.2961 | $281,003.37 |
| | 2900 | 166.3266 | $482,347.14 |
| | 1700 | 167.1812 | $284,208.04 |
| | 600 | 168.1867 | $100,912.02 |
| | 400 | 169.325 | $67,730.00 |
| | 100 | 170.11 | $17,011.00 |
| 3/21/2018 | 1695 | 169.0305 | $286,506.70 |
| | 1100 | 169.97 | $186,967.00 |
| | 1030 | 171.2689 | $176,406.97 |
| | 820 | 172.1744 | $141,183.01 |
| | 55 | 173.08 | $9,519.40 |
| | 3775 | 164.1894 | $619,814.99 |
| | 5027 | 164.8486 | $828,693.91 |
| | 2254 | 165.8922 | $373,921.02 |
| | 2850 | 166.9305 | $475,751.93 |
| | 1500 | 168.06 | $252,090.00 |
| | 7094 | 169.0457 | $1,199,210.20 |
| | 5200 | 169.9693 | $883,840.36 |
| | 3800 | 171.1426 | $650,341.88 |
| | 3800 | 171.9195 | $653,294.10 |

| | 950 | 172.8416 | $164,199.52 |
|---|---|---|---|
| | 9160 | 164.0162 | $1,502,388.39 |
| | 18760 | 164.7597 | $3,090,891.97 |
| | 4348 | 165.8901 | $721,290.15 |
| | 10745 | 166.8208 | $1,792,489.50 |
| | 4200 | 167.9936 | $705,573.12 |
| | 18178 | 168.9303 | $3,070,814.99 |
| | 16814 | 169.8326 | $2,855,565.34 |
| | 11740 | 171.0431 | $2,008,045.99 |
| | 11780 | 171.8595 | $2,024,504.91 |
| | 3025 | 172.8757 | $522,948.99 |
| | 1700 | 164.2271 | $279,186.07 |
| | 800 | 165.2588 | $132,207.04 |
| | 700 | 166.7114 | $116,697.98 |
| | 500 | 167.764 | $83,882.00 |
| 3/20/2018 | 3900 | 162.9164 | $635,373.96 |
| | 5101 | 163.9102 | $836,105.93 |
| | 2103 | 164.9954 | $346,985.33 |
| | 3220 | 165.8855 | $534,151.31 |
| | 5369 | 166.8834 | $895,996.97 |
| | 9816 | 167.8071 | $1,647,194.49 |
| | 3741 | 169.0199 | $632,303.45 |
| | 3000 | 169.722 | $509,166.00 |
| | 8743 | 162.807 | $1,423,421.60 |
| | 13002 | 163.6717 | $2,128,059.44 |
| | 8475 | 164.5492 | $1,394,554.47 |
| | 9772 | 165.6012 | $1,618,254.93 |
| | 16056 | 166.7953 | $2,678,065.34 |
| | 26770 | 167.7765 | $4,491,376.91 |
| | 13049 | 168.8006 | $2,202,679.03 |
| | 12883 | 169.6191 | $2,185,202.87 |
| 3/19/2018 | 6213 | 171.4446 | $1,065,185.30 |
| | 8349 | 172.2514 | $1,438,126.94 |
| | 5779 | 173.3135 | $1,001,578.72 |
| | 9659 | 174.8113 | $1,688,502.35 |
| | 15425 | 175.4335 | $2,706,061.74 |
| | 13551 | 176.3241 | $2,389,367.88 |
| | 5649 | 170.9167 | $965,508.44 |

| | | | |
|---|---|---|---|
| | 27189 | 171.8669 | $4,672,889.14 |
| | 17895 | 172.7902 | $3,092,080.63 |
| | 10955 | 173.6367 | $1,902,190.05 |
| | 21332 | 174.8684 | $3,730,292.71 |
| | 23933 | 175.8191 | $4,207,878.52 |
| | 9317 | 176.5819 | $1,645,213.56 |
| 3/15/2018 | 50,354 | 182.8076 | $9,205,093.89 |
| | 42,146 | 183.5057 | $7,734,031.23 |
| | 70,380 | 182.8100 | $12,866,167.80 |
| | 57,120 | 183.5140 | $10,482,319.68 |
| | 4,700 | 182.8330 | $859,315.10 |
| | 3,300 | 183.5383 | $605,676.39 |
| | 6,400 | 182.3660 | $1,167,142.40 |
| | 2,600 | 183.6315 | $477,441.90 |
| | 5,790 | 182.9273 | $1,059,149.07 |
| | 2,610 | 183.5884 | $479,165.72 |
| | 51,740 | 184.3179 | $9,536,608.15 |
| | 40,760 | 184.7805 | $7,531,653.18 |
| | 69,305 | 184.3106 | $12,773,646.13 |
| | 58,195 | 184.7696 | $10,752,666.87 |
| 3/14/2018 | 38,196 | 182.5204 | $6,971,549.20 |
| | 39,668 | 183.4088 | $7,275,460.28 |
| | 14,636 | 183.9882 | $2,692,851.30 |
| | 54,565 | 182.5391 | $9,960,245.99 |
| | 55,967 | 183.4711 | $10,268,327.05 |
| | 16,968 | 184.0118 | $3,122,312.22 |
| | 3,700 | 182.5476 | $675,426.12 |
| | 4,000 | 183.5940 | $734,376.00 |
| | 300 | 184.0467 | $55,214.01 |
| | 3,958 | 182.5469 | $722,520.63 |
| | 4,100 | 183.5156 | $752,413.96 |
| | 942 | 184.0334 | $173,359.46 |
| | 4,390 | 182.6240 | $801,719.36 |
| | 4,010 | 183.7210 | $736,721.21 |
| 3/13/2018 | 39,654 | 181.9159 | $7,213,693.10 |
| | 25,662 | 182.5314 | $4,684,120.79 |
| | 12,745 | 183.8776 | $2,343,520.01 |
| | 8,736 | 184.7237 | $1,613,746.24 |

| | | | |
|---|---|---|---|
| | 5,703 | 185.5784 | $1,058,353.62 |
| | 61,764 | 181.9615 | $11,238,670.09 |
| | 29,682 | 182.6152 | $5,420,384.37 |
| | 17,174 | 183.9100 | $3,158,470.34 |
| | 11,998 | 184.7779 | $2,216,965.24 |
| | 6,882 | 185.5838 | $1,277,187.71 |
| 3/12/2018 | 56,259 | 184.9030 | $10,402,457.88 |
| | 36,241 | 185.5238 | $6,723,568.04 |
| | 89,526 | 184.9565 | $16,558,415.62 |
| | 37,974 | 185.6028 | $7,048,080.73 |
| 3/9/2018 | 29,494 | 183.9145 | $5,424,374.26 |
| | 58,521 | 184.8903 | $10,819,965.25 |
| | 4,485 | 185.2872 | $831,013.09 |
| | 42,437 | 183.9401 | $7,805,866.02 |
| | 81,763 | 184.9082 | $15,118,649.16 |
| | 3,300 | 185.3174 | $611,547.42 |
| | 3,100 | 184.0000 | $570,400.00 |
| | 5,300 | 184.9411 | $980,187.83 |
| 3/8/2018 | 54,344 | 182.1316 | $9,897,759.67 |
| | 25,064 | 182.7593 | $4,580,679.10 |
| | 13,092 | 183.8115 | $2,406,460.16 |
| | 73,627 | 182.1329 | $13,409,899.03 |
| | 36,710 | 182.7412 | $6,708,429.45 |
| | 17,163 | 183.8567 | $3,155,532.54 |
| | 5,600 | 182.1983 | $1,020,310.48 |
| | 2,100 | 183.2005 | $384,721.05 |
| | 700 | 184.0421 | $128,829.47 |
| 3/6/2018 | 33,070 | 179.7218 | $5,943,399.93 |
| | 36,552 | 180.6023 | $6,601,375.27 |
| | 21,388 | 181.6404 | $3,884,924.88 |
| | 1,490 | 182.2221 | $271,510.93 |
| | 47,648 | 179.7348 | $8,564,003.75 |
| | 50,649 | 180.6427 | $9,149,372.11 |
| | 28,003 | 181.6809 | $5,087,610.24 |
| | 1,200 | 182.2583 | $218,709.96 |
| 3/5/2018 | 14,000 | 176.5458 | $2,471,641.20 |
| | 14,800 | 177.3944 | $2,625,437.12 |
| | 7,119 | 178.4443 | $1,270,344.97 |

| | | | |
|---|---|---|---|
| | 15,949 | 179.7159 | $2,866,288.89 |
| | 39,432 | 180.5252 | $7,118,469.69 |
| | 1,200 | 181.0560 | $217,267.20 |
| | 17,817 | 176.5469 | $3,145,536.12 |
| | 21,159 | 177.3920 | $3,753,437.33 |
| | 9,392 | 178.3785 | $1,675,330.87 |
| | 18,928 | 179.6271 | $3,399,981.75 |
| | 56,204 | 180.4681 | $10,143,029.09 |
| | 4,000 | 181.0275 | $724,110.00 |
| 3/7/2018 | 8,400 | 178.7554 | $1,501,545.36 |
| | 14,400 | 179.5805 | $2,585,959.20 |
| | 19,000 | 180.6881 | $3,433,073.90 |
| | 18,354 | 181.6478 | $3,333,963.72 |
| | 14,600 | 182.6832 | $2,667,174.72 |
| | 17,746 | 183.4958 | $3,256,316.47 |
| | 10,110 | 178.7595 | $1,807,258.55 |
| | 19,266 | 179.5193 | $3,458,618.83 |
| | 28,070 | 180.6818 | $5,071,738.13 |
| | 25,683 | 181.6701 | $4,665,833.18 |
| | 21,590 | 182.7483 | $3,945,535.80 |
| | 22,781 | 183.5253 | $4,180,889.86 |
| 3/2/2018 | 11,701 | 173.5466 | $2,030,668.77 |
| | 8,300 | 174.4131 | $1,447,628.73 |
| | 61,979 | 175.3922 | $10,870,633.16 |
| | 10,220 | 176.4224 | $1,803,036.93 |
| | 300 | 177.0900 | $53,127.00 |
| | 33,350 | 173.5871 | $5,789,129.79 |
| | 26,100 | 174.5257 | $4,555,120.77 |
| | 56,678 | 175.4589 | $9,944,659.53 |
| | 11,072 | 176.3910 | $1,953,001.15 |
| | 300 | 177.0833 | $53,124.99 |
| 3/1/2018 | 13,200 | 175.3678 | $2,314,854.96 |
| | 26,557 | 176.0592 | $4,675,604.17 |
| | 23,162 | 177.2413 | $4,105,262.99 |
| | 21,141 | 177.9807 | $3,762,689.98 |
| | 7,840 | 179.0141 | $1,403,470.54 |
| | 600 | 179.8733 | $107,923.98 |
| | 14,331 | 175.2523 | $2,511,540.71 |

| | | | |
|---|---|---|---|
| | 40,198 | 175.9982 | $7,074,775.64 |
| | 27,234 | 177.1312 | $4,823,991.10 |
| | 33,637 | 177.8752 | $5,983,188.10 |
| | 10,800 | 178.9037 | $1,932,159.96 |
| | 1,300 | 179.8477 | $233,802.01 |
| | 1,990 | 175.5253 | $349,295.35 |
| | 1,800 | 176.3161 | $317,368.98 |
| | 3,110 | 177.5659 | $552,229.95 |
| | 1,000 | 178.6820 | $178,682.00 |
| | 100 | 179.1500 | $17,915.00 |
| | 2,000 | 175.4565 | $350,913.00 |
| | 2,300 | 176.2939 | $405,475.97 |
| | 2,800 | 177.5057 | $497,015.96 |
| | 1,400 | 178.3079 | $249,631.06 |
| | 500 | 179.0720 | $89,536.00 |
| | 1,100 | 175.2491 | $192,774.01 |
| | 2,600 | 176.0169 | $457,643.94 |
| | 1,900 | 177.2800 | $336,832.00 |
| | 2,160 | 177.9768 | $384,429.89 |
| | 640 | 179.0466 | $114,589.82 |
| 2/28/2018 | 5,720 | 178.6855 | $1,022,081.06 |
| | 12,200 | 180.1273 | $2,197,553.06 |
| | 21,709 | 181.3715 | $3,937,393.89 |
| | 49,471 | 182.0677 | $9,007,071.19 |
| | 3,400 | 182.7041 | $621,193.94 |
| | 8,340 | 178.7068 | $1,490,414.71 |
| | 18,968 | 180.1772 | $3,417,601.13 |
| | 32,808 | 181.4623 | $5,953,415.14 |
| | 64,584 | 182.1070 | $11,761,198.49 |
| | 2,800 | 182.7807 | $511,785.96 |
| | 475 | 178.7205 | $84,892.24 |
| | 1,100 | 180.2350 | $198,258.50 |
| | 3,900 | 181.6490 | $708,431.10 |
| | 2,525 | 182.3432 | $460,416.58 |
| | 513 | 178.7347 | $91,690.90 |
| | 1,400 | 180.2050 | $252,287.00 |
| | 4,587 | 181.6775 | $833,354.69 |
| | 2,500 | 182.3860 | $455,965.00 |

| | | | |
|---|---|---|---|
| | 473 | 178.6834 | $84,517.25 |
| | 1,220 | 180.1543 | $219,788.25 |
| | 4,007 | 181.6353 | $727,812.65 |
| | 2,700 | 182.3452 | $492,332.04 |
| 2/27/2018 | 25,908 | 182.0866 | $4,717,499.63 |
| | 39,523 | 182.9557 | $7,230,958.13 |
| | 26,669 | 183.9030 | $4,904,509.11 |
| | 400 | 184.5700 | $73,828.00 |
| | 37,767 | 182.0902 | $6,877,000.58 |
| | 53,210 | 182.9343 | $9,733,934.10 |
| | 35,623 | 183.8542 | $6,549,438.17 |
| | 900 | 184.5744 | $166,116.96 |
| 2/26/2018 | 14,641 | 183.9772 | $2,693,610.19 |
| | 72,443 | 184.7040 | $13,380,511.87 |
| | 5,416 | 185.4171 | $1,004,219.01 |
| | 25,546 | 184.0579 | $4,701,943.11 |
| | 96,054 | 184.7340 | $17,744,439.64 |
| | 5,900 | 185.4402 | $1,094,097.18 |
| 2/23/2018 | 8,800 | 180.2089 | $1,585,838.32 |
| | 28,821 | 181.2932 | $5,225,051.32 |
| | 34,964 | 182.1698 | $6,369,384.89 |
| | 19,915 | 182.9340 | $3,643,130.61 |
| | 10,900 | 180.2267 | $1,964,471.03 |
| | 35,833 | 181.2519 | $6,494,799.33 |
| | 49,921 | 182.0920 | $9,090,214.73 |
| | 30,846 | 182.9089 | $5,642,007.93 |
| 2/22/2018 | 21,650 | 178.1707 | $3,857,395.66 |
| | 45,073 | 178.9453 | $8,065,601.51 |
| | 25,777 | 179.7782 | $4,634,142.66 |
| | 29,139 | 178.1500 | $5,191,112.85 |
| | 65,795 | 178.9516 | $11,774,120.52 |
| | 32,566 | 179.7975 | $5,855,285.39 |
| | 2,800 | 178.2914 | $499,215.92 |
| | 3,500 | 179.0542 | $626,689.70 |
| | 2,100 | 179.8377 | $377,659.17 |
| 2/21/2018 | 15,205 | 176.9175 | $2,690,030.59 |
| | 9,174 | 178.1222 | $1,634,093.06 |
| | 28,682 | 178.9320 | $5,132,127.62 |

| | | | |
|---|---|---|---|
| | 27,523 | 180.0341 | $4,955,078.53 |
| | 11,916 | 180.7430 | $2,153,733.59 |
| | 20,527 | 176.9389 | $3,632,024.80 |
| | 14,421 | 178.2019 | $2,569,849.60 |
| | 40,904 | 178.9892 | $7,321,374.24 |
| | 37,249 | 180.1081 | $6,708,846.62 |
| | 14,399 | 180.8002 | $2,603,342.08 |
| | 1,600 | 176.8735 | $282,997.60 |
| | 1,700 | 178.4194 | $303,312.98 |
| | 2,200 | 179.2995 | $394,458.90 |
| | 2,700 | 180.3337 | $486,900.99 |
| | 200 | 181.0650 | $36,213.00 |
| 2/20/2018 | 30,189 | 175.6975 | $5,304,131.83 |
| | 40,663 | 176.6435 | $7,182,854.64 |
| | 21,648 | 177.4202 | $3,840,792.49 |
| | 39,106 | 175.6746 | $6,869,930.91 |
| | 57,651 | 176.6324 | $10,183,034.49 |
| | 30,743 | 177.4187 | $5,454,383.09 |
| 2/16/2018 | 29,844 | 177.1036 | $5,285,479.84 |
| | 22,202 | 178.1515 | $3,955,319.60 |
| | 36,554 | 178.8717 | $6,538,476.12 |
| | 3,900 | 179.6693 | $700,710.27 |
| | 38,569 | 177.0706 | $6,829,435.97 |
| | 30,828 | 178.0474 | $5,488,845.25 |
| | 53,003 | 178.8491 | $9,479,538.85 |
| | 5,100 | 179.6408 | $916,168.08 |
| | 2,893 | 177.1733 | $512,562.36 |
| | 2,900 | 178.4266 | $517,437.14 |
| | 2,107 | 179.0808 | $377,323.25 |
| | 100 | 179.7800 | $17,978.00 |
| | 2,900 | 177.0914 | $513,565.06 |
| | 2,200 | 178.1541 | $391,939.02 |
| | 3,600 | 178.8794 | $643,965.84 |
| | 300 | 179.6800 | $53,904.00 |
| | 2,400 | 177.0367 | $424,888.08 |
| | 1,700 | 177.8888 | $302,410.96 |
| | 3,600 | 178.7918 | $643,650.48 |
| | 700 | 179.5243 | $125,667.01 |

| | | | |
|---|---|---|---|
| 2/15/2018 | 8,008 | 177.5645 | $1,421,936.52 |
| | 37,059 | 178.4507 | $6,613,204.49 |
| | 44,233 | 179.4053 | $7,935,634.63 |
| | 3,200 | 180.3313 | $577,060.16 |
| | 10,931 | 177.5704 | $1,941,022.04 |
| | 48,442 | 178.4164 | $8,642,847.25 |
| | 63,662 | 179.3809 | $11,419,746.86 |
| | 4,465 | 180.2660 | $804,887.69 |
| | 1,500 | 177.8893 | $266,833.95 |
| | 3,650 | 178.8003 | $652,621.10 |
| | 2,650 | 179.5852 | $475,900.78 |
| | 200 | 180.3650 | $36,073.00 |
| | 1,600 | 177.8963 | $284,634.08 |
| | 4,200 | 178.8908 | $751,341.36 |
| | 2,800 | 179.5896 | $502,850.88 |
| | 400 | 180.3575 | $72,143.00 |
| | 1,400 | 177.7736 | $248,883.04 |
| | 2,900 | 178.5521 | $517,801.09 |
| | 3,694 | 179.4291 | $662,811.10 |
| | 406 | 180.3357 | $73,216.29 |
| 2/14/2018 | 1,772 | 173.4880 | $307,420.74 |
| | 14,005 | 174.9678 | $2,450,424.04 |
| | 5,200 | 175.7685 | $913,996.20 |
| | 24,400 | 176.9588 | $4,317,794.72 |
| | 16,798 | 178.0848 | $2,991,468.47 |
| | 25,355 | 179.1175 | $4,541,524.21 |
| | 4,970 | 179.6034 | $892,628.90 |
| | 3,836 | 173.6151 | $665,987.52 |
| | 20,612 | 174.8769 | $3,604,562.66 |
| | 7,209 | 175.8668 | $1,267,823.76 |
| | 35,202 | 176.9656 | $6,229,543.05 |
| | 20,777 | 178.0790 | $3,699,947.38 |
| | 31,019 | 179.0714 | $5,554,615.76 |
| | 8,845 | 179.5662 | $1,588,263.04 |
| 2/13/2018 | 8,117 | 173.8951 | $1,411,506.53 |
| | 50,133 | 174.7686 | $8,761,674.22 |
| | 1,500 | 175.3860 | $263,079.00 |
| | 23,863 | 173.8930 | $4,149,608.66 |

| | | | |
|---|---|---|---|
| | 89,802 | 174.5992 | $15,679,357.36 |
| | 3,785 | 175.3731 | $663,787.18 |
| 2/12/2018 | 2,100 | 172.6457 | $362,555.97 |
| | 5,100 | 173.5538 | $885,124.38 |
| | 20,000 | 174.8800 | $3,497,600.00 |
| | 25,025 | 175.5967 | $4,394,307.42 |
| | 34,120 | 176.7343 | $6,030,174.32 |
| | 6,155 | 177.2683 | $1,091,086.39 |
| | 4,400 | 172.4355 | $758,716.20 |
| | 13,693 | 173.3643 | $2,373,877.36 |
| | 17,430 | 174.3833 | $3,039,500.92 |
| | 38,335 | 175.3712 | $6,722,854.95 |
| | 29,372 | 176.4228 | $5,181,890.48 |
| | 24,270 | 177.0925 | $4,298,034.98 |
| 12/8/2017 | 16,648 | $179.1478 | $2,982,452.57 |
| | 17,379 | $180.1298 | $3,130,475.79 |
| | 15,910 | $181.2854 | $2,884,250.71 |
| | 5,513 | $181.9010 | $1,002,820.21 |
| | 10,280 | $179.1275 | $1,841,430.70 |
| | 11,575 | $180.1103 | $2,084,776.72 |
| | 10,005 | $181.3503 | $1,814,409.75 |
| | 2,800 | $181.9229 | $509,384.12 |
| | 3,518 | $179.1529 | $630,259.90 |
| | 4,840 | $180.1065 | $871,715.46 |
| | 4,100 | $181.2689 | $743,202.49 |
| | 1,400 | $181.9357 | $254,709.98 |
| | 4,361 | $179.2375 | $781,654.74 |
| | 4,800 | $180.2147 | $865,030.56 |
| | 4,100 | $181.4717 | $744,033.97 |
| | 600 | $182.0500 | $109,230.00 |
| 12/7/2017 | 4,200 | $176.5935 | $741,692.70 |
| | 11,650 | $177.2696 | $2,065,190.84 |
| | 25,464 | $178.6347 | $4,548,754.00 |
| | 12,207 | $179.3667 | $2,189,529.31 |
| | 2,525 | $180.0702 | $454,677.26 |
| | 4,155 | $176.7790 | $734,516.75 |
| | 5,679 | $177.3499 | $1,007,170.08 |
| | 17,126 | $178.6689 | $3,059,883.58 |

| | | | |
|---|---|---|---|
| | 7,139 | $179.5489 | $1,281,799.60 |
| | 925 | $180.1395 | $166,629.04 |
| | 1,300 | $176.5904 | $229,567.52 |
| | 2,800 | $177.3400 | $496,552.00 |
| | 7,669 | $178.7090 | $1,370,519.32 |
| | 2,134 | $179.6379 | $383,347.28 |
| | 111 | $180.2978 | $20,013.06 |
| | 1,300 | $176.5919 | $229,569.47 |
| | 2,800 | $177.3375 | $496,545.00 |
| | 7,670 | $178.7095 | $1,370,701.87 |
| | 2,233 | $179.6080 | $401,064.66 |
| | 11 | $180.2900 | $1,983.19 |
| 11/28/2017 | 18,604 | $182.4996 | $3,395,222.56 |
| | 35,189 | $183.5075 | $6,457,445.42 |
| | 800 | $184.1650 | $147,332.00 |
| | 10,994 | $182.5117 | $2,006,533.63 |
| | 22,519 | $183.5180 | $4,132,641.84 |
| | 600 | $184.2000 | $110,520.00 |
| | 4,947 | $182.6433 | $903,536.41 |
| | 8,700 | $183.4920 | $1,596,380.40 |
| | 4,209 | $182.5973 | $768,552.04 |
| | 9,435 | $183.5133 | $1,731,447.99 |
| 11/27/2017 | 25,267 | $182.6585 | $4,615,232.32 |
| | 29,387 | $183.2312 | $5,384,615.27 |
| | 18,531 | $182.7307 | $3,386,182.60 |
| | 15,626 | $183.2648 | $2,863,695.76 |
| | 8,142 | $182.7018 | $1,487,558.06 |
| | 5,524 | $183.2711 | $1,012,389.56 |
| | 7,500 | $182.6988 | $1,370,241.00 |
| | 6,164 | $183.2606 | $1,129,618.34 |
| 11/15/2017 | 14,205 | $177.0960 | $2,515,648.68 |
| | 41,125 | $178.0796 | $7,323,523.55 |
| | 900 | $178.5033 | $160,652.97 |
| | 9,702 | $177.1100 | $1,718,321.22 |
| | 25,442 | $178.1157 | $4,531,619.64 |
| | 3,916 | $177.0859 | $693,468.38 |
| | 10,139 | $178.1591 | $1,806,355.11 |
| | 3,900 | $177.0872 | $690,640.08 |

| | | | |
|---|---|---|---|
| | 10,156 | $178.1393 | $1,809,182.73 |
| 11/14/2017 | 22,430 | $177.8761 | $3,989,760.92 |
| | 33,680 | $178.4477 | $6,010,118.54 |
| | 18,874 | $177.9834 | $3,359,258.69 |
| | 16,195 | $178.4956 | $2,890,736.24 |
| | 6,866 | $177.9589 | $1,221,865.81 |
| | 7,159 | $178.5214 | $1,278,034.70 |
| | 5,729 | $177.9067 | $1,019,227.48 |
| | 8,297 | $178.4691 | $1,480,758.12 |
| 10/12/2017 | 43,574 | $173.0030 | $7,538,432.72 |
| | 14,192 | $173.4372 | $2,461,420.74 |
| | 30,018 | $173.0229 | $5,193,801.41 |
| | 6,087 | $173.4969 | $1,056,075.63 |
| | 12,541 | $173.0576 | $2,170,315.36 |
| | 1,900 | $173.5172 | $329,682.68 |
| | 12,340 | $173.0612 | $2,135,575.21 |
| | 2,100 | $173.4838 | $364,315.98 |
| 10/11/2017 | 49,625 | $172.0031 | $8,535,653.84 |
| | 8,483 | $172.6191 | $1,464,327.83 |
| | 32,287 | $172.0115 | $5,553,735.30 |
| | 4,032 | $172.6817 | $696,252.61 |
| | 13,319 | $172.0161 | $2,291,082.44 |
| | 1,210 | $172.6456 | $208,901.18 |
| | 13,581 | $172.0173 | $2,336,166.95 |
| | 948 | $172.6457 | $163,668.12 |
| 10/2/2017 | 28,455 | $169.5556 | $4,824,704.60 |
| | 22,400 | $170.4512 | $3,818,106.88 |
| | 7,628 | $171.1393 | $1,305,450.58 |
| | 300 | $171.8300 | $51,549.00 |
| | 17,398 | $169.5655 | $2,950,100.57 |
| | 15,634 | $170.5103 | $2,665,758.03 |
| | 3,701 | $171.3087 | $634,013.50 |
| | 7,069 | $169.5889 | $1,198,823.93 |
| | 6,220 | $170.6064 | $1,061,171.81 |
| | 1,400 | $171.4604 | $240,044.56 |
| | 7,439 | $169.6106 | $1,261,733.25 |
| | 5,850 | $170.6270 | $998,167.95 |
| | 1,400 | $171.4057 | $239,967.98 |

| | | | |
|---|---|---|---|
| 9/29/2017 | 10,230 | $169.5590 | $1,734,588.57 |
| | 36,307 | $170.5407 | $6,191,821.19 |
| | 12,114 | $171.1613 | $2,073,447.99 |
| | 6,600 | $169.5284 | $1,118,887.44 |
| | 22,642 | $170.5508 | $3,861,611.21 |
| | 7,415 | $171.1893 | $1,269,368.66 |
| | 2,600 | $169.5121 | $440,731.46 |
| | 9,861 | $170.5981 | $1,682,267.86 |
| | 2,200 | $171.2944 | $376,847.68 |
| | 2,600 | $169.4429 | $440,551.54 |
| | 8,949 | $170.5424 | $1,526,183.94 |
| | 3,115 | $171.1844 | $533,239.41 |
| 9/20/2017 | 26,771 | $171.5173 | $4,591,689.64 |
| | 30,729 | $172.1679 | $5,290,547.40 |
| | 680 | $172.9315 | $117,593.42 |
| | 15,852 | $171.4930 | $2,718,507.04 |
| | 19,812 | $172.1352 | $3,410,342.58 |
| | 700 | $172.8800 | $121,016.00 |
| | 8,800 | $171.5855 | $1,509,952.40 |
| | 5,646 | $172.2787 | $972,685.54 |
| | 100 | $173.0300 | $17,303.00 |
| | 7,960 | $171.5331 | $1,365,403.48 |
| | 6,512 | $172.2154 | $1,121,466.68 |
| | 75 | $172.9300 | $12,969.75 |
| 9/19/2017 | 20,655 | $171.1822 | $3,535,768.34 |
| | 35,787 | $171.8586 | $6,150,303.72 |
| | 1,820 | $172.4872 | $313,926.70 |
| | 11,371 | $171.1470 | $1,946,112.54 |
| | 23,901 | $171.8258 | $4,106,808.45 |
| | 1,142 | $172.4850 | $196,977.87 |
| | 6,305 | $171.1711 | $1,079,233.79 |
| | 8,265 | $171.8939 | $1,420,703.08 |
| | 6,576 | $171.2021 | $1,125,825.01 |
| | 7,993 | $171.9029 | $1,374,019.88 |
| 9/8/2017 | 21,044 | $171.2023 | $3,602,781.20 |
| | 27,663 | $172.3768 | $4,768,459.42 |
| | 9,414 | $173.0147 | $1,628,760.39 |
| | 12,620 | $171.1816 | $2,160,311.79 |

| | | | |
|---|---|---|---|
| | 18,317 | $172.3665 | $3,157,237.18 |
| | 5,388 | $173.0338 | $932,306.11 |
| | 5,017 | $171.2451 | $859,136.67 |
| | 7,211 | $172.3684 | $1,242,948.53 |
| | 2,300 | $173.0060 | $397,913.80 |
| | 5,242 | $171.2280 | $897,577.18 |
| | 7,087 | $172.4082 | $1,221,856.91 |
| | 2,200 | $172.9839 | $380,564.58 |
| 9/7/2017 | 20,125 | $170.7401 | $3,436,144.51 |
| | 12,539 | $171.8341 | $2,154,627.78 |
| | 25,518 | $172.7831 | $4,409,079.15 |
| | 12,889 | $170.7443 | $2,200,723.28 |
| | 8,313 | $171.8701 | $1,428,756.14 |
| | 15,165 | $172.8005 | $2,620,519.58 |
| | 5,113 | $170.7390 | $872,988.51 |
| | 3,300 | $171.8821 | $567,210.93 |
| | 6,135 | $172.7336 | $1,059,720.64 |
| | 5,100 | $170.7429 | $870,788.79 |
| | 3,100 | $171.8526 | $532,743.06 |
| | 6,347 | $172.7453 | $1,096,414.42 |
| 8/28/2017 | 50,004 | $166.9905 | $8,350,192.96 |
| | 9,848 | $167.5103 | $1,649,641.43 |
| | 32,758 | $167.0079 | $5,470,844.79 |
| | 4,650 | $167.5324 | $779,025.66 |
| | 12,561 | $167.0140 | $2,097,862.85 |
| | 2,400 | $167.5050 | $402,012.00 |
| | 12,562 | $167.0089 | $2,097,965.80 |
| | 2,400 | $167.5032 | $402,007.68 |
| 8/25/2017 | 40,018 | $166.6110 | $6,667,439.00 |
| | 18,798 | $167.5242 | $3,149,119.91 |
| | 100 | $168.2600 | $16,826.00 |
| | 25,941 | $166.6218 | $4,322,336.11 |
| | 11,506 | $167.5266 | $1,927,561.06 |
| | 10,978 | $166.6560 | $1,829,549.57 |
| | 4,000 | $167.5888 | $670,355.20 |
| | 14,274 | $166.6021 | $2,378,078.38 |
| | 727 | $167.5827 | $121,832.62 |
| 8/15/2017 | 47,460 | $170.8035 | $8,106,334.11 |

| | | | |
|---|---|---|---|
| | 11,062 | $171.1863 | $1,893,662.85 |
| | 29,575 | $170.7984 | $5,051,362.68 |
| | 7,000 | $171.2103 | $1,198,472.10 |
| | 13,781 | $170.8266 | $2,354,161.37 |
| | 851 | $171.2552 | $145,738.18 |
| | 13,345 | $170.8354 | $2,279,798.41 |
| | 1,285 | $171.2569 | $220,065.12 |
| 8/14/2017 | 12,689 | $169.9445 | $2,156,425.76 |
| | 45,959 | $170.6641 | $7,843,551.37 |
| | 7,000 | $169.9380 | $1,189,566.00 |
| | 29,653 | $170.6547 | $5,060,423.82 |
| | 3,225 | $169.9596 | $548,119.71 |
| | 11,437 | $170.6636 | $1,951,879.59 |
| | 5,000 | $170.1089 | $850,544.50 |
| | 9,662 | $170.6981 | $1,649,285.04 |
| 7/13/2017 | 53,957 | $159.1045 | $8,584,801.51 |
| | 8,867 | $159.5852 | $1,415,041.97 |
| | 32,314 | $159.0923 | $5,140,908.58 |
| | 6,950 | $159.5757 | $1,109,051.12 |
| | 13,581 | $159.0990 | $2,160,723.52 |
| | 2,125 | $159.6015 | $339,153.19 |
| | 13,501 | $159.0926 | $2,147,909.19 |
| | 2,206 | $159.6060 | $352,090.84 |
| 7/12/2017 | 20,892 | $156.9655 | $3,279,323.23 |
| | 20,688 | $157.8784 | $3,266,188.34 |
| | 21,761 | $158.7397 | $3,454,334.61 |
| | 14,851 | $157.0139 | $2,331,813.43 |
| | 14,047 | $158.0447 | $2,220,053.90 |
| | 10,689 | $158.8638 | $1,698,095.16 |
| | 6,000 | $157.0198 | $942,118.80 |
| | 5,700 | $158.0505 | $900,887.85 |
| | 4,136 | $158.8291 | $656,917.16 |
| | 5,990 | $157.0210 | $940,555.79 |
| | 6,000 | $158.0643 | $948,385.80 |
| | 3,845 | $158.8927 | $610,942.43 |
| 6/30/2017 | 21,687 | $150.7158 | $3,268,573.55 |
| | 44,476 | $151.3428 | $6,731,122.37 |
| | 17,220 | $150.7907 | $2,596,615.85 |

| | | | |
|---|---|---|---|
| | 24,134 | $151.3668 | $3,653,086.35 |
| | 5,110 | $150.6761 | $769,954.87 |
| | 11,429 | $151.3592 | $1,729,884.30 |
| | 11,561 | $150.9889 | $1,745,582.67 |
| | 4,978 | $151.5096 | $754,214.79 |
| 6/29/2017 | 5,800 | $149.5815 | $867,572.70 |
| | 26,053 | $150.4396 | $3,919,402.90 |
| | 31,907 | $151.3786 | $4,830,036.99 |
| | 2,518 | $152.0775 | $382,931.15 |
| | 6,503 | $149.7578 | $973,874.97 |
| | 18,006 | $150.6295 | $2,712,234.78 |
| | 16,617 | $151.5344 | $2,518,047.12 |
| | 300 | $152.2833 | $45,684.99 |
| | 8,614 | $150.3505 | $1,295,119.21 |
| | 7,153 | $151.4049 | $1,082,999.25 |
| | 800 | $152.0800 | $121,664.00 |
| | 2,500 | $149.7091 | $374,272.75 |
| | 7,108 | $150.6306 | $1,070,682.30 |
| | 6,962 | $151.5007 | $1,054,747.87 |
| 6/22/2017 | 40,750 | $153.5408 | $6,256,787.60 |
| | 24,292 | $154.0914 | $3,743,188.29 |
| | 26,295 | $153.5613 | $4,037,894.38 |
| | 14,354 | $154.1089 | $2,212,079.15 |
| | 9,716 | $153.5749 | $1,492,133.73 |
| | 6,541 | $154.0833 | $1,007,858.87 |
| | 11,540 | $153.6201 | $1,772,775.95 |
| | 4,717 | $154.1707 | $727,223.19 |
| 6/21/2017 | 21,991 | $152.4941 | $3,353,497.75 |
| | 39,543 | $153.3331 | $6,063,250.77 |
| | 3,788 | $153.9722 | $583,246.69 |
| | 15,020 | $152.5208 | $2,290,862.42 |
| | 25,107 | $153.3907 | $3,851,180.30 |
| | 700 | $154.0071 | $107,804.97 |
| | 6,235 | $152.5576 | $951,196.64 |
| | 9,997 | $153.3720 | $1,533,259.88 |
| | 100 | $154.0300 | $15,403.00 |
| | 6,600 | $152.5683 | $1,006,950.78 |
| | 9,732 | $153.4037 | $1,492,924.81 |

| 6/9/2017 | 1,304 | $148.7973 | $194,031.68 |
|---|---|---|---|
| | 2,304 | $149.8222 | $345,190.35 |
| | 1,200 | $150.8279 | $180,993.48 |
| | 600 | $152.1233 | $91,273.98 |
| | 700 | $152.8643 | $107,005.01 |
| | 3,074 | $154.1402 | $473,826.97 |
| | 6,943 | $155.0159 | $1,076,275.39 |
| | 200 | $155.5600 | $31,112.00 |
| | 1,000 | $147.7060 | $147,706.00 |
| | 6,293 | $148.8848 | $936,932.05 |
| | 8,172 | $149.8888 | $1,224,891.27 |
| | 4,110 | $150.8109 | $619,832.80 |
| | 3,457 | $151.9094 | $525,150.80 |
| | 3,600 | $152.7933 | $550,055.88 |
| | 10,009 | $154.1378 | $1,542,765.24 |
| | 27,325 | $154.9786 | $4,234,790.25 |
| | 1,400 | $155.5186 | $217,726.04 |
| | 1,600 | $148.1025 | $236,964.00 |
| | 3,910 | $149.1653 | $583,236.32 |
| | 4,875 | $150.1300 | $731,883.75 |
| | 1,986 | $151.4067 | $300,693.71 |
| | 3,256 | $152.4988 | $496,536.09 |
| | 1,904 | $153.4036 | $292,080.45 |
| | 16,801 | $154.6629 | $2,598,491.38 |
| | 6,500 | $155.3617 | $1,009,851.05 |
| | 700 | $148.2536 | $103,777.52 |
| | 1,563 | $149.2228 | $233,235.24 |
| | 1,355 | $150.0335 | $203,295.39 |
| | 1,200 | $151.1358 | $181,362.96 |
| | 1,200 | $152.4733 | $182,967.96 |
| | 700 | $153.4114 | $107,387.98 |
| | 5,805 | $154.5926 | $897,410.04 |
| | 3,800 | $155.3673 | $590,395.74 |
| 6/8/2017 | 56,161 | $153.7416 | $8,634,282.00 |
| | 8,845 | $154.3883 | $1,365,564.51 |
| | 35,958 | $153.7440 | $5,528,326.75 |
| | 4,675 | $154.3446 | $721,561.01 |
| | 14,930 | $153.7521 | $2,295,518.85 |

| | | | |
|---|---|---|---|
| | 1,325 | $154.3136 | $204,465.52 |
| | 15,100 | $153.7543 | $2,321,689.93 |
| | 1,155 | $154.3795 | $178,308.32 |
| 5/30/2017 | 57,394 | $152.3124 | $8,741,817.89 |
| | 8,237 | $152.7292 | $1,258,030.42 |
| | 36,546 | $152.3142 | $5,566,474.75 |
| | 4,475 | $152.7366 | $683,496.29 |
| | 16,109 | $152.3458 | $2,454,138.49 |
| | 300 | $152.8300 | $45,849.00 |
| | 16,108 | $152.3462 | $2,453,992.59 |
| | 300 | $152.8533 | $45,855.99 |
| 5/26/2017 | 65,513 | $151.7120 | $9,939,108.26 |
| | 400 | $152.2175 | $60,887.00 |
| | 41,025 | $151.7114 | $6,223,960.19 |
| | 171 | $152.2017 | $26,026.49 |
| | 16,311 | $151.7080 | $2,474,509.19 |
| | 167 | $152.2180 | $25,420.41 |
| | 15,749 | $151.7036 | $2,389,180.00 |
| | 728 | $152.1903 | $110,794.54 |
| 5/17/2017 | 4,773 | $145.3299 | $693,659.61 |
| | 18,870 | $146.3574 | $2,761,764.14 |
| | 29,010 | $147.3380 | $4,274,275.38 |
| | 15,325 | $148.1400 | $2,270,245.50 |
| | 2,484 | $145.3156 | $360,963.95 |
| | 12,439 | $146.3666 | $1,820,654.14 |
| | 18,000 | $147.3399 | $2,652,118.20 |
| | 9,560 | $148.1438 | $1,416,254.73 |
| | 513 | $145.3428 | $74,560.86 |
| | 4,892 | $146.3264 | $715,828.75 |
| | 7,779 | $147.3785 | $1,146,457.35 |
| | 3,801 | $148.1318 | $563,048.97 |
| | 938 | $145.4048 | $136,389.70 |
| | 4,753 | $146.3417 | $695,562.10 |
| | 7,300 | $147.3309 | $1,075,515.57 |
| | 4,000 | $148.1200 | $592,480.00 |
| 5/16/2017 | 64,700 | $149.6867 | $9,684,729.49 |
| | 2,100 | $150.1057 | $315,221.97 |
| | 40,751 | $149.6866 | $6,099,878.64 |

| | 1,000 | $150.1210 | $150,121.00 |
|---|---|---|---|
| | 16,499 | $149.7041 | $2,469,967.95 |
| | 200 | $150.1600 | $30,032.00 |
| | 16,400 | $149.6861 | $2,454,852.04 |
| | 300 | $150.1550 | $45,046.50 |
| 4/12/2017 | 71,500 | $139.8584 | $9,999,875.60 |
| | 44,688 | $139.8570 | $6,249,929.62 |
| | 35,750 | $139.8600 | $4,999,995.00 |
| | 17,874 | $139.8624 | $2,499,900.54 |
| | 17,875 | $139.8541 | $2,499,892.04 |
| 4/11/2017 | 41,474 | $139.5439 | $5,787,443.71 |
| | 26,857 | $140.0608 | $3,761,612.91 |
| | 3,200 | $140.9127 | $450,920.64 |
| | 27,600 | $139.5658 | $3,852,016.08 |
| | 15,706 | $140.1147 | $2,200,641.48 |
| | 1,400 | $140.9357 | $197,309.98 |
| | 27,464 | $139.6338 | $3,834,902.68 |
| 3/31/2017 | 70,280 | $142.2861 | $9,999,867.11 |
| | 43,925 | $142.2880 | $6,250,000.40 |
| | 35,138 | $142.2941 | $4,999,930.09 |
| | 17,568 | $142.2972 | $2,499,877.21 |
| | 17,569 | $142.2955 | $2,499,989.64 |
| 3/30/2017 | 70,021 | $142.4049 | $9,971,333.50 |
| | 200 | $142.8800 | $28,576.00 |
| | 43,689 | $142.4026 | $6,221,427.19 |
| | 200 | $142.8700 | $28,574.00 |
| | 35,110 | $142.4081 | $4,999,948.39 |
| | 17,555 | $142.4096 | $2,500,000.53 |
| | 17,354 | $142.4064 | $2,471,320.67 |
| | 200 | $142.9400 | $28,588.00 |
| 3/20/2017 | 71,515 | $139.8300 | $9,999,942.45 |
| | 44,697 | $139.8283 | $6,249,903.74 |
| | 35,758 | $139.8286 | $4,999,991.08 |
| | 17,879 | $139.8251 | $2,499,932.96 |
| | 17,879 | $139.8266 | $2,499,959.78 |
| 3/17/2017 | 71,469 | $139.9200 | $9,999,942.48 |
| | 44,668 | $139.9208 | $6,249,982.29 |
| | 35,734 | $139.9205 | $4,999,919.15 |

| | | | |
|---|---|---|---|
| | 17,866 | $139.9229 | $2,499,862.53 |
| | 17,867 | $139.9188 | $2,499,929.20 |
| 3/9/2017 | 68,755 | $138.1405 | $9,497,850.08 |
| | 3,625 | $138.4894 | $502,024.08 |
| | 42,537 | $138.1381 | $5,875,980.36 |
| | 2,700 | $138.4833 | $373,904.91 |
| | 34,991 | $138.1438 | $4,833,789.71 |
| | 1,200 | $138.5058 | $166,206.96 |
| | 17,995 | $138.1515 | $2,486,036.24 |
| | 100 | $138.5300 | $13,853.00 |
| | 17,895 | $138.1489 | $2,472,174.57 |
| | 200 | $138.5250 | $27,705.00 |
| 2/28/2017 | 34,808 | $1,335.5556 | $46,488,019.32 |
| | 38,610 | $136.0828 | $5,254,156.91 |
| | 200 | $136.7950 | $27,359.00 |
| | 23,139 | $135.5718 | $3,136,995.88 |
| | 22,871 | $136.1075 | $3,112,914.63 |
| | 20,145 | $135.5923 | $2,731,506.88 |
| | 16,663 | $136.1326 | $2,268,377.51 |
| | 9,603 | $135.5886 | $1,302,057.33 |
| | 8,800 | $136.1291 | $1,197,936.08 |
| | 10,987 | $135.6275 | $1,490,139.34 |
| | 7,416 | $136.1683 | $1,009,824.11 |
| 2/27/2017 | 26,980 | $135.4619 | $3,654,762.06 |
| | 44,496 | $136.4384 | $6,070,963.05 |
| | 2,000 | $137.1135 | $274,227.00 |
| | 17,039 | $135.4657 | $2,308,200.06 |
| | 28,783 | $136.4679 | $3,927,955.57 |
| | 100 | $137.1500 | $13,715.00 |
| | 13,613 | $135.4652 | $1,844,087.77 |
| | 22,625 | $136.4531 | $3,087,251.39 |
| | 500 | $137.1260 | $68,563.00 |
| | 6,889 | $135.4664 | $933,228.03 |
| | 11,480 | $136.4702 | $1,566,677.90 |
| | 6,872 | $135.4627 | $930,899.67 |
| | 11,497 | $136.4691 | $1,568,985.24 |
| ***TOTAL NUMBER OF SHARES*** | **43,869,258** | ***TOTAL VALUE OF SHARES*** | **$8,131,699,235.91** |

# ATTACHMENT B

| Defendant Sandberg's Insider Sales of Facebook Class A Common Stock | | | |
|---|---|---|---|
| *SALE DATE* | *SHARES SOLD* | *PRICE PER SHARE* | *TOTAL SALE VALUE* |
| 11/15/2019 | 49,016 | $193.1500 | $9,467,440.40 |
| 10/23/2019 | 2,663 | $182.5643 | $486,168.73 |
| | 11,973 | $183.8075 | $2,200,727.20 |
| | 20,725 | $184.6782 | $3,827,455.70 |
| | 17,239 | $185.5929 | $3,199,436.00 |
| | 2400 | 186.1851 | $446,844.24 |
| 10/10/2019 | 28389 | 179.9098 | $5,107,459.31 |
| | 19118 | 180.9185 | $3,458,799.88 |
| | 7493 | 181.424 | $1,359,410.03 |
| 9/25/2019 | 3367 | 178.5026 | $601,018.25 |
| | 15674 | 179.5648 | $2,814,498.68 |
| | 10625 | 180.4295 | $1,917,063.44 |
| | 9552 | 181.5347 | $1,734,019.45 |
| | 13971 | 182.6955 | $2,552,438.83 |
| | 1811 | 183.1324 | $331,652.78 |
| 9/9/2019 | 14400 | 186.6578 | $2,687,872.32 |
| | 21787 | 187.3829 | $4,082,511.24 |
| | 18813 | 188.5177 | $3,546,583.49 |
| 8/27/2019 | 19839 | 181.7165 | $3,605,073.64 |
| | 22116 | 182.4226 | $4,034,458.22 |
| | 13045 | 183.4618 | $2,393,259.18 |
| 8/14/2019 | 19034 | 179.9393 | $3,424,964.64 |
| | 16151 | 180.8118 | $2,920,291.38 |
| | 3390 | 181.9041 | $616,654.90 |
| | 2900 | 183.1258 | $531,064.82 |
| | 6125 | 183.9491 | $1,126,688.24 |
| | 6200 | 184.9875 | $1,146,922.50 |
| | 1200 | 185.6243 | $222,749.16 |
| | 49014 | 179.71 | $8,808,305.94 |
| 7/25/2019 | 13551 | 198.95 | $2,695,971.45 |
| | 15044 | 199.8959 | $3,007,233.92 |
| | 12529 | 200.848 | $2,516,424.59 |
| | 6276 | 201.8628 | $1,266,890.93 |

| | | | |
|---|---|---|---|
| | 3400 | 202.8156 | $689,573.04 |
| | 600 | 204.49 | $122,694.00 |
| | 800 | 206.005 | $164,804.00 |
| | 1800 | 207.0378 | $372,668.04 |
| | 1000 | 208.0295 | $208,029.50 |
| 7/8/2019 | 20175 | 194.3816 | $3,921,648.78 |
| | 20088 | 195.1781 | $3,920,737.67 |
| | 14737 | 196.0778 | $2,889,598.54 |
| 6/25/2019 | 16681 | 188.7089 | $3,147,853.16 |
| | 25210 | 189.6525 | $4,781,139.53 |
| | 6894 | 190.538 | $1,313,568.97 |
| | 3025 | 191.6572 | $579,763.03 |
| | 3190 | 192.6135 | $614,437.07 |
| 6/10/2019 | 7837 | 174.6174 | $1,368,476.56 |
| | 27921 | 175.498 | $4,900,079.66 |
| | 11578 | 176.3807 | $2,042,135.74 |
| | 7664 | 177.38 | $1,359,440.32 |
| 5/29/2019 | 29417 | 182.046 | $5,355,247.18 |
| | 13252 | 182.8557 | $2,423,203.74 |
| | 11935 | 183.7729 | $2,193,329.56 |
| | 396 | 184.497 | $73,060.81 |
| 5/15/2019 | 40043 | 180.73 | $7,236,971.39 |
| 5/14/2019 | 4090 | 178.9446 | $731,883.41 |
| | 6800 | 179.8582 | $1,223,035.76 |
| | 16636 | 180.8035 | $3,007,847.03 |
| | 24908 | 181.8454 | $4,529,405.22 |
| | 2566 | 182.6195 | $468,601.64 |
| 4/16/2019 | 25282 | 179.1183 | $4,528,468.86 |
| | 29718 | 179.7147 | $5,340,761.45 |
| 4/4/2019 | 24243 | 176.0459 | $4,267,880.75 |
| | 24694 | 177.0954 | $4,373,193.81 |
| | 6063 | 177.7089 | $1,077,449.06 |
| 3/25/2019 | 6372 | 162.7195 | $1,036,848.65 |
| | 19759 | 163.833 | $3,237,176.25 |
| | 18398 | 164.4622 | $3,025,775.56 |
| | 10471 | 166.0874 | $1,739,101.17 |
| 3/13/2019 | 28451 | 172.9232 | $4,919,837.96 |
| | 26549 | 173.5831 | $4,608,457.72 |
| 2/26/2019 | 28869 | 164.5011 | $4,748,982.26 |
| | 23166 | 165.3378 | $3,830,215.47 |

|  |  |  |  |
|---|---|---|---|
|  | 2965 | 166.0227 | $492,257.31 |
| 2/15/2019 | 17038 | 163.95 | $2,793,380.10 |
|  | 6460 | 163.95 | $1,059,117.00 |
|  | 8185 | 163.95 | $1,341,930.75 |
|  | 4674 | 163.95 | $766,302.30 |
| 2/14/2019 | 24784 | 163.1243 | $4,042,872.65 |
|  | 24506 | 164.0179 | $4,019,422.66 |
|  | 5710 | 164.6024 | $939,879.70 |
| 1/23/2019 | 14576 | 143.7998 | $2,096,025.88 |
|  | 19825 | 144.5416 | $2,865,537.22 |
|  | 10355 | 145.4959 | $1,506,610.04 |
|  | 8553 | 146.4875 | $1,252,907.59 |
|  | 1691 | 147.7779 | $249,892.43 |
| 1/8/2019 | 10788 | 140.2563 | $1,513,084.96 |
|  | 10035 | 141.0987 | $1,415,925.45 |
|  | 33243 | 142.2447 | $4,728,640.56 |
|  | 934 | 142.8119 | $133,386.31 |
| 12/27/2018 | 10678 | 130.5963 | $1,394,507.29 |
|  | 16421 | 131.4551 | $2,158,624.20 |
|  | 15611 | 132.4907 | $2,068,312.32 |
|  | 7246 | 133.5145 | $967,446.07 |
|  | 5044 | 134.2628 | $677,221.56 |
| 12/10/2018 | 12675 | 139.6348 | $1,769,871.09 |
|  | 20454 | 140.6199 | $2,876,239.43 |
|  | 12481 | 141.6682 | $1,768,160.80 |
|  | 9390 | 142.4382 | $1,337,494.70 |
| 11/27/2018 | 17264 | 134.3595 | $2,319,582.41 |
|  | 25575 | 135.2053 | $3,457,875.55 |
|  | 12161 | 136.0255 | $1,654,206.11 |
| 11/15/2018 | 17039 | 144.22 | $2,457,364.58 |
|  | 6461 | 144.22 | $931,805.42 |
|  | 8186 | 144.22 | $1,180,584.92 |
| 11/14/2018 | 11178 | 142.0841 | $1,588,216.07 |
|  | 23034 | 143.0911 | $3,295,960.40 |
|  | 16854 | 144.1077 | $2,428,791.18 |
|  | 3934 | 145.059 | $570,662.11 |
| 10/23/2018 | 15242 | 151.5197 | $2,309,463.27 |
|  | 14546 | 152.5223 | $2,218,589.38 |
|  | 9938 | 153.4239 | $1,524,726.72 |
|  | 15274 | 154.3069 | $2,356,883.59 |

| | | | |
|---|---|---|---|
| 10/10/2018 | 2642 | 152.1052 | $401,861.94 |
| | 6986 | 152.9885 | $1,068,777.66 |
| | 8211 | 154.2511 | $1,266,555.78 |
| | 23921 | 155.1466 | $3,711,261.82 |
| | 10840 | 156.1112 | $1,692,245.41 |
| | 2400 | 157.1262 | $377,102.88 |
| 9/27/2018 | 1600 | 167.4203 | $267,872.48 |
| | 18641 | 169.0711 | $3,151,654.38 |
| | 28309 | 169.9005 | $4,809,713.25 |
| | 6450 | 170.9311 | $1,102,505.60 |
| 9/11/2018 | 2400 | 164.305 | $394,332.00 |
| | 16918 | 165.648 | $2,802,432.86 |
| | 34082 | 166.365 | $5,670,051.93 |
| | 1600 | 167.03 | $267,248.00 |
| 8/29/2018 | 34371 | 175.4449 | $6,030,216.66 |
| | 20629 | 176.0423 | $3,631,576.61 |
| 8/15/2018 | 17038 | 181.11 | $3,085,752.18 |
| | 6460 | 181.11 | $1,169,970.60 |
| | 8185 | 181.11 | $1,482,385.35 |
| 8/14/2018 | 9518 | 179.4157 | $1,707,678.63 |
| | 29212 | 180.7556 | $5,280,232.59 |
| | 16270 | 181.4096 | $2,951,534.19 |
| 7/19/2018 | 41078 | 208.3181 | $8,557,290.91 |
| | 13922 | 209.1569 | $2,911,882.36 |
| 6/28/2018 | 4424 | 193.9398 | $857,989.68 |
| | 17172 | 194.9445 | $3,347,586.95 |
| | 24444 | 195.7904 | $4,785,900.54 |
| | 8960 | 196.7074 | $1,762,498.30 |
| 6/12/2018 | 46206 | 192.2019 | $8,880,880.99 |
| | 8794 | 192.9173 | $1,696,514.74 |
| 5/30/2018 | 12492 | 185.8786 | $2,321,995.47 |
| | 5200 | 186.8012 | $971,366.24 |
| | 37308 | 187.7164 | $7,003,323.45 |
| 5/14/2018 | 43789 | 186.8425 | $8,181,646.23 |
| | 11211 | 187.5076 | $2,102,147.70 |
| | 17038 | 186.64 | $3,179,972.32 |
| | 6460 | 186.64 | $1,205,694.40 |
| | 8185 | 186.64 | $1,527,648.40 |
| 4/18/2018 | 40261 | 166.6601 | $6,709,902.29 |
| | 14739 | 167.3216 | $2,466,153.06 |

| | | | |
|---|---|---|---|
| 4/2/2018 | 16870 | 154.949 | $2,613,989.63 |
| | 20620 | 155.5987 | $3,208,445.19 |
| | 11610 | 156.6665 | $1,818,898.07 |
| | 3500 | 157.6479 | $551,767.65 |
| | 2400 | 158.5433 | $380,503.92 |
| 3/15/2018 | 28866 | 182.789 | $5,276,387.27 |
| | 26134 | 183.5057 | $4,795,737.96 |
| 3/2/2018 | 18200 | 173.62 | $3,159,884.00 |
| | 11080 | 174.5121 | $1,933,594.07 |
| | 22236 | 175.491 | $3,902,217.88 |
| | 3484 | 176.4824 | $614,864.68 |
| 2/15/2019 | 17038 | 179.52 | $3,058,661.76 |
| | 6461 | 179.52 | $1,159,878.72 |
| | 8185 | 179.52 | $1,469,371.20 |
| 2/14/2018 | 1900 | 173.4588 | $329,571.72 |
| | 10900 | 174.9736 | $1,907,212.24 |
| | 6300 | 176.5354 | $1,112,173.02 |
| | 12525 | 177.1428 | $2,218,713.57 |
| | 10500 | 178.3241 | $1,872,403.05 |
| | 12875 | 179.3158 | $2,308,690.93 |
| 11/15/2017 | 22,539 | $178.0700 | $4,013,519.73 |
| | 6,799 | 178.0700 | $1,210,697.93 |
| 10/15/2017 | 30,105 | 173.7400 | $5,230,442.70 |
| 8/15/2017 | 6,800 | 170.7500 | $1,161,100.00 |
| | 22,539 | 170.7500 | $3,848,534.25 |
| 7/5/2017 | 39,104 | 159.9700 | $6,255,466.88 |
| 6/19/2017 | 41,889 | 152.4684 | $6,386,748.81 |
| | 21,315 | 153.0059 | $3,261,320.76 |
| | 48,564 | 152.4950 | $7,405,767.18 |
| | 19,772 | 153.0369 | $3,025,845.59 |
| 6/6/2017 | 19,006 | 152.9900 | $2,907,727.94 |
| | 59,600 | 153.9791 | $9,177,154.36 |
| | 20,894 | 152.9984 | $3,196,748.57 |
| | 64,000 | 153.9830 | $9,854,912.00 |
| 5/24/2017 | 37,675 | 149.2252 | $5,622,059.41 |
| | 40,931 | 149.8383 | $6,133,031.46 |
| | 39,232 | 149.2191 | $5,854,163.73 |
| | 45,662 | 149.8264 | $6,841,373.08 |
| 5/15/2017 | 6,799 | 150.3300 | $1,022,093.67 |
| | 22,539 | 150.3300 | $3,388,287.87 |

| | | | |
|---|---|---|---|
| 5/11/2017 | 76,776 | 149.9190 | $11,510,181.14 |
| | 1,830 | 150.5266 | $275,463.68 |
| | 82,694 | 149.9187 | $12,397,376.98 |
| | 2,200 | 150.5125 | $331,127.50 |
| 4/18/2017 | 66,306 | 141.1978 | $9,362,261.33 |
| | 12,300 | 141.7298 | $1,743,276.54 |
| | 77,194 | 141.2185 | $10,901,220.89 |
| | 7,700 | 141.7675 | $1,091,609.75 |
| 4/15/2017 | 39,104 | 139.3900 | $5,450,706.56 |
| 3/30/2017 | 130,910 | 142.4079 | $18,642,618.19 |
| | 100 | 142.9000 | $14,290.00 |
| | 141,490 | 140.3737 | $19,861,474.81 |
| 3/15/2017 | 108,469 | 139.0274 | $15,080,163.05 |
| | 48,743 | 139.7823 | $6,813,408.65 |
| | 115,258 | $139.0197 | $16,023,132.58 |
| | 54,530 | $139.7733 | $7,621,838.05 |
| 2/28/2017 | 76,936 | $135.5835 | $10,431,252.16 |
| | 80,276 | $136.1570 | $10,930,139.33 |
| | 81,598 | $135.5826 | $11,063,268.99 |
| | 88,190 | $136.1450 | $12,006,627.55 |
| 2/16/2017 | 157,212 | $133.3889 | $20,970,335.75 |
| | 169,788 | $133.3889 | $22,647,834.55 |
| 2/15/2017 | 22,539 | $133.8500 | $3,016,845.15 |
| | 6,799 | $133.8500 | $910,046.15 |
| 1/18/2017 | 47,527 | $127.5160 | $6,060,452.93 |
| | 4,877 | $128.0291 | $624,397.92 |
| | 47,302 | $127.4857 | $6,030,328.58 |
| | 9,294 | $127.9636 | $1,189,293.70 |
| 1/15/2017 | 39,104 | $128.3400 | $5,018,607.36 |
| 1/5/2017 | 18,747 | $119.1238 | $2,233,213.88 |
| | 26,482 | $119.7830 | $3,172,093.41 |
| | 7,175 | $120.7180 | $866,151.65 |
| | 20,890 | $119.1333 | $2,488,694.64 |
| | 27,885 | $119.7908 | $3,340,366.46 |
| | 7,821 | $120.7137 | $944,101.85 |
| *TOTAL NUMBER OF SHARES* | **5,022,976** | *TOTAL VALUE OF SHARES* | **$790,389,018.86** |

# ATTACHMENT C

| Defendant Koum's Insider Sales of Facebook Class A Common Stock | | | |
|---|---|---|---|
| *SALE DATE* | *SHARES SOLD* | *PRICE PER SHARE* | *TOTAL SALE VALUE* |
| 2/20/2018 | 580,736 | 176.5977 | $102,556,641.91 |
| | 301,670 | 177.4104 | $53,519,395.37 |
| 2/15/2018 | 1,231,441 | 179.5200 | $221,068,288.32 |
| | 371,500 | 175.6494 | $65,253,752.10 |
| 11/16/2017 | 445,023 | 179.2623 | $79,775,846.53 |
| | 139,223 | 179.6297 | $25,008,585.72 |
| 11/15/2017 | 648,428 | 178.0700 | $115,465,573.96 |
| 10/31/2017 | 1,795,445 | 180.0899 | $323,341,510.51 |
| 10/30/2017 | 804,555 | 180.0820 | $144,885,873.51 |
| 8/31/2017 | 204,534 | 170.7542 | $34,925,039.54 |
| | 367,363 | 171.6449 | $63,055,985.40 |
| | 5,228 | 172.0857 | $899,664.04 |
| 8/30/2017 | 63,629 | 170.0204 | $10,818,228.03 |
| 8/16/2017 | 2,259,000 | 170.0535 | $384,150,856.50 |
| | 688,985 | 170.5287 | $117,491,716.37 |
| | 5,507 | 171.2825 | $943,252.73 |
| 8/15/2017 | 648,427 | 170.7500 | $110,718,910.25 |
| 7/18/2017 | 23,753 | 160.4930 | $3,812,190.23 |
| | 29,045 | 161.4763 | $4,690,079.13 |
| | 18,218 | 162.6140 | $2,962,501.85 |
| | 7,184 | 163.2087 | $1,172,491.30 |
| 7/17/2017 | 31,663 | 16.3764 | $518,525.95 |
| 7/14/2017 | 3,490,137 | 160.0180 | $558,484,742.47 |
| 5/16/2017 | 564,333 | 149.7052 | $84,483,584.63 |
| | 29,913 | 150.1050 | $4,490,090.87 |
| 5/15/2017 | 648,427 | 150.3300 | $97,478,030.91 |
| 4/28/2017 | 2,935,336 | 150.1825 | $440,836,098.82 |
| | 264,664 | 151.2436 | $40,028,736.15 |
| 3/24/2017 | 178,376 | 140.3737 | $25,039,299.11 |
| | 200 | 141.0000 | $28,200.00 |
| 3/23/2017 | 65,353 | 140.0524 | $9,152,844.50 |

| | | | |
|---|---|---|---|
| 3/21/2017 | 128,990 | 140.3920 | $18,109,164.08 |
| | 199,347 | 141.5366 | $28,214,896.60 |
| | 16,100 | 142.1496 | $2,288,608.56 |
| 3/20/2017 | 88,332 | 140.0115 | $12,367,495.82 |
| 3/17/2017 | 402,925 | 140.0727 | $56,438,792.65 |
| 3/16/2017 | 1,717,077 | 140.0109 | $240,409,496.14 |
| 3/15/2017 | 3,300 | 140.0000 | $462,000.00 |
| 2/21/2017 | 149,978 | 133.3527 | $19,999,971.24 |
| | 595,284 | 133.3566 | $79,385,050.27 |
| 2/15/2017 | 647,390 | 133.8500 | $86,653,151.50 |
| ***TOTAL NUMBER OF SHARES*** | **22,796,019** | ***TOTAL VALUE OF SHARES*** | **$3,671,385,163.57** |